RICHARD LEVINE (CSB # 91671)
rlevine@shslaborlaw.com
MICHAEL D. SCHWARTZ (CSB # 133619)
mschwartz@shslaborlaw.com
MICHAEL SIMIDJIAN (CSB # 251767)
msimidjian@shslaborlaw.com
SILVER, HADDEN, SILVER, WEXLER & LEVINE
1428 Second Street, Suite 200
P. O. Box 2161
Santa Monica, CA 90407-2161
(310) 393-1486 Telephone
(310) 395-5801 Fax
Attorneys for Defendant ANTHONY SCLAFANI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. CR 10-163 JHN |
|---|---|
| Plaintiff, | **DEFENDANT ANTHONY SCLAFANI'S REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE WITNESSES' TESTIMONY FOR FAILURE TO DISCLOSE *BRADY/GIGLIO* MATERIAL AND SPOILATION SANCTIONS** |
| vs. | |
| ANTHONY SCLAFANI, | |
| Defendant. | |
| | Date:          August 22, 2011 |
| | Time:          10:00 a.m. |
| | Courtroom: 17 |
| | Honorable Terry J. Hatter |
| | United States District Judge |

## I.     INTRODUCTION

In May 2005, private investigator Dan Tregarthen completed an internal affairs investigation regarding Defendant Anthony Sclafani (hereafter "Defendant Sclafani"). The investigation arose as a result of Defendant Sclafani's lawful exercise of police powers on February 24, 2005 with respect to Jamal White and on February 25, 2005 with respect to Angelica Vargas. The investigation, which Tregarthen conducted on behalf of the Desert Hot Springs Police Department

-1-

(hereafter "Department"), resulted in Defendant Sclafani suffering no punitive action[1] for his conduct towards White and Vargas in February 2005. Shortly thereafter, Chief of Police Walter McKinney encouraged the Federal Bureau of Investigation (hereafter "FBI") to investigate his officers, including Defendant Sclafani, for allegedly using excessive force against citizens.

In or about mid-2006, the FBI acceded to Chief McKinney's request and initiated an investigation of Defendant Sclafani and others. Approximately one year later, on May 2, 2007, the FBI served a subpoena on the Department to turn over reports and records of administrative investigations of Department officers for alleged excessive force against citizens. By this time, the FBI had already begun to interview supposed witnesses regarding the alleged misconduct of Department officers. One such witness was Andrea Heath, who claimed that Defendant Sclafani had unlawfully used his Taser on White and Vargas in February 2005. These statements, however, were inconsistent with what Heath had told Tregarthen in 2005. A verbatim recording of Heath's statement, as well as Vargas' statement, had been made during the initial administrative investigation. However, neither the Department nor FBI sought to ensure the preservation of those recordings at the onset of the government's investigation.

The FBI also issued a subpoena on the Department on September 27, 2010. In that subpoena, the FBI sought the Taser cartridge of the Taser that Defendant Sclafani used to lawfully subdue White on February 24, 2005. The Department, which was aware of the ongoing investigation, and also the February 2010 indictment of Defendant Sclafani, had destroyed the Taser cartridge on or about June 10, 2010.

---

[1]     The Public Safety Officers' Procedural Bill of Rights, California Government Code section 3300 et seq.—which applies to sworn peace officers such as Defendant Sclafani—defines punitive action as "any action that may lead to dismissal, demotion, suspension, reduction in salary, written reprimand, or transfer for purposes of punishment." CAL. GOV. CODE § 3303.

1    In the Opposition to Defendant Sclafani's Motion to Exclude Witnesses and

2    for Spoilation Sanctions (hereinafter "Opposition"), the government asserts that (a)

3    it cannot be held responsible for the loss and/or destruction of three pieces of

4    exculpatory evidence—namely, (1) the Taser Cartridge that Defendant Sclafani

5    used to lawfully subdue White was favorable to Defendant Sclafani, (2)

6    the audio recording of the administrative interview of Vargas conducted by private

7    investigator Tregarthen, and (3) the audio recording of the administrative interview

8    of Heath also conducted by Tregarthen.

9    The government's position, however, is without merit as the government

10   under these circumstances can be held liable for the loss and/or destruction of

11   exculpatory evidence.  As a result of the undue prejudice that will befall Defendant

12   Sclafani, this Court should grant Defendant's Motion and exclude the testimony of

13   witnesses White, Vargas, and Heath, and/or instruct the jury to draw an adverse

14   inference from the destruction of evidence relevant to the case.

15   **II.    ARGUMENTS**

16          A.    THE LOSS OF EXCULPATORY EVIDENCE CAN BE

17                ATTRIBUTED TO THE GOVERNMENT

18          The government asserts that the destruction of exculpatory evidence cannot

19   be attributed to it because the Desert Hot Springs Police Department maintained the

20   items in question. Opposition 12:11–12.[2]  In reliance on this argument, the

21   government relies on *United States v. Higgenbotham*, 539 F.2d 17 (9th Cir. 1976).

22   However, the government here must be held responsible for the destroyed evidence

23   because the instant matter is distinguishable from *Higgenbotham*.

24          The possibility that the accused's defense will be impaired by loss of memory

25   and destruction of exculpatory evidence is the most serious form of prejudice

26   _____

27          [2]    The government likewise asserts that its failure to preserve evidence
     does not violate the Jencks Act, 18 U.S.C. § 3500.  Defendant Sclafani did not raise
28   the issue in his moving papers, and will likewise not discuss the Jencks Act here.

1  "because the inability of a defendant adequately to prepare his case skews the
2  fairness of th entire system." *Doggett v. United States*, 505 U.S. 647, 654 (1992).
3  In *Higgenbotham*, the court found that a local police department had not been
4  acting on behalf of federal authorities when it failed to preserve several
5  photographs.  There, the local police department had used the photographs as part
6  of an identification procedure that resulted in a victim identifying the appellant as
7  the culprit.  A police officer heard that the federal authorities would be prosecuting
8  the case, and assumed that federal authorities would have no interest in the
9  photographs.  Although the court held the government blameless because the
10 government never had the photographs in its possession, the court did not foreclose
11 the possibility that the government could be held liable under the proper
12 circumstances.  *Higgenbotham* provided three factors to be considered in assessing
13 whether the prosecution is to be held liable for the actions of the local police
14 department: "(1) the degree of negligence or bad faith involved, (2) the importance
15 of the lost evidence, and (3) the sufficiency of the other evidence adduced at the
16 trial to sustain the conviction." 539 F.2d at 21.  "Each case must turn on its own
17 facts." *Id.* at 22.

18      Here, the mistakes of the Desert Hot Springs Police Department can be
19 imputed to the government as all three factors weigh in favor of Defendant Sclafani.
20 Tregarthen, who the Desert Hot Springs Police Department had hired to conduct an
21 administrative investigation into the February 2005 incidents involving Defendant
22 Sclafani, concluded his investigation in May 2005.  When Tregarthen's
23 investigation failed to conclude that Defendant Sclafani had engaged in misconduct
24 related to White or Vargas in February 2005, Chief McKinney encouraged the FBI
25 to initiate an investigation into Defendant Sclafani and other police officers.  Chief
26 McKinney, as head of the Department, was ultimately responsible for maintaining
27 all of the evidence from the administrative investigation.  As Chief McKinney
28 requested that the FBI initiate the investigation related to the recently concluded

administrative investigation of Defendant Sclafani, and was also aware that the FBI had acceded to his request, the Department must be deemed to have been acting on behalf of the federal government. The Department's failure to preserve or turn over evidence must, therefore, be imputed to the government.

First, as discussed above, the conduct of the Department can most generously be called gross negligence. With respect to the audio recordings of the Vargas administrative investigation, the Department hired Tregarthen to conduct the investigation. As a result, the Department was responsible for ensuring that Tregarthen returned the audio recordings of the witnesses interviewed and for maintaining those audio recordings. This responsibility becomes all that more apparent once Chief McKinney contacted the FBI at the conclusion of Tregarthen's administrative investigation and requested that it investigate Defendant Sclafani based on the same incidents that had been adjudicated administratively. Thus, the Department acted grossly negligently in failing to ensure that the audio recordings were in its possession and secure. The government's knowledge regarding the existence of the administrative investigation likewise made it responsible for ensuring that relevant evidence be preserved.

With respect to the White Taser cartridge, the Department indicated that it had destroyed the Taser cartridge on or about June 10, 2010. (Gov.'s Exhibit H, at 25.) For reasons unknown, the Department destroyed the Taser even though the FBI on May 2, 2007, first subpoenaed reports or records from "internal affairs ('IA') investigation[s] initiated in response to use of force complaints . . . during the time period from 2003 to the present." Gov.'s Exhibit A, at 2. The exhibits included with the government's Opposition indicate that other subpoenas were sent to the Department regarding the matters that formed basis of the indictment against Defendant Sclafani. Gov.'s Exhibit B, at 5. In light of the Department's knowledge that the government had been conducting an investigation for years, as well as Defendant Sclafani's indictment mere months before in February 2010, the

destruction of the Taser cartridge was grossly negligent.

Interestingly, the government must also bear some responsibility for failing to procure the Taser cartridge used during the White incident sooner. The government waited four years after it initiated an investigation—and one week before the statute of limitations was to run—to finally indict Defendant Sclafani. This delay contributed to the destruction of evidence that was favorable to Defendant Sclafani. *See United States v. Cederquist*, 641 F.2d 1347 (1981). The government's May 2, 2007 subpoena evinces an interest in not only reports and records of IA investigations based upon citizen complaints for use of force, but also a concern regarding the use of Tasers. *Id.* However, the government waited until September 27, 2010 to request the Taser cartridge. *See* Gov.'s Exhibit E, at 22. The government's delay is all the more unreasonable given that the investigation into Defendant Sclafani's use of a Taser commenced in or about mid-2006. The FBI, as noted above, initiated the investigation at the behest of Chief McKinney. Given the nature of the allegations that the FBI was aware of from the outset, there is no reasonable reason for the government to fail to procure or protect the Taser cartridge that Defendant Sclafani used during the White incident. As a result, this Court should find that both the Department and the government were negligent, if not grossly negligent, in allowing the loss and/or destruction of the evidence in question.

Second, the importance of the evidence supports a finding that the loss and/or destruction of evidence should be attributed to the government. Contrary to the assertion of the government, the lost and/or destroyed evidence was exculpatory to Defendant Sclafani. Opposition 15:18. As the government acknowledged, Defendant Sclafani suffered no punitive action at the conclusion of Tregarthan's impartial administrative investigation in 2005. Opposition 5:12–19. This means that Tregarthan, on behalf of the Department, could not establish by a preponderance of the evidence that Defendant Sclafani had used excessive force

1   against White or Vargas. *See Cal. Correctional Peace Officers Ass'n v. State Pers.*
2   *Bd.*, 10 Cal. 4th 1133, 1153 (1995); *County of Santa Cruz v. Civil Service Comm'n*
3   *of Santa Cruz*, 171 Cal. App. 4th 1577, 1581 (2009). Thus, once the government
4   initiated its investigation against Defendant Sclafani, the Taser cartridge and audio
5   recordings became exculpatory material because even with the existence of the
6   evidence, no finding could be made of improper/illegal conduct under the more
7   generous preponderance standard.

8          Specifically, the Taser cartridge proved useful to undermine claims that
9   Defendant Sclafani allegedly repeatedly deployed the darts of his Taser at White.
10  The government is correct in asserting that a microchip within the Taser records its
11  usage. Opposition 19:16–18. However, the microchip does not differentiate
12  between "dart mode" or "drive stun mode." The manner in which the Taser is
13  deployed can be ascertained from an analysis of the Taser prongs. When an officer
14  deploys a Taser in "dart mode," carbon builds up at the tips of the prongs. *See*
15  *Wilson v. Taser Int'l*, Inc., No. No. 07-cv-01844-PAB-KLM consolidated with
16  07-cv-02248-PAB-BNB2010, U.S. Dist. LEXIS 92787, at *7–*9 (D. Colo. Aug. 16,
17  2010). The carbon build up on the prongs of the Taser that Sclafani would have
18  shown that Defendant Sclafani did not repeatedly shoot White in "dart mode."

19         The audio recordings were likewise exculpatory in light of the administrative
20  investigation. On the one hand, the audio recordings belie the allegations with
21  respect to the Vargas incident simply by virtue of the outcome of the administrative
22  investigation. On the other hand, the audio recordings serve a much more
23  pragmatic, common sense purpose. While the government has referred to
24  Tregarthen's summary of the interviews of Heath and Vargas, those summaries are
25  far from adequate for purposes of Defendant Sclafani's defense. The verbatim
26  audio recordings reveal not only the exact words spoken, but also the demeanor of
27  the interviewees, which would in turn reveal their lack of credibility. Therefore,
28  this Court should find that the second *Higgenbotham* factors weighs in favor of

1    Defendant Sclafani.

2        Third, the insufficiency of other evidence warrants this Court attributing the

3    loss and/or destruction of evidence to the government. The government asserts that

4    other evidence is available as a proxy for the lost and/or destroyed evidence at issue

5    here. This claim, however, is not accurate as other forms of evidence are

6    insufficient and not comparable. With respect to the destroyed Taser cartridge used

7    in the White incident, there is no adequate substitute for the carbon build-up on the

8    Taser prongs. Only the prongs can establish that Andrea Heath gave false

9    testimony at the grand jury, and that Defendant Sclafani did not deploy his Taser in

10   "dart mode" repeatedly at White. The Taser downloads, while they may show the

11   number of times that Defendant Sclafani activated his Taser, are insufficient for

12   Defendant Sclafani's defense. As noted above, the downloads are unable to

13   distinguish between a deployment in "dart mode" or "drive stun mode."

14   Consequently, there is no sufficient and comparable evidence that would assist

15   Defendant Sclafani in his defense against the charge that he used excessive force on

16   White.

17        With respect to the audio recordings of Vargas and Heath, there is no

18   sufficient or comparable evidence to replace the loss of the recordings. As noted

19   above, the audio recordings contain the verbatim statements of Vargas and Heath.

20   Also of great importance is that the audio recordings would have revealed the

21   demeanor of both Vargas and Heath during their interviews. The summaries

22   Tregarthen prepared are insufficient as they do not convey the demeanor of Vargas

23   and Heath, and thus render an assessment of their credibility impossible.

24   Furthermore, the summaries were written with a different purpose than are

25   applicable to Defendant Sclafani's defense. Namely, Tregarthen did not prepare his

26   summaries and reports for the purpose of a defense against federal criminal charges.

27   With a different focus in mind, Tregarthen issued summaries and reports that are

28   insufficient for a proper defense. Defendant Sclafani, as a result, has been unduly

1  prejudiced in the absence of adequate and comparable evidence.  This Court,

2  therefore, should find that the third *Higgenbotham* weighs in favor of Defendant

3  Sclafani, and that the government is liable for the destruction of exculpatory

4  evidence.

5        B.    <u>THE COURT SHOULD EXCLUDE WITNESSES AND/OR ISSUE</u>

6                <u>AN INSTRUCTION ADVERSE TO THE GOVERNMENT IN LIGHT</u>

7                <u>OF THE DESTRUCTION OF EXCULPATORY EVIDENCE</u>

8        As Defendant Sclafani noted in his initial Memorandum of Points and

9  Authorities, this Court should fashion an appropriate remedy in light of the loss

10  and/or destruction of exculpatory evidence.  Even if the destruction, and ultimately

11  the deprivation, of evidence does not rise to the level of a due process violation, a

12  court may nonetheless devise a remedy to correct for prejudice a defendant may

13  suffer under its supervisory powers. *See United States v. Chapman*, 524 F.3d 1073,

14  1084 (9th Cir. 2008).  For the reasons outlined in this Motion, as well as the moving

15  papers, this Court should find that Defendant Sclafani has been unduly prejudiced

16  by the loss and/or destruction of evidence.  As a result, in order to remedy the

17  prejudice to Defendant Sclafani, this Court should exclude the testimony of White,

18  Vargas, and Heath, and/or instruct the jury to draw an adverse inference from the

19  destruction of evidence relevant to the case.

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

**III.    <u>CONCLUSION</u>**

Based on the foregoing, Defendant Sclafani respectfully request that this Court grant the instant Motion and permit him to introduce evidence of Heath's bias for purposes of impeachment.

Dated: August 8, 2011                    Respectfully submitted,

SILVER, HADDEN, SILVER
WEXLER & LEVINE

By: _____/s/_____
MICHAEL SCHWARTZ
Attorneys for Defendant Anthony Sclafani

00607-pld.wpd

1

## PROOF OF SERVICE

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

4          I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 1428 Second Street, P.O. Box 2161, Santa Monica, California 90407-2161.

5

6          On August 8, 2011, I served the foregoing document described **DEFENDANT ANTHONY SCLAFANI'S REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE WITNESSES' TESTIMONY FOR FAILURE TO DISCLOSE** *BRADY/GIGLIO* **MATERIAL AND SPOILATION SANCTIONS**, on the parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

7

8

9    Cheryl L O'Connor, Esq.                   Steven M Arkow. Esq.
     AUSA - Office of US Attorney              AUSA - Office of US Attorney
10   Criminal Div - US Courthouse              Criminal Div - US Courthouse
     312 North Spring Street 13th Floor        312 N Spring St
11   Los Angeles, CA 90012-4700                Los Angeles, CA 90012-4700
     213-894-2434                              213-894-2434
12   Fax: 213-894-6296                         Email: USACAC.Criminal@usdoj.gov
     Email: Cheryl.OConnor@usdoj.gov

13

14   [X]    **[By e-mail in PDF Format]**    I sent the above-referenced document to the parties by PDF to the e-mail addresses noted above.

15

16          Executed on August 8, 2011, at Santa Monica, California.

17     X   FEDERAL   I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

18

19   CHERYL L. MITCHELL                    /s Cheryl L. Mitchell

20

21

22

23

24

25

26

27

28