1  RICHARD A. LEVINE (CSB #91671)
   rlevine@shslaborlaw.com
2  MICHAEL SIMIDJIAN (CSB # 251767)
   msimidjian@shslaborlaw.com
3  SILVER, HADDEN, SILVER, WEXLER & LEVINE
   1428 Second Street, Suite 200
4  P. O. Box 2161
   Santa Monica, CA 90407-2161
5  (310) 393-1486 Telephone
   (310) 395-5801 Fax
6  Attorneys for Defendant ANTHONY SCLAFANI

7

8                    UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10

   UNITED STATES OF AMERICA,          )  Case No. CR 10-163 TJH
11                                     )
                                       )  **DEFENDANT ANTHONY**
12            Plaintiff,               )  **SCLAFANI'S OBJECTIONS TO**
                                       )  **PRESENTENCE REPORT AND**
13       vs.                           )  **SENTENCING MEMORANDUM**
                                       )
14  ANTHONY SCLAFANI,                  )
                                       )
15                                     )  Date:      July 23, 2012
              Defendant.               )  Time:      10:00 a.m.
16                                     )  Courtroom: 17
                                       )
17                                     )

18

19

20

21

22

23

24

25

26

27

28

I.   <u>INTRODUCTION</u>

Through counsel, Mr. Anthony Sclafani files the following Sentencing Memorandum setting forth all the factors that this Honorable Court should consider in determining what type and length of punishment is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

At the heart of its case, the Government portrayed Mr. Sclafani as an "angry" man who raged against others for little or no reason. As will be detailed below and the Exhibits filed concurrently herewith, Mr. Sclafani has a well-earned reputation as a devoted husband and father of four; a man of faith who has given his time freely to community service; and a dedicated, respected Police Sergeant for the City of Desert Hot Springs Police Department. For all the reasons set forth in this Memorandum and accompanying Exhibits, Mr. Sclafani respectfully requests that this Court impose a punishment substantially below the sentence suggested under the Sentencing Guidelines.

II.   <u>OBJECTION TO PRESENTENCE INVESTIGATION REPORT</u>

Although Mr. Sclafani did not object (Document 155) to the manner in which the Probation Officer calculated the recommended sentence in the Presentence Investigation Report ("Report") (Document 149), Mr. Sclafani does object to certain factual inaccuracies and discrepancies upon which the Probation Officer relied upon and cited in the Report.

   A.   <u>Paragraph 16 of the Report Inaccurately Describes the Tasing of Ms. Vargas</u>

The Report states on page 6 in paragraph 16, "Taser download printouts show that after Gutting tased, Sclafani tased Vargas for three complete cycles lasting a total of approximately 40 seconds, including one time striking her left breast." Document 149:1037. This assertion finds no support in the documentary or testimonial evidence the parties proffered at trial. First, it was never established

1  with any degree of certainty that Mr. Sclafani deployed his Taser *after* Mr. Gutting
2  deployed his. As Taser expert Mr. Greg Meyer testified, the internal clocks of
3  different Tasers will not match with one another unless and until the Tasers have
4  been synchronized to the same computer at approximately the same time. It is only
5  then that an individual Taser will come closest to matching the internal clock of
6  another Taser. Otherwise, "time drift" causes the internal clocks of multiple Tasers
7  to differ from one another for potentially several minutes. The only certainty
8  established at trial was that both Mr. Gutting and Mr. Sclafani deployed their
9  Tasers. There was never evidence introduced that the Tasers of Mr. Sclafani and
10 Mr. Gutting had recently been synchronized at or about the same time. Thus, the
11 order in which each man deployed his Taser cannot be ascertained.

12      Second, it is inaccurate to say that Mr. Sclafani tased Ms. Vargas three times.
13 According to the uncontroverted evidence as reflected in the Taser download,[1] Mr.
14 Sclafani *activated* his Taser three times. As Ms. Vargas did not testify, it cannot be
15 ascertained whether one or more of the activations completed the circuit and had an
16 effect on Ms. Vargas.

17      Third, the Report inaccurately states that the "three complete cycles last[ed] a
18 total of approximately 40 seconds." As the Taser download for Mr. Sclafani shows,
19 *each* Taser activation lasted *5 seconds*. Thus, at most Mr. Sclafani's Taser was
20 activated for a *total of 15 seconds*. It appears that the Report incorrectly includes
21 the time between each activation to calculate 40 seconds of tasing. There was no
22 evidence that Mr. Sclafani activated his Taser more than three times, or that each
23 activation lasted more than the default five-second cycle. Thus, it is mathematically
24 impossible for the tasing to have lasted a total of approximately 40 seconds.

25  B.   The "Victim Impact" Regarding Ms. Vargas Does Not Account for Ms.
26        Vargas' Statements to a Treating Physician in 2005

27  _____

28      [1] Mr. Sclafani's Taser downloads for February 25, 2005, were introduced and entered into
evidence at trial as Government's Exhibit 50.

1    The "Victim Impact" section of the Report is incomplete and misleading as it

2  fails to reference statements Ms. Vargas made to a treating physician when she went

3  to St. Joseph's Hospital in March 2005.  In paragraph 19 of the Report, the

4  Probation Officer wrote, "[Ms.] Vargas reported that she suffered bruises and a torn

5  ligament in her ankle". Document 149:1038.

6    The medical report pertaining to Ms. Vargas on March 16, 2005, and which

7  was introduced by the Government at trial as Exhibit 60, states under "History of

8  Present Illness," "in the process she was maced and she somehow sprained or

9  twisted [her] right ankle." The medical report further provides that Ms. Vargas'

10  ankle "revealed no evidence of fracture, only soft tissue swelling." Ibid.  The

11  Report, therefore, is incomplete as it does not account for Ms. Vargas' uncertainty

12  as to the cause of her injury, and is misleading as it exaggerates the extent of any

13  injury suffered.

14  II.    SENTENCING UNDER *BOOKER*

15    The Sentencing Guidelines are no longer mandatory, but instead provide a

16  starting point for the Court's sentencing decision. Booker v. United States, 543 U.S.

17  220, 245–46 (2005).  District courts are no longer "tied to the sentencing range

18  indicated in the Guidelines.  But they would be obliged to 'take account of' that

19  range along with the sentencing goals Congress enumerated in 18 U.S.C. § 3553(a).

20  Cunningham v. California, 552 U.S. 270, 277 (2007).  A Court, however, should

21  not presume "that the Guidelines range is reasonable," but instead should "make an

22  individualized assessment based on the facts presented." Gall v. United States, 552

23  U.S. 38, 50 (2007).  The Court need not find "extraordinary circumstances to justify

24  a sentence outside the Guidelines range." Id. at 47.

25    The guiding principle of § 3553(a) is to arrive at a sentence that is "sufficient,

26  but not greater than necessary" to accomplish the other sentencing goals set out in

27  the statute. 18 U.S.C. § 3553(a).  Section 3553(a)(2) states that such purposes are:

28    (A)    to reflect the seriousness of the offense, to promote respect for

the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

(C)   to protect the public from further crimes of the defendant; and

(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, § 3553(a) further directs sentencing courts to consider the following factors:

1)   "the nature and circumstances of the offense and the history and characteristics of the defendant" (§ 3553(a)(1));

2)   "the kinds of sentences available" (§ 3553(a)(3));

3)   "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (§ 3553(a)(6)); and

4)   "the need to provide restitution to any victims of the offense." (§ 3553(a)(7)).

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Koon v. United States, 518 U.S. 81, 113 (1996); see also Rita v. United States, 551 U.S. 338, 357–58 (2007) (stating that the "sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or the appeals court."). Beyond the actual deprivation of liberty when incarcerated, a host of other consequences and hardships attend a conviction. Included among these consequences are "losses of family life, of socioeconomic status, of employment and career opportunities; diminution of certain civil rights and entitlements; and countless humiliations and indignities commonly associated with living in

1  confinement." United States v. Mateo, 299 F. Supp. 2d 201, 209–210 (S.D.N.Y.

2  2004).

3      Other statutory sections also give the district court direction in sentencing.

4  Under 18 U.S.C. § 3582, imposition of a term of imprisonment is subject to the

5  following limitation: in determining whether and to what extent imprisonment is

6  appropriate based on the Section 3553(a) factors, the judge is required to

7  "recogniz[e] that imprisonment is not an appropriate means of promoting correction

8  and rehabilitation."

9      Under 18 U.S.C. § 3661, "no limitation shall be placed on the information

10  concerning the background, character, and conduct of [the defendant] which a court

11  of the United States may receive and consider for the purpose of imposing an

12  appropriate sentence" (emphasis added).  This statutory language certainly

13  overrides the (now-advisory) policy statements in Part H of the sentencing

14  guidelines, which list as "not ordinarily relevant" to sentencing a variety of factors

15  such as the defendant's age, educational and vocational skills, mental and emotional

16  conditions, drug or alcohol dependence, and lack of guidance as a youth.  See

17  U.S.S.G. § 5H1.

18      In sum, in every case, a sentencing court must now consider all of the §

19  3553(a) factors, not just the Guidelines, in determining a punishment that is

20  sufficient but not greater than necessary to meet the goals of sentencing.  And

21  where the Guidelines conflict with other sentencing factors set forth in § 3553(a),

22  these statutory sentencing factors should generally trump the Guidelines.  See

23  United States v. Denardi, 892 F.2d 269, 276–77 (3d Cir. 1989) (Becker, J,

24  concurring in part, dissenting in part) (arguing that since § 3553(a) requires

25  sentence be no greater than necessary to meet four purposes of sentencing,

26  imposition of sentence greater than necessary to meet those purposes violates

27  statute and is reversible, even if within Guideline range).

28      In light of the number of years that have passed since the 2005 incidents

1 which were at issue, Mr. Sclafani's lack of criminal history, his exemplary character

2 and compelling personal history, and his continuing value to his community, Mr.

3 Sclafani respectfully requests that this Honorable Court vary the sentence

4 downward substantially and impose a reasonable sentence in accordance with the

5 factors set forth below.

6 III.   THE GOALS OF § 3553(A) WILL BE ACCOMPLISHED BY A

7        SENTENCE SUBSTANTIALLY BELOW THE ADVISORY GUIDELINES

8        In the present case, the following factors must be considered when

9 determining what type and length of sentence is sufficient, but not greater than

10 necessary, to satisfy the purposes of sentencing:

11      A.   The Nature and Circumstances of the Offense and the History and

12           Characteristics of the Offender

13      This Honorable Court should consider first the history and characteristics of

14 Mr. Sclafani as the Court has had ample opportunity to consider the nature and

15 circumstances of the offense throughout the litigation of the case.

16      The history and characteristics of Mr. Sclafani are discussed in detail in the

17 social profile report of Mr. Kent Costley, which is filed concurrently herewith as

18 Exhibit A, and generally will not be repeated here.  However, it bears noting for this

19 Court that subsequent to his conviction, Mr. Sclafani has developed "a community

20 outreach program, on his own, designed to reduce conflictive interactions between

21 the public and law enforcement." Exhibit A, at 24.  The program that Mr. Scalfani

22 has developed and is scheduled to present to numerous groups across Southern

23 California, is filed concurrently herewith as Exhibit B for this Honorable Court's

24 review.

25      Not only has Mr. Sclafani received support from community organizations

26 and labor unions representing police officers (see, e.g., Exhibit C), but Mr.

27 Sclafani's commitment to his program has inspired seven active and retired police

28 officers to volunteer to continue the program in Mr. Sclafani's absence should this

1  Honorable Court sentence Mr. Sclafani to incarceration. <u>See</u> Exhibit C, Letter from
2  Radames Gil et al. (June 8, 2011 [<u>sic</u>]).  At a time when most people would focus
3  their efforts and energy on spending time with family and enjoying the creature
4  comforts of freedom, Mr. Sclafani has instead dedicated himself to helping at-risk
5  community members and law enforcement avoid unnecessary conflict.

6       Furthermore, Mr. Sclafani requests this Honorable Court take into
7  consideration that former Desert Hot Springs Police Department Chief of Police
8  Walter McKinney—who purportedly contacted the FBI in 2005 regarding alleged
9  excessive force at the Department by several officers, including Mr. Sclafani—also
10  later wrote a Letter of Recommendation on behalf of Mr. Sclafani in 2006. Exhibit
11  D.  In his letter, Chief McKinney wrote in part,

12       Tony Sclafani volunteered for many policy and procedure assignments
13       where he conducted exhaustive research, performed analysis and
14       presented completed staff work that has become the basis for enhanced
15       organizational risk management, service delivery efficiencies as well
16       as more clearly defined policy and procedure that personnel will more
17       easily understand and operate by.
18       [¶]
19       I wholeheartedly encourage any prospective decision maker reviewing
20       Tony's resume for work history, education and experience to also
21       review samples of his work where the essence of high quality
22       analytical work is personified.
23  It seems unlikely that Chief McKinney would have authored such a complimentary
24  letter if he truly believed that Mr. Sclafani was the monster painted at trial.  The
25  overwhelming evidence of Mr. Sclafani's conduct and characteristics supports the
26  imposition of a punishment substantially below the sentence suggested under the
27  Sentencing Guidelines.
28  ///

B.    <u>The Need for the Sentence Imposed To Promote Certain Statutory</u>
<u>Objectives</u>

18 U.S.C.S. § 3553(a)(2)(B) requires district courts to consider whether the sentence imposed affords adequate deterrence to criminal conduct. In the present case, it is not likely to be a possibility, let alone a probability in the future that Mr. Sclafani will re-offend.

First, Mr. Sclafani no longer serves as a public safety officer in any capacity for the Desert Hot Springs Police Department as he has retired from service. Second, even upon the completion of Mr. Sclafani's punishment, California law expressly precludes him from ever returning to law enforcement based upon his conviction. California Government Code section 1029(1) automatically disqualifies any person who has been convicted of a felony from ever holding office as a peace officer anywhere in the state of California. Mr. Sclafani, therefore, has no future in law enforcement regardless of the punishment this Honorable Court imposes. Furthermore, the letters of family and friends of Mr. Sclafani speak warmly of his calm, caring demeanor, and the notable absence of aggression or propensity for violence. A reasoned disposition by this Honorable Court need not be hardened by the need to deter Mr. Sclafani.

Under 18 U.S.C. § 3553(a)(2)(C), the district court must also consider whether the sentence imposed protects the public from further crimes of the defendant. As already posited when addressing the issue of deterrence, Mr. Sclafani does not present a threat to the community, either now or in the future. Mr. Sclafani has no interest in resuming his law enforcement career and, as already discussed, he has demonstrated a commitment in seeking to protecting the public and law enforcement officers from going through those experiences which brought Mr. Sclafani before this Honorable Court. Mr. Sclafani—through his presentation to at-risk youth, probationers, parolees, gang members, and anyone who may have a higher propensity toward law enforcement contact—will humble himself by

discussing his own trial and conviction, and subject himself to possible taunts, ridicule, and even retribution from those whom he would have possibly arrested prior to his conviction. Although no one has ordered to Mr. Sclafani to use his limited time before sentencing in this manner, Mr. Sclafani has voluntarily done so in order to prevent others from enduring the same experiences that have tormented him since the inception of the Government's investigation.

The many letters in support of his character—not only from family, friends and co-workers, but from the organizations to which Mr. Sclafani will present his story—demonstrate that the public has nothing to fear from this broken man. It is evident not only from Mr. Sclafani's positive effect on others over the years, but also his effect on others presently, that the public needs no protection from him. Quite the contrary, the outpouring of support for Mr. Sclafani and his own commitment to reducing unnecessary conflict between the general public and law enforcement dictates that the public will benefit substantially more from Mr. Sclafani sharing his experiences with at-risk members of the community than from him being incarcerated as recommended in the Report.

IV.   CONCLUSION

As the letters of support on behalf of Mr. Sclafani indicate, he is a hard-working father who has dedicated himself to helping others. Mr. Sclafani has suffered greatly as a result of the Government's investigation, the trial, and ultimately, the conviction. If Mr. Sclafani is incarcerated, he will additionally lose the opportunity to spend time with his wife, to watch his four sons grow from boys into men, and to freely enjoy the company of loved ones who rely on him for support and guidance. For the rest of his life, Mr. Sclafani will continuously be reminded of his conviction, and will never again enjoy the freedom from restrictions that he has enjoyed hitherto. Moreover, society will lose an advocate willing the bare his soul and suffer indignities for the benefit of others.

///

1    It is humbly requested that this Honorable Court consider the totality of Mr.

2  Sclafani's history and characteristics as it exercises its discretion in meting out a

3  fair and reasonable punishment.

4                                      SILVER, HADDEN, SILVER, WEXLER &
                                       LEVINE

5

6  June 25, 2012                              /s/
                                       _____
7                                      MICHAEL SIMIDJIAN
                                       Attorneys for Defendant

8  00807R2-pld.wpd

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28