**PROFILE**

I hold a bachelors degree in Psychology and Economics from the University of New Mexico, which I received in 1973. During my 30-year career in probation and parole I have conducted and/or prepared over 3,000 investigations and presentence reports, social profiles and sentencing recommendations for the courts at the state and federal levels.

While serving for 17 years as Supervisor of Presentence Investigations for the U.S. Probation Office – Central District of California, I extensively researched the U.S. Sentencing Guidelines and their application to the full spectrum of federal crimes, including corporate offenses. I have received specialized training in financial crimes, drug offenses, crimes of violence and immigration offenses. I developed the format for the corporate presentence report for the Central District of California.

I have dealt extensively with crime victims, and I have received specialized training in restitution and victim compensation. I was responsible for training the U.S. Probation Office in determining offenders' abilities to pay fines and restitution. I have worked closely with local, state and federal law enforcement agencies, including the Federal Bureau of Investigation, U.S. Secret Service, U.S. Immigration and Customs Enforcement, Federal Securities and Exchange Commission and the Bureau of Prisons. I have served as teacher, mentor and advisor to others in the federal judicial system, including district court judges. I have served as the departmental liaison to the Office of the Federal Public Defender and the United States Attorney's Office.

I have received on-going training from the U.S Sentencing Commission regarding U.S. Sentencing Guideline amendments and relevant case law. Having also served as the Deputy Chief U.S. Probation Officer for the Central District of California, the largest district in the Nation, I am well versed in the workings of the federal court on both the local and national level. I retired in 2007 after 20 years in federal service.

I am an active member of the National Legal Aid & Defender Association (NLADA) and the National Alliance of Sentencing Advocates and Mitigation Specialists (NASAMS).

KENT R. COSTLEY

# Kent Costley & Associates

27943 Seco Canyon Road, Suite 316 · Santa Clarita, CA 91350
661-367-7060 · Fax 661-296-1210
kentcostleyassociates@gmail.com

Honorable Terry J. Hatter, Jr.
Senior United States District Judge
United States Court House
Los Angeles, California

Dear Judge Hatter:

This social profile of defendant Anthony Sclafani is respectfully submitted to promote the goals of sentencing as set forth in 18 USC 3553(a). Mr. Sclafani is presently on Pretrial Supervision after being released on April 6, 2010, on a $50,000 unsecured appearance bond. He is in compliance with all conditions of release.

## Introduction

Mr. Sclafani is before the Court after being convicted by jury of two counts of Deprivation of Rights Under Color of Law in violation of 18 USC 242.  Throughout he has steadfastly and resolutely maintained his innocence, unwavering in his trust in the American justice system and confident that a full airing of all facts would find him vindicated of any wrongdoing. The verdict leaves him staggered, emotionally stricken, bereft of spirit, and, with the specter of imminent incarceration, plainly terrified for the welfare of his wife and four young sons.

Once the consummate professional, admired, respected and devoted to the community as an officer of the law, his life and that of his family have, understandably, unraveled completely. He has been professionally destroyed, publically humiliated and personally degraded by publicity attendant to the trial and by events before and subsequent to it.

Those who have known Mr. Sclafani for a lifetime believe unequivocally that he did not commit the crimes of which he has been convicted, and they find themselves in shock and disbelief with the findings of the jury. As the attached character reference letters attest, he is an individual whose life has been defined by love of family and church and dedication to his profession. Understandably, they ask why a professional of Mr. Sclafani's reputation and leadership responsibilities would have knowingly used excessive force when he has never before exhibited

1

such behavior in the performance of his duties, either before the incidents alleged in the Indictment or during the seven-year pendency of this case.

As the following social profile will demonstrate, the charges are indeed at profound variance with his upbringing and character. As reflected by information in his personnel file from the Desert Hot Springs (DHS) Police Department, his professional comportment has consistently exceeded standards in practically every evaluative category; he has served in a position of leadership and authority and he has received numerous letters of appreciation from members of the community and commendations from his superiors.

Notably lacking in his background investigations, psychological assessments and performance evaluations is any reference or hint of the kind of behavior which forms the basis for the indicted charges. As a law enforcement officer working in severely understaffed conditions in a city besieged by gang activity, high parolee population, and statistically rated as 197 percent higher than the national violent crime rate, Mr. Sclafani has never been accused of racial intolerance, cruelty or acts of a sadistic nature that would be perceived as antecedents to the charges of which he now stands convicted.

Unlike some occupations which accommodate prolonged contemplation, introspection and procrastination without serious cost, the nature of Mr. Sclafani's profession demanded a constant state of readiness, immediate situational assessment and instant action on the spot, factors that cannot be fully appreciated by those of us who are not confronted daily by the darker side of human behavior so often prompted by drugs, alcohol and situational rage. From the safe and convenient vantage point of perfect hindsight, fault is usually not hard to find, and it's not easily defended, especially, it would seem, after a seven-year span between the dates of the charged offenses and the weighing of evidence by a jury.

It is respectfully posited that any contemplated term of imprisonment should be significantly tempered by the contribution Mr. Sclafani has made toward the safety of the community. His DHS personnel jacket describes an incident in which he administered CPR to a dying infant while waiting for responding paramedics to arrive at the scene, by itself a testament to his dedication to serve the public. But, the full measurement of any officer's contribution to public

safety cannot be adequately quantified or gauged by written performance evaluations, commendations or certificates of appreciation.  It is found in the very nature of the job, the fact that society benefits from a collective police presence, and the realization that complete chaos would reign but for those like Mr. Sclafani who have put their lives in jeopardy during each duty shift in the trenches. Many job titles fall in the genre of "public service," but law enforcement epitomizes that descriptor. With 20 years of service in such capacity, this contribution by Mr. Sclafani takes on rather awesome proportions, which, it is respectfully asserted, should not be disregarded when contemplating a fair sentence.

As the following social profile will reflect, Mr. Sclafani is a good and decent man whose priorities have always been his family, church and devotion to his job as an officer of the law. It is hoped that the Court will consider the instant conviction against the backdrop of a meaningful and purposeful life dedicated to the welfare of others, and that a sentence will be imposed substantially below the calculated guideline range.

The following narrative is based on numerous interviews with Mr. Sclafani (Tony). I have also interviewed his wife, Amber Sclafani, and each of his four sons. I have read the character reference letters submitted on his behalf, and I have also reviewed case file documents, including the Federal Presentence Report prepared by U.S. Probation Officer Colleen Ghaffari. I have studied the United States Sentencing Commission Guidelines Manual and relevant appendices.

BACKGROUND

Tony was born in San Bernardino, California in 1970, the eldest in a sib line of three; his younger siblings are Brian (now 39) and sister Jodie (now 36). Brian presently works for Costco and Jodie is a school teacher; both live in Fontana, California. Tony's father, Pete, is of second-generation Italian heritage, and his mother, Judy (nee Hernandez) (now 64) is Hispanic.

Pete (now 65), the youngest of 12 siblings, was born in Michigan and moved with his family to California in conjunction with his father's employment in the steel mills in the Riverside/San Bernardino, California area. Pete was raised in the Fontana area and worked mainly as a general

3

laborer at Alumax Steel in Riverside, California, and Judy was employed part time as a teacher's aide. Judy and Pete have lived in the same house since they were married, the same residence in which Tony and his siblings grew up.

The Sclafani household was governed primarily by the stereotypical Italian work ethic which stressed loyalty, honesty and self-motivation, traits that Tony and his father have always shared. As described by Tony, "I was raised with the mindset that nobody would outwork me or try harder than me, or call into question my integrity."

Tony's father made a "decent" living, working mainly night shifts. In retrospect, Tony describes his family as "probably poor, but we didn't know it at the time." Growing up, there was parental tension in the Sclafani household, which, at the time, Tony attributed to his father's strictness, but looking back he now realizes that his mother's constant nagging of his father was the true source of friction, adding "I can't understand why my dad would ever have put up with her." There was no alcohol or drug abuse in the household.

A significant portion of the Sclafani household income was spent on private Catholic schools where Tony attended from first grade through eighth grade. Although he did not present major behavioral problems, he admittedly tested the patience of his parents and also the nuns at his parochial school. Discipline was meted out by both parents, but notably by his father whose usual response was to kick and punch. As described by Tony, his father "had a temper, and I told him after becoming a cop that I had arrested people for doing less than he had." Tony's wife, Amber, who has known Tony since junior high school, comments on her father-in-law's behavior during Tony's formative years:

> His dad was not very nice. He is a wonderful grandfather—couldn't ask for a better one. As a father, his anger always got the best of him and Tony got the worst of it. He got in trouble for what he did wrong, but he would step in for his brother and sister and get their punishment as well.
>
> He has defended his brother and sister as long as I've known him, and he always got the worst of it. I was worried when we got married that those

traits would carry over to disciplining our children, but Tony is not like that. I'm that one who is the disciplinarian; I'm the one who gets the belt out. He was always adamant that he would not have the same kind of relationship with his own sons that he experienced with his father.

Tony comments on this subject:

My father and I didn't enjoy the same relationship that I enjoy with my sons. I have always controlled my emotions and it's my nature not to let emotions take over, contrary to the Government's depiction of me as a sort of a knuckle-dragging brute.

As Tony progressed through school, sports became a high priority and he generally excelled in every athletic endeavor that he joined, including football, soccer and baseball. He transferred to public school in 9th grade. He was popular with his peer group and made friends easily because of his sports activities. He was neither bullied nor was he a bully. Academic performance was usually a 3.0 GPA because that was required of him to be able to drive, not because he was interested in college. The expectations of his parents were simply that he "get a job and start earning money," which he did.

Tony obtained employment as a dishwasher in a local pizza parlor while still in high school, saved his money religiously and quickly worked his way up to manager. He bought his first house when he was 18 years old, a small fixer-upper, after his parents co-signed on the loan, but he continued to live with his family, using the new house as a rental property. He and Amber continued dating through high school, and graduation from Fontana High School in 1988 found them on separate career tracks. Unlike Tony, Amber's professional pursuits were scholastically oriented with plans to attend medical school, and she began her undergraduate studies at Loma Linda University.

Amber's formative years were marked by much unhappiness caused by her father's bi-polar disorder and related behavior, and she leaned heavily on Tony as a support system throughout high school. She makes the following comments on Tony's presence during these times:

5

I was accepted to college in my junior year of high school; Tony was very supportive of my academics and encouraged me to pursue that. He had no idea what he wanted to do; his family had always encouraged him to just get a job and make money -- that was a man's responsibility. College was not important for a man. So he worked very hard and helped me throughout.

I continued to go to school and he supported me and my mother; my dad was gone due to drugs and bi-polar disorder since I was 16. We had a huge financial burden, just me and my mom.

I would go to Tony and tell him that my mother couldn't make the house payment. I was able to stay in school and he would cover all of that. He would make my car payment, my mother's house payment, groceries-- everything he could possibly do to keep me in school. His family didn't know anything about that because they wouldn't necessarily have approved.

With Amber away at college, Tony began to look for a career field that would take him out of the pizza-manager business, but he wasn't confident enough to try college. He narrowed his choice to being a fireman or a policeman, the latter winning out primarily because he always had a high level of respect for law enforcement, but he was also attracted by what he perceived as their "rock star status" in the community and the perceived glamor of the job.

In 1989, at the age of 19, he approached the Fontana Police Department and was accepted as a police cadet, the requirements for which were the same as a regular police officer, including a written exam, standard IQ testing and a psychological evaluation. One of the main requirements of being a cadet was proof of enrollment in college studies, so Tony enrolled, less than enthusiastically, at Chaffey College. Typically, a cadet would enter the police training academy when he or she turned 21 years old, but, due to budget issues, Tony was sent to the academy early where he completed the 18-week militaristic-type course and graduated in

1992. Out of about 55 cadets who started, only 16 made the final cut. Tony recalls a conversation he had with his grandfather on the day he graduated:

> My grandfather, who was Hispanic, and served in World War II, told me a story about returning after the war. He was in full uniform in Los Angeles one day and began getting racial slurs by two policemen. Here my grandfather was, having served his country, and he's being insulted by the police because of his race. That conversation stuck with me for the rest of my life in the way I have tried to treat people. I am of mixed racial heritage myself.
>
> Sometimes, being in law enforcement, there is a tendency to categorize people, put them in a box, but I pride myself on never having done that because of what my grandfather told me.

Tony was single, living at home, not yet 21 and dating Amber when he became a Fontana policeman. He enjoyed the reality of the work and the fact that he was making a difference in the community. Like any other officer fresh to the job, handling obnoxious people without passing judgment was a challenge, but with experience came the realization that those who were acting out were not doing so out of anger at him personally, but because they were angry at their own situations.

The end of each shift found Tony physically exhausted, but not necessarily nervous or emotionally spent. There were exceptions, of course, where the sheer brutality of a situation would leave him shaken, especially instances of extreme domestic violence and child abuse. The prevailing thought at the time was to leave work issues at work and not share such experiences with anyone but other policeman, a trend that has now been reversed—for the better, in Tony's opinion.

After five months in the company of a training officer, Tony was put on patrol on his own. It was a rite of passage that he found exciting and fulfilling. His confidence in the training regimen allowed him to take on these solo responsibilities without nervousness or fear. As the end of his

probationary period approached, he was receiving good reports from his immediate superiors which were readily endorsed as they were passed up the chain of command. The euphoria of having accomplished all of this hard work did not last long. The day before his probationary period was to end, he was called to a sergeant's office and flatly informed he was not meeting standards and was being let go. Tony and his immediate supervisors had seen his good evaluations and were at a loss to figure out what had happened, but he was an at-will probationary employee and no explanation had to be given for the termination except that he did not meet standards. The news was devastating and made more so by not knowing what compelled it. After two days, the reason came to light.

Tony had earlier walked into an office and observed one of station sergeants having sexual intercourse with a female dispatcher, an incident he did not at first report, choosing simply to look the other way and absent himself from the office as quickly as possible. The female dispatcher made a complaint that Tony had threatened her later with a cheese knife while she was at her work station in the company of several other dispatchers. It was a complete lie; the allegations were unsubstantiated by the other dispatchers. Tony then explained to his superiors what he had observed between the dispatcher and the sergeant, he sought legal counsel for reinstatement and asked to be polygraphed about the threat with the cheese knife, but those requests were denied and, lacking further recourse as an at-will employee, he was terminated.

The event was a soul-crushing experience, but Tony's captain, who knew what really happened, remained supportive, and would later give Tony a glowing recommendation for employment in the law enforcement field. Tony comments:

> It was psychologically debilitating. It was not just losing a job, it was also losing it in front of everybody that I knew in the community. But it was also a realization of how much I defined myself by that job. I was thoroughly depressed, thinking at the time it was the end of the world, not knowing, of course, what was in store for me [with the instant conviction].

After being unemployed for six months Tony found a job with the Rialto School District; he worked as a campus security officer during the day and at a restaurant at night.

After learning that the Sheriff's Office in Riverside, California was hiring, he applied for a deputy position and was hired after their background investigator confirmed the veracity of Tony's explanation of circumstances behind his firing from Fontana Police Department. Tony and Amber were married in 1994, just before he started with the Riverside Sheriff's Office. Amber had gotten her undergraduate degree and was accepted to medical school on the east coast. However, she would not leave Tony and Tony "would not give up being a cop." The compromise was made by Amber, who decided to pursue her degree locally in nursing.

Tony was assigned to the County Jail and later to the County Hospital which had a jail ward. At the ward he dealt with severely disturbed inmates and later received a letter of appreciation and other accolades from the ward staff regarding his handling of an extremely volatile and dangerous inmate who, while being subdued, injured Tony.

He was rotated to patrol status, where he remained from 1995 to 2000. During that time he received good evaluations, with occasional chiding to be more diplomatic during patrol briefings, where, Tony concedes, he was somewhat "unfiltered" when he expressed his opinions. Tony returned to college in 1997. He had lost two friends in the line of duty and began thinking about going into a different field. Tony explains:

> I think that by that point the newness of the job had worn off. I had seen how cops very rarely stayed married. And cop's kids are either really good and end up being cops, or they're jerks because their dad's never around. I sure as hell did not want my kids to be cops. So, I graduated from Chaffey with an Associate's Degree and later transferred to Cal State San Bernardino.

> I was going to be a teacher, my major was history, and then I slowly got sucked back into the police thing, and then I ended up changing from history to criminal justice.

9

Never enamored by guns, Tony accidentally discharged his weapon, wounding himself in the leg, although he returned to work the same day after receiving medical treatment. He was thereafter the butt of jokes, not malicious in nature, but embarrassing nevertheless. He was found to have been at fault after an inquiry.

About a month later, without proper authorization, Tony jerry-rigged his belt holster to accommodate a non-approved light attachment to his sidearm. While on a call at a residence, he removed the sidearm to examine it when he was alone in the kitchen. The sidearm accidentally discharged, sending a bullet through wall of the kitchen and into a wall of adjacent house. No one witnessed the accidental discharge. Tony checked the outside wall for an exit hole and found none. Hoping to avoid additional hazing by fellow officers and embarrassed by his clumsiness, instead of immediately reporting the incident to his supervisor, he panicked and used some toothpaste as spackle to conceal the hole. He did not report the incident until several hours later when the owner of the adjacent residence, who was not at home during the weapon's discharge, returned and found the bullet and contacted police. For this incident, Tony was placed on administrative leave and then terminated from the Riverside Sheriff's office. He adds:

> After an investigation they decided to fire me. And I didn't blame them one bit. Coming home and having to tell Amber what happened was hell. We didn't have large sums of money in the bank and were already living paycheck to paycheck. At that point I had two kids, and that was the paradigm shift in my life because the circumstances of my personal life were so different from the first time I was fired...
>
> I ended up getting a job at Fontana School District as a substitute campus security guard in 2000. The guy who hired me was told what happened in the previous two firings. He assigned me as a crossing guard. So, there I am with my little yellow vest and stop sign...
>
> It was then I realized that from here on out I had to be a by-the-book type of guy; I thought my law enforcement career was over. I figured I

would be a teacher. I graduated and got enrolled in getting teacher credentials. I played crossing guard for a long time. But it was good for me because it was a humbling experience.

At home, things remained stable despite all of this. Amber stood by me and has been there ever since. It's a testament to what a good woman she is that she is still there supporting me.

The experience took the pride out of me that I had gotten being a cop. And that was a good thing for me. It was a public exposure to failure.

Shortly thereafter, Tony was offered a job as police sergeant for the Fontana School Police Department, and was quickly promoted to a full time training officer. He found the work to be different from his previous law enforcement positions and was still committed to pursuing a teaching career when he learned from a friend that the city of Desert Hot Springs (DHS) was hiring police officers.

After six to eight months at the Fontana School Police Department, Tony was hired as a sergeant at DHS Police Department. Looking back, he believes he was not prepared to be a supervisor at a municipal police department, especially in a city with such high crime rates. As described by Tony, DHS was a "cesspool of crime," caused in large part by the huge parolee population. Tony adds:

The socio-economics were terrible in DHS. It was a poor community with inexpensive housing and practically no jobs within the community itself. The people who live in DHS are usually the workers, such as maids and gardeners, for the affluent communities of Palm Springs, Desert Mirage and all of those high-end places. There is a high dropout rate and the crime stats are out of control.

DHS has the least amount of officers per capita. So you throw all of that stuff into the mix; high parolees, cheap housing, low number of cops, we

11

would go from call to call, all day, every day, but we were only dealing with the major problems. If someone wasn't dead or stabbed, the cops just didn't have the time and resources to deal with it. They might take a report and give a case number if a house was burglarized, but there would be no follow-up investigation. None of that stuff happens because there just aren't the resources to do it.

Unfortunately, the Police Department was the stepchild of the city. Even the city workers had better retirement benefits. When I started there in 2005, I had about a half-day of training about DHS. On my first day I did a Taser class that lasted about four hours and then I rode around with another officer, and I wouldn't really consider it training.

It was more like, "Here is the north end of town, here is the south end. Watch out for these guys. Here are the keys: this one opens up the jail, this one opens the back door. Here's my phone number; if you need anything, give me a call. See you later."

After the things I learned by being a supervisor over time at DHS, the way I handled the crime I am convicted of would not be handled the same way now, because now I've got nine years as a sergeant with eight of those years in DHS in that environment. I could go to any police department anywhere now and be a successful supervisor because I made it in DHS with zero resources.

The policy manuals were crap and on any duty shift the officer compliment in the field would be only two officers and a supervisor — and that was pretty much every day for the entire city. So, we would literally go from call to call. If you're the primary officer, then your

12

partner is your back-up. On the next call the back-up becomes the primary, so they're just flip-flopping.

The report writing for any officer was usually backed up by 100 reports. They just didn't have the time to write them quick enough. We were so backlogged that some of the reports were a year and half old when I came on board. That made some huge problems for citizens who needed reports to make claims on their insurance, or for car accidents, things like that...

If someone got stabbed or died, that's the report that had to be prioritized. I felt like we threw out all of the best practices that our profession demands because we absolutely couldn't do it. You had to constantly cut corners in procedure in order to maximize officer safety in dangerous situations. Every aspect of this police department was absolutely deficient. We were just trying to get through the day without being killed...

Politically and financially, DHS had a checkered history. When Tony was hired, the police department had been in existence for about 10 years, and this was the third attempt at its establishment. Each prior attempt could not be sustained financially and was disbanded, resulting in contractual agreements with the Riverside Sherriff's Office. Reportedly, over a 10-year period eleven police chiefs were hired, each one arriving with a new set of marching orders, resulting in virtually no real departmental progress and complete chaos among the employees.

Rumors circulated that the City Manager was corrupt, and the Police Chief was fired and replaced by Walter McKinney. McKinney had previously worked for the Los Angeles Housing Authority and later served as Police Chief in Hawaiian Gardens, California. In that capacity he

was charged by the Los Angeles County District Attorney for perjury, a charge that was reduced later to a misdemeanor. Tony adds:

> So now DHS hires this man to be our Police Chief. In one of our first meetings with him the supervisory team is told that the City Manager is concerned that the amount of force that is being used is excessive and that he [McKinney] has started looking into it.

> We tried to explain that DHS was not Beverly Hills, that this was a cesspool of crime and that we had no resources to adequately do the job. Our philosophy was "We ask; We tell and then We make," meaning that we ask a suspect to do something, then we tell the suspect to do something and then we make the suspect do something." This is because our radios are going off constantly and we simply didn't have the time to do the community policing that would be in place if this was an ideal department.

> McKinney decided to initiate two internal affairs (IA) investigations against me along with a whole bunch of other people. He hires a guy from LAPD, retired, who comes in and does these investigations. I totally cooperated with the investigation and explained this is what I did and this is why I did what I did.

> There were some things that he felt should have been done different, but I equated a lot of that to the fact that LAPD has tons of resources – when you're a sergeant in LAPD, you're a supervisor, not a worker bee. But in DHS, you have to be a worker bee because there's only two other guys covering the city...

14

000025

....I was dinged on some procedural stuff, but they cleared me on the excessive force. They said "Okay, you were following the policies, and while we may not necessarily agree with the policies being a little too liberal, you followed policies."

So, we go through the IA process...and then I don't hear anything about any of this stuff...I kept on [McKinney] pretty regularly, asking [about the status] and he says don't worry about it.

McKinney instructed Tony to look into the Taser Program, saying that the use of force was a problem and that he needed to assign the project to a supervisor. Tony opines that he received the assignment because he had by now obtained his Master's Degree and was therefore the logical choice.

Because of the drastic shortage of officers for field duty, Tony was always looking for ways to add more. In doing so, he noticed that a sworn police officer, Andrea Heath, was working as a dispatcher. Considering the disparity in wages (dispatchers were paid $15 per hour and sworn officers were paid $30 per hour), Tony approached his lieutenant with the suggestion that Heath be moved to patrol to alleviate the shortage of officers in the field. However, he was told that she was "bad news, a terrible police officer." At personnel meetings with McKinney and other supervisors, Tony persisted in making his point, only to find out later that rumors were circulating of a sexual relationship between Heath and McKinney, and that McKinney had reportedly promised to protect Heath after telling her of Tony's plan.

Later, in 2006, a new City Manager was hired and instructed that due to budget issues, a reduction in force would require the loss of one departmental sergeant. Tony, who had no "bumping rights," was laid off for six months. However, he was allowed to stay on a reserve police officer basis. Although he was not paid in such capacity, the moved allowed him to keep his credentials current. Tony explains what happened next:

McKinney ultimately got terminated, but in the time he was there, he had started these IAs and then he shipped off to the FBI a series of cases, saying [to the effect] "I think there is systematic excessive force going on here in DHS and you guys need to look into it." My case was part of that. In 2006, the FBI comes in with their first subpoena. This is after McKinney had been let go.

Now, there is a new chief named John Hensley and for the first time we have a legitimate chief. He gets the subpoena and everybody tries to cooperate with the subpoena like they are supposed to do. They give the FBI everything and Hensley had a couple of meetings with the FBI and his perspective was that it was just a big fishing expedition.

[Hensley] finally amended the Taser policy based on my recommendations from some time ago and tightened it up. Hensley brings me back in as a police officer [when a vacancy occurs]...I worked as a police officer for probably one or two months, and he makes me an acting sergeant.

I'm back to running my own shift and it's back to business as usual. They ended up hiring a permanent chief, Patrick Williams, and he has been the chief since 2007. When Williams got there and put these best practices in place, crime started coming down and we were actually solving crimes.

...When [Williams] goes out and talks about how the department used to be and what it is today – he always goes back to 2005 because that was the low...the dividing line for comparison...

16

000027

Within 30 days of being brought back after being laid off, Tony was promoted to the permanent position of sergeant in 2007.  Over time, Tony became Williams' "go to guy." He restructured and ran the field training program and then became the Administrative Sergeant in charge of hiring and recruiting, managing the background checks and ensuring that the best possible people were hired. He also was dong internal affairs. Tony adds:

> When I started in DHS, I'd never carried a Taser. I knew of them, but didn't know anything about it. So, I followed the training. I used the Taser as it was told to me to be used. When I got assigned to look into the policy I started pulling up studies as to the effects of the Taser, policy considerations, long-term effects...

> Maybe we shouldn't be using it as liberally as our policy said we could.... It was because of my research into the policy recommendations that changed my mindset into how and when those Tasers should be deployed.  Unfortunately, for me, that came after these incidents, not before.  Because I'd only worked for the department from November of 2004, and my incidents happened in February of 2005...I was still trying to find my way around...

> . . . it happened,  and I followed the policies and the training and what was the practices of the department at that time... I didn't do everything perfect.   There was no criminal intent — I followed the training. Unfortunately, it probably wasn't the best.  There probably were other things that could have been used, although, I still say, even in these two situations, the options were minimal.

### Home and Family Life

Tony's son Nicholas was born in 1997, followed by Zachary (now 12), Jacob (now10) and Anthony (now 8).  Prior to the birth of Nicholas, Amber suffered a miscarriage. Although the event left both her and Tony emotionally devastated, the effects for her lasted much longer. Financial pressures were also causing some discord, and Amber's pregnancy with Nicholas brought on more tension. After the birth of Nicholas, Tony and Amber separated, but reconciled when Tony realized that he simply could not live without Amber and his new son. Since that reconciliation they have remained solidly together as a couple.

Home life consisted of family activities together. Tony has always been a very involved father to the extent that his professional life would allow. As described by Amber, he has always been outgoing and able to socialize much easier than she can. Both Amber and Tony described themselves as being obsessive-compulsive in certain respects; she describes herself as "not being the kind of person who has social outlets" and is in constant motion when at home with on-going projects, usually related to housecleaning and home improvement tasks. By her own admission, she has a tendency to overspend, which has caused some occasional friction with Tony who is more conservative in his expenditures. Her compulsive side does not manifest itself at work, where she remains focused on her nursing career.

Tony is just the opposite. His compulsiveness has typically been with his job and he is the more relaxed of the two when at home, although he typically spent many hours on work-related projects at home.   As a person who has many friends of every ethnicity, he has been sought out for his guidance and advice in multi-cultural settings, and he maintained close public relations with local businesses during his tenure with the DHS Police Department. He has been involved in community activities outside the police department, including but not limited to the Rotary Club and membership on the School Site Council, although he has now distanced himself from these activities because he doesn't want his legal difficulties to put anyone at unease. As the person closest to Tony, Amber has watched him change over the years, commenting:

> You're a different person as a cop at 21 compared to one at 40. In the early days
> of his career everything was about proving himself at work, moving up, and work

18

had to have a high priority. I don't say that in a negative way. I am a spender and he would work extra hours for me to get what I wanted. In trying to make a good impression he spent most of his time at work. He was so very dedicated to his profession. I recall that for one year he worked almost <u>every</u> day. That is commitment.

To the extent his job would allow --working six days a week, 14-18 hours per day -- Tony was an involved participant in the activities of his sons. Each of their children has a very special bond with him; he communicates easily with them and they have always placed tremendous confidence in his guidance and advice. Amber concedes that the father-son bonds hold special significance in their household. Each boy is tremendously proud of Tony's accomplishments and they have modeled themselves on his example, to the extent, as Amber puts it, "They are so much like their father it's scary at times." The family has always made their spiritual life a high priority and they attend mass regularly.

Tony's extended family has always been an important part of his life as most recently demonstrated during the illness of Tony's 4-year-old niece, his sister's daughter, who recently died of a rare form of brain cancer, an event which was obviously devastating to all family members. Tony was a mainstay of support for his sister and her husband during this time, and provided a sense of calm spirituality despite his own concerns about the instant case.

None of the Sclafani children have emotional or behavioral disorders, although both Amber and Tony concede that their youngest son, Anthony, has presented more challenges than any of his siblings. Issues related to Tony's conviction have obviously brought on adjustment difficulties, most significantly with Tony's two older sons, who understand the gravity of the situation and the potential impact his absence from the home will have. This is especially so since Tony has spent many hours with them alone after leaving his employment with the DHS Police Department.

### Post Indictment Events and Impact of Conviction

Needless to say, the news of the Indictment brought the Sclafani household to a virtual

least a semblance of normal activity, but with the certainty of trial came the need to readjust

all priorities. For Tony, with the conviction has come profound depression. Night time brings

only about three hours of restless sleep. He has been sustained throughout by his Catholic faith

and reliance on his family when possible, but he and Amber are mindful of keeping their fears

in check in order not to convey a sense of panic to their sons. Amber describes their situation:

> As things went on my oldest one would get angry and he would do so to
> the point that he would unleash on the little one. The last couple of years
> have definitely changed his carefree childhood. The second oldest cries
> and worries a lot; the idea of their dad missing their childhood is a big
> thing for him. As adults we think about it, but it's not a normal thing for a
> kid. For them to not have him around is a lot more than they can handle.
>
> Obviously, I just don't think jail for Tony is the right answer. I think it does
> a disservice to the community. For seven years we have been punished.
> The mental and physical pressure and the depression it has taken on him
> has been excruciating. The uncertainty of what is going to happen has
> confined us emotionally, physically and psychologically.

Tony has compensated as best he can by simply spending more time with his sons. He takes

comfort in the morning routine of fixing their breakfast and seeing them off to school. For a

while he simply returned to bed and remained there for the remainder of the day. That has

changed somewhat with his involvement in developing a community outreach and education

program, which will be addressed later in this report. As well, he was recently hired by a local

company as security consultant, where he works from 20 to 40 hours per week. (A letter from

his employer is attached to this report). As he often stated during interview with the

undersigned, his family is the "absolute most important thing in the world to me," and it is obvious from his sons' statements that they feel the same way.

As Amber has pointed out, all of Tony's sons have modeled themselves on his example. Each is academically at the top of his classes because of Tony's expectations of high achievement and his desire to see them attend college. His eldest, Nicholas, has always wanted to attend Harvard Law School and has competed in the academic decathlon and is taking honors classes.

For Tony, there is a spirit of being resigned to a sentence of imprisonment, but a resolute stance that he did what was right in standing up to the instant charges, something that he has always tried to instill in his sons, and to have admitted wrongdoing would be pure hypocrisy in his eyes. He adds:

> My faith is a very big part of who I am. I attend regularly, although I sometime feel a little hypocritical -- I'm a little pissed off at God right now; I know it's not his fault, but it's hard to understand why this is happening to me. Our faith as a family is very big. When my niece was sick with terminal cancer, our faith sustained the family through it all, but my son's first words on hearing about the conviction was that he was angry at God for letting this happen to me. I told him I felt just the way he did, but we could not go there as much as we wanted to. And that we have to continue to keep our beliefs. I think things happen as part of a plan that's supposed to work out in the end, but to me, right now, this is an absolute death sentence, despite what people tell me to the contrary.

> I told my sons not to let this be an excuse to be knuckleheads. I have seen kids whose parents have been in prison, and I tell them not to let this to be a reason to screw up.

Tony has been able to mentally disengage with the "cop mentality" for the most part, although his department has been "phenomenal" in its support by keeping him on the payroll for the first year he was at home on administrative leave. After that, he would meet occasionally with his chief, who assigned him projects to work on from home to which allowed his salary to

continue. For that he will be grateful for the rest of his life. Among numerous letters, the totality of which will not be presented here in the interests of brevity, Mr. John Hensley, former Chief of Police of Desert Hot Springs, has submitted a letter to the Court, which is excerpted as follows:

> I was hired by the Desert Hot Springs city manager as interim chief of police...in 2006. The department had just terminated the employment of the prior chief of police and department was in shambles. I was asked by city leaders to begin rebuilding the department's reputation and professionalism.

> ...I found Tony to be a good communicator, an honest person, trustworthy, and a compassionate police officer...Mr. Sclafani cared a great deal about the citizens of Desert Hot Springs and their quality of life...he routinely volunteered to meet and discuss community issues with residents and merchants alike. These selfless acts by Tony contributed to rebuilding the police department's reputation in the community...

> It was no secret in the organization that I considered Mr. Sclafani as a future commander in the organization before my departure...

> In over thirty years of law enforcement service, I have never before written such a letter as this, but I feel strongly that Mr. Sclafani is worth standing behind, and I respectfully request that you consider the information I have shared with you.

Josephine Zerrill-Hicks writes:

> ..His recent conviction does not conform with how he has historically conducted himself... I have always abided by the expression, "The conviction is about convicting the criminal; sentencing is about sentencing the person..."

22

000033

Kate Singer, Commander, Desert Hot Springs Police Department, expresses her feelings as a co-worker of Tony:

> ...I don't know what was said during the course of Tony's trial and I truly wish I had been able to provide some perspective to you, Judge Hatter, and the jurors. I believe that the allegations and ultimate findings are a direct contradiction to the behaviors and actions of the man I have come to know over the last four years. My experience is that Tony's observations or rules and procedures has been thoroughly acceptable as has his adherence to proper safety practices...

Richard Daniels, City Manager for the City of Desert Hot Springs, writes:

> ...Sergeant Sclafani was a member of the Police Officer's Association Board of Directors. In that role he was a member of the negotiating team. Three times we sat across the table and negotiated vigorously on behalf of our respective organizations. In all cases I found Sergeant Sclafani to be a man of integrity and commitment to the City and its residents...

Officer Steve O'Connor, who has served as a police officer with Tony, remarks:

> ...Citizens gravitated to Tony as if he were one of their family. Approachable and easy to talk to, Tony had a mannerism about him that made citizens feel more comfortable and safe...

> ...A depression beyond the capacity of what Tony may display in public has set in to such a degree that it is drastically and negative affecting his family in ways that are immeasurable at this time, and will only be realized in the future...

Another co-worker of long acquaintance in the Desert Hot Springs Police Department, Radames Gil, writes of Tony:

> ...Your Honor, when I tell you that Tony is not the violent, inhumane individual portrayed by the prosecution in this case, please believe me, his is the complete opposite of that description. There is not a single human being Tony would not help out in a time of need. I can't even keep track of all the good deeds Tony has been responsible for at others' times of need...

Daniel Garcia, Tony's brother-in-law, writes:

> ...Last year my four-year-old daughter was diagnosed with brain cancer and we were all devastated. Tony would take days off from work to help my family and me in our time of need and help organize fundraisers for my daughter. My daughter passed away on August 11, 2011, and we were all crushed and still are. Tony continues to provide comfort and support vigorously, despite going through his own personal challenges with the charges that were brought against him....

### Community Outreach and Education

As reflected in the documents attached, over the last several months Tony has developed, on his own, a community outreach program designed to reduce conflictive interactions between the public and law enforcement. He has already started making presentations which have met with remarkable success, and community interest is increasing exponentially. As more fully articulated in his papers, the program proposes the following goals:

1. Initiate an educational program that attempts to educate and form a partnership between law enforcement and the public with a goal of focused change for at-risk members of the public;

2. Educate the youth of the community on the needs and expectations of law enforcement officers when they during mutual interaction;

3. Educate at-risk adults (probation, parole, sex registrants) on the needs and expectations of law enforcement officers when they are being contacted;

4. Educate the general public on the role and profession of a law enforcement offer, explaining law enforcement's needs and expectations that will provide more insight for the non-law enforcement person and

5. Listen and document the community's perceptions of law enforcement and share those perceptions with the law enforcement officers so that they can better understand the public's perception of law enforcement, thus providing continuity and better interconnectivity between them.

The response from the community at large has been tremendous. As shown by the letters attached to this report, Tony's outreach program has thus far garnered the commitment of at least 45 community agencies who have invited him to make his presentation to their members, and the list is growing daily. This includes both law enforcement departments and public service entities which serve the greater Los Angeles Metropolitan area. As of this writing, Tony has a commitment from the community to get this program in front of *three thousand* people, and there are hundreds more "in the pipeline."

Some of these agencies are the Diocese of San Bernardino (Restorative Justice Office), the Desert Hot Springs Police Officers Association, the Palm Springs Unified School District, Movement of Catholic Christian Communities, Prison Fellowship, Teen Challenge, Riverside County Probation Department, the Indio Police Officers Association and Americorps.

Tony also volunteers his time and energy to a foundation established by his sister to assist families who are dealing with the devastating effects of childhood brain cancer.

25

Tony remains willing and able to make this presentation throughout the state and even the nation if given the opportunity. His assessment is that the law enforcement community will benefit the most from the outreach program. He adds:

> The unique part of this training is that I will be able to present my situation to cops in a way that they will be able to see and understand that they have to change their mindsets...and I can effectively alter the minds and opinions of current, active duty officers....I think if we can stop one officer from using excessive force, I will have made a huge contribution back to society, and I don't know how you can place a value on that...

With time constraints created by the scheduled sentencing date, defense contemplated the idea of requesting a continuance of sentencing in order that Tony could demonstrate to the Court the viability and full impact of this outreach program and his sincere commitment to reduce the tension between the law enforcement community and the general public, especially in those areas where the crime rate is excessive due to the high percentage of at-risk individuals.

However, Tony advised defense counsel and the undersigned that he did not wish to postpone sentencing, the reason being that he wished to put the matter behind him as quickly as possible because of the anxiety and stress created by waiting; and he is rather intractable in that stance. Of special significance, however, is a letter submitted by seven officers of the Desert Hot Springs Police Department in which they express their solid commitment that the program will continue even if Tony is incarcerated. Obviously, they would prefer if Tony himself is afforded the opportunity to engage with the community because they believe its effectiveness would be greater if he was front and center. If that is not possible they will do everything they can to assure that the present momentum of this valuable and promising program is sustained.

It is respectfully submitted that the Court consider this outreach program – in combination with home confinement or intermittent confinement – in lieu of imprisonment; or, in the alternative, as a significant factor which warrants a lesser term of total imprisonment.

### Factors Under 18 USC 3553(a)

#### The Nature and Circumstance of the Offense

It is readily acknowledged that the *nature* of these charges is not insignificant, and that Mr. Sclafani, despite his assertion of innocence, stands convicted of conduct in which two individuals were injured during the performance of his duties as a law enforcement officer. The Court, having heard all testimony during trial, will determine whether the evidence weighed by the jury warrants the harsh sentence of imprisonment that has been recommended by the Government, or whether a sanction of lesser severity is proper pursuant to the spirit of *Booker*, which now allows the Court to more comfortably balance accountability with compassion.

It is respectfully asserted that the *circumstances* of this case would suggest the latter alternative. Mr. Sclafani was indeed acting under the color of law, but in that same capacity he was required to make split-second decisions -- real-time choices in every sense of the phrase -- that did not lend themselves to significant preplanning, forethought or lengthy contemplation about results, which were, simply, to control situations which he perceived as being out of control and, by extension, creating unsafe situations. This seems supported by the fact that the criminal acts of which Mr. Sclafani stands convicted have no precedency in his personal or professional life. There is no pattern of abuse that has been established here, especially considering the amount of years that he put into the job. Logic would dictate that abusiveness is a personality trait that cannot be hidden over the course of 42 years. It is not something that simply materializes on a particular weekend and then evaporates forever after.

#### Characteristics of the Defendant

Mr. Sclafani is good and decent man, a staunch Catholic who has practiced his faith every day of his life. He claims neither to be pristine nor without fault, but he has managed by example to raise four wonderful sons, and his public profile is demonstrably one of compassion for others less fortunate. Although now understandably bitter and uncomprehending of the verdict in this case, the contribution he has made towards the safety and security of the community in his

service as a law enforcement officer is something of which he, his family and his former superiors at DHS Police Department are justifiably proud.

<u>The Seriousness of the Offense, Promoting Respect for the Law and Providing Just Punishment</u>

By virtue of his conviction after trial, consequences must obviously follow for Mr. Sclafani. With that reality clearly in focus, it is respectfully asserted that a draconian prison term, which will shut him away for years from the family who needs his presence in their lives, is not necessary given the totality of his service to the community in the past and the promise of what he can offer in the future as contributing member of society. He has the skills, education, aptitude and empathy to reinvent himself in a way which will overcome the obstacles attendant to a convicted felon.

Perhaps it is appropriate to emphasize here what has already been pointed out by others in the criminal justice system, which is that respect for the law is promoted by punishments that are fair, not those that simply punish for punishment's sake or fail to take into consideration the totality of a person's life.

<u>Deterrence in Sentencing</u>

To the extent the Court must consider deterrence when imposing sentence, it seems accepted that a 2-pronged approach is generally applicable: deterrence should be effected with respect to both the offender himself and to others who may find themselves similarly situated.

With respect to the first prong, the loss of Mr. Sclafani's career, the misery and chaos his conviction has brought upon his family and his permanent status as convicted felon will obviate any concern that he will ever again appear in Court. From a strictly pragmatic view, it is noted that Mr. Sclafani will never be in a position where he has authority over others. A hardened sentence need not be imposed to deter Mr. Sclafani from breaking the law.

The second prong, general deterrence, is *supposedly* accomplished when harsh punishment is received in public view, but it is also widely accepted as the least effective and least fair

principle of sentencing because there is little or no consideration of the unique circumstances of the defendant.

In Mr. Sclafani's case, general deterrence will be accomplished by the entirety of the judicial process, including the publicity it generates and the attendant public humiliation his conviction has brought upon him and his family, not to mention that he has exposed himself to incarceration, official oversight in the community for years, and a significant financial sanction. Thus, the exercise of leniency will neither send the implicit message to others that he somehow escaped justice nor will it give the green light for others to act in a similar fashion. It is respectfully posited that a sentence of increased severity need not be imposed in this case to dissuade others.

### The Need To Protect the Public from further Crimes of the Defendant

Mr. Sclafani will not present a danger to the community. As a former law enforcement officer who has faithfully discharged his duties over the course of 20 years, the public has nothing to fear from him. He does not have a criminal mentality and – notwithstanding the instant conviction --he has no history of deliberately harming others. To the contrary, his life story is in complete contrast to the charges for which he must now answer before the Court.

By the measure of all known risk-prediction instruments, Mr. Sclafani will pose no danger to the community.

### Conclusion

Mr. Sclafani has been brought to his knees. He is broken. With the finding of a jury, his significant achievements, attained through extraordinarily hard work, focused vision, dedication and perseverance have been practically effaced. To be in his presence is to see a picture of abject, soul-crushing defeat.

Despite what may have been perceived by the jury, Mr. Sclafani is not a sadistic individual who takes pleasure in the suffering of others. If his life story conveys nothing else, it should serve as testament to that fact.

Having been exposed to some rather harsh corporeal punishment at the hands of his own father, he has assiduously avoided repeating that behavior with his own sons, and he has prided himself on his ability to control his emotions at all times, especially in the performance of his duties as a law enforcement officer who has undoubtedly faced countless situations which could have easily provoked an overly forceful response.

It is worth repeating that no one in Mr. Sclafani's personal or professional life has ever witnessed --not even for a second --the kind of behavior which could be perceived as a precursor to the allegations which bring him before the Court facing a possible sanction of years in prison. It seems logical that if he was predisposed to this type of conduct, it would have manifested itself at some point, but it has not.

What is abundantly clear is that this defendant has devoted all of his adult life to law enforcement and the principles it embraces. The journey has not been a cake walk; there have been stumbles along the way and mistakes made for which he has paid his dues, but nothing which approaches the acts of which he has been convicted; they stand in glaring contrast to every aspect of his life. Every life has certain elements that remain constant, such as values instilled in childhood, cultural mores, upbringing, self-motivation, single-mindedness, self-sacrifice, drive, spirituality and devotion to family. In the instant case, these intrinsic elements define Mr. Sclafani.

Assuming that a sentence of imprisonment will be imposed, it respectfully requested that the Court consider in mitigation the tremendous contribution Tony has made to society simply by virtue of 20 years in the field of law enforcement, as well his commitment to reduce conflictive interactions in the community through an outreach program which has tremendous potential. As stated in the Introduction to this report, there is no way to sufficiently gauge the extent to which any one officer has protected the community. It cannot be measured in terms of arrests effected, or citations issued or accidents investigated. An officer's true value is society's

30

knowledge and confidence that he or she is simply there to protect and serve, and Tony has been there –and doing that -- for 20 years. That should certainly count for something.

If the Court has any questions about this report, please feel free to contact me.

Respectfully submitted,

*Kent R Costley*
KENT R COSTLEY