ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
STEVEN M. ARKOW (California Bar No. 143755)
MARGARET L. CARTER (California Bar No. 220637)
    1100/1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6975/7413
    Facsimile: (213) 894-6269/6436
    E-mail:   steven.arkow@usdoj.gov
              maggie.carter@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>            v.<br><br>ANTHONY SCLAFANI,<br><br>            Defendant. | CR No. 10-163-TJH<br><br>GOVERNMENT'S SENTENCING POSITION AND RESPONSE TO DEFENDANT'S OBJECTION TO PRESENTENCE REPORT AND SENTENCING MEMORANDUM; DECLARATION OF STEVEN M. ARKOW; EXHIBITS<br><br>Sentencing Date: July 23, 2012<br>Sentencing Time: 10:00 a.m. |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby files the government's sentencing memorandum and response to Defendant Anthony Sclafani's Objections To Presentence Report And Sentencing Memorandum filed on June 25, 2012 (Docket No. 157) and the Defendant's Objections to Presentence Report And Sentencing Memorandum (Amended) filed June 25, 2012 (Docket No. 158) ("Def. Mem."). The following memorandum respectfully requests that the Court sentence

1  defendant to a term of 108 months imprisonment, a three-year

2  period of supervised release, a $15,000 fine, and a $200 special

3  assessment.

4       The government's sentencing memorandum and response are

5  based on the attached memorandum of points and authorities,

6  testimony and evidence presented at trial, and the files and

7  records in this matter.

8  DATED: July 13, 2012            Respectfully submitted,

9                                  ANDRÉ BIROTTE JR.
                                    United States Attorney

10                                 ROBERT E. DUGDALE

11                                 Assistant United States Attorney
                                    Chief, Criminal Division

12

13                                 _____/s/_____
                                    STEVEN M. ARKOW

14                                 MARGARET L. CARTER
                                    Assistant United States Attorney

15

16                                 Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

                                                                PAGE

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . .  ii

I.    INTRODUCTION.. . . . . . . . . . . . . . . . . . . .   1

II.   ARGUMENT.. . . . . . . . . . . . . . . . . . . . . .   4

      A.   APPLICABLE LAW. . . . . . . . . . . . . . . . .   4

      B.   GUIDELINES ANALYSIS.. . . . . . . . . . . . . .   5

      C.   ANALYSIS OF 18 U.S.C. § 3553(a) FACTORS.. . . .   8

           1.   Nature and Circumstances of the Offense. . .   8

           2.   History and Characteristics of Defendant.. . .  16

           3.   Need for the Sentence Contemplated.. . . . . .  24

      D.   IMPOSITION OF A FINE. . . . . . . . . . . . . .  26

      E.   SUPERVISED RELEASE TERM.. . . . . . . . . . . .  27

IV.   CONCLUSION.. . . . . . . . . . . . . . . . . . . . .  28

i

**TABLE OF AUTHORITIES**

**FEDERAL CASES:**                                            **PAGE(S)**

United States v. Carty, 520 F.3d 984 (9th Cir. 2008). . . . .   5

United States v. Gall, 552 U.S. 38 (2007).. . . . . . . . . .   5

United States v. Robinson, 20 F.3d 1030 (9th Cir. 1994).. . . 26


**FEDERAL STATUTES:**

18 U.S.C. § 242.. . . . . . . . . . . . . . . . . . 1, 2, 5

18 U.S.C. § 3553(a).. . . . . . . . . . . . . . . . . . passim


**UNITED STATES SENTENCING GUIDELINES:**

U.S.S.G. § 2A2.2. . . . . . . . . . . . . . . . . . . 5, 6

U.S.S.G. § 2H1.1. . . . . . . . . . . . . . . . . 5, 6, 17

U.S.S.G. § 3A1.1. . . . . . . . . . . . . . . . . . . 2, 6

U.S.S.G. § 3A1.3. . . . . . . . . . . . . . . . . . . 2, 6

U.S.S.G. § 3C1.1. . . . . . . . . . . . . . . . . . . . 7

U.S.S.G. § 3D1.4. . . . . . . . . . . . . . . . . . . . 6

U.S.S.G. § 5D1.2. . . . . . . . . . . . . . . . . . 2, 27

U.S.S.G. § 5D1.3. . . . . . . . . . . . . . . . . . . 27

U.S.S.G. § 5E1.2. . . . . . . . . . . . . . . . . 2, 26, 27

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

On February 17, 2012, a jury convicted defendant Anthony Sclafani ("defendant") of two counts of depriving an individual of rights under the color of law, in violation of 18 U.S.C. § 242. Defendant, a police sergeant and watch commander at the Desert Hot Springs Police Department ("DHSPD"), abused his authority when he willfully used excessive force, by pepper spraying and shocking with a Taser gun two arrestees on two consecutive days, without any lawful justification.

At trial, the government proved beyond a reasonable doubt that defendant pepper sprayed and tased the victim, Jamal White ("White") — while White was handcuffed and in custody at the DHSPD jail — out of anger, because White had been mouthing off at defendant, and for no legitimate law enforcement purpose.[1] The government also proved that, on the very next day, defendant illegally pepper sprayed and tased victim Angelica Vargas ("Vargas"), who was also in police custody at the DHSPD jail and was too drunk to run or walk on her own. Thereafter, defendant sought to cover up his misconduct by falsely describing the victims' conduct in his police reports to make the force appear justified and, in the case of the Vargas incident, by approving false statements in his subordinate's use-of-force report.

The United States Probation Office has calculated defendant's advisory sentencing guidelines (the "guidelines" or

---

[1]  Because this Court presided over the trial, the government summarizes trial testimony and exhibits herein only as necessary to support its arguments and sentencing recommendation.

1

1  "U.S.S.G.") range to be 87 to 108 months based on a total

2  offense level of 29.  (PSR ¶ 74.)  The Probation Office's

3  Recommendation Letter recommends that the Court sentence

4  defendant to 87 months in prison, and that the Court also impose

5  one year of supervised release and no fine.  (Rec. Letter at 1.)

6      The government concurs with the factual findings and

7  guidelines calculation, with the exception set forth more fully

8  in the Government's Objection to the Presentence Report (Docket

9  No. 154), in which the government maintains that, because the

10  victims were either handcuffed and in custody or restrained in a

11  jail cell and in custody, the appropriate offense level

12  calculation under the guidelines should include a two-level

13  upward adjustment for offenses involving restraint of the

14  victims, pursuant to U.S.S.G. § 3A1.3, or alternatively, a two-

15  level upward adjustment for offenses involving vulnerable

16  victims, pursuant to U.S.S.G. § 3A1.1.  The government's

17  proposed guidelines calculation results in a total offense level

18  of 31 and an advisory guidelines range of 108 to 135 months.

19  The applicable advisory fine range is $15,000 to $150,000,

20  U.S.S.G. § 5E1.2, and the advisory range for a term of

21  supervised release is 1 to 3 years, U.S.S.G. § 5D1.2.  The

22  government submits that the Court should impose a sentence of

23  108 months imprisonment, a three-year period of supervised

24  release, a fine of $15,000, and a $200 special assessment.

25      Despite stipulating that he would file any objections to

26  the Presentence report by April 20, 2012 (see Docket No. 151),

27  on April 24, 2012, four days after the deadline, defendant filed

28  a Notice re Objections to Presentence Investigation Report

2

1  (Docket No. 155) in which defendant made no objections and

2  stated that he had no objections to the calculations in the PSR.

3  On June 25, 2012, over two months after the deadline, defendant

4  filed Objections to Presentence Report and Sentencing Memorandum

5  in which he stated that he had no objections to the calculations

6  in the PSR, but did object to factual statements in paragraphs

7  16 and 19 of the PSR.  (Def. Mem. at 1-3.)  Defendant does not,

8  other than to say that he agrees with the calculations in the

9  PSR, dispute the government's contentions that the Court should

10  also apply additional upward adjustments for either restraint of

11  victim or vulnerable victims.  Defendant makes no sentencing

12  recommendation, other than to ask for "punishment substantially

13  below the sentence suggested in the Sentencing Guidelines."

14  (Def. Mem. at 1.)

15      The government submits that it is necessary in this case to

16  impose a significant sentence of 108 months imprisonment, which

17  represents the low end of the guideline range as calculated by

18  the government, and the high end of the guidelines range

19  calculated by the probation office.  Defendant intimidated,

20  abused, and repeatedly assaulted two helpless victims who were

21  in his custody at the jail in two separate incidents without any

22  lawful justification.  To cover up his illegal conduct, he then

23  concocted lies that the victims were combative and physically

24  resistant to justify his uses of force. In one of the incidents,

25  he conspired with a rookie officer under his supervision to

26  submit a false use-of-force report supporting defendant, which

27  defendant then approved.  The government also submits that a

28

3

1  guidelines fine of $15,000 and guidelines supervised release

2  term of three years should also be imposed.

3      The Court should reject defendant's arguments for a lenient

4  sentence significantly below the guidelines because it is based

5  upon false premises that, first, that police officers somehow

6  deserve significantly less time for abusing their police powers

7  simply because they are police officers, and, second, that

8  defendant was otherwise a blameless officer.  It is, if

9  anything, aggravating that defendant was a supervising police

10  officer who violated citizens' rights after being entrusted with

11  the public's protection, and there is no reason in either the

12  guidelines applicable to civil rights violations or in any

13  sentencing consideration or public policy that would justify

14  giving trained law enforcement officers in positions of power

15  less punishment when they abuse their power for no legitimate

16  law enforcement purpose.  Moreover, and as explained in greater

17  detail below, defendant's service record is not blameless, but

18  in fact shows a prior incident in which defendant committed

19  misconduct and then lied, manipulated evidence, intimidated his

20  partner, and discouraged victim reporting in order to cover up

21  his misconduct.  This, along with defendant's attempts to blame

22  others by continuing to state that he was "following policy"

23  warrants the 108-month sentence that the government recommends.

24                              **II.**

25                          **ARGUMENT**

26  A.    APPLICABLE LAW

27      The federal statute governing sentencing requires district

28  courts to calculate the applicable guidelines range, use that

range as the "initial benchmark" as to what an appropriate sentence would be, and then determine the sentence to impose by considering both the guidelines and the sentencing factors enumerated by Congress.  18 U.S.C. § 3553(a); United States v. Gall, 552 U.S. 38, 49-50 (2007) ("[T]o secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. . . . [T]he district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party."); United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) ("[T]he guidelines are the starting point and the initial benchmark, and are to be kept in mind throughout the process.").  As further stated below, a significant sentence of 108 months in prison is necessary to advance the goals of sentencing as set forth in section 3553(a).

B.     GUIDELINES ANALYSIS

The government submits that the applicable offense level calculation under the guidelines is 31 and that the applicable advisory guidelines range is 108 to 135 months:

**Base Offense Level U.S.S.G. §2H1.1:**

| | | |
|---|---|---|
| Base Offense Level for Underlying Offense | 14 | [§ 2A2.2] |
| Dangerous Weapon Used | +4 | [§ 2A2.2(b)(2)(B)] |
| Bodily Injury to Victim | +3 | [§ 2A2.2(3)(A)] |
| Total Base Offense Level | 21[2] | [§ 2H1.1(a)(1)] |

---

[2]     A base offense level of 21 applies because the guideline addressing 18 U.S.C. § 242 is U.S.S.G. § 2H1.1, which uses as a base offense level the offense level applicable to the underlying offense if it is greater than those specified in

| | | |
|---|---|---|
| **Specific Offense Characteristics:** | | |
| Color of Law | +6 | [§ 2H1.1(b)(1)(B)] |
| **Adjustments:** | | |
| Restraint of Victim Adjustment | +2 | [§ 3A1.3] |
| Multiple Count Adjustment | +2 | [§ 3D1.4] |
| **Total Offense Level:** | **31** | |

The government concurs with the PSR's calculations as far as

they go (PSR ¶¶ 25-39), but contends, for reasons fully set

forth in the government's Objection to the PSR (see Docket No.

154), that defendant should receive an additional two-level

increase for victim restraint, pursuant to U.S.S.G. § 3A1.3, or,

in the alternative, for victim vulnerability, pursuant to

U.S.S.G. § 3A1.1(b)(1).  With the inclusion of either of these

two-level increases, defendant's total offense level is 31, his

criminal history category is I (PSR ¶ 44), and the sentencing

guidelines range is 108 to 135 months.

The government's guidelines calculation is a conservative

one.  The government is not seeking the application of both

victim adjustments, even though case law arguably supports

applying both here.  (See Docket No. 154 at 10-11, fn. 3 (citing

cases).)  The Court should, however, consider all of the reasons

why the victims here were both restrained and vulnerable when

evaluating the factors set forth in 18 U.S.C. § 3553(a),

including that both victims had been arrested by the DHSPD and

were under the custody and control of defendant, that

Jamal White was handcuffed in a jail, that Angelica Vargas was

---

§ 2H1.1(a)(2) and (3).  Here, the underlying offense is
aggravated assault, addressed by U.S.S.G. § 2A2.2.  (PSR ¶ 25.)

1  in a locked jail cell when defendant pepper sprayed her, that

2  she was too intoxicated to stand or walk on her own, that she

3  was a 5'3", overweight woman, and that at the time defendant

4  tased both victims, they had already been debilitated when

5  defendant pepper sprayed them in the face and eyes.  PSR ¶¶ 10-

6  12 and 15-17.  Each of these is an aggravating factor that

7  illustrates the severe nature and circumstances of defendant's

8  offenses and which support the government's request for a

9  significant custodial sentence of 108 months.

10  The government also has not sought application of an upward

11  adjustment for obstruction of justice pursuant to U.S.S.G.

12  § 3C1.1, even though it is clear from comparing the jury's

13  verdicts at trial to the use-of-force reports that defendant

14  wrote and approved that defendant lied and encouraged another to

15  lie to justify his use of force, by, among other things, falsely

16  indicating that White physically assaulted him and that Vargas

17  attempted to escape, by failing to disclose in his report all of

18  the times that he tased Vargas, and by approving a report by

19  Matthew Gutting ("Gutting") that made no mention of defendant's

20  own use of force against Vargas.[3]  (Declaration of Steven M.

21  Arkow ("Arkow Decl."), Ex. A at A-7 to A-10.)  Defendant's

22  conduct in this regard should be considered as an aggravating

23  factor under § 3553(a), for the reasons further set forth below.

24  _____

25  [3]    If the obstruction enhancement was included,
defendant's resulting offense level would increase to level 33,

26  resulting in a guidelines range of 135 to 168 months.  If the two
victim enhancements (restraint and vulnerable status) and

27  obstruction adjustment were all included, defendant's resulting
guidelines offense level would increase to level 35, resulting in

28  a guidelines range of 168 to 210 months.

1  C.   ANALYSIS OF 18 U.S.C. § 3553(a) FACTORS

2       1.   Nature and Circumstances of the Offense

3       The nature and circumstances of defendant's offenses merit

4  a significant 108-month sentence because they illustrate many

5  aggravating factors. These include that defendant, a police

6  supervisor entrusted with protecting the public, disregarded his

7  sworn duty and abused both his position of power and the weapons

8  entrusted to him by repeatedly using them against a handcuffed

9  victim in defendant's custody and a woman who was too drunk to

10  walk or stand on her own, all because he was angry at or annoyed

11  with the victims, and for no legitimate law enforcement purpose.

12  Defendant pepper sprayed and tased both victims repeatedly,

13  following the same general pattern during two incidents on two

14  consecutive nights, and causing excruciating pain and

15  humiliation for the victims, including, in the case of Angelica

16  Vargas, long-term injury to her leg. Moreover, the

17  circumstances here show that defendant then lied about his

18  behavior by writing false reports in which he omitted key facts

19  and fabricated victim conduct to justify his unlawful use of

20  force. Defendant also covered up his own misdeeds by approving

21  reports written by his supervisee Gutting, which also contained

22  false information.

23       The Probation Office properly notes that it is aggravating

24  that defendant pepper sprayed and then twice tased each victim,

25  tasing a second time while the victim was still suffering the

26  effects of the pepper spray and the initial tase. (Rec. Letter

27  at 2; PSR ¶¶ 10-12 and 15-17). Indeed, former DHSPD Officer

28  Dennis Decker ("Decker") testified at trial (and defendant does

1  not dispute similar statements in the PSR) that, although victim

2  Jamal White was writhing on the ground and moaning in pain after

3  defendant first tased him, defendant ordered White to get up or

4  defendant would tase White again.  (PSR ¶ 12.)  Because White

5  was handcuffed behind his back on the ground, he was physically

6  unable to get up on his own.  Defendant then fired his Taser,

7  this time striking White in the dart mode, again causing White

8  to suffer pain, and his muscles to convulse.  (Id.; Arkow Decl.,

9  Ex. B at 481).  As for Ms. Vargas, defendant pepper sprayed her

10 and then threw her back into her cell without providing

11 decontaminant, although he then opened all of the jail doors to

12 air out the pepper spray smell for himself and other officers

13 (PSR ¶ 15).  Defendant thereafter opened Ms. Vargas's cell door,

14 and he and Gutting tased her multiple times.[4]  The fact that the

15 two assaults occurred on consecutive nights and followed roughly

16 the same pattern (pepper spraying followed by multiple tasings)

17

18     [4]    Defendant's use-of-force report states that he deployed
   his Taser twice against Ms. Vargas, once with "no effect" and

19 then with "little effect" and does not mention that Gutting also
   tased.  (Arkow Decl., Ex. A at A-8.)  Gutting's use-of-force

20 report states that he deployed his Taser only once against Ms.
   Vargas without "any affect on her" and does not mention that

21 defendant tased Ms. Vargas.  (Id., Ex. A at A-10.)  Contrary to
   the reports, the downloads for their Taser guns show that Gutting

22 tased Vargas first, followed by defendant who activated his Taser
   for three complete cycles over the course of forty  seconds.

23 (PSR ¶ 16; Arkow Decl., Ex. B at B-30 & B-31 (Taser downloads);
   see also id., Ex. B at B-33 to B-34 & B-36) (case audit showing

24 repeated changing of number of Taser cartridges booked into
   evidence).)  Photos show that Ms. Vargas was hit by a Taser in

25 left breast (Gov't Trial Ex. 3 (photo not attached here due to
   its sensitive nature)), and Gutting admitted at trial that he hit

26 Ms. Vargas in the back or shoulder area.  Finally, Ms. Vargas
   testified in a deposition that she was tased twice, causing pain

27 to her chest and such inability to control her bladder that she
   urinated on herself.  (Arkow Decl., Ex. C at C-49 to C-60 & C-67

28 to C-70.)

1   is also aggravating as it suggests a course of conduct by or
2   common practice of this defendant.
3        Defendant's crimes are also extremely serious because of
4   their callousness.  Defendant illegally assaulted the two
5   victims because he was angry at or annoyed with them, and not
6   for any legitimate law enforcement purpose.  Far from "following
7   policy" as defendant still maintains that he has done (e.g.,
8   Def. Mem., Ex. B at 8, 10), defendant's own witness, DHSPD
9   Internal Affairs investigator Daniel Tregarthen, who admitted at
10  trial to a tendency to disbelieve the victims here, nevertheless
11  testified that there was no possible legitimate reason for
12  pepper spraying Jamal White.  Dennis Decker and Jamal White both
13  testified that defendant tased White repeatedly because
14  defendant was angry with White for mouthing off, and for no
15  legitimate law enforcement reason.  The jury thoroughly rejected
16  defendant's and Gutting's preposterous defense that Ms. Vargas
17  was attempting to escape from the DHSPD jail, and defendant's
18  own expert witness, Norm Fort, testified that Ms. Vargas would
19  have been too drunk to walk or stand on her own at the time that
20  defendant pepper sprayed and tased her.  Even Gutting testified
21  that there would have been no legitimate law enforcement reason
22  for defendant to have tased Ms. Vargas after Gutting did.
23       Defendant's treatment of the victims after he inflicted
24  pain and humiliation on them also shows the callousness of his
25  crimes.  While White was moaning and writhing in pain after
26  having been tased the first time, defendant told him to get up
27  or defendant would tase White again, even though White could not
28  get up because he was handcuffed.  (PSR ¶ 12.)  Decker testified

1  that even after Ms. Vargas (the supposed escape risk) had been

2  cited and released and was sitting in the lobby with nowhere to

3  go with no transportation in her underwear and a see-through

4  paper jumpsuit, defendant was ranting about how Ms. Vargas was

5  still in the police station.  Although the lobby was open to the

6  public 24 hours a day and recently released arrestees frequently

7  waited there, Detective Eddie Cole testified that Ms. Vargas was

8  thereafter found wandering on the street outside, still with no

9  transportation and nowhere to go, and still wearing only

10  underwear and a paper jumpsuit.

11       As previously discussed herein and in the government's

12  prior filing, it is also aggravating that both victims were

13  under defendant's custody and control because they were

14  arrestees, held in police custody, in a jail.  Victim White was

15  handcuffed, and victim Vargas was locked in a jail cell when

16  assaulted.  (See PSR ¶¶ 10, 12, 15.)  Both victims were also

17  vulnerable when they were tased because at that point, defendant

18  had already pepper sprayed them both in the face and eyes.  (PSR

19  ¶¶ 10, 15.)  In addition, victim Vargas was a 5'3" overweight

20  woman who was too intoxicated to stand or run on her own.

21  (Arkow Decl., Ex. B at B-12).

22       As the Probation Office correctly notes (Rec. Letter at 2),

23  defendant's crimes are more egregious because he was a

24  supervising officer.  Defendant was a sergeant and watch

25  commander with supervisory authority over all of the other

26  officers on duty on the night of the assaults, and with the

27  power to approve reports about the assaults.  He was not only

28  acting as a police officer who betrayed the public trust and

11

1  disregarded his duty to serve and protect, but as a police

2  officer to whom other officers look to as an example, and whose

3  authority kept other officers (such as Decker, who testified

4  that he did nothing and said nothing about the White incident

5  because defendant was a sergeant) from intervening to stop the

6  assault on the victims here.

7       A comparison of defendant's and Gutting's use-of-force

8  reports to the evidence at trial shows that defendant abused his

9  role even further by covering up his crimes after the fact by

10  falsely describing the victim conduct in his police reports to

11  make it appear that they were being combative or resistant in

12  order for defendant to justify his pepper spraying and tasing

13  and to cover up his excessive force.  For instance, defendant

14  (contrary to the trial testimony of both White and Decker)

15  claimed that once he placed White, already handcuffed, on the

16  bench inside the booking area of the station, White tried to

17  spit at and kick defendant.  (Id., Ex. A at A-7.)  Defendant

18  also claimed that Ms. Vargas was "banging her head against the

19  walls and doors of the cell" and that he needed to use force "to

20  restrain her so she could not hurt herself." (Id., Ex. A at

21  A-8.)  Trial evidence illustrated, however, that the cell walls

22  were concrete and the doors were metal, there were no

23  photographs of injuries to Ms. Vargas's head, no reports of

24  injuries or bruises to her head, and defendant never requested

25  that she receive medical attention.  Defendant's report also

26  fails to mention that Gutting also tased Ms. Vargas, even though

27  it happened right of front of defendant.  Gutting also testified

28  both that he and defendant met by themselves in the watch

commander's office for about 20 minutes after the incident to discuss how to document the uses of force against Ms. Vargas and that defendant approved Gutting's report.  Like defendant's, Gutting's report fabricates a supposed escape by Vargas and makes no mention of defendant's use of force.

Along with the jury's convictions, these false reports belie defendant's continued insistence that he was somehow following a too-lenient DHSPD policy.  (Compare, e.g., Def. Mem., Ex. B at 8, 10, with, e.g., Arkow Decl., Ex. B at S566 (Trial Ex. 12 (DHSPD Policy Re: Control Devices and Techniques) §§ 308.52 ("All Taser discharges shall be documented in the related arrest/crime report") & Ex. B at S579 (Trial Ex. 15 (DHSPD Policy Re: Report Preparation) § 344.11 ("All reports shall accurately reflect the identify of the persons involved, all pertinent information seen, heard or assimilated by any other sense, and any actions taken.").)  They constitute an attempt to cover up and blame the victims of defendant's crimes and are aggravating factors that weigh in favor of the significant sentence within the guidelines range.

The three relatively minor factual objections that defendant makes to the PSR should in no way change the Court's analysis of the seriousness of defendant's crimes.  There appears to be no dispute that the Taser download printouts introduced at trial establish that defendant activated his Taser three times in attempts to tase Ms. Vargas, and that he did so over the course of forty seconds (see Def. Mem. at 2.).  The government submits that this is the proper reading of PSR ¶ 16. The jury's verdict on Count Two also settles any dispute that

1   defendant's tasing of Ms. Vargas was in any way justified.

2   Together these things are sufficient to show that defendant made

3   multiple attempts to tase a woman too drunk to run, with no

4   justification, and that, just as when he tased Mr. White (Arkow

5   Decl., Ex. B at B-45), defendant did so over a relatively long

6   period of time — his assault on Ms. Vargas was not an encounter

7   involving one "split-second" decision.  (Compare Def. Mem.,

8   Ex. A at 28 & Ex. C at 68 with Arkow Decl., Ex. B at B-30.)

9        The government submits that there is also significant

10   evidence that shows that defendant tased after Gutting and that

11   he made contact at least once.  Defense witness Tregarthen

12   established that the Taser download reports for the Vargas

13   incident were downloaded by the same DHSPD officer (Radames Gil)

14   on the same day, and were thereafter relied upon during a DHSPD

15   internal affairs investigation, and that no lack of

16   synchronization was ever noted.  After being recalled by the

17   defense, expert Greg Meyer testified that the officer

18   downloading the reports would have seen whether there was any

19   "time drift" between the time clock inside a Taser and the time

20   clock in the downloading computer, which means that Gil would

21   have seen whether Gutting's and defendant's Tasers were out of

22   synch.  Defense witness Andrew Hinz, the Taser technical

23   services expert who inspected the only set of Taser probes DHSPD

24   produced to the government, also established that those probes

25   completed a circuit, which means that a debilitating, painful

26   electric current of about nineteen pulses per second did in fact

27   course through Ms. Vargas's body for at least one of cycles.

28   Finally, Ms. Vargas testified in a civil deposition that she

14

felt the shock of the Taser two separate times.  (Id., Ex. C at C-53 to C-56 & C-68 to C-69.)

Defendant also contends that the statement in PSR ¶ 19 of the PSR that "Vargas reported that she suffered bruises and a torn ligament in her ankle as a result of the offense," is somehow incomplete or misleading because it fails to account for an earlier medical report shortly after the incident, on March 16, 2005, which states that Ms. Vargas reported that "in the process she was maced and she somehow sprained or twisted her right ankle," and that Ms. Vargas's ankle "revealed no evidence of fracture, only soft tissue swelling."  (See Def. Mem. At 3.)  The government submits that omitting these statements does not make the PSR misleading because the PSR makes clear that information regarding Vargas's torn ligament come from Vargas's later statements to FBI agents and were based on a later examination that Vargas had after she had returned to Arizona.  (PSR ¶ 19.)  The omitted statements are not mutually exclusive — a fracture is not the same thing as a torn ligament, which is consistent with "soft tissue swelling" reported in the earlier medical report.  Moreover, as the Probation Officer concluded, they make no meaningful difference to the Court's analysis of the victim impact of defendant's crimes. (See Second Addendum to PSR (Docket No. 161).)  Moreover, there can be no doubt that Ms. Vargas's leg injury was in fact severe because it is undisputed that the ankle remained swollen three years after she was tased (PSR ¶ 19), and, indeed, was also swollen and painful at the time of Ms. Vargas's civil deposition in 2011. (Arkow Decl., Ex. C at 40-44, 60-61, 75.)

15

1          2.   History and Characteristics of Defendant

2          Section 3553(a)(1) states that the Court shall consider the

3     "history and characteristics of the defendant."  The

4     government's recommended sentence incorporates this factor

5     because, to whatever extent mitigating circumstances exist here,

6     they are accounted for by the government's conservative

7     guidelines calculation and its recommendation for a sentence

8     that is at the low end of its guidelines calculation and within

9     the guidelines range calculated in the PSR.  Moreover, there are

10    significant aggravating factors here, including that defendant

11    as a supervisory officer knew better, and that — contrary to his

12    assertions that his crimes here were aberrant — defendant has

13    previously committed misconduct and then manipulated evidence

14    and dissuaded witnesses from coming forward in an attempt to

15    cover it up.  The Court should flatly reject the pleas for

16    probation in letters submitted by defendant's family and former

17    colleagues, because the writers do not appear to know about or

18    accept either the circumstances of the crimes here or

19    defendant's past attempts to cover up misconduct.  The Court

20    should also reject defendant's plea to counsel law enforcement

21    and the public on use-of-force issues — presumably in lieu of a

22    significant custodial sentence — because his proposal shows a

23    total lack of understanding of his crimes, a failure to accept

24    responsibility by blaming DHSPD policies, and a willingness to

25    blame victims and the public for police misconduct.

26         It is an aggravating, not mitigating, factor that defendant

27    was a police supervisor who had been working as a sworn officer

28    since 1990.  As discussed in greater detail above, defendant's

16

1  position as sergeant gave him a greater public trust, greater

2  influence over officers that he supervised, greater

3  responsibility for the welfare of victims White and Vargas, and

4  greater ability to act with impunity and attempt to cover up any

5  misconduct.  He abused his elevated position when he committed

6  the crimes at issue in this case, and as a sergeant and veteran

7  officer, he knew better.  His betrayal of the public trust in

8  this case is therefore particularly egregious.

9         The Court should therefore reject the argument submitted in

10  the privately paid-for report authored by Kent Costley (the

11  "Costley report") (Def. Mem., Ex. A), that would essentially

12  give all veteran police officers reduced sentences even in

13  police misconduct cases where they violated the constitutional

14  rights of citizens that they were sworn to protect.  Costley

15  argues that Sclafani's service as a police officer warrants a

16  sentence "substantially below the calculated guideline range."

17  (Def. Mem., Ex. A at 3.)  He makes clear that this argument

18  applies to veteran police officers generally: "[T]he full

19  measurement of any officer's contribution to the public . . . is

20  found in the very nature of the job[.]"  (Id. at 2-3.)  There

21  is, however, simply no basis in sentencing law for such a

22  proposition and to accept it would be to weaken the enforcement

23  of civil rights laws in all police cases.  Nothing in the

24  sentencing guidelines or § 3553(a) suggest that police should

25  get a reduced sentence for civil rights violations because they

26  serve the public.  To the contrary, the guidelines consider this

27  factor and provide for a six-level enhancement when civil rights

28  violations are committed under color of law.  U.S.S.G.

17

1    § 2H1.1(b)(1)(B).  This makes sense because police officers are

2    given a solemn trust when they are given weapons to use against

3    the public.  It is a fundamental part of the job to use those

4    weapons only when necessary.  When that trust is violated,

5    police officers should not receive lenient treatment, but

6    instead the significant sentences recommended in the guidelines.

7         The rest of the Costley report should also be accorded

8    little weight because it is filled with self-serving statements

9    from defendant, is clearly an attempt to present a favorable

10   rather than objective profile of the defendant, and is

11   inconsistent with the objective evidence before the Court.

12   Notably, the government requested, but defendant has not

13   produced the interviews and discussions relied on in the report

14   for evaluations and opinions, and defendant has also refused to

15   provide information concerning the compensation paid for the

16   report.  (Arkow Decl. ¶¶ 7-10).

17        It is also aggravating that defendant does not have the

18   blameless record that he claims, but instead previously engaged

19   in police misconduct and tried to cover it up instead of taking

20   responsibility.  In 2000, while a deputy sheriff in Riverside

21   County, defendant improperly discharged his firearm on a call,

22   shooting through two private residences, including an infant's

23   nursery at a neighboring house.  (See Arkow Decl. ¶ 5 & Ex. D.)

24   Instead of reporting the discharge of his weapon, as required by

25   department policy, defendant instead tried to hide it by

26   plugging up the bullet hole with toothpaste.  (Id., Ex. D at D-81

27   to D-82.)  When he was confronted at the scene by his partner on

28   the call, defendant told the deputy, who was relatively new and

18

1   considered defendant to be a mentor, to "just get the fuck out."

2   (Id. at D-80 & D-82.)  When his partner further asked defendant

3   if he smelled any burnt gun powder, defendant lied and said he

4   did not.  (Id. at D-80.)  Defendant's bullet went not only went

5   through the wall in the residence where defendant shot it, but

6   the bullet flew into the neighbor's house and pierced through

7   one child's room, flew through another child's nursery, through

8   another door into a bathroom, and landed in the bathtub.  (Id.

9   at D-77.)  Defendant did not initially go to the neighbor's

10  house or make any attempt to see if the residents were safe.

11  Later that day, the mother in the neighboring house called 911

12  to report that a bullet had been shot into her home.  Defendant

13  responded to the call.  Defendant saw that his bullet had

14  penetrated through the walls of this woman's house and into the

15  children's room and nursery.  The woman wanted defendant to

16  investigate the shooting and press charges, but defendant —

17  knowing full well that he had fired the shot — dissuaded her,

18  telling her that although "he was a father also, so he

19  understood her concern," it would be hard to prove who shot the

20  bullet.  (Id. at D-77.)  Defendant was required to take

21  photographs of the bullet holes, which he did, but then

22  destroyed the film. (Id. at D-82.) Defendant was fired, having

23  previously been fired from his prior job as a police officer at

24  the Fontana Police Department for not meeting standards. (Def.

25  Mem., Ex. A at 9.)

26      Defendant's behavior reveals a mind set that chooses

27  dishonesty to avoid having to answer to his own misconduct.

28  This in turn shows a lack of respect for the law and a need for

19

1  a significant sentence for deterrence.  When defendant applied

2  to become a police officer with DHSPD, he minimized his firing

3  from the Riverside Sheriff's Department as a "policy violation,"

4  rather than answering the application question completely and

5  honestly. (Arkow Decl., Ex. E at E-85.)  Even in his sentencing

6  papers, in which defendant cites his devotion to his own family

7  and claims that the offense conduct was aberrant, defendant

8  makes no mention of the danger that he caused another family or

9  that he dissuaded a mother from investigating a shooting into

10  her children's bedrooms in order to hide his own misconduct.

11  Instead, the incident is mentioned only in the Costley report,

12  which states that defendant told Costley only that he did not

13  report the incident until the owner of the house saw the bullet

14  and contacted the police.  (Def. Mem., Ex. A at 11.)

15       Defendant's other personal history and characteristics,

16  including his education, income, and family background, do not

17  warrant a sentence below the guidelines.  (See PSR ¶ 50

18  (defendant reported a happy childhood upbringing, denies any

19  abuse, and remains close with his parents and siblings, seeing

20  them approximately twice each week); PSR ¶ 59 (defendant has a

21  masters degree in Public Administration); PSR ¶ 68 (defendant

22  was regularly employed and his income in recent years averaged

23  more than $200,00); and PSR ¶ 56 (defendant did not report any

24  physical or mental health conditions)).  Indeed, defendant

25  cannot blame his misconduct on an absence of family or community

26  support, mental or physical limiting conditions, or inability to

27  find solid employment.  Moreover, defendant's lack of criminal

28

20

1    history has already been taken into account by the advisory

2    guidelines in his criminal history score.

3        The Court should also reject defendant's claim that his

4    religious faith and love for his own family warrant a lenient

5    sentence substantially below the guidelines.  Certainly, love

6    for one's own family does not meaningfully distinguish defendant

7    from the vast majority of others convicted of these types of

8    crimes, nor is the fact that he does not kick and punch his own

9    sons a mitigating factor warranting a lenient sentence.  (Def.

10   Mem., Ex. A at 31.)  Indeed, these personal factors are not

11   mitigating precisely because they in no way prevented defendant

12   from abusing the authority that was given to him by the public

13   and his police department to commit these crimes.  Indeed,

14   during the Riverside shooting incident, defendant actually

15   invoked his family to dissuade another mother from investigating

16   danger to hers.  (Arkow Decl., Ex. D at D-77.)  Defendant also

17   committed the crimes here even after having had to go home and

18   tell his wife he was fired from two other police departments

19   (see Def. Mem., Ex. A at 11), and knowing full well that

20   committing crimes would negatively impact his family and his

21   ability to spend time with his children (id.).[5]

22       For similar reasons, the Court should attach little weight

23   to letters of support that defendant attaches from family,

24   friends, and colleagues who did not witness the assaults and did

25

26       [5]    Although defendant's incarceration will impact his
     family, it is not the type of impact which would warrant a
27   reduction of his sentence.  Another custodial parent remains in
     the home, and it appears that the family has an extensive support
28   network of family and friends.  (E.g., Def. Mem., Ex. C at 42.)

1   not hear and see all of the evidence presented at trial and

2   developed in this investigation.  (Def. Mem. at 9 & Ex. C.)

3   These letters do not account for the serious nature of this

4   offense or any of the aggravating factors that are present here.

5   Indeed, some of the letters discount the fact that defendant was

6   in fact convicted, stating, for example, "[I] sit in

7   bewilderment at how a case such as Tony's could've resulted in

8   conviction"; "I personally cannot help it but to wonder why the

9   jury discounted DHSPD department policy"; "my opinion of

10  [defendant] has not changed or wavered," and "Tony had followed

11  policy and was still convicted."  (See e.g., Def. Mem., Ex. C at

12  22, 30, 32, 60.)  The Court should discount these letters which

13  rely on defendant's version of events that the jury rejected.

14       The Court should also soundly reject defendant's proposal

15  to create a training program instead of serving a significant

16  prison term as misguided and profoundly insufficient to account

17  for the serious nature of his crimes.  Defendant is ill-equipped

18  to provide excessive force training when he maintains (in the

19  proposed curriculum!) that he was following policy and lacked

20  criminal intent (id., Ex. B at 8, 10); cites an Internal Affairs

21  proceeding in which he was cleared of excessive force without

22  acknowledging that the investigation was influenced by his own

23  false reports regarding the incidents (id., Ex. A at 16); and

24  maintains "[t]here probably were other things that could have

25  been used, although, I still say, even in these two situations,

26  that the options were minimal" (id., Ex. A at 18).

27       In fact, of course, the DHSPD policy regarding excessive

28  force tracks constitutional law on the use of force, and

1  defendant's claims that his force was justified and within

2  policy are contradicted by the policies, the evidence at trial,

3  and most importantly, the jury's verdicts in this case.  (See

4  Arkow Decl., Ex. B at Trial Ex. 11 (DHSPD Policy Re: Use of

5  Force § 300.2) ("[O]fficers shall use only that amount of force

6  that reasonably appears necessary, given the facts and

7  circumstances perceived by the officer at the time of the event,

8  to effectively bring the incident under control.") & B-14 (DHSPD

9  Policy § 308.11) ("When a decision has been made to restrain or

10 arrest a violent or threatening suspect, an approved control

11 device may only be used when its use appears reasonable under

12 the circumstances.").)[6]

13      It is alarming to the government that defendant focuses

14 extensively on training the "at risk" public on how to avoid

15 having forced used on them.  (E.g., Def. Mem., Ex. B at 1 (Steps

16 4 of 6).)  This further shows defendant's tendency to refuse

17 responsibility for his conduct and to blame the victims.

18 Defendant believes that he should lecture citizens "[to] make

19 better decisions when interacting with law enforcement" so "they

20 will not inadvertently display the poor behavior" (id., Ex. B

21 at 4), such as "subject rude to officer's request" (id., Ex. B

22 at 7) that leads to police officer improper use of police force.

23  It is also alarming that so many in law enforcement have

24 endorsed this program when they do not accept the jury's

25

26 _____

27      [6]      Notably, defendant never actually cites the policy that
   he believes justified using force against two victims for no
   legitimate law enforcement reason, and states elsewhere that
28 "[t]he policy manuals were crap."  (Def. Mem., Ex. A at 13.)

23

1  determination of the facts of this case or do not know whether

2  defendant's proposed curriculum properly reflects the facts as

3  the jury has determined them.   (See, e.g., Def. Mem., Ex. C at 2

4  ("we're there to help the public even when they might be a

5  danger to themselves or when they may not understand our role")

6  & 22 ("I personally cannot help it but to wonder why the jury

7  discounted DHSPD department policy").)[7]   If anything, the

8  proposed training program raises the specter of _more_ police

9  officers convicted of civil rights violations because they blame

10 policy or victims for their crimes, not fewer.

11      3.   Need for the Sentence Contemplated

12      All of these circumstances make clear that nothing less

13 than the significant custodial sentence recommended by the

14 government will be sufficient to reflect the seriousness of the

15 offense, promote respect for the law, afford adequate

16 deterrence, and provide just punishment.   Section 3553(a)(2)

17 states that the Court shall consider the "need for the sentence

18 imposed."   Among the relevant considerations are the need for

19 the sentence:

20      (A)   to reflect the seriousness of the offense, to
              promote respect for the law, and to provide just
21            punishment for the offense;

22      (B)   to afford adequate deterrence to criminal
              conduct; [and]

23

24

25      ───────────

26      [7]    Dennis Decker testified that Radames Gil, who authored
        both letters cited here, was a "meat-eater" who used force
        against the public more frequently than other officers, who beat
27      a suspect found hiding under a wheelbarrow for no legitimate law
        enforcement purpose, and who thereafter laughed and joked about
28      doing so.

                                24

(C)   to protect the public from further crimes of the
defendant . . . .

18 U.S.C. § 3553(a)(2).

As discussed above, defendant's crimes were serious and dehumanizing to his victims.  The need to reflect the seriousness of the offense and to provide just punishment are accounted for by the advisory guidelines range of 108 months in prison.

The need for specific and general deterrence is also manifest in this case.  Defendant was a veteran officer and a supervisor when he committed this offense.  His oath to uphold the law and the Constitution was not sufficient to prevent him from abusing his authority and assaulting arrestees who were restrained and in his custody.  Defendant had already committed police misconduct, lied to cover it up, and been previously fired, but nevertheless committed the two instant crimes and falsified his accounts of the victims' behavior to cover up those crimes.  This shows his lack of respect for the law and the need to deter him from future wrongdoing, whether or not he is barred from future police service.

Moreover, a 108-month sentence is necessary as matter of general deterrence to send a message to the public that the police are not above the law, that police misconduct will not be tolerated with the proverbial "slap on the wrist," and to uphold the public's trust in law enforcement.  Indeed, defendant's own letters show the danger of an overly-lenient sentence for this defendant, because so many of them are from currently-serving police officers who cannot accept the jury's verdict and still

fail to understand the wrongness of the defendant's behavior.
Accepting the view of defense profiler Costley that any veteran
police officer should get a pass for civil rights violations
simply because they are police officers simply misapprehends the
nature of the crime, the danger to the public, and damage that
excessive force violations do to law enforcement institutions.
Accordingly, this defendant needs to and should be sentenced to
a significant prison term.  The 108-month guidelines sentence is
sufficient, but not more than necessary, to accomplish all of
these sentencing goals.  Indeed, as stated above, it is a low
end sentence of a conservative guidelines calculation.  To give
a substantially lower sentence would fail to take into account
all of the factors considered by the guidelines, and enumerated
in 18 U.S.C. § 3553(a) as goals of sentencing.

D.   IMPOSITION OF A FINE

A monetary fine should be also imposed in this case.  The
PSR calculates the advisory guidelines fine range as $15,000 to
$150,000.  PSR ¶ 83.  The guidelines presume that the Court
should order a fine, and place the burden on the defendant to
establish inability to pay.  U.S.S.G. § 5E1.2(a) ("The court
shall impose a fine in all cases, except where the defendant
establishes that he is unable to pay and is not likely to become
able to pay any fine.") (emphasis added); United States v.
Robinson, 20 F.3d 1030, 1034-35 (9th Cir. 1994) (stating that
the burden is on the defendant to establish inability to pay a
fine).  According to defendant's self-reported figures set forth
in the PSR, he currently has substantial assets, including over
$71,000 in cash.  PSR ¶ 63.  Based on defendant's financial

1  condition, a fine at the low end of his advisory fine guidelines

2  range, that is, $15,000, is appropriate and will not unduly

3  burden him or his dependents.

4      Should defendant establish that payment of this fine would

5  have an "unduly severe" impact upon him, then the guidelines

6  recommend that the Court place defendant on an installment plan

7  to pay the fine.  U.S.S.G. § 5E1.2(f).  If the defendant cannot

8  pay the fine through the installment plan, the Court should <u>then</u>

9  consider reducing the fine, or imposing an alternative punitive

10  sanction in lieu of a fine.  <u>Id.</u>

11  E.  <u>SUPERVISED RELEASE TERM</u>

12      The Probation Office in this case has recommended a one-

13  year term of supervised release on the ground that defendant is

14  unlikely to recidivate because he is unlikely to ever again be a

15  police officer.  (Rec. Letter at 3.)  The government submits,

16  however, that for the reasons set forth in the § 3553 analysis

17  above, a three-year period of supervised release is warranted.

18  <u>See</u> U.S.S.G. §§ 5D1.2 n.3 & 5D1.3 n.4.  Defendant has committed

19  a serious crime of violence, has abused a significant position

20  of public trust, has taken advantage of vulnerable victims who

21  were totally within his custody and control, has lied and blamed

22  the victims to cover it up just like he covered up past

23  misconduct, and continues to this day to blame his crimes on a

24  too-lenient policy at DHSPD.  Defendant also faces, and should

25  receive, a significant custodial sentence.  It will therefore

26  serve both the deterrence, public protection, and reintegration

27  goals of supervised release for defendant's sentence to include

28  a three-year supervised release term.  Indeed, the government

respectfully submits that if the Court were to accept the
rationale in the Recommendation Letter, a one-year term of
supervised release would be warranted in any police misconduct
case.   There is nothing in the guidelines or in public policy to
suggest that less supervision is warranted for all such crimes,
and courts do not generally provide short supervised release
terms for other types of crimes that result in a professional
bar, such as for licensed brokers, doctors, or lawyers.   The
court should not adopt this type of categorical approach here,
and there is no individualized reason to give this particular
defendant a short term of supervised release.

## IV.

## CONCLUSION

For the foregoing reasons, the government respectfully
requests that this Court sentence defendant to 108 months
imprisonment, three years of supervised release, a $15,000 fine,
and a $200 special assessment.

DATED: July 13, 2012         Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
STEVEN M. ARKOW
MARGARET L. CARTER
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

28