# EXHIBIT D

# INCIDENT REPORT

RIVERSIDE COUNTY SHERIFF CA0330000

☒ INITIAL  ☐ SUPPLEMENTAL

DATE PREPARED: 03/29/00

| 1. FILE NUMBER | 2. DATE/TIME REPORTED | 3. DATE/TIME ASSIGNED | 4. DATE/TIME INV. START | 5. DATE/TIME INV. TERM | 6. Adult ARR | 7. Juv. ARR |
|---|---|---|---|---|---|---|
| PERS 00 ▓▓▓ | | | | | | |

| 8. OFFENSES - CODE SECTION | CRIME | COUNTS | 9. EDP CODE |
|---|---|---|---|
| Administrative Investigation (Accidental Discharge) | | | |

| 10. OFFENSES - CODE SECTION (Add or Change to) | CRIME | COUNTS | 11. EDP CODE |
|---|---|---|---|
| | | | |

| 12. OFFENSES - CODE SECTION (Add or Change to) | CRIME | COUNTS | 13. EDP CODE |
|---|---|---|---|
| | | | |

| 14. LOCATION OF OCCURRENCE | 15. REP. DIST. | 16. OCCURRED ON - DATE/TIME | 17. OR BETWEEN: DATE/TIME |
|---|---|---|---|
| | | | |

| 18. BUSINESS NAME | 19. BUSINESS PHONE | 20. CASE STATUS / CLEARANCE |
|---|---|---|
| | | |

## VICTIM - REPORTING PARTY - WITNESS - OTHER:

☐ See Additional Persons Report

| 21. TYPE | 22. NAME (Last, First, Middle) | 23. SEX | 24. RACE | 25. DOB | 26. AGE | 27. HT | 28. WT | 29. HAIR | 30. EYES | 31. SKN |
|---|---|---|---|---|---|---|---|---|---|---|

| 32. RESIDENCE ADDRESS | CITY | ZIP | 33. RES. PHONE |
|---|---|---|---|

| 34. BUSINESS ADDRESS | CITY | ZIP | 35. BUS. PHONE |
|---|---|---|---|

| 36. TYPE | 37. NAME (Last, First, Middle) | 38. SEX | 39. RACE | 40. DOB | 41. AGE | 42. HT | 43. WT | 44. HAIR | 45. EYES | 46. SKN |
|---|---|---|---|---|---|---|---|---|---|---|

| 47. RESIDENCE ADDRESS | CITY | ZIP | 48. RES. PHONE |
|---|---|---|---|

| 49. BUSINESS ADDRESS | CITY | ZIP | 50. BUS. PHONE |
|---|---|---|---|

## SUSPECT:

☐ Adult  ☐ Juvenile  ☐ Parole  ☐ Probation  ☐ See Additional Persons Report  ☐ ARRESTED

| 51. TYPE | 52. NAME (Last, First, Middle) | 53. SEX | 54. RACE | 55. DOB | 56. AGE | 57. HT | 58. WT | 59. HAIR | 60. EYES | 61. SKN |
|---|---|---|---|---|---|---|---|---|---|---|

| 62. DRIVER'S LICENSE NUMBER / ID NUMBER | 63. STATE | 64. SOCIAL SECURITY NUMBER | 65. MNI NUMBER | 66. CII NUMBER |
|---|---|---|---|---|

| 67. RESIDENCE ADDRESS | CITY | ZIP | 68. RES. PHONE |
|---|---|---|---|

| 69. BUSINESS ADDRESS | CITY | ZIP | 70. BUS. PHONE |
|---|---|---|---|

71. JUVENILE DISPOSITION: [ ] Other Juris. [ ] Juv. Crt. Prob. [ ] Within Dept. [ ] Detained [ ] Not Detained

72. **GANG DATA**

Gang Name(s): _____

☐ Member  ☐ Associate  ☐ Self Admit  ☐ Prior Knowledge

TATTOOS / SCARS / MARKS
☐ Face ☐ Neck ☐ R.Arm ☐ L.Arm ☐ Hands ☐ Torso ☐ Back ☐ Legs

73. TATTOOS / SCARS / MARKS / CLOTHING DESCRIPTION

## VEHICLE:
☐ REFER TO CHP 180 FORM FOR STOLEN, RECOVERED, TOWED OR IMPOUNDED

| 74. TYPE | 75. LICENSE | 76. STATE | 77. YEAR | 78. MAKE | 79. MODEL | 80. BODY STYLE: | 81. STRRCV AUTO VALUE |
|---|---|---|---|---|---|---|---|

| 82. COLOR/COLOR | 83. VIN # | 84. OTHER IDENTIFIERS | 85. DISPOSITION OF VEHICLE |
|---|---|---|---|

| 86. REGISTERED OWNER | 87. ADDRESS | CITY | STATE | ZIP | 88. PHONE |
|---|---|---|---|---|---|

☐ PROPERTY REPORT ATTACHED FOR STOLEN, RECOVERED, OR DAMAGED PROPERTY

89. DAMAGED PROPERTY VALUE

| REPORTING OFFICER | OFF. ID | REVIEWED BY / DATE | ENTERED BY / DATE | ENTERED BY / DATE |
|---|---|---|---|---|
| Bruce A. Meeks | 1198 | | | |

COPIES TO:

Form A .frp rev 2/98

1

SUBJECT TO COURT'S PROTECTIVE ORDER

S04832
D-72




PERSONNEL INVESTIGATION
DEPUTY ANTHONY SCLAFANI
PERS 00 067 001                                                         PAGE 8

---

1  10) Audio Tape         One audio cassette tape containing Dispatch Radio transmissions
2                         and PSAP (911) of ER 00 064 046 (415PC) and ER 00 064 076
3                         (246PC).
4
5  **SYNOPSIS**
6
7  This report will reflect an investigation into allegations that on Saturday, March 4, 2000: 1) That
8  Deputy Sclafani equipped his department approved .40 caliber pistol with a tactical lighting
9  device that was not authorized for carry by members of this department; 2) That Deputy Sclafani
10 carried this weapons system in a holster that it was not designed, and because it was not so
11 designed, Deputy Sclafani made unauthorized modifications to this holster to accommodate this
12 weapons system; 3) That Deputy Sclafani accidentally / negligently discharged a personally
13 owned department approved .40 caliber semiautomatic pistol inside the Contreras' residence at
14 ▓▓▓▓▓▓▓▓▓▓ Rubidoux; 4) That Deputy Sclafani failed to immediately report the
15 discharge of the firearm; 5) That after discharging the firearm, Deputy Sclafani destroyed and hid
16 the evidence of the accidental discharge; and 6) That at about 1410 hours on this date, Mrs.
17 Stacey Lowry reported finding a bullet hole in her residence at ▓▓▓▓▓▓▓▓▓▓ Rubidoux.
18 Deputy Sclafani contacted Mrs. Lowry at her residence, and he tried to dissuade her from
19 pursuing the investigation. As to allegations one to five, this report makes a finding of
20 **SUSTAINED** as to a violation of General Orders. As to allegation six, this report makes a
21 finding of **UNFOUNDED**.
22
23
24 **DETAILS**
25
26 On Saturday, March 4, 2000, I was the on-duty sergeant for the Jurupa Valley Station. At about
27 1440 hours, I responded to ▓▓▓▓▓▓▓▓▓▓ Rubidoux at the request of Deputy Sclafani.
28 Deputies Sclafani and Petersen were assigned as a two-deputy rove car, and they were currently
29 investigating a reported 246PC (Shooting at an Inhabited Dwelling).
30
31 When I arrived, Deputy Sclafani met me on the street in front of the residence. Deputy Sclafani
32 approached me, and he said he had something he needed to tell me. Deputy Sclafani then
33 blurted, "Sarge, I fucked up." I asked him what happened, and he told me he had been involved
34 in another accidental discharge, and he had failed to immediately report it. On January 29, 2000,
35 Deputy Sclafani had accidentally discharged a department shotgun (see PERS 00 047 002 for
36 details).

 

PERSONNEL INVESTIGATION
DEPUTY ANTHONY SCLAFANI
PERS 00 067 001·                                                        PAGE  9

1   I asked Deputy Sclafani to tell me what happened and he told me the following: Earlier in the day
2   (between 1110-1140 hours), he and Deputy Petersen had responded as backup for Deputy
3   Himmelberg on a 415PC (Disturbing the Peace) at ▮▮▮▮▮▮▮▮▮▮▮ Rubidoux. This
4   residence is next door to ▮▮▮▮▮▮▮ Drive.

6   Deputy Sclafani said he was standing downstairs by himself, while Deputy Petersen was upstairs.
7   Deputy Sclafani could see the light on his pistol was on. He drew the weapon to turn it off, and
8   saw some foam had melted to the lens of the light. As he was attempting to remove the foam
9   from the lens, the gun fired.

11  Deputy Sclafani told me the gun firing startled him. He jumped back into something, knocking
12  the object over, and breaking it. Deputy Petersen came into the room, and asked him what had
13  happened. Deputy Sclafani said he panicked, and told Deputy Petersen, he had accidentally
14  fallen and broke something. He told Deputy Petersen to leave the room, and he did.

16  Deputy Sclafani told me he looked around the room, and he saw the bullet had impacted on the
17  north wall. The hole seemed very small, and he could hardly see it. He went outside and looked
18  for an exit hole, and he did not find one. Deputy Sclafani believed the round had stayed in the
19  wall.

21  Deputy Sclafani told me he was embarrassed at being involved in another accidental discharge,
22  and he did not want to look "stupid" in front of his peers. He felt since the hole was so small, the
23  homeowners would not notice it, so he decided not to report it.

25  However, later in the day (1416 hours), he and Deputy Petersen were dispatched to ▮▮▮▮
26  ▮▮▮▮▮▮, Rubidoux, reference a Shooting at an Inhabited Dwelling. When he contacted Mrs.
27  Lowry, the reporting party, he realized the round from his weapon had exited the residence at
28  ▮▮▮▮▮▮▮▮▮, and it had entered the Lowry residence. He then contacted me, and he
29  requested I respond.

31  While speaking to Deputy Sclafani, I noticed his eyes were red and watery, and he was on the
32  verge of crying. I told him to wait by his patrol car, while I spoke to Deputy Petersen.

34  When I had initially arrived, I saw Deputy Petersen climbing over the backyard fence of ▮▮▮
35  ▮▮▮▮▮▮. He had a 35mm camera in his hand. He told me the ▮▮▮▮▮ras' were not home, and
36  he was photographing the damage.

38  I looked toward the residence at ▮▮▮▮▮▮▮▮▮ Drive. The residence has a stucco exterior, and
39  it also had a stucco chimney on the north side. I could see what appeared to be a hole in the side
40  of the chimney, about seven-feet from the ground. I then looked toward the next door residence

SUBJECT TO COURT'S PROTECTIVE ORDER

9

S04840
D-74

 

```
PERSONNEL INVESTIGATION
DEPUTY ANTHONY SCLAFANI
PERS 00 067 001                                                    PAGE 10
```

1  at ▓▓▓▓▓▓▓. I could see what appeared to be a hole in the lower right corner of a window,
2  on the second floor of the south side the house.
3
4  I asked Deputy Petersen what happened. He told me when they were at the ▓▓▓ras' residence
5  earlier, he had been upstairs with the suspect, while Deputy Sclafani was downstairs, and Deputy
6  Himmelberg was outside with the parents of the suspect. He heard a loud noise coming from
7  downstairs, and he went to investigate. He saw Deputy Sclafani in the kitchen. Deputy Sclafani
8  told him he had fallen into something, but he was all right. Deputy Sclafani told him to go away,
9  and he did.
10
11  I then contacted ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Mrs. ▓▓▓ had
12  reported finding a bullet hole in her house. I had her show me the damage to her property. I
13  explained to her a deputy's accidental discharge of a firearm had caused the damage. I have
14  listed her statement and interview below (page 11).
15
16  I contacted Lieutenant McDaniels and advised him of the circumstances regarding this weapon
17  discharge. He directed me to conduct an administrative investigation into this incident. He told
18  me to have both deputies report to the station, and he would meet them.
19
20  I had Sheriff's Forensics Technician Sorenson respond. He arrived at about 1606 hours. I
21  directed him to take photographs and measurements of the damage to the Lowry's residence
22  (attachment 7A and 8A).
23
24  The Contreras' were no longer home, so I was unable to contact them. I left my business card on
25  their door asking that they call me.
26
27  I responded to the Jurupa Valley Station where I met with Captain Labahn and Lieutenant
28  McDaniels in Lieutenant McDaniels' office. I briefed them on the information that I had.
29
30  At about 1730 hours I had Deputy Petersen come into Lieutenant McDaniels' office. Captain
31  Labahn ordered Deputy Petersen not to discuss this incident with anyone other than himself, me,
32  Lieutenant McDaniels, or the legal representative of his choice. I told Deputy Petersen I would
33  interview him regarding this matter later.
34
35  At about 1740 hours I had Deputy Sclafani come into Lieutenant McDaniels' office. Captain
36  Labahn ordered Deputy Sclafani not to discuss this incident with anyone other than himself, me,
37  Lieutenant McDaniels, or the legal representative of his choice. I told Deputy Sclafani I would
38  interview him regarding this matter later.
39
40  At about 1815 hours, Lieutenant McDaniels told me he had telephoned Deputy Himmelberg, and

041300

SUBJECT TO COURT'S PROTECTIVE ORDER




PERSONNEL INVESTIGATION
DEPUTY ANTHONY SCLAFANI
PERS 00 067 001                                                                                          PAGE 11

1  ordered him not to discuss this incident with anyone other than myself, or the legal
2  representative of his choice. He told Deputy Himmelberg I would interview him regarding this
3  matter later.

**Weapon Information:**

7  On Saturday, March 4, 2000 at about 1754 hours, I took possession of Deputy Sclafani's
8  handgun, loaded magazine, tactical light, and holster. I issued him a property receipt (attachment
9  6A) for the items.

11  On Monday, March 6, 2000, at about 1120 hours, I transported Deputy Sclafani's pistol, tactical
12  light, and holster to the Sheriff's Training Center where I gave them to Armorer White. I
13  explained the circumstances of this incident to Armorer White, and I requested he do an
14  inspection of the pistol and equipment. I also requested Armorer White obtain a fired round
15  from this weapon for possible later ballistic tests.

17  On Friday, March 10, 2000 at about 1335 hours, I responded back to the Sheriff's Training
18  Center. Armorer White released the pistol and equipment back to me. On Thursday, March 16,
19  2000 I received his report on this weapon (attachment 4). I read the report, and saw Armorer
20  White did not find anything mechanically wrong with the weapon.

22  He learned the M3 lighting system is manufactured for the Glock Model 22 by Tactical
23  Illuminator, but the lighting system is not authorized for use by members of the Sheriff's
24  department. In researching this matter, Armorer White spoke to L.C. Action, a company that
25  sells law enforcement equipment. They originally told him the M3 is manufactured by Sure-Fire.
26  However, L.C. Action later recontacted and told him there had been a mistake, Sure-Fire did not
27  manufacture the M3. Department Directive #94-026 states the only lighting system authorized is
28  the Laser Products Sure-Fire Tactical Light System (attachment 6C).

30  Armorer White learned the Uncle Mike's size 15 holster is manufactured for the Glock Model
31  22, for use with a Sure-Fire L-30 or L-60 series lighting system. It is not designed for the M3
32  lighting system. The M3 is a much smaller system than either the L-30 or L-60 system.
33  Additionally, they do not ship Uncle Mike's holsters with any type of packing material as was
34  found in Deputy Sclafani's holster. Armorer White believes an unknown person(s) placed the
35  foam material in the holster to compensate for the smaller lighting system.

**Interview with Mrs. Stacey Lowry**

39  On Saturday, March 4, 2000 at about 1500 hours I contacted Mrs. Lowry at her residence,
40  ███████████. I asked her if she could show me the damage. I followed her upstairs and into

04/30/0

SUBJECT TO COURT'S PROTECTIVE ORDER

11

S04842
D-76

 

PERSONNEL INVESTIGATION
DEPUTY ANTHONY SCLAFANI
PERS 00 067 001                                                                                         PAGE 12

1   a bedroom on the south side of the residence. She told me the room belonged to her one of her
2   children. I looked toward the window and saw the hole I had seen from outside. I then saw a
3   hole in the northeast corner of the room, about five to six-feet from the floor. I followed the path
4   of this hole, and saw it went into the next room. Mrs. Lowry told me this room was the nursery
5   for her other child. I looked and saw another hole in a door. I opened the door, and saw it was a
6   second access to the upstairs bathroom. I saw an impact mark on the north wall of the bathroom
7   above the bathtub. I then saw an expended round in the bathtub.
8
9   Mrs. Lowry told me her and her family had been away between 1045-1400 hours today. When
10  they arrived home, she found the damage. She thought her neighbor's son was responsible for
11  shooting at her residence, so she called 911 to report the incident. Shortly after that, two deputies
12  arrived to investigate. At this time Mrs. Lowry still thought her neighbor's son was responsible.
13  I immediately told her that her neighbors were not responsible for the shooting. I told her three
14  deputies had been at the Contreras' residence earlier in the day. I explained to her that I did not
15  know all of the details, but a deputy had accidentally discharged his weapon and caused the
16  damage. I assured her the Sheriff's department would be responsible for any damage caused by
17  the discharge.
18
19  I went back outside and Mr. Paul Lowry contacted me. I began to relay the same information I
20  had given to his wife. While I was talking to him, Deputy Sclafani approached and told Mr.
21  Lowry that he was the deputy who had discharged his weapon. He apologized several times to
22  Mr. Lowry. I instructed Deputy Sclafani to go and wait for me at his patrol car.
23
24  After I had spoken to Mr. Lowry, Mrs. Lowry recontacted me, and she said she there was
25  something additional she thought I should know. At about 1602 hours Mrs. Lowry and I spoke
26  on her front porch. I tape recorded our conversation with her permission (attachment 9C).
27
28  I asked Mrs. Lowry to tell me what had happened, and she related the following: When they
29  arrived home and discovered the bullet hole, she called 911. The first officer to contact her was
30  the one with dark hair (Deputy Sclafani). Deputy Sclafani asked her what had happened. She
31  took him upstairs and showed him the damage, and relayed as much information as she had to
32  him. She told him she felt her neighbor's son was possibly responsible for shooting her house.
33
34  Deputy Sclafani then left, and she thought he went to their neighbor's house. He returned a few
35  minutes later, and he told Mrs. Lowry, her neighbors were not home. He asked her how did she
36  want the matter handled. She told him, she liked her neighbors, but if their son was responsible
37  she wanted to pursue this as far as they could.
38
39. Deputy Sclafani responded that he was a father also, so he understood her concern. However,
40  Deputy Sclafani added it was going to be hard to prove who did it (fired the gun). Mrs. Lowry

12

SUBJECT TO COURT'S PROTECTIVE ORDER                                    S04843




PERSONNEL INVESTIGATION
DEPUTY ANTHONY SCLAFANI
PERS 00 067 001                                                            PAGE 13

1  told him, she had seen the boy's mother at the bank earlier in the day, and the boy's father was at
2  work, so she felt the son was responsible. Deputy Sclafani then told her that he and other
3  deputies had been at their neighbor's house earlier in the day, and the entire family had been
4  there.
5
6  Deputy Sclafani then left, and a few minutes later a deputy with blond hair (Deputy Petersen)
7  contacted her. She said it was her understanding Deputy Petersen had jumped over her
8  neighbor's fence, and he was trying to get into their house. Deputy Petersen left, but he returned
9  a few minutes later. He told her that somebody else was on their way to talk to her, and that I
10 arrived a short time later.
11
12 Mrs. Lowry said she was concerned because Deputy Sclafani did not tell her when he first
13 arrived that he was the one who discharged his gun. Instead, he made statements that they were
14 going to have a hard time proving who shot the weapon, when he knew full well he was
15 responsible.
16
17 Mrs. Lowry said when they had initially returned home, she saw no signs that anyone had
18 attempted to gain entry to her house. What frightened and bothered her the most was that at the
19 time of the shooting, no one came and checked to see if she or her family had been shot.
20
21 Mrs. Lowry had nothing further to add, so I concluded this interview at 1609 hours.
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40



04/13/0d

SUBJECT TO COURT'S PROTECTIVE ORDER

S04844
D-78




PERSONNEL INVESTIGATION
DEPUTY ANTHONY SCLAFANI
PERS 00 067 001                                                                                   PAGE  37

1  I ordered Deputy Sclafani not to talk to anyone about this incident, until Sheriff's Administration
2  had reached a disposition. I ended this interview at 1232 hours.
3
4
5  **Interview with Deputy Petersen**
6
7  On Saturday, March 25, 2000, at about 2200 hours, Senior Investigator Rene Rodriguez and I
8  met with Deputy Petersen in the FTO Consultation room at the Jurupa Valley Station for an
9  administrative interview. Also present was Lester Lang, as Deputy Petersen's RSA
10 representative. I explained to Deputy Petersen that he was not the focus of this investigation.
11 However, I advised Deputy Petersen of his obligation to speak truthfully during the interview and
12 that failure to do so could result in discipline up to and including termination. Deputy Petersen
13 stated that he fully understood this admonition, and he agreed to answer my questions. I tape
14 recorded this interview (attachment 9H and 9I).
15
16 Deputy Petersen has been employed by this agency as a Sworn Deputy Sheriff since June 1996.
17 He was graduated from the Sheriff's Training Academy in November 1996. He was assigned to
18 the Robert Presley Detention Center until approximately December 1998. He was transferred to
19 the Moreno Valley Station where he successfully completed the Field Training Program in April
20 1999. Since April 1999 he has been assigned to the Jurupa Valley Station.
21
22 Deputy Petersen remembered this incident. I asked him to tell me what happened, and he related
23 the following: On Saturday, March 4, 2000, he was assigned to Watch II (0700-1700). He was
24 assigned with Deputy Sclafani as a two-deputy patrol unit. Their designator was 2E10.
25
26 They had responded to the ███████ address as a backup unit at Deputy Himmelberg's request.
27 He was responding to a call of the reporting party's son throwing things from an upstairs
28 window. Deputies Petersen and Sclafani arrived shortly after Deputy Himmelberg. When they
29 arrived, Deputy Petersen saw the suspect through an upstairs window. The suspect was throwing
30 things out of the window, and yelling at his parents.
31
32 Deputy Petersen, and Sclafani walked inside the house, as Deputy Himmelberg brought the
33 handcuffed suspect downstairs. Deputy Himmelberg had the suspect sit on a sofa that was by the
34 front living room window. Shortly after they were inside, Deputy Erickson and his ride-a-long
35 arrived. All of the deputies began to talk to the suspect, questioning him about his actions. I had
36 Deputy Petersen mark on a sketch the location of the suspect and sofa (attachment 5E).
37
38 Shortly after Deputy Erickson arrived, he began making statements that the situation at the house
39 was under control, and he wanted to go serve an arrest warrant. Deputy Erickson and his ride-a-
40 long left after a few minutes.

04300

 

PERSONNEL INVESTIGATION
DEPUTY ANTHONY SCLAFANI
PERS 00 067 001                                                                                      PAGE 38

1  After they spoke to the suspect's parents, a decision was made to allow the suspect to gather
2  some of his belongings and leave. Deputies Himmelberg and Petersen took the suspect upstairs
3  to his bedroom. Deputy Himmelberg went in the bedroom with the suspect. Deputy Petersen
4  milled around on the upstairs landing. He went to the stairs, and he began using his foot to
5  flatting out a plastic mat that was on the stairs. Earlier he had tripped on this mat.

7  Deputy Petersen heard a loud pop or bang. This noise was followed by a clanking sound. He did
8  not immediately associate the noises with a gunshot. He walked down to the kitchen to see what
9  caused the noise.

11 He reached the kitchen door. He looked inside, and he saw Deputy Sclafani standing next to the
12 kitchen stove. Deputy Sclafani was bent over, and he appeared to be wiping up something from
13 the floor. Deputy Sclafani was facing the north wall with his right side next to the stove. Deputy
14 Petersen was standing behind Deputy Sclafani. He asked Deputy Sclafani what happened.
15 Deputy Sclafani looked up at Deputy Petersen, and said "I'm fine. I'm fine. Everything's fine
16 Evan, just get the fuck out." I asked him if he smelled any burnt gunpowder while he was
17 standing at the door. He said he did not. Deputy Petersen turned, and he saw the suspect's
18 father had entered the house. The home owner asked if everything okay. Deputy Petersen told
19 the homeowner that everything was okay. I had Deputy Petersen mark on his sketch his and
20 Deputy Sclafani's positions (attachment 5E).

22 At this point Deputy Petersen began to suspect that something more had occurred in the kitchen.
23 The more he thought about the noise, the more he believed it sounded a gunshot, and it did not
24 make sense that Deputy Sclafani was telling him to get out.

26 Deputy Petersen was standing in the living room area. He had just finished talking to the
27 homeowner, and the homeowner walked outside. He saw Deputy Sclafani walking from family
28 room into a hall next to the stairs. Deputy Sclafani then walked out the front door of the house.

30 Deputy Petersen walked back into the kitchen, and he saw spilled coffee on the floor next to the
31 stove. He began to look around, other than the spilled coffee, he did not see anything out of
32 place. He then walked into the adjoining family room. He started looking at the walls in the
33 family room. He saw a bullet hole in the North wall over the fireplace. He looked at the hole,
34 and he could not see all the way through. He did not think the hole went all the way through the
35 wall.

37 Deputy Petersen believed Deputy Sclafani had fired his weapon. He was concerned and
38 confused because Deputy Sclafani had not said anything about shooting his gun. Deputy
39 Petersen saw Deputy Sclafani start to come back into the room. He stepped away from the wall
40 and out of the room. He went out of the room by the same hall that Deputy Sclafani had used

041300

SUBJECT TO COURT'S PROTECTIVE ORDER                S04861
                                                                                                                D-80

 

PERSONNEL INVESTIGATION
DEPUTY ANTHONY SCLAFANI
PERS 00 067 001                                                                PAGE 39

1  earlier. Deputy Sclafani went back into the kitchen, and on into the family room. I had Deputy
2  Petersen mark on his sketch the direction he left the family room by, and the direction Deputy
3  Sclafani used to come back into the kitchen (attachment 5E).
4
5  Deputy Petersen stood by the downstairs bathroom, and he saw Deputy Sclafani walk to the
6  fireplace and look at the hole. Deputy Petersen walked away for a few seconds. When he
7  returned, he walked to the kitchen door. He could see Deputy Sclafani was still standing at the
8  hole. He had his back to Deputy Petersen, but it appeared that Deputy Sclafani was poking
9  around the wall. I asked him what he meant by poking around. He told me Deputy Sclafani had
10 his hands up by the hole. Deputy Petersen did not know exactly what Deputy Sclafani was
11 doing, but later Deputy Sclafani told him he had put toothpaste in the hole to cover it up. Deputy
12 Petersen now believed that was what Deputy Sclafani was doing at the wall.
13
14 Deputy Petersen saw the coffee was still on the floor. Deputy Petersen grabbed a paper towel,
15 and he began to wipe up the coffee. A few seconds later, the suspect's mother came into the
16 kitchen. Deputy Petersen tried to explain to her; they had spilled some coffee, and they would
17 clean it up. He said both the wife and husband spoke limited English.
18
19 While they were cleaning up the coffee, he heard a call of a man with a gun call being broadcast.
20 Deputy Himmelberg had already released the suspect. Deputy Petersen told Deputy Himmelberg
21 they had to go because of the man with a gun call.
22
23 They all went to their patrol cars and left. Deputy Petersen's reason for leaving was only one
24 deputy was responding to the man with a gun call, and he believed they should respond as a
25 backup unit. At this point, Deputy Petersen believed that Deputy Sclafani had discharged his gun
26 in the house.
27
28 They responded to the man with a gun call on Mary Ellen. After they handled that call, they left
29 to meet Deputy Erickson for lunch. They did not get to have lunch, for I called them back to the
30 Mary Ellen address. After they cleared the Mary Ellen address a second time, they went back for
31 lunch.
32
33 Deputy Sclafani was being too quiet. Whenever Deputy Petersen would try to talk to him,
34 Deputy Sclafani would rebuff him. He told Deputy Petersen he was sick, and he did not want to
35 talk. I asked Deputy Petersen if he every asked Deputy Sclafani, did he discharge his gun in the
36 house. Deputy Petersen said he did not ask. He told me he kept waiting for Deputy Sclafani to
37 tell him without being asked.
38
39 While they were at lunch, Deputy Sclafani continued to be very quiet. Deputy Petersen told me
40 he also was very quiet. He felt that Deputy Sclafani should have talked to him, and he should

 

PERSONNEL INVESTIGATION
DEPUTY ANTHONY SCLAFANI
PERS 00 067 001                                                                                             PAGE 40

1  have told him what happened. Deputy Petersen told me he began to realize that if Deputy
2  Sclafani did not say something, he (Petersen) would have to say something. Deputy Petersen
3  hoped it would not come to that, but if Deputy Sclafani did not say something soon, he (Petersen)
4  would have to contact me.
5
6  After they had lunch, they responded to and handled other calls. Deputy Petersen asked Deputy
7  Sclafani several times if he wanted to talk about anything. Each time Deputy Sclafani would
8  rebuff his attempt to get him to talk.
9
10 Deputy Petersen releated this situation was very stressful for Deputy Petersen. He is a relatively
11 new patrol deputy. He said when he first arrived at the Jurupa Valley Station, Deputy Sclafani
12 had taken him under his wing. Deputy Petesen said Deputy Sclafani guided him, and he became
13 his mentor. He told me he looked up to and respected Deputy Sclafani. Deputy Petersen said he
14 had conflicting emotions regarding this incident. He wanted to be loyal to Deputy Sclafani, but
15 he knew if Deputy Sclafani did not say something soon, he (Petersen) would have to report the
16 incident.
17
18 Finally at about 1400 hours, they received a call of a 246PC. Deputy Sclafani had just got back
19 into the patrol car, and Deputy Petersen told him they had a 246PC on ▓▓▓▓. Deputy
20 Petersen said he recognized the location as the same street they had been on earlier. When he
21 told Deputy Sclafani about the location of the 246PC call, Deputy Sclafani slumped down in his
22 seat. Deputy Sclafani then told him that while he was in the kitchen, he was messing with his
23 light, and he shot his gun. He told Deputy Petersen he had gone outside to see if his round had
24 exited the house. He also told Deputy Petersen he had filled the hole with toothpaste to cover it
25 up.
26
27 Deputy Petersen said as they arrived at the house on ▓▓▓▓ he told Deputy Sclafani it was
28 time for him to make it right. He told him he needed to contact me and report the discharge. It
29 was then Deputy Sclafani requested I respond.
30
31 Deputy Petersen said he exited the patrol car, and he went to the house they had been at earlier in
32 the day. No one was home, but Deputy Petersen stayed in the yard near the porch. Deputy
33 Sclafani also exited the patrol car, but he went to the house next door where they were reporting
34 the 246PC. A few minutes later, Deputy Sclafani came back outside. He told Deputy Petersen,
35 he could not bring himself to continue talking to the reporting party, and he asked him to contact
36 them. Deputy Petersen then contacted the reporting party, and obtained her block-out. He
37 believed that I would most likely have him write a 246PC report, so he also took several pictures
38 of the damage. He told me he later discarded the film, when he learned that I was going to have
39 Deputy Martinez write the report.
40

04130