1                    UNITED STATES OF AMERICA
                     UNITED STATES DISTRICT COURT
2                  CENTRAL DISTRICT OF CALIFORNIA
                          WESTERN DIVISION
3
                              - - -
4                  HONORABLE TERRY J. HATTER, JR.
              UNITED STATES DISTRICT JUDGE PRESIDING
5                             - - -

6
    UNITED STATES OF AMERICA,          )
7                                      )
                    PLAINTIFF,         )
8                                      )
    VS.                                )   CASE NO.:
9                                      )   CR 10-00163-TJH
    ANTHONY SCLAFANI,                  )
10                                     )
                    DEFENDANT.         )
11                                     )
                                       )
12  _____)

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 TUESDAY, FEBRUARY 14, 2012

17                  LOS ANGELES, CALIFORNIA

18

19

20

21

22
                 LAURA MILLER ELIAS, CSR 10019
23               FEDERAL OFFICIAL COURT REPORTER
                 312 NORTH SPRING STREET, ROOM 453
24               LOS ANGELES, CALIFORNIA 90012
                      PH:  (213)620-0890
25

```
 1

 2
        APPEARANCES OF COUNSEL:
 3
        ON BEHALF OF PLAINTIFF:
 4

 5                  BY:  MARGARET CARTER
                         STEVEN M. ARKOW
 6                  ASSISTANT UNITED STATES ATTORNEY

 7                  1100 UNITED STATES COURTHOUSE
                    312 NORTH SPRING STREET
 8                  LOS ANGELES, CA 90012

 9
        ON BEHALF OF DEFENDANT:
10
                    SILVER, HADDEN, SILVER, WEXLER & LEVINE
11
                    BY:  MICHAEL D. SCHWARTZ, ESQ.
12                       MICHAEL SIMIDJIAN, ESQ.

13                  1428 SECOND STREET
                    SUITE 200
14                  SANTA MONICA, CA 90012

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              INDEX

 2    WITNESSES FOR
      THE GOVERNMENT:
 3
                          DIRECT        CROSS       REDIRECT       RECROSS
 4
      SHERMAN, TERRY
 5
      BY:  MS. CARTER     21                        95, 106
 6    BY:  MR. SCHWARTZ                  76                         103

 7    COLE, EDDIE

 8    BY:  MR. ARKOW      111                        172
      BY:  MR. SCHWARTZ                 145
 9


10
      EXHIBITS    RECEIVED      EXHIBITS       RECEIVED
11
      60           18           3              19
12    4            19           61             20
      62           20           49             36
13    55           36           57             36
      73           36           75             36
14
      80           36           10             107
15    11          108           12             109
      13          110           14             110
16    48          111           79             134
      52          137           85             184
17

18

19

20

21

22

23

24

25
```

UNITED  STATES  DISTRICT  COURT

```
 1    LOS ANGELES, CALIFORNIA; TUESDAY, FEB. 14, 2012; 9:15 A.M.

 2                             - - -

 3              THE COURT:  Good morning.

 4              We're outside the presence of the jury.

 5              Mr. Nicolaysen has joined us as well.  Thank you.

 6              MR. NICOLAYSEN:  Your Honor, good morning and thank

 7    you for the Court's patience.  I have been in the adjoining

 8    witness room with Ms. Vargas discussing where we are.  The

 9    bottom line is that in terms of her communicational behavior

10    and lack thereof, we are essentially in the same place this

11    morning Tuesday, February 14th where we were last Thursday

12    and Friday the 9th and 10th of February.  I do not anticipate

13    any progress or any greater likelihood this morning that she

14    will be responsive and cooperative on the witness stand to

15    questions on direct.

16              However, when I make that statement, I don't mean

17    to suggest that she is someone who then should be held in

18    contempt.  I respectfully submit to Your Honor that we once

19    again need to revisit the challenging issue of --

20              THE COURT:  Take that hat off.  Take that hat off.

21              I'm sorry.  Go ahead.

22              MR. NICOLAYSEN:  Certainly, Your Honor.  Thank you.

23    May the record reflect that my client is now entering the

24    courtroom?

25              THE COURT:  Yes.
```

1          MR. NICOLAYSEN:  Thank you.

2          THE COURT:  Are any of these people here with her

3    to your knowledge, the ones that just came?

4          MR. NICOLAYSEN:  The gentleman who has just raised

5    his hand on the far left is Santiago my client's brother and

6    he has accompanied her today.  He was in the adjoining

7    witness room with me when I was meeting with her a few

8    minutes earlier.  I would ask that he be allowed to stay.  I

9    believe he has my client's trust and confidence.

10          I believe, Your Honor, we are once again facing the

11    challenging the question of where the line is drawn between a

12    nonresponsive witness who is acting in a willful disobedience

13    such that contempt may be an appropriate sanction versus

14    nonresponsive behavior that is a reflection of a mental

15    condition over which she is not under control.

16          THE COURT:  Well, that's one of the things that

17    concerns me, and I wonder if I should not try to have her

18    evaluated properly.

19          MR. NICOLAYSEN:  May I address our thoughts on

20    this?  Government counsel and I discussed this last night

21    even as late as 9 o'clock, and we wrestled with our options

22    and came up with the suggestion that if the Court would have,

23    if you will, a mock direct with Ms. Vargas.

24          Allow the government to call her to the stand and

25    like a preliminary hearing under Rule 104 (a), just to see

```
 1    whether we can make progress without the jury being here.
 2    And to the degree she indeed does respond to questions and
 3    gives us the confidence necessary to proceed, then the jury
 4    enters the courtroom with her already on the stand and direct
 5    examination begins.
 6            Conversely, if she's nonresponsive then it would
 7    be, of course, Your Honor's assessment as to the nature of
 8    the nonresponsiveness and whether that invites further mental
 9    exam or whether it is a willful disobedience.  That, of
10    course, will be the Court's decision.  The thought is let's
11    proceed without the jury, have a preliminary sense of where
12    we are.  That would be our joint request of the Court.
13            THE COURT:  Any counsel wish to be heard?
14            MR. SCHWARTZ:  I spoke with counsel this morning
15    when we came to the courtroom.  I think it's really the best
16    thing to do to have her take the stand outside the presence
17    of the jury that way an assessment can be made.  And to be
18    quite frank, that way she's not blurting something out that
19    either side doesn't want blurted out and she's embarrassed
20    herself in front of the jury in case that is what happens.  I
21    think it's best for all the parties that it be done in this
22    forum and the Court then can decide about her competency or
23    not.
24            THE COURT:  Thank you.
25            Anybody on behalf of the government, Ms. Carter?
```

```
 1              MS. CARTER:  The government concurs with the

 2    proposal and submits based on the comments of other counsel.

 3              THE COURT:  Ms. Vargas, would you come to the

 4    witness stand to be sworn?

 5              MR. NICOLAYSEN:  May I accompany her, Your Honor?

 6              THE COURT:  Yes.  Right up on the witness stand

 7    there.

 8              THE CLERK:  Would you please raise your right hand?

 9              THE COURT:  Raise your right hand, please.

10              Suggest you don't want to answer.

11              Ms. Vargas, you're not able to answer?  It would

12    appear that --

13              THE WITNESS:  Yes.

14              MR. NICOLAYSEN:  May she be excused, Your Honor?

15              THE COURT:  All right.

16              MS. CARTER:  Your Honor?

17              THE COURT:  Yes.  You may step down.

18              MS. CARTER:  Your Honor, before the witness is

19    excused, I would ask that Your Honor speak to the witness

20    about the importance of this proceeding and also about what

21    might happen next in terms of what a competency evaluation

22    might mean, how long it might take.  I think that might be

23    important to judging whether this is reluctance or inability.

24              THE COURT:  Well, I believe that she does

25    understand the serious nature of these proceedings and she
```

```
 1    knows that she's been called several times by subpoena.  She
 2    has been in this courtroom.  I talked to her.  I released
 3    her.  Thought I had her word that she would return on her
 4    own.  She has not done that.  But I want you to understand,
 5    ma'am, that --
 6              MR. NICOLAYSEN:  Would you like her at the lectern,
 7    Your Honor?
 8              THE COURT:  It would be helpful.
 9              Ms. Vargas, you remember the conversations that
10    we've had previously?  Do you?  You understand that I have
11    the impression from the manner in which you are conducting
12    yourself that you are unable to respond properly not that
13    you're unwilling to do so, but that you just can't.  And that
14    being the case, I'm going to arrange for you to have a full
15    psychological psychiatric evaluation.  That might take as
16    long as 90 days because you'll be sent perhaps to some other
17    state.
18              Now, you don't have to have that if you're willing
19    to obey the orders of the Court and that is conduct yourself
20    properly, to take the oath properly, to answer questions
21    truthfully under oath both from the government and from the
22    defense, and that would be the end of it.  But the decision
23    really rests with you.  And as I say, I have the distinct
24    impression that it's not because you're unwilling to do so,
25    but for some reason you can't.
```

1          Now, do you want to come back up on the stand, take

2     the oath properly and answer the questions and avoid the

3     possibility of being locked up for probably more than

4     90 days, could be as much as 120 days, that's four months,

5     while they conduct the full psychological and psychiatrist

6     evaluation of you perhaps in Springfield, Missouri or some

7     other Bureau of Prisons facility.  Is that what you want?

8     You decide.

9          And if you can't decide, then I have to make the

10    decision for you.  You can answer questions and be gone today

11    on your own so you choose, if you can.  If you can't, then I

12    have no other recourse.

13          MS. VARGAS:  I want to go home today.

14          THE COURT:  You say you want to go home today.

15    Come to the lectern and talk to me.  You say you want to go

16    home today?  Do you?  It's up to you.  You can go home today.

17    All you have to do is answer the questions under oath, and

18    then you can go home.  But if you're unable to do so, then

19    I'm gonna have you confined and have a full evaluation

20    perhaps it's in your best interest because you seem to have

21    some real problems here.

22          But if you think that you can answer the questions

23    under oath truthfully and I'll allow you to do that and then

24    you'll be excused.  Go home with your brother.  You can go

25    wherever.  It's up to you.

```
 1            Ms. Vargas, what do you want to do?  You're not
 2   able to take the witness stand.  Tell me if you can.
 3            MR. NICOLAYSEN:  May I speak to the Court on her
 4   behalf?
 5            THE COURT:  Yes.
 6            MR. NICOLAYSEN:  Your Honor, I think we're at an
 7   impasse where a mental health evaluation needs to be done to
 8   avoid a contempt citation.  That is my primary concern as
 9   counsel.  But I also worry about the prejudicial impact of
10   the prolonged incarceration that would be attendant to such a
11   mental health evaluation so I'm going to respectfully --
12            MS. VARGAS:  You know, I don't want to be here.
13            THE COURT:  You don't want to be here today?
14            MS. VARGAS:  No.
15            THE COURT:  You would rather be confined and go
16   through a prolonged psychological psychiatrist evaluation?
17   It may take months.  You would rather do that?  You could be
18   finished here today and be excused.  Let the record reflect
19   that counsel is conferring with Ms. Vargas.
20            MR. NICOLAYSEN:  Your Honor, I would ask that the
21   Court allow certain parameters to be set in regard to the
22   mental health evaluation.  First, I would ask that the Court
23   make it specific in the order that a psychiatrist be the
24   mental health professional that conducts the assessment
25   because we may have the possibility of a brain disorder or
```

1    other Axis I conditions involving severe psychosis, the types

2    of conditions for which a psychiatrist would be uniquely

3    qualified.  And also for which medication might potentially

4    provide an opportunity to resolve the behavior that is quite

5    observable here today.

6            Second, I would ask that we do this on an expedited

7    basis, that is at MDC not at one of the federal medical

8    centers that we otherwise tend to use for competency

9    evaluations under Section 4241.  Therefore, I would ask the

10   Court not to send her to Springfield, Rochester or any of

11   these other facilities.  It needs to be done locally.  And if

12   necessary to have the Bureau of Prisons bring an outside

13   psychiatrist in if they don't have a full-time psychiatrist

14   on staff.

15           The other request I would ask because, of course,

16   government counsel is concerned about suspending the trial is

17   that we have immediate follow-up.  We need to know if there

18   is any progress as between the psychiatrist and Ms. Vargas.

19   And I would ask that we come back even within 24 hours.  Is

20   she engaging the psychiatrist in any type of dialogue that is

21   productive in allowing the evaluation to be done?  If so, we

22   don't want to interrupt that evaluation, but we need to know

23   if we're getting anywhere.  Otherwise, incarceration is

24   serving no productive purpose for anyone.

25           THE COURT:  Well, it may for Ms. Vargas.  It

1    appears that she really needs to have an evaluation which

2    then could lead to something that would help her, and that's

3    all I'm trying to do here today is to help her frankly.

4    Several of your suggestions certainly will be put in place in

5    the order that's given.  We'll try the local evaluation.  And

6    rather than MDC itself, I'm going put in the order that she

7    be moved to White Memorial Hospital where they do have

8    psychiatric facilities available and that we try to expedite

9    the hearing.

10           But with regard to this case, I don't see that she

11    is going to be available.  So I'm not gonna suggest to them

12    that they do it in 24 hours or anything of that nature.  Just

13    that they expedite it as quickly as they can.

14           MR. NICOLAYSEN:  Is Your Honor ruling under 804

15    that she is an unavailable witness?

16           THE COURT:  I am.

17           MR. NICOLAYSEN:  To that extent that would seem to

18    conclude her status in these proceedings as a witness.  I

19    would ask then that we clarify the procedural structure as to

20    why she is even incarcerated at all.  Now, I agree with

21    Your Honor and I thank Your Honor.

22           THE COURT:  Well, let me back up then because it

23    very may well be that I need to still have her in the status

24    of a material witness in order to get her the kind of the

25    treatment that she needs.  The evaluation first and then

 1   perhaps treatment.  So no, I am not going to declare her to

 2   be unavailable at this point.

 3           MR. NICOLAYSEN:  So she's technically a designated

 4   witness?

 5           THE COURT:  A material witness.  That is correct.

 6           All right.  You have something, Ms. Carter?

 7           MS. CARTER:  Yes, Your Honor.

 8           First of all, I would just ask that the specifics

 9   that the witness's counsel has identified in terms of how the

10   evaluation should be conducted be phrased in terms of

11   recommendation rather than an order.  I know that that

12   language gives MDC and Bureau of Prisons the flexibility to

13   do these things in the most expeditious manner.

14           And I would also ask Your Honor to suspend the

15   trial at this point because I think this is obviously a

16   crucial witness for our case.  This is a victim.  There is no

17   fault of the government in Ms. Vargas' current status.  We

18   have done everything to try to raise this issue with the

19   Court and resolve this issue early in our case.  And now we

20   are getting fairly late in the government's case and this

21   witness is crucial to the government's presentation of

22   evidence.

23           THE COURT:  I don't see how the government can

24   suggest that we suspend this matter.  It's so unfair to these

25   jurors.  No, I'm not going to do that.  Excuse me one minute.

1          MS. CARTER:  I do understand the inconvenience to

2     the jurors, however, I would submit that it's unfair to the

3     government not to do it because this witness is so crucial

4     and there's no fault on the government's part.

5          THE COURT:  Again, I can't agree with you on that

6     at all.  I mean you have evidence that has already been put

7     before this jury and perhaps there is even more.  And the

8     fact that she's not here to testify is not that crucial to

9     your case, frankly.  Especially, if she's gonna be testifying

10    in her present condition.  It just doesn't make any sense.

11    All right.

12         MR. NICOLAYSEN:  Your Honor, one suggestion I had

13    made to the government is that she be called for the very

14    limited purpose of simply allowing the jury to see her

15    physically because that is a relevant consideration in regard

16    to the discretion of a law enforcement officer to either use

17    manual force to control or subdue an individual versus using

18    a taser device, but that there be no substantive testimony

19    elicited.  So at most she can just state her name and the

20    jury can observe her and she can -- and that would conclude

21    direct examination and it would conclude her status as a

22    witness.

23         THE COURT:  And then she would not receive the kind

24    of care she really ought to receive.

25         MR. NICOLAYSEN:  And again, I thank the Court for

1    that because that's right.  That is absolutely right.  It's

2    just my job as counsel to be --

3              THE COURT:  No, I understand.

4              MR. NICOLAYSEN:  To clarify why she is in the state

5    she is in.  I couldn't agree with Your Honor more.  We have

6    to be clear as to what exactly the structure in which she is

7    confined in custody undergoing mental health treatment.  Is

8    it to assess her competency as a witness or is it to provide

9    a resource at government expense that's in her personal

10   interest?

11             The Court is being very compassionate and very

12   thoughtful in that regard, but the distinction has to be

13   clear on the record I respectfully submit.

14             THE COURT:  Well, given her behavior and her

15   absconding and other things, I could have a criminal contempt

16   hearing.

17             MR. NICOLAYSEN:  Indeed you could, yes.  And I

18   would then propose that we are undergoing the mental health

19   evaluation to determine with some certainty as to whether she

20   is or she is not subject to the sanction power of this Court

21   under the contempt statute.

22             THE COURT:  Exactly, exactly.

23             MR. NICOLAYSEN:  Understood.

24             I do respectfully disagree with Ms. Carter,

25   although we have agreed on many other things and I appreciate

1    working with her on this, but in terms of designating the

2    type of mental health professional here, I do ask the Court

3    to be clear it must be done by a psychiatrist.

4            THE COURT:  I don't think there's much doubt about

5    it.  When I speak of psychological psychiatric evaluation, I

6    fully expect a psychiatrist to be part of that and perhaps

7    the psychiatrist will call upon the psychologist to do a good

8    bit of testing.  It will be both.

9            MR. NICOLAYSEN:  Will that be articulated

10   specifically in the Court order?

11           THE COURT:  We'll make it so.

12           MR. NICOLAYSEN:  Thank you, Your Honor.

13           THE COURT:  Well, let me ask the government this,

14   though.  Would you care to have this witness prospective

15   witness called to the stand knowing pretty much what the jury

16   is going to see?  Ms. Carter.

17           MS. CARTER:  Your Honor, the government would like

18   Ms. Vargas to take the stand and answer questions from both

19   sides.  I believe that something short of that would not meet

20   the government's needs and we would hold out hope that an

21   evaluation can be done and at some point in this trial or who

22   knows what could happen as proceedings continue that

23   Ms. Vargas would be available to testify.

24           THE COURT:  I think we'll proceed as I have

25   indicated.  The marshal is going to send a couple deputies up

```
 1    now and we need to prepare an order.  And all counsel can

 2    look at the proposed order or provide proposed orders and

 3    we'll agree on one that should go forward, but let's do that

 4    before she leaves the courtroom here and they come up to take

 5    her into custody.

 6              MS. VARGAS:  Can I go home with my mom and my

 7    brother?

 8              THE COURT:  If you want to testify, you can.

 9              MS. VARGAS:  I'll just go check myself in

10    somewhere.

11              MS. CARTER:  May I have a moment, Your Honor?

12              THE COURT:  Certainly.

13              MR. NICOLAYSEN:  May we confer, Your Honor?

14              THE COURT:  We're in recess.  You can certainly

15    confer.

16                        (Recess taken.)

17              MR. NICOLAYSEN:  May I address Your Honor?

18              THE COURT:  Go right ahead.

19              MR. NICOLAYSEN:  Thank you, Your Honor.

20              I have conferred with government counsel and we

21    agree that this has to be done on an expedited basis and that

22    a follow-up status conference to allow the Court to assess

23    the progress of the psychiatric slash psychological

24    evaluation should be made so that we know where we are.

25              So I would ask that this be reconvened, the Vargas
```

```
 1    matter, within 24 hours perhaps tomorrow afternoon if the
 2    Court is available.  This way we know that there is something
 3    that is or isn't being accomplished both in terms of the
 4    restoration of competency if that's the right away to
 5    articulate it or in terms of whether the government indeed
 6    feels this is a productive use of their time from a
 7    litigation strategy standpoint.
 8            THE COURT:  Well, it goes beyond just the
 9    government's strategy, you know.  It goes with regard to this
10    jury and the management of this case properly.
11            MR. NICOLAYSEN:  May we then adjourn for today as
12    to the Vargas matter, but do so with a scheduled reappearance
13    tomorrow?
14            THE COURT:  But with an order to go forth for the
15    expedited psychological slash psychiatric examination.
16            MR. NICOLAYSEN:  It would be best if we had an
17    appearance by one of the treating psychologists, preferably
18    the psychiatrist at White Memorial.
19            THE COURT:  Well, that's gonna be difficult because
20    their schedules are such that to get them in on time. . .
21            MR. NICOLAYSEN:  Would the Court permit the
22    psychiatrist to make an appearance on the record on the
23    speakerphone?
24            THE COURT:  Of course.
25            MR. NICOLAYSEN:  May we consider that as the
```

1    practical option so that there is direct input from the

2    mental health professional conducting the evaluation?

3              THE COURT:  All right.  We can certainly do that.

4              MR. NICOLAYSEN:  Thank you, Your Honor.

5              THE COURT:  Ms. Carter.

6              MS. CARTER:  Once again, Your Honor, I would just

7    ask the Court to phrase some of the specific things as

8    recommendations rather than orders.

9              THE COURT:  Oh, yes.

10             MS. CARTER:  Because I understand that there are

11   several options for expediting this at MDC and the Bureau of

12   Prisons and I would want to give them the flexibility --

13             THE COURT:  Well, I don't want to give them too

14   much flexibility because what they'll do is use their

15   contract person over there if that person is available at the

16   MDC.  I want her to be seen at White Memorial not at the MDC.

17             MR. NICOLAYSEN:  Your Honor, thank you.  Permit me

18   I just want to put on the record that I do respectfully

19   object to the government's position and it's exactly the word

20   flexibility.  As her counsel, flexibility is a problem here.

21   It's what we don't want to have.

22             I think a directive from Your Honor clearly

23   designating a psychiatric assessment needs to be the path

24   that we go on.  Otherwise, the lowest common denominator

25   approach tends to be the government's way of handling it.

1          THE COURT:  And when you're speak of the

2     government, you're speaking of the Bureau of Prisons at this

3     time?

4          MR. NICOLAYSEN:  I am indeed.  I meant the Bureau

5     of Prisons not the United States Attorney's Office.

6          THE COURT:  All right.  We'll fashion the order as

7     quickly as possible.

8          Are there any other matters any other counsel wish

9     to take up before we call the jury back?  We have to move on

10    with this case.

11         MR. NICOLAYSEN:  Your Honor, would you like me to

12    remain available in the courtroom to review the proposed

13    order?

14         THE COURT:  That might be a worthy thing to do.

15    We'll have it very shortly.

16         MS. CARTER:  Your Honor, may I please just have a

17    personal break for two minutes?

18         THE COURT:  Of course.

19         MS. CARTER:  Thank you.

20              (Recess taken.)

21         THE COURT:  Please be seated.

22         Ladies and gentlemen, thank you for your patience.

23    We had some matters of law to take care of and we're ready to

24    proceed now with the government's case and the government may

25    call its next witness.

```
 1              Before that has anything about this matter come to
 2    your attention?  If so, please raise a hand.  I see no hands
 3    having been raised.
 4              Now, Ms. Carter.
 5              MS. CARTER:  Your Honor, at this time the
 6    government would move into evidence Exhibit 60, a certified
 7    business record -- I'm sorry -- as a business record and also
 8    a document evidencing medical statements designed to
 9    facilitate treatment.
10              THE COURT:  Is that pursuant to a stipulation or
11    anything?
12              MS. CARTER:  No, Your Honor.  They're -- the
13    business records declaration, that is follows it at
14    Exhibit 60 A.
15              THE COURT:  Fine.  It will be received then.
16                   (Exhibit 60 was admitted.)
17              MS. CARTER:  Can I request permission to publish
18    the first page of Exhibit 60?
19              THE COURT:  Go right ahead.
20              MS. CARTER:  And if you could please magnify the
21    portion of the exhibit at the very bottom showing the name
22    Angelica Vargas?  And if you could clear that magnification
23    and magnify the portion at the top titled history of present
24    illness.
25              Your Honor, at this time I would like to read from
```

```
 1    the stipulation at Exhibit 84 with regards to Government's
 2    Exhibit 3 and 4.
 3              THE COURT:  Go right ahead.
 4              MS. CARTER:  Government Exhibit 3, which is a
 5    Desert Hot Springs Police Department photograph of the left
 6    breast of Angelica Vargas taken by Desert Hot Springs Police
 7    Department Officer Andrea Heath on February 25th, 2005.
 8              Government's Exhibit 4, which is a citation to
 9    appear for Angelica Vargas issued on February 25th, 2005.
10              And I would move Exhibits 3 and 4 into evidence.
11              THE COURT:  They will come in.
12                 (Exhibits 3 and 4 were admitted.)
13              MS. CARTER:  May I publish Exhibit 3 for the jury?
14              THE COURT:  Go right ahead.
15              MS. CARTER:  And, Your Honor, if I may switch to
16    the document camera to publish this exhibit right side up?
17              THE COURT:  You may.
18              MS. CARTER:  Well, Your Honor, I was hoping this
19    will only take a moment, but I'll switch back and proceed.  I
20    apologize the camera was not on.
21              THE COURT:  No problem.
22              MS. CARTER:  Your Honor, may I now switchback to
23    the government's computer to publish Exhibit 4 for the jury?
24              THE COURT:  Certainly.
25              MS. CARTER:  Can you please magnify the citation
```

```
 1    portion of Exhibit No. 4?  Let's start by magnifying the top

 2    portion with the name Angelica Maria Vargas and the height

 3    and weight information.

 4            Now, can you please magnify the lower portion of

 5    the document beginning with correctable violations and

 6    including the name M. Gutting and signature.

 7            Your Honor, I would now like to enter into evidence

 8    Exhibits 61 and 62 as certified public records.

 9            THE COURT:  They will come in.

10            (Exhibits 61 and 62 were admitted.)

11            MS. CARTER:  And I would request to publish the

12    first page of Exhibit No. 61 for the jury.

13            THE COURT:  Go right ahead.

14            MS. CARTER:  Can you magnify the portion of the

15    exhibit reading Count I, Count II and Count III?

16            I would now like to publish for the first page of

17    Exhibit No. 62.

18            THE COURT:  Yes, you may.

19            MS. CARTER:  Please magnify the portion under

20    charge information which shows status convict for Count I and

21    dismiss for Counts II and III.  You may clear the exhibit.

22            At this time the government calls Terry Sherman to

23    the stand.

24            THE COURT:  Very well.  Would you come straight

25    ahead?  Come right up on the witness stand to be sworn,
```

```
 1    please.
 2              THE CLERK:  Please raise your right hand.
 3                        (Witness sworn.)
 4              THE CLERK:  Please have a seat.  State and spell
 5    your name for the record.
 6              THE WITNESS:  Terry Sherman.  T-e-r-r-y
 7    S-h-e-r-m-a-n.
 8              THE COURT:  Do you have a middle name?
 9              THE DEFENDANT:  Yes, Your Honor.  Wayne.
10    W-a-y-n-e.
11              THE COURT:  Go ahead, Ms. Carter.
12                        DIRECT EXAMINATION
13    BY MS. CARTER:
14    Q.   Who is your current employer?
15    A.   Desert Hot Springs Police Department.
16    Q.   For how long have you worked for Desert Hot Springs
17    Police Department?
18    A.   It will soon be seven years.
19    Q.   When did you first begin working there?
20    A.   April of 2005.
21    Q.   What was your position when you first started at Desert
22    Hot Springs Police Department?
23    A.   Kind of multi-tasking.  CSO Community Service Officer
24    and starting the process of being a CSI and reserve officer.
25    Q.   What's a CSI?
```

1    A.    Crime scene investigator.

2    Q.    What does a CSI do?

3    A.    Investigate major crimes such as homicides, rapes,

4    burglaries and help with detectives investigating other

5    crimes and follow-up investigations.

6    Q.    Did you ever become a CSI at Desert Hot Springs Police

7    Department?

8    A.    I am now.

9    Q.    When did you become a CSI at Desert Hot Springs?

10   A.    Beginning of 2006.

11   Q.    Do you currently hold any other positions at Desert Hot

12   Springs Police Department?

13   A.    Yes, ma'am.

14   Q.    What positions?

15   A.    Property room evidence.

16   Q.    And are you the property evidence and room manager?

17   A.    Yes, ma'am.

18   Q.    What do you do as property room manager at Desert Hot

19   Springs Police Department?

20   A.    I control the intake and the out-take and destruction

21   and handling of evidence that's booked in by patrol officers.

22   Q.    How long have you had that position?

23   A.    About two years, I guess, now.  Maybe a little longer.

24   Q.    What year and month did you start in that position?

25   A.    I want to say August of maybe 2008 when the former

1    property officer retired.

2    Q.   Who was the former property officer?

3    A.   Nancy Allen.

4    Q.   Now, you mentioned you're responsible for intake and

5    out-take and destruction of evidence when it's booked in by

6    officers.  Where do officers at Desert Hot Springs Police

7    Department book evidence?

8    A.   In the property room in lockers.

9    Q.   As part of your duties as the property and evidence room

10   manager, are you responsible for making sure that evidence is

11   properly booked and stored at Desert Hot Springs Police

12   Department?

13   A.   Yes, ma'am.

14   Q.   Have you received training on the proper booking of

15   evidence?

16   A.   Yes, ma'am.

17   Q.   Have you received training on the proper maintenance of

18   evidence?

19   A.   Yes, ma'am.

20   Q.   What policies and procedures govern how evidence is

21   supposed to be booked at Desert Hot Springs Police

22   Department?

23   A.   There's policy manual procedures.  There's certain

24   guidelines that are put down by the State that tells us how

25   long we have to keep things and how long we don't have to

1    keep things.  Also, the courts will also regulate what we

2    need to do with evidence after a case has been sentenced or

3    adjudicated.

4    Q.   What are these guidelines put down by the State that

5    regulate how long you have to keep things at Desert Hot

6    Springs Police Department?

7    A.   The guidelines can be anywhere from 60 days for

8    safekeeping, 90 days for found property, one year one day for

9    misdemeanors 357, lifetime for felonies.  And again, the

10   courts regulate.  Also, case has been adjudicated, they can

11   order destruction.

12   Q.   Can you describe for the jury how evidence is booked at

13   Desert Hot Springs Police Department?

14   A.   Can you be more specific?  I mean, it's depending on the

15   crime, depending on the circumstances.

16   Q.   What is the process that an officer has to go through to

17   book evidence at Desert Hot Springs Police Department?

18   A.   Well, first, you have to have a crime and collect the

19   evidence, whatever it may be.  Then that officer at that time

20   will either bring it into the station and package it or if he

21   can't package it, he'll put a tag on it to identify it.  They

22   fill out what you call a property control receipt and then --

23   which tells us the location that property was put at and

24   that's put into evidence.

25   Q.   When you referred to the location that property is put

1    at, did you mean within the Desert Hot Springs Police

2    Department evidence room?

3    A.    Yes, ma'am.

4    Q.    How soon after an incident are officers supposed to book

5    evidence?

6    A.    Under normal circumstances, it should be as soon as

7    possible, but given the circumstances, it could be two,

8    three, four hours later or days.

9    Q.    Under what circumstances could it take days to book

10   something into evidence?

11   A.    Homicide.

12   Q.    Why would it take long in the case of a homicide?

13   A.    If you've got bloody clothing, you can't book it in

14   while it's wet.  You have to hang it up to dry.  So it could

15   take anywhere between 24 and 48 hours to dry.  It has to be

16   photographed.  And if there's any processing that needs to be

17   done on that clothing for trace evidence or anything of that

18   sort, you have to do that.  Then it can be packaged, rolled

19   up and then placed into evidence.

20   Q.    Other than circumstances that relate to the condition of

21   the evidence itself, are there any circumstances that would

22   justify a delay of days or weeks for an officer to book

23   something into evidence?

24   A.    If that officer might have been hurt, taken to the

25   hospital or had got called back out, there could be, you

```
 1    know, where it might take a day for them to it get booked in.

 2    They might not have got it booked in that day, but it might

 3    still be in their custody or they might have placed it into a

 4    locker to secure it.  Then come back a couple days later and

 5    get it and then book it in.

 6    Q.   Are you familiar with any other types of circumstances

 7    that would justify a delay of days or weeks in booking

 8    evidence?

 9    A.   Not really.  Those -- that would be about it I would

10    recommend.

11    Q.   How soon are property control records supposed to be

12    filled out after evidence is booked?

13    A.   You normally fill it out when you're booking in your

14    property.

15    Q.   Who generally fills out a property control record?

16    A.   The officer himself.

17    Q.   And the information that is contained on a property

18    control record, where does that come from, the booking

19    officer or some other person?

20    A.   The person that's booking in the evidence is who

21    normally writes down what's on the sheet so that it matches

22    the evidence that they have booked in.

23    Q.   If there is an incident involving an officer use of

24    force in the Desert Hot Springs Police Department jail, is

25    evidence from those incidents supposed to be booked into
```

1    evidence?

2    A.    Yes, ma'am.

3    Q.    Are you familiar with those types of incidents?

4    A.    Yeah, I guess you could say I am, yes, ma'am.

5    Q.    What type of evidence would you generally expect to be

6    booked into evidence after an officer used a taser in the

7    jail?

8    A.    It could be the taser cartridge itself.  It could be

9    sometimes the property sheet that -- where the use of force

10   was done when they were treated for medical and given medical

11   unless it's booked with the report.  It depends.  Every

12   officer is different.  Policy and procedure changes over the

13   years, so depending on what the policy and procedure manual

14   says now, could have been different from what it said five

15   years ago, seven years ago.

16   Q.    Were you ever aware of a time in your enter career at

17   Desert Hot Springs Police Department where officers were not

18   supposed to book taser cartridges from a tasing incident in

19   the jail?

20   A.    To my knowledge, I can't recall, ma'am.

21   Q.    Can you describe for the jury how evidence is maintained

22   at Desert Hot Springs Police Department once it's booked into

23   evidence?

24   A.    It's passed through a locker.  On the other side, we

25   remove that property.  When we take it into custody, we check

1    the PCR, which is the property control sheet to make sure

2    that it matches the evidence that's been booked in.  We then

3    assign it a location and place that piece of evidence upon

4    the shelf, and then we file the paperwork where that location

5    was and put that into a file by itself.

6    Q.    What paperwork tells you where a specific piece of

7    evidence is located?

8    A.    The property control record, the PCR.

9    Q.    When you say you put paperwork into a file by itself,

10   are you referring to the property control record?

11   A.    Yes, ma'am.

12   Q.    Where are property control records maintained?

13   A.    Locked inside the evidence room.

14   Q.    Who has copies of any particular property control

15   record?

16   A.    There's three copies.  One copy goes with the report,

17   one goes with the evidence and one goes in the file.

18   Q.    When you say that the third copy goes in a file, where

19   is that file?

20   A.    My file inside the property room.

21   Q.    Who has access to property after it's booked?

22   A.    Me and my two assistants, volunteers.

23   Q.    Do you know who had access to evidence after it's booked

24   when Nancy Allen was the property manager?

25   A.    Nancy.

1   Q.   Can other officers access property after it's been
2   booked?
3   A.   If they ask for it.
4   Q.   How can an officer ask for evidence after it's been
5   booked?
6   A.   Come and ask me.
7   Q.   Is that access recorded in any way?
8   A.   If they take it out, yes.
9   Q.   How is it recorded?
10  A.   On the back of the sheet they sign for it saying they're
11  taking the responsibility for the property that's been
12  released to them.
13  Q.   Is there a computer system that logs evidence?
14  A.   When you book it in, yes.
15  Q.   What is that computer system?
16  A.   Well, depends on which one you're asking about.
17  Q.   Let's say the computer system currently in effect.
18  A.   Alliance.
19  Q.   When did the Department first start using the Alliance
20  system?
21  A.   Approximately November of 2007.
22  Q.   Is evidence that was booked in after that start date of
23  November 2007 in the Alliance system?
24  A.   Yes, ma'am.
25  Q.   Is there a system for evidence that was booked in before

1    November of 2007?

2    A.   Yes, ma'am.

3    Q.   What's that system called?

4    A.   Rims.

5    Q.   Was the Department using the Rims system when you

6    started at the Department in April 2005?

7    A.   Yes, ma'am.

8    Q.   In connection with this case, did you at some point look

9    for evidence booked in early 2005?

10   A.   Yes, ma'am.

11   Q.   Did you determine whether the Rim system was used at

12   that time to book evidence?

13   A.   Yes, ma'am.

14   Q.   What kind of entries does an officer put into the Rims

15   system when he or she books evidence?

16   A.   Basically, the description of what it is, if it has any

17   monetary value, the -- just a brief description of it and

18   that's about it as far as the property section goes.

19   Q.   Is the Rims system also used for case audit forms?

20   A.   It can.  I mean, you can audit.  You can run an audit on

21   it, yes.

22   Q.   Have you heard rumors that Rims records can be changed?

23          MR. SCHWARTZ:  Objection.  Speculation.  Hearsay.

24          THE COURT:  Sustained.

25   BY MS. CARTER:

```
 1    Q.   Have you heard anything that would indicate that Rims
 2    records can be changed?
 3              MR. SCHWARTZ:  Same objection, Your Honor.
 4              THE COURT:  Sustained.
 5    BY MS. CARTER:
 6    Q.   Do you have any knowledge of whether Rims records can be
 7    changed after they're first created?
 8              MR. SCHWARTZ:  Objection.  Vague.
 9              THE COURT:  It's overruled.  You may answer if you
10    have knowledge.
11              THE WITNESS:  Could you repeat the question, ma'am?
12    BY MS. CARTER:
13    Q.   Do you have any knowledge that Rims records can be
14    changed once created?
15    A.   It can by a supervisor, but it shows an audit trail.
16    And an officer can also change it prior to -- before it's
17    been approved by a supervisor.
18    Q.   At some point after you became evidence custodian, did
19    you look for evidence relating to the Jamal White and
20    Angelica Vargas cases?
21    A.   Yes, ma'am.
22    Q.   Why did you do that?
23    A.   I had a directive from my bosses.
24    Q.   Who were your bosses that gave you that directive?
25    A.   I believe it was Commander Smith at the time.
```

```
 1    Q.    When did Commander Smith first tell you to look for
 2    evidence related to the Jamal White and Angelica Vargas
 3    cases?
 4    A.    Sometime in the 2009, '10, I'm not sure.
 5    Q.    Do you know why they asked you to look for evidence
 6    related to these cases?
 7    A.    Not at first I didn't, no.
 8    Q.    What did you later understand?
 9    A.    The FBI wanted them.
10    Q.    When you were first directed to look for evidence in the
11    Jamal White and Angelica Vargas cases in 2009 or 2010, what
12    specifically were you asked to do?
13    A.    First, I was asked to pull the records.
14    Q.    What records were those?
15    A.    Report records.
16    Q.    Can you tell us specifically what report records?
17    A.    Stacked about this tall.  You guys asked for a lot.  I
18    don't know.
19              THE COURT:  When you say about this tall --
20              THE WITNESS:  I would say probably close to a
21    foot-and-a-half tall, Your Honor.
22    BY MS. CARTER:
23    Q.    Did that include case audit records?
24    A.    No, ma'am.  That would have been done on the property in
25    evidence that you asked for later on.
```

1  Q.   So first you were asked to pull records for these two

2  cases.   When were you asked to do that?

3  A.   Again, about 2009, I guess.   Somewhere around there.

4  Q.   At that point did you know those two cases were being

5  investigated?

6  A.   No, because it wasn't just specifically for those two

7  cases.   I was asked to pull several cases.

8  Q.   Did you know that the cases you were being asked to pull

9  were being investigated?

10  A.   All I knew is the FBI wanted them at that time.

11  Q.   So in 2009 did you know that the FBI wanted information

12  from the Jamal White and Angelica Vargas cases?

13  A.   Eventually, I did, yes.

14  Q.   Did you know that when you pulled the record that you

15  first talked about for a variety of cases including Jamal

16  White and Angelica Vargas?

17  A.   I believe originally, ma'am, I wasn't asked to pull

18  Jamal White or Angelica Vargas.   I was just asked to pull

19  several cases from 2005, 2004 and various years up to and

20  then I pulled them and I was told to just bring them in to

21  give them, which I did.   And I didn't ask questions.   Some

22  things are better left not knowing.

23  Q.   And those records included Jamal White and Angelica

24  Vargas in February 2005?

25  A.   Not at that time I don't believe.   It wasn't until a

1    little bit that I was asked specifically to pull Jamal White

2    and Ms. Vargas' case.

3    Q.   Was that in 2009?

4    A.   2009, 2010.  I kept pulling those case all the time.

5    Q.   And at that point did you know that this was for an FBI

6    request?

7    A.   Yes, ma'am, I did.

8    Q.   So the cases that pulled for the FBI request, did you

9    check to see what physical evidence there was for those

10   cases?

11   A.   Not unless I was asked to do so.

12   Q.   Were you asked to do so?

13   A.   No, ma'am.  I can't recall.

14   Q.   At some point did you look to see what physical evidence

15   existed for the Angelica Vargas and Jamal White cases?

16   A.   Yes, ma'am, I was.

17   Q.   When was that?

18   A.   I want to say 2010 I believe it was.

19   Q.   When in 2010?

20   A.   I can't specifically recall.  It was early in the year.

21   I remember the FBI came to the station.

22   Q.   In September 2010 was there also a grand jury subpoena

23   pursuant to which the Department had to produce physical

24   evidence relating to the Angelica Vargas and Jamal White

25   cases?

```
 1          MR. SCHWARTZ:  Objection, Your Honor.  Speculation.
 2    Foundation.
 3          THE COURT:  Well, it's overruled.  He may answer if
 4    he has knowledge.
 5          THE WITNESS:  I don't know.  I'm not a supervisor.
 6    That would have gone to the bosses not me.
 7    BY MS. CARTER:
 8    Q.   In Fall 2010 did you eventually actually hand over
 9    physical evidence to the FBI relating to the Angelica Vargas
10    and Jamal White cases?
11    A.   Yes, ma'am, I believe I did.
12          MS. CARTER:  Your Honor, I now want to read from
13    the stipulation at Exhibit 84 the portions pertaining to
14    Government's Exhibits 49, 55, 57, 73, 75 and 80.
15          THE COURT:  Go right ahead.
16          MS. CARTER:  Government Exhibit 49, which is a
17    Biotox Laboratory report of the toxicology analysis of a
18    blood sample taken from Angelica Vargas on February 25, 2005.
19          Government's Exhibit 55, which is a Desert Hot
20    Springs Police Department Property Control Record No. 8092
21    for one taser cartridge booked under the name Gutting related
22    to the use of force on Angelica Vargas.
23          Government's Exhibit 57, which is a Desert Hot
24    Springs Police Department Control Record No. 5630 for a blood
25    sample taken from Angelica Vargas taken on February 25, 2005.
```

```
 1              Government's Exhibit 73, which is a Desert Hot
 2    Springs Police Department Property Control Record No. 5846
 3    for one taser cartridge booked under the name Sclafani
 4    relating to the use of force on Jamal White.
 5              Government Exhibit 75, which is a Desert Hot
 6    Springs Police Department Property Disposition sheet for
 7    approval to destroy a taser cartridge in Case No. 05-769
 8    relating to the use of force on Jamal white.
 9              Government Exhibit 80, which is a Desert Hot
10    Springs Police Department taser audit printout for 05-769
11    showing the chronological history for entries made by Desert
12    Hot Springs Police Department personnel on the Desert Hot
13    Springs Police Department leased records management system or
14    RMS pertaining to the arrest report and related documents for
15    Jamal White.
16              I would now like to move into evidence Exhibits 49,
17    55, 57, 73, 75 and 80.
18              THE COURT:  Is this the stipulation that you have
19    agreed with the government, Mr. Schwartz?
20              MR. SCHWARTZ:  Yes, Your Honor, it is.
21              THE COURT:  Those items will be received.
22         (Exhibits 49, 55, 57, 73, 75 and 80 were admitted.)
23              MS. CARTER:  May I have a moment?
24              THE COURT:  Go right ahead.
25    BY MS. CARTER:
```

1    Q.    What evidence, if any, did you find evidence relating to

2    the Angelica Vargas case?

3    A.    I believe it was a Biotox receipt.

4    Q.    Did you find a taser cartridge?

5    A.    I found a taser cartridge.  I cannot recall if it was

6    hers or Jamal White's.

7    Q.    When you say hers or Jamal White's, do mean whether it

8    was related to the Angelica Vargas incident or the Jamal

9    White incident?

10   A.    Yes, ma'am.

11   Q.    Did you find any tasers that had been used either by

12   Angelica Vargas or Jamal White?

13   A.    I can't recall.  I'd have to look.

14   Q.    Other than the one taser cartridge that you recall

15   finding, did you find any other taser cartridges for the

16   Angelica Vargas or Jamal White incident?

17   A.    The one that was destroyed.

18   Q.    Did you find evidence that a second taser cartridge

19   related to one of those cases had been destroyed?

20   A.    Yes, ma'am.

21   Q.    Did you find any other physical taser cartridges other

22   than the one you just mentioned?

23   A.    No, ma'am.

24         MS. CARTER:  Your Honor, I would request that

25   Exhibit 54 be handed to the witness.  This is a piece of

```
 1    physical evidence that's been in the agent's custody.  I
 2    would request that he be permitted to approach your clerk.
 3               THE COURT:  Yes, he may do so, and actually, he can
 4    just provide it to the witness.
 5    BY MS. CARTER:
 6    Q.   Is Exhibit 54 the taser cartridge you found?
 7    A.   It could be, that's whatever I gave you.  I never saw
 8    it.  It was closed.
 9               MS. CARTER:  Can you show Exhibit 54 to the jury by
10    holding it up?
11               THE COURT:  He's done that.
12    BY MS. CARTER:
13    Q.   Can you describe exactly what's in there?
14    A.   One plastic cartridge with two metal darts.
15    Q.   Do you see a small fragment of a wire?
16    A.   Yes, ma'am, I guess.
17               THE COURT:  Don't guess.
18               THE WITNESS:  It looks more like a screen or
19    something to me, not wire, but it may be the wire.
20    BY MS. CARTER:
21    Q.   Do you know based on your training and experience that
22    taser cartridges like this can have up to 20 feet of wire?
23    A.   Some cartridges, yes.
24    Q.   Would each dart have a long wire when it's first shot?
25    A.   Yes, ma'am.
```

Q.   Are there any other long wires in Exhibit 54?

A.   No, ma'am.

Q.   Are there -- do you what AFIDs are?

A.   Yes, ma'am.

Q.   What are they?

A.   They're identifying markers inside a taser cartridge when fired to identify that cartridge.

Q.   Do you see any AFIDs in Exhibit 54?

A.   No, ma'am.

Q.   Based on your training and experience, would expect to see the AFIDs booked into evidence in a situation where an officer had used force in a jail and there was no dispute about which officer used force?

A.   Depends.

Q.   On what?

A.   Circumstances.  Sometimes, yes.  Sometimes, no.  If the jail door is open it causes the vortex circular air blowing around, those little AFIDs are gone.  They're no more than the size of a penny.

Q.   Is the evidentiary purpose of AFIDs to identify whose taser was fired?

A.   It identifies the taser cartridge, yes.

          MS. CARTER:  Now, I would like to publish for the jury and the witness Exhibit 53.

          THE COURT:  Go right ahead.

BY MS. CARTER:

Q.   Do you know whose handwriting is on this form except for the words keep this taser per Ed Smith 6-22-09?

A.   No, ma'am.

Q.   Under description this exhibit reads taser cartridge. Would that be an appropriate description if the evidence item that was described by the property record also included darts, wires and AFIDs?

A.   Yes, ma'am.

Q.   Why is that?

A.   Taser cartridge is the taser cartridge.  It's just short and to the point.

Q.   Now, down at the bottom where it says Officers Sclafani Badges 0556, Date 02-25-05 and Time 0410, who writes that information?

A.   Depends on who's booking it in.  Normally, it would be the officer himself.

Q.   Could it also be the property manager?

A.   No, ma'am.

Q.   Where it says officers and badge numbers, should those entries describe the officer who actually books the item into evidence?

A.   It could, but it could also be the officer who took and collected it at the scene.

Q.   Would that information get on the form because it's

```
 1   coming from the officer booking the evidence or from the
 2   property room manager taking the evidence?
 3   A.   From the officer booking the evidence.
 4   Q.   Whose writing is "Keep this taser per Ed Smith 6-22-09,"
 5   if you know?
 6   A.   I really don't know, but I can speculate.
 7            THE COURT:  Well, don't speculate.
 8            THE WITNESS:  Okay, Your Honor.  Thank you.
 9   BY MS. CARTER:
10   Q.   Do you know why that information was written there?
11   A.   Again, I wasn't in the property room in charge of at
12   that time.
13   Q.   Now, this property control record pertaining to the
14   Angelica Vargas case, were there any other control sheets for
15   any other pieces of evidence related to the Angelica Vargas
16   case?
17   A.   I believe there might have been one for Biotox.
18            MS. CARTER:  I would now like to publish for the
19   jury and the witness Exhibit No. 57.
20            THE COURT:  Go right ahead.
21            MS. CARTER:  And could you magnify the portion of
22   the exhibit with lines on it, the center of the page.  You
23   could clear that magnification and get the whole thing in the
24   magnification from Desert Hot Springs Police Department No.
25   5630 down to the last line transport to receive by.
```

1    Q.    Is Exhibit 57 what you were referring to when you said

2    that there might be a property control record for Biotox?

3    A.    Yes, ma'am.

4    Q.    Why did you call it for Biotox?

5    A.    Biotox is a company that does our test for alcohol and

6    blood screening.

7    Q.    Now, this information at the line Officers M. Gutting

8    Badges 0504, Date 2-25-05 Time 1600, who provides that

9    information?

10   A.    Again, the officer that would be booking it in.

11   Q.    And that time 1600, what is that time supposed to

12   reflect?

13   A.    The time on the clock.

14   Q.    The time when the item is booked into evidence or the

15   time when the blood was taken?

16   A.    It could be time evidence is booked in, blood taken,

17   time the officer was doing the report.  There could be a

18   number of variances for it.

19   Q.    How is anybody supposed to tell what that time pertains

20   to?

21   A.    Normally, it's the time the officer's doing his report

22   and booking it in.

23   Q.    Now, when a blood sample like this one is entered into

24   evidence or booked into evidence, what happens to it?

25   A.    Same process as the evidence that's booked in.  It's

```
 1    placed, taken out.  We take it in.  We receive it.  We put in
 2    a location until Biotox comes the following week or the day,
 3    whatever day they come on to pick up the blood to take in for
 4    screening.  We maintain custody of it and then it's taken out
 5    and given to them.
 6    Q.   Does the booking officer do anything else with it
 7    between the time the blood sample is booked into evidence
 8    until the time it goes to Biotox?
 9    A.   He can't do anything with it.  It's in my custody.
10    Q.   And what happens to a blood sample once it goes to
11    Biotox?
12    A.   Couldn't tell you.
13    Q.   Does it come back to the Department?
14    A.   Not the blood, no.
15    Q.   What does come back, if anything?
16    A.   A report.
17    Q.   Where does that come back to?
18    A.   The Department, to records, to the people up front.
19    Q.   When a blood sample is entered into evidence by a
20    booking officer, should that entry into evidence appear on
21    the case audit form in the RMS system for that case?
22    A.   Yes, if it's booked in.
23    Q.   What date should appear on the RMS system entry?
24    A.   Whatever day they entered it.
25         MS. CARTER:  I would now like to publish Exhibit 49
```

```
 1    for the jury and the witness.
 2              THE COURT:  Go right ahead.
 3              MS. CARTER:  And if you could please magnify the
 4    portion of the document beginning with patient name and going
 5    down to that portion down to specimen:  Blood.
 6    Q.   Are you familiar with these type of forms based on your
 7    training and experience?
 8    A.   Yes, ma'am.
 9    Q.   Can you explain to us why this form shows a later time
10    under time taken than the 1600 time that the blood was booked
11    into evidence on Exhibit 57?
12    A.   Unless the dates are different, it could be that the
13    blood was taken at 1659.  It could be their time at the
14    Biotox Laboratories.  Could be an error.  I don't know.  I
15    can't speculate.
16    Q.   You're familiar -- based on your familiarity with these
17    forms, what does that time taken supposed to reflect?
18    A.   I really can't tell you what Biotox form time taken
19    means.  It may be the time taken into their lab to work on
20    it.  I don't know.
21    Q.   As a CSI, crime scene investigator, do you work with
22    blood samples on the cases that you investigate?
23    A.   Sometimes.
24    Q.   Do you have to read these Biotox laboratory forms in the
25    course of your duties?
```

1    A.    No, ma'am.

2    Q.    Before you were a CSI, you were a patrol officer;

3    correct?

4    A.    A reserve officer, yes.

5    Q.    Did you ever book blood samples into evidence for any of

6    your cases?

7    A.    Yes, ma'am.

8    Q.    When you got the Biotox reports back, was it your

9    responsibility to read them?

10   A.    If it pertained, if I had to go to court, yes.

11   Q.    And based on that training and experience, this time

12   taken on these forms refer to the time that the blood sample

13   was taken?

14   A.    Again, I don't know.  I can't speculate.  All I know is

15   that the time taken is when blood is drawn, it's written on

16   the Biotox envelope and the blood is placed in.  So that time

17   can be different from the time that's on the sheet here.

18   Q.    But under taken on this form is that supposed to

19   represent the time the blood sample was taken?

20   A.    I don't know.

21          MR. SCHWARTZ:  Objection.  Asked and answered.

22          THE COURT:  It has been, but he answered that he

23   doesn't know.  Sustained.

24          MS. CARTER:  I would now like to publish the jury

25   and this witness, the second page of Exhibit 56 the case

```
 1    audit form for the Angelica Vargas case.
 2              THE COURT:  Go ahead.
 3    BY MS. CARTER:
 4    Q.   I would like to magnify the top one-third.
 5              Do you see on this exhibit a number of entries
 6    related to a blood sample property record in March 2005?
 7    A.   Yes, ma'am.
 8    Q.   That third line entry, is that the entry that's
 9    generally created when a piece of evidence is first booked
10    in?
11    A.   The created property record, that one?
12    Q.   Yes.
13    A.   It can be, yeah, I believe so.
14    Q.   Where it says property record, does that refer to the
15    property control records that we've been discussing?
16    A.   That refers to what was booked in at the time, yes.
17    Q.   Do you see Officer 252 listed in the by column?
18    A.   Yes, ma'am.
19    Q.   Who is that officer?
20    A.   I don't know.
21    Q.   Can you explain why the dates on this report show the
22    booking into evidence of a blood sample considerably after
23    the date on the property control record at Exhibit 57?
24    A.   Yes, ma'am.  It looks like the property officer at that
25    time went in, got blood out of the locker, then went to RMS,
```

1    entered into RMS that she received that blood and it was now

2    being checked out and was gonna be sent to Biotox.

3    Q.   Then can you explain why these dates in early March are

4    considerably after the date that the blood sample was

5    supposedly analyzed by Biotox as listed on Exhibit 49?

6    A.   No, ma'am, I cannot.

7              MS. CARTER:  I would now like to publish for the

8    jury Exhibit 55.

9              THE COURT:  Go right ahead.

10             MS. CARTER:  Can you please magnify the portion of

11   the exhibit with the horizontal lines on it?

12   Q.   Did you find this property control record when you

13   looked for evidence in the Angelica Vargas case?

14   A.   I believe I did, yes.

15   Q.   Can you tell the jury why there are two dates on this

16   form?

17   A.   No, ma'am, I can't.

18   Q.   February 25th, 2005 and April 14th, 2005?

19   A.   No, ma'am, I can't.

20   Q.   If you could clear this magnification and magnify just

21   the area where it says date and time.

22             After the '05, there is handwriting here.  Is that

23   a reference to BIN 3A?

24   A.   I don't see where you're talking about there, ma'am.

25   Q.   Do you recall any reference to BIN 3A in connection with

1    this property control record based on your search for

2    evidence related to the Angelica Vargas case?

3    A.    Ma'am, I'm gonna have to say no, because this was

4    pre-me, and the property room when I started looking for this

5    stuff had been remodeled.

6    Q.    Where did you find this property control record when you

7    found it?

8    A.    In some files, old property receipt records.

9    Q.    Are those your files in the property control room?

10   A.    They are now.

11   Q.    Can you please clear the magnification?

12         Were you able to find the taser cartridge

13   referenced in this form?

14   A.    I believe this might be the one I found.  I'm not sure.

15         MS. CARTER:  Could I ask that the witness be handed

16   Exhibits 53, 54, and 55?

17         THE COURT:  Certainly.  They're all already in

18   evidence?

19         MS. CARTER:  I previously read a stipulation

20   between the parties that Exhibit 54 is a taser cartridge

21   referred to in Exhibit 53, the property control record.

22   Q.    Is there anything that you see looking at the two

23   exhibits that would indicate that that's not the case?

24   A.    53 and 54 appear to be the same.

25   Q.    So the property control record and Exhibit 55, which is

UNITED STATES DISTRICT COURT

1    on the monitors, is that a different taser cartridge?

2    A.   I believe so, yes, ma'am.

3    Q.   Were you able to find the taser cartridge referred to in

4    Exhibit 55?

5    A.   No, ma'am.

6    Q.   Were you able to find any indication of what happened to

7    it?

8    A.   I believe that one was destroyed.

9            MS. CARTER:   And now I would like to ask to have

10   put in front of the witness Exhibits No. 73 and 75.

11           THE CLERK:   73 and 75?

12           MS. CARTER:   Yes.

13           Can you put Exhibit No. 57 back up on the screen

14   with the Court's permission?

15           THE COURT:   Go right ahead.

16   BY MS. CARTER:

17   Q.   Why did you believe that the taser described in

18   Exhibit 55 the property control record -- I'm sorry.

19           I believe I misspoke.   I would like to have Exhibit

20   No. 55 displayed with the Court's permission.

21           Why did you state that the taser cartridge

22   described in Exhibit No. 55 had been destroyed?

23   A.   Because one taser cartridge had been destroyed.

24   Q.   Was it this taser cartridge described in Exhibit 55?

25   A.   Not according to the records you just handed me.

```
 1    Q.   So for the taser cartridge described in Exhibit 55, were
 2    you able to find any indication of what happened to this one?
 3    A.   Not at this time, no.
 4    Q.   Were you able to find any forms authorizing the
 5    destruction of this taser cartridge?
 6    A.   Not at this time, no.
 7    Q.   Now, there is no writing on Exhibit 5 saying keep this
 8    taser.  Can you tell us whether the taser cartridge described
 9    in Exhibit 55 was already destroyed or -- I'm sorry -- was
10    already missing when the FBI requested the evidence in 2009
11    or 2010?
12    A.   I can't answer that cause I don't know.
13              MS. CARTER:  I would now like to publish for the
14    witness and the jury Exhibit No. 56.
15              THE COURT:  Go right ahead.
16    BY MS. CARTER:
17    Q.   Should a case audit form like this one show all evidence
18    booking associated with a case?
19    A.   If it's been booked in, yes.
20    Q.   Should the form show any evidence destroyed in the
21    ordinary destruction policies?
22    A.   If it was done correctly, yes.
23    Q.   I would now like to turn your attention to the top of
24    page 3 of the exhibit.  If you could please magnify the top
25    one-quarter.
```

1          Now, there are several entries here at the top of

2     the page to three spent taser cartridge.  One approximately

3     seven lines down that reads disposition added evidence

4     locker.  What does that mean?

5     A.   It means -- looks like it was another taser cartridge

6     was added into the report.  Added into the evidence locker

7     showing that it was put into evidence.

8     Q.   Based on your knowledge of these forms, does this entry

9     mean that three spent taser cartridges were added to the

10    evidence locker?

11    A.   I'm not really sure, but according to what I'm reading

12    here, yeah, it would say that.

13    Q.   Would the officer who entered the items into the

14    evidence ordinarily be the same officer listed in the by line

15    on the case audit form?

16    A.   In most cases, sometimes, yes.

17    Q.   So there are several entries referring to three spent

18    taser cartridges, and then when we get to the eighth and

19    ninth entries, there's a change in the quantities to two

20    spent taser cartridges and then back again to three spent

21    taser cartridges.

22          Other than on this case audit form, have you seen

23    these types of changes before?

24    A.   From time to time, yes.

25    Q.   How should changes like this you see on the case audit

1  form be reflected in the records that are kept by the

2  property manager.

3          MR. SCHWARTZ:  Objection.  Vague as to time.

4          THE COURT:  Sustained.

5  BY MS. CARTER:

6  Q.   Based on your knowledge of the procedures and practices

7  in the evidence room, how currently would the information on

8  this form be reflected, the changes on this firm be reflected

9  in the records kept by the property manager?

10  A.   Depending on the circumstances, the officer that books

11  it in, we get it in, we don't open the packages to verify if

12  there's three or if there's two.  If an officer says he made

13  a mistake and the report hasn't been approved, they can go in

14  and change whatever they need to change prior to approval.

15  Once it's been approved, the report's locked and it takes a

16  supervisor to override and go back in and change any evidence

17  or anything of that sort.

18  Q.   To the best of your knowledge, was that the same

19  procedure in the effect when you first started as a patrol

20  officer at Desert Hot Springs Police Department?

21  A.   Yes, ma'am.  The only other person that could change it

22  would be the property officer herself.

23  Q.   Now, I would like to turn your attention to page 5 of

24  the exhibit.  And if you could magnify the bottom quarter of

25  the page.  At the bottom, again, shows a change in the number

1    of spent taser cartridges from three to two.  Do you see

2    that?

3    A.   Yes, ma'am.

4    Q.   Is there anything that you reviewed in the records, in

5    the property control records kept by the property control

6    manager that would explain these changes in quantity of taser

7    cartridges?

8    A.   No, ma'am.

9    Q.   I would now like to turn you to the bottom of page 6 of

10   the exhibit.  And if you could magnify the bottom quarter of

11   the page.  Do you see the entry sixth from the bottom where

12   it says case locked by 041?

13   A.   Yes, ma'am.

14   Q.   What does case locked mean?

15   A.   Means the report has been locked by the supervisor.

16   Q.   Do you know which supervisor has the code 041?

17   A.   No, ma'am, I do not.

18   Q.   Now, I would like to turn you to page 7 of the document.

19   And if you could please magnify the top one-quarter.  Do you

20   see the top, the entries at lines three and four of the

21   document that say case unlock?

22   A.   Yes, ma'am.

23   Q.   What's that mean?

24   A.   Means the supervisor went in and unlocked the report.

25   Q.   Who can unlock cases?

1    A.    Supervisors.

2    Q.    I would now like to clear that magnification and magnify

3    the line toward the bottom of the page that reads 6-22-2009.

4    And if you could magnify a few lines below that as well.  Do

5    you see your own officer code anywhere on this page?

6    A.    Yes, ma'am, I do.

7    Q.    Which one is your officer code?

8    A.    CSO 4.

9    Q.    Did you view and print this case audit in January of

10   2010 because the FBI had requested information about this

11   case?

12   A.    I believe so.

13   Q.    As of that time, did the taser cartridge described in

14   the property control record in Exhibit No. 55, did that taser

15   cartridge exist?

16   A.    I don't know.  I wasn't looking for it.

17   Q.    Now, we have talked about Exhibit 54 the one taser

18   cartridge for the Angelica Vargas case that you found.  Did

19   you find any physical evidence relating to the Jamal White

20   case?

21   A.    Yes, ma'am.

22   Q.    What did you find?

23   A.    One taser cartridge that had been destroyed.

24   Q.    When you say you found one taser cartridge that had been

25   destroyed, did you find the actual taser cartridge?

1    A.    I did when I destroyed it.

2          MS. CARTER:  I would now like to show Exhibit No.

3    73 for the witness and the jury.

4          THE COURT:  Go right ahead.

5    BY MS. CARTER:

6    Q.    And if you could magnify the top half of the page.  Is

7    this the property control record for the cartridge you were

8    referring to as the destroyed cartridge?

9    A.    Yes, ma'am.

10   Q.    Now, where it says at the bottom copy to property room

11   file 3-13-05, what does that mean?

12   A.    That's when it was booked and logged in to the property

13   room.  It's when it was received behind closed doors.

14   Q.    Why is that date different from the 02-24-2005 time

15   0300, date and time above it?

16   A.    Because that was the time she was able to get into the

17   property room and clean out the lockers and book stuff in.

18   So that's the time that we accepted it into the property room

19   and the date.

20   Q.    Which date represents the one where the property manager

21   actually takes custody of the evidence?

22   A.    3-13-05.

23   Q.    So what does the date 02-24-05 time 0300, what does that

24   represent?

25   A.    That represents the time the officer filled out his

```
 1    property form and booked the cartridge in.
 2    Q.   Did you find this form and give it to the FBI?
 3    A.   Yes, ma'am.
 4    Q.   Where did you find it?
 5    A.   In the property room in the stack of old PCRs.
 6    Q.   When did you find it?
 7    A.   Right when we were getting ready to destroy it.
 8    Q.   When was that?
 9    A.   I believe it was in March or something of that year of
10    2010 I think when we did it.  It was pre before you guys
11    asked us to save anything.
12    Q.   Was it after January 2010 when you first began looking
13    at the evidence in these cases?
14    A.   Not really.  I didn't really start looking for them
15    until you guys started coming to the office and asking for
16    stuff.
17    Q.   When did you give this property control record to the
18    FBI?
19    A.   I don't know.  I have a receipt in my office that shows
20    when I signed it over to you guys because you took the
21    original.
22    Q.   Was that in the Fall of 2010?
23    A.   It's possible.
24    Q.   At the time you gave this property control record to the
25    FBI, did the taser cartilage described in it exist?
```

```
 1    A.   No, ma'am.
 2         MS. CARTER:  I now would like to turn your
 3    attention to and publish for the jury Exhibit No. 75.
 4         THE COURT:  Go right ahead.
 5    BY MS. CARTER:
 6    Q.   Whose handwriting is on this form?
 7    A.   My signature at the bottom.
 8    Q.   Do you know whose handwriting is on the remainder of it?
 9    A.   Probably one of my volunteers assisting me.
10    Q.   And this form relates to the taser cartridge described
11    in Exhibit 73; correct?
12    A.   Yes, ma'am.
13    Q.   Did you authorize the destruction of that taser
14    cartridge in June 2010?
15    A.   Yes, ma'am.
16    Q.   Did you you yourself destroy the evidence in June 2010?
17    A.   No, ma'am, but I was present.
18    Q.   Who destroyed it?
19    A.   Probably my volunteer.  Just opened the envelope and
20    threw it in the trash.
21    Q.   What was the name of the volunteer?
22    A.   It could have been either Robin Hunt or it could have
23    been Anne Mous.
24    Q.   And you were present when this happened?
25    A.   I was there, yes, ma'am.
```

1  Q.   Did you interview with FBI agents in August 2010?

2  A.   I wouldn't call it an interview, but they were there.

3  Q.   Was that the time when you provided physical evidence of

4  property control record forms to the FBI?

5  A.   I believe that was when they were asking for

6  information, yes.

7  Q.   At that time didn't you tell the FBI that you did not

8  yourself destroy the evidence referred to in Exhibit 73 and

9  75?

10  A.   Yes, ma'am.  I just said I was present.  I didn't say I

11  destroyed it.  I said I was present.

12  Q.   Didn't you tell the FBI agents that you weren't present

13  when the evidence was destroyed?

14  A.   No, ma'am.  I might have, but I was present.  I was

15  there at the time I signed it because she destroyed it.

16  Evidence was destroyed that day that I signed the sheet, and

17  I was in either the proximity or right there.  I didn't

18  physically watch her or stand over top of her, but I was

19  present and I signed for it to be destroyed.

20  Q.   Didn't you tell the agents when you met with them in

21  August 2010 that you didn't know whether the evidence existed

22  or not at the time you signed this property disposition sheet

23  in --

24  A.   Not this sheet, ma'am.  It was the other one.  The one

25  that you were asking about that we could not find.

```
1    Q.    You interviewed again with the government in

2    November 2011; correct?

3    A.    Yes, ma'am.

4    Q.    At that time didn't you tell the government that you

5    never saw the cartridge referred to in this property

6    disposition sheet?

7    A.    I believe I told them I never saw the cartridge that you

8    were asking for that we could not find.  This cartridge we

9    verified.  I said I had to sign for it so therefore it was

10   destroyed.

11   Q.    Didn't the agents ask you specifically about a document

12   bearing Bates Stamp No. S-1763 as Exhibit 57 -- or as

13   Exhibit 75 does?

14   A.    Yeah, they asked me about this.

15   Q.    And didn't you say that you could not say whether the

16   cartridge was lost or not?

17   A.    Not for this one.  It was for the one we could not find.

18   I honestly cannot answer that on that.  The one I signed I

19   know we destroyed.

20   Q.    Didn't you also say you looked for the cartridge when

21   the federal government requested it?

22   A.    Yes, ma'am, and I looked for it again when they were

23   present.  Twice.

24          MS. CARTER:  I would now like to publish for the

25   witness and the jury Exhibit No. 80.
```

1          THE COURT:  Go right ahead.

2          MS. CARTER:  And I would like to ask that the

3   witness be also handed the hard copy of Exhibit No. 80.

4          THE COURT:  Very well.

5          MS. CARTER:  And I would like to publish page 4 of

6   the exhibit.

7          THE COURT:  Go right ahead.

8          MS. CARTER:  And if you could magnify the portion

9   with 2010 entries, please.

10  Q.   Do you see any record on the case audit for the Jamal

11  White case any mention of the destruction of the taser

12  cartridge that was referenced in Exhibit 73 or 75?

13  A.   No, ma'am.

14  Q.   That should appear on this case audit form, shouldn't

15  it?

16  A.   It should of if we were using that system, but at the

17  time when we were transferring over and I took over the

18  property room, we were not using this system.

19  Q.   Did you make an entry in the new system for this case?

20  A.   No, ma'am that's why we have a record on paper.

21  Q.   The record you're referring to on paper is that

22  Exhibit No. 75 the property disposition sheet?

23  A.   Yes, ma'am.

24          MS. CARTER:  If you could publish Exhibit No. 75

25  once more.

```
 1              THE COURT:  Go right ahead.
 2    BY MS. CARTER:
 3    Q.   This exhibit -- does this exhibit show when the taser
 4    cartridge was actually destroyed?
 5    A.   6-10 of '10.
 6    Q.   Where does it show when it was actually destroyed?
 7    A.   6'10 of '10 in the lower left-hand corner.  Approved by
 8    me.
 9    Q.   Does this document show who actually destroyed the
10    evidence?
11    A.   Physically threw it away in the trash can, no, ma'am.
12              MS. CARTER:  I would now like to publish again page
13    4 of Exhibit 80.
14              THE COURT:  Go right ahead.
15    BY MS. CARTER:
16    Q.   And I would like to magnify the entries beginning with
17    January 11, 2010 to the bottom.  This audit shows that you
18    reviewed this case in January 2010; correct?
19    A.   Yes, ma'am.
20    Q.   Was that for the same reasons that you reviewed the
21    Angelica Vargas case in January 2010?
22    A.   It's possible.
23              THE COURT:  Well, I'll strike that it's possible.
24    Do you know or not?
25              THE WITNESS:  No, sir, I do not.
```

BY MS. CARTER:

Q.   You viewed this case again two days before you authorized the destruction of the tasering case; is that correct?

THE COURT:   Well, you're asking him.  Don't ask him if it's correct or not.  Just ask him the question.

BY MS. CARTER:

Q.   Did you review this case again two days before you destroyed the taser cartridge?

A.   Yes, ma'am.

Q.   And when you would have viewed that case, would you have also seen your earlier viewing in January of 2010?

A.   Not unless I was running an audit.

Q.   Now, there are also several entries with your officer number with the date August 10, 2010.  Do you see those there?

A.   Yes, ma'am.

Q.   Is that approximately the date that you met with the government to provide them with the physical evidence in the Jamal White and Angelica Vargas cases?

A.   I believe it was, yes, ma'am.

Q.   By then the taser cartridge referenced in Exhibit 73 and 75 was it after gone?

A.   Yes, ma'am.

Q.   Do you know Anthony Sclafani?

```
 1    A.   Yes, ma'am.
 2    Q.   How do you know him?
 3    A.   From work.
 4    Q.   What work are you talking about?
 5    A.   From the police department.
 6    Q.   Have you known him ever since you started with Desert
 7    Hot Springs Police Department?
 8    A.   Yes, ma'am.
 9    Q.   Did you know him before that?
10    A.   Only in passing.
11    Q.   Did you work with him at the Fontana School Police
12    Department?
13    A.   No, ma'am.
14    Q.   When you say you knew him in passing, what did you mean?
15    A.   At that time I believe he was working for another agency
16    and just briefly in passing was like introduced.
17    Q.   Did you work at the Fontana School Department before you
18    worked at the Desert Hot Springs Police Department?
19    A.   School police or school department?
20    Q.   School police.
21    A.   Yes, ma'am.  School police.
22    Q.   Did Anthony Sclafani work there as well?
23    A.   Not while I was there.
24    Q.   Did Anthony Sclafani talk to you about coming to work at
25    the Desert Hot Springs Police Department?
```

```
 1    A.    No, ma'am.

 2    Q.    Could you identify Anthony Sclafani if you saw him in

 3    the courtroom today?

 4    A.    Yes, ma'am.

 5    Q.    Can you please look around the room and if you see him,

 6    describe where he's sitting and what he's wearing?

 7    A.    He's to my right.  He's wearing a white shirt, dark tie,

 8    black jacket with stripes.

 9            THE COURT:  Indicating for the record the defendant

10    Sclafani.

11    BY MS. CARTER:

12    Q.    How often do you currently speak to the defendant?

13    A.    Whenever I see him.

14    Q.    How often is that?

15    A.    Well, when we were at work, it was quite often.  But

16    since all this mess has started, haven't really seen him that

17    much so maybe once a week when he started coming back.

18    Before that, I hadn't seen him for three or four months.

19    Q.    How would you describe your relationship with him?

20    A.    Friendly.

21    Q.    Do you each lunch with him at work?

22    A.    No, ma'am.

23    Q.    Do you socialize with him outside of work?

24    A.    No, ma'am.

25    Q.    Have you ever discussed this case with him?
```

1    A.    We've talked about things in the past.

2    Q.    When was that?

3    A.    When it was going on, the investigation, and then right

4    before he was placed on admin leave.

5    Q.    When you refer to the time period of the investigation,

6    can you give us month and years?

7    A.    Probably just before you guys went to the grand jury and

8    asked for an indictment.

9    Q.    Was this the same time period when you were being asked

10   to collect evidence in this case?

11   A.    Yes and no.  I mean, you had already collected most of

12   your reports and stuff and everything.

13   Q.    Was it around the time you first met with FBI in August

14   of 2010?

15   A.    No.  I believe Anthony was gone by then.

16   Q.    Was it around the time that you authorized destruction

17   of a taser cartridge in June 2010?

18   A.    No, I don't think so.  I think he was gone by then, too.

19   Q.    What did you discuss with him about the investigation?

20   A.    Just basically, you know, what was going on because I

21   wasn't present when it happened.  I wasn't working for the

22   Department at the time.  And basically I wanted to know why

23   they would even be investigating these cases.

24   Q.    Did you what incidents the Bureau was investigating?

25   A.    He said he wasn't even sure at the time himself.

```
 1    Q.   Did he mention Angelica Vargas or Jamal White?

 2    A.   Those names didn't come up until we started pulling

 3    reports and I was asked to pull those specifically.

 4    Q.   Did he mention tasing incidents with either a Hispanic

 5    woman or a black male?

 6    A.   No, ma'am.

 7    Q.   Have you ever discussed with the defendant that you met

 8    with the FBI?

 9    A.   He was gone, ma'am.

10    Q.   Have you ever talked with the defendant about the fact

11    that you were subpoenaed to testify in this case?

12    A.   Yes, ma'am.

13    Q.   When was that?

14    A.   When you guys started passing out subpoenas a

15    year-and-a-half ago.

16    Q.   What was the discussion you had with him about that?

17    A.   I told him I got a subpoena from the FBI, and then he

18    says you're probably going to get one from my defense and I

19    said okay, fine.

20    Q.   Have you ever met with the defendant's attorneys?

21    A.   Personally met with them one-on-one or just met 'em?

22    Q.   Have you met them?

23    A.   Yeah.

24    Q.   Have you ever had any conversations with them about this

25    case?
```

1   A.   Not in directly with his attorneys, but with his

2   investigator.

3   Q.   Is that investigator that you're referring to a man

4   named Tom Crompton?

5   A.   I'm not sure.  It may be, yes.

6   Q.   When did you speak with this investigator?

7   A.   Briefly one day about a year ago in the office and then

8   just probably maybe a week, two weeks before the trial

9   started.

10  Q.   When you say two weeks before the trial started, is that

11  two weeks before this trial commenced on February 7th?

12  A.   Yes, ma'am.

13  Q.   What did you discuss with the investigator when you met

14  with him about a year ago?

15  A.   Basically, you know, he said he wanted to talk to me.

16  And i said here's my numbers, give me a call, we'll do lunch.

17  If you got time, we'll get together and talk about whatever

18  you need to investigate.

19  Q.   What did you discuss with the investigator two weeks

20  before this trial began?

21  A.   Wanted to know if I had Nancy Allen's phone number and,

22  you know, if I had been subpoenaed and just basically about

23  the case.  I can't really again recall the details.

24  Q.   On either of those occasions, did you discuss the

25  evidence that we've been going over today?

1  A.   I believe about a year ago when they asked what you guys

2  took, but you had to, you know, supply it to them as well,

3  and I told them you guys had taken the originals.

4  Q.   We previously discussed an interview you had with the

5  government in November 2011.  Do you recall that?

6  A.   Yes, ma'am.

7  Q.   At that time trial in this case was also scheduled for

8  November; correct?

9  A.   I believe it was, yes.

10  Q.   And you met with the government at the Desert Hot

11  Springs Police Department station; is that right?

12  A.   Yes, ma'am.

13  Q.   At that time did Jim Henson walk into your office and

14  tell the government he was available to interview?

15  A.   Yeah, I believe he did.  I believe he came to my door

16  and said he was there for the interview.

17  Q.   Did you tell any member of the defense team about that

18  including the defendant?

19  A.   Uh, I don't think I did because it wouldn't -- doesn't

20  matter.

21  Q.   Did you tell any member of the defense team that the

22  government had interviewed Henson?

23  A.   No.  I think I told them they might want to interview

24  him because he had -- Jimmy and come to me and asked me, you

25  know, they were done.

```
1    Q.    Who on the defense team did you tell that to?

2    A.    I believe it might have been Tony just in passing.

3    Q.    When did you tell him?

4    A.    Probably the next day when he came back to work or that

5    following Monday.

6    Q.    And when you say Tony, are you referring to the

7    defendant?

8    A.    Officer Sclafani.

9    Q.    Did you tell the defendant about that because you

10   believed it would be helpful to the defense for the defendant

11   to know that information?

12   A.    Told him just in general because I was talking to him

13   and also to let him know that they're talking to other people

14   and that if they're want to cross talk to him, they can talk

15   to him, too.  I was not ordered not to talk to anybody.

16   Q.    When you had the conversation with defendant, did you

17   believe that it would be helpful for him to know who the

18   government was talking to?

19   A.    Sure.

20   Q.    Do you now Matt Gutting?

21   A.    Yes, ma'am, I do.

22   Q.    How do you know him?

23   A.    I worked with him at Desert Hot Springs Police and just

24   saw him here last week.

25   Q.    Have you known him ever since you started at Desert Hot
```

```
 1    Springs Police Department?
 2    A.   Yes, ma'am.
 3    Q.   Did you know him before that?
 4    A.   No, ma'am.
 5    Q.   How often do you speak to him?
 6    A.   Uh, last week was the first time I had talked to him in
 7    months.
 8    Q.   How you would you describe your relationship with him?
 9    A.   Casual, friendly when we see each other.
10    Q.   Have you ever socialized with him outside of work?
11    A.   No, ma'am.
12    Q.   Have you ever discussed this case with him?
13    A.   Yes, ma'am.
14    Q.   When was that?
15    A.   Last week.
16    Q.   What did you discuss?
17    A.   All the stuff that was going on in this trial, who we
18    saw coming down the hall.  Former Officer Decker that used to
19    work with us.  Talked about the witness you brought in that
20    you had to go find.  We talked about the other gentleman that
21    was up here on the stand.  We talked about everything.
22    Q.   Did you talk about what Gutting testified about?
23    A.   No, I didn't see him after that.  I saw him briefly in
24    the hall and he stayed and I left.
25    Q.   Did you talk to him about what you thought you might be
```

1    testifying about?

2    A.   No, because I really didn't know what I was going to be

3    testifying about.

4    Q.   Did either you or he mention any prior meetings with the

5    government?

6    A.   Yeah, yes, ma'am.

7    Q.   Did you or he mention any prior meetings with the

8    defendant or the defense team?

9    A.   We -- I don't know if we talked about the defense team,

10   but we did talk about meeting with the government.

11   Q.   Do you know Matt Drew?

12   A.   Yes, ma'am.

13   Q.   How do you know him?

14   A.   I worked with him at Desert Hot Springs Police

15   Department also.

16   Q.   Have you known him ever since you started at the

17   Department?

18   A.   Yes, ma'am.

19   Q.   How often do you currently speak to him?

20   A.   Saw Matt talked to him last week for the first time in

21   probably over a year, maybe six months.

22   Q.   How would you describe your relationship with Matt Drew?

23   A.   Again, friendly when met.

24   Q.   Have you ever socialized with him outside of work?

25   A.   No, ma'am.

1   Q.   Have you ever discussed this case with him?

2   A.   Last week.

3   Q.   Did either of you mention what you might be testifying

4   about?

5   A.   Basically, just talking about maybe he might be

6   testifying to the fact that he arrested Jamal for a 3056

7   hold, which is a parole violation and that he believed that

8   Tony transported him at the time.

9   Q.   Did you or he talk about any prior meetings with the

10  government?

11  A.   I don't believe he did because I don't know if he met

12  with the government or not.  We didn't get into that detail.

13  Q.   Did you or he talk about any prior meetings with the

14  defense team?

15  A.   Again, we didn't talk about that I don't believe.

16  Q.   Did you mention to him or Gutting any of the evidence

17  that I have been asking you about today?

18  A.   Um, I basically told them that when the FBI came, they

19  should have, you know, came and got some of the evidence from

20  one of the cases that we had left and that was about it.

21  Q.   During any of the time you were waiting to testify in

22  this case, did you have lunch with Matt Drew or Matt Gutting?

23  A.   Yeah, we both went to lunch, all of us.

24          MS. CARTER:  May I have a moment, Your Honor?

25          THE COURT:  Of course.

1          MS. CARTER:  Nothing further at this time.

2          THE COURT:  Ladies and gentlemen, I think we should

3    probably take the luncheon recess at this time and ask that

4    you come back at 1 o'clock.  Everyone please rise for the

5    jury.

6                        (Jury not present.)

7          THE COURT:  We're outside the presence of the jury.

8    Any matters any counsel wish to take up?

9          MS. CARTER:  Not from the government Your Honor.

10         MR. SCHWARTZ:  Nothing.  Thank you.

11         THE COURT:  I understand that with regard to the

12   Vargas matter that White Memorial can't do anything until

13   later this week so we checked with the MDC.  They thought

14   they could do something tomorrow.  Turns out that they don't

15   have any psychiatrists available.  So forgetting that, then

16   we're back to later in the week with White Memorial on

17   Ms. Vargas.  All right.  Thank you.  1 o'clock then.

18                        (Lunch Recess.)

19         THE COURT:  Good afternoon.  We're again outside

20   the presence of the jury.  Are there any matters that any

21   counsel wish to address?

22         Mr. Nicolaysen.

23         MR. NICOLAYSEN:  Your Honor, I'm overstaying my

24   welcome in this court.

25         THE COURT:  No, no, not all.

1            MR. NICOLAYSEN:  I thank the Court.  As always,

2    your clerk has done a great job drafting an order.  This

3    order had been drafted with the expectation that White

4    Memorial had taken Ms. Vargas --

5            THE COURT:  Well, we're about to have the marshals

6    take her over there now.

7            MR. NICOLAYSEN:  We have come full circle.  We had

8    to revisit that for logistical reasons over the past several

9    hours, and now -- and again, thanks to your clerk's

10   persistence -- and I want to thank the marshals, too.  They

11   also did a good job.  They were calling repeatedly.

12           The bottom line is I think now White Memorial will

13   have the psychiatrist so we can keep the examination local.

14           THE COURT:  Yes.

15           MR. NICOLAYSEN:  And Your Honor's order does

16   provide for a 4:00 p.m. follow-up status conference tomorrow,

17   the 16th.

18           THE COURT:  Right.

19           MR. NICOLAYSEN:  I appreciate the Court has done

20   that.  And the telephonic participation by the psychiatrist

21   on staff at White Memorial in my view is an essential element

22   of tomorrow's proceeding.  Your Honor's allowing that

23   telephonic participation.  My only request is that we do what

24   we can to insure that, indeed, the psychiatrist does

25   participate so that we have direct feedback.

```
 1              THE COURT:  We'll try.  We'll try.
 2              MR. NICOLAYSEN:  Again, Your Honor, thank you for
 3    the Court's time and commitment and very gracious sensitivity
 4    to my client's needs.  I know that the Court has been very
 5    responsive to the unique challenges faced here and has done
 6    so in a very compassionate way.
 7              THE COURT:  Well, I thank you for the
 8    representation which you are providing her.
 9              MR. NICOLAYSEN:  Well, it's my pleasure.
10              THE COURT:  I just wish that the public understood
11    what good lawyers do.
12              MR. NICOLAYSEN:  Your Honor, it's my pleasure.  And
13    I will be upstairs for the balance of the day if the Court
14    needs me for anything.  Otherwise, I'll just be here tomorrow
15    at 4:00.
16              THE COURT:  Thank you.  All right.  If no one else
17    has anything, we'll bring the jury back now.
18              Well, do we have the witness?
19              Would you return to the witness stand, CSI.
20                        (Jury present.)
21              THE COURT:  Please be seated.
22              Good afternoon, ladies and gentlemen.
23              CSI Sherman, would you repeat your full name for
24    the record and spell your last name, please.
25              THE WITNESS:  Yes, Your Honor.  Terry William
```

1    Sherman.

2              THE COURT REPORTER:  (Sneezes.)

3              THE WITNESS:  Bless you.

4              THE COURT REPORTER:  Thank you.

5              THE COURT:  And spell your last name.

6              THE WITNESS:  S-h-e-r-m-i-n.

7              THE COURT:  And you understand you're still under

8    oath in this matter.

9              THE WITNESS:  Yes, Your Honor.

10             THE COURT:  Very good.

11             Let's commence the cross-examination.

12             Did you need to speak to counsel first?

13             MR. SCHWARTZ:  Um, for a moment, Your Honor.

14             THE COURT:  Yes, go right ahead.

15             MR. SCHWARTZ:  Thank you, Your Honor.

16             THE COURT:  Go right ahead.

17                       CROSS-EXAMINATION

18   BY MR. SCHWARTZ:

19   Q.   Afternoon.

20   A.   Afternoon, sir.

21   Q.   You started with Desert Hot Springs Police Department

22   about 2005?

23   A.   Yes, sir.

24   Q.   And you started as a CSO?

25   A.   Yes, sir.

 1    Q.    That's a community services officer?

 2    A.    Yes, sir.

 3    Q.    And then at some point after that, you also were a

 4    reserve officer?

 5    A.    Yes, sir.

 6    Q.    And your current assignment and position is as a CSI.

 7    A.    That is correct, sir.

 8    Q.    Now, going back to 2005 to the present day, have there

 9    been changes to your knowledge in how evidence is booked and

10    gathered and kept at Desert Hot Springs?

11              MS. CARTER:  Objection, vague.

12              THE COURT:  Could we have a better time foundation?

13              MR. SCHWARTZ:  Of course.

14    BY MR. SCHWARTZ:

15    Q.    Are you aware or have any knowledge of how evidence was

16    booked and kept as a record at Desert Hot Springs Police

17    Department back when you started in 2005?

18    A.    At the time, I was only trained how to book in the

19    evidence.  I wasn't working in the property room.

20    Q.    And when did you begin to work in the property room?

21    A.    Probably mid-2006, just on a temporary basis to assist.

22    Q.    And since that time frame, has there been any changes

23    that you've noted going from the positions that you've worked

24    there in how evidence is booked and handled in the property

25    room in Desert Hot Springs Police Department?

1          MS. CARTER:  Objection.  Vague as to changes.

2          THE COURT:  Could we be more specific?

3     BY MR. SCHWARTZ:

4     Q.   Back in 2006 when you worked in the property room in

5     some capacity, was it an organized place?

6          MS. CARTER:  Objection.  Vague.

7          THE COURT:  Which place?

8          MR. SCHWARTZ:  The property room and how the

9     property room procedures were run.

10          MS. CARTER:  Same objection, Your Honor.

11          THE COURT:  It's overruled.

12          You may answer.

13          THE WITNESS:  We were working out of -- essentially

14     out of a utility closet.  It was a very small room.  It had

15     multiple shelves, and property was stacked to the ceiling.

16     BY MR. SCHWARTZ:

17     Q.   Did that change at any point between that time frame

18     which is 2006 that you became familiar with it until

19     currently?

20     A.   Yes, it did.

21     Q.   And when did that change take place?

22     A.   Approximately 2008, 2009 area.

23     Q.   And when you first began working as a CSO in Desert Hot

24     Springs, was it a busy department?

25     A.   I'm sorry, sir?

```
 1    Q.    Was it a busy department?

 2    A.    Very.

 3              MS. CARTER:  Objection, vague.

 4              THE COURT:  Well, that's overruled.

 5              The answer will stand.

 6    BY MR. SCHWARTZ:

 7    Q.    And do you have knowledge about how many calls would an

 8    officer average a night back in 2005 when you first started

 9    at Desert Hot Springs?

10              MS. CARTER:  Objection, calls for speculation.

11              THE COURT:  Overruled.

12              You may answer if you have knowledge.

13              THE WITNESS:  It wasn't uncommon for an officer to

14    take 20 calls a day if not more.

15    BY MR. SCHWARTZ:

16    Q.    And when you first started working back in 2006 in some

17    capacity at the booking facility or the booking utility

18    closet at Desert Hot Springs Police Department, were the

19    records caught up to date or were they behind?

20    A.    They were behind.

21    Q.    Were they far behind?

22    A.    Essentially, yes.

23    Q.    And up until -- in your current position now as you work

24    in that booking department or the property department, are

25    the records kept much more up to date than they were back in
```

1    2006?

2    A.   Yes, sir.

3         MR. SCHWARTZ:   And Your Honor, may I publish

4    Exhibit No. 53.

5         THE COURT:   Of course.

6    BY MR. SCHWARTZ:

7    Q.   And do you still have that in front of you, sir,

8    Exhibit 53?

9    A.   Yes, sir.

10   Q.   Counsel asked you before the lunch break, the writing on

11   here, to keep this taser per Ed Smith.   Remember that?

12   A.   Yes, sir.

13   Q.   Who was Ed Smith?  Do you know?

14   A.   Commander Smith.

15   Q.   And when you say Commander Smith, in the hierarchy of

16   the police department, where would the commander fall in?

17   A.   One step underneath the chief.

18   Q.   And to your knowledge, when you started back in April of

19   2005, was Commander Smith working for the department?

20   A.   No, sir.

21   Q.   And, in fact, it was an entirely different

22   administration in the department back in 2005 when you

23   started, wasn't it?

24   A.   Yes, sir, it was.

25   Q.   And commander Smith back in 2009 was part of the third

1    administration since you had begun working in 2005; correct?

2    A.   Yes, sir.

3    Q.   So from April of 2005 when you began at Desert Hot

4    Springs, as of this date on this exhibit, June of 2009, there

5    had been three administrations at Desert Hot Springs?

6    A.   Yes, sir.

7    Q.   And all three instituted different changes to how the

8    property was kept in the property booking room; correct?

9    A.   Pretty much so, yes, sir.

10   Q.   Is it -- would you categorize that as progressively more

11   organized?

12   A.   If I don't, um -- this one now, this administration now,

13   yes.  They came in and implemented it and made the property

14   room bigger and remodeled it.

15   Q.   In this current administration now, who's the chief?

16   A.   Patrick Williams.

17   Q.   And was Ed Smith his commander back in 2009?

18   A.   Uh, no.  Williams would be over top of Smith.

19   Q.   But was Ed Smith working as a commander for Williams

20   back in 2009?

21   A.   Yes, sir.

22        MR. SCHWARTZ:  Now may I publish Exhibit 49 to the

23   witness, please?

24        THE COURT:  Go right ahead.

25        MR. SCHWARTZ:  Thank you.

BY MR. SCHWARTZ:

Q.    And counsel showed you this before the lunch, Exhibit
49.  Do you recognize what that is?

A.    Yes.  It's the Biotox report.

Q.    Now, you noted that there were several different reports
and pieces of evidence that you went and pulled for the FBI
when they came to speak with you back in 2010; is that
correct?

A.    Yes, sir.

Q.    Is this one of them?

A.    It's possible, yes.

        THE COURT:  Well, do you know whether it is?

        THE WITNESS:  Your Honor, I pulled so many, I can't
honestly answer that.  No.

        THE COURT:  Thank you.

BY MR. SCHWARTZ:

Q.    And are you familiar with this document outside of just
pulling it as a piece of record or property?

A.     It's the report that we get back from the laboratory
after the blood has been processed for chemical analysis or
alcohol.

Q.    Now, on this report, it has date collected.  Do you see
that?

A.    Yes, sir.

Q.    And there's no date put in there, is there?

1    A.    No, sir.

2    Q.    And this is coming from Biotox; is that correct?

3    A.    That is correct.

4    Q.    And when you get a report back from Biotox, you get just

5    this piece of paper; right?

6    A.    Yes, sir.

7    Q.    Which is to your knowledge created by Biotox

8    laboratories; right?

9    A.    Yes, sir.

10         MR. SCHWARTZ:  Your Honor, may I publish Exhibit 75

11   to the witness, please?

12         THE COURT:  Go right ahead.

13         MR. SCHWARTZ:  Thank you.

14   Q.    And counsel also spoke to you toward the end of your

15   testimony about this exhibit.  Do you recall that?

16   A.    Yes, sir.

17   Q.    And that would be a property disposition sheet?

18   A.    Yes, sir.

19   Q.    And that's your signature at the bottom?

20   A.    Yes, sir.

21   Q.    And you recall at least being physically present when

22   this piece of evidence was destroyed?

23   A.    Yes, sir.

24   Q.    Now, as you sit here today, did my client tell you to

25   destroy this piece of evidence?

```
 1   A.    No, he did not.
 2   Q.    And was this piece of evidence destroyed in some form or
 3   another to help cover something up?
 4   A.    No, sir, it was not.
 5   Q.    Now, did the FBI ask you to look for more than one taser
 6   cartridge?
 7   A.    I believe they did, yes.
 8   Q.    Did you search for more than one?
 9   A.    Yes, I did with them present.
10   Q.    And you only found one.
11   A.    The only one that they have.
12   Q.    And that was some point after the date on this form
13   which is June of 2010?
14   A.    Yes, because the one PCR said do not destroy.
15   Q.    Now, is the policy in a misdemeanor case to destroy
16   evidence one year one day after the case is filed unless you
17   hear otherwise?
18   A.    Unless we hear otherwise, it can be destroyed one year
19   one day, that is statute of limitations is up on it or if the
20   Court has so ordered the case adjudicated, then the -- no
21   appeals, the evidence can be destroyed.
22   Q.    Now, was there some point while you were working as a
23   CSI from January 1st, 2010 through the end of June of 2010,
24   those six months was there some point where you went through
25   different, I guess, pieces of evidence to decide to purge
```

1    them to make room for new pieces of evidence?

2    A.    Yes, sir.  We were -- I was ordered basically to clean

3    up the property that we had from 1997 to present.  Get it up

4    to date.  Purge every piece of evidence that we could

5    possibly purge and get the property room organized because it

6    had been remodeled and it was new and they wanted to bring it

7    in and get it up to date.

8    Q.    And was the destruction of this piece of evidence part

9    of that purging process?

10    A.    Yes, sir, it was.  We started back from '97 and moved

11    forward.

12    Q.    And who ordered you to do that?

13    A.    The chief.

14    Q.    Chief Williams.

15    A.    Yes, sir.

16    Q.    Not my client.

17    A.    No.

18    Q.    Now, counsel also asked you on direct testimony if you

19    had found any tasers in the property room.  Do you remember

20    that?

21    A.    Yes.

22    Q.    And would it be normal based on your experience both as

23    a CSI and working the property room for a taser to be booked

24    in as evidence?

25    A.    It's rare that a taser gets booked in.  If it is, it's

```
 1    only temporary and then it's given back to the officer.
 2    Q.   More commonly some form of the cartridges are booked in;
 3    correct?
 4    A.   Yes, sir.
 5    Q.   Now, you also noted that AFIDs that have been discussed
 6    previously that they're no bigger than the size of a head of
 7    pen you said or something on direct examination?
 8    A.   Just relatively about the size of a head of a pen with
 9    little a round ball on the end of it.  Big enough to read a
10    number.
11    Q.   And counsel asked you if it was normal procedure for an
12    officer to collect those AFIDs in processing a taser
13    cartridge and booking it into evidence.  You recall that?
14    A.   Yes.
15    Q.   And those AFIDs that fall down, are you familiar with
16    the Desert Hot Springs Police Department the booking area?
17    A.   Yes, sir, I am.
18    Q.   And are you familiar with the outside where the sally
19    port is?
20    A.   Yes, sir.
21    Q.   And there's a doorway that leads down the hallway to
22    where the watch commander's office is?
23    A.   Yes, sir.
24    Q.   And you noted on direct that when those doors are open,
25    there's some kind of a wind factor in there?
```

1    A.    Yes, sir.

2    Q.    Can you describe that?

3    A.    The winds commonly blow and it's why we have the

4    windmills out there, so it's not uncommon for us to have 20,

5    30 mile an hour wind.  Just pulling open the door can cause a

6    draft that comes through.  Uh, even if there is no draft, if

7    there is a slight little breeze, we get a nice breeze that

8    comes through every once in a while.  So, I mean, you can be

9    standing there and the next thing you know if you had hair,

10   it's flying in the air.

11   Q.    And had it been your experience with those doors open

12   that AFIDs on the floor are blowing around?

13   A.    Yes.

14         MS. CARTER:  Objection.  Foundation.  Lack of

15   personal knowledge.

16         THE COURT:  You can answer if you do have personal

17   knowledge.

18         THE WITNESS:  Well, I can attest to seeing AFIDs

19   being on the ground and the winds blowing them away,

20   Your Honor.

21   BY MR. SCHWARTZ:

22   Q.    And in your experience going through evidence that's

23   being booked, have you had experience over the years you've

24   come across taser cartridges that have been booked in

25   different cases?

1    A.    Yes, sir, I have.

2    Q.    And are they always booked with AFIDs?

3    A.    I have yet to see any AFIDs but one that I collected

4    myself personally.

5    Q.    And have you had occasion to see taser cartridges booked

6    with the wires attached to the darts or the prongs?

7    A.    Yes, sir.

8    Q.    And in your experience as a CSI, is it common that the

9    entire length of the wire is always attached to those darts?

10   A.    Sometimes, yes.  Sometimes, no.  It depends on the if

11   suspects broke them, pulled them off, if they've snapped in

12   two.  Depends.  There can be extenuating circumstances.

13         MR. SCHWARTZ:  Have just a moment, Your Honor,

14   please?

15         THE COURT:  Of course.

16         MR. SCHWARTZ:  Now, the destruction of evidence

17   form, the property disposition sheet, may counsel publish

18   that again, Your Honor?

19         THE COURT:  What exhibit number is this?

20         MR. SCHWARTZ:  75.

21         THE COURT:  Thank you.

22   BY MR. SCHWARTZ:

23   Q.    Did you help create this form meaning the form itself,

24   not what's on the specific form, but the fact of the written

25   disposition sheet form?

1    A.    No.  This form was already existing when I arrived.

2    Q.    And do you know when that form itself, just the general

3    property disposition sheet, when that came into play, when

4    that was first used at Desert Hot Springs?

5    A.    No, sir.  I cannot give you that time frame.

6    Q.    Now, counsel showed you on direct the case audit form.

7    You remember that?

8    A.    Yes, sir.

9    Q.    Now, are case audit forms usually part of being booked

10   into evidence with a report in a case?

11   A.    No, sir.

12   Q.    And how is the information on the case audit form

13   created if you know?

14   A.    Can you be more specific?

15   Q.    I'll try to.  At the time of the case audit form that

16   counsel showed you, going back to the first page or one of

17   the pages, talking 2005 right after you started say

18   April 2005.

19   A.    Yes, sir.

20   Q.    At that time there was a RMS system?

21   A.    Yes, sir.

22   Q.    So if an officer were to go into the computer with a

23   certain case number, that officer could -- that entry into

24   the computer with that case number would show on the case

25   audit form?

1    A.    If that's the case number that he entered, yes.

2    Whatever case number you enter, that's the one that shows

3    that you entered to look at that case.

4    Q.    Now, you were asked on direct if you recall, if there

5    were a number of entries that went from three spent taser

6    cartridges that went to two and then back to three.  Do you

7    recall that?

8    A.    Yes.

9    Q.    And the number next to it, 054 that denotes the

10   officer's ID number?

11   A.    Yes, sir.

12   Q.    Do you recall offhand what my client's ID was at the

13   time?

14   A.    No, we've had so many officers come and go.

15   Q.    Would it refresh your recollection to look at the case

16   audit form?

17   A.    Yes.

18   Q.    And showing you in the yellow the 056 and the narrative

19   by Tony Sclafani, would that be my that client's ID number?

20   A.    It should be, yes.  It should match up to him.

21          MR. SCHWARTZ:  Your Honor, can I also publish

22   Exhibit No. 53?

23          THE COURT:  Go right ahead.

24   BY MR. SCHWARTZ:

25   Q.    Going back to Exhibit No. 53, which was the -- what was

1   the title of this particular document?

2   A.   The PCR commonly referred to as the property control

3   record or property control receipt.

4   Q.   And do you see an officer's name at the bottom?

5   A.   Sclafani's.

6   Q.   Do you see a badge number?

7   A.   056.

8   Q.   Now, of the items that counsel showed you previously and

9   going back and, Your Honor, I apologize if I can republish

10  56?

11          THE COURT:   Go right ahead.

12  BY MR. SCHWARTZ:

13  Q.   Where she went over the three changed to two several

14  times.  Do you see that?

15  A.   Yes, sir.

16  Q.   That was a different officer's number, wasn't it?

17  A.   Yes, sir.

18  Q.   It wasn't my client's, was it?

19  A.   No, sir.

20  Q.   You noted earlier that an officer themselves can go into

21  the system and change a report up until when that report is

22  locked; is that correct?

23  A.   Yes, sir.

24  Q.   So only after it is locked, does an officer have to have

25  a supervisor go into the system for them; is that correct?

```
 1    A.    Yes, sir.
 2    Q.    Now, you noted on direct there were several occasions
 3    when you gathered materials for the FBI when they were
 4    present at the Police Department; right?
 5    A.    Yes, sir.
 6    Q.    And you had to interact with them at that time?
 7    A.    Yes, sir.
 8    Q.    You noted on direct you were asked whether you
 9    interviewed with the FBI.  Do you remember that?
10    A.    Yes, sir.
11    Q.    And your answer or response was if you call that an
12    interview.  Do you recall that?
13    A.    Yes, sir.
14    Q.    Why did you say that?
15    A.    Because it wasn't really sit down and saying they were
16    gonna talk to me.  They all came in, act like they're your
17    buddy and asking questions about what was on the computer and
18    lo and behold to me there's an FBI agent back there taking
19    shorthand taking notes.  And I didn't know this until
20    afterwards or until about a midway point through that they
21    were writing down everything I was saying.
22    Q.    And did they tape record at all to your knowledge?
23    A.    To my knowledge, the FBI doesn't use tape recording.
24    Q.    And did they ever go over those notes they took to make
25    sure that you felt they accurate about your statements?
```

A.    Not until the 11th or of 2011.

Q.    Now, there is a name you mentioned also on direct testimony Nancy Allen?

A.    Yes, sir.

Q.    Who was she?

A.    She was the former records slash property slash multi-person.

Q.    So to your knowledge, when you worked there alongside her, did she have multiple positions?

A.    Yes, sir, she did.

Q.    And was one of those positions to be in charge of the evidence or property room?

A.    Yes, sir, it was.

Q.    And one of those also was of a records clerk or records supervisor?

A.    Records supervisor.  There was really no clerks.

Q.    Any other position?

A.    She was at one time the chief's secretary many administrations ago.  She also pulled records for the courts for superior court for the DA's office and for civil trials for insurance agencies, et cetera.

Q.    So she wore multiple hats while she worked there to your knowledge?

A.    Yes, sir.

Q.    Now, you as manager of the property room, how many hats

```
 1    do you wear?
 2    A.    Three or four, five.  Depends on what day of the week it
 3    is.
 4    Q.    Is that because it's a small Department?
 5    A.    Yes, sir.
 6    Q.    And very busy Department?
 7    A.    Very busy.
 8              MR. SCHWARTZ:  May I have just a moment please,
 9    Your Honor.
10              THE COURT:  Certainly.
11              MR. SCHWARTZ:  May I have a moment to confer,
12    Your Honor?
13              THE COURT:  Go ahead.  Just be at ease, ladies and
14    gentlemen.
15    BY MR. SCHWARTZ:
16    Q.    Officer Sherman, have you been honest today?
17    A.    Yes, sir.
18              MS. CARTER:  Objection, Your Honor.
19              THE COURT:  What's the objection?
20              MS. CARTER:  Withdrawn.
21    BY MR. SCHWARTZ:
22    Q.    And would you lie on the witness stand to protect my
23    client?
24    A.    No, sir, I would not.
25              MS. CARTER:  Objection, Your Honor.
```

```
 1              THE COURT:  Overruled.  The answer will stand.

 2              MR. SCHWARTZ:  Nothing further, Your Honor.

 3              THE COURT:  Redirect.

 4                     REDIRECT EXAMINATION

 5   BY MS. CARTER:

 6   Q.   You testified on cross-examination about --

 7              THE COURT:  Well, you're asking him?

 8              MS. CARTER:  I'm going to ask him if he recalls it.

 9   Just to point his attention to that particular part of his

10   cross-examination testimony.  I can rephrase.

11              THE COURT:  Thank you.

12   BY MS. CARTER:

13   Q.   Do you recall testifying on cross-examination that you

14   did a case audit around the time that you signed -- I'm

15   sorry -- that you cleaned out the property room around the

16   time that you signed the property disposition sheet at

17   Exhibit 75?  Do you recall that?

18              MR. SCHWARTZ:  Objection.  Misstates the facts.  He

19   never used the word case audit for that.

20              THE COURT:  Well, if he understands the question,

21   he can answer.

22              THE WITNESS:  I'm not sure what she's asking me.

23   BY MS. CARTER:

24   Q.   Do you recall testifying on cross-examination that you

25   cleaned out the property room around the same time that you
```

1   signed Exhibit 75, the property disposition sheet?

2   A.   I believe I stated that we were in the process of

3   cleaning out the evidence room getting rid of old evidence.

4   Q.   And at that time you had already been trained on the

5   destruction of evidence; is that correct?

6   A.   Yeah.  Yes, ma'am.

7   Q.   Did you know at that time that it was a serious

8   violation to destroy evidence that could be relevant to a

9   pending investigation?

10  A.   I would have if we had been notified at the time you

11  guys were investigating, but you didn't notify us so

12  therefore statute of limitation was up.  I destroyed the

13  evidence.

14  Q.   At the time that you destroyed -- at the time that you

15  signed Exhibit 75, the property disposition sheet in

16  June 2010, hadn't you already been reviewing these cases

17  pursuant -- because of the FBI's investigation in

18  January 2010?

19  A.   Not just your case.  I was pursuing all cases at that

20  time.  Started from 1997 and moving forward destroying drugs

21  and anything else that was relevant.

22  Q.   Were you pulling records related to the Vargas and White

23  investigations as well as others for the FBI?

24  A.   To my knowledge, yes, I was.

25          MR. SCHWARTZ:  Objection.  Vague as to time,

1    Your Honor.

2              THE COURT:   Could we have a time frame?

3    BY MS. CARTER:

4    Q.    In January 2010 were you pulling records for the FBI

5    related to the Vargas and White cases among to others?

6    A.    I believe I was, yes.

7    Q.    Do you also -- do you recall testifying on

8    cross-examination that when you started working in the

9    evidence room in 2006, the records were more behind than

10   today?

11   A.    Yes.

12   Q.    Before 2010 are you aware of any audit or other

13   investigation to determine what evidence booked in the White

14   and Vargas cases actually existed?

15   A.    No, ma'am.  When Nancy Allen was in the property room,

16   she was in charge of all that.  We were on a need to know

17   basis.  The less I knew the better I felt, and it wasn't

18   until Nancy retired that I officially took over the property

19   room.  So I had no control over everything up until the day

20   she retired.

21   Q.    Between the time you took over the property room in 2008

22   and 2010, did you ever do any kind of an audit to determine

23   or other investigation to determine whether the evidence

24   booked in the White and Vargas cases actually in the property

25   room?

A.   The only audits you're gonna see with my name on them is when I went in to pull the cases to review to go to the Superior Court website to review the cases to see if they'd been adjudicated, sentenced or pending or if there was a warrant out for their arrest.  At which time the decision if they're done, then process is then taken one step further and the destruction sheets are ordered up and we ordered them up and we go through.  We attach the reports and it would go through and we destroy the evidence.

Q.   Between the time that you took over the property room in 2008 --

A.   I took over in 2009 when Nancy retired.

Q.   Between the time that you took over the property room when Nancy Allen retired and 2010 was there audit or other investigation to determine whether the evidence booked in the White and Vargas cases was actually present in the property room?

A.   You have the sheets in front of you.  My name is there. I did not do an audit personally myself.  I had no concern or any other interest in this case.  All my concern was getting rid of the cases when cases were adjudicated and the statute of limitations under California Penal Code.

Q.   So is the answer to my question is no?

A.   Redirect me and ask me again.

Q.   Between the time that you took over the property room

1    when Nancy Allen retired and 2010, did you ever do an audit

2    or other investigation to determine whether the evidence

3    booked in the White and Vargas cases were actually in the

4    property room?

5    A.   And as I said, I did run it.  I did check to verify to

6    see what evidence was there.

7    Q.   When was that?

8    A.   Well, look at the audit sheet and it will tell when I

9    went in.  I have been in that case so many times I cannot

10   give you an honest definitive answer.

11   Q.   The times that you went in to determine what evidence

12   was actually present in the property room for those cases,

13   those times correspond to the entry dates with your officer

14   number in the case audits; is that right?

15   A.   If I went in that day, that's the day that I went in.

16   That's the day that shows up on the computer.  I have no

17   control over that.

18           MS. CARTER:  May I publish Exhibit 55 which is in

19   evidence?

20           THE COURT:  Certainly.

21   BY MS. CARTER:

22   Q.   Do you recall that this is the property control record

23   that we talked about for which there was no taser cartridge

24   and for which there was no property disposition sheet?

25           MR. SCHWARTZ:  Objection.  Outside the scope of

1    cross.

2              THE COURT:  It may be, but in an effort to move

3    this along, I'm gonna allow it.  Go ahead.

4              THE WITNESS:  Yes.

5    BY MS. CARTER:

6    Q.   Does the fact that there is no property disposition

7    sheet for this piece of evidence mean that it didn't exist at

8    the time that you did this purging process that you described

9    in June 2010?

10   A.   It's possible.

11   Q.   If it had existed --

12             THE COURT:  Just a minute.  Strike that.  Ask

13   another question.

14   BY MS. CARTER:

15   Q.   If this piece of evidence referred to in this property

16   record had existed at the time that you did the purging

17   process in June of 2010, would you have purged it?

18             MR. SCHWARTZ:  Objection.  Calls for speculation.

19             THE COURT:  Overruled.  You may answer.

20             THE WITNESS:  If I had an order not to destroy,

21   then no, I would not have.

22   BY MS. CARTER:

23   Q.   Other than that circumstance and based on the purging

24   process that you've described, if this piece of evidence

25   referred to in this property control record had existed in

1    June 2010, would you have purged it?

2    A.    Again, it would depend on what you FBIs would have

3    wanted.  As I was going through in June of 2010, if that

4    would have been there with the other ones when we had

5    knowledge and already had order not to destroy, then I would

6    have not destroyed it.

7    Q.    Were you aware of an order not to destroy evidence from

8    the White and Vargas cases as of June 2010?

9    A.    Not until I was told not to destroy that one piece of

10   evidence.  That was the only thing that I was told.  You guys

11   had five years to put a press on all this stuff and you never

12   did.

13              MS. CARTER:  Objection.  Nonresponsive.  Move to

14   strike.

15              THE COURT:  It will be stricken.

16              MS. CARTER:  Just the last sentence.

17   Q.    So if this piece of evidence referred to in the property

18   control record for Exhibit 55 had existed as of the time of

19   your June 2010 purge, would you have purged it?

20   A.    Again, if I was ordered not to have destroyed it, I

21   would not have.  There was no indication or not told to hold

22   the evidence, I would have destroyed it, but I didn't.

23   Q.    You can clear the exhibit.  Does the Department still

24   use the RMS system for case audits?

25   A.    We do not use that system.  We use Alliance now for all

1    of our reports and property entries.

2    Q.    Does the Department still use the RMS system to access

3    cases from the time period before Alliance was put into

4    effect?

5    A.    Yes, ma'am, we have to.  We have open cases and

6    homicides still in there.

7    Q.    For those open cases that were commenced that were

8    started before the Alliance system, does the Department still

9    use the RMS system?

10   A.    We have transposed it over now into the Alliance system

11   if we can update and bring it in so that it's understanding

12   because all of the records have been printed and held in the

13   case files and stuff into a storage container.

14   Q.    Do you recall testifying on cross-examination that you

15   didn't realize that the FBI was taking notes when they came

16   to talk to you at the station in August 2010?

17   A.    Yes.

18   Q.    Would you have said something different to the FBI

19   agents if you had known that they had been taking notes?

20   A.    I probably wouldn't have talked to you.

21            MS. CARTER:  May I have a moment?

22            THE COURT:  You may.

23   BY MS. CARTER:

24   Q.    Was the defendant ever your direct supervisor?

25   A.    No.

```
 1              MS. CARTER:  Nothing further, Your Honor.

 2              THE COURT:  Any further questions of this witness?

 3              MR. SCHWARTZ:  Yes, Your Honor.  Very briefly.

 4                        RECROSS-EXAMINATION

 5   BY MR. SCHWARTZ:

 6   Q.   You just testified a moment ago that had you known the

 7   FBI was taking notes, you probably would not have talked to

 8   them?

 9   A.   Correct.

10   Q.   Why?

11   A.   Because I would have known what they were gonna twist my

12   words around and try to use it to their advantage.

13   Q.   And you also testified a moment ago that back in 2005 it

14   was on a RMS system and now it's gone on an Alliance system?

15   A.   Correct.

16   Q.   To your knowledge, if you know, did the RMS system have

17   a problem with repeating entries by itself without the person

18   actually putting entries in?

19   A.   I'm not aware of it.  It possibly has.  I know that's

20   one of the things that we had so we did update the system.

21              MS. CARTER:  Objection.  Move to strike.

22              THE COURT:  It will be stricken.

23   BY MR. SCHWARTZ:

24   Q.   And counsel showed you -- Your Honor, may I publish

25   Exhibit 55?
```

1          THE COURT:  Go right ahead.

2    BY MR. SCHWARTZ:

3    Q.   Do you recall this exhibit?

4    A.   Yes, sir.

5    Q.   And counsel asked you about a taser cartridge being

6    purged or whether you purged a taser cartridge back in 2010.

7    Do you recall that?

8    A.   Yes, sir.

9    Q.   And if that taser cartridge had been in existence when

10   you were going through the purging process, if you would have

11   purged that.  Do you recall that?

12   A.   Yes, sir.

13   Q.   Now, the way that the property room operated to your

14   knowledge, could that have been purged before you even became

15   the manager of the property room?

16   A.   It's very possible.  I'm wondering if the 414 down below

17   might not have been it.

18          MS. CARTER:  Objection.  Move to strike.

19          THE COURT:  It will be stricken.

20   BY MR. SCHWARTZ:

21   Q.   To your knowledge, how that property room was managed

22   was it common to have that, those pieces of evidence that

23   were no longer needed or used purged every so often?

24   A.   Yes, every so often it was purged.

25   Q.   And when you went through that process to purge things

1     that were still there from 1997 through that date of 2010,

2     that was just to clean it out completely; is that correct?

3     A.    Yes, to get it up to date.

4     Q.    And back in January of 2010 when the FBI you testified

5     first began asking you for items, were you given any specific

6     direction about what item its they wanted?

7     A.    I was just told by my Commander Smith to get these items

8     and bring them to him and hand them over.

9     Q.    And the items to get to Commander Smith, did you get

10    those items?

11    A.    Yes.

12          MR. SCHWARTZ:  May counsel publish, Your Honor,

13    Exhibit 53?

14          THE COURT:  Go ahead.

15    BY MR. SCHWARTZ:

16    Q.    And on Exhibit 53 this taser cartridge with the words

17    "keep this taser per Eddie Smith dated June 22nd, 2009," was

18    that one of the items that you were asked to give over if you

19    remember?

20    A.    That was one of the items that was told to be kept.

21    That's one of the items they took at a later date.

22    Q.    And to your knowledge, publish Exhibit 55, was this item

23    told to be kept?

24    A.    No.

25    Q.    And in January of 2010, were you still in the process of

1    trying to organize the property room?

2    A.    Yes.

3    Q.    Was it in disarray at that time?

4    A.    It wasn't in complete disarray, but it was still

5    unorganized.

6              MR. SCHWARTZ:  Nothing further at this time,

7    Your Honor.  Thank you.

8              THE COURT:  All right.  Thank you.

9              MS. CARTER:  May I ask two questions, Your Honor?

10             THE COURT:  If you must.

11             MS. CARTER:  Thank you.  May I publish Exhibit 55?

12             THE COURT:  You may.

13                   FURTHER REDIRECT EXAMINATION

14   BY MS. CARTER:

15   Q.    Do you know for sure whether the taser cartridge

16   referenced in Exhibit 55 even existed as of 6-22-09 the date

17   written on Exhibit 53?

18   A.    No, ma'am, I do not.

19   Q.    Is there any record of the taser cartridge referenced in

20   Exhibit 55 being purged pursuant to any normal evidence

21   destruction policy?

22   A.    No, ma'am.  None has been found.

23             MS. CARTER:  Nothing further.

24             THE COURT:  Anything further?

25             MR. SCHWARTZ:  No.  Thank you, Your Honor.

```
 1              THE COURT:  Thank you very much, Officer.  You're
 2    excused.
 3              THE WITNESS:  Thank you, Your Honor.
 4              THE COURT:  Government may call its next witness.
 5              MR. ARKOW:  Yes, Your Honor.  At this time the
 6    government would like to read several portions from the
 7    stipulation Government Exhibit 84 and then display them on
 8    the monitor to the jury at the appropriate moment.
 9              THE COURT:  Go ahead.
10              MR. ARKOW:  Reading from Government Exhibit 84 the
11    stipulation regarding the Desert Hot Springs Police
12    Department business records, Government Exhibit 10 is the
13    Desert Hot Springs Police Department Law Enforcement Code of
14    Ethics in effect on February 24th, 2005 and February 25th,
15    2005.  And ask that Government Exhibit 10 be moved into
16    evidence and with the Court's permission, display it for the
17    jury.
18              THE COURT:  It may come in and you may display it.
19                   (Exhibit 10 was admitted.)
20              MR. ARKOW:  Magnify the first paragraph to allow
21    the jury to read.  We're going to move to Government
22    Exhibit 11.
23              THE COURT:  Go ahead.
24              MR. ARKOW:  Government Exhibit 11 is the Desert Hot
25    Springs Police Department Policy Section 300 regarding use of
```

1    force in effect on February 24th, 2005 and February 25th,

2    2005.   Government moves Government Exhibit 11 into evidence.

3              THE COURT:  It will come in.

4                   (Exhibit 11 was admitted.)

5              MR. ARKOW:  With the Court's permission, ask to

6    publish portions of Exhibit 11 on the monitor?

7              THE COURT:  Go ahead.

8              MR. ARKOW:  If you can display on the first page

9    the Use of Force policy, the first paragraph.  If you can

10   magnify Section 300, the Purpose and Scope 300.1 at the top

11   of the page.

12        While keeping that up, also magnify a little

13   further down in the page, Section 300.2, the policy on use of

14   force.

15        And then moving to the second page of Use of Force

16   Policy, the top of the page Section 300.22 which is entitled

17   Factors Used to Determine The Reasonableness of Force within

18   that same exhibit.  If you can magnify Section 300.22, the

19   factors.

20        And finally with respect to this exhibit, the

21   fourth page which is the Section No. 300.4 with the caption

22   Reporting the Use of Force.  You can magnify that.

23        Now, turning to Government Exhibit 12, it is the

24   Desert Hot Springs Police Department Policy Section 308

25   regarding control devices in effect on February 24th, 2005

1    and February 25th, 2005.  The government would move

2    Government Exhibit 12 into evidence and with the Court's

3    permission ask to publish it to the jury.

4              THE COURT:  It may come in and you can publish it.

5                   (Exhibit 12 was admitted.)

6              MR. ARKOW:  Can you magnify Government Exhibit 12

7    Section 308 Control Devices and Techniques the first two

8    sections?  Section 308.1 which is entitled Purpose and Scope,

9    and then the section immediately under that, Section 308.11

10   When These Devices May Be Used.

11             Move forward to the second page of the Desert Hot

12   Springs policy on Control Devices and Techniques and

13   specifically the Section 308.5 which has the caption Taser

14   Guidelines and magnify that paragraph of the policy.

15             And moving further down the policy to the section

16   that's labeled 308.52 Report of Use and the section

17   immediately below that Section 308.53 Post-Use Procedures

18   Probe Removal if you can magnify that for the jury.

19             And if you could move forward to the next page

20   which continues with the policy on Post-Use Procedures For

21   Taser Removal, which has Items 3 through 9 and magnify that

22   for the jury.

23             The next exhibit Government Exhibit 13 is the Taser

24   Addendum to the Desert Hot Springs Police Department Policy

25   regarding the use of force in effect on February 24th, 2005

1  and February 25th, 2005.  The government would move

2  Government's Exhibit 13 into evidence and with the Court's

3  permission ask to publish it.

4           THE COURT:  It may come in and you can publish it.

5                (Exhibit 13 was admitted.)

6           MR. ARKOW:  Can you magnify the first two

7  paragraphs of the Use of Force Taser Addendum?

8        Then if you could scroll down that page and magnify

9  the bottom half of that page.  And if you can move forward to

10  the last page Use of Force Taser Addendum document

11  specifically the paragraph that's labeled F with the heading

12  Documentation and magnify that paragraph for the jury.

13        And now turning to Government Exhibit 14, which is

14  an electronic mail memorandum written on January 7th, 2005

15  regarding new use of force form, I would ask that Government

16  Exhibit 14 be moved into evidence and with the Court's

17  permission be published to the jury.

18           THE COURT:  It may come in and be published.

19                (Exhibit 14 was admitted.)

20           MR. ARKOW:  It's a one-paragraph memo.  If you can

21  magnify the use of instruction on new use of force report

22  forms.

23        And finally one more exhibit to read from the

24  stipulation before the next witness and that's Government's

25  Exhibit 48 which is the Desert Hot Springs Police Department

```
 1    Law Enforcement Blood Withdrawal Check-Off Sheet dated

 2    February 25th, 2005 relating to Angelica Vargas.  Government

 3    would move Government Exhibit 48 into evidence and also ask

 4    the Court's permission to publish that exhibit to the jury.

 5             THE COURT:  It may come in and you can publish.

 6                   (Exhibit 48 was admitted.)

 7             MR. ARKOW:  At this time the government calls its

 8    next witness Eddie Cole.

 9             THE COURT:  Very well.  Would you come

10    straightforward, sir.  Come right up on the witness stand to

11    be sworn, sir.

12             THE CLERK:  Please raise your right hand.

13                   (Witness sworn.)

14             THE CLERK:  Please have a seat.  State and spell

15    your name for the record.

16             THE WITNESS:  Eddie Cole C-o-l-e.

17             THE COURT:  Do you have a middle name, Mr. Cole?

18             THE WITNESS:  Roy.

19             THE COURT:  Is Eddie your given name?

20             THE WITNESS:  It is.

21             THE COURT:  Have you checked your weapon before

22    coming in?

23             THE WITNESS:  I did.

24             THE COURT:  Go ahead.

25                         DIRECT EXAMINATION
```

```
 1    BY MR. ARKOW:
 2    Q.   Mr. Cole, how are you currently employed?
 3    A.   I'm a detective for the Desert Hot Springs Police
 4    Department.
 5    Q.   And where are they located?
 6    A.   In the City of Desert Hot Springs in Riverside County.
 7    Q.   How long have you been employed with the Desert Hot
 8    Springs Police Department?
 9    A.   14 years, four months.
10    Q.   Did you have prior law enforcement experience before
11    joining the Desert Hot Springs Police Department?
12    A.   Yes.
13    Q.   Can you give the jury a sense of the -- any other law
14    enforcement positions you held and if you recall,
15    approximately the length of times you held those positions in
16    law enforcement?
17    A.   I have five years when I started with the Los Angeles
18    Housing Authority Police.  I have a year and 18 months with
19    the Riverside County Sheriff's Department.  I have another
20    four-and-a-half years with the Los Angeles City Housing
21    Authority Police.  I have two years eight months with the
22    Hawaiian Garden Police Department and the 14 years and four
23    months with Desert Hot Springs.
24    Q.   Are you familiar with the City of Desert Hot Springs and
25    the streets and the geography?
```

1    A.    Yes.

2    Q.    Are you familiar generally with a location of apartment

3    complexes on Ironwood Drive known as Country Hill?

4    A.    Yes.

5    Q.    Could you estimate approximately how far within -- in

6    terms of miles that apartment complex is from the Desert Hot

7    Springs Police Department station?

8    A.    Approximately two-and-a-half-miles.

9    Q.    And I want you to focus your attention on any question I

10   ask as what was in effect in February 2005.  Do you have that

11   date in mind?

12   A.    Yes.

13   Q.    And was the Desert Hot Springs Police Department's

14   location in February 2005 approximately two-and-a-half miles

15   from these apartments on Ironwood Drive?

16   A.    Yes.

17   Q.    Are you familiar with the policies regarding use of

18   force in the training that you received as a Desert Hot

19   Springs Police Department officer regarding use of force

20   prior to February 2005?

21   A.    Yes.

22   Q.    Did Desert Hot Springs Police Department officers have

23   different options to use when they were dealing with a

24   suspect in the field on patrol?

25   A.    I don't understand your question.

1    Q.   When a police officer on patrol was dealing with a

2    suspect in the field, were there different ways that a police

3    officer could interact with the suspect?

4              MR. SCHWARTZ:  Objection.  Vague.

5              THE COURT:  Sustained.

6    BY MR. ARKOW:

7    Q.   Are you familiar with a concept known as escalation of

8    force or continuum of force?

9              MR. SCHWARTZ:  Objection.  Compound.

10             THE COURT:  That's overruled.  You may answer.

11             THE WITNESS:  Yes.

12   BY MR. ARKOW:

13   Q.   And which of those terms do you use more?

14   A.   The escalation and de-escalation of force.

15   Q.   Can you explain to the jury what the escalation of force

16   refers to?

17   A.   It would refer to when you're dealing with a suspect

18   starting verbally with a suspect, giving him commands to

19   follow and maybe going physical with him by trying to take

20   him into custody, putting your hands on him.  If it escalated

21   any further where you might have to use pepper spray or a

22   taser or a baton.  It just depends on the situation.

23   Q.   And so these levels of interaction, are they going up a

24   ladder so to speak?

25   A.   They would be.

1    Q.   And then what was the last level of force that you

2    explained?  Was it baton?

3    A.   Yes, it was.

4    Q.   And was baton and taser and pepper spray considered

5    within the same range of force?

6    A.   Yes.

7    Q.   And after that level of force, what would be the next

8    level?

9    A.   Deadly force.

10   Q.   Did you receive training regarding when a taser can be

11   used on a suspect?

12   A.   Yes, I did.

13   Q.   And what was the training as to under what circumstances

14   were you trained that you could use a taser?

15            MR. SCHWARTZ:  Objection.  Vague as to time.

16            THE COURT:  Could we have a time frame?

17   BY MR. ARKOW:

18   Q.   Well, in February 2005, what were trained on when you

19   can use a taser in the field on a suspect?

20   A.   Any time you had a suspect that wasn't complying with

21   your commands and they were trying to attack you or hurt

22   someone else, then you could use your taser.

23   Q.   Did there have to be a perception of some level of

24   danger that you felt in justifying the use of a taser?

25   A.   Yeah, that would be based on each individual officer.

1    Q.   Did you receive training as to whether an officer could

2    use a taser because the officer was upset or angry at the

3    suspect?

4    A.   No.

5    Q.   When you say no, what do you mean by no?

6    A.   I didn't receive training on it.

7    Q.   Could you have used a taser if a suspect made you angry?

8    A.   No.

9    Q.   Could you have used a taser if a suspect was mouthing

10   off to you?

11   A.   No.

12   Q.   Could you have used a taser against a suspect if the

13   suspect was cursing you?

14   A.   No.

15   Q.   Could you have used a taser if a suspect was throwing up

16   in the holding cell at the jail?

17   A.   No.

18   Q.   Could you have used a taser if the suspect threw up in

19   the back of a patrol car?

20   A.   No.

21   Q.   If the suspect -- have you had circumstances or

22   experience where a suspect has thrown up in the back of a

23   patrol car?

24   A.   I have.

25   Q.   And who cleans up the mess that's created because of

1    that?

2    A.   It's normally the officer would clean it up.

3    Q.   The officer whose patrol car it is?

4    A.   Yes.

5    Q.   And how about if a suspect is arrested and brought in as

6    a prisoner at the Desert Hot Springs holding cell and throws

7    up, how is that handled?  Have you had that experience?

8    A.   I have.

9    Q.   And how is that handled at Desert Hot Springs Police

10   Department?

11   A.   It depends on the situation.

12   Q.   What are some of the variety of ways it could be

13   handled?

14   A.   If you brought a drunk in let's say and they threw up,

15   sometimes you would have them clean it up once they were

16   sober.

17   Q.   If a suspect refused to clean up the throw up, could you

18   use a taser on that suspect?

19   A.   No.

20   Q.   What was the phone call, telephone call policy for

21   arrestees in the holding cell at the Desert Hot Springs

22   Police Department in effect in about February 2005?

23   A.   They're allowed three phone calls based on, you know,

24   the situation.

25   Q.   What do you mean by based on the situation?

1    A.   Well, if the person is being very irrational and very

2    hostile towards officers, they might not get the phone calls

3    right away until they calm down.

4            THE COURT:  Did you say three or free?

5            THE WITNESS:  Three.

6            THE COURT:  And they are free?

7            THE WITNESS:  They are free.

8    BY MR. ARKOW:

9    Q.   Was there a limit that they could only call within a

10   certain state or is there a limit on that?

11   A.   I don't believe there was a limit.

12   Q.   Were you trained to document uses of force that officers

13   used in the field?

14   A.   I was.

15   Q.   And what was that training?

16   A.   Initially, use of force was documented in our police

17   report.

18   Q.   And how was it documented in the police report?

19   A.   I don't understand your question, sir.

20   Q.   Just explain how would it be documented in the report.

21   A.   You would just write in what actually happened in the

22   body of your report.

23   Q.   And what was the policy or what were you trained as to

24   whether reports documenting use of force had to be turned in

25   promptly or not?

1    A.   They should be turned in by the end of your shift to

2    your watch commander.

3    Q.   And approximately how long is a shift?

4    A.   12 hours.

5    Q.   What other procedures were you trained on when use of

6    force was used about booking or collecting evidence involved

7    in the use of force?

8            Well, for instance, if a taser was the weapon that

9    was used in the use of force, what were you trained as far as

10   booking or collecting evidence regarding the deployment of

11   taser?

12   A.   We would collect the cartridge, the two prongs that were

13   used and take photos of the person that was tased and book it

14   into evidence.

15   Q.   And were you trained on how promptly this evidence from

16   the use of the taser had to be booked into evidence?

17   A.   Should be done at the end of shift.

18   Q.   Did you also mention whether photographs -- were you

19   trained or was there a policy on taking photographs when a

20   use of force was used?

21   A.   I did.

22   Q.   What was that training?

23   A.   Those photographs were taken of the person that was

24   tased.

25   Q.   And what was the procedure once the photographs were

1    taken?  What would happen to the photographs?

2    A.    They were booked into evidence also.

3    Q.    Would the photographs be attached to the report?

4    A.    Some could be.

5    Q.    But the photographs would need to be taken and kept with

6    the file?

7    A.    Yes.

8    Q.    And was -- how were you trained as to how prompt the

9    photographs needed to be taken?

10   A.    They should be taken immediately depending on, like I

11   say, the situation after they were removed from the person

12   that was tased.

13   Q.    And you say after they were removed.  Are you referring

14   to a certain -- something that was removed from the person

15   who was tased?

16   A.    The prongs.  After they were removed from the person's

17   body, then you would take pictures of the areas where they

18   struck the body.

19   Q.    Was that to document or show taser wounds on the

20   person's body?

21   A.    To show where they actually struck the body.

22   Q.    And whose responsibility would it be for taking the

23   photographs of the individual who was tased and had taser

24   darts strike the body?

25   A.    Usually would be the person that arrested them or the

1    person that tased them.

2    Q.   And who was responsible for booking any of the other

3    items like the taser cartridge when there was a taser

4    deployed?

5    A.   That would be the officer that made the arrest.

6    Q.   What if that officer who made the arrest wasn't the

7    officer who actually used the taser on the suspect?

8    A.   Then it would be the person who actually used the taser.

9    Q.   I want to direct your attention to a specific incident.

10   Do you recall at the beginning of your shift one night coming

11   into the Desert Hot Springs Police Department station through

12   the back sally port exit door and seeing a female arrestee in

13   one of the holding cells crying?

14   A.   I did.

15   Q.   What was this female arrestee wearing at the time that

16   you first noticed her?

17   A.   She was sitting in the holding cell wearing a bra, some

18   pants and she had toilet paper wrapped around her hands and

19   feet.

20   Q.   And this incident occurred in approximately February of

21   2005?

22   A.   Yes.

23   Q.   And where were you when you first noticed this arrestee?

24   A.   I was walking, I believe, back from my office through

25   the jail to go back out the sally port door.

1    MR. ARKOW:  May I publish what's already been

2    admitted into evidence Government Exhibit 1?

3         THE COURT:  Go right ahead.

4         MR. ARKOW:  Let me just back up in time.

5    Q.   If you would refer to this diagram, does that appear to

6    be a fair and accurate diagram of the part of the Desert Hot

7    Springs Police Department station that's known as the booking

8    area and the holding cells?

9    A.   Yes.

10   Q.   So when you started your shift that night of this

11   incident, where did you enter the building?

12   A.   Through the sally port where the two police cars are

13   parked.

14   Q.   So where I'm drawing or marking, is that the door that

15   you came in?

16   A.   Yes.

17   Q.   And what did you do after you entered the jail at this

18   point?

19   A.   I walked through that door and out of the other interior

20   door into the main part of the police department.

21   Q.   Is that where it says to dispatch?

22   A.   It would be straight through the door where it says

23   watch commander.

24   Q.   And at the time that you first entered the jail, had you

25   noticed the woman who was in one of the holding cells?

1    A.    I did not.

2    Q.    At what point did you notice her?

3    A.    After I went, I believe, to my office and was walking

4    back through the jail again to go out the sally port door.

5              MR. ARKOW:  And if Government's Exhibit 30 can be

6    displayed on the screen?

7              THE COURT:  Certainly.

8    BY MR. ARKOW:

9    Q.    Do you recognize what's depicted in Government's

10   Exhibit 30?

11   A.    Yes, the jail portion at the station.

12   Q.    And where did you first enter the jail that night?

13   A.    I walked in where you can see the rear portion of the

14   police vehicle.

15   Q.    Through that door?

16   A.    Yes.

17   Q.    And then you went to the rest of the station through

18   this door?

19   A.    Through the open door, yes.

20   Q.    Now then, when you came back out into the booking area

21   when you noticed the woman crying in the cell, what was she

22   wearing?

23              THE COURT:  Well, it's asked and answered.

24   BY MR. ARKOW:

25   Q.    Did you see any toilet paper?

```
 1    A.    I did.

 2    Q.    And where was the toilet paper?

 3    A.    On her hands and feet.

 4    Q.    Did she appear wet?

 5    A.    After I opened the door, yes, she did.

 6    Q.    Why do you say after you opened the door?

 7    A.    Because initially when I saw her, I was looking through

 8    the window of the jail door.

 9    Q.    Did she appear to be cold?

10    A.    Based on the toilet paper wrapped around her hands and

11    feet, I assumed she was.

12              THE COURT:  Why did you open the door?

13              THE WITNESS:  Because she was crying.

14    BY MR. ARKOW:

15    Q.    Can you describe how she was crying?

16    A.    Just crying.

17    Q.    Was it a loud screaming, whaling crying?  Was it a

18    whimpering crying or any other words?

19    A.    More like a whining cry.

20    Q.    And what was your position at the time?  What was the

21    rank that you held on this night?

22    A.    I was a sergeant.

23    Q.    You said she had toilet paper on her feet.  Why did you

24    think she had toilet paper on her feet?

25    A.    Because she was cold.
```

UNITED STATES DISTRICT COURT

1    Q.   Did the woman in the holding cell who had toilet paper

2    on her feet say anything to you?

3    A.   She asked for help.

4    Q.   And what did you do?

5    A.   I opened the door and I noticed that she was wet, so I

6    closed the door.  I went to our storage section of the police

7    department.  I got a paper jumpsuit and I brought it back to

8    the jail along with a paper bag.  I had her take off the wet

9    clothes and have her put on the jumpsuit and I gave her some

10   blankets.

11   Q.   Did you detect any odor or any smell in that holding

12   cell?

13   A.   Not that I noticed.  I wasn't paying attention to that.

14   Q.   Did you detect any odor of pepper spray?

15   A.   Initially, when I walked in the sally port door.

16   Q.   And did you still detect the odor of pepper spray when

17   you were in the holding cell talking with this woman?

18   A.   Not that I remember.  I was more concerned with getting

19   her some clothes, dry clothes.

20   Q.   Could you tell if this woman had urinated on herself or

21   in her clothes?

22   A.   I could not.

23   Q.   Did this woman who was in the holding cell act

24   antagonistically toward you?

25   A.   No.

```
1    Q.    Did this woman in the holding cell act combative towards
2    you?
3    A.    No.
4    Q.    Did this woman in the holding cell resist you in any
5    way?
6    A.    No.
7    Q.    When you were assisting this woman, was the holding cell
8    door open?
9    A.    Yes, it was.
10   Q.    Did this woman in the holding cell try to leave the
11   holding cell?
12   A.    No.
13   Q.    Did the holding cell door remain open during the time
14   you were assisting her?
15   A.    It did.
16   Q.    Did this woman in the holding cell try to push past you
17   to get out of the holding cell?
18   A.    No.
19   Q.    Did this woman in the holding cell touch or push you at
20   any time?
21   A.    She did not.
22   Q.    Do you know who the supervisor who was in charge of the
23   jail at this time for that night shift?
24   A.    That would have been, I believe, Sergeant Sclafani.
25   Q.    And was Mr. Sclafani the watch commander that night?
```

1    A.    He would have been the day shift commander, I believe.

2    Q.    At any point did you see this woman in the holding cell

3    interact with any other officers at the Desert Hot Springs

4    Police Department that night in the holding cell?

5    A.    No.

6    Q.    Did you see a Desert Hot Springs Police Department

7    officer named Andrea Heath doing anything with the woman in

8    the holding cell?

9    A.    When I entered the sally port door, I saw her standing

10   at the door where female was in the cell.

11   Q.    And when you say you saw her standing at the door,

12   you're referring to Officer Heath?

13   A.    I am.

14   Q.    And what point did you see Officer Heath standing at

15   that holding cell door?

16   A.    When I initially walked through the sally port door when

17   I arrived.

18   Q.    And was the holding cell door where this woman was open

19   at the time that this woman was dealing with Officer Heath?

20   A.    I believe it was.

21   Q.    And did Officer Heath appear to be doing anything or

22   have anything in her hand?

23   A.    I believe she had a camera in her hand.

24   Q.    Other than taking a booking photograph of a suspect,

25   what other reasons based on your training would an officer be

1   taking photographs of a suspect at the jail?

2   A.   If the suspect was involved in a fight, prior injuries

3   before they got there, car accident, any injuries before they

4   got there.

5   Q.   Would it also include if there was force used on the

6   suspect?

7   A.   Yes.

8   Q.   Besides Officer Heath, what other officers did you see

9   at the jail that night when the woman was in the holding

10  cell?

11  A.   I believe Officer Gutting was there, but I'm not sure.

12  Q.   And did you also see Mr. Sclafani?

13  A.   Not that I recall.

14  Q.   Did you ever see any interaction between Mr. Sclafani

15  and this woman in the holding cell?

16  A.   No.

17  Q.   When you first walked in to the jail through the sally

18  port door, did you see Officer Heath with the woman in the

19  holding cell?

20  A.   I don't understand your question.

21  Q.   When you first walked into the jail that night, was it

22  your testimony that you saw Officer Heath in the holding cell

23  with the woman?

24  A.   No.  She was standing in front of the holding cell.

25  Q.   And did Officer Heath make eye contact with you?

1    A.    She did.

2    Q.    And did Officer Heath through that eye contact make any

3    gesture or give you any look?

4    A.    She made eye contact with me and she just looked kind of

5    strange as I walked through.

6    Q.    You're referring to Officer Heath?

7    A.    I am.

8    Q.    Can you describe a little more what you mean by when you

9    walked into the jail and you saw Officer Heath, she made eye

10   contact with you that gave a strange look?

11   A.    I walked in the sally port door and she looked directly

12   at me making eye contact with me and she looked kind of

13   strange in the face.  I can't describe it, but just looked

14   kind of strange and that was it.

15   Q.    Did Officer Heath look -- did this look like -- indicate

16   to you that Officer Heath was troubled about something?

17             MR. SCHWARTZ:  Objection.  Leading.

18             THE COURT:  Sustained.

19

20   BY MR. ARKOW:

21   Q.    Did you have any impression based on your observation of

22   Officer Heath's look at you as to Officer Heath's reaction to

23   the situation?

24             MR. SCHWARTZ:  Objection.  Speculation.  Vague.

25             THE COURT:  Sustained.

```
 1   BY MR. ARKOW:

 2   Q.   Can you maybe demonstrate for the jury the look that you

 3   recall Officer Heath giving you when you saw her with the

 4   woman in the holding cell?

 5   A.   It was nothing other than just eye contact.  She looked

 6   directly at me as I walked into the door, just right in the

 7   face.  That was pretty much it.

 8            MR. ARKOW:  May I have a moment, Your Honor?

 9            THE COURT:  Of course.

10   BY MR. ARKOW:

11   Q.   Do you recall ever saying that the look she gave you was

12   to indicate to you that something wasn't right?

13            MR. SCHWARTZ:  Vague as to time, Your Honor.

14            THE COURT:  Could we have a time?

15   BY MR. ARKOW:

16   Q.   Do you recall when you testified before the grand jury

17   on December 17th, 2009 that the look that she gave you was it

18   appeared something was bothering her?

19            MR. SCHWARTZ:  Objection, Your Honor as to the form

20   of the question.

21            THE COURT:  That's overruled.  You may answer if

22   you can.

23            THE WITNESS:  I'm sorry.  Can you repeat it,

24   please?

25   BY MR. ARKOW:
```

```
1    Q.   Do you recall testifying before the grand jury on
2    December 17, 2009 and stating that it appeared, this is in
3    reference to the look Officer Heath gave you, that it
4    appeared something was bothering her?
5    A.   Yes.
6              THE COURT:  Is there some reason why you did not
7    communicate with her further if you had that feeling?
8              THE WITNESS:  She was involved in what she was
9    doing and I was going to do what I had to do so I didn't stop
10   to talk with her.
11             THE COURT:  Go ahead.
12   BY MR. ARKOW:
13   Q.   About how much time elapsed before you then returned to
14   the holding cell where this woman was to assist her?
15   A.   I don't recall.
16   Q.   Was it a relatively short period of time?
17   A.   I don't remember the exact amount of time.
18   Q.   After you gave the woman in the holding cell the paper
19   jumpsuit and the blankets, what did you do next?
20   A.   I left and went on patrol.
21   Q.   And at that time it was in the evening?
22   A.   It was.
23   Q.   At some point later in the evening, did you see the
24   woman that you had seen crying in the holding cell later that
25   night?
```

1    A.    Yes.

2    Q.    When did you see that woman again?

3    A.    I don't remember the exact time, but it was sometime

4    later.  I saw her walking eastbound on Pearson Boulevard.

5    Q.    And were you driving a patrol car?

6    A.    Yes.

7    Q.    And what was this woman wearing?

8    A.    The same jumpsuit that I gave her.

9    Q.    And did this woman appear to see your patrol car?

10   A.    Yes.

11   Q.    Did this woman do anything to wave you down?

12   A.    Yes, she was waving her hands.

13   Q.    And what did that indicate to you?

14   A.    That she was trying to get my attention.

15   Q.    And did that work?

16   A.    It did.

17   Q.    And what did you do?

18   A.    I pulled over to where she was standing and stopped.

19   Q.    Did -- the location where she was approximately how far

20   was it from where the Desert Hot Springs Police Department

21   station was in 2005?

22   A.    About three or four blocks maybe.

23   Q.    And when you pulled your patrol over to the woman on the

24   street, what did you do next?

25   A.    She walked over to the patrol car and said she had been

1    released from the jail.  She was -- didn't know where she was

2    going.  She was from Arizona and she didn't know what she was

3    gonna do.  Something to that nature.

4    Q.   Do you know the circumstances under which this woman was

5    released from the jail that night?

6    A.   I do not.

7    Q.   Did the woman have any belongings or any items with her?

8    A.   I believe she had a paper bag, the one I gave her with

9    her clothes.

10   Q.   After the woman told you her situation, what did you do?

11   A.   I put her in the back of the patrol car.  I drove her to

12   the Spa Hotel on Palm Drive and 8th.  I told her to go inside

13   and explain to them her situation and then see if they could

14   help her in getting a room.

15   Q.   And did you drive this woman to this hotel?

16   A.   Yes.

17   Q.   She got out of your car?

18   A.   She did.

19   Q.   Any other interaction or observations that you made of

20   the woman after she went into the hotel?

21   A.   No.

22        MR. ARKOW:  I would ask the witness be shown what's

23   been marked for identification Government's Exhibit 79.

24        THE COURT:  Go ahead.  All right.  He has it.

25   BY MR. ARKOW:

1    Q.   Before I ask you to look at government Exhibit 79, when

2    you saw this woman, did she have her own vehicle?  Was she --

3    did it look like she was driving or had a vehicle next to

4    her?

5    A.   No.

6    Q.   What did it look like her situation was?

7    A.   She was just walking down the street.

8    Q.   I would ask you to look at Government's Exhibit 79 and

9    tell the jury do you recognize that?

10   A.   Yes.

11   Q.   What is it?

12   A.   It's a jumpsuit similar to the one that I gave her that

13   night.

14            MR. ARKOW:  I would ask that Government Exhibit 79

15   be moved into evidence.

16            THE COURT:  It will come.

17                 (Exhibit 79 was admitted.)

18            MR. ARKOW:  With the Court's permission, I would

19   ask that Detective Cole be allowed to hold it up and display

20   it to the jury?

21            THE COURT:  Of course.

22            MR. ARKOW:  If you can pick it up.

23            THE COURT:  Could we see the bottom of that,

24   Detective?  Are there any feet it in?

25            THE WITNESS:  No.

1     THE COURT:  Was the person wearing the suit similar

2  to that that you gave her and later saw on patrol wearing

3  shoes with that?

4     THE WITNESS:  I don't recall if she was or not.

5  BY MR. ARKOW:

6  Q.  When you saw her out on the street was it cold?

7  A.  I don't recall.

8  Q.  Does it get cold in February at night?

9  A.  It could.

10     THE COURT:  In the desert?

11     THE WITNESS:  Yes.

12     MR. ARKOW:  Just a moment, Your Honor.

13  Q.  Following up on that question about what were on her

14  feet, do you recall when you saw her in the holding cell

15  earlier that evening was she wearing shoes in the jail?

16  A.  She wasn't.  In-custodies are not allowed to wear shoes

17  in the jail.

18  Q.  Does that refresh your memory as to whether she was

19  wearing shoes when you saw her on the street waving you down?

20  A.  It does not.

21  Q.  When you saw this woman that you had earlier seen in the

22  holding cell on the street that night, were you concerned for

23  her?

24  A.  No.  I just stopped because she was flagging me down.

25  Q.  And then when you saw what she was wearing and her

 1    situation, were you concerned for her situation?

 2    A.   I'm not sure what your question is.

 3    Q.   Why did you help her in the way that you did?

 4    A.   Because she said she was from Arizona.  She didn't know

 5    the city and she didn't have any place to go.

 6    Q.   Is that -- was that a common practice that arrestees

 7    would be released at night if they had no place to go?

 8    A.   That would up to the arrestee if they chose to be

 9    released.

10    Q.   If the arrestee wanted to stay in the lobby area of the

11    jail, lobby area of the station, would the arrestee be

12    permitted to do that?

13    A.   Yes.

14    Q.   Is the lobby area of the station an area where the

15    public can go?

16    A.   Yes.

17    Q.   And what are the hours that the lobby of the Police

18    Department station is open?

19    A.   24/7.

20         MR. ARKOW:  Just one moment, Your Honor.

21         THE COURT:  Very well.

22         MR. ARKOW:  At this time I would ask to read one

23    more exhibit from the stipulation Government Exhibit 84 and

24    this pertains to Government Exhibit 52.

25         Government Exhibit 52 is a City of Desert Hot

```
 1   Springs Department of Finance Treasury receipt documenting
 2   the release of Angelica Vargas' vehicle on March 11, 2005.  I
 3   move Government Exhibit 52 into evidence.
 4            THE COURT:  It will come in.
 5                 (Exhibit 52 was admitted.)
 6            MR. ARKOW:  And with the Court's permission, ask
 7   that it be published for the jury.
 8            THE COURT:  Go right ahead.
 9   BY MR. ARKOW:
10   Q.   Mr. Cole, are you familiar with what's in Government
11   Exhibit 52, the treasury receipt which says in payment of
12   vehicle release?
13   A.   Yes.
14   Q.   What's the purpose of that document?
15   A.   That's a receipt for someone who paid to have their
16   vehicle released after it was impounded.
17   Q.   And does the person whose vehicle it is have to fill out
18   this form before they can get the vehicle released back to
19   them?
20   A.   That form is filled out by the officer or records person
21   that's releasing the vehicle.
22   Q.   And does the officer who is filling out this form fill
23   out the form in front of the person who wants their vehicle
24   back?
25   A.   Not necessarily.
```

UNITED STATES DISTRICT COURT

```
 1   Q.   Does the person who wants their vehicle back need to

 2   come in person back to Desert Hot Springs to get their

 3   vehicle?

 4   A.   Yes.

 5             MR. ARKOW:  Just one moment.

 6             THE COURT:  Okay.

 7   BY MR. ARKOW:

 8   Q.   And finally is this form a condition that has to be

 9   filled out before the person can get their vehicle back?

10   A.   Once they fill out the form and pay the 70 bucks I

11   believe it says on there.

12   Q.   And do you recognize the officer at the bottom of the

13   form, the bottom left it says received by?

14   A.   Looks like it says Heath.

15             MR. ARKOW:  No further questions at this time.

16             THE COURT:  Cross-examination, Mr. Schwartz.

17             MR. SCHWARTZ:  May I have a very quick personal

18   break, Your Honor?

19             THE COURT:  Well, let's just take the mid-afternoon

20   recess.  Everyone please rise for the jury.

21                     (Jury not present.)

22             THE COURT:  Any matters counsel wish to take up at

23   this time?  If not, we'll take about ten minutes.

24             MR. SCHWARTZ:  Thank you, Your Honor.

25                     (Recess taken.)
```

```
 1              THE COURT:  We're again outside the presence of the
 2    jury.  Is there any matters that any counsel wish to raise?
 3              Mr. Arkow, you have something?
 4              MR. ARKOW:  Yes, Your Honor.  Although it maybe
 5    seems that sometimes we're slow going --
 6              THE COURT:  It does.
 7              MR. ARKOW:  The Court is agreeing?
 8              THE COURT:  Yes.
 9              MR. ARKOW:  Well, I think the government has made
10    its case-in-chief substantial progress and we're actually at
11    the point now of nearing what we believe will be the end of
12    the government's case.  And I think it could be finished
13    depending how long the remainder of the today's session.
14              THE COURT:  Well, we've just heard from the jury
15    with a reminder to all of us that today is Valentine's Day
16    and they would like to leave a bit earlier so we're only
17    gonna go to 5:00 today.
18              MR. ARKOW:  So given what might remain of
19    cross-examination and redirect and how that plays out and
20    some other things, by tomorrow the government can be done.
21    And given and I know it's fluid situation at least from the
22    government's perspective hoping it's fluid and that it can
23    change for the better with the witness Ms. Vargas, I was
24    gonna ask the Court's indulgence and also the jury's
25    indulgence to entertain the idea of recessing after today
```

1    until 4:00 p.m. tomorrow when I understand we're to receive

2    what admittedly is a preliminary report, but it is still more

3    information than we have now.

4          And it would be a one-day break, but I believe in

5    talking from the government's perspective about this witness

6    and hopefully in the time between what the Court has ordered

7    earlier today and tomorrow, there might be some development

8    with that recess.

9          THE COURT:  Well, let me tell where we are at this

10   point.  The last word that I got is that the marshals are

11   taking Ms. Vargas over to White Memorial.  A lot of back and

12   forth about it between the marshals and White Memorial and

13   who is going to pay for it and all the rest of it.  But it

14   appears a lot of work by our clerk here as well as one of my

15   senior law clerks that they do have a bed available for

16   Ms. Vargas for this evening, but they won't be able to start

17   the evaluation until tomorrow morning and so we'll see where

18   we are.

19         MR. ARKOW:  And hopefully they're still on track.

20   There will be that report at 4:00.

21         THE COURT:  What we're hoping, but why would we

22   have the jury come in after that?

23         MR. ARKOW:  Well, probably not.  It would end up

24   for the jury being a dark day tomorrow with the hope that

25   given the progress that government's made and I think we are

1    back on track to the trial estimate, I believe that taking

2    that day tomorrow to assess and get further information on

3    Ms. Vargas.

4              THE COURT:  Let me inquire of Mr. Schwartz.

5              MR. SCHWARTZ:  Thank you, Your Honor.  And while I

6    may in some form or another sympathize as a fellow attorney

7    with witness problems, logistical problems, and to be quite

8    frank, as a human being sympathetic to Ms. Vargas' plight

9    which I think both counsel understand she has a mental health

10   history that dates far back beyond this case and nobody wants

11   to see anybody in that state.  There are some logistical

12   problems with us going on a dark day, and if those problems

13   can be in some form or another by government agreed on, I

14   wouldn't mind.

15             I've got an expert toxicologist coming in who is

16   very quick.  It's about the blood alcohol level and what

17   happens based on his 45 years of experience, the effect it

18   could have on a person's ability to perceive and recall

19   events properly and their actions.  I don't expect that being

20   more than a half-hour, 40 minutes on both cross and direct.

21             And I did communicate with Greg Meyer who has

22   testified previously in this case when the question came up

23   when I was looking at some of the evidence, that neither said

24   asked him regarding the taser's use, not use of force, but

25   just how the taser operates regarding the computer system

1   inside the taser and the clocks and I asked him to be

2   available to come back on Thursday.

3          He texted me back he is in Texas.  I asked him for

4   tomorrow.  He said he couldn't be here until Thursday and as

5   long he could be out by 11 o'clock, he could be here at

6   9 o'clock.  I expect to ask him two questions to be quite

7   frank.

8          THE COURT:  Well, if necessary, I would think you

9   would be able to call these witnesses out of order.  The

10  government would just allow you that if we're gonna have this

11  dark day tomorrow for the jury.

12         MR. SCHWARTZ:  The last concern, Your Honor, to be

13  quite frank on the record is a personal one.  We had agreed

14  to try to cut it short on Fridays.  We have tried to extend

15  it as long as possible.  With a dark day and my need, that

16  pushes into the following week or not depending on how the

17  evidence goes and who testifies.  I hate to be the cause of

18  that per se, but if we were on, if we had evidence tomorrow,

19  that may not be a necessity and we would be arguing on Friday

20  morning.  Those are my only concerns addressing to the Court.

21         THE COURT:  Well, maybe I'll inquire of the jury if

22  they indeed are willing to come back.  Are we available next

23  Tuesday?

24         THE CLERK:  Yes.

25         THE COURT:  Let's see where they are on this

1    because I don't want to inconvenience them any further.  So

2    let's bring them in.

3                          (Jury present.)

4            THE COURT:  Please be seated, ladies and gentlemen.

5    I understand some of you have some romantic plans for this

6    evening or earlier and would like to leave earlier than

7    just -- please be seated again, Detective.  We won't go past

8    5:00, but let me ask you something else.  We've had some

9    logistical problems involving witnesses among other things.

10   If we were to ask you not to come in tomorrow in order to try

11   to get those things in order, it would probably mean that we

12   would have to spill over until next Tuesday, the day after

13   the holiday, President's Day, I believe.  And I told you that

14   we would work to see if we couldn't finish this by this

15   Friday, but if we were to be dark for you tomorrow, we'll be

16   here working on things.  But are there any of you who would

17   not be able to be here on the 21st?  I see Juror No. 3 about

18   to raise his hand.

19           JUROR NO. 3:  It's not that I can't be here.  I

20   have arranged for consultants to be flying in from New York.

21   They have already postponed their trip once.  It's -- I got a

22   project on a very tight time line that's going on.

23           THE COURT:  I understand.  Excuse us a minute.

24   Counsel, come to the side bar with the reporter.

25           (The following proceedings were held at side bar.)

1          THE COURT:  It seems we would have that.  Okay.  We

2   may have to go to tomorrow and see what happens.  But would

3   you have witnesses available?  Okay.  All right.  See what

4   happens.

5          MR. SCHWARTZ:  That would be my only concern that

6   Friday would still have to be a dark day.

7          THE COURT:  All right.  So that's where we are

8   right now and we'll have to go from there.

9          MS. CARTER:  We would like to see if we could find

10  out the status of the witness and see what the psychiatrist

11  says her availability might be.

12         THE COURT:  Yes, we may have to do that.  All

13  right.  Yes, let's inquire of the juror.  Juror No. 3, would

14  you come over, sir?

15         THE COURT:  We're talking to Juror No. 3.

16         JUROR NO. 3:  I just have people coming from

17  New York.  It would be very difficult.  Very tight time line

18  of the project.  I understand, but it would make it difficult

19  and that's all I can say.

20         THE COURT:  Yes, you would be able to?

21         JUROR NO. 3:  I'm fine.

22         THE COURT:  If we were to do that, it would spill

23  into next week so let's see.  All right.

24                    (Side bar concluded.)

25         THE COURT:  We're back on the record.

```
 1            All right, ladies and gentlemen, thank you again
 2     for your patience and I'll -- I think what we'll do and
 3     particularly nice for those of you who do have romantic kinds
 4     of plans for this evening that you won't come in tomorrow.
 5     We'll try to get this moved along as quickly as possible and
 6     try to finish it up by Tuesday.  And if there is anyone who
 7     does have a problem, I wish you would let me know now.  I see
 8     no hands having been raised.
 9            All right.  We're gonna continue with the
10     government's case and we're going to reach cross-examination.
11            Detective Cole, would you repeat your full name and
12     spell your last name for the record.
13            THE WITNESS:  Eddie Roy Cole.  E-d-d-i-e R-o-y
14     C-o-l-e.
15            THE COURT:  And you understand you are still under
16     oath in this matter?
17            THE WITNESS:  Yes, Your Honor.
18            THE COURT:  Cross-examination, Mr. Schwartz.
19            MR. SCHWARTZ:  Thank you, Your Honor.
20                         CROSS-EXAMINATION
21     BY MR. SCHWARTZ:
22     Q.   Good afternoon, Detective.
23     A.   Good afternoon.
24     Q.   You have been at Desert Hot Springs for about 14 years
25     you said and four months?
```

1   A.   Yes.

2   Q.   And you went through the taser training; correct?

3   A.   I did.

4   Q.   And the use of force training; correct?

5   A.   Yes.

6   Q.   And do you recall what year at Desert Hot Springs that

7   you got -- you were first given or deployed a taser?

8   A.   I do not know.

9   Q.   As of 2005, January or February of 2005, do you know if

10   taser were relatively new at the Department at that time?

11          MR. ARKOW:   Objection as to relatively new.

12          THE COURT:   Sustained.

13   BY MR. SCHWARTZ:

14   Q.   Do you know in 2005 how long members of the Department

15   had been given tasers for as of that time, specifically

16   February 2005?

17   A.   I don't recall.

18   Q.   You recall at some point being trained on tasers;

19   correct?

20   A.   I do.

21   Q.   And when tasers were first deployed at the Department,

22   they were used more prevalently than they were after people

23   got used to using them; correct?

24   A.   Yes.

25   Q.   And in fact you yourself used them more often when you

1    were first trained on it then after you got used to it;

2    correct?

3                MR. ARKOW:  Vague and ambiguous as to the time

4    period.

5                THE COURT:  Could we have a time frame.

6    BY MR. SCHWARTZ:

7    Q.   Back in February 2005 tasers were still relatively new

8    to the Department based on your experience; correct?

9                MR. ARKOW:  Same objection.

10               THE COURT:  Well, it's overruled.  You may answer

11   if you can.

12               THE WITNESS:  I don't recall.

13   BY MR. SCHWARTZ:

14   Q.   And back in 2005 -- strike that.

15               You testified on direct that it was your

16   understanding based on policy that for an officer at Desert

17   Hot Springs Police Department in 2005 to use a taser the

18   subject who was being tasered had to be some form of violence

19   or potentially violent; correct?

20   A.   Yes.

21   Q.   And are you familiar with Desert Hot Springs Police

22   Department Use of Force Taser Addendum?

23   A.   Not that I recall.

24   Q.   Would it refresh your memory to see a copy of it?

25   A.   Yes.

1    Q.   And do you have a copy of Exhibit 13 in front of you,

2    sir?

3    A.   No.

4         MR. SCHWARTZ:  May the witness be given a copy of

5    13 with the Court's permission?

6         THE COURT:  Certainly.

7         MR. SCHWARTZ:  With the Court's permission, may I

8    publish it, too.

9         THE COURT:  You may.

10   BY MR. SCHWARTZ:

11   Q.   Now, Detective, the copy you have does not have any

12   highlighted area on the front page, does it?

13   A.   No.

14   Q.   If I can draw your attention to the computer screen, you

15   see any highlighted areas on the screen?

16   A.   Yes.

17   Q.   And are you familiar with this policy?

18   A.   I'm just trying to find it.

19   Q.   I understand.  Have you had a chance to look it over?

20   A.   I did.

21   Q.   Are you familiar with it?

22   A.   Yes.

23   Q.   You have seen it before?

24   A.   Yes.

25   Q.   And that's a copy of the Desert Hot Springs Police

1  Department Use of Force Taser Addendum; correct?

2  A.   It appears to be.

3  Q.   And in order to be a Desert Hot Springs police officer

4  in the field, every officer to your knowledge would have to

5  be familiar with this addendum; correct?

6  A.   Yes.

7  Q.   And you see on your computer screen the highlighted

8  areas?

9  A.   Yes.

10  Q.   And you see the two bullet points I'm pointing to with

11  my pen?

12  A.   Yes.

13  Q.   And above that do you see the part, the beginning of

14  that paragraph says to further clarify?

15  A.   Yes.

16  Q.   And how long has it been before just a few moments ago

17  when you saw this that you had had a chance to review this

18  policy?

19  A.   This addendum it's been a while.

20  Q.   And before you testified on direct earlier today, did

21  you have a chance to review the addendum?

22  A.   No, I did not.

23  Q.   Did you see on the addendum where it says, "To further

24  clarify instances when deployment in either mode of the Taser

25  X-26 is deemed reasonable and thus justifiable, the following

1    guidelines have been established"?

2    A.    Yes.

3    Q.    And the first bullet point, "Where the detention of the

4    subject is legal and necessary and the subject refuses to

5    submit to such detention by use of force, fleeing or lack of

6    cooperation."

7    A.    Yes.

8    Q.    And then it says, "Further in which a hands-on

9    confrontation is inevitable and could result in further

10   injury to either the officer or the subject being detained."

11   Do you see that?

12         MR. ARKOW:   Objection.   Defense counsel is just

13   reading the document not asking a question.

14         THE COURT:   It's overruled.   You can ask him if

15   it's correct.

16   BY MR. SCHWARTZ:

17   Q.    Do you see that?

18   A.    Yes, I do.

19   Q.    Based on your training and experience and now having had

20   a chance to review this addendum which you hadn't reviewed in

21   quite some time, isn't it true that police officers in Desert

22   Hot Springs back in 2005 when you worked there, they were

23   trained they could deploy a taser justifiably if the subject

24   was either using force against the officer, fleeing or not

25   cooperating?

1          MR. ARKOW:  Objection.  Incomplete recitation of

2    what this policy is.

3          THE COURT:  Overruled.  You can go into it on

4    redirect.

5          THE WITNESS:  According to this addendum, yes.

6    BY MR. SCHWARTZ:

7    Q.   And based on the taser training you went through as an

8    officer there that you were told in your training that tasers

9    would help cut down on injuries to both the officer and the

10   suspect?

11   A.   Yes.

12   Q.   And that tasers may be an effective means of controlling

13   a suspect; correct?

14   A.   Correct.

15   Q.   And that would be controlling a suspect for purposes of

16   securing that suspect pursuant to a lawful arrest; correct?

17   A.   Correct.

18   Q.   Or pursuant to lawful detention; correct?

19   A.   Correct.

20   Q.   Now, in your training the booking process is still a

21   part of the overall lawful arrest process; correct?

22   A.   It is.

23   Q.   So while a person is going through a booking process,

24   he's still considered under arrest; is that correct?

25   A.   Yes.

1    Q.   And while a person is going through the booking process,

2    the arrest part of it has not ended yet, has it?

3    A.   It has not.

4    Q.   Because the booking process is part of that arrest

5    process; correct?

6    A.   Yes.

7    Q.   So based on your training and now having a chance to

8    look at the addendum and refresh your memory, back in 2005,

9    February 2005, an officer at the Desert Hot Springs Police

10   Department may be able to deploy a taser justifiably if a

11   subject who is going through that booking process is not

12   cooperating; correct?

13   A.   Yes, according to this addendum.

14   Q.   And, of course, circumstances of the individual's arrest

15   and what's going on at the time?

16   A.   And the officer.

17   Q.   And what the officer perceives; is that correct?

18   A.   That is correct.

19   Q.   And you're trained -- you were trained, were you not,

20   that the officer's perception was part of the formula about

21   whether or not a use of force was justifiable back at that

22   time?

23   A.   Yes.

24   Q.   And even currently; is that correct?

25   A.   That is correct.

1    Q.   Now, based on your training as a Desert Hot Springs

2    police officer, a suspect who is handcuffed can still be

3    considered dangerous; correct?

4    A.   Yes.

5    Q.   Basically, if a person can kick, a person's still

6    considered dangerous?

7    A.   Yes.

8    Q.   And if a person is in the midst of kicking or thrashing,

9    that person considered not in control at that time; correct?

10   A.   Correct.

11   Q.   You spoke earlier with counsel about escalation and

12   de-escalation; is that correct?

13   A.   I did.

14   Q.   You also were asked about the term a use of force

15   continuum; is that right?

16   A.   Yes.

17   Q.   And on a use of force continuum based on your training,

18   an officer does not have to climb a ladder, does he or she?

19   A.   No, it depends on the situation.

20   Q.   Sometimes as the situation presents itself, it may be

21   necessary to use lethal force, an officer doesn't have to

22   wait to go through the necessary steps to use that lethal

23   force; correct?

24   A.   That's true.

25   Q.   And if the situation presents itself where an officer

```
1    must use a control device to control the suspect, an officer
2    may not have to go through those steps if the situation
3    presents itself that way; correct?
4    A.   Correct.
5    Q.   And a taser back in 2005 according to the addendum was a
6    control device; correct?
7    A.   Yes.
8    Q.   Now, going back to the incident that counsel spoke to
9    you about earlier back in February of 2005 with the arrestee,
10   the female Hispanic who was in the jail cell.  Do you recall
11   that?
12   A.   I do.
13   Q.   Now, you testified that you smelled an odor of pepper
14   spray when you first walked into the sally port door; is that
15   right?
16   A.   Yes.
17   Q.   And was it a strong odor or a slight odor or somewhere
18   in between?
19   A.   It was a slight odor.  It would kinda get in your throat
20   a little bit.
21   Q.   It didn't knock you down; right?
22   A.   No.
23   Q.   But you could definitely tell when you breathe; correct?
24   A.   Yes.
25   Q.   And that was right when you walked in the door of the
```

1    sally port; right?

2    A.   Yes.

3    Q.   Now, when you first saw the woman in the jail cell, she

4    was -- Andrea Heath was standing in front of that jail cell;

5    is that right?

6    A.   Yes.

7    Q.   And she was taking photographs of the woman; right?

8    A.   I believe she was.

9    Q.   Do you recall testifying at the grand jury that you saw

10   Andrea Heath taking the photographs of the woman at that

11   time?

12   A.   I thought I said I saw her there with a camera.  I was

13   not sure if she was taking pictures at the time.

14   Q.   You testified at the grand jury some time ago; right?

15   A.   Yes.

16   Q.   Would it refresh your recollection to see a copy of the

17   transcript about what you said at the grand jury as it

18   pertains to Andrea Heath taking photos of the female at that

19   time?

20   A.   Yes.

21            MR. SCHWARTZ:  Your Honor, may I give a copy of the

22   transcript to the clerk?

23            THE COURT:  Why don't you show it to government

24   counsel first.

25            MR. SCHWARTZ:  Sure.  If I could just give counsel

1    a moment to get the page and the lines, Your Honor.

2            THE COURT:  Thank you.  You can bring it forward to

3    the clerk.

4            MR. SCHWARTZ:  Thank you, Your Honor.  May I ask

5    the witness to please read.

6            THE COURT:  Read to yourself.

7            MR. SCHWARTZ:  Should be on page 16 already lines 3

8    through 9.

9            THE COURT:  All right.  He's read it.

10   BY MR. SCHWARTZ:

11   Q.   Does that refresh your memory, Detective Cole that when

12   you first saw Andrea Heath interacting with this woman in the

13   jail cell, you saw Andrea Heath taking photographs of her?

14   A.   I recall testifying to that, yes.

15           THE COURT:  As you sit here today, do you recall

16   that?

17           THE WITNESS:  I remember her having a camera in her

18   hand.  I don't know if she was actually taking pictures, but

19   I remember her having a camera in her hand so I assume she

20   was taking pictures.

21           THE COURT:  Well, don't assume.

22   BY MR. SCHWARTZ:

23   Q.   You have no reason to doubt your memory as you testified

24   to the grand jury, do you?

25   A.   No.

1    Q.    Now, at that time at Desert Hot Springs Police

2    Department were you issued, you being generally the police

3    officers that were working there, were they issued cameras

4    through the Department or did they have to use their own if

5    you know?

6    A.    Your own and there were two issued to the Department.

7    Q.    So how many officers, if you know or recall, were

8    actually working for Desert Hot Springs back in

9    February 2005?

10   A.    I don't recall.

11   Q.    More than two obviously?

12   A.    Yes.

13   Q.    So did most of the officers based on your recollection

14   have to use their own cameras to take photographs?

15   A.    Yes.

16   Q.    And as you saw Ms. Heath interacting with the person in

17   the jail cell with the camera in her hand seemingly taking

18   pictures, that's when you exchanged eye contact with

19   Ms. Heath?

20   A.    Yes.

21   Q.    That was for a brief moment the eye contact; correct?

22   A.    Yes.

23   Q.    Now, you know Ms. Heath very well, don't you?

24   A.    I do.

25   Q.    You worked with her for a number of years?

1    A.   Yes.

2    Q.   And you actually felt you were a mentor to her; correct?

3    A.   Yes.

4    Q.   And Ms. Heath had -- it was not uncommon for Ms. Heath

5    to call you if she had a problem; correct?

6    A.   Sometimes.

7    Q.   And if she had a complaint; correct?

8    A.   Yes.

9    Q.   And if she had a concern; is that right?

10   A.   Yes.

11   Q.   And at that time back in February of 2005, you're a

12   patrol sergeant; right?

13   A.   I was.

14   Q.   Now, do you have a special assignment beside your patrol

15   sergeant duties back in 2005 February?

16   A.   Yes.

17   Q.   What was that special assignment?

18   A.   I was a sexual assault and child abuse investigator.

19   Q.   And Ms. Heath also work at that time as an investigator

20   for you?

21   A.   She did.

22   Q.   And so were you her direct supervisor?

23   A.   Yes.

24   Q.   And at that time frame back in February 2005, Andrea

25   Heath worked in the dispatch a lot, too; correct?

1   A.   She did.

2   Q.   Because she was very fluent in dispatch, wasn't she?

3   A.   She was.

4   Q.   And there were many shifts where she worked the entire

5   shift as a dispatcher; correct?

6   A.   Correct.

7   Q.   The second time you saw the woman in the jail cell when

8   you were coming back out to actually go out on patrol; is

9   that correct?

10  A.   Yes.

11  Q.   And you testified earlier -- strike that.

12          Do you recall testifying earlier that from the time

13  you walked in the sally port and first saw Andrea Heath with

14  a camera in front of the jail cell with the woman inside the

15  cell until the time you left and saw the woman a second time,

16  you hadn't seen my client Sergeant Sclafani in the station;

17  correct?

18  A.   I didn't recall seeing him.

19  Q.   But you recall seeing Matthew Gutting?

20  A.   I believe I saw Matthew Gutting.

21  Q.   You know who he is; correct?

22  A.   Yes, I do.

23  Q.   You worked with him for a few years, too?

24  A.   Yes.

25  Q.   And when you walked back out to go back out on patrol

1  that night, you heard some kind of crying or whimpering kind

2  of crying from that jail cell; correct?

3  A.   Yes.

4  Q.   When I say that jail cell, the one that the Hispanic

5  female was in.

6  A.   No. 3.

7  Q.   And being supervisor of some kind -- strike that.

8       Were you the senior sergeant on staff at that time?

9  A.   I believe I was.

10  Q.   And having not seen my client Sergeant Sclafani during

11  that time period back on that night in February 2005, as a

12  sergeant and a senior sergeant, when you heard the whimpering

13  in the jail cell, you felt it was incumbent upon to you to go

14  check out and see if the prisoner was okay?

15  A.   Yes.

16  Q.   Even though that wasn't your call; correct?

17  A.   Correct.

18  Q.   Even though that wasn't your prisoner; correct?

19  A.   Correct.

20  Q.   Being an officer in general and a sergeant specifically

21  there, it was important that you make sure of the welfare of

22  the prisoner; correct?

23  A.   Yes.

24  Q.   That's why you looked in the window first?

25  A.   Yes.

```
 1    Q.    And you saw her condition that she looked like she was
 2    cold; correct?
 3    A.    Yes.
 4    Q.    And that she had some toilet paper wrapped around her
 5    feet?
 6    A.    And hands.
 7    Q.    Was that uncommon back then for prisoners to do that?
 8    A.    Not if they were cold.
 9    Q.    So it was a common sight for you to observe if a
10    prisoner was cold back in the jail cell to wrap toilet paper
11    around themselves?
12    A.    Yes.
13    Q.    And is one of the reasons that you noted earlier is
14    because prisoners were not allowed to have shoes when they
15    were in the holding cell?
16    A.    Correct.
17    Q.    So you got her a jumpsuit; correct?
18    A.    Yes.
19    Q.    And you got her some blankets; right?
20    A.    Yes.
21    Q.    Tried to keep her warm; is that correct?
22    A.    Yes.
23    Q.    Now, at that time Desert Hot Springs was Desert Hot
24    Springs considered holding facility that could hold a
25    prisoner for more than six hours?
```

1    A.    We could hold up to 24 hours.

2    Q.    Back in February 2005 or currently?

3    A.    Since I have been there.  Part of the CDC was they can

4    hold up to 24 hours as long as we feed them every eight

5    hours.

6    Q.    And if a prisoner had no longer a reason to be there,

7    they already had been through the whole booking process and

8    they were not going to be held over to go to court while in

9    custody, would there be a reason to keep them?

10   A.    No.

11   Q.    And are you familiar with what a site release is?

12   A.    Yes.

13   Q.    What is that?

14   A.    That's where someone is arrested and they sign a

15   citation stating they promising to appear in court on the

16   charges.

17   Q.    And was Desert Hot Springs Police Department back in

18   2005 a busy place?

19   A.    Yes.

20   Q.    And was it common for officers to go from one call to

21   another without much of a break at all?

22   A.    Not uncommon.

23   Q.    And if there was a female in a holding cell, would you

24   be able to as an officer put any other inmates who are

25   non-female in those holding cells with her?

1    A.    No.

2    Q.    And you only have three holding cells; right?

3    A.    Yes.

4    Q.    Now, back in February 2005, if a person was to be site

5    released on a misdemeanor, was it common practice to let them

6    leave once they went through the booking process?

7    A.    Yes.

8    Q.    Even if that person was a DUI arrest?

9    A.    Yes, as long as they did what they had to do to get the

10   release.

11   Q.    And after you had given the female, the Hispanic female

12   in the holding cell the blanket and the jumpsuit, you went

13   back on patrol; correct?

14   A.    Yes.

15   Q.    And the next time you saw the female, you were on

16   Pearson.  Is that Pearson Avenue or Pearson Street?

17   A.    Pearson Boulevard.

18   Q.    Boulevard.  Fair enough.

19          THE COURT:  Strike that.

20          MR. SCHWARTZ:  Sorry, Your Honor.

21   Q.    And on Pearson Boulevard, which direction were you

22   driving when you saw the female?

23   A.    Westbound.

24   Q.    And she was heading eastbound?

25   A.    Yes.

1    Q.    So you were heading towards each other; is that right?

2    A.    Yes.

3    Q.    And was she on the same side of the street as your

4    patrol car or on the opposite side of the street?

5    A.    I was on the north side.  She was on the south side.

6    Q.    So was she walking in the right direction that traffic

7    would be flowing on the side of the street she was on?

8    A.    Yes.

9    Q.    And Pearson Boulevard where you saw her, there are no

10   streetlights, are there?

11   A.    In the area where I saw her?

12   Q.    Correct.

13   A.    No.

14   Q.    Very dark; correct?

15   A.    Yes.

16   Q.    And you saw her sometime about 10:00 at night; is that

17   right?

18   A.    I don't recall what time it was.

19   Q.    When you saw her there on Pearson Boulevard and she was

20   heading east bound, she flagged you down; is that right?

21   A.    Yes.

22   Q.    Now, how far down the street were you in your patrol car

23   when you first noticed the Hispanic woman in the jumpsuit

24   walking towards you on the other side of the street?

25   A.    I just made a right turn off Palm Drive so I believe

UNITED STATES DISTRICT COURT

```
1    half a block.
2    Q.   And your headlights were on; right?
3    A.   Yes.
4    Q.   And as you're driving westbound and she is walking
5    eastbound, she's walking into your headlights; is that
6    correct?
7    A.   Yes.
8    Q.   And can you describe for the jury or demonstrate what
9    kind of motions she was making as she flagged you down?
10   A.   She was just waving her hand like this.
11             THE COURT:  Back and forth across her head.
12             THE WITNESS:  Yes.
13   BY MR. SCHWARTZ:
14   Q.   And you were driving your patrol car?
15   A.   Driving an SUV.
16   Q.   Was it a marked SUV?
17   A.   Yes.
18   Q.   Describe what you mean by a marked SUV.
19   A.   It had the words the City of Desert Hot Springs Police
20   on both sides and the back.
21   Q.   And did you have to make a U-turn in order to be on the
22   same side of the street as her so you can to talk to her?
23   A.   Yes.
24   Q.   And did you effectuate that U-turn?
25   A.   Yes, I did.
```

1    Q.    Did you have to drive past her to make the U-turn to

2    come around where she was?

3    A.    No, I kinda turned just a little bit ahead of her.

4    Q.    Any other cars on the road at that time?

5    A.    No.

6    Q.    And when you pulled up, was she on your passenger side?

7    A.    Yes.

8    Q.    And you rolled down the windows so you can talk to her?

9    A.    Yes, I did.

10   Q.    And those windows on that SUV, were they tinted or

11   untinted?

12   A.    They are lightly tinted.

13   Q.    Now, is there difference in the tint to the front

14   windows as opposed to the back windows?

15   A.    The front are lightly tinted and the rear ones are dark.

16   Q.    What about the windshield, also lightly tinted?

17   A.    Yes.

18   Q.    Now, it wasn't until you got closer to her that you

19   could see that she was wearing that jumpsuit; correct?

20   A.    No, I could see the jumpsuit immediately.

21   Q.    And you saw no limitation of her mobility as she walked

22   down the street; is that correct?

23   A.    No.

24   Q.    That's not correct?  I asked a double negative.  Did you

25   see limitation in her mobility as she walked down the street?

1    A.    I did not.

2    Q.    And when you made contact with her, did she complain of

3    any pain?

4    A.    No.

5    Q.    Did she complain about being tased?

6    A.    No.

7    Q.    Did she complain about being pepper sprayed?

8    A.    No.

9    Q.    Now, based on your training and experience with Desert

10   Hot Springs Police Department, there are no special rules

11   regarding a handcuffed prisoner as it relates to that

12   prisoner being tased, are there?

13   A.    Not that I recall.

14          MR. ARKOW:  Objection.  Vague.

15          THE COURT:  Sustained.

16   BY MR. SCHWARTZ:

17   Q.    Based on your training at Desert Hot Springs Police

18   Department, are there any special rules or policies in place

19   to treat a handcuffed prisoner different with regards to

20   whether an officer can tase that prisoner if the prisoner

21   falls into the addendum as we spoke about as opposed to a

22   nonhandcuffed prisoner?

23          THE COURT:  At what period in time?

24          MR. SCHWARTZ:  I'll be more specific, Your Honor.

25   I'm sorry.  May I publish again, Your Honor, Exhibit No. 13?

```
 1              THE COURT:  You may.
 2   BY MR. SCHWARTZ:
 3   Q.   And you looked at that a few moments ago; is that
 4   correct?
 5   A.   Yes.
 6   Q.   And you had a chance to read through all three pages
 7   briefly?
 8   A.   Yes.
 9   Q.   Did you see anything in that addendum that
10   differentiates whether a prisoner is handcuffed or not?
11   A.   No.
12              MR. SCHWARTZ:  Your Honor, may I publish Exhibit
13   No. 11?
14              THE COURT:  Go right ahead.
15              MR. SCHWARTZ:  May madam clerk give the witness a
16   copy of Exhibit 11?
17              THE COURT:  Certainly.  He has it.
18   BY MR. SCHWARTZ:
19   Q.   I'm gonna ask you look at it, Detective and have you
20   seen this before?  Had a chance to look at that, Detective?
21   A.   Yes.
22   Q.   And have you seen this policy before?
23   A.   Yes, I have.
24   Q.   Are you familiar with it?
25   A.   I am.
```

1    Q.   Turn to the second page, please.  Do you see where it

2    says factors used to determine the reasonableness of force?

3    A.   Yes, I do.

4    Q.   Do you see a list of factors from A through J?

5    A.   Yes.

6    Q.   Does -- and those factors are delineated at least.  Does

7    it mention handcuffs?

8    A.   No.

9    Q.   Now, I asked you a few moments ago if you recall what

10   time it was that you saw the Hispanic female walking on

11   Pearson Boulevard.  Do you remember that?

12   A.   Yes.

13   Q.   Would it refresh your memory to read a copy of your

14   testimony from the grand jury regarding what time that was

15   that you saw the Hispanic female walking down Pearson

16   Boulevard?

17   A.   Yes.

18        MR. SCHWARTZ:  And, Your Honor, may the witness and

19   counsel please refer to page 20 of the grand jury testimony?

20   Lines 21 through 25 and on the next page lines 1 through 7.

21   It starts on page 20, sir, and it's lines 21 through 25 and

22   continues on to page 21.

23        THE COURT:  What lines on 21?

24        MR. SCHWARTZ:  Sorry, Your Honor.  Page 21 lines 1

25   through 7.

1          THE COURT:  Thank you.  All right.  He's read it.

2    BY MR. SCHWARTZ:

3    Q.   Does that refresh your memory, Detective that you saw

4    this Hispanic female about 10:00 at night?

5    A.   Yes.

6    Q.   That's when you were westbound on Pearson Boulevard and

7    she was walking eastbound?

8    A.   Yes.

9    Q.   And when you first saw the Hispanic female, all you saw

10   was basically a shadow waving for your attention; is that

11   correct?

12   A.   No, I could actually see her.

13   Q.   Do you recall testifying at the grand jury that you

14   saw --

15          THE COURT:  Well, that's improper.  He didn't say

16   he doesn't recall.

17   BY MR. SCHWARTZ:

18   Q.   Do you have any reason to doubt your grand jury

19   testimony?

20   A.   No.

21   Q.   And at the time you testified before the grand jury --

22          THE COURT:  Well, the grand jury testimony is not

23   in evidence.

24          MR. SCHWARTZ:  I understand, Your Honor.

25   Q.   Are you sure that you saw her in that jumpsuit when you

174

1    first made that right turn or did you see a shadow?

2    A.    I could see the jumpsuit.

3    Q.    Now, based on your experience as a police officer at

4    Desert Hot Springs Police Department for all those years, was

5    it common for somebody who is arrested for a public or some

6    kind of intoxication offense who is drunk to be yelling from

7    the jail cell?

8    A.    Yes.

9    Q.    Happen pretty frequently?

10   A.    Yes.

11   Q.    You noted on direct earlier that a person to your

12   knowledge the policy of Desert Hot Springs was they're

13   entitled to three phone calls when they're being hold in that

14   booking area under arrest; correct?

15   A.    Yes.

16   Q.    And you said that was contingent on their ability to

17   actually cooperate in the booking process; right?

18   A.    Yes.

19   Q.    And their ability to make a phone call; is that right?

20   A.    Yes.

21   Q.    And if they were uncooperative or unable to care for

22   themselves, would it be normal policy to wait until they were

23   cooperative make a phone call?

24   A.    Yes.

25   Q.    Now, when we showed you before the Taser Addendum and

```
 1   Use of Force Policy, your understanding based on your
 2   training and experience at Desert Hot Springs, were those
 3   hard fast rules or guidelines?
 4   A.   That was the policy.
 5   Q.   Well, that was the policy, but was the policy to act
 6   more as a guide for officers or a hard and fast rule?
 7            MR. ARKOW:  Asked and answered.
 8            THE COURT:  Sustained.
 9            MR. SCHWARTZ:  Have just a moment, Your Honor?
10            THE COURT:  Very well.
11   BY MR. SCHWARTZ:
12   Q.   Detective, you're familiar with the three different
13   holding cells in Desert Hot Springs Police Department; right?
14   A.   Yes.
15   Q.   In Cell 1 back in February of 2005, was there a concrete
16   bench in that cell if you remember?
17   A.   I don't recall.
18            MR. SCHWARTZ:  Nothing further at this time,
19   Your Honor.
20            THE COURT:  Redirect, Mr. Arkow.
21                     REDIRECT EXAMINATION
22   BY MR. ARKOW:
23   Q.   Now, you were just asked about the interior of the
24   holding cell.  Back in 2005, what was the inside of the
25   holding cell?  What material were the walls of the holding
```

1    cell?

2    A.    The same as they are today cement wall.

3    Q.    Hard cement?

4    A.    Yes.

5    Q.    And what was the material in 2005 of the holding cell

6    door?

7    A.    The same as it is now, metal.

8    Q.    Hard metal?

9    A.    Yes.

10          MR. ARKOW:  If we could publish again the Taser

11   Addendum, which is Government's Exhibit 13?

12          THE COURT:  Certainly.

13   BY MR. ARKOW:

14   Q.    And directing your attention to the two paragraphs that

15   defense counsel showed you, it's the second paragraph, and

16   directing your attention to the paragraph that now is being

17   highlighted, can you read that to yourself and then I want to

18   ask you a question.

19          Have you had an opportunity to read the paragraph,

20   the second one, the bullet that begins where the subject has

21   been lawfully arrested and detained and although handcuffed?

22   A.    Yes.

23   Q.    Is that the policy on using a taser on a handcuffed

24   suspect?

25   A.    Yes.

1  Q.    And are there certain requirements that are set forth in

2  that policy as to when an officer can use a taser on a

3  handcuffed suspect?

4  A.    According to this, yes.

5  Q.    And is one of those requirements that the -- I'm using

6  the term suspect.  In this policy it's referred to as

7  subject.  Is that the same used interchangeably suspect or

8  subject; is that correct?

9  A.    Yes.

10  Q.    And is one of the requirements that the subject has to

11  maintain in his capacity the ability to inflict damage?

12  A.    Or injury to himself or others.

13  Q.    Is that one of the requirements?

14  A.    Yes.

15  Q.    And then in addition to that requirement for an officer

16  to be authorized to use a taser on a subject, is another

17  requirement that the subject has to -- actually does inflict

18  damage or injury to himself or another officer?

19  A.    I think that would go inside with the other bullet point

20  above that so you would use both.  I don't see how you can

21  neglect one and not have the other.

22  Q.    Well, does the second bullet refer to taser policy

23  regarding handcuffed suspects where the first bullet point

24  isn't addressed specifically to a handcuffed suspect?

25  A.    This one -- yes.  This one talks specifically about

1    someone handcuffed.

2    Q.   Is the policy on the second bullet that's magnified is

3    that the policy and training of Desert Hot Springs as to when

4    an officer can use a taser on a handcuffed suspect?

5             THE COURT:  Well, that's compound.  Training and

6    policy.

7    BY MR. ARKOW:

8    Q.   Was that policy as to when an officer can use a taser on

9    a handcuffed suspect?

10   A.   I think it would be the top bullet point and it talks

11   about although, if a person handcuffed, but it would still

12   reflect on the top policy to talk about a person fleeing or

13   lack of cooperation, all of that taken into consideration and

14   then it would be up to the officer.  I think you would have

15   to put them both together.  I don't think you can just rely

16   on just the one specific one.

17   Q.   Now, directing your attention to that first bullet point

18   which you referred to, if that can also be magnified at the

19   same time, does that first bullet point state the

20   requirements when an officer can use a taser on a subject?

21   A.   Yes.

22   Q.   And is one of the requirements that the subject refuses

23   to submit to detention by use of force, fleeing or lack of

24   cooperation?

25   A.   Correct.

1    Q.   And in addition to that requirement, is another

2    requirement that has to be satisfied that there has to be a

3    hands-on confrontation being inevitable?  Is that another

4    requirement?

5    A.   Yes.

6    Q.   And is another requirement before an officer can use a

7    taser on a subject, the requirement that, you know, there

8    could be a result in further injury to either the officer or

9    the subject being detained?

10   A.   Yes.

11   Q.   So all of these requirements that are set forth in the

12   policy have to occur for taser use on a subject to be

13   justified according to the policy?

14   A.   Not all of them just when it says or, it's one or the

15   other.  If they're using force, if they're trying to flee,

16   it's totally -- you don't have to have all of these

17   requirements.  It doesn't say a person must do try to flee

18   and injure someone.  It says you can use force if they're

19   fleeing, lack of cooperation, you know.  It doesn't just

20   specifically say you have to have one, two, three and four in

21   order to use a taser.  I'm assuming it's one of those at

22   which time an officer can make a decision to use force.

23   Q.   And if one of those present, is there also a requirement

24   according to this policy that a hands-on confrontation is

25   inevitable?

1   A.   Yes.  It's saying that if in a situation where it looks

2   like you're gonna go hands-on and someone's gonna be injured

3   or someone's gonna be hurt or a person is trying to flee,

4   then at that time you can use a taser is my understanding.

5   Q.   And you were questioned about the factors to be

6   considered when using a taser.  This was in Government's

7   Exhibit 11 and if I could ask that be published?

8               THE COURT:  Certainly.

9               MR. ARKOW:  And specifically the third page Section

10  300.22.

11  Q.   And if you look at those factors to determine the

12  reasonableness of force and your training in February of

13  2005, is whether a suspect is handcuffed a relevant factor in

14  your determination whether the subject poses a risk or a

15  threat to the officer?

16  A.   I'm sorry.  Which one are you reading?

17  Q.   Well, I'm asking you to look at those factors and answer

18  whether a subject is handcuffed is that a factor that is

19  relevant to whether the subject poses a threat or a risk to

20  the officer?

21              And I'm asking you based on the factors and any

22  other training and policy on use of force that you're aware

23  of at Desert Hot Springs as of February 2005.  Well,

24  Detective Cole --

25              THE COURT:  Well, just a minute.

```
1              THE WITNESS:  I'm sorry.  I was reading.

2              THE COURT:  No, continue.

3              THE WITNESS:  And I'm reading A through J?

4              MR. ARKOW:  A through J.  And not just these

5    factors, but any other factors based on your training and

6    policy at Desert Hot Springs, would the fact that a subject

7    is handcuffed --

8              THE COURT:  Now you're changing your question.

9              MR. ARKOW:  Let me withdraw the question ask this

10   question.

11   Q.   Would the fact that a subject is handcuffed be a

12   relevant factor in determining whether that subject is posing

13   a threat to the officer?

14   A.   No.

15   Q.   Would the fact -- do you account at all for the fact

16   that a subject is handcuffed in determining what a reasonable

17   use of force is?

18   A.   It depends on what the handcuffed subject is doing at

19   the time.

20   Q.   And what do you mean by what the subject is doing at the

21   time?

22   A.   Well, if he's trying to kick you or kick someone else,

23   then he's still is a danger to someone and he could injure

24   someone so no, it wouldn't.

25   Q.   But the suspect would have to be posing a danger to
```

1    someone to use tasers.  Was that the policy?

2    A.    Yeah, he'd have to be posing a threat to someone trying

3    to hurt them or hurt himself according to the policy or

4    injure himself or someone else.  He was totally

5    uncontrollable according to the policy.  Because he's

6    handcuffed doesn't mean he cannot be uncontrollable or he

7    can't injure himself or can't injure other people.

8    Q.    Do you recall being asked on cross-examination about a

9    prisoner requesting or making phone calls, requesting to make

10   phone calls?

11   A.    Yes.

12   Q.    Is an arrestee in a holding cell requesting to make a

13   phone call, is that a reason to say that the person is being

14   uncooperative?

15   A.    If the person is just sitting in a cell and they're just

16   asking for a phone call, no.

17   Q.    And if a person is asking to make a phone call is that

18   in and of itself a reason to deny that person a phone call?

19   A.    That would be based on the person's behavior prior to

20   you putting them in there.  If they were fighting with you

21   and yelling and kicking on the door and screaming, then

22   you're not gonna open the door to let them make a phone call

23   because they're out of control and you open the door, then

24   you have a potential of them getting out and fighting with

25   you or doing other things.  If they're normally sitting down

```
 1   and they're doing what they supposed, they come out and get
 2   their phones calls and go back in.  But if they're yelling
 3   and kicking and screaming and beating on the door and yelling
 4   profanity, then you're not gonna put yourself in that danger
 5   to open the door to let them make a phone call.  You tell
 6   them calm down and once you calm down, we'll allow you to
 7   make your phone calls.
 8   Q.   So in the situation where the person is yelling and
 9   kicking and screaming, the officer wouldn't go into the
10   holding cell?
11   A.   No.
12   Q.   Why not?
13   A.   Because he put himself in danger.
14   Q.   Do you recall whether Mr. Sclafani was at the jail that
15   night when you saw the woman crying in the holding cell?
16           MR. SCHWARTZ:  Objection.  Asked and answered.
17           THE COURT:  Sustained.
18   BY MR. ARKOW:
19   Q.   Would seeing a copy of your grand jury testimony refresh
20   your memory as to whether you remember seeing Mr. Sclafani?
21   A.   Yes.
22   Q.   Do you still have before you your grand jury testimony?
23   A.   Yes.
24   Q.   Can you look at -- may I have a moment, Your Honor?
25           THE COURT:  You may.
```

1    BY MR. ARKOW:

2    Q.   Can you look at page 19 starting at line 10 through 14

3    and after you have looked at that, can you put the exhibit

4    down?

5         THE COURT:   All right.   He's read it.

6    BY MR. ARKOW:

7    Q.   Does that refresh your memory as to whether you saw

8    Mr. Sclafani that night in the jail?

9         MR. SCHWARTZ:   Objection.   Vague as to time.   We

10   have the entire night.

11        THE COURT:   You should be more specific.

12   BY MR. ARKOW:

13   Q.   Well, does that refresh your memory as to any time that

14   night that you saw Mr. Sclafani in the jail?

15   A.   I think the question was did I see him in the jail and I

16   said no, he was in his office according to my grand jury

17   testimony.

18        THE COURT:   I'm going to strike that.   Ask another

19   question.

20   BY MR. ARKOW:

21   Q.   Do you remember seeing Mr. Sclafani at the police

22   station, any part of the Desert Hot Springs Police Department

23   station that night?

24   A.   According to my testimony --

25        THE COURT:   Well, that's not the question of how

1    you answered the grand jury.  Your recollection now is what

2    is at issue.  Ask it again, please.

3         MR. ARKOW:  Yes.

4    Q.   Do you recall seeing Defendant Sclafani at any time that

5    night in any area of the police department station?

6    A.   Yes.

7    Q.   Where do you recall seeing Defendant Sclafani in the

8    station?

9    A.   The watch commander's office.

10        MR. ARKOW:  And if we can have Government Exhibit 1

11   published?

12        THE COURT:  Very well.

13   BY MR. ARKOW:

14   Q.   When you say the watch commander office is this where I

15   have notated the line in color?

16   A.   Yes.

17   Q.   And approximately when in relation to the events you

18   have described that night do you remember seeing Defendant

19   Sclafani in the watch commander office?

20   A.   I don't recall.

21   Q.   Was it before or after you gave the woman in the holding

22   cell the blanket and the paper jumpsuit?

23   A.   I don't recall.

24   Q.   Was it before you went out on patrol that night?

25   A.   I don't recall.

```
 1   Q.   Do you recall being asked on cross-examination as to
 2   whether the woman you saw in the holding cell and you later
 3   saw that night on the street told you anything about being
 4   pepper sprayed.  Do you recall those questions?
 5   A.   I do.
 6   Q.   Had the woman in the holding cell earlier told you
 7   anything about being pepper sprayed?
 8   A.   Yes.
 9   Q.   What did she tell you?
10   A.   That she had been pepper sprayed.
11   Q.   So by the time you saw her in your patrol car that
12   night, did you already know from her that she had been pepper
13   sprayed?
14   A.   Yes.
15           MR. ARKOW:  May I have a moment, Your Honor?
16           THE COURT:  You may.
17           MR. ARKOW:  No further questions.
18           THE COURT:  Something further of this witness?
19           MR. SCHWARTZ:  No.  Thank you, Your Honor.
20           THE COURT:  Thank you very much, Detective.  You
21   are excused.  You may call your next witness.
22           MR. ARKOW:  May I have a moment, Your Honor?
23           THE COURT:  You may.  Just relax, ladies and
24   gentlemen.  Your next witness.
25           MR. ARKOW:  I want to read now and introduce two
```

UNITED STATES DISTRICT COURT

1    stipulations.  I move to admit Exhibit 84 that's been the

2    stipulation regarding the Desert Hot Springs Police

3    Department.

4          THE COURT:  That stipulation has been received at

5    the very beginning of this trial.

6          MR. ARKOW:  And then the government would move to

7    admit another stipulation into evidence.  It's government

8    exhibit marked for identification 85 stipulation regarding

9    Desert Hot Springs Police Department codes and terms.

10         THE COURT:  All right.  Is this the stipulation

11    that you have agreed to, Mr. Schwartz?

12         MR. SCHWARTZ:  Yes, Your Honor.  Thank you.

13         THE COURT:  It will be received.

14              (Exhibit 85 was admitted.)

15         MR. ARKOW:  With the Court's permission, I would

16    ask to have it published.  It's a two-page exhibit.

17         THE COURT:  Go ahead.

18         MR. ARKOW:  As it's being displayed, the

19    stipulation says United States of America Defendant Anthony

20    Sclafani hereby stipulate and agree the following terms and

21    codes used in records of the Desert Hot Springs Police

22    Department DHSPD have the following meaning in February 2005.

23         And then there's two columns.  The column on the

24    left is for computer-aided dispatch officer numbers and then

25    it has various alphabetical and numeric numbers.  The second

1    column in the middle says, police record management systems,

2    officer number.  Also has codes.  And then the third column

3    is entitled meaning and that states which officer the codes

4    refer to.

5              MR. SCHWARTZ:  Your Honor, may counsel confer for a

6    moment, please?

7              THE COURT:  Go right ahead.

8              MR. ARKOW:  And then if you can publish the second

9    page, which at the top is a continuation of what was on the

10   first page, and then it also has a box with two columns.  The

11   column on the left is a computer code or entry in shorthand,

12   and then the column on the next to it on the right is the

13   meaning of that code.

14             And, Your Honor, if I could orally add to that

15   stipulation?  Just conferred with defense counsel for on page

16   1, if you can publish that, the police records management

17   system officer number for the very first entry 56 should be

18   056.  So if we can just orally modify that.  And then on the

19   second page, the entry under the same column for police

20   records management system for officer number 54, it should be

21   054.

22             THE COURT:  I take it that is the agreement?

23             MR. SCHWARTZ:  Yes, Your Honor.  Thank you.

24             THE COURT:  Thank you.  That will be received.

25             MR. ARKOW:  And with that being said, the

| | |
|---|---|
| 1 | government at this time would ask to given the hour, to |
| 2 | adjourn and recess in light of the earlier agreement on |
| 3 | scheduling that the parties and the Court and the jury has |
| 4 | reached. |
| 5 | THE COURT:  Very well.  All right.  Ladies and |
| 6 | gentlemen, please remember the admonition not to discuss the |
| 7 | matter among yourselves or with anyone.  Just enjoy the rest |
| 8 | of the Valentine's Day and we'll see you on Thursday morning. |
| 9 | Don't have too good a time tomorrow.  Everyone please rise |
| 10 | for the jury. |
| 11 | (Jury not present.) |
| 12 | THE COURT:  We're outside the presence of the jury. |
| 13 | I understand that it may be possible that we could get some |
| 14 | news tomorrow morning.  There is a psychiatrist who is on |
| 15 | call making rounds in the morning.  I don't know that how |
| 16 | much can get done and how quickly, but since we have multiple |
| 17 | counsel on both sides, perhaps you could check with |
| 18 | Ms. Skipper and find out if we have anything, say, by perhaps |
| 19 | we should say 11:00.  And if not, then we'll have to wait |
| 20 | until later.  I understand that this particular doctor leaves |
| 21 | by 1:00.  Whether somebody else would then be participating |
| 22 | in the evaluation, I just don't know so we'll have to play it |
| 23 | by ear, but you should check in at least by 11:00 tomorrow, |
| 24 | somebody from each legal team. |
| 25 | All right.  We're outside the presence of the jury. |

1    Any counsel have any matters that he or she wishes to take up

2    at this time?

3              MR. ARKOW:  Not from the government at this time.

4              THE COURT:  Mr. Schwartz, anything?

5              MR. SCHWARTZ:  Your Honor, we spoke earlier

6    Thursday morning Mr. Meyer will be here.  He's got a two-hour

7    window.  If we can have him go on first just for those two or

8    three questions.  I'm gonna ask him several questions, but it

9    will be very quick.  My other witnesses for Thursday, we'll

10   just have to sit here and wait until the government's done

11   with its case.  That's how court goes.  Get him in and out.

12             THE COURT:  All right.  I take it the government is

13   still in agreement with that?

14             MR. ARKOW:  Yes, Your Honor.  Regarding Mr. Meyer

15   coming on Thursday morning, yes.

16             THE COURT:  All right.  Fine.

17             MR. SCHWARTZ:  Thank you, Your Honor.

18             THE COURT:  We'll be in recess until tomorrow at

19   11:00 when there will be at least a telephonic call into the

20   Court.  We're in recess.

21             (Proceedings were concluded at 4:30 p.m.)

22

23

24

25

UNITED STATES DISTRICT COURT

1        CERTIFICATE OF REPORTER

2

3    COUNTY OF LOS ANGELES        )

4                                 )  SS.

5    STATE OF CALIFORNIA          )

6

7    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

8    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

9    DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

10   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

11   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

12   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

13   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

14   OF MY STENOGRAPHIC NOTES.

15

16

17   DATE: JANUARY 7, 2013_____

18

19     ____/s/  LAURA MILLER ELIAS____

20   LAURA MILLER ELIAS, CSR 10019

21   FEDERAL OFFICIAL COURT REPORTER

22

23

24

25

UNITED STATES DISTRICT COURT