1                      UNITED STATES OF AMERICA
                     UNITED STATES DISTRICT COURT
2                   CENTRAL DISTRICT OF CALIFORNIA
                           WESTERN DIVISION
3
                               - - -
4                  HONORABLE TERRY J. HATTER, JR.
            UNITED STATES DISTRICT JUDGE PRESIDING
5                              - - -

6
     UNITED STATES OF AMERICA,          )
7                                       )
                    PLAINTIFF,          )
8                                       )
     VS.                                )    CASE NO.:
9                                       )    CR 10-163-TJH
     ANTHONY SCLAFANI,                  )
10                                      )
                    DEFENDANT.          )
11                                      )
     _____)
12

13

14                REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  TUESDAY, FEBRUARY 7, 2012

16                     LOS ANGELES, CALIFORNIA

17

18

19

20

21                LAURA MILLER ELIAS, CSR 10019
                  FEDERAL OFFICIAL COURT REPORTER
22               312 NORTH SPRING STREET, ROOM 453
                  LOS ANGELES, CALIFORNIA 90012
23                     PH:  (213)620-0890

24

25

```
 1
      APPEARANCES OF COUNSEL:
 2
      ON BEHALF OF PLAINTIFF:
 3
                  BY:  MARGARET CARTER
 4                     STEVEN ARKOW
                  ASSISTANT UNITED STATES ATTORNEY
 5
                  1100 UNITED STATES COURTHOUSE
 6                312 NORTH SPRING STREET
                  LOS ANGELES, CA 90012
 7

 8    ON BEHALF OF DEFENDANT:

 9                SILVER HADDEN SILVER WEXLER & LEVINE

10                BY:  MICHAEL SCHWARTZ, ESQ.
                       MICHAEL SIMIDJIAN, ESQ.
11
                  1428 SECOND STREET
12                SANTA MONICA, CA 90401

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1
                                    INDEX
2

3     PROCEEDINGS                              PAGE

4     JURY VOIR DIRE                           15

5
      OPENING STATEMENTS
6
      BY:  MS. CARTER                          160
7
      BY:  MR. SCHWARTZ                        171
8

9

10    WITNESSES FOR
      THE GOVERNMENT:
11
                        DIRECT      CROSS    REDIRECT    RECROSS
12
      HARPER, KAREN
13
      BY:  MR. ARKOW      189
14    BY:  MR. SCHWARTZ              200

15

16
            EXHIBITS         ADMITTED
17
              63             190
18            64             191
              65             192
19

20

21

22

23

24

25

                      UNITED STATES DISTRICT COURT

```
 1    LOS ANGELES, CALIFORNIA; TUESDAY, FEB. 7, 2012; 10:05 A.M.

 2                        - - -

 3              THE CLERK:  Calling Criminal Case 10-163.

 4              United States of America versus Anthony Alonzo

 5    Sclafani.

 6              Counsel.

 7              MR. ARKOW:  Steven Arkow for the United States.

 8              THE COURT:  Thank you.

 9              MS. CARTER:  Maggie Carter also on behalf of the

10    United States.

11              THE COURT:  Thank you.

12              MR. ARKOW:  Also present at counsel table is FBI

13    Special Agent Steve Novak.

14              THE COURT:  Thank you.

15              MR. SCHWARTZ:  Good morning, Your Honor.

16              THE COURT:  Good morning.

17              MR. SCHWARTZ:  Michael Schwartz on behalf of

18    Mr. Sclafani.

19              MR. SIMIDJIAN:  Good morning, Your Honor.  Michael

20    Simidjian on behalf of Mr. Scalfani.

21              THE COURT:  Thank you.

22              MR. SCHWARTZ:  My client is present.

23              THE COURT:  Thank you all.  Please be seated.

24              Were there any matters that any counsel wish to

25    raise at this time?
```

```
 1           MR. SCHWARTZ:  Yes.  I'm not sure it's a matter we
 2   need to raise per se with the Court, but we were working out
 3   stipulations.  Up until this morning there was some confusion
 4   I think with Bates stamped pages and things of that nature
 5   which we're trying to work out with Mr. Arkow.  It may take
 6   another several minutes.  There's a good degree of
 7   stipulation as to foundation from our book of evidence,
 8   exhibit book.
 9           THE COURT:  All right.  If you need some additional
10   time, you may have it.
11           MR. SCHWARTZ:  Thank you, Your Honor.
12           THE COURT:  All right.  We'll just be in recess,
13   and let the clerk know when you're available.
14                      (Recess taken.)
15           THE COURT:  All right.  We're again outside the
16   presence the jury.  Who wishes to be heard?  Ms. Carter?
17           MS. CARTER:  Thank you, Your Honor.
18           Your Honor, during the recess we did review some of
19   the issues with the defense stipulation.  I believe they're
20   making a few adjustments so we should be able to reach a
21   stipulation on their exhibit.  I also wanted to raise with
22   the Court a couple of other issues.
23           One of our witnesses who is under subpoena in this
24   case, one of the victims in this case, there's also a pending
25   state civil proceeding where this defendant is also a
```

```
 1    defendant and she is a witness in that case as well.  And
 2    this morning when the FBI agents went to pick her up, she had
 3    just been picked up by the plaintiff's investigators and
 4    there may have been a misunderstanding on her part as to
 5    whether these were the FBI agents or whether this was for the
 6    civil case.  And she's being driven to Indio right now and
 7    the plaintiff's attorneys have said that they don't want to
 8    release her to testify here this morning because she's under
 9    subpoena for their case at 11 o'clock.  And so I wanted to
10    bring this to your attention and see whether the Court was
11    interested in possibly contacting the state court judge in
12    that proceeding or whether we should get a bench warrant to
13    have the agent go get her.
14              THE COURT:  I think that's what we'll do.  We'll
15    issue a bench warrant and have the marshals serve it
16    immediately.
17              MS. CARTER:  Okay.  This is for a witness Angelica
18    Vargas.
19              THE COURT:  If you do have the name of the judge
20    out there, I'll call him or her.
21              MS. CARTER:  His name is Randall B. White.  He's in
22    Department 2H in Indio.
23              THE COURT:  All right.  We'll see if we can locate
24    him.  Did you get that down, Ms. Skipper?
25              THE CLERK:  Department?
```

1          THE COURT:  2H Indio.

2          MS. CARTER:  And the name of the case is Moore

3   versus the City of Desert Hot Springs.

4          Your Honor, I there are a couple of other issues I

5   wanted to mention briefly.  I wanted to let the Court know

6   that we plan to have a possible rebuttal expert sit during

7   the trial to hear the testimony and he may testify in

8   rebuttal.

9          THE COURT:  Certainly.

10          MS. CARTER:  I also wanted to let the Court know

11   that during the opening, I plan to show a couple of

12   demonstratives, mostly photographs, but there is an item of

13   physical evidence a jail jumpsuit that I plan to hold up.

14          THE COURT:  Have you shown these items to the

15   defense?

16          MS. CARTER:  I have, Your Honor.  We also wanted to

17   demonstrate a taser gun without the dart cartridge on the end

18   and to show how the spark sounds, but I understand Your Honor

19   may have some reservations about that.

20          THE COURT:  Well, you say that there is no

21   cartridge; is that right?

22          MS. CARTER:  That is correct.  It would have the

23   electrical capability, though, and you would be able to hear

24   the shocking sound.

25          THE COURT:  All right.  Mr. Schwartz.

 1          MR. SCHWARTZ:  No objection to the expert on the

 2     stand being able to do that without the cartridge,

 3     Your Honor.

 4          THE COURT:  But I take it that you wanted to use

 5     that in opening statement as well?

 6          MS. CARTER:  The taser, yes.

 7          THE COURT:  All right.  To just show it?

 8          MS. CARTER:  Yes, Your Honor, and to make the

 9     sound.

10          THE COURT:  Is there any objection to that?

11          MR. SCHWARTZ:  No, Your Honor.

12          THE COURT:  All right.  There is no objection

13     evidently.  All right.

14          MS. CARTER:  Your Honor, I believe also that there

15     was the motion last week regarding the documents from the

16     Riverside court, and I'm not sure whether those will be made

17     available pursuant to the Court's protective order or what

18     the status of the Court's review was?

19          THE COURT:  I think Ms. Skipper has been in touch

20     with your firewall assistant.

21          MS. CARTER:  Okay, wonderful.

22          And then lastly, Your Honor, I believe that both

23     sides are requesting an early recess on Friday afternoon.  I

24     believe that defense has a religious observance, and the

25     government, actually this attorney, my husband is being sworn

1    in as a superior court judge and I would like to be there for

2    that.

3           THE COURT:  Of course, you should be.  While we're

4    talking about that, we'll have to have an early recess on

5    Thursday because the court meeting and it's in Riverside so

6    we'll only be going from perhaps 9:00 to 12:00 on Thursday.

7    So both Thursday and Friday it looks like a half day.

8           MS. CARTER:  May I have one moment, Your Honor?

9           THE COURT:  Of course.

10          MS. CARTER:  Your Honor, one last matter.  I

11   believe both sides in their exhibit books intend to use

12   documents that were provided to the parties pursuant to this

13   Court's protective orders, and I just wanted to make the

14   Court aware that we are planning on using some of those

15   documents in trial.

16          THE COURT:  Certainly, you may do so.

17          MS. CARTER:  And I believe that's all that the

18   government wanted to raise.

19          THE COURT:  Mr. Schwartz, anything?

20          MR. SCHWARTZ:  Your Honor, may I have a moment with

21   counsel?

22          THE COURT:  Surely you may.

23          MR. SCHWARTZ:  I have spoken with counsel.  We have

24   nothing at this time.  Thank you.

25          THE COURT:  Thank you.

1          Let me just go over with you the procedures to be

2     followed.  We're gonna seat 12 prospective jurors from the

3     panel and we'll start in the second row, seat farthest from

4     me that individual being Prospective Juror No. 1 and when we

5     filled up six seats in the back leaving the last seat in the

6     back row closest to me vacant for the time being, the seventh

7     person whose name is called will seat him or herself

8     immediately in front of Juror No. 1 at the far end there and

9     then we'll seat 12.  We'll two seats closest to me, front and

10    back vacant, while we go through the voir dire for the first

11    12 individuals.

12         And when we move to the alternates, Alternate No. 1

13    will be in the second row and that's important for you to

14    know because if one of the first 12 has to be excused for any

15    reason, then Alternate No. 1 will fill in.  We'll call two

16    individuals, though.  Alternate -- Proposed Alternate No. 2

17    will be in the front row.  If Proposed Alternate No. 1 is

18    excused, then the individual who has been called as Alternate

19    No. 2  will move his or herself into that second row becoming

20    Alternate No. 1.  And, of course, you know that you have one

21    challenge each side for the two alternates.

22         And the manner in which we will exercise the

23    peremptory challenges are plaintiff defendant, then plaintiff

24    defendant defendant.  Plaintiff defendant defendant.

25    Plaintiff defendant defendant.  Plaintiff defendant

1    defendant.  Plaintiff defendant defendant and plaintiff

2    defendant.

3            Of course, you don't have use all of the challenges

4    that you have.  However, if you accept, that is considered

5    the use of a challenge.  If you pass, that is also considered

6    a use of the challenge.  If however having either accepted or

7    passed and there is a change in the makeup of the veneer

8    persons, you still have a challenge or challenges remaining,

9    you're free to use whatever challenge or challenges you have.

10           Any comment about that?  Yes, Ms. Carter.

11           MS. CARTER:  Your Honor, I'm sorry.  I would ask

12   the Court's indulgence to please reread the order of the

13   challenges.

14           THE COURT:  Well, it's plaintiff defendant.  Then

15   plaintiff defendant defendant.  Plaintiff defendant

16   defendant.  Plaintiff defendant defendant.  Plaintiff

17   defendant defendant.  Plaintiff defendant defendant and

18   plaintiff defendant.

19           MS. CARTER:  Thank you, Your Honor.

20           THE COURT:  Certainly.

21           Then with regard to -- in the back let's not have

22   any talking, please.  The only talking takes place in the bar

23   of this court when we're in session.  If you want to talk,

24   just step outside.  And while we're talking about this, you

25   gentlemen have to move over to the, my right side your left

1    side.   Jury panel will be using the center and the left.

2          And with regard to the challenges for the

3    alternates, we'll start with the government then go to the

4    defense.  So government, defense.  If there are no questions

5    about that, let me just indicate to you that during the

6    trial, I expect counsel to remain behind or as close to the

7    lectern as possible and using the microphone so that not only

8    the jurors can you hear you, but importantly the reporter.

9          And also if you have an objection, please rise and

10   state it succinctly.  Don't attempt to argue it unless I ask

11   you to do so and that's not likely.  Please hold any requests

12   for side bars to a minimum.  We don't want to have an OJ

13   Simpson circus over here.  Just don't believe in it.  The

14   jurors in my years here have always indicated to me

15   afterwards they couldn't understand the reason for the side

16   bars that were had and I agree with them.

17          If, however, you have a matter that has to be taken

18   care in order for us to continue with the trial, then we'll

19   have that side bar.  It's not necessary for the defendant to

20   attend the side bar.  Counsel can quite adequately represent

21   him.  If he wishes to be there, he may, of course, come up to

22   the side bar.

23          And I should also indicate that, Mr. Scalfani, you

24   understand that you don't have to do anything other than show

25   up in court and you've done that now and indicate that to the

1    members of the jury.  However, if you do wish to testify in

2    your own behalf, which is your right, you may do so, but you

3    have to understand that while you're exercising that right,

4    you stand the possibility of incriminating yourself not only

5    through questions from the government, but perhaps even

6    questions from your own counsel.  So I'm sure you will go

7    over carefully with counsel whether you do intend to testify,

8    which is your right, but you have no obligation to do so as

9    you know.  You have no other obligation other than to just be

10   here in court and you're here.

11         Also, since we have more than one counsel at each

12   table, you certainly may confer with each other quietly

13   that's not a problem, but if you need to talk across the

14   counsel table, then you will ask for the Court's permission

15   just as Mr. Schwartz did earlier here.  Any question about

16   that?

17         If you need a read back, again, you inquire through

18   the Court.  And I'm sorry, you're gonna have to sit on the

19   other side here.  We're gonna bring the jury panel down here

20   very shortly.  If you need to have an exhibit handed to a

21   witness, you do that through the Court as well and normally

22   you pass the item to the clerk and the clerk will give it to

23   the witness.  There should never be an occasion where you

24   approach the jury box and very seldom would you approach the

25   witness stand, but if it is necessary on some occasion and

1    once in a while that is necessary, again, you would inquire

2    through the Court.

3           If there are no questions -- yes, Mr. Arkow.

4           MR. ARKOW:  Regarding the jury selection process,

5    can I inquire if the government wants to propose a challenge

6    to one of the jurors, should the government counsel confer

7    with defense counsel before asking the Court to strike or do

8    you want the government counsel to --

9           THE COURT:  No.  You exercise your challenges

10   independently.  There is not an Arizona system or anything

11   like that.  You have the first challenge.  You use it as you

12   choose to.  Confer with co-counsel and decide.

13          MR. ARKOW:  Yes, Your Honor.  And then second, the

14   parties filed a joint proposed jury questionnaire.

15          THE COURT:  Yes, I have looked at it and I'm glad

16   you mention that.

17          MR. ARKOW:  I know the Court has its questions it

18   asks the panel first in terms of biographical information.

19          THE COURT:  Right.  If you have something that you

20   wish to have me ask that I haven't covered, it may be that I

21   just didn't intend to cover or it may be something I will

22   cover it.  Just give me the number and I'll determine whether

23   I will ask it.  And I'm glad you did raise that because that

24   is one important thing, too, that during the voir dire, I

25   will be asking general questions of the veneer persons.  And

```
1   after I finish those general questions, I'll turn to counsel
2   and ask if there are any additional questions and you can
3   tell me at that time.  Then I'll ask more personal questions
4   of the individual jurors and after that, again turn to
5   counsel and inquire if there are additional questions and/or
6   challenge for cause.
7             Counsel, do you intend to call Ms. Vargas today?
8             MS. CARTER:  Your Honor, I believe we would like if
9   the schedule permits with jury selection.
10            THE COURT:  Right.  We certainly hope to get there.
11  All right.  Anything else then.
12            MS. CARTER:  Your Honor, I just wanted to mention
13  that we do also have one other witness today who has a
14  medical issue that we're trying to accommodate.  That is one
15  other factor with regard to Ms. Vargas, but if we can get her
16  here, we want to either call her first or second.
17            THE COURT:  All right.  Fine.  Well, we're
18  certainly going to try to do that.  All right.  Anything
19  else?  If not we should bring the panel up and let's call for
20  the panel, too.
21            Counsel, I understand that an FBI agent is bringing
22  Ms. Vargas back so we won't need a warrant.
23            MS. CARTER:  Thank you, Your Honor.
24                  (Jury panel present.)
25            THE COURT:  Good morning, ladies and gentlemen.
```

```
 1   I'm Judge Hatter and I want to welcome you to the United
 2   States District Court for those of you who have not been
 3   previously and for those of you who have not been to a
 4   courtroom, I want to welcome you.  You're about to
 5   participate in a jury voir dire, that is a selection process.
 6   And I'm very fond of telling individuals who go through that
 7   process, if you are one of those people who plays the
 8   lottery, I bet you haven't had much success, but I can
 9   promise you today that your chances of having your name
10   called will be a lot better so we're gonna do that.
11           You are here for a criminal case, ladies and
12   gentlemen so that means that those of you who are selected
13   finally to deliberate must deliberate fairly for both the
14   government and for the defendant in this case.  And in a
15   criminal case in the United States District Court, the case
16   is commenced, started by the return of an indictment by the
17   grand jury.  And let me tell you at the very beginning that
18   there is nothing by way of evidence in the indictment, there
19   is nothing by way of a presumption, indeed, the only
20   presumption in a criminal case, whether it be state court or
21   federal court, is a presumption of innocence that runs with
22   the defendant throughout a trial until or if he or she is
23   proven guilty beyond a reasonable doubt.
24           A defendant in a criminal case, again, whether it
25   be state court or here in federal court doesn't have to do
```

```
 1   anything at all other than show up in court and the defendant
 2   in this case has done that.  But before we go any further,
 3   I'm gonna ask that you all please rise to be sworn.
 4                        (Jury panel sworn.)
 5           THE COURT:  Thank you.  Please seated.
 6           Now, ladies and gentlemen I'm going to introduce
 7   the parties in this case.  Starting with the prosecution and
 8   state side, the government, well, the prosecutor is called
 9   the people, and on the federal side referred to as the
10   government so the prosecutors and they're the plaintiffs in
11   the case and they have the obligation of proving the
12   defendant guilty beyond a reasonable doubt.
13           And representing the United States, which is the
14   government, is Assistant United States Attorney Mr. Steven
15   Arkow and Assistant United States Attorney Margaret Carter.
16   And assisting them, ladies and gentlemen, is a gentlemen that
17   we refer to as a case agent and in this instance since it's
18   Federal Bureau of Investigation Special Agent Mr. Steven
19   Novak.  Thank you.
20           The defendant in this case, ladies and gentlemen is
21   Anthony Scalfani.  Would you please rise?  And representing
22   Mr. Scalfani are two attorneys, Mr. Michael Schwartz, and
23   Mr. Michael Simidjian.  Thank you both.
24           Now, let me ask you ladies and gentlemen, do you
25   know any of the individuals that I have just introduced to
```

```
 1    you?  If so, please raise a hand.  I see no hands having been
 2    raised.  Are there any of you ladies and gentlemen who know
 3    anybody in the United States Attorney's Office for the
 4    Central District of California?  And it's not unusual because
 5    this is the largest United States Attorney's Office outside
 6    of Washington, DC.  And many times there's someone who might
 7    even be related not only to one of the Assistant United
 8    States Attorneys or indeed one of the secretaries or
 9    paralegals or someone else in the office.  If you are related
10    to or know anybody in that large office, please raise a hand.
11            All right.  I see a gentleman there.  Would you
12    please rise and try to keep your voice your voice up.  Your
13    name, sir?
14            MR. PARIKH:  Apur Parikh.
15            THE COURT:  And whom do you think you know, sir?
16            MR. PARIKH:  I know someone that works for the
17    federal attorney's office on death penalty cases.  I don't
18    know if that's the same thing, though.
19            THE COURT:  Federal public defender?
20            MR. PARIKH:  Yeah, she defends people on death row
21    here in L.A.
22            THE COURT:  Well, that office is not involved in
23    this case, but thank you, sir.
24            Anyone here thinks he or she may know someone in
25    United States Attorney's Office, the government prosecutor?
```

1           Yes, your name, ma'am?

2           MS. GRIFFITH:  Allison Griffith.

3           THE COURT:  Yes, Ms. Griffith.

4           MS. GRIFFITH:  My sister is a U.S. Attorney in

5    Texas.  I just wanted to let you know.

6           THE COURT:  Yeah, no, I appreciate that.  And if

7    you're called into the box, I'm going to be asking you some

8    questions about that.  Thank you.

9           And you mentioned Texas, Texas is one of two other

10   states like California that has more than three federal

11   districts.  California has four, New York has four and Texas

12   has four.  And that's because the populations in those

13   states, the large state of Alaska, the largest state in the

14   union is merely the Federal District of Alaska.  There's some

15   94 Federal Districts throughout the United States and we

16   happen to be the largest by far with over 20 million people

17   in this District.

18          And before we went to divisions, we had people who

19   were as close to downtown Phoenix as they were to downtown

20   Los Angeles much closer to Las Vegas than downtown

21   Los Angeles.  But even with divisions, this being the

22   headquarters or Western Division that runs all the way to

23   San Luis Obispo Monterey County line, we get jurors who are

24   as close to San Francisco as they are to downtown

25   Los Angeles.  So we all appreciate the work that you do as

citizens to make sure that we continue to have the finest

jury system in the world on the federal side.  I can't speak

for the State side anymore because it was some 33 years ago

that I was a state court judge.

Ladies and gentlemen, as I indicated to you, well,

let me ask you this, though, before I even begin.  Are there

any of you who cannot accept the law as given to you by the

Court for religious, philosophical or any particular reason?

If so, please raise a hand.  I see no hands having been

raised.

I'm going to read to you from the indictment which

as I indicated to you is the manner in which we start a

criminal case on the federal side to acquaint you with the

charges that have been brought against the defendant and to

remind that they are only charges.  The grand jury charges in

Count I, 18 United States Code Section 242 and that's

deprivation of rights under color of law that on or about

February 24th, 2005 in Riverside County within the Central

District of California, the defendant Anthony Scalfani, then

a sworn law enforcement officer employed by the City of

Desert Hot Springs Police Department while acting under color

of law did stun Jamal White with an X26 taser gun, a

dangerous weapon after Jamal White had been arrested and

handcuffed which resulted in bodily injury to Jamal White.

And thereby did willfully deprive Jamal White of the rights

1   secured and protected by the constitution and laws of the

2   United States to be secure in his person against an

3   unreasonable search and seizure.

4            Count II.  18 United States Code Section 242.  On

5   or about February 25th, 2005 in Riverside County within the

6   Central District of California, the defendant Anthony

7   Scalfani then a sworn law enforcement officer employed by the

8   City of Desert Hot Springs Police Department while acting

9   under color of law did spray Angelica Vargas -- did spray her

10   face and eyes with pepper spray and did stun Angelica Vargas

11   with an X26 taser gun, a dangerous weapon after Angelica

12   Vargas had been detained, which resulted in bodily injury to

13   Angelica Vargas.  And thereby did willfully deprive Angelica

14   Vargas of the rights secured and protected by the

15   constitution and laws of the United States to be secure in

16   her person against an unreasonable search and seizure.

17            This two count indictment has been signed by the

18   foreperson of the grand jury as a true bill and co-signed by

19   the proper officials in the United States Attorney's Office

20   for the Central District of California.  And again I remind

21   you that these are merely charges nothing more.  The only

22   presumption which Mr. Scalfani has is the presumption of

23   innocence which will run with him throughout this trial until

24   or if he is proven guilty beyond a reasonable doubt.

25            Now, ladies and gentlemen, if you serve on this

1    jury, you'll have various obligations.  First of all, you

2    must accept the law as given to you by the Court whether you

3    agree with it or not.  Secondly, you must not go outside of

4    this courtroom in order to investigate or to do anything to

5    find out about this case.  Everything that you need in order

6    to be able to be fair to both Mr. Scalfani and the government

7    will be presented to you right here in this courtroom.  There

8    are good lawyers on both sides of the case.

9          You cannot use any electronics.  I'm a real

10   dinasour when it comes to them.  I don't know whether it's

11   tweeting or twitting or whatever it is you can't don't that.

12   You can giggle, but you can't Goggle or whatever that is.

13   You can't use any kind of electronics.  You can't use any

14   books or anything else.  You can't talk to anyone about the

15   case until after you have been discharged so that's very

16   important.

17         And the third very important obligation that you

18   have is to be fair to both sides and not let sympathy, public

19   opinion, any kind of emotion guide you in reaching a fair

20   decision in this case.

21         Now, during the voir dire, ladies and gentlemen,

22   there are two kinds of challenges that are normally used.

23   One is what's called a challenge for cause.  For example, if

24   it turned out that the prospective juror who indicates that

25   she has a sister who is an Assistant U.S. Attorney somewhere

1   in Texas, that sister were here in this office, more than

2   likely I would have excused her.  Not that she wouldn't try

3   her best to be fair and probably would be fair, but there

4   would be the appearance of unfairness.  It isn't often that

5   we have challenges for cause, but they do come up during the

6   voir dire from time to time.

7           The challenge that you'll see being used here most

8   likely is what's called -- I'm sorry.  The kind of challenge

9   that you'll see being used here, ladies and gentlemen, most

10  likely today is what's called a peremptory challenge.  And

11  that's simply a challenge that a lawyer uses when he or she

12  is just not satisfied with the entire make up of the panel.

13          So if you happened to be peremptorily challenged,

14  please don't give a second thought to it.  It's been my

15  experience over the years that one who is peremptorily

16  challenged in one case merely goes upstairs or across the

17  hall and serves quite adequately in another case.

18          And if someone you've become friendly with on the

19  panel becomes peremptorily challenged, again, don't give a

20  second thought to it.  It just means the lawyer who exercises

21  that challenge at that time is not pleased with the entire

22  make up of the panel as he or she happens to see it at that

23  time.  The attorney doesn't have to indicate why he or she is

24  making that challenge.

25          Our clerk is gonna start calling names.  When your

1    name is called, you'll go in the jury box and the entrance is

2    down here close to the bench if you go in from this one

3    entrance.  The first person whose name is called will seat

4    his or herself in the second row in the chair farthest from

5    me thereby becoming Juror No. 1.  The next person will seat

6    his or herself immediately next to Juror No. 1 becoming Juror

7    No. 2.  After six of your fellows have seated themselves in

8    the second row, leaving the last seat in the second row, the

9    one nearest me vacant for the time being, the seventh person

10   whose name is called will seat his or herself immediately in

11   front of Juror No. 1.

12        And after 12 of your fellows then have seated

13   themselves in the jury box leaving the two seats closest to

14   me, front row and back row vacant, then I'll commence a

15   colloquy with your fellows in the jury box and that's simply

16   a question-and-answer session.

17        And those of you ladies and gentlemen who remain in

18   the general courtroom area should pay very close attention to

19   the questions and the answers because then if one of your

20   fellows is excused from the jury box and your name is called,

21   you'll take the seat that has just been vacateded.  And if

22   you have listened very carefully to all of the questions and

23   answers, we don't have to go over all of them again and we

24   can shorten this selection process.

25        Before I go into the calling of the names by our

```
 1    clerk, though, let me read to you some of the names that both
 2    sides have indicated are names of witnesses who may be
 3    called.  It's not clear that all of these individuals will be
 4    called, but they could be.  If you know anybody whose name is
 5    called, please raise a hand.  Daniel Bressler, Commander,
 6    Desert Hot Springs Police Department.  Eddie Cole, Sergeant,
 7    Desert Hot Springs Police Department.  John Collard, an
 8    officer with the Desert Hot Springs Police Department.
 9    Dennis Decker.  Matthew Drew.  Matthew Gutting, an officer
10    with the Indio Police Department.  Karen Harper.  Andrea
11    Heath.  Kayla Kittridge Johnson.
12         Heng Liv H-e-n-g L-i-v, Special Agent at the FBI.
13    Tamara McKen, Special Agent Federal Bureau of Investigation.
14    Walter McKinney.  Greg Meyer.  Terry Sherman.  It's an
15    evidence custodian, he or she, with the Desert Hot Springs
16    Police Department.  Edwin Smith, Commander, retired from the
17    Desert Hot Springs Police Department.  Regina Steimer.
18    Angelica Vargas.  Ray Voeltz, V-o-e-l-t-z, an officer with
19    the Desert Hot Springs Police Department.  Philip Weigle,
20    W-e-i-g-l-e, officer Desert Hot Springs Police Department.
21    Jamal White and Carloyn Firestone.
22         Vaimaona Asofaafetai V-a-i-m-a-o-n-a,
23    A-s-o-f-a-a-f-e-t-a-i.  Kathleen Rocha.  Nancy Allen.  Eddie
24    Cole.  John Collard, I think was on the other list.  Brian
25    Koahou K-o-a-h-o-u.  Roy Logan.  David O'Dodd.  Ray Voeltz
```

```
 1    V-o-e-l-t-z.  Radameus R-a-d-a-m-e-u-s Gill.  Chief Patrick
 2    Williams.  Kate Singer.  Merrick Rex.  Norma Williams.
 3    Daniel Tregarthen T-r-e-g-a-r-t-h-e-n.  Jeff Love.  Thomas
 4    Streid.  Michael Brave.  Matthew Drew, I think I read his
 5    name from the other list as well.
 6              Gabby Mendoza.  Mike Valentich V-a-l-e-n-t-i-c-h.
 7    Terry Sherman, also from the other list.  Gus Paiz P-a-i-z.
 8    Suzy S-u-z-y Genera G-e-n-e-r-a.  Paul Tapia T-a-p-i-a.
 9    Maureen Black.  Don Crager C-r-a-g-e-r.  Manual Sanchez.
10    Eugene Casey.  Andrew Hinz H-i-n-z.  Hector Galeano
11    G-a-l-e-a-n-o.  Alicia Galeano.  Frank Norwood.  Rebelio
12    Rodriguez.  Jimmy Martin Henson, Jr.  Norm Fort F-o-r-t.
13    Well, I see no hands having been raised.
14              Now, ladies and gentlemen I'm going to ask the
15    clerk to commence calling the names.  If your name is called,
16    go into the jury box as I have just indicated.
17              THE CLERK:  Laurie Pacheco P-a-c-h-e-c-o.
18              THE COURT:  Would you go into the second row,
19    ma'am, and into that far seat.
20              THE CLERK:  Teresa Garcia G-a-r-c-i-a.
21              THE COURT:  Would you seat yourself right next to
22    the first juror, please.
23              THE CLERK:  Aaron Jennerjahn J-e-n-n-e-r-j-a-h-n.
24    Craig Allen Helsley H-e-l-s-l-e-y.  Bradley Ryan Smalarz
25    S-m-a-l-a-r-a-z.  Linda P. Ahles A-h-l-e-s.  Allison Griffith
```

```
 1   G-r-i-f-f-i-t-h.  That will be the first row.
 2            THE COURT:  First row in the far seat, ma'am.
 3            THE CLERK:  Fred Carter C-a-r-t-e-r.  Robert A.
 4   Meneshian M-e-n-e-s-h-i-a-n.  Alber Kohanzadeh
 5   K-o-h-a-n-z-a-d-e-h.  Apur Parikh P-a-r-i-k-h.  Burton
 6   Prelutsky P-r-e-l-u-t-s-k-y.
 7            THE COURT:  Now, ladies and gentlemen in the jury
 8   box, let me ask you again are there any among you that cannot
 9   accept the law as given to you by the Court for any reason
10   whether it be religious, philosophical or anything at all?
11   If so, please raise a hand.  Use the microphone if you need
12   to.  Juror No. 3, yes, sir.
13            MR. JENNERJAHN:  Could you give an example of what
14   you are referring to?
15            THE COURT:  Well, I'm gonna give you the law as
16   applies to the case.  You're gonna be the judges of the
17   facts.  I'm the judge of the law and I'll tell you what the
18   law is as it relates to the facts of the case.  And I'm
19   asking you can you accept the law as given to you by the
20   Court whether you agree with it or not?  And if you have some
21   problem, religious problem, philosophical problem with
22   accepting the law as given to you by the Court, then you
23   should let me know.  Do you have a problem, sir?
24            MR. JENNERJAHN:  No.  I was just trying to
25   understand if you had like an example, a specific situation,
```

```
 1    say, if, you know, I thought maybe you had an example to
 2    illustrate and I would say, okay, I kinda sympathize in that
 3    direction.
 4           THE COURT:  Whatever the law will happen to be or
 5    actually is and there will be a whole group of laws that I'll
 6    be reading to you that will apply to the facts of this case.
 7    And I'm asking you if you have any problem with accepting the
 8    law, whatever it happens to be, whether you agree with it or
 9    not?  Do you accept it?  That's what I'm asking you.  All
10    right?
11           MR. JENNERJAHN:  That's fine, I guess.
12           THE COURT:  There are various statutes, for
13    example, that apply to this case 18 United States Code
14    Section 242.  I'll be reading that to you.  There will be
15    other examples of the law that I'll be reading to you.  I'm
16    asking can you accept the law?
17           It's the law of the United States and whether you
18    can accept it or if you have some kind of a religious
19    prohibition from accepting the law from anybody other than
20    what your religious background calls for or you have just
21    some philosophical meanings that would not allow you to
22    accept the law as given to you by the Court.  That's all.
23           Is there anyone here who cannot accept the law as
24    given to them by the Court?  If so, please raise a hand.  I
25    see no hands having been raised.
```

```
 1            Are there any among you, ladies and gentlemen, who
 2    have ever studied law?  I don't mean just in law school.  It
 3    could be in high school, community college or undergraduate
 4    school or as a real estate broker.  All right.  We'll take
 5    you by the numbers.  I see Juror No. 6.  Well, even before
 6    that Juror No. 4.  Yes, sir.
 7            MR. HELSLEY:  I had background from colleges.  I
 8    had a few law classes and real estate classes as well.
 9            THE COURT:  How long ago?
10            MR. HELSLEY:  College was approximately 20 some
11    years ago, 22 years ago.
12            THE COURT:  Was there anything about those courses
13    that would affect your ability to accept the law as given to
14    you by the Court?
15            MR. HELSLEY:  No.
16            THE COURT:  Thank you, sir.  Pass that to Juror
17    No. 6.  Yes, ma'am.
18            MS. AHLES:  Um, I have a real estate license.  Also
19    I have a paralegal certificate and I work for a law office.
20            THE COURT:  And does the law firm that you work for
21    do criminal work?
22            MS. AHLES:  No.
23            THE COURT:  All right.
24            MS. AHLES:  I did previously work for the FBI.
25            THE COURT:  How long did you work for them?
```

1          MS. AHLES:  About five-and-a-half years.

2          THE COURT:  What did you do for the FBI?

3          MS. AHLES:  Stenographer.

4          THE COURT:  And since we're at that point, let me

5    ask you and ask any of the other jurors, having worked for

6    the FBI, which is very a well-known law enforcement agency,

7    would you tend to accept the testimony of a law enforcement

8    officer's testimony as opposed to a non-law enforcement

9    person simply because that person is in law enforcement?

10         MS. AHLES:  Possibly.

11         THE COURT:  You would not want to be fair?

12         MS. AHLES:  No.  I would be fair, yes.

13         THE COURT:  Then why would you accept the law

14   enforcement's testimony over some other person's testimony if

15   you didn't believe one or the other?

16         MS. AHLES:  Well, it's a matter of who you believe.

17         THE COURT:  Yes.  Would you tend to believe a law

18   enforcement officer testimony simply because that person is

19   in law enforcement and for no other reason?

20         MS. AHLES:  I may tend to, yes.

21         THE COURT:  So if you heard a non-law enforcement

22   officer or several non-law enforcement officers testifying

23   differently than the law enforcement officer, you would

24   discredit the non-law enforcement officer's testimony and

25   accept the law enforcement officer's testimony.  Is that what

 1    you're saying?

 2              MS. AHLES:  Well, it's a matter of who you believe.

 3              THE COURT:  But you think you would tend to believe

 4    the law enforcement officer regardless.  Is that what you're

 5    telling me?

 6              MS. AHLES:  I possibly would tend to believe the

 7    law enforcement over someone not in law enforcement, but that

 8    is all based on what is said.  I mean, you have to evaluate.

 9              THE COURT:  So then you wouldn't just simply accept

10    the law enforcement officer's testimony because that person

11    is in law enforcement?

12              MS. AHLES:  No.

13              THE COURT:  All right.  Thank you.  You think you

14    could be fair to both sides here?

15              MS. AHLES:  Yes.

16              THE COURT:  Anyone else here who studied law at any

17    level?  All right.  Juror No. 11.  Yes, sir.

18              MR. PARIKH:  I have a background in

19    telecommunications law and policy in graduate school, and

20    then I did my Series VII in '63 so I studied the financial

21    service, financial rules and regulations.

22              THE COURT:  All right.  You understand none of that

23    really applies to this case?

24              MR. PARIKH:  Correct.

25              THE COURT:  Can you accept the law as given to you

```
 1    after the facts have been found by you the members of the
 2    jury in this case?
 3              MR. PARIKH:  I can.
 4              THE COURT:  Anybody else here who has studied law
 5    at any level?  I see no other hands.
 6              Are there any of you ladies and gentlemen who are
 7    related to lawyers and don't be ashamed.  There are a lot of
 8    us who are.  Juror No. 6 and then we'll get to Juror No. 7
 9    right after that.
10              MS. AHLES:  Back to me.  My ex-husband is an
11    attorney and my example brother-in-law is an FBI agent.
12              THE COURT:  And what kind of law did your
13    ex-husband practice if you know?
14              MS. AHLES:  Civil.
15              THE COURT:  All right.  And did you have many
16    occasions to talk to your example brother-in-law about his
17    work in the FBI?
18              MS. AHLES:  Well, we were working together at the
19    same time in the FBI on various cases.
20              THE COURT:  All right.  So again, I'm going to ask
21    you do you think that given this kind of a history, you would
22    just tend to believe a law enforcement officer whether it be
23    FBI or Sheriff's deputy or local police just because those
24    people are in law enforcement?
25              MS. AHLES:  Well, in this case you've got law
```

```
 1    enforcement on both sides.
 2              THE COURT:  Well, I'm still asking you, though,
 3    there will be other people who are non-law enforcement
 4    officers who will be testifying.  Would you tend to give more
 5    credence to a law enforcement officer simply because that
 6    person's in law enforcement and not because of any further
 7    evaluation?
 8              MS. AHLES:  No, I don't think so.
 9              THE COURT:  All right.  Thank you.  Juror No. 7,
10    please.  Yes, ma'am.
11              MS. GRIFFITH:  My sister is a U.S. attorney.
12              THE COURT:  That's right.  In which district in
13    Texas?
14              MS. GRIFFITH:  Eastern District.
15              THE COURT:  And how long has she been an Assistant
16    U.S. Attorney?
17              MS. GRIFFITH:  She's been a U.S. Attorney for the
18    last three years.  She was a State District Attorney for five
19    years previously to that.
20              THE COURT:  I see.  Is she the United States
21    Attorney or is she the Assistant United States?
22              MS. GRIFFITH:  She is the Assistant United States
23    Attorney.
24              THE COURT:  All right.  There are probably a number
25    of assistants in the office.  All right.  Do you tend to talk
```

1  to your sister about her work?

2          MS. GRIFFITH:  Every day.

3          THE COURT:  And do you talk about her work every

4  day?

5          MS. GRIFFITH:  Yeah.

6          THE COURT:  And do you know which division she's

7  in?

8          MS. GRIFFITH:  She's in the criminal side where the

9  child labor and family courts and child abuse basically is

10  her background.

11          THE COURT:  That doesn't sound too much like what

12  goes on.  Was that the work that she was doing on the State

13  side?

14          MS. GRIFFITH:  In the family courts.  Right now she

15  prosecutes pedophiles, child abusers, that sort of thing.

16          THE COURT:  And you understand it has nothing to do

17  with charges in this case?

18          MS. GRIFFITH:  Yes, I understand that.

19          THE COURT:  And can you put aside the relationship

20  with your sister as it affects being fair to both sides in

21  this case?

22          MS. GRIFFITH:  Yes.

23          THE COURT:  And can you follow the law as given to

24  the Court to apply to the facts which only you and your

25  fellow jurors will have found?

```
 1            MS. GRIFFITH:  Yes.

 2            THE COURT:  All right.  Thank you.

 3            Anyone here who has ever worked in law enforcement

 4    and perhaps we can go back to Juror No. 6 at least.  Pass

 5    that over, please.  And I don't mean just the FBI, but as I

 6    indicated could be at the county level, state level, locally

 7    or indeed if you were in the armed forces, whether you were

 8    military patrol person, air patrol person, shore patrol

 9    person, any of those things.  Really want to find out if any

10    of you have ever been sworn law enforcement.

11            Now, Juror No. 6, you were not sworn law

12    enforcement, were you?

13            MS. AHLES:  No.  We had a clearance, but I was not

14    sworn law enforcement, no.

15            THE COURT:  But you worked closely with sworn law

16    enforcement officers?

17            MS. AHLES:  Correct.

18            THE COURT:  Over what period of time?

19            MS. AHLES:  Um, '72 to '77, end of '77.

20            THE COURT:  Anybody here who worked for law

21    enforcement whether it be in a sworn position or in any other

22    capacity?  If so, raise a hand.  I see no hands having been

23    raised.

24            Are there any among you who have law enforcement

25    officers in your immediate families or among your very close
```

```
 1    friends?  If so, please raise a hand.  All right.  Take that
 2    over to Juror No. 8, please.  Yes, sir.
 3                MR. CARTER:  I have a few friends in -- been in law
 4    enforcement.
 5                THE COURT:  Where?
 6                MR. CARTER:  Gilstrap retired Sheriff here in L.A.
 7    County.
 8                THE COURT:  What's his name?
 9                MR. CARTER:  Ken Gilstrap.
10                THE COURT:  He wasn't the Sheriff.  He was, what, a
11    deputy sheriff?
12                MR. CARTER:  Deputy Sheriff, I'm sorry.  And then
13    Jim Lawry with the Los Angeles Police Department, George
14    Grasser, who is with the Sheriff's Department and Sid Hail
15    with the Sheriff's Department here in Los Angeles.
16                THE COURT:  Well, tell us how you come to know so
17    many law enforcement officers?
18                MR. CARTER:  Well, I know those gentlemen.  I was a
19    minister in their local churches, became friends, stayed
20    friends.
21                THE COURT:  Play golf with them?
22                MR. CARTER:  Play golf with them.  Yes, absolutely,
23    at least some of them.  I have worked out with a few of them,
24    too, because we were runners together.
25                THE COURT:  Would you tend to accept the law
```

1    enforcement officer's testimony just because that person is a

2    law enforcement officer and for no other reason?

3              MR. CARTER:  Possibly biased, but I would hope not.

4              THE COURT:  Would you listen carefully --

5              MR. CARTER:  Yes.

6              THE COURT:  -- to the testimony and evaluate it

7    apart from the person being in law enforcement?

8              MR. CARTER:  Yes.

9              THE COURT:  Would you have to pray over it?

10             MR. CARTER:  I pray for discernment, yes.

11             THE COURT:  Would you do that for any witness?

12             MR. CARTER:  Any person.

13             THE COURT:  All right.  Anybody else here who has a

14   law enforcement officer in his or her family or among close

15   friends?  If so, well, I see no hands having been raised.

16             Have you any of ladies and gentlemen heard anything

17   at all about this case?  If so, raise a hand.  I'm not

18   surprised.  I don't see any hands.  I don't recall anything

19   in the media.

20             But let me just tell you that if you do serve on

21   this jury and if there is anything in the media whether it be

22   the electronic media, the print media or in anything, you

23   must not discuss it with your fellow jurors or with anyone

24   else, but let either our clerk or someone else on my staff

25   know about it, and then we can talk about it as to whether it

```
 1   has affected you in any particular way.

 2         So often when there are stories in the paper about

 3   an ongoing trial and you finally finish that trial, you can't

 4   recognize the story and the trial that you have just sat

 5   through.  So you have to be very careful about what is

 6   disseminated in the media.

 7         Any of you familiar with the use of taser guns?  If

 8   so, raise a hand.  I see no -- Juror No. 3.  Pass it over.

 9   How do you happen to be familiar with taser guns, sir?

10         MR. JENNERJAHN:  Well, I just know what they do.

11   I'm not an expert.

12         THE COURT:  Well, how do you know what you know

13   about them?

14         MR. JENNERJAHN:  I have read about them, seen video

15   demonstrations.

16         THE COURT:  And why were you bothering to look at

17   demonstrations about them?

18         MR. JENNERJAHN:  Just curiosity.  Seeing, you know,

19   progression of technology from the very first models that

20   came out on the market to what they have now.

21         THE COURT:  Have you ever used one yourself?

22         MR. JENNERJAHN:  No, I have not.

23         THE COURT:  Have you ever seen one demonstrated in

24   person?

25         MR. JENNERJAHN:  No, but I have seen it on video,
```

```
 1    but not in person.
 2              THE COURT:  I see.  Do you have any particular
 3    feeling about the use of tasers by law enforcement one way or
 4    the other?
 5              MR. JENNERJAHN:  I sometimes think that the use of
 6    tasers and mace seems to be a little bit excessive by law
 7    enforcement nationwide.  It seems to be kind of endemic
 8    almost anywhere you go.
 9              THE COURT:  And you have a preference between
10    tasers and bullets?
11              MR. JENNERJAHN:  Well, tasers are supposed to be
12    nonlethal.  That's something that bullets rarely are.  Yet
13    there's a lot of reports about people have severe reactions
14    to tasers and there have been instances where people have
15    actually died from being tased by law enforcement.
16              THE COURT:  Do you think you would have difficulty
17    to being fair both sides in this case given your feelings
18    about the use of tasers?
19              MR. JENNERJAHN:  You know it's hard to say.  I
20    haven't heard any of the mitigating facts.
21              THE COURT:  But you think that you could have an
22    open mind and listen to all of the evidence and then decide
23    the case fairly for both the defendant and for the
24    government?
25              MR. JENNERJAHN:  Yeah, I think so.
```

1      THE COURT:  You have some hesitation about it?

2      MR. JENNERJAHN:  Well, I recognize a certain amount

3  of bias in myself in regards to law enforcement and use of

4  tasers and mace and all of these so-called nonlethal.

5      THE COURT:  Let's talk about your bias towards law

6  enforcement.  What is that bias?

7      MR. JENNERJAHN:  As I said, I think law enforcement

8  is overactive with the use of these items.

9      THE COURT:  All law enforcement?

10     MR. JENNERJAHN:  Well, there is a lot of

11 controversy and there's a lot of these cases get into the

12 media about situations where, you know, law enforcement have

13 been accused of being excessive in their use of these

14 nonlethal items like tasers and mace.

15     THE COURT:  And what about pepper spray?

16     MR. JENNERJAHN:  Pepper spray.  Same thing

17 basically, kind of, yeah.

18     THE COURT:  You have that same understanding about

19 pepper spray as you do about mace?

20     MR. JENNERJAHN:  Somewhat.

21     THE COURT:  And about tasers?

22     MR. JENNERJAHN:  Yeah.

23     THE COURT:  But you think you could be open-minded,

24 listen to all of the case, and then decide the case fairly

25 for both sides?

```
 1              MR. JENNERJAHN:  Yeah, I think so.

 2              THE COURT:  All right.  Anybody else here have any

 3    familiarity whatsoever with either taser guns or pepper

 4    spray?  If so, raise a hand.  I see no hands having been

 5    raised.

 6              Are there any among you, ladies and gentlemen, have

 7    strong opinions about law enforcement at any level either pro

 8    or con?  If so, raise a hand.  All right.  Juror No. 12.

 9    Yes, sir.

10              MR. PRELUTSKY:  Well, I've written a lot of

11    television shows from a police point of view.

12              THE COURT:  Does that make you con or pro?

13              MR. PRELUTSKY:  Yes, actually, makes me a little

14    bit pro.

15              THE COURT:  But can you put aside any of these

16    shown that you've seen whether it's this new one Southland or

17    any of the others?  And you smiled as though you have seen

18    that one.

19              MR. PRELUTSKY:  No, I try not to watch very much

20    television these days.  They decided I was too old to write

21    for it.

22              THE COURT:  Have you ever written any law

23    enforcement theme shows?

24              MR. PRELUTSKY:  Yes, I did.  Actually, I broke in

25    because Jack Web invited me to write for Dragnet in the last
```

```
 1    '60s.  Then there was McMillian and Wife and Diagnosis
 2    Murder.
 3              THE COURT:  I think you're only talking to me.
 4    We're the only two old enough to know some of these.
 5              MR. PRELUTSKY:   Diagnosis Murder was fairly
 6    recent.  The others go back.
 7              THE COURT:  Jack Web particularly.
 8              Do you think you can put aside your writings and
 9    the familiarity that you have with what are commonly called
10    cop shows and decide this case fairly for both sides?
11              MR. PRELUTSKY:  I believe so.
12              THE COURT:  Is there anything at all about the fact
13    that a law enforcement officer is a defendant in this case
14    going to affect your being fair to both sides?
15              MR. PRELUTSKY:  I don't believe so.
16              THE COURT:  Ask that of all of you in the jury box.
17    The fact we have a law enforcement officer who is a defendant
18    here going to affect your being fair to the government as
19    well as to this defendant?  If so, raise a hand.  Again, I
20    see no hands having been raised.
21              Have any of you ever been involved with a police
22    support group whether it be neighborhood watch or any kind of
23    program that the police sponsor?  All right.  If so, raise a
24    hand.  Juror No. 12 tell us.
25              MR. PRELUTSKY:  Uh, yeah, years ago when I lived in
```

```
 1    Studio City, there was a neighborhood watch.  They had a

 2    police officer out once or twice to talk to us.

 3              THE COURT:  All right.  Anything about belonging to

 4    such a group going to affect your being fair minded when you

 5    listen to the testimony of both law enforcement officers and

 6    non-law enforcement officers?

 7              MR. PRELUTSKY:  No.

 8              THE COURT:  Are there any among you, ladies and

 9    gentlemen, who ever had an unpleasant experience with law

10    enforcement to the point where you don't feel that you could

11    be fair to both sides?  And remember you have to be fair not

12    only to the defendant, but to the government as well.

13              Are there any among you who have had such an

14    unpleasant experience with law enforcement at any time in

15    your lives that would affect your being fair to both sides

16    here?  If so, raise a hand.  I see no hands having been

17    raised.

18              But let me ask you this.  Are you familiar with any

19    problem that any family member, close family member or close

20    friend may have had with law enforcement that may affect your

21    judgment to being fair to both sides in this case?  Again, if

22    so, raise a hand.  I see no hands having been raised.

23              I'm gonna move on to some more personal questions,

24    but first of all, I'm gonna ask are there any more general

25    questions first from the government, Mr. Arkow?
```

```
 1              MR. ARKOW:  Your Honor, may I have a moment to
 2    confer?
 3              THE COURT:  You may.
 4              MR. ARKOW:  Your Honor, may I inquire I believe the
 5    Court is going to ask some questions about biographical
 6    questions?
 7              THE COURT:  Personal questions.  I'm now asking if
 8    you have any further general questions.  Well, there's one I
 9    intend to ask and that is about prior juror service.
10    Anything else?
11              MR. ARKOW:  Yes, Your Honor.  On the proposed
12    questions, Proposed Question No. 8 and Proposed Question
13    No. 24.
14              THE COURT:  No. 24 will not be asked.  There will
15    be an instruction regarding it.
16              MR. ARKOW:  For now Question No. 8.
17              THE COURT:  Well, I think in a sense we've gone
18    into it, but I'll ask it anyway.  Ladies and gentlemen, have
19    any of you ever had any kind of a position that involved
20    prisoners or arrestees?  If so, raise a hand.
21              Do you have any -- I see no hands raised.  Do you
22    have any relatives or friends who have been custodial
23    officers?  I asked about law enforcement.  It probably would
24    be covered.  If you didn't think that was covered, do you
25    have any relatives or close friends who have had contacts
```

1    with arrestees or prisoners?  If so, raise a hand.  All

2    right.  Juror No. 8.

3              MR. CARTER:  I have a friend Gary who has worked in

4    the correctional facility, the women's correctional facility

5    here in L.A. County.  I'm in a men's group with him and I see

6    him every week.

7              THE COURT:  Does he talk about his work?

8              MR. CARTER:  He's talked about it.

9              THE COURT:  And is that going to affect you in any

10   way in being fair to both sides in this case?

11             MR. CARTER:  I don't believe so, no.

12             THE COURT:  Has he ever talked about the use of any

13   tasers or pepper spray in handling any of these prisoners or

14   arrestees?

15             MR. CARTER:  No.

16             THE COURT:  Mr. Schwartz.

17             MR. SCHWARTZ:  Thank you, Your Honor.  With respect

18   I would ask the Court to inquire as to Question 17, 18 and

19   32.

20             THE COURT:  Yes.  Any of you, ladies and gentlemen,

21   familiar with the Desert Hot Springs Police Department?  If

22   so, raise a hand.  I see no hands having been raised.

23             And I know Juror No. 3 you've indicated that you've

24   read or heard about police officers who are accused of using

25   excessive force, have you?

1          MR. JENNERJAHN:  Yes.

2          THE COURT:  And do you look for these kinds of

3  stories or what?

4          MR. JENNERJAHN:  No, I don't look for them.

5          THE COURT:  But you have seen them?

6          MR. JENNERJAHN:  I have seen them.  I've

7  acknowledged them, yes.

8          THE COURT:  Has it formed an opinion in your mind

9  that you just can't trust law enforcement?

10          MR. JENNERJAHN:  I wouldn't go that far as to say

11  they're untrustworthy, but I do think and I do have -- hold

12  the firm opinion that law enforcement is over eager to use a

13  lot of these so-called nonlethal devices stun guns and mace

14  and pepper spray.

15          THE COURT:  As opposed to shooting their guns.

16          MR. JENNERJAHN:  Or using a baton or other kind of

17  striking instrument they can use.

18          THE COURT:  I see.  Are you willing to listen to

19  all of the evidence in this case and decide fairly for the

20  defendant as well as for the government?

21          MR. JENNERJAHN:  Yeah, I think so.

22          THE COURT:  All right.  Anything further from

23  either side in terms of general questions before I move to

24  more personal questions?

25          MR. SCHWARTZ:  No.

1          MR. ARKOW:  None from the government.

2          THE COURT:  All right.  And I hope I didn't see you

3     freeze up, ladies and gentlemen, when I say I would move to

4     more personal questions.  I don't get anywhere near as

5     personal as they do on those shows on television, the reality

6     shows or some of those things.

7          All I really want to know from you is where you

8     live.  How long you've been at your present address.  You

9     don't need to give us the address.  Tell us what city you

10    live in.  Tell us what you do.  If you're not presently

11    working, tell us what you did when you last worked outside of

12    the home.

13         Tell us who is in the home with you not passing

14    judgment on the relationships at all.  Don't really care.  We

15    need to know who is in the home with you.  If you have

16    children and they're underage, just tell us the sexes as well

17    as the ages.  If they are adults you can tell us the sexes,

18    but you don't have to tell us the ages thereby giving away

19    your own age, but tell us if they are married, what the

20    in-laws do.

21         Before I go to that, though, let me just ask a

22    general question of all of you.  Who here has had prior jury

23    experience whether it be in state court, not even in

24    California necessarily, but any state or in federal court?

25    Looks like we've got some veteran jurors here.  Who was the

```
 1    first one in the back row, No. 1.

 2              Tell us where you last served, ma'am, and what kind

 3    of case.

 4              MS. PACHECO:  I guess I got kicked off so I didn't

 5    last very long.

 6              THE COURT:  What kind of case was it?

 7              MS. PACHECO:  I don't remember.

 8              THE COURT:  You don't remember whether it was

 9    criminal or civil?

10              MS. PACHECO:  I think it was civil.

11              THE COURT:  And where was that?

12              MS. PACHECO:  Somewhere down here.

13              THE COURT:  When you say down here, downtown

14    Los Angeles?

15              MS. PACHECO:  Yeah, I can't remember the name of

16    it.

17              THE COURT:  Have you ever been actually on a jury?

18              MS. PACHECO:  No, never made it all the way.

19              THE COURT:  All right.  Who else do we have?  Juror

20    No. 4.

21              MR. HELSLEY:  The case was probably 15 years ago in

22    Orange County.  It was an abuse case.

23              THE COURT:  All right.  So it was a civil case?

24              MR. HELSLEY:  Yeah.

25              THE COURT:  You understand that in California that
```

```
1    in a civil case you don't have to have a unanimous verdict;

2    is that right?

3              MR. HELSLEY:  Correct.

4              THE COURT:  You just have to have three-fourths of

5    the individuals who agree so nine out of 12 would be

6    sufficient.  But in a criminal case whether it be in state

7    court in California or here in federal court such as this

8    case, the verdict must be unanimous.  You accept that, sir?

9              MR. HELSLEY:  Yes.

10             THE COURT:  Is there anything at all about your

11   prior juror experience going to affect your being able to

12   accept the law as given to you by the Court in this case?

13             MR. HELSLEY:  No.

14             THE COURT:  Anyone else in the second row?  Juror

15   No. 6.

16             MS. AHLES:  It was in the early to mid-'70s.  I was

17   on two juries.

18             THE COURT:  Where?

19             MS. AHLES:  Downtown.  L.A. Superior.  Criminal.

20             THE COURT:  Did you reach verdicts in those cases?

21             MS. AHLES:  One was a hung jury.  The other one

22   was --

23             THE COURT:  You don't have to tell us what the

24   verdict was.  Did you reach a verdict?

25             MS. AHLES:  Oh, in one of them.
```

```
 1              THE COURT:  You reached a verdict and the other one
 2     the jury could not agree?
 3              MS. AHLES:  Correct.
 4              THE COURT:  And often that can be rather traumatic.
 5     Was there anything at all about being part of a hung jury
 6     going to affect your being able to deliberate fairly with
 7     your fellow jurors in this case?
 8              MS. AHLES:  No.
 9              THE COURT:  All right.  Juror No. 7.  Pass it on
10     after that.
11              MS. GRIFFITH:  Pretty much like Juror 1.  It was
12     just a civil case that I ended up not getting -- I was
13     excused from it.
14              THE COURT:  When was that?
15              MS. GRIFFITH:  Five, six years ago.
16              THE COURT:  And where was that?
17              MS. GRIFFITH:  Torrance.
18              THE COURT:  Orange County?
19              MS. GRIFFITH:  Torrance.
20              THE COURT:  Thank you.  And Juror No. 8.
21              MR. CARTER:  I served two years ago in Pomona in
22     the Pomona courts.  It was a case where he was contesting a
23     DUI charge.
24              THE COURT:  All right.  So that was considered a
25     criminal case?
```

```
1          MR. CARTER:  Yes.

2          THE COURT:  Did you reach a verdict in that case?

3          MR. CARTER:  Yes.

4          THE COURT:  Was there anything at all about that

5   case that's going to affect your being fair to both sides in

6   this case?

7          MR. CARTER:  No.

8          THE COURT:  Thank you, sir.  Anybody else?  Juror

9   No. 9.

10          MR. KOHANZADEH:  Yes, I served.

11          THE COURT:  Sorry.  Juror No. 10.

12          MR. KOHANZADEH:  About more than 15 years ago in

13  Marin County, California.  And the case was about BMW car

14  seats getting too hot or burning someone.

15          THE COURT:  So that was a civil case; is that

16  right?

17          MR. KOHANZADEH:  If you say so.  I don't know.

18          THE COURT:  Well, did you reach a verdict in that

19  case?

20          MR. KOHANZADEH:  Yes.

21          THE COURT:  And do you recall whether you had to

22  have a unanimous verdict or not?

23          MR. KOHANZADEH:  I think so, yes.  I'm not sure.  I

24  don't remember.

25          THE COURT:  Well, it could be that it was
```

```
 1    unanimous, but that you didn't need to have all 12.
 2              MR. KOHANZADEH:  It was unanimous, but may not have
 3    needed to be, yes.
 4              THE COURT:  Perhaps a civil case was and I take it
 5    since your memory is not that clear about it, that's not
 6    going to affect your being fair in this case?
 7              MR. KOHANZADEH:  I don't think so.
 8              THE COURT:  All right.  Anyone else?  Juror No. 11.
 9              MR. PARIKH:  About four years ago here at the state
10    level in Los Angeles.  It was a case where --
11              THE COURT:  Just was it civil or criminal?
12              MR. PARIKH:  It was criminal.
13              THE COURT:  Did you reach a verdict?
14              MR. PARIKH:  No.  I was excused by the prosecutor.
15              THE COURT:  Juror No. 12.
16              MR. PRELUTSKY:  I thought maybe it was just if you
17    had actually served on a jury, but I have never been on a
18    jury.
19              THE COURT:  But you have been called?
20              MR. PRELUTSKY:  I have been excused from a jury.
21              THE COURT:  Civil or criminal?
22              MR. PRELUTSKY:  Criminal.
23              THE COURT:  About how long ago?
24              MR. PRELUTSKY:  Maybe about four years.
25              THE COURT:  And Juror No. 3, I see you thinking
```

1    about maybe what?

2            MR. JENNERJAHN:  Last year I was excused from a

3    jury in a trial in a drunken driving charge for a county

4    coroner.

5            THE COURT:  In Los Angeles County?

6            MR. JENNERJAHN:  Yeah, yeah.

7            THE COURT:  All right.  Anything at all about being

8    called and then being excused going to affect your being a

9    fair juror in this case?

10           MR. JENNERJAHN:  No.

11           THE COURT:  All right.  Thank you.

12           Now, let me ask Juror No. 1, where do you reside,

13   ma'am, what city?

14           MS. PACHECO:  In Burbank.

15           THE COURT:  How long have you been at your present

16   address?

17           MS. PACHECO:  Then you're going to know how old I

18   am.  Since birth.

19           THE COURT:  Is that right?

20           MS. PACHECO:  Well, went to college.  I had a condo

21   still in Burbank.  It's my parents' home.  I still live

22   there.

23           THE COURT:  Prop 13 you don't pay any property

24   taxes.

25           MS. PACHECO:  We would be homeless without it.

```
1              THE COURT:  What do you do, ma'am?

2              MS. PACHECO:  I teach.

3              THE COURT:  In what level?

4              MS. PACHECO:  Preschool.

5              THE COURT:  Are you married?

6              MS. PACHECO:  Yes.

7              THE COURT:  And what does your husband do?

8              MS. PACHECO:  He is a truck driver.

9              THE COURT:  And do you have children?

10             MS. PACHECO:  I have two boys 17 and 19.

11             THE COURT:  Interesting ages.  What do they do?

12             MS. PACHECO:  High school and college.

13             THE COURT:  Where is the son in college?

14             MS. PACHECO:  Glendale and the Art Institute in

15    North Hollywood.

16             THE COURT:  Anyone else in the home?

17             MS. PACHECO:  Just the 17 year old.

18             THE COURT:  Juror No. 2, where do you reside,

19    ma'am?

20             MS. GARCIA:  In Azusa, California.

21             THE COURT:  And how long have you been at your

22    present address?

23             MS. GARCIA:  11 years.

24             THE COURT:  And what do you do, ma'am?

25             MS. GARCIA:  Work in a manufacturing company.
```

```
 1              THE COURT:  Are you married?

 2              MS. GARCIA:  Yes.

 3              THE COURT:  And what does your husband do?

 4              MS. GARCIA:  He's a chemist.

 5              THE COURT:  And do you have children?

 6              MS. GARCIA:  Yes.

 7              THE COURT:  Tell us.

 8              MS. GARCIA:  31.

 9              THE COURT:  Well, you didn't have to tell us.  I

10    wouldn't have thought you had one 31.

11              MS. GARCIA:  I have three kids and two grandkids

12    that I'm raising.

13              THE COURT:  Tell us about the older son.  What does

14    he do?

15              MS. GARCIA:  Oldest daughter.  She is a housewife.

16    She doesn't work.

17              THE COURT:  Takes care of the house, doesn't she?

18              MS. GARCIA:  Yes, and her kids.

19              THE COURT:  Sounds like a lot of work to me.  What

20    does your son-in-law do?

21              MS. GARCIA:  My son?

22              THE COURT:  No.  The daughter who is married.

23              MS. GARCIA:  He is a supervisor in a manufacturing

24    company.

25              THE COURT:  All right.  And you have two other
```

1    children?

2         MS. GARCIA:  Yes.  My other daughter she doesn't

3    work either.  She is a housewife, too.

4         THE COURT:  Boy, I bet they wouldn't like hearing

5    that from you.  And what does that son-in-law do?

6         MS. GARCIA:  Supervisor, too.

7         THE COURT:  Both of them are?

8         MS. GARCIA:  Yes, uh-huh.

9         THE COURT:  They're supervising their wives and

10   telling them they're not working.  And the youngest?

11        MS. GARCIA:  My son he is in high school, senior

12   year.

13        THE COURT:  All right.  You say you are raising two

14   grandchildren at home?

15        MS. GARCIA:  Yes, I have full custody of them.

16        THE COURT:  Anyone else in the home?

17        MS. GARCIA:  No, that's it.

18        THE COURT:  All right.  Thank you, ma'am.

19        Juror No. 3, where do you live, sir?

20        MR. JENNERJAHN:  I live in Los Angeles.

21   Q.   Well, since the city is so large, tell us what part of

22   the city?

23        MR. JENNERJAHN:  Close to Hollywood, West

24   Hollywood.

25        THE COURT:  And what do you do, sir?

```
 1              MR. JENNERJAHN:  I'm a cinema projectionist.
 2              THE COURT:  Are you married?
 3              MR. JENNERJAHN:  No.
 4              THE COURT:  Do you reside with anyone?
 5              MR. JENNERJAHN:  Older brother.  He's a tour bus
 6    driver.
 7              THE COURT:  Anyone else in the home?
 8              MR. JENNERJAHN:  No.
 9              THE COURT:  All right.  Juror No. 4, where do you
10    live, sir?
11              MR. HELSLEY:  Thousand Oaks, California.
12              THE COURT:  And how long have you been at your
13    present address?
14              MR. HELSLEY:  About 11 years.
15              THE COURT:  Let me go back to Juror No. 3.  How
16    long have you been at your present address?
17              MR. JENNERJAHN:  About 16 years.
18              THE COURT:  All right.  Thank you.
19              And now you have been there in Thousand Oaks for
20    11 years at that address, sir?
21              MR. HELSLEY:  Yes.
22              THE COURT:  And before that you were in Orange
23    County?
24              MR. HELSLEY:  Yes.
25              THE COURT:  And what do you do, sir?
```

```
 1               MR. HELSLEY:  I work for an automotive
 2    manufacturer.
 3               THE COURT:  And are you married, sir?
 4               MR. HELSLEY:  Yes.
 5               THE COURT:  What does your wife do?
 6               MR. HELSLEY:  She is a stay at home wife raising
 7    our daughter.
 8               THE COURT:  She's clearly working.  How old is your
 9    daughter?
10               MR. HELSLEY:  Seven.
11               THE COURT:  Oh, yes, clearly.  Enjoy them while
12    they're young.  Anyone else in the home?
13               MR. HELSLEY:  No.
14               THE COURT:  Thank you.
15               Juror No. 5, where do you reside, sir?
16               MR. SMALARZ:  Agoura Hills.
17               THE COURT:  And how long have you been at your
18    present address?
19               MR. SMALARZ:  Three months.
20               THE COURT:  Where were you before?
21               MR. SMALARZ:  San Luis Obispo.
22               THE COURT:  For how long?
23               MR. SMALARZ:  Six years.
24               THE COURT:  How long have you been in Southern
25    California?
```

1          MR. SMALARZ:  Born and raised here.  Went up to

2     San Luis Obispo for school and back down for work.

3          THE COURT:  Cal Poly.  Good school.  And what kind

4     of work do you do?

5          MR. SMALARZ:  Systems engineer.

6          THE COURT:  And are you married, sir?

7          MR. SMALARZ:  Yes.

8          THE COURT:  What does your wife do?

9          MR. SMALARZ:  She's in television production.

10          THE COURT:  And do you have children?

11          MR. SMALARZ:  No.

12          THE COURT:  And anyone else in the home?

13          MR. SMALARZ:  Yes, we're living with the in-laws.

14          THE COURT:  I have seen those movies.  Tell us what

15     the in-laws do.

16          MR. SMALARZ:  My mother-in-law is graphic design

17     and my father-in-law is a carpenter.

18          THE COURT:  Anyone else in the home?

19          MR. SMALARZ:  No.

20          THE COURT:  Juror No. 6, where do you live, ma'am?

21          MS. AHLES:  Culver City.

22          THE COURT:  And how long have you been at your

23     present address?

24          MS. AHLES:  About 27 years.

25          THE COURT:  And what do you do, ma'am?

```
 1              MS. AHLES:  Legal secretary.
 2              THE COURT:  That's right.  You told us that.  It's
 3    with a civil law firm?
 4              MS. AHLES:  Correct.
 5              THE COURT:  Are you married, ma'am?
 6              MS. AHLES:  Divorced.
 7              THE COURT:  And that's right and you did tell us
 8    you had not remarried.
 9              MS. AHLES:  I mentioned my ex.  I have not
10    remarried.
11              THE COURT:  Do you have children?
12              MS. AHLES:  I have one son.
13              THE COURT:  What does he do?
14              MS. AHLES: He is a college student.
15              THE COURT:  Where?
16              MS. AHLES:  UCSD.
17              THE COURT:  Do you what he's studying?
18              MS. AHLES:  Chemistry.
19              THE COURT:  Terrific school down there.  It's one
20    of the hidden gems.  Everybody thinks about Berkeley and
21    UCLA, but UCSD.  I had a daughter went to Muir College there.
22              All right.  If you'll pass that over to Juror
23    No. 7.  Where do you, live ma'am?
24              MS. GRIFFITH:  Harbor City.
25              THE COURT:  How long have you been at your present
```

```
 1    address?
 2              MS. GRIFFITH:  Birth.
 3              THE COURT:  Okay.  And what do you do?
 4              MS. GRIFFITH:  I work in film production.
 5              THE COURT:  What do you do for them?
 6              MS. GRIFFITH:  I'm assistant production
 7    coordinator.
 8              THE COURT:  And are you married?
 9              MS. GRIFFITH:  No.
10              THE COURT:  Do you reside with anyone?
11              MS. GRIFFITH:  Yes, I take care of my mom.
12              THE COURT:  Anyone else in the home?
13              MS. GRIFFITH:  No.
14              THE COURT:  And Juror No. 8, where do you live,
15    sir?
16              MR. CARTER:  San Dimas, California.
17              THE COURT:  And how long have you been at your
18    present address?
19              MR. CARTER:  Two years.
20              THE COURT:  Where were you before?
21              MR. CARTER:  San Dimas.
22              THE COURT:  For how long?
23              MR. CARTER:  25 years.
24              THE COURT:  All right.  What do you do, sir?
25              MR. CARTER:  I'm a Bible vocational minister.  I'm
```

```
 1    self-employed, have my own business and I'm a minister with a

 2    denomination.

 3              THE COURT:  And what is the business?

 4              MR. CARTER:  I clean windows.

 5              THE COURT:  Oh, good.

 6              MR. CARTER:  Politically correct it's visual

 7    technician.

 8              THE COURT:  And are you married, sir?

 9              MR. CARTER:  No, I'm not.

10              THE COURT:  Do you reside with anyone?

11              MR. CARTER:  My son.

12              THE COURT:  What does he do?

13              MR. CARTER:  He is learning the business.

14              THE COURT:  Anyone else in the home?

15              MR. CARTER:  No.

16              THE COURT:  Juror No. 9, where do you reside, sir?

17              MR. MENESHIAN:  Burbank.

18              THE COURT:  And how long have you been at your

19    present address?

20              MR. MENESHIAN:  Over 20 years.

21              THE COURT:  And what do you do, sir?

22              MR. MENESHIAN:  Insurance sales.

23              THE COURT:  And what kind of insurance?

24              MR. MENESHIAN:  Auto, home insurance.

25              THE COURT:  Now, are you married?
```

```
 1                    MR. MENESHIAN:  Single.

 2               THE COURT:  And do you reside with anyone?

 3                    MR. MENESHIAN:  Mom, dad and brother.

 4               THE COURT:  Tell us what mom, dad and brother do.

 5                    MR. MENESHIAN:  Mom is self-employed.  She has a

 6      beauty salon.  My dad he is a barber as well.  Brother is

 7      going to school.

 8                    THE COURT:  At what level?

 9                    MR. MENESHIAN:  Going to L.A. Film School.

10               THE COURT:  Anyone else in the home?

11                    MR. MENESHIAN:  No.

12               THE COURT:  Thank you.

13                    Juror No. 10, where do you live, sir?

14                    MR. KOHANZADEH:  Santa Monica.

15               THE COURT:  And how long have you been at your

16      present address?

17                    MR. KOHANZADEH:  Oh, about 11, 12 years.

18               THE COURT:  And what do you do, sir?

19                    MR. KOHANZADEH:  I'm a mortgage broker.

20               THE COURT:  And are you married?

21                    MR. KOHANZADEH:  Um, I -- yes.  I'm not legally

22      married, but we have lived together for 30 years.

23               THE COURT:  Well, I told you we don't care about

24      what the relationship is, you know.  It clearly sounds like a

25      common law marriage to me.  And what does your wife do?
```

```
 1              MR. KOHANZADEH:  She works for Santa Monica
 2   Community Housing.
 3              THE COURT:  And do you have any children?
 4              MR. KOHANZADEH:  Yes, we have two.
 5              THE COURT:  And male?  Female?
 6              MR. KOHANZADEH:  Two daughters.  One is in college.
 7   The other is still living with us.
 8              THE COURT:  The one in college is studying what, if
 9   you know, and where?
10              MR. KOHANZADEH:  Pre-med.  She wants to become a
11   doctor.
12              THE COURT:  And where is she?
13              MR. KOHANZADEH:  At Claremont McKenna.
14              THE COURT:  Good.  Clarement colleges are
15   outstanding.  In fact I'm hoping my oldest granddaughter is
16   gonna end up out there from Delaware.  And you have one at
17   home?
18              MR. KOHANZADEH:  Yes.
19              THE COURT:  She is what, in high school?
20              MR. KOHANZADEH:  Junior in high school.
21              THE COURT:  All right.  Anyone else in the home?
22              MR. KOHANZADEH:  No.
23              THE COURT:  Thank you, sir.
24              Juror No. 11, where do you reside, sir?
25              MR. PARIKH:  Studio City.
```

```
 1              THE COURT:  And how long have you been at your
 2    present address?
 3              MR. PARIKH:  Nine years.
 4              THE COURT:  Where were you before that?
 5              MR. PARIKH:  I was in Rochester, New York.
 6              THE COURT:  Boy, it's a little bit warmer here.
 7    Plus it looks like that wonderful film company is going
 8    under, but yeah, that's sad.  It's sad.
 9              What do you do, sir?
10              MR. PARIKH:  I work for an electric car company.
11              THE COURT:  And are you married?
12              MR. PARIKH:  I am not.
13              THE COURT:  Do you reside with anyone?
14              MR. PARIKH:  I do not.
15              THE COURT:  Thank you.
16              Juror No. 12, where do you live, sir?
17              MR. PRELUTSKY:  North Hills.
18              THE COURT:  And how long have you been at your
19    present address?
20              MR. PRELUTSKY:  12 years.
21              THE COURT:  What do you do presently?
22              MR. PRELUTSKY:  I write.
23              THE COURT:  Are you married, sir?
24              MR. PRELUTSKY:  Yes.
25              THE COURT:  Tell us what your wife does.
```

```
 1              MR. PRELUTSKY:  She stays home, takes care of the
 2    dog.
 3              THE COURT:  It's a good thing the dog has her.
 4    Anyone else in the home?
 5              MR. PRELUTSKY:  No, that's it.  Just the three of
 6    us.
 7              THE COURT:  That's why you have that contented look
 8    on your face.
 9              Thank you.  Let me ask if the government has any
10    additional questions and/or challenge for cause?
11              MR. ARKOW:  Moment, Your Honor?
12              THE COURT:  You may.
13              MR. ARKOW:  Your Honor, I just want to clarify the
14    procedures.  What the government has in mind is three
15    challenges for cause.  I have the prospective juror numbers.
16    Should I --
17              THE COURT:  No, if you have ones for cause, we'll
18    have to have a side bar.  And I beg your forgiveness, ladies
19    and gentlemen, but there's a matter of law that we have to
20    take care of outside of your presence.  Ask that counsel come
21    to side bar, please.
22         (The following proceedings were held at side bar:)
23              MR. ARKOW:  Prospective Juror No. 6 she is a woman
24    who worked with the FBI.  She initially right away indicated
25    that she would have what she called possible bias in favor of
```

```
 1   the testimony of the local law enforcement.
 2            THE COURT:  I don't think she said local.
 3            MS. CARTER:  Your Honor, that's correct.  She
 4   didn't say local.  She would tend to believe law enforcement
 5   witnesses over other law enforcement witnesses.  And she said
 6   that several times even when Your Honor tried to clarify.
 7            THE COURT:  Then she said that there's law
 8   enforcement on both sides.
 9            MS. CARTER:  Your Honor, that may be, but this is a
10   case where some of our eyewitness testimony is from victims
11   who are not law enforcement against officers who are law
12   enforcement officers.  Could make a big difference given that
13   weight on a credibility scale.
14            THE COURT:  That's why you have peremptory
15   challenges.  No.
16            MS. CARTER:  Your Honor, I misunderstood.  I
17   thought you wanted to get all of the cause challenges taken
18   care of now.
19            THE COURT:  Well, I don't normally do it that way,
20   but. . .
21            MS. CARTER:  There may be some also the defense
22   wants to raise.
23            MR. SCHWARTZ:  If I could suggest that the Court --
24   I'm not familiar with the Court's normal practice.  If we all
25   did our for causes now and you were to excuse either side for
```

1    cause, the questions would much be quicker.  We could

2    question two or three at one time as opposed to one after

3    another.  If each has more than one for cause, if the Court

4    were to grant either or both sides, maybe the questioning

5    would go quicker for the new jurors coming in box and there

6    would be more than one coming in the box.

7           MS. CARTER:  Your Honor, that way if there are

8    issues, for cause issues, then there wouldn't be any

9    confusion as to somebody exercising a peremptory challenge

10   until all the for cause issues are done.  I'm not sure how

11   the Court intended to proceed.

12          THE COURT:  Well, that could play out to your

13   advantage or disadvantage.  Normally, take both sides in

14   agreement and take it up that way.  Let's do it then.  But

15   still it's really not right for the government then to get

16   three bites at the apple to begin with, and then go to the

17   defense at the same time.  Could be to their detriment to

18   have three at the same time, but if you don't mind their

19   taking three, let's see.

20          MR. SCHWARTZ:  I'll defer to the Court.  If you

21   give -- the Court grants one challenge cause, one challenge

22   for cause, we've already made a challenge to the Court.

23          THE COURT:  Yeah, that's normally what happens.

24   Let's hear yours.

25          MR. SCHWARTZ:  Juror No. 3.  I know he did say in

1    the end that he would try to be fair.  I think everybody

2    would like to try to think they can be fair.

3        THE COURT:  Not everybody.  Some people will tell

4    you they just can't be fair.

5        MR. SCHWARTZ:  That's true.  I'm very worried he's

6    predisposed to whatever information he may have read about

7    tasers and pepper spray.  The line he used was he said that

8    the use of them has become endemic in most law enforcement.

9    And he said he had similar opinions more than once he said it

10   was used much too often.

11       Even when the court somewhat I guess facetiously

12   asked would he prefer bullets, I think with the laughter in

13   the courtroom he said no, but still quick may be other kinds

14   of force.  I think he's very biased in this case about using

15   tasers and pepper spray statement.

16       MR. ARKOW:  I believe the Court did question that

17   prospective juror extensively and he did say he could be

18   open-minded.  That he would be judging the facts of this case

19   even though he had been exposed.  He said he would be

20   open-minded.

21       THE COURT:  Okay.  No.  All right.  Back to you.

22       MS. CARTER:  I think our next one for cause

23   challenge is to Juror No. 8.  He's a minister to various law

24   enforcement stated and possibly has a bias with law

25   enforcement.  Hoped he wouldn't be, but that he was possibly

```
 1    biased.  I think that his close personal relationships and I
 2    think since he's a minister of law enforcement, I think might
 3    make it harder to set aside his possible bias.
 4              THE COURT:  Let's proceed with the use of the
 5    number of peremptories here.
 6              MR. SCHWARTZ:  On cause we pass for now,
 7    Your Honor.
 8              MS. CARTER:  Our last one would be Juror 12, the
 9    one who wrote cop shows.  He said that writing from a police
10    point of view has made him biased toward law enforcement.  He
11    said he was biased toward law enforcement so I think that's a
12    big problem.  In this case we have basically a beat sergeant
13    and on the government side maybe people who saw things at the
14    station, but it's the FBI agents who are going to be
15    different.  From the point of view that he is writing about
16    Dragnet or Diagnosis Murder and he was  affirmative that he
17    was biased.
18              THE COURT:  Anything about that?
19              MR. SCHWARTZ:  I think I need to put on record my
20    mother used to watch McMillian and Wife.  The question from
21    the Court he answered that he could be fair.
22              THE COURT:  That's why we have peremptory
23    challenges.  Thank you all.
24                   (Side bar concluded.)
25              THE COURT:  Back on the record.  Government may
```

```
1    exercise its first peremptory challenge.
2              MR. ARKOW:  Yes, Your Honor.
3              The government would like to thank and excuse
4    Prospective Juror No. 12.
5              THE COURT:  Thank you very much, sir.  If you could
6    go back up to the jury assembly room.
7              THE CLERK:  Rodolfo Villasenor V-i-l-l-a-s-e-n-o-r.
8              THE COURT:  Would you take the seat that was just
9    vacated, sir.
10             Have you been able to follow the questions and
11   answers so far, sir?
12             MR. VILLASENOR:  Yes, sir.
13             THE COURT:  And based on what you have heard, could
14   you be fair to both sides here?
15             MR. VILLASENOR:  Yes, sir.
16             THE COURT:  Have you ever worked in law
17   enforcement?
18             MR. VILLASENOR:  No, I have not.
19             THE COURT:  Do you have any relatives or close
20   friends who have?
21             MR. VILLASENOR:  Yes.  I have cousins that have
22   been or are in law enforcement.
23             THE COURT:  And where?
24             MR. VILLASENOR:  One is in -- that's still in law
25   enforcement is in West Covina.
```

1          THE COURT:  With the local police department?

2          MR. VILLASENOR:  Yes, Your Honor.  And there's, I

3    have three other cousins that have been in law enforcement,

4    but they're retired now.

5          THE COURT:  Do you tend to see these cousins fairly

6    frequently?

7          MR. VILLASENOR:  Yes, at family gatherings.

8    Sometimes I see a couple of them, yes.

9          THE COURT:  You think having so many extended

10   family members who are in law enforcement, would affect

11   you're being able to be fair to the government as well as to

12   the defendant?

13         MR. VILLASENOR:  I don't believe so.

14         THE COURT:  Can you listen to the testimony and

15   decide for yourself whether that witness is a law enforcement

16   officer or not, whether he or she is telling the truth?

17         MR. VILLASENOR:  Yes.  I'll decide that on an

18   individual basis.

19         THE COURT:  All right.  Have any experience with

20   the use of taser guns?

21         MR. VILLASENOR:  No.  No personal experience.

22         THE COURT:  Have you seen it on television or

23   somewhere else?

24         MR. VILLASENOR:  Well, yes, sure.

25         THE COURT:  You have any opinions about it one way

1    or the other?

2         MR. VILLASENOR:  Well, I sure wouldn't like to be

3    on that end of it, you know.  Looks pretty bad.

4         THE COURT:  But do you understand that being on the

5    other end of a gun could be perhaps worse?

6         MR. VILLASENOR:  Oh, absolutely, yes.  But I don't

7    think either one I would care for.

8         THE COURT:  What about pepper spray?

9         MR. VILLASENOR:  I don't know if there is different

10   grades of it, but I've had a whiff of pepper spray before.

11        THE COURT:  Now, how did that come about?

12        MR. VILLASENOR:  Well, it was my son.  We had one

13   in the medicine cabinet and he thought -- he didn't know what

14   it was.  So he decided -- he thought it was some sort of

15   deodorant spray.  He pushed the trigger on it, and I was in a

16   far room and had the air going and so that pepper spray went

17   all over the house.

18        THE COURT:  Why did you happen to have it in the

19   medicine cabinet?

20        MR. VILLASENOR:  Um, well, we just thought it was a

21   good place to store it.  That's all.

22        THE COURT:  But why did you have it all?  What was

23   the purpose?

24        MR. VILLASENOR:  I think I bought it for my

25   daughter.  It was just one of those little, it looked like a

```
 1    lighter type thing, like for a key change or something like

 2    that.

 3              THE COURT:  So she would have it if she were out by

 4    herself?

 5              MR. VILLASENOR:  Uh, yes.  It was for

 6    self-protection, yes.

 7              THE COURT:  Again, do you think that you could have

 8    an open mind and listen to all of the evidence in the case

 9    and decide this case fairly for both sides?

10              MR. VILLASENOR:  I believe so.

11              THE COURT:  All right.  Do you have any feeling

12    that perhaps you can't?

13              MR. VILLASENOR:  No.  I think I have a fairly open

14    mind.

15              THE COURT:  All right.  Have you had any prior jury

16    experience, sir?

17              MR. VILLASENOR:  Yes, I have.

18              THE COURT:  Tell us about that.

19              MR. VILLASENOR:  Well, over the years, I have

20    probably served about five, six times, but I can't recall all

21    the cases.

22              THE COURT:  And reached verdicts in those cases?

23              MR. VILLASENOR:  Um, well, I can recall, you know,

24    the major ones.  There was a couple of civil cases and two

25    criminals.
```

```
 1              THE COURT:  And you reached verdicts in those?

 2              MR. VILLASENOR:  Uh, one it was settled before.

 3              THE COURT:  The civil case, yes?

 4              MR. VILLASENOR:  Yes.

 5              THE COURT:  But did you reach a verdict in a civil

 6    case?

 7              MR. VILLASENOR:  Yes.

 8              THE COURT:  And that was in state court?

 9              MR. VILLASENOR:  To be honest, I don't recall.

10              THE COURT:  How long ago was it?

11              MR. VILLASENOR:  It was probably 20 years ago.

12              THE COURT:  All right.  But you don't think it was

13    in federal court, do you?

14              MR. VILLASENOR:  Well --

15              THE COURT:  Have you been a juror in federal court

16    previously?

17              MR. VILLASENOR:  You know I don't -- I don't really

18    pay that much attention to it.

19              THE COURT:  Well, I tell you I think you would pay

20    a lot of attention to it, the difference between the two.

21    But you don't recall?

22              MR. VILLASENOR:  No, sir.

23              THE COURT:  When was the last time you served as a

24    juror?

25              MR. VILLASENOR:  I believe it was like, well, I was
```

1    called like a year or two ago, but then I didn't serve.

2             THE COURT:  When was the last time that you

3    actually served that you can recall?

4             MR. VILLASENOR:  That must have been like about

5    eight years ago, ten years ago, something like that.

6             THE COURT:  And you don't remember where that was?

7             MR. VILLASENOR:  Um, I think that was in the Van

8    Nuys court.

9             THE COURT:  And do you recall whether you reached a

10   verdict or not?

11            MR. VILLASENOR:  Yes, we did.  We reached a

12   verdict.

13            THE COURT:  Was it civil or criminal?

14            MR. VILLASENOR:  It was civil.

15            THE COURT:  And you understand that in the state

16   court you don't have to all of you agreeing unanimously in

17   order to reach a verdict in state court.  You understand

18   that?

19            MR. VILLASENOR:  Yes, sir.

20            THE COURT:  But you understand that in this case

21   you would have to all agree.  The verdict would have to be

22   unanimous.  You understand that?

23            MR. VILLASENOR:  Yes, sir.

24            THE COURT:  You understand that the standard of

25   proof in that civil case, even though it was state court is

```
 1   the same as it would be here in federal court.  That's by the
 2   lowest standard that we have a mere preponderance of the
 3   evidence, a slight weighing one side or the other.
 4            Whereas in a criminal case, this case, the standard
 5   of proof is the highest that we have.  It's beyond a
 6   reasonable doubt.  Do you understand that?
 7            MR. VILLASENOR:  Yes, I do, sir.
 8            THE COURT:  Do you accept that?
 9            MR. VILLASENOR:  Yes.
10            THE COURT:  Would you hold it against the
11   defendant, it would be this defendant, if he upon the advice
12   of his attorneys decided not take the witness stand which is
13   his constitutional right, would you hold that against him?
14            MR. VILLASENOR:  No, I would not.
15            THE COURT:  Do you understand all of you, ladies
16   and gentlemen, that defendant doesn't have to do anything
17   other than what he is doing here in court.  That is show up.
18   He doesn't have to do anything else.
19            The prosecution, the government has the burden of
20   proof and the standard of proof is beyond a reasonable doubt.
21   Is there anyone who disagrees with that?  If so, please raise
22   a hand.  I see no hands having been raised.
23            Where do you live?
24            MR. VILLASENOR:  I live in Reseda.
25            THE COURT:  And how long have you been at your
```

```
 1   present address?

 2           MR. VILLASENOR:  Over 30 years.

 3           THE COURT:  And what do you do presently?

 4           MR. VILLASENOR:  I'm an electrician.

 5           THE COURT:  Are you married, sir?

 6           MR. VILLASENOR:  Yes.

 7           THE COURT:  What does your wife do?

 8           MR. VILLASENOR:  She is a homemaker.

 9           THE COURT:  And you have children?

10           MR. VILLASENOR:  We have children, but they're not

11   living with us anymore.

12           THE COURT:  All right.  Tell us what the oldest

13   does male or female.

14           MR. VILLASENOR:  The oldest is a female and she's

15   married and she has five children and the second --

16           THE COURT:  Well, what does the son-in-law do?

17           MR. VILLASENOR:  The son-in-law was a highway

18   patrolman.

19           THE COURT:  All right.  Is he still?

20           MR. VILLASENOR:  No, sir.

21           THE COURT:  And did you ever talk with him about

22   his working as a highway patrolman?

23           MR. VILLASENOR:  Very little, very little.  He's

24   been out of the law enforcement now for some time.

25           THE COURT:  How many years would you say?
```

1          MR. VILLASENOR:  Probably 12 years or something

2     like that.

3          THE COURT:  I see.  And your next child?

4          MR. VILLASENOR:  I have -- the next son is single

5     and he's working for the Department of Water and Power.

6          THE COURT:  And where does he live?

7          MR. VILLASENOR:  He lives in West Hills.

8          THE COURT:  All right.  Does he reside with anyone

9     as far as you know?

10         MR. VILLASENOR:  He resides with my other son.

11         THE COURT:  And what does he do?

12         MR. VILLASENOR:  And he is in college.

13         THE COURT:  Where is he studying?

14         MR. VILLASENOR:  Um, you know, he started with ITT

15     and I really --

16         THE COURT:  Don't know where now?

17         MR. VILLASENOR:  Yes, but I really don't know

18     exactly where.

19         THE COURT:  Who is in the home with you and your

20     wife presently?

21         MR. VILLASENOR:  No one.

22         THE COURT:  Just the two of you?

23         MR. VILLASENOR:  Just the two of us right now.

24         THE COURT:  Thank you.  Let me ask any additional

25     questions and/or challenge first of all from the government.

```
 1    I'm sorry.  First of all, for the defense.

 2             MR. SCHWARTZ:  Thank you, Your Honor.  May I

 3    confer, please?

 4             THE COURT:  You may.  I'm asking for additional

 5    questions and challenge for cause.  You have additional

 6    questions?

 7             MR. SCHWARTZ:  Yes, Your Honor.  What about No. 17

 8    and 18?

 9             THE COURT:  Are you familiar, sir, with the Desert

10    Hot Springs Police Department?

11             MR. VILLASENOR:  No, sir.

12             THE COURT:  Have you ever heard of it before you

13    came here today?

14             MR. VILLASENOR:  Well, in a vague sense.  I know

15    whereabouts it is.

16             THE COURT:  You know where the town is?

17             MR. VILLASENOR:  Well, I believe it's near Palm

18    Springs.

19             THE COURT:  Have you ever visited there at Desert

20    Hot Springs?

21             MR. VILLASENOR:  No, I have been to Palm Springs so

22    I don't know if we've passed by there.

23             THE COURT:  Have you ever read any stories or heard

24    on the radio or television about any police officers who have

25    been accused of using excessive force?
```

 1          MR. VILLASENOR:  Only some video clips like you see

 2   in the news.  The most outstanding one is the one where the

 3   policeman was spraying the crowd with or the demonstrators

 4   with pepper spray.

 5          THE COURT:  And which demonstrators are you talking

 6   about?

 7          MR. VILLASENOR:  Was that in Oakland or somewhere

 8   over there.

 9          THE COURT:  And after seeing those things, do you

10   think you could still have an open mind about this case and

11   decide this case fairly for both sides?

12          MR. VILLASENOR:  I believe so because in every

13   organization you have good and you have bad.

14          THE COURT:  All right, sir.

15          And let me ask the government if it has any

16   additional questions and/or challenge for cause?

17          MR. ARKOW:  Yes, Your Honor.  Could the Court

18   inquire with respect to No. 32 on page 10.

19          THE COURT:  Have you, sir, ever been falsely

20   accused of a crime?

21          MR. VILLASENOR:  No, sir.

22          THE COURT:  You have any family members that you

23   know of who have been falsely accused?

24          MR. VILLASENOR:  No, sir.

25          THE COURT:  Well, let me ask the other members of

```
 1   the jury box.  Have any of you ever been falsely accused of a

 2   crime to your knowledge?  If so, raise a hand.  I see no

 3   hands.  Relatives or close friends who may have been falsely

 4   accused.

 5           All right.  Juror No. 4.

 6           MR. HELSLEY:  I don't know if this qualifies, but

 7   when I was about 21, me and three other friends were in a car

 8   in Huntington Beach.  We were detained because the policeman

 9   told us there was a robbery in the area that fit the

10   description of the car.  We were briefly handcuffed and then

11   released.

12           THE COURT:  Does that experience in any way color

13   your ability to be fair to both sides in this case?

14           MR. HELSLEY:  No, I don't think so.

15           THE COURT:  Anybody else have an experience,

16   negative experience, with law enforcement they would like to

17   tell us about?  I see no other hands.

18           All right.  The defense may exercise its first

19   peremptory challenge.

20           MR. SCHWARTZ:  Thank you, Your Honor.  With respect

21   we ask the Court to please thank and excuse Juror No. 7.

22           THE COURT:  All right.  Thank you very much, ma'am.

23   If you would go back to the jury assembly room.

24           THE CLERK:  Jesse Uribe U-r-i-b-e.

25           THE COURT:  Mr. Uribe, have you been able to follow
```

```
 1    the questions and answers so far, sir?
 2              MR. URIBE:  I have.
 3              THE COURT:  And based on what you have heard, could
 4    you be fair to both sides here?
 5              MR. URIBE:  Yes, I would.
 6              THE COURT:  Have you ever worked in law
 7    enforcement?
 8              MR. URIBE:  No, I have not.
 9              THE COURT:  Ever had any bad experience with law
10    enforcement?
11              MR. URIBE:  Not that I can recall, no.
12              THE COURT:  Have you any knowledge of the -- of
13    this case?  First of all, anything about it ever come to your
14    attention in the newspaper or on television?
15              MR. URIBE:  No, sir.
16              THE COURT:  Are you familiar with the law in any
17    way?  For example, have you taken real estate law?
18              MR. URIBE:  I am a licensed realtor so I have some
19    very many years ago.
20              THE COURT:  Is that going to affect the manner in
21    which you would accept the law given to you by this Court in
22    this case?
23              MR. URIBE:  No, sir.
24              THE COURT:  Do you know anything at all about the
25    Desert Hot Springs Police Department?
```

```
 1                MR. URIBE:  No.

 2                THE COURT:  Have you had prior jury experience?

 3                MR. URIBE:  Two years ago I was here.  I believe it

 4   was a civil -- no, I'm sorry, a criminal case.

 5                THE COURT:  Did you reach a verdict?

 6                MR. URIBE:  Actually, I think it was like a hung

 7   jury or something like that.

 8                THE COURT:  All right.  Were you so affected by the

 9   nature of the jury being hung you couldn't be a fair juror in

10   this case?

11                MR. URIBE:  No, sir.

12                THE COURT:  Where do you live?

13                MR. URIBE:  Whittier, California.

14                THE COURT:  And how long have you been at your

15   present address?

16                MR. URIBE:  Uh, well, a little over two years.

17                THE COURT:  Where were you before?

18                MR. URIBE:  Neighboring city, Pico Rivera.

19                THE COURT:  And how long were you there?

20                MR. URIBE:  Pico Rivera, I was there for seven

21   years.

22                THE COURT:  How long have you been in the general

23   area all together?

24                MR. URIBE:  I lived in San Gabriel all my life.

25                THE COURT:  What do you do, sir?
```

1          MR. URIBE:  Currently, a loan facilitator or I deal

2    with real estate loans.

3          THE COURT:  And are you married, sir?

4          MR. URIBE:  Divorced.

5          THE COURT:  And do you know what your ex-wife does?

6          MR. URIBE:  She's a nurse, LVN, I believe getting

7    her registry or whatever.

8          THE COURT:  Do you have children?

9          MR. URIBE:  Two boys.

10         THE COURT:  What do they do?

11         MR. URIBE:  One is in middle school and the

12   youngest is in elementary school.

13         THE COURT:  Do you reside with anyone presently?

14         MR. URIBE:  A girlfriend and her two kids.

15         THE COURT:  And what does the girlfriend do?

16         MR. URIBE:  Real estate.

17         THE COURT:  And are the children in school?

18         MR. URIBE:  The oldest is in college and the

19   youngest is in high school.

20         THE COURT:  Male or female?

21         MR. URIBE:  The oldest is a boy and the youngest is

22   a girl.

23         THE COURT:  All right.  Anyone else in the home?

24         MR. URIBE:  Kaiser, our dog.

25         THE COURT:  All right.  Let me ask if there are any

```
 1    additional questions and/or challenge for cause.  First of
 2    all, the government?
 3              MR. ARKOW:  No further questions, Your Honor.
 4              THE COURT:  Any challenge for cause?
 5              MR. ARKOW:  No, Your Honor.
 6              THE COURT:  Defense any further questions and/or
 7    challenge for cause?
 8              MR. SCHWARTZ:  Yes, Your Honor.  Ask Questions 28,
 9    30 and 32.
10              THE COURT:  Have you ever been falsely accused of a
11    crime, sir?
12              MR. URIBE:  No, sir.
13              THE COURT:  Do you have any close family members
14    who may have been to your knowledge?
15              MR. URIBE:  No, sir.
16              THE COURT:  Have you ever worked in law
17    enforcement?
18              MR. URIBE:  No, sir.
19              THE COURT:  Any relatives or close friends who
20    have?
21              MR. URIBE:  Uh, I -- previously, I was a banker so
22    a lot of my clients were LAPD, but just again, clients.  They
23    would come and chat.  Nothing personal.
24              THE COURT:  Do you think you would tend to accept a
25    law enforcement officer's testimony over a non-law
```

1    enforcement officer's testimony?

2             MR. URIBE:  No, I would not, sir.

3             THE COURT:  Any challenge for cause?

4             MR. SCHWARTZ:  No, Your Honor.

5             THE COURT:  We're back to the government.

6             MR. ARKOW:  Yes, Your Honor.  The government would

7    ask the Court to thank and excuse Prospective Juror No. 8,

8    Mr. Carter.

9             THE COURT:  Thank you very much, Mr. Carter.  Go

10   back to the jury assembly room.

11            THE CLERK:  Rafael Diaz D-i-a-z.

12            THE COURT:  Have you been able to follow the

13   questions and answers so far, Mr. Diaz?

14            MR. DIAZ:  Yes, but I don't understand too much

15   English, and I told the lady over there and I don't read

16   English very well.

17            THE COURT:  Are you an American citizen?

18            MR. DIAZ:  Yes.

19            THE COURT:  How long have you been an American

20   citizen?

21            MR. DIAZ:  About six or seven years.

22            THE COURT:  From where?

23            MR. DIAZ:  Over here?

24            THE COURT:  Where did you come from?

25            MR. DIAZ:  From Mexico.

```
 1              THE COURT:  What kind of work do you do?

 2              MR. DIAZ:  I do the color separation technician.

 3              THE COURT:  Do you have to pass an examination in

 4      English before you became a citizen?

 5              MR. DIAZ:  Ah, well, they give it to read the

 6      questions and I memorize it.  And when I go to the American

 7      citizen and I know the answers, you know.

 8              THE COURT:  You don't understand much of what's

 9      going on here; is that right?

10              MR. DIAZ:  No, not too much.

11              THE COURT:  Well, understand this.  You're not

12      excused.  You go back upstairs to the jury assembly room and

13      they'll call you for another matter.

14              MR. DIAZ:  Okay.

15              THE COURT:  You understood that?

16              MR. DIAZ:  Yes.

17              THE COURT:  All right.  Go ahead.

18              THE CLERK:  Eric Diamond D-i-a-m-o-n-d.

19              THE COURT:  Have you been able to follow the

20      questions and answers so far, sir?

21              MR. DIAMOND:  Yes, sir.

22              THE COURT:  Based on what you have heard, do you

23      think you can be fair to both sides here?

24              MR. DIAMOND:  Yes.

25              THE COURT:  Have you worked in law enforcement?
```

```
 1              MR. DIAMOND:  No.

 2              THE COURT:  Have any relatives or close friends who

 3    have?

 4              MR. DIAMOND:  No.

 5              THE COURT:  Ever had an unpleasant experience with

 6    law enforcement?

 7              MR. DIAMOND:  No.

 8              THE COURT:  Would you tend to accept a law

 9    enforcement officer's testimony over a non-law enforcement

10    officer's testimony just because the person testifying

11    happens to be in law enforcement?

12              MR. DIAMOND:  No, Your Honor.

13              THE COURT:  You have any familiarity with taser

14    guns?

15              MR. DIAMOND:  A little.

16              THE COURT:  How?

17              MR. DIAMOND:  News stories occasionally.

18              THE COURT:  Have you formed any opinion about the

19    use of tasers by law enforcement?

20              MR. DIAMOND:  No.

21              THE COURT:  Any familiarity with pepper spray?

22              MR. DIAMOND:  A little.

23              THE COURT:  And again, have you formed any opinion

24    about the use of pepper spray by law enforcement?

25              MR. DIAMOND:  No.
```

```
1              THE COURT:  Have you had prior jury experience?
2              MR. DIAMOND:  Yes, five years ago.
3              THE COURT:  Where was that?
4              MR. DIAMOND:  Chatsworth.
5              THE COURT:  And what kind of case was it?
6              MR. DIAMOND:  Civil, and I was excused.
7              THE COURT:  All right.  But you understand that if
8      you had been deliberating in that civil case in state court
9      that it wouldn't have required a unanimous verdict?
10             MR. DIAMOND:  Yes.
11             THE COURT:  And you understand that the burden of
12     proof whether it be state court or federal court is always
13     upon prosecution?
14             MR. DIAMOND:  Yes.
15             THE COURT:  You understand the prosecution in this
16     case is the government?
17             MR. DIAMOND:  Yes.
18             THE COURT:  Where do you live, sir?
19             MR. DIAMOND:  Northridge.
20             THE COURT:  And how long have you been at your
21     present address?
22             MR. DIAMOND:  My whole life.
23             THE COURT:  What do you do?
24             MR. DIAMOND:  Attorney.
25             THE COURT:  Tell us what kind of law you practice.
```

1          MR. DIAMOND:  Right now doing civil contract work

2    for a practice in Orange County while I await responses from

3    some government agencies.

4          THE COURT:  Have you ever practiced in criminal

5    law?

6          MR. DIAMOND:  I law clerked for the Orange County

7    District Attorney's Office.

8          THE COURT:  And when was that?

9          MR. DIAMOND:  2009, 2010.

10          THE COURT:  Where did you go to law school?

11          MR. DIAMOND:  Chapman in Orange County.

12          THE COURT:  Are you married?

13          MR. DIAMOND:  No.

14          THE COURT:  Do you reside with anyone?

15          MR. DIAMOND:  My parents and my brother.

16          THE COURT:  I see.  Can you accept the law as given

17    to you by the Court?

18          MR. DIAMOND:  Yes.

19          THE COURT:  Let me ask the government, any

20    additional questions and/or challenge for cause?

21          MR. ARKOW:  Yes, Your Honor.  Can the Court inquire

22    further regarding Questions 22 on page 7 and 30 on page 9?

23          THE COURT:  Have you ever sought employment with

24    law enforcement, sir?

25          MR. DIAMOND:  I currently have an application

```
1    pending with the FBI.

2              THE COURT:  Is that to be a special agent?

3              MR. DIAMOND:  Yes.

4              THE COURT:  And you are presently a member of the

5    California bar?

6              MR. DIAMOND:  Correct.

7              THE COURT:  Well, I'm going to excuse you from this

8    matter and send you back up to the jury assembly room.  Thank

9    you.

10             THE CLERK:  Wendy Witz W-i-t-z.

11             THE COURT:  Ms. Witz, have you been able to follow

12   the questions and answers so far, ma'am?

13             MS. WITZ:  Yes.

14             THE COURT:  Based on what you have heard, can you

15   be fair to the government as well as to the defendant?

16             MS. WITZ:  Yes.

17             THE COURT:  Have you ever worked in law

18   enforcement?

19             MS. WITZ:  No.

20             THE COURT:  Do you have any relatives or close

21   friends who have?

22             MS. WITZ:  No.

23             THE COURT:  Have you ever attempted to work in law

24   enforcement?

25             MS. WITZ:  No.
```

```
 1              THE COURT:  Ever had an unpleasant experience with
 2    law enforcement?
 3              MS. WITZ:  No.
 4              THE COURT:  Ever heard of this case before?
 5              MS. WITZ:  No.
 6              THE COURT:  Are you familiar with the use of taser
 7    guns?
 8              MS. WITZ:  Well, I know what they are, but. . .
 9              THE COURT:  How do you know what they are?
10              MS. WITZ:  In the news.
11              THE COURT:  And have you formed any opinion about
12    the use of them by law enforcement?
13              MS. WITZ:  No.
14              THE COURT:  Do you know what pepper spray is?
15              MS. WITZ:  Yes.
16              THE COURT:  And how do you know about that?
17              MS. WITZ:  The news.
18              THE COURT:  Have you formed any opinion about law
19    enforcement's use of pepper spray?
20              MS. WITZ:  No.
21              THE COURT:  Have you had prior jury experience?
22              MS. WITZ:  No.
23              THE COURT:  Do you understand that in a criminal
24    case that a defendant doesn't have to do anything, doesn't
25    even have to put on a case, doesn't have to cross-examine
```

```
 1   witnesses, doesn't have to do anything but show up in court?

 2          MS. WITZ:  Yes.

 3          THE COURT:  Do you understand that?

 4          MS. WITZ:  Yes.

 5          THE COURT:  Do you accept that?

 6          MS. WITZ:  Yes.

 7          THE COURT:  Where do you live?

 8          MS. WITZ:  Los Angeles.

 9          THE COURT:  What part of the City?

10          MS. WITZ:  What do you mean?

11          THE COURT:  What part of Los Angeles?  480 square

12   miles.

13          MS. WITZ:  Well, by USC.

14          THE COURT:  All right.  Thank you.  That's good

15   enough.  And what do you do?

16          MS. WITZ:  I'm a legal secretary.

17          THE COURT:  And what kind of law firm?

18          MS. WITZ:  Immigration.

19          THE COURT:  And do they do any criminal work to

20   your knowledge?

21          MS. WITZ:  No.

22          THE COURT:  How long have you been at your present

23   address?

24          MS. WITZ:  About a year.

25          THE COURT:  Where were you before that?
```

1          MS. WITZ:  Los Angeles also.

2          THE COURT:  In that same area?

3          MS. WITZ:  A little further up, yes.

4          THE COURT:  South, north, east, west?

5          MS. WITZ:  South.

6          THE COURT:  And how long have you lived in

7    Los Angeles?

8          MS. WITZ:  All my life.

9          THE COURT:  And are you married?

10          MS. WITZ:  No.

11          THE COURT:  Do you reside with anyone?

12          MS. WITZ:  Yes.

13          THE COURT:  Tell us.

14          MS. WITZ:  My mother, my brother, two of my

15    sisters, her husband, my daughter and my sister's daughter.

16          THE COURT:  All right.  You'll have to tell us what

17    each of those individuals does.

18          MS. WITZ:  Well, my mother she is a stay home mom.

19    My brother he's on disability so he doesn't work.  My two

20    sisters one of them is a retail associate, the other one a

21    stay at home mom, I guess.  Her husband is a painter.  My

22    daughter goes to school.

23          THE COURT:  In what grade?

24          MS. WITZ:  Kinder.

25          THE COURT:  Kindergarten; is that right?

1        MS. WITZ:  Yes.

2        THE COURT:  All right.  Anyone else in the home?

3        MS. WITZ:  No.

4        THE COURT:  Thank you.  Let me ask if there are any

5    additional questions and/or challenge for cause?

6        MR. ARKOW:  Can the Court inquire further regarding

7    Question No. 22 on page 7?

8        THE COURT:  Do you have any kind of view point

9    whether it be religious, philosophical or otherwise that

10   would make it difficult for you to be a fair juror in this

11   case?

12       MS. WITZ:  No.

13       THE COURT:  Anything else?

14       MR. ARKOW:  Not from the government.

15       THE COURT:  The defense, Mr. Schwartz, any

16   additional questions and/or challenge for cause?

17       MR. SCHWARTZ:  May I confer for a moment?

18       THE COURT:  You may.

19       MR. SCHWARTZ:  We ask the Court please inquire as

20   to Questions 17 and 18.

21       THE COURT:  Do you have any opinion about the

22   Desert Hot Springs Police Department?

23       MS. WITZ:  No.

24       THE COURT:  Have you seen or read or heard anything

25   recently or at any time about police officers who are accused

 1    of using excessive force?

 2            MS. WITZ:  No.

 3            THE COURT:  Thank you.  The defense may exercise

 4    its next peremptory challenge.

 5            MR. SCHWARTZ:  Thank you, Your Honor.  Defense

 6    would ask the Court to thank and excuse Juror No. 3.

 7            THE COURT:  Thank you very much, sir.  If you would

 8    go back up to the jury assembly room.

 9            THE CLERK:  Gregory Farmer F-a-r-m-e-r.

10            THE COURT:  Mr. Farmer, have you been able to hear

11    the questions and answers so far?

12            MR. FARMER:  Yep.

13            THE COURT:  Based on what you have heard -- would

14    you use that microphone, please.  And based on what you have

15    heard, could you be fair to both sides here?

16            MR. FARMER:  I think so.

17            THE COURT:  Have you ever worked in law

18    enforcement?

19            MR. FARMER:  No.

20            THE COURT:  Have you ever attempted to?

21            MR. FARMER:  No.

22            THE COURT:  Have you ever had any problems with law

23    enforcement?

24            MR. FARMER:  No, except for getting arrested a

25    couple times.

```
 1              THE COURT:  Do you know why you were arrested?

 2              MR. FARMER:  Mostly traffic crap.

 3              THE COURT:  Do you have any strong opinions about

 4    law enforcement one way or the other?

 5              MR. FARMER:  No.

 6              THE COURT:  Are you familiar with the use of taser

 7    weapons?

 8              MR. FARMER:  Just what you hear in the news and on

 9    TV.

10              THE COURT:  What about pepper spray?  Do you know

11    anything about the use of it?

12              MR. FARMER:  Not really.  Just what you hear on TV

13    and whatnot.

14              THE COURT:  Do you know anything at all about the

15    Desert Hot Springs Police Department?

16              MR. FARMER:  No.

17              THE COURT:  Would you hold it against this

18    defendant if he decided not to put on a defense, which is his

19    right?

20              MR. FARMER:  No.

21              THE COURT:  Do you have any strong opinions about

22    law enforcement pro or con?

23              MR. FARMER:  I never really thought about it.

24              THE COURT:  All right.  Have you had prior jury

25    experience sir?
```

```
 1                 MR. FARMER:  No.

 2                 THE COURT:  You do understand that the defendant

 3     has a right to show up in court and do nothing else?

 4                 MR. FARMER:  Yep.

 5                 THE COURT:  Does that sit all right with you?

 6                 MR. FARMER:  Well, the law is the law.

 7                 THE COURT:  Do you accept it?

 8                 MR. FARMER:  Have to.

 9                 THE COURT:  And will you accept it in this case?

10                 MR. FARMER:  Yeah.

11                 THE COURT:  Where do you live, sir?

12                 MR. FARMER:  South El Monte.

13                 THE COURT:  And how long have you been at your

14     present address?

15                 MR. FARMER:  Close to 17 years.

16                 THE COURT:  What do you do, sir?

17                 MR. FARMER:  Auto mechanic.

18                 THE COURT:  And are you married?

19                 MR. FARMER:  Yes.

20                 THE COURT:  What does your wife do?

21                 MR. FARMER:  Housemaker.

22                 THE COURT:  And do you have children?

23                 MR. FARMER:  She does.

24                 THE COURT:  How many?

25                 MR. FARMER:  Well, total of three daughters and
```

```
 1    like 11 grandkids.
 2            THE COURT:  All right.  Do you know what the three
 3    daughters do?
 4            MR. FARMER:   One is a housewife out in Tennessee.
 5    The other is a housewife out in Ontario Rialto area and the
 6    one that's at the house has got a hurt back.
 7            THE COURT:  Do you know what any of the husbands
 8    do?
 9            MR. FARMER:  Husband out in Rialto I think he is a
10    forklift operator and the husband in Tennessee is an auto
11    mechanic.
12            THE COURT:  And how many people are in the home
13    with you and your wife and this one daughter?
14            MR. FARMER:  Daughter's four kids and
15    brother-in-law.
16            THE COURT:  And what does the brother-in-law do?
17            MR. FARMER:  He is out of work.  Construction.
18            THE COURT:  All right.  Thank you.
19            Let me ask counsel any additional questions and/or
20    challenge for cause?  First of all, the government.
21            MR. ARKOW:  No, Your Honor.
22            THE COURT:  And the defense.
23            MR. SCHWARTZ:  No, Your Honor.  Thank you.
24            THE COURT:  All right.  We're still with the
25    defense.
```

1          MR. SCHWARTZ:  Thank you, Your Honor.  Defense

2     would ask the Court to please thank and excuse Juror No. 1.

3          THE COURT:  Thank you very much.

4          MR. ARKOW:  Can the government be heard at side

5     bar?

6          THE COURT:  Prior to the juror being excused?

7          MR. ARKOW:  Yes.

8          (Following proceedings occurred at side bar:)

9          THE COURT:  Mr. Arkow.

10         MR. ARKOW:  Yes, Your Honor.  This is the second

11    strike that the defense has made of a woman on panel and this

12    woman is a Hispanic juror.

13         THE COURT:  How do you know?

14         MR. ARKOW:  Well, I'm judging that from the last

15    name.

16         THE COURT:  Well, you can't just tell from a name.

17    You can't necessarily tell from looking at her either, can

18    you?

19         MR. ARKOW:  It's based on the surname.

20         THE COURT:  Well, she is married.

21         MR. ARKOW:  Well, looking at the veneer, there

22    aren't others that I can see.  The Court says it's hard to

23    tell if there's other Hispanic women.

24         MS. CARTER:  I'll just make a slight correction.  I

25    see one other woman who appears to be Hispanic to my eyes,

```
 1   but other than that, I think it's a concern because we have a
 2   Hispanic female victim in this case.
 3              THE COURT:  There's also a black victim and I don't
 4   see any noticeable blacks on the panel so far.
 5              MS. CARTER:  Certainly, Your Honor, I would agree
 6   with you with regard to the box and I see very, very few in
 7   the veneer such that we would be raising a similar concern if
 8   one of them made it to the box and was struck.  There may be
 9   reasons, but that's something that we're looking out for
10   given the victims in the case.
11              THE COURT:  All right.  Mr. Schwartz.
12              MR. SCHWARTZ:  First of all, Your Honor, this is
13   the second female and one male.  I don't see anything about
14   this woman besides her surname that she is Hispanic.  Given
15   this jurisdiction, there are probably a good number of
16   Hispanics on this jury as well as Caucasians.  I don't think
17   because one of the alleged victims is Hispanic that I'm
18   restricted to only kick off Caucasians in this particular
19   case.
20              THE COURT:  That's not the inquiry.
21              MR. SCHWARTZ:  The Court's made a ruling that the
22   government has made a prima facia showing so I should have
23   give my reason?
24              THE COURT:  I did.
25              MR. SCHWARTZ:  To be quite frank with the Court
```

```
 1    she's a teacher.  Teachers I don't keep them on the jury
 2    panel most of the time.
 3                THE COURT:  They know too much.
 4                MR. SCHWARTZ:  Maybe yes, maybe no.  Everybody's
 5    got their quirks.  That's one of mine.
 6                THE COURT:  You can use a quirk for a peremptory,
 7    but you'll have to watch it.  We'll excuse her.
 8                        (Side bar concluded.)
 9                THE COURT:  We're back on the record.
10                Ms. Pacheco, you're excused.  If you'll go back
11    upstairs to the jury assembly room, ma'am.
12                THE CLERK:  Juanita Armas A-r-m-a-s.
13                THE COURT:  Well, ladies and gentlemen, this has
14    gone on a bit longer than usual, but we're going to take a
15    recess so you can refresh yourselves, but please don't talk
16    about the process or anything that's going on in it.  Ask
17    that you come back in ten minutes.  You can go out and use
18    the rest room, whatever.  Try to sit as close to where you
19    are presently sitting when you return.
20                Same thing is true for those of you in the jury
21    box, and more importantly, you have to sit in the very same
22    seats that you're in now so memorize your placement and who
23    is sitting next to you, that sort of thing.  We have the
24    jurors designated by numbers so it's important to come back
25    and keep the same numbers.
```

```
 1                        (Recess taken.)

 2              THE COURT:  Hopefully everybody is in the same

 3     order.

 4              Ms. Armas, have you been able to hear the questions

 5     and answers so far, ma'am?

 6              MS. ARMAS:  Yes, I have.

 7              THE COURT:  And based on what you have heard, could

 8     you fair both to the defendant and to the government here?

 9              MS. ARMAS:  I've had instances with the law, abuse.

10              THE COURT:  Tell us.

11              MS. ARMAS:  This is back in the day when I was a

12     very young girl.  My brother was 14 and I was 19.  And he was

13     mouthing off at an officer and they both came out and beat

14     him up.

15              THE COURT:  You were there?

16              MS. ARMAS:  Uh-huh, yes.

17              THE COURT:  And you understand that that has

18     nothing to do with this case?

19              MS. ARMAS:  Um, yes, I do, but I feel that an

20     officer can misuse his authority.

21              THE COURT:  Well, that's why you want to make sure

22     you're being fair and you look at all of the evidence and

23     decide whether in this case that is the case or not; isn't

24     that right?

25              MS. ARMAS:  Yes.
```

1          THE COURT:  Have you formed an opinion that all law

2     enforcement officers are bad?

3          MS. ARMAS:  Well, that's not the only time that

4     I've had an instance, though.  It's hard for me to respect

5     authority sometimes because of what has happened in our

6     lives.

7          THE COURT:  But yet you understand that most law

8     enforcement officers are good people, do you?

9          MS. ARMAS:  Most, yes.

10          THE COURT:  So then why should it be a problem for

11     you deciding the case fairly?

12          MS. ARMAS:  I guess I'm just prejudice towards

13     authority, officers in general.

14          THE COURT:  All right.  I'm gonna excuse you and

15     let you go back to the jury assembly room.

16          THE CLERK:  Samuel Kim.

17          THE COURT:  Mr. Kim, have you been able to hear the

18     questions and answers so far, sir?

19          MR. KIM:  Yes.

20          THE COURT:  And based on what you have heard, could

21     you be fair to both sides?

22          MR. KIM:  Yes.

23          THE COURT:  Have you ever worked in law

24     enforcement?

25          MR. KIM:  No.

1          THE COURT:  Have you ever applied to be a law

2    enforcement officer?

3          MR. KIM:  No, sir.

4          THE COURT:  Have you ever had a problem with law

5    enforcement?

6          MR. KIM:  No, sir.

7          THE COURT:  Have you ever heard of the Desert Hot

8    Springs Police Department?

9          MR. KIM:  No, I haven't.

10          THE COURT:  Are you familiar with the use of taser

11    weapons by law enforcement officers?

12          MR. KIM:  Not much.

13          THE COURT:  You say not much.  What little bit do

14    you know about it?

15          MR. KIM:  I know it's self-defense device.

16          THE COURT:  What do you know, if anything, about

17    pepper spray?

18          MR. KIM:  Also it's self-defense device.

19          THE COURT:  And in terms of its use by law

20    enforcement, do you know anything about it?

21          MR. KIM:  As far as I concerned, it's a nonlethal

22    weapon.

23          THE COURT:  And you'd say the same thing about the

24    use of taser guns?

25          MR. KIM:  Yes, sir.

1          THE COURT:  Do you have any formed opinions about

2     law enforcement pro or con?

3          MR. KIM:  No, sir.

4          THE COURT:  Have you had prior jury experience?

5          MR. KIM:  Yes, I have.

6          THE COURT:  Where was that most recently?

7          MR. KIM:  2000 in Glendale, civil case.

8          THE COURT:  Did you reach a verdict?

9          MR. KIM:  Yes.

10          THE COURT:  And do you understand that the standard

11     of proof that you used there was by a mere of the

12     preponderance of the evidence?

13          MR. KIM:  Yes.

14          THE COURT:  And in this criminal case if you serve

15     as a juror, you all will have to decide the case unanimously

16     and beyond a reasonable doubt.  Do you understand that?

17          MR. KIM:  Yes, sir.

18          THE COURT:  Where do you live, sir?

19          MR. KIM:  Downtown L.A.

20          THE COURT:  And how long have you been at your

21     present address?

22          MR. KIM:  Three years.

23          THE COURT:  Where were you before?

24          MR. KIM:  Glendale.

25          THE COURT:  For how long?

```
 1              MR. KIM:  Five years.
 2              THE COURT:  How long have you been in Southern
 3    California all together?
 4              MR. KIM:  33 years.
 5              THE COURT:  What do you do, sir?
 6              MR. KIM:  Aerospace engineer.
 7              THE COURT:  And are you married, sir?
 8              MR. KIM:  Divorced.
 9              THE COURT:  What does your ex-wife do?
10              MR. KIM:  Real estate.
11              THE COURT:  And do you reside with anyone
12    presently?
13              MR. KIM:  Daughter.
14              THE COURT:  What does your daughter do?
15              MR. KIM:  She works at beauty salon.
16              THE COURT:  Anyone in the home?
17              MR. KIM:  No.
18              THE COURT:  Let me ask any additional questions
19    and/or challenge for cause.  Mr. Arkow?
20              MR. ARKOW:  No further questions.  No challenge.
21              THE COURT:  All right.  Mr. Schwartz.
22              MR. SCHWARTZ:  No, Your Honor.  Thank you.
23              THE COURT:  All right.  We're back to the
24    government for its peremptory challenge.
25              MR. ARKOW:  The government would ask the Court to
```

1      thank and excuse Prospective Juror No. 4.

2              MR. SCHWARTZ:  Your Honor, I would request a side

3      bar before he's excused.

4          (Following proceedings were held at side bar:)

5              MR. SCHWARTZ:  We have a challenge.  The peremptory

6      challenge, Your Honor, to Juror No. 4 is the third peremptory

7      that the government has used.  All three have been white

8      males.  My client is a white male.  This juror has no

9      connection to law enforcement, has no connection to excessive

10     force cases, no connection to this case at all.  He's a white

11     male.  And all three peremptories they have used have been to

12     excuse from the jury white males in a case where my client is

13     a white male and the alleged victims are minorities.

14             MS. CARTER:  Your Honor, we have certain concerns

15     about this juror.  The first he said he had a few law classes

16     in college and I have some concern about that level of legal

17     training and what he learned in college.  In addition,

18     Your Honor, this juror has been leaning back in his chair and

19     closing his eyes and looking exaspirated when various of the

20     Court's questions has been asked.  He had his hands folded

21     when other prospective jurors were talking about what they

22     had seen about tasers on the news.

23             He appeared to have also a facial reaction when he

24     was asked if having a defendant who is in law enforcement

25     would stop him from being fair.  So he's been closing his

1   eyes, leaning back.  I'm not sure he wants to be here and pay

2   attention.  I don't know if he was actually sleeping.

3           MR. SIMIDJIAN:  He wasn't sleeping.

4           MS. CARTER:  He's been closing his eyes, leaning

5   back and looking exaspirated.

6           MR. SCHWARTZ:  The jurors have been here since 7

7   o'clock in the morning and had no lunch break.  I understand

8   we all have things to do and as a juror he's been with the

9   rest of them since 7 o'clock.  Maybe it's not the most

10  comfortable thing for him.  Actually, he's right now leaning

11  forward in his seat and has a facial expression that means

12  he's actually paying attention and listening to those answers

13  as well.  And as far as his background in law, that's over 20

14  years ago a few college courses.

15          MS. CARTER:  Your Honor, certainly all of these

16  would be reasons that you wouldn't sustain for a cause

17  challenge.  This is the government's peremptory.

18          THE COURT:  I understand.  All right.  One other

19  group to watch.  All right.  You may exercise your peremptory

20  challenge.

21                    (Side bar concluded.)

22          THE COURT:  Thank you, Mr. Helsley.  Please go back

23  up to jury assembly room.

24          THE CLERK:  Kimberly Conod C-o-n-o-d.

25          THE COURT:  Ms. Conod, have you been able to hear

```
1    the questions and answers so far, ma'am?

2              MS. CONOD:  Yes.

3              THE COURT:  And based on what you have heard so

4    far, can you be fair to both sides?

5              MS. CONOD:  Yes.

6              THE COURT:  Have you ever worked in law

7    enforcement?

8              MS. CONOD:  No.

9              THE COURT:  Have you ever had any problems with law

10   enforcement?

11             MS. CONOD:  No.

12             THE COURT:  Do you have any relatives or close

13   friends who are in law enforcement?

14             MS. CONOD:  My friend's dad is a retired homicide

15   detective in L.A.  One of my girlfriend's just finished the

16   police academy in Ventura County.

17             THE COURT:  And do you think as a result of these

18   relationships you might find it difficult not to just accept

19   law enforcement officer's testimony simply because that

20   person is in law enforcement?

21             MS. CONOD:  No.

22             THE COURT:  Do you anything at all about this

23   Desert Hot Springs Police Department?

24             MS. CONOD:  No.

25             THE COURT:  Are you familiar at all with the use of
```

```
 1    taser weapons by law enforcement?
 2              MS. CONOD:  No, other than in the news.
 3              THE COURT:  And have you formed any opinion about
 4    the use of taser weapons by law enforcement?
 5              MS. CONOD:  No.
 6              THE COURT:  What about pepper spray?
 7              MS. CONOD:  No opinion.
 8              THE COURT:  All right.  Have you ever studied law?
 9              MS. CONOD:  In college I took one class about the
10    First Amendment.
11              THE COURT:  All right.  I'm not going to ask you
12    what grade you got.
13              MS. CONOD:  It was so long ago I couldn't tell you.
14              THE COURT:  Couldn't have been that long ago.
15    You're not that old.
16              Would you be able to accept the law as given to you
17    by the Court?
18              MS. CONOD:  Yes.
19              THE COURT:  All right.  Have you had prior jury
20    experience?
21              MS. CONOD:  Um, no.  I got called in for jury duty
22    in West Covina and was questioned but excused.
23              THE COURT:  Do you know what kind of case it was,
24    civil or criminal?
25              MS. CONOD:  I'm going to think it was criminal.
```

1           THE COURT:  All right.  How long ago was that?

2           MS. CONOD:  Um, six or seven years ago.

3           THE COURT:  Where do you reside?

4           MS. CONOD:  Camarillo, California.

5           THE COURT:  And how long have you been at your

6    present address?

7           MS. CONOD:  Three years.

8           THE COURT:  Where were you before?

9           MS. CONOD:  Before I was in Covina, California.

10          THE COURT:  For how long?

11          MS. CONOD:  All my life.

12          THE COURT:  What do you do?

13          MS. CONOD:  I work for ABC Television Network.

14          THE COURT:  What do you do for them?

15          MS. CONOD:  Research.

16          THE COURT:  Are you married?

17          MS. CONOD:  I'm engaged.

18          THE COURT:  Congratulations.  What does your

19   fiancee do?

20          MS. CONOD:  He's a lead ultrasound tech at

21   Northridge Hospital.

22          THE COURT:  And do you presently reside with

23   anyone?

24          MS. CONOD:  With him.

25          THE COURT:  Anyone else?

| | |
|---|---|
| 1 | MS. CONOD:  That's it. |
| 2 | THE COURT:  Excuse me one minute. |
| 3 | Any additional questions and/or challenges for |
| 4 | cause?  First from the government. |
| 5 | MR. ARKOW:  If the Court could inquire regarding |
| 6 | Question No. 22 on page 7? |
| 7 | THE COURT:  Do you have any kind of views that |
| 8 | would make it difficult for you to be fair to both sides in |
| 9 | this case, ma'am? |
| 10 | MS. CONOD:  No. |
| 11 | THE COURT:  Thank you.  Any challenge for cause? |
| 12 | MR. ARKOW:  No, Your Honor. |
| 13 | THE COURT:  Mr. Schwartz. |
| 14 | MR. SCHWARTZ:  We ask the Court to inquire of |
| 15 | Question No. 18. |
| 16 | THE COURT:  Do you recall hearing or seeing |
| 17 | anything about police officers being charged with using |
| 18 | excessive force on suspects? |
| 19 | MS. CONOD:   Just on the news, yes, but this case |
| 20 | particularly, no. |
| 21 | THE COURT:  And seeing those news items, has it |
| 22 | formed any opinion in your mind about the use of excessive |
| 23 | force by police officers? |
| 24 | MS. CONOD:  It depends on all the circumstances. |
| 25 | THE COURT:  Are you willing to look at all of the |

```
 1    evidence in this case and accept the law as given to you and
 2    to apply that to the evidence?
 3              MS. CONOD:  Yeah.  Yes.
 4              THE COURT:  All right.  We're back to the defense.
 5              MR. SCHWARTZ:  Thank you.  We would ask the Court
 6    to please thank and excuse Juror No. 3.
 7              THE COURT:  All right.  Thank you very much,
 8    Mr. Farmer.  You may go back upstairs, sir.
 9              THE CLERK:  Richard Gibbs G-i-b-b-s.
10              THE COURT:  Mr. Gibbs, have you been able to hear
11    the questions and answers so far, sir?
12              MR. GIBBS:  Yes.
13              THE COURT:  And based on what you have heard, could
14    you be fair to the defendant as well as to the government?
15              MR. GIBBS:  Yes.
16              THE COURT:  Have you ever worked in law
17    enforcement?
18              MR. GIBBS:  No.
19              THE COURT:  Have you ever applied for any work with
20    law enforcement?
21              MR. GIBBS:  No.
22              THE COURT:  Have you ever had any problems with law
23    enforcement?
24              MR. GIBBS:  No.
25              THE COURT:  Do you have any particular views about
```

1   the use of taser weapons by law enforcement?

2           MR. GIBBS:  I don't.

3           THE COURT:  What about pepper spray?

4           MR. GIBBS:  No particular views.

5           THE COURT:  Are you familiar at all with the Desert

6   Hot Springs Police Department?

7           MR. GIBBS:  Not specifically.

8           THE COURT:  Do you know anything at all about them?

9           MR. GIBBS:  No.  Just that they have a police

10  department based on today.

11          THE COURT:  All right.  Do you know where it is?

12          MR. GIBBS:  Vaguely.

13          THE COURT:  Do you think maybe from the name it's

14  out in the desert?

15          Have you had prior jury experience, sir.

16  A.   I have.

17  Q.   Tell us about it most recently.

18  A.   Uh, back in the late '90s, uh, one jury, uh, criminal

19  case.

20  Q.   Where?

21  A.   We went to verdict in Glendale.

22  Q.   And was there anything at all about that case going to

23  affect you being a fair juror in that case?

24  A.   No.

25  Q.   And you had other jury experience as well?

```
 1    A.    I was not selected for the jury.

 2    Q.    Where do you live, sir?

 3    A.    Thousand Oaks.

 4    Q.    And how long have you been at your present address?

 5    A.    Eight years.

 6    Q.    And where were you before then?

 7    A.    Westlake.

 8    Q.    For how long?

 9    A.    About four years.

10    Q.    Is that Westlake Village?

11    A.    That is correct.

12    Q.    What do you do, sir?

13    A.    Finance for a market research firm.

14    Q.    Are you married?

15    A.    Yes.

16    Q.    What does your wife do?

17    A.    Homemaker.

18    Q.    And do you have children?

19    A.    Two children.  Seven and four.  Daughters.

20    Q.    Good.  Enjoy them while they're young.  Anyone else in

21    the home?

22    A.    No.

23          THE COURT:  Any additional questions and/or

24    challenge for cause?  First from the government.

25          MR. ARKOW:  Yes, Your Honor.  Question No. 22 on
```

```
 1    page 7.
 2              THE COURT:  Do you have any kind of views that
 3    would make it difficult for you to be a fair and impartial
 4    juror in this case?
 5              MR. GIBBS:  No.
 6              THE COURT:  Any challenge for cause?
 7              MR. ARKOW:  No, Your Honor.
 8              THE COURT:  Mr. Schwartz.
 9              MR. SCHWARTZ:  No questions, no challenge,
10    Your Honor.
11              THE COURT:  Thank you.  We're back to the defense.
12              MR. SCHWARTZ:  Please thank and excuse Juror No. 8.
13              MR. ARKOW:  Your Honor, can we ask to be heard?
14         (Following proceedings were held at side bar:)
15              THE COURT:  Mr. Arkow.
16              MR. ARKOW:  Yes, Your Honor.  This is another
17    strike on a female juror and in looking at the veneer, again,
18    it appears to be the one other Hispanic prospective juror.
19    This is a pattern of striking female jurors.
20              THE COURT:  Especially Hispanic?
21              MS. CARTER:  Exactly.
22              MR. SCHWARTZ:  First juror was a Caucasian woman.
23              THE COURT:  Well, I'm not sure.
24              MR. SCHWARTZ:  There's no showing she was Hispanic.
25    Her name was not Hispanic.  Nothing about her was Hispanic.
```

```
 1    Second female Ms. Pacheco was her surname.  Nothing about her

 2    affectation showed she was Hispanic.

 3              THE COURT:  She was female.

 4              MR. SCHWARTZ:  She was female.  And we have also

 5    used two peremptories on two males.  This is number five.

 6    It's been two and two and we've kicked off males.  This juror

 7    is a legal secretary for an immigration firm and the same

 8    rationale I have as to the issue of someone who works with a

 9    law office has some experience with law or legal principals

10    which might be applicable in this case.  She currently works

11    there as we speak.

12              MS. CARTER:  Your Honor, just to put on the record,

13    there are other jurors who work as legal secretariesand  as

14    paralegals on the jurors and so I think that reason doesn't

15    distinguish this juror from the others, but what does

16    distinguish her from a lot of the people on the current panel

17    in the veneer is she is a Hispanic female.  There just aren't

18    that many even coming up.

19              MR. SCHWARTZ:  I would would hesitate to say she is

20    probably more Philippino than Hispanic, Your Honor.

21              THE COURT:  Possibly.

22              MR. SCHWARTZ:  I have been watching all the jurors.

23    She seemed to have some kind of smirk on her face and not a

24    pleasant one.  I've used the challenges equally.  I wasn't

25    mad-dogging, wasn't -- didn't seem as though she was looking
```

1    at our side of the table at times.

2          THE COURT:  Well, fairly, it's clear she is a

3    minority female.  All right.  I'll give you a pass this time,

4    but both sides are just trying to work different sides of the

5    coin.  I guess both are going to have to watch it or I'll

6    have to declare a mistrial before long.  Let's see where we

7    are.

8          MR. SCHWARTZ:  Thank you, Your Honor.

9          THE COURT:  She'll be excused.

10               (Side bar concluded.)

11         THE COURT:  Back on the record.

12         Thank you, Ms. Witz.  If you'll go back up to the

13   jury assembly room, ma'am.

14         THE CLERK:  Joanna Kuehl K-u-e-h-l.

15         THE COURT:  Ms. Kuehl, have you been able to hear

16   the questions and answers so far, ma'am?

17         MS. KUEHL:  Yes, I have.

18         THE COURT:  And based on what you have heard, could

19   you be fair to both sides?

20         MS. KUEHL:  I would try, but I have a sister who is

21   a detective and a brother-in-law who is a sergeant Spokan

22   Washington Police Department.  They have been at least

23   20-year veterans.  Good friend who's a detective, retired

24   from that department.  I have been involved all my life with

25   those people.

1        My dad is retired a fire fighter so we've had a lot

2   of contact with police people over the years.  I've heard a

3   lot of cases that my sister and brother-in-law have been

4   involved in that are similar in that issues of excessive

5   force.  Problems with police officers being able to do their

6   jobs because they are always afraid of being in this sort of

7   situation.

8        THE COURT:  So you don't think you could be fair;

9   is that right?

10        MS. KUEHL:  I would have to be honest and say I

11   would do my best, but I think that you have to be realistic

12   and say that I would have a bias.  These are people I love.

13        THE COURT:  But they are not in this case.

14        MS. KUEHL:  They're not in this case, but over half

15   my life that I have all this involvement with people.  It's

16   part of my makeup.  I think it's very hard to judge what

17   somebody else is doing.  I work in an intensive care unit.  I

18   know what adrenaline can do.  You have to make split

19   decisions.  And if you're always living with that knowledge

20   well, if I make a decision that doesn't exactly abide with

21   the law, I'm gonna be in this situation like this.

22        THE COURT:  All right.  You may go back upstairs to

23   the jury assembly room.  Perhaps they can find another case

24   for you.

25        THE CLERK:  Julie Garibaldi G-a-r-i-b-a-l-d-i.

1            THE COURT:  Ms. Garibaldi, have you been able to

2      follow the questions and answers so far, ma'am?

3            MS. GARIBALDI:  Yes.

4            THE COURT:  And based on what you have heard, could

5      you be fair to both sides?

6            MS. GARIBALDI:  Yes.

7            THE COURT:  Have you ever worked in law

8      enforcement?

9            MS. GARIBALDI:  No.

10            THE COURT:  Any relatives or close friends who

11      have?

12            MS. GARIBALDI:  No.

13            THE COURT:  Ever had any problems with law

14      enforcement?

15            MS. GARIBALDI:  No.

16            THE COURT:  Do you know anything about the use of

17      taser guns by law enforcement?

18            MS. GARIBALDI:  Only from what I have seen on TV.

19            THE COURT:  And what you have seen has it formed an

20      opinion that you have that would make it difficult for you to

21      be fair to both sides in this case?

22            MS. GARIBALDI:  Absolutely not.

23            THE COURT:  What about pepper spray?

24            MS. GARIBALDI:  No.

25            THE COURT:  Do you know anything at all about the

1    Desert Hot Springs Police Department?

2              MS. GARIBALDI:  I do not.

3              THE COURT:  Have you had prior jury experience?

4              MS. GARIBALDI:  No.

5              THE COURT:  Do you understand that in a criminal

6    case under our system of laws, under our constitution, a

7    defendant doesn't have to do anything other than show up in

8    court?

9              MS. GARIBALDI:  I understand that.

10             THE COURT:  Do you accept that?

11             MS. GARIBALDI:  I do.

12             THE COURT:  Where do you live?

13             MS. GARIBALDI:  Downtown here.

14             THE COURT:  And how long have you been at your

15   present address?

16             MS. GARIBALDI:  Five years.

17             THE COURT:  Where were you before?

18             MS. GARIBALDI:  Toluca Lake.

19             THE COURT:  For how long?

20             MS. GARIBALDI:  Eight years.

21             THE COURT:  What do you do?

22             MS. GARIBALDI:  I'm an actor.

23             THE COURT:  And are you married?

24             MS. GARIBALDI:  No.

25             THE COURT:  Do you reside with anyone?

```
 1              MS. GARIBALDI:  No.

 2              THE COURT:  Do you have any view points on any

 3   matters, philosophical, political or otherwise that would

 4   make it difficult for you to be fair to both sides in this

 5   case?

 6              MS. GARIBALDI:  No.

 7              THE COURT:  Thank you.  Ask if there's any

 8   additional questions and/or challenge for cause?  First of

 9   all from the government, Mr. Arkow.

10              MR. ARKOW:  No, Your Honor.

11              THE COURT:  Mr. Schwartz.

12              MR. SCHWARTZ:  Thank you, Your Honor.  Question No.

13   18.

14              THE COURT:  I think we've covered it.

15              Any challenge for cause?

16              MR. SCHWARTZ:  No, Your Honor.  Thank you.

17              THE COURT:  All right.  We're back to the

18   government.

19              MR. ARKOW:  May I have a moment, Your Honor?

20              THE COURT:  You may.

21              MR. ARKOW:  The government would ask the Court to

22   thank and excuse Prospective Juror No. 6.

23              THE CLERK:  Raoul Kugel K-u-g-e-l.

24              THE COURT:  Mr. Kugel, have you been able to follow

25   the questions and answers so far?
```

1           MR. KUGEL:  Yes, sir.

2           THE COURT:  And based on what you have heard, could

3    you be fair to the government as well as to the defendant?

4           MR. KUGEL:  I'm trying to.

5           THE COURT:  And what's the problem?

6           MR. KUGEL:  I personally feel that a few years ago

7    I got wrongfully convicted and accused by the police

8    department and the court.  Therefore, I'm not very much into

9    the police department and the court system.

10          THE COURT:  So if you were charged again, you don't

11   care whether you have a fair jury or not; is that right?

12          MR. KUGEL:  Correct.

13          THE COURT:  All right.  Back upstairs, sir, but

14   you'll stay.  You're not to be excused.

15          THE CLERK:  Alejandro Torres T-o-r-r-e-s.

16          THE COURT:  Mr. Torres, have you been able to

17   follow the questions and answers so far, sir?

18          MR. TORRES:  Yes, I do.

19          THE COURT:  And based on what you have heard, could

20   you be fair to both sides?

21          MR. TORRES:  Yes, I will try my best.

22          THE COURT:  And do you see some problem in being

23   fair to both sides?

24          MR. TORRES:  No.

25          THE COURT:  Have you ever worked in law

1    enforcement?

2              MR. TORRES:  No.

3              THE COURT:  Do you have any relatives or close

4    friends who have?

5              MR. TORRES:  No.

6              THE COURT:  Have you ever had any difficulty with

7    law enforcement?

8              MR. TORRES:  No.

9              THE COURT:  Do you have any opinion about the use

10   of taser guns by law enforcement?

11             MR. TORRES:  No, just the one I see on the TV.

12             THE COURT:  You have seen it used on TV?

13             MR. TORRES:  Yes.

14             THE COURT:  And do you have any feelings one way or

15   the other about the use of it by law enforcement?

16             MR. TORRES:  No, I don't.

17             THE COURT:  What about pepper spray?

18             MR. TORRES:  Just know that it's used in

19   self-defense.

20             THE COURT:  I mean have you seen any stories about

21   law enforcement using pepper spray?

22             MR. TORRES:  Yes, few cases like the one on someone

23   was saying about what is happening in Oakland.

24             THE COURT:  In Oakland?

25             MR. TORRES:  Right.

1          THE COURT:  Have you formed any opinions because of

2     your region or philosophically that would make it difficult

3     for you be to be fair either side here?

4          MR. TORRES:  No.

5          THE COURT:  Have you had prior jury experience?

6          MR. TORRES:  I've never been selected to.

7          THE COURT:  Have you been called for jury service

8     before?

9          MR. TORRES:  Yes.

10          THE COURT:  When most recently?

11          MR. TORRES:  About, almost two years.

12          THE COURT:  Was that state court?

13          MR. TORRES:  I don't remember.

14          THE COURT:  All right.  Where do you live, sir?

15          MR. TORRES:  El Monte.

16          THE COURT:  And how long have you been at your

17     present address?

18          MR. TORRES:   For about 15 years.

19          THE COURT:  What do you do, sir?

20          MR. TORRES:  I work in machine shop.

21          THE COURT:  Are you married?

22          MR. TORRES:  Yes, I do.

23          THE COURT:  What does your wife do?

24          MR. TORRES:  She stays at home.

25          THE COURT:  She takes care of the home?

```
 1              MR. TORRES:  Right, and the kids and the money.

 2              THE COURT:  How many kids?

 3              MR. TORRES:  Two.  One 12 and one 9.

 4              THE COURT:  Boys or girls?

 5              MR. TORRES:  Both boys.

 6              THE COURT:  Anyone else in the home?

 7              MR. TORRES:  No.

 8              THE COURT:  Just the kids and the wife and the

 9   money.

10              MR. TORRES:  Not that much.

11              THE COURT:  Thank you.  Let me ask you if there are

12   any additional questions and/or challenge for cause?

13              MR. ARKOW:  Not from the government.

14              THE COURT:  Mr. Schwartz.

15              MR. SCHWARTZ:  No. 32, Your Honor.

16              THE COURT:  Have you ever been falsely accused of a

17   crime, sir, to your knowledge?

18              MR. TORRES:  No.

19              THE COURT:  Do you have any relatives or close

20   friends that you know that may have been?

21              MR. TORRES:  No.

22              THE COURT:  Thank you.  Any challenge for cause?

23              MR. SCHWARTZ:  No, Your Honor.  Thank you.

24              THE COURT:  All right.  Back to the defense.

25              MR. SCHWARTZ:  Defense would ask the Court to
```

```
 1    please thank and excuse Juror No. 10.

 2            THE COURT:  Thank you very much, sir.  Go back to

 3    the jury assembly room.

 4            THE CLERK:  Kurt William Smythe S-m-y-t-h-e.

 5            THE COURT:  Mr. Smythe, have you had an opportunity

 6    to hear all the questions and answers so far, sir?

 7            MR. SMYTHE:  Yes, I have.

 8            THE COURT:  And based on what you have heard, could

 9    you be fair to both sides?

10            MR. SMYTHE:  I believe so, yes.

11            THE COURT:  Have you worked in law enforcement?

12            MR. SMYTHE:  No.

13            THE COURT:  Do you have any relatives or close

14    friends who have?

15            MR. SMYTHE:  Yes.

16            THE COURT:  Tell us.

17            MR. SMYTHE:  Uh, my uncle's brother is a retired

18    narcotics detective from the city of Santa Barbara.  A

19    neighbor who is a Sheriff Deputy that I grew up with and I

20    have numerous friends that I went to school with who took

21    careers in law enforcement.

22            THE COURT:  Do you think as a result of having all

23    those relationships that it would be very difficult for you

24    not to just accept the law enforcement officer's testimony

25    simply because that person is a law enforcement officer and
```

```
 1    for no other reason?

 2              MR. SMYTHE:  No, I believe I can be fair to both

 3    sides.

 4              THE COURT:  Do you know anything about the Desert

 5    Hot Springs Police Department?

 6              MR. SMYTHE:  No, sir.

 7              THE COURT:  Have you seen any reports about the use

 8    of excessive force by police officers in the news?

 9              MR. SMYTHE:  Nothing I can recall.

10              THE COURT:  Are you familiar with the use of taser

11    guns by law enforcement?

12              MR. SMYTHE:  That is a tool they use, yes.

13              THE COURT:  Do you have any particular view about

14    it pro or con?

15              MR. SMYTHE:  No, I don't think so.

16              THE COURT:  What about the use of pepper spray by

17    law enforcement?

18              MR. SMYTHE:  Same.  It's a tool.

19              THE COURT:  All right.  Have you had prior jury

20    experience, sir?

21              MR. SMYTHE:  I wasn't selected.  Been this far, but

22    I was dismissed.

23              THE COURT:  And where was that?

24              MR. SMYTHE:  In Santa Maria.

25              THE COURT:  What kind of case?
```

```
 1              MR. SMYTHE:  It was civil.

 2              THE COURT:  And you understand if you had been

 3    selected, it wouldn't have required a unanimous verdict in

 4    order to reach a conclusion of that case?

 5              MR. SMYTHE:  Correct.

 6              THE COURT:  Would you hold it against the defense

 7    here if the defendant upon the advice of his attorneys

 8    decided not to take the witness stand which is his

 9    constitutional right?

10              MR. SMYTHE:  I would be all right with it I guess.

11              THE COURT:  You guess?

12              MR. SMYTHE:  Yeah.

13              THE COURT:  You all right with the constitution of

14    the United States?

15              MR. SMYTHE:  Yes.

16              THE COURT:  All right.  Where do you live?

17              MR. SMYTHE:  Santa Maria.

18              THE COURT:  And how long have you been at your

19    present address?

20              MR. SMYTHE:  12 years.

21              THE COURT:  What do you do?

22              MR. SMYTHE:  I'm self-employed.

23              THE COURT:  Doing what?

24              MR. SMYTHE:  My wife and I run a small appliance

25    sales and service business.
```

 1              THE COURT:  I see.  Do you have children?

 2              MR. SMYTHE:  Yes, two daughters.

 3              THE COURT:  And what do they do?

 4              MR. SMYTHE:  My oldest daughter runs the office

 5    with my wife while I'm out in the field and my youngest stays

 6    at home with her son.

 7              THE COURT:  Anyone else in the home?

 8              MR. SMYTHE:  Yes.  My youngest daughter and

 9    three-year-old grandson.

10              THE COURT:  Any additional questions or challenges

11    for cause?

12              MR. ARKOW:  Yes, Your Honor.  Question 22 and

13    Question No. 8.

14              THE COURT:  Do you have any particular views that

15    are based on religion, philosophy or anything that would

16    prevent you from being fair to both sides here?

17              MR. SMYTHE:  No, sir.

18              THE COURT:  What was the other one?

19              MR. ARKOW:  No. 8 on page 4.

20              THE COURT:  Are you familiar with any family

21    members or friends who've had to work with prisoners or

22    arrestees?

23              MR. SMYTHE:  I had a co-worker that was killed at

24    the Lompoc prison as a guard.  He worked with me when we were

25    doing concrete for my father-in-law.  He went on to a career

```
1    in corrections officer and he was killed in prison.
2              THE COURT:  Well, you understand that as tragic
3    that was, it has nothing at all to do with the facts of this
4    case.  Can you put that aside and decide this case fairly for
5    both sides?
6              MR. SMYTHE:  I believe so, yes, sir.
7              THE COURT:  All right.  Any challenge for cause?
8              MR. ARKOW:  No, Your Honor.
9              THE COURT:  Mr. Schwartz.
10             MR. SCHWARTZ:  No additional questions.  No
11   challenge for cause.
12             THE COURT:  Thank you.  We're back to the defense.
13             MR. SCHWARTZ:  Defense would accept, Your Honor.
14             THE COURT:  Thank you.  We're back to the
15   government.
16             MR. ARKOW:  May I have a moment, Your Honor?
17             THE COURT:  You may.
18             MR. ARKOW:  The government would ask the Court to
19   thank and excuse Juror No. 1.
20             THE COURT:  Thank you, sir.  If you would go back
21   upstairs.
22             THE CLERK:  Robert Stirzel S-t-i-r-z-e-l.
23             THE COURT:  Mr. Stirzel, have you been able to
24   follow the questions and answers so far, sir?
25             MR. STIRZEL:  Yes, I have.
```

```
 1              THE COURT:  And based on what you have heard, could
 2    you be fair to both sides?
 3              MR. STIRZEL:  Yes.
 4              THE COURT:  Have you ever worked in law
 5    enforcement?
 6              MR. STIRZEL:  No.
 7              THE COURT:  Have any relatives or close friends who
 8    have?
 9              MR. STIRZEL:  Best friend retired LAPD bomb squad
10    officer.
11              THE COURT:  As a result of having a best friend who
12    is in law enforcement, do you think it would be difficult for
13    you not to accept any other law enforcement officer's
14    testimony simply because that person is law enforcement
15    officer?
16              MR. STIRZEL:  No.
17              THE COURT:  Are you familiar at all with the Desert
18    Hot Springs Police Department?
19              MR. STIRZEL:  I am not.
20              THE COURT:  Are you familiar with the use of taser
21    guns by law enforcement?
22              MR. STIRZEL:  Only what I have seen on TV and news.
23              THE COURT:  And has what you have seen on TV and in
24    the news formed any opinion in your mind one way or the
25    other?
```

1          MR. STIRZEL:  No.

2          THE COURT:  What about the use of pepper spray by

3   law enforcement?

4          MR. STIRZEL:  No.

5          THE COURT:  Have you had prior jury experience?

6          MR. STIRZEL:  I have not.

7          THE COURT:  Do you understand that in a criminal

8   case whether it be state court or federal court, the

9   prosecution alone bears the burden of proof?

10         MR. STIRZEL:  I do.

11         THE COURT:  You accept that?

12         MR. STIRZEL:  Yes.

13         THE COURT:  You understand the standard of proof is

14   the highest we have in the law, it's beyond a reasonable

15   doubt?

16         MR. STIRZEL:  Yes.

17         THE COURT:  Where do you live?

18         MR. STIRZEL:  I live in Palmdale.

19         THE COURT:  How long have you been at your present

20   address?

21         MR. STIRZEL:  About 22 years.

22         THE COURT:  What do you do, sir?

23         MR. STIRZEL:  I am in retail, store manager.

24         THE COURT:  And are you married?

25         MR. STIRZEL:  Yes.

```
 1              THE COURT:  What does your wife do?
 2              MR. STIRZEL:  She's a homemaker.
 3              THE COURT:  Do you have children?
 4              MR. STIRZEL:  I have four boys.
 5              THE COURT:  Tell us their ages.
 6              MR. STIRZEL:  24, 22, 20.
 7              THE COURT:  I shouldn't have asked.  I didn't think
 8    they're that old.
 9              MR. STIRZEL:  11.
10              THE COURT:  Pause and tell us what the older ones
11    do.
12              MR. STIRZEL:  My oldest works for a hospital in
13    security and my 22 year old works as a cook also in a
14    hospital, different hospital.  My 20 year old is a student at
15    College of the Canyons and my 11 year old is in school.
16              THE COURT:  Either of the older boys 22 and 24,
17    either of them married?
18              MR. STIRZEL:  No.
19              THE COURT:  Do they all reside at home with you and
20    your wife?
21              MR. STIRZEL:  Just my 11 year old.
22              THE COURT:  Do know if the others reside with
23    anyone?
24              MR. STIRZEL:  They do not.  My two oldest live
25    together.
```

```
 1              THE COURT:  I see.  Do you have any kind of view
 2   point that is based on religious belief or philosphy or
 3   political leanings that would make it difficult for you to be
 4   fair to both sides in this case?
 5              MR. STIRZEL:  I do not.
 6              THE COURT:  Thank you.  Any additional questions
 7   and/or challenge for cause, Mr. Arkow?
 8              MR. ARKOW:  No further questions and no challenge
 9   for cause.
10              THE COURT:  Mr. Schwartz.
11              MR. SCHWARTZ:  No questions, no challenge,
12   Your Honor.
13              THE COURT:  Thank you.  Back to the government.  As
14   I recall, you accepted.  Now we're back to the government.
15              MR. ARKOW:  I believe after the defense passed, the
16   government exercised a challenge for Prospective Juror No. 1
17   Mr. Kim.  That was the last peremptory.
18              MR. SCHWARTZ:  Ours would so indicate as well,
19   Your Honor.
20              THE COURT:  All right.  So we're back to the
21   defense then.
22              MR. SCHWARTZ:  Thank you.  Defense would accept.
23              THE COURT:  Thank you.  We're back to the
24   government.
25              MR. ARKOW:  Could I have a moment, Your Honor?
```

```
 1              THE COURT:  Yeah.

 2              MR. ARKOW:  The government accepts the jury as

 3   presently constituted.

 4              THE COURT:  Ladies and gentlemen would you please

 5   rise to be sworn.

 6                        (Jury sworn.)

 7              THE COURT:  Thank you.  Please be seated.

 8         Now, we're going to call two individuals who will

 9   be alternate jurors.  And ladies and gentlemen, it's very

10   important that whoever serves in these positions understand

11   that there is only one 14-person jury until the time of

12   deliberations.  If one of the first 12 has to be excused,

13   then the first alternate called will go in and then they'll

14   start the deliberations from the very top.  And  the  same

15   thing would be true if the second alternate had to be used.

16   So we'll call two names at this time.  The first person will

17   sit in the empty seat in the second row.

18              THE CLERK:  Mustafa Alloush A-l-l-o-u-s-h, Anthony

19   Szeto S-z-e-t-o.

20              THE COURT:  Mr. Alloush, have you been able to

21   follow the questions and answers so far, sir?

22              MR. ALLOUSH:  Yes.

23              THE COURT:  And based on what you have heard, could

24   you be fair to both sides?

25              MR. ALLOUSH:  Yes.
```

1          THE COURT:  And Ms. Szeto, have you been able to

2     follow the questions and answers so far, ma'am?

3          MR. SZETO:  Yes, sir.

4          THE COURT:  Based on what you have heard, could you

5     be fair to the government as well as to the defendant?

6          MR. SZETO:  Yes.

7          THE COURT:  Mr. Alloush,, have you ever worked in

8     law enforcement?

9          MR. ALLOUSH:  No, sir.

10          THE COURT:  Have you ever had any problems with law

11     enforcement?

12          MR. ALLOUSH:  No, sir.

13          THE COURT:  Do you have any relatives or close

14     friends who have been in law enforcement?

15          MR. ALLOUSH:  Currently, I have a friend in the

16     Hawthorne Police Department and one potential Sheriff

17     Department.  He's trying to apply there.

18          THE COURT:  Are these close friends?

19          MR. ALLOUSH:  Yes.

20          THE COURT:  And do you think having these close

21     friends, one in law enforcement and one attempting to become

22     a law enforcement officer that it would be rather difficult

23     for you not to accept the law enforcement officer's testimony

24     simply because that person is a law enforcement officer?

25          MR. ALLOUSH:  No, sir.

1          THE COURT:  Do you anything at all about the Desert

2    Hot Springs Police Department?

3          MR. ALLOUSH:  No, sir.

4          THE COURT:  Have you read any reports about

5    officers using tasers to subdue suspects or arrestees?

6          MR. ALLOUSH:  No, sir.

7          THE COURT:  Are you familiar at all with the use of

8    taser guns?

9          MR. ALLOUSH:  I've held one, but I never shot it

10   and.

11         THE COURT:  How did you come to hold one?

12         MR. ALLOUSH:  In the hotel room where my I was on

13   vacation with my buddy, he had his weapons with him.

14         THE COURT:  Is this one who is already with the

15   Hawthorne Police Department?

16         MR. ALLOUSH:  Yes.

17         THE COURT:  And you held it but. . .

18         MR. ALLOUSH:  I didn't shoot it.

19         THE COURT:   Did your buddy shoot it?

20         MR. ALLOUSH:  No.

21         THE COURT:  Are you familiar at all with the use of

22   pepper spray?

23         MR. ALLOUSH:  Same concept.  It's all defense

24   mechanisms, but I've never shot it or any of that.

25         THE COURT:  Have you ever seen on television or

1   anywhere else the use of pepper spray by law enforcement?

2   Have you ever seen that in the news or television anywhere?

3            MR. ALLOUSH:  Yeah, but I don't really -- it

4   doesn't really affect me or anything.

5            THE COURT:  I see.  Have you had prior jury

6   experience?

7            MR. ALLOUSH:  No, sir.

8            THE COURT:  Well, you understand that in a criminal

9   case, whether it be state court or federdal court as here, a

10  defendant doesn't have to do anything other than show up in

11  the court?

12           MR. ALLOUSH:  Yes.

13           THE COURT:  And the defendant in this case has done

14  that.  He has no other obligations.  Now, the government

15  alone bears the burden of proof.  Do you accept that?

16           MR. ALLOUSH:  Yes, sir.

17           THE COURT:  Where do you live?

18           MR. ALLOUSH:  Redondo Beach.

19           THE COURT:  How long have you been at your present

20  address?

21           MR. ALLOUSH:  Uh, three years.

22           THE COURT:  And where were you before?

23           MR. ALLOUSH:  Torrance.

24           THE COURT:  For how long?

25           MR. ALLOUSH:  Pretty much all my life.

```
 1              THE COURT:  What do you do, sir?
 2              MR. ALLOUSH:  Independent logistics contractor.
 3              THE COURT:  What does that mean?
 4              MR. ALLOUSH:  Uh, pretty much like, uh, run a
 5   trucking business.
 6              THE COURT:  And are you married, sir?
 7              MR. ALLOUSH:  Yes, sir.
 8              THE COURT:  What does your wife do?
 9              MR. ALLOUSH:  Works in retail.
10              THE COURT:  And do you have children?
11              MR. ALLOUSH:  No, sir.
12              THE COURT:  Anyone else in the home?
13              MR. ALLOUSH:  Uh, mother-in-law.  She has her own
14   clothing business.
15              THE COURT:  All right.  If you'll pass that over to
16   Ms. Szeto.
17              Have you ever worked in law enforcement?
18              MS. SZETO:  No.
19              THE COURT:  Do you have any relatives or close
20   friends who have?
21              MS. SZETO:  No.
22              THE COURT:  Ever had a problem with law
23   enforcement?
24              MS. SZETO:  Not yet.
25              THE COURT:  Do you have any strong views about the
```

```
 1    use of taser weapons by law enforcement?
 2              MS. SZETO:  No.
 3              THE COURT:  What about pepper spray?
 4              MS. SZETO:  No.
 5              THE COURT:  Do you know anything at all about the
 6    Desert Hot Springs Police Department?
 7              MS. SZETO:  No.
 8              THE COURT:  Have you had prior jury experience?
 9              MS. SZETO:  I was selected maybe four years ago,
10    but the case was dismissed on the first day of the trial.
11              THE COURT:  And was that state or federal court?
12              MS. SZETO:  It was a state court.
13              THE COURT:  Do you know whether it was a civil case
14    or a criminal case?
15              MS. SZETO:  I don't remember, but I think the lady
16    was selling counterfeited product.
17              THE COURT:  Yes, it was probably a criminal case?
18              MS. SZETO:  Yes.
19              THE COURT:  So if you had served on that case, you
20    would have had to reach a unanimous verdict in the same way
21    as you would here.  You understand that?
22              MS. SZETO:  Yes, I do.
23              THE COURT:  Where do you live?
24              MS. SZETO:  Rosemead.
25              THE COURT:  How long have you been at your present
```

1  address?

2          MS. SZETO:  15 years.

3          THE COURT:  What do you do?

4          MS. SZETO:  Accountant.

5          THE COURT:  And are you married?

6          MS. SZETO:  I guess I'm still legally married.  I

7  filed divorced five years ago, but I'm still waiting for the

8  final judgment.

9          THE COURT:  You know, I have a son in that

10 situation, too.  He is waiting.

11         Well, do you have children?

12         MS. SZETO:  I have two girls, five and seven.

13         THE COURT:  And do you know what your ex-husband

14 does?

15         MS. SZETO:  Not really.

16         THE COURT:  That's probably why he's your

17 ex-husband or soon to be or one day will be.

18         MS. SZETO:  Waiting for that.

19         THE COURT:  Anyone in the home with you and your

20 daughters at this time?

21         MS. SZETO:  I live with my parents and my brother.

22         THE COURT:  What does your brother do?

23         MS. SZETO:  I think he's a sale manager, I guess.

24         THE COURT:  Do you know what your parents do?

25         MS. SZETO:  My mom stays home and takes care of the

```
 1    kids for me and my dad is a cook.
 2              THE COURT:  All right.  Thank you.
 3              Let me ask if there are any additional questions of
 4    either of these prospective jurors or challenge for cause.
 5    First of all, the government.
 6              MR. ARKOW:  Yes, Your Honor.  Questions 8 and 22.
 7              THE COURT:  We'll dispense with 22.
 8              Mr. Alloush, Ms. Szeto, have either of you have any
 9    relatives or friends who ever had to deal with arrestees or
10    prisoners to your knowledge?  Mr. Alloush?
11              MR. ALLOUSH:  No, sir.
12              THE COURT:  Ms. Szeto?
13              MS. SZETO:  No.
14              THE COURT:  Thank you.  Any challenge for cause?
15              MR. ARKOW:  No, Your Honor.
16              THE COURT:  All right.  Mr. Schwartz.
17              MR. SCHWARTZ:  Yes, Your Honor.  Thank you.
18    Question No. 32.
19              THE COURT:  Ms. Szeto, have you or any family
20    member or close friend ever been falsely accused of
21    committing a crime?
22              MS. SZETO:  No.
23              THE COURT:  And what about you, Mr. Alloush?
24              MR. ALLOUSH:  No, sir.
25              THE COURT:  Thank you.  Any challenge for cause?
```

1          MR. SCHWARTZ:  No, Your Honor.

2          THE COURT:  All right.  The government may exercise

3   its one peremptory challenge.

4          MR. ARKOW:  The government would ask the Court to

5   thank and excuse Prospective Alternate Juror No. 1,

6   Mr. Alloush.

7          THE COURT:  Thank you, Mr. Alloush.  If you would

8   go back upstairs to the jury assembly room, sir.

9          And Ms. Szeto, would you move to that second seat,

10  please.

11         THE CLERK:  Laurie Schmidt S-c-h-m-i-d-t.

12         THE COURT:  Ms. Schmidt, you probably thought you'd

13  never win the lottery.

14         Have you been able to follow the questions and

15  answers so far, ma'am?

16         MS. SCHMIDT:  Yes.

17         THE COURT:  And based on what you have heard, could

18  you be fair to both sides?

19         MS. SCHMIDT:  Yes.

20         THE COURT:  Have you ever worked in law

21  enforcement?

22         MS. SCHMIDT:  No.

23         THE COURT:  Any relatives or close friends who

24  have?

25         MS. SCHMIDT:  No.

1          THE COURT:  Ever had any problems with law
2     enforcement?
3          MS. SCHMIDT:  No.
4          THE COURT:  Have any familiarity at all with the
5     Desert Hot Springs Police Department?
6          MS. SCHMIDT:  Do not.
7          THE COURT:  Have you seen any news reports about
8     law enforcement use of taser equipment?
9          MS. SCHMIDT:  Certainly have seen reports on TV
10    news, but really don't have an opinion based on that.
11         THE COURT:  What about -- same question with regard
12    to pepper spray?
13         MS. SCHMIDT:  Same response.  No opinion.
14         THE COURT:  All right.  Have you any particular
15    view point that's been shaped by religion or philosophy,
16    politics, whatever that would make it difficult for you to be
17    fair to both sides in this case?
18         MS. SCHMIDT:  None.
19         THE COURT:  Have you had prior jury experience?
20         MS. SCHMIDT:  Yes.
21         THE COURT:  Tell us.
22         MS. SCHMIDT:  In 2007 I was on a jury.  We came to
23    a guilty verdict for a murder trial and that was held in the
24    Los Angeles court system.  It was the courthouse right near
25    LAX so I assume that was federal.

```
 1            THE COURT:  No, it was state.

 2            MS. SCHMIDT:  Oh, it was.  Okay.  Thank you.

 3            THE COURT:  Was there anything at all about that

 4  case, though, that would make it difficult for you to be a

 5  fair juror in this case?

 6            MS. SCHMIDT:  No.

 7            THE COURT:  And you put it aside and decide this

 8  case on its own facts?

 9            MS. SCHMIDT:  Yes.

10            THE COURT:  And the law that I give to you to apply

11  to that those facts?

12            MS. SCHMIDT:  Yes.

13            THE COURT:  Where do you live?

14            MS. SCHMIDT:  Long Beach.

15            THE COURT:  And how long have you been at your

16  present address?

17            MS. SCHMIDT:  Almost four years.

18            THE COURT:  Where were you before?

19            MS. SCHMIDT:  Playa Del Rey.

20            THE COURT:  For how long?

21            MS. SCHMIDT:  About three years.

22            THE COURT:  How long have you been in Southern

23  California?

24            MS. SCHMIDT:  I moved here in January of 2005.

25            THE COURT:  From where?
```

```
 1              MS. SCHMIDT:  Wisconsin.

 2              THE COURT:  It is warmer than Wisconsin.

 3              What do you do?

 4              MS. SCHMIDT:  I own my business and I do furniture,

 5    custom furniture and sustainable furniture for commercial.

 6              THE COURT:  And your business deals with furniture?

 7              MS. SCHMIDT:  Correct.

 8              THE COURT:  Are you married?

 9              MS. SCHMIDT:  No, I'm not.

10              THE COURT:  Do you reside with anyone?

11              MS. SCHMIDT:  I do.  Boyfriend, I suppose.

12              THE COURT:  You suppose?

13              MS. SCHMIDT:  However you say a partner or

14    whatever.

15              THE COURT:  After I certain age --

16              MS. SCHMIDT:  Yeah, it doesn't really matter.

17              THE COURT:  What does he do?

18              MS. SCHMIDT:  He is my business partner.

19              THE COURT:  Okay.  Good.  Anyone else in the home?

20              MS. SCHMIDT:  No, sir.

21              THE COURT:  Let me ask any additional questions

22    and/or challenge for cause.  First of all, the government?

23              MR. ARKOW:  No, Your Honor.

24              THE COURT:  And any challenge for cause?

25              MR. ARKOW:  No, Your Honor.
```

1          THE COURT:  Mr. Schwartz?

2          MR. SCHWARTZ:  No, Your Honor.  Both counts.

3          THE COURT:  All right.  You may exercise your one

4     peremptory challenge.

5          MR. SCHWARTZ:  We would accept, Your Honor.

6          THE COURT:  Would you both rise to be sworn.

7                    (Alternate jurors sworn.)

8          THE COURT:  We have a few people left and I tell

9     you if I were you, I would never play the lottery.  If you

10    couldn't get your names called from this small group, just

11    think about your chances there.  No, but, very seriously I

12    want to thank you on behalf of the parties and on my own

13    behalf because it is citizens such as you who give us the

14    finest jury system in the world at the federal level and we

15    really appreciate it.  If you would go back to the jury

16    assembly room now.  Thank you very much.

17          Well, ladies and gentlemen of the jury, I'm not

18    going to take too much more of your time, but I do want to go

19    over a few things with you.  First of all, you have to

20    understand that nothing by way of this voir dire, the jury

21    selection process, has anything at all to do with evidence.

22    We haven't reached that point yet.

23          I should also tell you that since you are jurors in

24    this case, it's very important that you not talk about it

25    among yourselves or with anyone.  The very first time you

should talk about this case is during deliberations.  Most of you reside with someone so when you go home, you're gonna be asked if you are on a jury.  Simple answer is yes.  You're not even free to talk about whether it's a civil case or a criminal case.

Make sure you wear your juror badges in very prominent places so it will make it easier for you to get in and out of the courthouse.  There's a lot more attention to security these days than there used to be and it will help you in that regard.  Also to let others know you are a juror and they should not be talking to you.  It's all right if someone even among the parties says hello, good morning, good afternoon as the occasion may call for, but no idle talk with the parties or with anyone else.

If you want to talk about how sad the Lakers are this year and how strangely good the Clippers are this year or if you want to talk about the Dodgers and whether we're gonna get a real owner or a parking lot guy as that columnist writes about him or if the Kings or the Ducks are ever gonna get it together or USC and UCLA, I have opinions on all of those things.  If you want to talk to me, that's fine, but no idle talk with anyone at all because someone might see you talking innocently about something and think you are talking about the case.

And not only must you be fair to both sides as you

1    taken an oath to do, but there must be the appearance of that

2    as well.  Make sure when you come back into the jury room, I

3    mean from the jury room, and you'll be shown that in just a

4    minute, that you take the very same seats you're in each time

5    because you're a juror by number on the record and we have to

6    keep the record straight.

7            Now, the first time, probably the first couple

8    times you come in, you'll be like little second and third

9    graders coming back from recess, you may be stumbling over

10   each other, but you can practice in there and you can get it

11   right by the third time.  I think the record is the second

12   time by some jury over 33 years somebody did it.

13           But make sure, too, when you come into the jury box

14   that you don't bring something that you don't need such as a

15   book or magazine or something of that nature.  If you have

16   something of value, don't leave it in the jury room and

17   that's simply because we just can't attest to the veracity of

18   all the contractors and others who come through the building.

19   So if it's something of importance, bring it in and put it

20   under your seats.

21           Also, if you wish to take notes, you may do so.

22   Just have to let our clerk know and she'll provide you with a

23   note pad and pen or pencil, but I alert you to one thing

24   that's so important.  You know you're the judges of the

25   facts.  We're gonna work together here.  I'm the judge of the

1     law.  You're the judges of the facts.  We'll get this fairly

2     done for both sides.

3           But if you're taking notes, too often the notetaker

4     is looking down at what he or she is taking rather than

5     looking at the witness.  And since you are the judges of

6     facts, you may have missed a simple nuance, raising of an

7     eyebrow, whatever facial expression that might lead you to

8     believe or not believe a particular witness and you would

9     have missed it.  So make sure if you are gonna take notes,

10    you pay as good attention as you can possibly can as to the

11    witnesses as they testify because that's where the evidence

12    comes from.

13          And one further thing with regard to note taking,

14    those notes stay here.  They belong to the court not to the

15    note takers.  They won't be looked at.  If you take notes,

16    you can have a pad, just turn it over and leave it on your

17    seat each other.  You can use it, however, during

18    deliberations to help you with your memory recall, help your

19    fellow jurors, that sort of thing, but once you leave here,

20    the notes stay and then you'll have to, if you intend to use

21    those notes to write your first screenplay that's gonna sell

22    and become a millionaire that way, you're gonna have to

23    memorize pretty much what you put down because those notes do

24    belong to the court.

25          Also, make sure that you don't bring any gum or

1    anything of that nature into the courtroom.  We don't allow

2    it because too often it ends up under the seats, sometimes

3    even backs of seats, on seats and can be rather disconcerting

4    to the fellow jurors and to the Court.  But if you have a

5    throat lozenge or something like that, of course, you may use

6    it just as I need one now.

7            But also in the jury room, you'll find that there

8    is a refrigerator, coffee maker, other kinds of things.  If

9    you need anything at all, just let one of our staff know.  We

10   want to try to make your stay here as comfortable as possible

11   because we do appreciate the work you're doing on behalf of

12   the justice system.  There's soft drinks in the refrigerator.

13   If you like a different brand, you may bring your own.  Just

14   make sure it's soft, and then it will be all right.

15           Also, make sure that any cell phones that you have

16   are turned off when you're here in the courtroom.  In the

17   jury room you may use them.  Of course as I pointed out to

18   you earlier on, you can't use them to try to find out

19   anything about the case because everything that you need to

20   fairly decide this case for both sides is gonna be presented

21   to you right here in this courtroom.

22           We're going to take about 40 minutes to give you

23   time to grab something because I imagine you probably have

24   rush peristolsis or reverse peristolsis, stomach rumblings in

25   other words, going on by this time and I see several people

1    nodding their heads in agreement.  There is a little

2    cafeteria upstairs on the fourth floor might be eastiest for

3    you.  There is a little coffee stand or something down on the

4    first floor.  Make use of those things.

5         During the ordinary day, we'll be taking about an

6    hour-and-a-half for lunch and I know many times our jurors

7    have never really spend any time in downtown Los Angeles and

8    you've probably heard rumors about it and this and that and

9    the other.  Except at night, and that's true of any big city,

10   I'm from Chicago and lived in New York and other places, any

11   big city you have to be careful at night.  That's true here,

12   too, but you won't be here at night.

13        In the daytime it's quite safe and there's much

14   that you can see during that period of time.  The new

15   cathedral that looks like it ought to be in New Mexico, but

16   it's here and it's beautiful inside and you can even eat in

17   the courtyard there.  The new Disney music hall.  There's

18   several museums downtown.  The Contemporary Art Museum,

19   Japanese Asian American National Museum, Little Tokyo

20   Chinatown, Olvera Street where the City began all this within

21   walking distance and you ought to avail yourselves of those

22   opportunities.

23        Go next door to city hall one of the prettiest city

24   halls that you'll find.  The politicians are pretty much the

25   same, but I say that having worked over there many years ago,

but they don't seem to change much.  But the hearing rooms,

other things are beautiful.  If you can get upstairs to the

Bradley Room on the top floor on a clear day, you can see out

to Avalon, you know, in Catalina so it's worthwhile doing.

When you come back from this refreshment period,

you're still not going to have evidence.  Our first order of

business is gonna be opening statements.  And in opening

statements which I often liken to somebody with a map trying

to tell you where he or she is going, during the opening

statements the lawyers are going to tell you where they think

the evidence is gonna take you.  And remember at all times

you're the judges of the facts.  You'll make the final

decisions on that.  And the opening statements are not to be

argument either.  Arguments come at the end of the case.

The government when we do commence evidence, will

call its first witness and when that witness answers a

question, that is the first evidence.  Not the question

itself and indeed nothing that the lawyers say from their

mouths is evidence with one exception and that's when there

has been a stipulation, and a stipulation is simply an

agreement between the two sides.

And when I indicate to you that the Court has

accepted that agreement or stipulation, then you as the

judges of the facts are free to accept it or not accept it as

you would any other evidence presented to you.  But other

1    than that, too many times the lawyers pose their questions as

2    though they're almost answers so don't pay any attention to

3    that, but pay attention to the answers that you get from the

4    witnesses who are under oath.

5         After the government has rested, the defense as I

6    have told you has no obligation to put on a defense case at

7    all, but it has a right to do so and it very well may do so.

8    After the defense puts on the case, as I expect, then they

9    rest, then the government has a right, but not an obligation

10   to put on what's called a rebuttal case.

11        After both sides have completely rested, then we'll

12   have the arguments.  And unlike the opening statements where

13   the lawyers are gonna tell you where they think the evidence

14   is going to take you, during the arguments, they'll argue to

15   you where they think the evidence has taken, but again, only

16   you will decide that.

17        After we finish that, then I'll give you the final

18   instructions of the Court, which you've all taken an oath to

19   accept whether you agree with it or not and you apply those

20   laws to the evidence which only you will have found and that

21   should be the very first time you will have discussed this

22   case when you go back to the jury room to deliberate.

23        Are there any of you who would have a problem

24   staying as long as 5:30 today because of any transportation

25   problems or anything of that nature, if so raise a hand?

1        All right.  We'll try to go until about 5:30.

2        Are there any of you having a problem coming by

3    9:00 tomorrow morning?  Again, I see no hands having been

4    raised.  9:00 tomorrow.  We'll take a recess in the morning,

5    another recess in the afternoon and take approximately an

6    hour-and-a-half for lunch and that's not because we need that

7    much time, but I have other matters that I need to deal with

8    as well.

9        On Thursday we'll only be going a half day because

10   there are court meetings unfortunately so we'll be going from

11   9:00 until 12:00 and the same thing is true on Friday because

12   there is a religious holiday on Friday.  I don't know if you

13   know about that or not.  On Monday is what we call a law and

14   motion day so you won't be here, but I'll be here listening

15   to other matters, and then on Tuesday at 9:00 and we'll

16   certainly finish this matter by next week.

17       Yes, I see a couple of hands now.  Let's see in the

18   back.  Juror No. 3 first.

19       JUROR NO. 3:  Are we allowed to communicate the

20   fact that your expectation is to complete this next week?

21   Are we allowed to communicate that to our employers?

22       THE COURT:  Oh, yes.  I expect it to be over by the

23   end of next week.

24       JUROR NO. 4:  You said no court on Mondays.  Are we

25   supposed to report to work?

1          THE COURT:  Oh, work, sure.  That's up to you

2    depending on how do you want to handle that.

3          Alternate No. 2.

4          ALTERNATE NO. 2:  Do we attend all these things

5    which you're talking about?

6          THE COURT:  Yes, everything.  And if one of your

7    fellows in the first 12 has to be excused, and you're moved

8    up and go in there and do that, but it's one 14-person jury,

9    that's right.  You're all treated the same.

10                    (Jury excused.)

11          THE COURT:  Please be seated.  We're outside the

12    presence of the jury.  We're gonna ask the jury to come back,

13    I guess, it would be 3:35.  How much time is the government

14    asking for its opening statement, Ms. Carter?

15          MS. CARTER:  I believe it will be about 20 to

16    25 minutes, Your Honor.

17          THE COURT:  Well, let's not make it any more than

18    25 minutes.  Defense may have up to that amount of time.

19          MR. SCHWARTZ:  Thank you, Your Honor.

20          THE COURT:  All right.  3:35 then.  Thank you.

21                    (Recess taken.)

22          THE COURT:  We're again outside the presence of the

23    jury.  We finally have all 14 of the members back.

24          Anything that any counsel wishes to raise before we

25    start?  Ms. Carter, you have something?

```
 1            MS. CARTER:  Yes, Your Honor.  Just one small
 2   matter.  We had talked to Your Honor about our possible
 3   rebuttal expert sitting in during the course of the trial,
 4   but I forgot to specifically ask Your Honor whether he could
 5   take notes during the trial.
 6            THE COURT:  If he is an expert, he can, yes.
 7            MS. CARTER:  Thank you.  That's all.
 8            THE COURT:  All right.  Let's bring the members of
 9   the jury in.
10                     (Jury Present.)
11            THE COURT:  Please be seated, ladies and gentlemen.
12   I'm sorry to understand the five star cafeteria upstairs that
13   was closed at 2:00.  It was a problem.  If you get a chance,
14   you can go there tomorrow.
15            And remember no gum chewing allowed.
16            All right.  We're ready to start the opening
17   statements and we'll hear from the government first.
18   Ms. Carter.
19            MS. CARTER:  Yes, Your Honor.
20            Police have great powers.  They have the power to
21   stop you.  The power to search you.  The power to arrest you.
22   They even have the power to use physical force under certain
23   circumstances, but police are not allowed to abuse their
24   power.
25            THE COURT:  Ms. Carter, remember it's not argument.
```

1    It's opening statement.

2          MS. CARTER:  Yes, Your Honor.

3          In February 2005 on two separate occasions, the

4    defendant Anthony Sclafani abused his power as a sergeant

5    with the Desert Hot Springs Police Department.  He abused his

6    power when he willfully pepper sprayed and repeatedly shocked

7    with a taser gun without any justification two police in

8    police custody.

9          First on February 24th, 2005, the defendant pepper

10   sprayed and tasered Jamal White while Mr. White was

11   handcuffed.  The defendant acted out of anger because

12   Mr. White had refused to clean up vomit from the defendant's

13   patrol car and because Mr. White was mouthing off to

14   defendant, calling defendant fat and other insults.

15         The very next day on February 25th, 2005, the

16   defendant pepper sprayed, kicked and tasered Angelica Vargas.

17   Again, the defendant acted out of anger because Ms. Vargas

18   was drunk and because she was banging on the jail door asking

19   to make a phone call.  Defendant also acted to amuse himself

20   at Ms. Vargas's expense.  After defendant had pepper sprayed

21   Ms. Vargas and Ms. Vargas was crying for fresh air, defendant

22   joked about tasing her and laughed at her while he tased her.

23         Neither Mr. White nor Ms. Vargas resisted arrest,

24   attacked the defendant or did anything to justify defendant's

25   use of force.  Neither of them kicked, spit at or ran from

1   the defendant.  Because of the defendant, Mr. White and

2   Ms. Vargas each suffered great pain from the pepper spray and

3   the shocks with the taser.  Based on these two incidents in

4   February 2005, defendant is charged with two counts of

5   deprivation of rights under color.

6           Ladies and gentlemen, you will learn that the issue

7   in this case which you will decide is whether defendant's use

8   of force was reasonable and whether defendant acted

9   willfully, that is with the intent to use excessive force.

10  The evidence you will see shows that defendant's use of force

11  on Mr. White and Ms. Vargas was unreasonable and excessive

12  and that defendant willfully deprived Mr. White and

13  Ms. Vargas of their constitutional rights to be free from

14  unreasonable search and seizure.

15          During this trial, ladies and gentlemen, you will

16  learn what a taser gun is and how it works.  Greg Meyer, a

17  former L.A. Police Department officer who is an expert on

18  taser guns will explain a taser shoots probes at

19  approximately 180 feet per second.  Probes like this, ladies

20  and gentlemen, with barbs on them like that.  When the probe

21  strike, they pulse electricity into the victim causing the

22  spasms and convulsions.  The electricity from the probes

23  completely incapacitates the victim.

24          You will also learn, ladies and gentlemen, that

25  without a taser cartridge like the one in this photograph, a

1    taser can also be used in what's called a dry stun mode where

2    it shoots off a current of electricity that can also be used

3    in direct contact with a person to shock them and I'm gonna

4    to show it for you now so you can hear what it sounds like.

5          Now, you can see I took my hand away from the taser

6    as it continued to shock and you'll learn during the course

7    of the trial, ladies and gentlemen, that if no one

8    deactivates the shock, it runs for a full five-second cycle

9    of electricity.  You will also learn and Mr. Meyer will also

10   explain that a taser gun has a memory chip that can record

11   every time a taser gun is fired and for how long, the full

12   five-second cycle or something less than that.  This

13   information can then be downloaded and printed out.  You will

14   see taser downloads in this case that are related to the

15   defendant's use of excessive force against Mr. White and

16   Ms. Vargas.

17         Ladies and gentlemen, the indictment in this case

18   is in two counts.  One for Mr. White and one for Mrs. Vargas.

19   The first count is based on Mr. Jamal White.  The evidence

20   will show, ladies and gentlemen, that defendant and another

21   police officer came to Mr. White's door on February 24, 2005

22   in response to a report of domestic disturbance or domestic

23   violence.  Mr. White will tell you that there was no

24   disturbance and no domestic violence at his apartment and

25   that he was annoyed that the police were bothering him.

1   Mr. White was also annoyed that one of the officers stuck his

2   head into the apartment where his girlfriend Karen Harper was

3   only wearing a robe.

4          You will also hear that Mr. White was on parole at

5   the time and had failed to report to his parole officer so

6   there was a warrant out for his arrest.  The officers

7   discovered the warrant and placed Mr. White under arrest.

8   Mr. White and Ms. Karen Harper will tell you that Mr. White

9   did not arrest in any way.  Defendant put Mr. White in his

10  patrol car and drove to the Desert Hot Springs Police

11  Department jail.  Mr. White was handcuffed with his hands

12  behind his back in the car.

13         During the drive, Mr. White was mouthing off to

14  defendant complaining about the arrest and how he shouldn't

15  have been arrested.  Mr. White will tell you and the evidence

16  will show you, ladies and gentlemen, that all Mr. White was

17  doing was mouthing off.  You'll learn, ladies and gentlemen,

18  what the defendant did when Mr. White started mouthing off.

19  Defendant didn't call for backup.  He didn't just ignore

20  Mr. White and keep driving the very short drive to the

21  station.  Instead defendant pulled the patrol car over, got

22  out, opened the door to the back seat area where Mr. White

23  was and pepper sprayed Mr. White.

24         Mr. White will testify that the pepper spray made

25  him gag, burned his eyes and because of the pepper spray, he

1    threw up a little bit on the back seat of the patrol car.

2    Mr. White will also testify that when he arrived at the jail,

3    the defendant ordered him to clean up the throw up on back

4    seat.  But Mr. White could not comply because he was still

5    handcuffed and he argued with the defendant that there was no

6    way he could clean it up and that he didn't have anything to

7    clean it up with.  And he argued defendant shouldn't have

8    pepper sprayed him in the first place because that's what

9    made him throw up.

10          You'll hear, ladies and gentlemen, what happened

11    next inside the station.  You'll hear that defendant again he

12    used excessive force on Mr. White in the jail area during the

13    booking process.  Mr. White and Dennis Decker, who was a

14    Desert Hot Springs police officer at the time will both tell

15    you what happened next.  They'll testify that Mr. White was

16    sitting on the bench in the jail area again handcuffed in

17    this area of a small booking area of the jail.

18          While Mr. White was sitting there handcuffed, he

19    was again mouthing off at the defendant.  Mr. White cursed

20    and yelled and called the defendant a fat Italian and other

21    insults.  The witnesses will tell you the defendant was

22    yelling back at Mr. White, telling him to shut up and that

23    defendant was becoming increasingly and increasingly angry.

24    Then, although Mr. White was handcuffed and was not doing

25    anything other than mouthing off at the defendant, defendant

shocked Mr. White twice with his taser gun out of anger and
for no lawful purpose.

The download for defendant's taser gun on
February 24th, 2005 confirms that the defendant fired the
taser twice.  Once for three seconds and once for the full
five-second cycle.  You will learn that when defendant
shocked Mr. White with the taser, he caused bodily injury to
Mr. White.  He caused the taser darts to enter Mr. White's
skin.  He caused Mr. White the pain that comes from 19 pulses
per second of electricity coursing through his body
convulsing on the ground rolling and moaning in pain.

Count two, ladies and gentlemen, is based on what
defendant did to Ms. Vargas the very next day.  You will
learn that on the very next day, February 25th, 2005,
Ms. Vargas was driving through Desert Hot Springs on her way
to Arizona to Los Angeles.  Ms. Vargas had been drinking that
day and she was too drunk to drive.  She pulled off the
freeway in Desert Hot Springs to look for a place to sleep.
As she was driving though Desert Hot Springs she rear ended
empty school bus fortunately no children on the bus and no
one was injured.  Desert Hot Springs Police Department
Matthew Gutting arrived at the scene and arrested Ms. Vargas.
Ms. Vargas was very sorry to have hit the school bus and said
I'm sorry to Officer Gutting.  When Officer Gutting arrested
her, Ms. Vargas did not resist in any way.  Officer Gutting

1    drove Ms. Vargas back to the Desert Hot Springs jail.  During

2    the drive Ms. Varga got sick and threw up in Officer

3    Gutting's patrol car.

4         Ms. Vargas will testify that she passed out and at

5    some point she woke up in the jail cell.  She realized where

6    she was, that her grandmother who she was driving to see was

7    going to be worried because she never made it to Los Angeles.

8    Ms. Vargas some officers outside of her jail cell door and

9    began knocking on the cell door asking to use the telephone.

10   She had to knock several times to get anyone's attention.

11   Finally, a police officer opened the door and Ms. Vargas

12   believing that she was being allowed to used telephone

13   stepped out of the cell.  The evidence will show, ladies and

14   gentlemen, that Ms. Vargas did not run out of the cell.  She

15   stepped out because the officer who will you learn was the

16   defendant opened the door and she thought she was being

17   allowed to use the telephone.

18        But at that point the defendant sprayed her in face

19   with pepper spray which caused her eyes to burn and made it

20   hard for her to breathe.  She will tell you that the officer

21   pushed her back into the cell and closed the door.

22   Ms. Vargas was in a small cell with no ventilation.  She

23   coughed and gasped for air.  She banged on the door screaming

24   out for help that she couldn't breathe and that she needed

25   fresh air.  The evidence will show, ladies and gentlemen,

1    that the officer who sprayed Ms. Vargas in the face was the

2    defendant.  The evidence will also show that while Ms. Vargas

3    was locked in her cell with no fresh air, choking, gasping

4    and coughing for breath, defendant opened all of the doors to

5    the jail to air out the pepper spray smell for himself and to

6    provide fresh air for the other officers and employees at the

7    jail.

8           You will learn that after being pepper sprayed,

9    Ms. Vargas banged on the door crying out that she couldnpt

10   breathe.  Defendant again opened her cell door and this time

11   he did it knowing full well that the jail doors were wide

12   open.  Ms. Vargas needing fresh air stepped out of the cell.

13   Defendant then shocked Ms. Vargas with his taser gun.

14   Ms. Vargas felt terrible pain and fell to the ground.  She

15   will testify that she was then surrounded by officers who

16   were laughing at her and calling her names like fat ugly

17   bitch and clown.  She will tell you that she was so overcome

18   she lost control of her bladder and urinated on herself.  She

19   will tell you that she still couldn't breathe.  She noticed

20   the door to the parking area was open so she began crawling

21   towards the door for air.  She was not running, she was not

22   kicking, she was not trying to escape.

23          And the evidence will show, ladies and gentlemen,

24   that she could not feasibly escape because the parking lot

25   outside the jail is secured with brick walls like these and

1  remote controlled gates like these.  You will learn, ladies

2  and gentlemen, that the officers followed her continuing to

3  laugh at her and call her names.  Ms. Vargas will tell you

4  that she was begging them to stop.  That she was in pain and

5  that her shirt had gotten torn exposing her breasts.

6          The evidence will show that at this point defendant

7  again shocked Ms. Vargas with his taser gun without

8  justification and for no lawful purpose.  You will hear from

9  Dennis Decker that when he came into the station from patrol,

10  he walked in open jail doors to see Ms. Vargas laying face

11  down handcuffed on the floor crying.  He will tell you that

12  the station still smelled of pepper spray and that the jail

13  doors were still standing open.  He will tell you that the

14  Defendant Sclafani and Officer Gutting were standing over

15  Ms. Vargas and that Ms. Vargas' shirt was ripped, her breasts

16  were exposed and she was wet.

17          You will hear that later that night a female police

18  officer Andrea Heath photographed Ms. Vargas' injuries using

19  Officer Gutting's camera.  You will also hear, ladies and

20  gentlemen, that Officer Gutting mysteriously lost all of the

21  pictures showing Ms. Vargas' injuries.  All that is except

22  for the one that showed Ms. Vargas' exposed naked breast.

23          You will also hear from Sergeant Eddie Cole who

24  will testify that sometime after Ms. Vargas' injuries were

25  photographed, Sergeant Cole entered the jail area and heard a

woman crying in one of the cells.  He looked in to make sure

that the woman was all right and he saw Ms. Vargas crying,

whimpering, wet wearing only a bra.  Officer Cole will

testify that the jail cells get very cold and that Ms. Vargas

had wrapped her feet with toilet paper in an apparent attempt

to get warm.  Officer Cole provided Ms. Vargas with blankets

and a jail jumpsuite like this made out of thin, see-through

paper.

The evidence will show that a few hours later

Ms. Vargas was given a citation and released on her own

recognizance, but even then and even after what she had just

been through, Ms. Vargas didn't leave the station right away.

Ms. Vargas had nowhere to go.  She had no car.  No one to

pick her up.  So she sat in the lobby of the Desert Hot

Springs Police Department.  Dennis Decker will tell you that

he saw Ms. Vargas sitting in the lobby.  He will also tell

you that defendant Sclafani was angry even at this and went

on a rant about wanting to get Ms. Vargas out of the station.

Ms. Vargas will tell you that at some point Officer

Andrea Heath told Ms. Vargas that she had to leave the police

station even though Ms. Vargas at that point still didn't

have a ride or a place to go.  You will hear that Ms. Vargas

had to walk out into the cold night in the desert wearing

only a paper jail jumpsuit over her bra.

That is the evidence that you will over the next

```
 1    few days, ladies and gentlemen.  That is the evidence that
 2    will demonstrate that defendant willfully deprived Mr. White
 3    and Ms. Vargas of their constitutional rights to be free from
 4    excessive force, unreasonable search and seizure.  And that
 5    will prove beyond a reasonable doubt that defendant is guilty
 6    of both counts of the indictment of deprivation of rights
 7    under the color of law.
 8              THE COURT:  Thank you, Ms. Carter.
 9              Now, ladies and gentlemen on behalf of the
10    Defendant Sclafani, we'll hear from Mr. Schwartz.
11              MR. SCHWARTZ:  Thank you Your Honor.
12              May counsel confer with counsel very briefly?
13              THE COURT:  Of course you may.
14              MR. SCHWARTZ:  Thank you, Your Honor.
15              THE COURT:  Certainly.
16              MR. SCHWARTZ:  As the Court instructed you, opening
17    statement is not evidence.  It's somewhat of a road map.
18    It's what the attorneys expect the evidence to be.
19    Obviously, it was about half hour or less from the
20    prosecution.  I'll do the same.  You're going to be here for
21    a few days and more evidence than what's said in opening
22    statement.  Kind of like a preview of a movie.  The best
23    parts maybe lives up to the movie, maybe it doesn't.
24              Back on February 24th, 25th, 2005, my client was a
25    probationary sergeant for the Desert Hot Springs Police
```

1    Department.  You'll hear evidence what that means is that for

2    the first year he worked there, he could be let loose.  He

3    could be terminated for no apparent reason.  He had to pass

4    probation.  Somewhat new to that facility, that agency, he

5    was trying to get his feet wet as far as how they did things.

6              And on the 25th, he was called out to what was a

7    domestic violence or what we call a 415 in the Penal Code

8    section, disturbing the peace call at a set of apartments

9    that were known to be a high crime area.  You're gonna hear

10   evidence from multiple officers Desert Hot Springs albeit a

11   very small town or enclave out in the desert has a lot of

12   crime.  And these officers would go from call to call to call

13   sometimes 20, 30, 50 calls a night.  You're also gonna hear

14   evidence that that particular police department at that time

15   was very understaffed.  You were lucky if they had two

16   officers and a sergeant on duty at any given shift.

17             On this particular evening of the 25th of February

18   of 2005, my client was a sergeant and he went out to a call

19   with another officer named Matthew Drew.  It was on the

20   second floor of the apartments.  As they got to the door,

21   they knocked on the door and they heard a loud, deep voice,

22   angry voice on the other side of the door call out who the F

23   is this.  I'm using the colorful language, but that was the

24   language he used.  High crime area.  Somebody challenging on

25   the other side of the door.  They said they were police.

1    They were there on a call.  The door opened up.

2           There were two people inside the apartment.  One

3    was Karen Harper, the second Jamal White.  My client and his

4    partner Matthew Drew explained why they were there and they

5    asked if they could talk to both parties because after all

6    somewhat of a domestic violence call had to interview both

7    parties see in fact there was a domestic violence or some

8    kind of disturbance.

9           My client interviewed Ms. Harper and Mr. White, who

10   was not being questioned, walked out of the apartment.  Now,

11   as is commonplace to see who they're dealing, they ran the

12   parties for wants and warrants.  See if they had any

13   outstanding warrants for their arrest.  Who they would be

14   dealing with.  Lo and behold, there was a warrant in the

15   system for Mr. White who was a parolee back from state prison

16   who had absconded from his parole agent.  That means he

17   wasn't reporting in.  There was a warrant for his arrest.  He

18   was informed that he would be put under arrest, he became

19   very agitated, very loud, challenging, threatening.

20   Regardless of that, he was handcuffed and he was taken

21   downstairs for arrest.  The officers had gleaned there was in

22   fact no domestic violence, but he was being arrested for his

23   warrant.

24          Now, Matthew Drew at the time was a canine officer

25   which means in his patrol car he had a dog.  And normally

1    where a suspect would sit in the back, the dog was in the

2    back with the cage.  He couldn't transport Mr. White back to

3    the station.  He had a dog in the back.  My client, although

4    he was a supervisor, he was gonna be the one to be transport

5    Mr. White which he did.

6            Now, Mr. White was being loud, being vocal.  You

7    may hear a term of art from several witnesses called

8    chipping.  He was trying to get underneath the officer's

9    skin.  My client told him to stop and tried to ignore it.  He

10   put him in back of the patrol car.  He seat belted him.  In

11   the back of those patrol cars, there are seat belts and that

12   belt comes up, it comes up -- it almost sticks out past the

13   person's waist.  It doesn't go past, but it sticks way up.

14           Why?  You're going to hear evidence, testimony,

15   that when the officers goes to buckle somebody in that belt,

16   that connector sticks way up so they don't have to lean to

17   close to the arrestee because it's not safe.  They can buckle

18   them without leaning too far into the car.  That's what my

19   client did.  Mr. White was seat belted in.  My client began

20   to transport him to the Desert Hot Springs Police Department.

21           Now, Desert Hot Springs Police Department at the

22   time had no ability to keep anybody in custody for more than

23   six hours.  They're not considered a holding facility, had to

24   be a bigger jail for that.  As my client was transporting

25   Mr. White, Mr. White became very belligerent and vocal in the

1    backseat and he was able to maneuver himself and unbuckle

2    that seat belt because, again, it was sticking up and he was

3    able to unclick that click.  He turned his body and began to

4    try to kick out the windows of the patrol car.

5            My client told him to stop.  He continued to kick

6    and out of fear that that window would break and injure

7    Mr. White or my client, the very least the patrol car, the

8    client stopped the car with the intention to get out and

9    hobble Mr. White.  You'll hear evidence that hobbling is a

10   technique used by police officers.  It's not hog tying and

11   it's taken from the colloquial.  Basically, putting a strap

12   on the ankles or the bottom part of the legs of somebody,

13   making it tight, hanging that strap out the door or closing

14   the door so the legs are stationary.  They can't move around.

15   My client felt that was the safe thing to do at the time.

16   He's trying to kick out a window.  My client went and opened

17   the door of the car.  He saw Mr. White still kicking up a

18   storm, realized I'm not gonna get a hobble on him by myself.

19   Now, Desert Hot Springs Police Department as described is a

20   very small department.  It's very difficult to call for

21   backup all the time because there was no backup many times.

22   Officers went from call to call to call.  At best two or

23   three on at one night for the entire city.

24           My client told him stop.  Mr. White refused.  My

25   client based on his training and experience used one burst of

UNITED STATES DISTRICT COURT

1   pepper spray.  And you'll hear evidence, testimony, that

2   pepper spray was considered a high level of force known as

3   what's called a command presence, just giving somebody an

4   order, but an effective use of force without having to go,

5   and again, you'll hear testimony of the term hands on.  It

6   can avoid injuries.  The officer will not have to wrestle

7   with somebody or grapple with somebody.

8            Many times the use of the spray gets a person to

9   comply.  It could be debilitating to a certain degree.  It's

10  not pleasant.  You'll hear testimony that people cough,

11  people choke.  Lo and behold the evidence will show that when

12  my client did spray Mr. White with one burst, which my client

13  reported, Mr. White stopped.  My client was able to close the

14  door and rolling down both front windows to air out the car

15  drove back to the station.

16           He got into the station and as you have seen -- and

17  there will be other photographs of the station and other

18  depictions or description -- coming into the police station

19  and the holding area in that police station was a very small

20  place.  We're not talking small.  We're talking tiny.  The

21  evidence will show that in that holding area there was at

22  least one desk with a computer, there was across from that on

23  the other side a desk where people would be fingerprinted and

24  there's a very small, small little area in between.  That's

25  all there was.  Three were small holding cells.  Each cell

 1    was made out of some kind of concrete or stone, floor, sides

 2    and benches.  That's what it was.

 3            My client sat him down, him being Mr. White, on a

 4    bench.  He was still handcuffed behind his back.  My client

 5    went around to the watch commander's office to complete some

 6    paperwork on the arrest.  Mr. White was sitting on the bench

 7    and he's becoming loud again and he was chipping and acting

 8    agitated.  My client told him to stop.  He wouldn't stop.

 9    Sergeant Sclafani then came back around and you will see,

10    you'll have a chance to see Mr. White.  He's not a small

11    person.  He is very built and buff.  He's about somewhere

12    between five ten and six feet tall and he was upset.

13            Now, when my client came back around, Mr. White

14    started to get up.  My client told him not to.  You'll hear

15    testimony that he may be handcuffed, but if he goes to stand

16    up, he's still considered dangerous and he's considered

17    noncompliant.  As he went to stand up, my client told him not

18    to.  My client tried to slowly but surely push him back down.

19    At that moment in time, Mr. White tried to get up and turn

20    his head as if he was about to spit.

21            Now, the evidence will show this is happening very

22    quickly, fluid not step-by-step-by-step.  We're talking

23    within a second or two maybe at most.  My client took out his

24    taser and as a show of force, as you demonstrated by the

25    prosecution, showed it to Mr. White pulling the trigger and

UNITED STATES DISTRICT COURT

1    just having those electrodes go off.  That's all he did.  The

2    Government's Exhibit 72 which has been stipulated to shows

3    the downloads, the computer downloads for that taser at that

4    call.  That's the time, that's the date.

5            Now, the first was three seconds.  The second was

6    five.  The three-second burst there will be testimony that

7    was when my client was demonstrating the show of force.  You

8    don't stop being noncompliant if you keep trying to be

9    challenging and physically threatening by trying to get up

10   when you're told not to, this is what can happen to you.

11   You'll hear testimony that's how he was trained that that

12   taser can be used as much as a show of force as it can be

13   used as a weapon in case the show of force doesn't work.

14           In this case the show of force did not work and

15   Mr. White turned as if to either head butt or spit on my

16   client.  And you'll hear testimony that my client along with

17   other officers have been trained that spitting on somebody is

18   considered a battery and is considered to be dangerous

19   because it can transmit diseases, especially in this day and

20   age.  As he turned to spit, my client didn't use the taser,

21   but he took his forward momentum and he forced him to the

22   ground and Mr. White ended up on the ground.  He ended up on

23   his back with his hands handcuffed behind his back.

24           My client told him to get up.  Mr. White said he

25   couldn't.  So after several times of several orders of get up

1    and I can't, my client started to bend down to help him up,

2    and you'll hear testimony when my client bent down,

3    Mr. White's focus shifted from my client looking at him to my

4    client's left and he went to go give a kick.  As he did that,

5    made that motion as if he's starting to kick my client, my

6    client didn't wait to be kicked.  Didn't wait to be kicked in

7    the groin.  Didn't wait to be kicked in the legs.  That's

8    when he tasered him.

9         And you will hear evidence that that was part and

10   parcel of my client's training at that time.  You will hear

11   testimony that tasers have evolved not just in the mechanics

12   or the science, but in their use.  Back in 2005 when they

13   first started being deployed in more of a prevalent manner,

14   they were used much more frequently by officers because

15   that's what they were trained to do.  My client also was

16   trained to use them.

17        This is a copy of a stipulated exhibit.  And this

18   was the taser addendum to the force policy regarding tasers

19   for Desert Hot Springs Police Department at that time back in

20   2005.  It talks about, as my client was trained, the evidence

21   will show where the detention of a subject was legal and

22   necessary and the subject refuses to submit to such detention

23   by use of force, fleeing or lack of cooperation, that's when

24   a taser can be used.  That was the policy.  That's how he was

25   trained back in 2005.  In which a hands-on confrontation is

1    inevitable that could result in further injury to either

2    officer or the subject.

3         It can also be used or back in 2005 my client was

4    trained, when the subject has been lawfully arrested or

5    detained and although handcuffed or restrained, maintains his

6    capacity -- in his capacity the ability to actually inflict

7    damage to Department property or injure himself, attempt to,

8    and an officer may be using that taser to attempt to

9    de-escalate the situation.

10        That's what happened with Mr. White.  After he was

11   tased and again after he was tased, the evidence will show

12   that one five-second cycle you'll hear Mr. Meyer testify that

13   when the two prongs go in in order for the taser to actually

14   be effective both have to have a good grab so that the

15   electricity can cycle through the body.  The person can't

16   move.  It disrupts the central nervous system and the

17   muscles.  And in that five seconds they can't move, it gives

18   the officer time to readjust and reassess the situation.  And

19   most of the time when they're done either the pain or the

20   fact that now they have to take a second to readjust

21   themselves, gives the officer the time to now control them.

22        That's important because the next day as mentioned

23   by the prosecution on the 26th, my client was not part of the

24   actual arrest of Ms. Vargas.  Ms. Vargas was arrested for

25   running into the back of, thank God, an empty school bus and

1    it was a DUI arrest.  Now, you may hear evidence from Andrea

2    Heath that she heard Ms. Vargas at the scene apologize.  You

3    will see evidence in this case that Ms. Heath could not have

4    seen that.  She could not.  She was the dispatcher.

5        And Dennis Decker will testify that he actually

6    started out to that call because when the call came in, he

7    remembers that call from seven years ago of a rear-ending of

8    a school bus, everybody was worried that there would be hurt

9    kids.  He remembers the call.  He remembers Andrea Heath not

10   being at the call, but dispatching the call.  He knows who

11   she is.  He worked with her.  That was her voice.

12       But even more importantly and you'll see this in

13   the evidence, the CAD report for calls for service, the

14   actual computer printout of what the officers were doing that

15   day on that call does not have Ms. Heath respond to the call

16   at all.  And you're gonna hear evidence that policy is when

17   you respond to a call, you call in that you're a responding

18   party.  But even more importantly, that same report, the same

19   computer printout of the dispatch of that call, which

20   Ms. Heath claims and will claim in front of you to have been

21   at, shows Ms. Heath as the dispatcher both taking the call

22   and dispatching the call.  The evidence will show Ms. Heath

23   is a liar.

24       Now, in this particular call, you will see what's

25   been stipulated to as an exhibit.  This is the actual Biotox

1    Laboratories blood alcohol testing of Ms. Vargas' blood

2    alcohol level.  This was taken at 1659 which in layperson's

3    terms is almost 5 o'clock, it's almost 4:59 of that day,

4    about an hour after officers responded to her stuck

5    underneath the school bus in the car.

6            And her blood alcohol level an hour after she was

7    there was a .22 blood alcohol level.  You will hear evidence

8    that's more than two-and-a-half times the legal limit.

9    You'll also hear evidence that amount of blood alcohol in

10   your system, anyone's system, will render the person hardly

11   effective in remembering things properly or perceiving things

12   realistically.

13           Now, Ms. Vargas will also testify as she has

14   previously that not only was she that high blood alcohol

15   level, but at this time even to the current day she has an

16   anxiety disorder she takes medication for.  And she will tell

17   you herself she in fact because of that disorder has

18   blackouts.  And in this case she may have experienced more

19   than one blackout because of her disorder coupled with the

20   high alcohol level.

21           Matt Gutting, who at that time was a Desert Hot

22   Springs Police Department officer, was the handle officer.

23   It was his call and he'll tell you that Ms. Vargas was so

24   drunk he couldn't do any field sobriety test on her in the

25   field which are physical tests to see if she could drive a

car.  It was all he could do to get her into his patrol car
and yes, she threw up in his patrol car.

He will also tell you he was also a new officer.  A
probationary officer there for less than six months, brand
new.  And he will tell you that he transported Ms. Vargas
back to the station and he basically put her into a holding
cell because he couldn't do anything else with her.  She was
too drunk to even book.  And then he went to either to go
write reports or on another call, but he left the area.

After Ms. Vargas had some kind of blood draw at
5:00 in the holding cell, she fell asleep.  My client came on
shift at 6 o'clock.  That's when his shift began.  He was
gonna be the watch commander.  Part of his duties as a watch
commander is to check in the windows of all the holding cells
to see if the person is still alive basically, they're okay,
need any help.

He looked in Ms. Vargas' cell and saw her asleep on
a bench, I know it's late in the day, on a cement bench.
Now, he had to make sure that she's actually sleeping and not
somehow passed out or in need of medical attention.  So he
banged on the door a bunch of times.  He banged a few times
until he saw her get up.  She is alive.  She seems okay.  As
he goes to walk away from the door to check other two holding
cells who's in there, are they okay, he hears her begin to
bang her head on the door and scream.

1          The evidence will show he's in a quandary.  He's

2     got somebody who's banging their head on the door.  He can't

3     let that happen, but he's by himself.  Told her to stop

4     through the door.  She wouldn't.  And he went and he opened

5     the door to confront her to get her to stop before she

6     injured herself.  That was his responsibility.  As he opened

7     that door, she ran out at him possibly to get out the door,

8     possibly not, but she ran at him.  His training, his instinct

9     he pushed her away.  She was drunk.  She fell down.

10          Before he can close the door, she jumped backed up

11     and ran a second time which surprised him.  You'll hear

12     evidence that was surprising to him because number one, she

13     was obviously very drunk and number two, he was much bigger

14     than her and the fact she would come at him again was a shock

15     to him.  Rather than push her down again, which he didn't

16     mean to have her fall down the first time, you'll hear

17     evidence that it's not only the cement floors and cement

18     walls, but a cement bench.  And rather than have her hit her

19     head against the bench, he took out his pepper spray as was

20     his training and he sprayed her one burst.  That stopped her

21     in tracks for a moment, gave him time to close the door so

22     she couldn't run out of that door.

23          Now, you'll hear evidence that that pepper spray

24     can be smelled and inhaled all around the jail.  Had a very

25     poor ventilation system at the time and the jail shared a

building with City Hall, same building.  And you'll hear
evidence that whenever they pepper sprayed anybody in the
jail and there will be testimony that was done somewhat often
unfortunatley at Desert Hot Springs with people that were
there, that smell of pepper spray was not only smelled in the
jail area, it was smelled in City Hall, too.

So they had a habit because assuming the air
conditioning didn't work and the fan didn't work of opening
the back door, opening every door they possibly could to
ventilate the place.  That's what was done.  Now, Sergeant
Sclafani at that point realized she is in there and it's hard
for me to breathe, it's harder for her.  So he walked over
and he opened the door and he walked into the cell and he saw
that she was basically trying to decontaminate herself by
putting her head in the toilet.

He couldn't have that happen.  When he went inside
the cell, he showed her a decontaminate, very similar looking
bottle to the pepper spray, explaining to her that he was
gonna spray this on her to decontaminate her.  When he showed
her the bottle, she saw it, she jumped up and she tried to
run out the door.  Rather than try to tackle her as she's
running out that door because she could hurt herself, injure
herself.  He was much larger than her and he was afraid of
falling down on top of her and hurting her.

As he was trained, he took out his

1    Department-issued taser and he tased her.  He saw no effect.

2    The testimony will be that if it's seen to have the prongs go

3    inside and there's no effect that you pull until there's

4    effect because sometimes even if essentially the person falls

5    down, even if they're not, those prongs can find their way

6    into the skin better than the original contact.  There was no

7    effect.  Ms. Vargas began to make it outside that door into

8    the parking lot.

9           You're gonna hear evidence that the parking lot was

10   shared with City Hall at the time.  There will be evidence

11   that the officers that had the custom of when they came in

12   and parked their cars in that lot, they leave their cars

13   running with the keys in the car.  And many times that gate

14   was open for people to come in and out of.  There's a large

15   gate you'll hear testimony of where the cars exited that lot.

16   Afraid that she can go either into a patrol car or run into

17   somebody from City Hall in her state or condition or even

18   hurt herself, my client tried to tase her.  It didn't work.

19          Matthew Gutting who was in the station and heard

20   commotion came out.  He saw her going out the door and he

21   tased her.  He downloads which will be in evidence showed one

22   tase.  Mrs. Vargas dropped.  It seemed to be effective.  And

23   a third officer came out and picked her up to bring her

24   inside, which was Officer Collins and that was that case.

25   That was that incident.

1          Now, there will be conflicting testimony at the

2    time about whether or not the incident could have even been

3    seen by Ms. Heath and regarding that -- the size of that

4    police area, that area, how many people could have been

5    there, how many times it was tased, how many times each

6    person was tased.  You will hear evidence that Ms. Heath's

7    recollection of how many times on the first day Mr. White was

8    tased and the second day Ms. Vargas was tased is exactly the

9    same between four and six.  Neither is consistent I'll be

10   able to show with the downloads, neither one.

11          You'll hear evidence that Ms. Heath will tell you

12   that the same rationale for tasering get up, get up and

13   basically baiting somebody was on both days.  And Ms. Heath

14   will tell you she saw the first incident with Mr. White from

15   behind the watch commander's window, which was a mirrored

16   window, from the inside of the jail area.  There will be

17   testimony that at that time that window was boarded up either

18   with plywood or with poster board.  There will be conflicting

19   testimony on that as people try to remember back to 2005.

20          You will hear evidence that the second incident

21   with Ms. Vargas, Ms. Heath claims to have been standing in

22   the doorway to watch the whole thing.  She's a trained police

23   officer and you will hear testimony that even based on her

24   training, she sat and did nothing for both incidents.  You

25   will also her testimony that shortly after Ms. Vargas'

```
 1   incident, she had a conversation with Ms. Heath about the
 2   incident.
 3            As we stated in the very beginning, as the Court
 4   instructed, opening statement is at best a road map.  It is
 5   not all the evidence.  Look at all the evidence.  Watch these
 6   witnesses testify, review the documents honestly and with a
 7   fine-tooth comb.  And if you can do that, at the end of this
 8   case, there be a lot more evidence than either side both
 9   talked about at the end of this case when all is said and
10   done, you will come to only the verdicts that are supported
11   by the evidence and are just, truly just.  That's not guilty.
12   Thank you, folks.
13            THE COURT:  Thank you, Mr. Schwartz.
14            The government may call its first witness.
15            MR. ARKOW:  Yes, Your Honor.  The government calls
16   Karen Harper.
17            THE COURT:  Could you come straight ahead, please.
18   Come right up on the witness stand, please.
19            THE CLERK:  Would you please raise your right hand.
20                     (Witness sworn.)
21            THE CLERK:  Please have a seat.  State and spell
22   your name for the record.
23            THE WITNESS:  Karen Harper.  K-a-r-e-n H-a-r-p-e-r.
24            THE COURT:  Ms. Harper, do you have a middle name?
25            THE WITNESS:  No, sir.
```

```
 1              THE COURT:  Go ahead, please.
 2                     DIRECT EXAMINATION
 3    BY MR. ARKOW:
 4    Q.   Ms. Harper, what city do you live in now?
 5    A.   Desert Hot Springs, California.
 6    Q.   And how long have you lived in Desert Hot Springs,
 7    California?
 8    A.   Eight years.
 9    Q.   So back in 2005 you were living in Desert Hot Springs?
10    A.   Yes, sir.
11    Q.   How are you currently employed?
12    A.   I'm a bus driver at a Montessori School in Palm Springs.
13    Q.   Do you have any other jobs at that school?
14    A.   A clerk and a teacher's aid.
15    Q.   And back in February 2005, do you remember where you
16    were living in Desert Hot Springs?
17    A.   Yes, at Ironwood Apartments.
18              MR. ARKOW:  I would ask that you be shown what's
19    marked for identification as Government's Exhibit 63.  And
20    this witness will be looking at Government Exhibit 63, 64 and
21    65.
22              THE COURT:  Thank you.
23    BY MR. ARKOW:
24    Q.   I would first ask that you look at what's in
25    Government's Exhibit 63.  Is that a photograph?
```

1    A.    Yes.

2    Q.    Do you recognize what's depicted in that photograph?

3    A.    Yes, that's my apartment.

4    Q.    That's the apartment that you lived in in February 2005?

5    A.    Yes.

6          MR. ARKOW:  I would ask that Government Exhibit 63

7    be moved into evidence.

8          THE COURT:  It will come in.

9               (Exhibit 63 was admitted.)

10         MR. ARKOW:  With the Court's permission, I would

11   like to publish?

12         THE COURT:  Go right ahead.

13   BY MR. ARKOW:

14   Q.    I'm putting on the projector which is also now on the

15   monitor, the photograph in Exhibit 63.  Was your apartment --

16   there is two floors, a first floor and second floor.  Which

17   apartment was yours on?

18   A.    Upstairs, Apartment 306.

19   Q.    If I could point and I'm indicating the door at the top

20   of the stairs was that the door to your Apartment 306?

21   A.    Yes.

22   Q.    And then could you now look at -- put that exhibit in

23   the folder.  We might return to that.  Look at the folder if

24   you have it in front of you Government Exhibit 64.  Do you

25   recognize what's depicted in that photograph?

```
1   A.    Yes.

2   Q.    What is that?

3   A.    This is the grounds of the Country Hills Apartments.

4            MR. ARKOW:  I would move Government's Exhibit 64

5   into evidence.

6            THE COURT:  It will come in.

7                 (Exhibit 64 was admitted.)

8            MR. ARKOW:  And with the Court's permission, I

9   would like to publish.

10           THE COURT:  Go right ahead.

11  BY MR. ARKOW:

12  Q.    Can you explain to the jury from what angle we're

13  looking at the courtyard of the apartment that you lived in

14  in February 2005?

15  A.    Right on the patio, if you come outside the door, this

16  is right over when you come out the door of the courthouse.

17  Q.    The door of --

18  A.    Of the Apartment 306.

19  Q.    So what we saw in Government's Exhibit 63, if someone

20  was on the steps outside your apartment door and took a

21  picture into the courtyard of your apartment complex, this is

22  the view that they would be seeing?

23  A.    Yes.

24  Q.    Now, directing your attention to February 2005, how were

25  you employed at that time?
```

1    A.    I worked at Eisenhouer Medical Center.

2    Q.    What was your job there?

3    A.    A diet tech.

4              MR. SCHWARTZ:  Objection, Your Honor.  Relevance.

5              THE COURT:  That's overruled.  Let's move on.

6    BY MR. ARKOW:

7    Q.    At that time did you know an individual named Jamal

8    White?

9    A.    Yes.

10   Q.    I'd ask that you look if you have the folder marked

11   Government's Exhibit 65, do you recognize the person depicted

12   in that photograph?

13   A.    Yes.

14   Q.    Who is that?

15   A.    Jamal White.

16             MR. ARKOW:  I would move Government's Exhibit 65

17   into evidence.

18             THE COURT:  It will come in.

19                 (Exhibit 65 was admitted.)

20             MR. ARKOW:  With the Court's permission, I would

21   like to publish.

22             THE COURT:  Go right ahead.

23   BY MR. ARKOW:

24   Q.    Is that the photograph in Government Exhibit 65 that

25   you're looking at a picture of Jamal White?

```
1    A.    Yes.

2    Q.    How did you meet Mr. White?

3    A.    When I was working at Eisenhouer.

4    Q.    And what was Mr. White doing at Eisenhouer?

5    A.    I think he was a contract at thetime.

6    Q.    And what kind of a position did he have there?

7    A.    He was a dishwasher.

8    Q.    That was at the hospital?

9    A.    Yes.

10   Q.    And was Mr. White also living in this apartment that we

11   saw in Government Exhibit 63 at Apartment 306 with you at the

12   time?

13   A.    Yes.

14   Q.    Do you remember the time when the police came to your

15   door at night, knocked on the door and Mr. White was

16   arrested?

17   A.    Yes.

18   Q.    Was that in the evening?

19   A.    Yes, it was.

20   Q.    And Mr. White was home at the time?

21   A.    Yes.

22   Q.    Had Mr. White -- and were you home at the residence at

23   the time also?

24   A.    Yes.

25   Q.    Had Mr. White gotten home that night before you?
```

1   A.   Yes, he was already there.

2   Q.   And when you arrived home, just generally, what was

3   Mr. White doing?

4   A.   Watching TV.

5   Q.   And at some point the officers came to your door at

6   Apartment 306?

7   A.   Yes, they did.

8   Q.   How did you know that they came to the door?

9   A.   They knocked on the door.

10  Q.   And then what happened?

11  A.   I answered the door and the two officers standing at the

12  door.  And I said hello and he said hello, we're here on a

13  spousal abuse charge or domestic violence call.

14  Q.   How many officers were on the other side of the door?

15  A.   Just two.

16  Q.   And can you generally describe because we're gonna try

17  to differentiate, can you describe one of the officer in

18  terms of appearance and then the other officer so later on we

19  can know what officer you're referring to?

20  A.   Okay.  It was one officer that was tall and had brown

21  hair like and built, very muscular, built.  And there was

22  another officer that was a little slimmer with light brown

23  hair.

24  Q.   And when the officers said they were there to

25  investigate domestic violence or spousal abuse, what did you

```
1    tell the officers?

2    A.   I says that's not going on here.

3    Q.   Was there any altercation between you and Mr. White that

4    evening prior to the officers arriving?

5    A.   No, I just came home.

6    Q.   Were you and Mr. White yelling at each other in the

7    apartment?

8    A.   No.  There was music downstairs playing very loud.

9    Q.   But that was from the apartment unit underneath yours?

10   A.   Yes.

11   Q.   Now, what happened when you told the officers that there

12   was no altercation, there was no domestic violence?  What

13   happened next?

14   A.   The one officer with the big, the kind of built body --

15   Q.   Is that the one with the dark hair?

16   A.   Dark hair.  Excuse me.  The one with the dark hair says

17   can we please come in and I said okay.  So we let them in and

18   when he came in, he says can I talk to you?  And I said okay,

19   yes.  And he says well, can we see some ID?  So Jamal gave

20   him his ID and I gave him my ID.

21        And then he says do you mind if I talk to her?  And

22   Jamal goes she has her robe on and he said that's okay, it's

23   not going to take long.  And Jamal says well, can't she get

24   dressed?  And he says no, let me just talk to her.  So he

25   just said let me talk to her and --
```

UNITED STATES DISTRICT COURT

1    Q.    Which officer are you talking about?

2    A.    I'm talking about the officer with the dark hair.

3    Q.    When Jamal White was asked to produce his identification

4    did he do so?

5    A.    Yes, he did.

6    Q.    Did he resist in any way?

7    A.    No, he showed him his ID.

8    Q.    And then after he showed him ID, then what happened?

9    A.    Then the officer asked can I talk to her?  Well, we

10   talked about that already.  And then he says well, I would

11   like to talk to her alone.  So he says do you mind stepping

12   outside to Jamal.

13   Q.    And what did Jamal White say?

14   A.    He said okay and he walked out the door.

15   Q.    Did Mr. White have to be brought out the door?

16   A.    No.  He just says there's nothing going on and he walked

17   out the door with the other officer.

18   Q.    Did the other officer have to put his hands on Jamal

19   White for Jamal White to step outside the door?

20   A.    No, sir.  The other officer stood sideways for Jamal to

21   walk out the door.

22   Q.    Jamal White and this other officer were outside your

23   apartment?

24   A.    Yes.

25   Q.    And directing your attention, I'm gonna put on the

1    overhead Exhibit 63, Jamal White and the other officer were

2    either at the landing, the top of the stairs or somewhere on

3    the stairs where I'm pointing while you were inside the

4    apartment with the taller, bigger officer?

5    A.   Yes, they was on the stairs.

6    Q.   And then where did you go inside with the taller officer

7    with the dark hair?

8    A.   Well, the living room, the wall, right there.  Well,

9    that's the living room.

10   Q.   This is an outside porch?

11   A.   Right.

12   Q.   But then there's a glass window and then the other side

13   of the glass window is the living room?

14   A.   Yes.

15   Q.   Okay.  And then you were seated inside the living room

16   with the taller officer with dark hair?

17   A.   Yes.

18   Q.   While Mr. White and the other officer were outside at

19   the top of the stairs?

20   A.   Yes.

21   Q.   And what did you talk about inside the living room area

22   with the taller officer with dark hair?

23   A.   He asked me, he said now that he's not in here you can

24   tell me what happened.  And I says nothing happened.  I just

25   got home and I just want to take a shower.  He says are you

1    sure?  And I say yes, I'm sure.  He sat there and he says

2    well, you could tell me and I says there's nothing to tell.

3    Q.    So essentially you told that officer that everything was

4    fine, there was no disturbance?

5    A.    Right.

6    Q.    Now, when you were talking to this other officer, the

7    taller officer with dark hair, was he seated inside that

8    living room area the entire time you were talking to him?

9    A.    Yes.

10   Q.    And where was that officer's back in relation to this

11   stucco wall at the top of your apartment?

12   A.    His back is facing the wall.

13   Q.    So his back was to the wall?

14   A.    Yes.

15   Q.    From where that officer, the taller one with dark hair

16   was seated in your living room apartment talking with you,

17   could that officer see what was happening outside with the

18   other officer and Mr. White?

19   A.    No.

20             MR. SCHWARTZ:  Objection.  Speculation.

21             THE COURT:  That's overruled.  But please you're

22   doing an awful lot of leading.  I let it go to see if we can

23   move on, but please refrain.

24             THE WITNESS:  No.

25   BY MR. ARKOW:

1    Q.   Why not?

2    A.   Because you can't see through the wall.  You have to

3    stand up.  The only way you can see him if he was outside,

4    but he wasn't outside.  He's sitting down talking to me

5    face-to-face asking me questions.

6    Q.   And you're referring to the taller officer with dark

7    hair?

8    A.   Yes, sir.

9    Q.   And then after you spoke with this the taller officer

10   with dark hair, then what happened?

11   A.   He got up and he says okay, thank you.  And then I

12   walked out, was getting ready to walk out behind him to see

13   Jamal.  And he says that's okay, I'm going to talk to Jamal.

14   I says well, can I talk to him?  And he goes I'm going to

15   talk to him.  He'll be right back and that was it.

16   Q.   During the time that you were talking to the taller

17   officer with dark hair inside the apartment, did you hear any

18   signs or indication that Mr. White was struggling with the

19   other officer outside?

20   A.   No.  Jamal and the other officer was just standing

21   outside, but the music was playing downstairs very loud.

22   Q.   Did you hear Mr. White and the other officer having any

23   conversation?

24   A.   No.

25   Q.   And at any point did the officer outside on the steps

```
 1    call in to ask for assistance or ask the taller officer
 2    talking to you to come outside and help him?
 3    A.   No, not at all.
 4    Q.   Throughout the entire time that you saw the officers
 5    interacting with Mr. White, was Mr. White complying with all
 6    of the officers' commands?
 7    A.   Yes.
 8    Q.   Was Mr. White in any way resisting anything that the
 9    officers asked Mr. White to do?
10    A.   No.
11         MR. ARKOW:  Just a moment, Your Honor.  No further
12    questions.
13         THE COURT:  Cross-examination.
14         MR. SCHWARTZ:  Thank you, Your Honor.
15                   CROSS-EXAMINATION
16    BY MR. SCHWARTZ:
17    Q.   Good afternoon, ma'am.
18         Now, this happened, the incident that was just gone
19    into or asked about by the government happened about seven
20    years ago?
21    A.   In '05.
22    Q.   And is it safe to say your memory of it was probably
23    better back then as it is now?
24    A.   No.
25    Q.   You remember just as well now as you did seven years
```

```
 1   ago?

 2   A.    Yes.

 3   Q.    Remember shortly after this took place, the arrest of

 4   Mr. White, you were interviewed by an investigator about this

 5   case.  You remember that?

 6   A.    No.

 7   Q.    You were interviewed by a Daniel Tregarthen from Desert

 8   Hot Springs Police Department?

 9   A.    No.

10   Q.    You remember giving him a statement?

11   A.    No.

12   Q.    Now, when you first got home that night, Mr. White was

13   there already; correct?

14   A.    Yes.

15   Q.    He was watching TV; right?

16   A.    Yes.

17   Q.    And do you remember telling Mr. Tregarthen back in 2005

18   when he interviewed you that Mr. White had been drinking?

19   A.    No.

20   Q.    That Mr. White was speaking loudly?

21   A.    No.

22   Q.    And shortly after you got home is when there was a knock

23   on the door; correct?

24   A.    I would say.

25   Q.    And before the door was opened, Mr. White called out
```

1    from inside who is it; correct?

2    A.    No, I answered the door.

3    Q.    Oh, you answered the door, but did Mr. White say

4    anything in response verbally to the door being knocked on?

5    A.    No.

6    Q.    That you recall?

7    A.    Not that I recall.

8    Q.    Do you recall telling Mr. Tregarthen back in 2005 that

9    Mr. White responded who the fuck is it?

10   A.    No.

11   Q.    And there are two officers at the door when you opened

12   the door; right?

13   A.    Yes.

14   Q.    One seemed to be built you said?

15   A.    Yes.

16   Q.    Muscular?

17   A.    Yes.

18   Q.    The other one seemed more slim?

19   A.    Yes.

20   Q.    About the same age or different ages?

21   A.    It's hard to say.

22   Q.    Both caucasian?

23   A.    Yes.

24   Q.    Both with some kind of brown hair?

25   A.    One had really dark hair.

1   Q.   One had dark brown hair or very dark hair and one had

2   more light-colored brown hair?

3   A.   Yes.

4   Q.   And difference in ages could you tell?

5   A.   Yes.

6   Q.   And the one with the dark brown hair, he was a little

7   bit older than the other one?

8   A.   Yes.

9   Q.   And the one with the dark brown hair, he's the one that

10  talked to you; correct?

11  A.   The built one.

12  Q.   Sorry?

13  A.   The built one.

14  Q.   The built one with the dark, dark hair?

15  A.   Yes.

16  Q.   That was inside your apartment?

17  A.   Yes.

18  Q.   And as you testified to a moment ago, when you spoke to

19  that officer, the built one with dark brown hair, you were

20  seated inside your apartment; correct?

21  A.   Yes.

22  Q.   And he was also seated for part of the conversation?

23  A.   Yes, he was.

24  Q.   And he told you that he was there to investigate a

25  domestic violence call; right?

1  A.   Yes.

2  Q.   And you told him there was no domestic violence;

3  correct?

4  A.   Right.

5  Q.   And he explained to you that even though you told him

6  there's not, he still had to investigate since he was called

7  out?

8  A.   Yes.

9  Q.   And he also told you that many times victims of domestic

10  violence don't like to report it?

11          MR. ARKOW:  Objection.  Hearsay.

12          THE COURT:  That's sustained.

13  BY MR. SCHWARTZ:

14  Q.   Now, as part of your conversation with this officer, he

15  asked you if anything had happened in the house; correct?

16  A.   Yes, correct.

17  Q.   You said the apartment?

18  A.   The apartment.

19  Q.   And you said nothing to report to the police; right?

20  A.   Yes.

21  Q.   Now, downstairs there was very loud music?

22  A.   Yes.

23  Q.   And did you tell him that maybe it was downstairs that

24  was being loud and not you guys?

25  A.   It was not us at all.

1    Q.    While he was talking to you, Mr. White was outside

2    speaking with the other officer?

3    A.    Yes.

4    Q.    And from where the officer was interviewing you, the

5    muscular with the dark hair, where he was sitting there's no

6    way from your knowledge of your apartment he could have seen

7    Mr. White outside standing with the other officer?

8    A.    Correct.

9    Q.    Now, could you hear Mr. White talking to the other

10   officer outside?

11   A.    The music was loud.

12   Q.    So is that you could or you couldn't?

13   A.    No, you can't.

14   Q.    And is it safe to say that since you couldn't hear it --

15         THE COURT:  Well, it's not safe to say.  You could

16   ask it differently.

17         MR. SCHWARTZ:  Thank you, Your Honor.

18   Q.    Now, while you were talking with this officer in your

19   living room, were you curious about the conversation between

20   Mr. White and the other officer?

21   A.    No, sir.

22   Q.    And you couldn't make out what was being said; right?

23   A.    Right.

24   Q.    And just as an estimate, if you can, how long did your

25   conversation last with the officer in your living room?

```
 1    A.    I'm going to say maybe ten minutes.

 2    Q.    And at the end of it, that officer got up; right?

 3    A.    Yes.

 4    Q.    And he told you that he was gonna go outside and speak

 5    to Mr. White?

 6    A.    Yes.

 7    Q.    And you inquired about whether you can go see Mr. White?

 8    A.    And he said no.

 9    Q.    He being the officer talking to you?

10    A.    Yes.

11    Q.    He told you he wanted to speak to him first?

12    A.    Yes.

13    Q.    And told you Mr. White would see you again shortly?

14    A.    Yes.

15    Q.    And that didn't happen; right?

16    A.    No.

17    Q.    Mr. White got arrested; correct?

18    A.    I don't know.  I went in and took a shower and when I

19    came back, I didn't see Jamal.

20    Q.    You didn't see anybody placing handcuffs on Mr. White?

21    A.    No.

22    Q.    You didn't see the actual arrest of Mr. White?

23    A.    No.

24    Q.    Once the officer told you that you couldn't speak to

25    Mr. White at that time, you left the living room to go take a
```

```
 1   shower?

 2   A.   Yes.

 3   Q.   You didn't look out the window; right?

 4   A.   No, I didn't.

 5   Q.   You didn't hear anything going on outside at that time,

 6   did you?

 7   A.   Just the music.

 8            MR. SCHWARTZ:  May I have just a moment please,

 9   Your Honor?

10            THE COURT:  Of course.

11            MR. SCHWARTZ:  Have a moment to confer with my

12   client?

13            THE COURT:  Go right ahead.  Just be at ease,

14   ladies and gentlemen.

15            MR. SCHWARTZ:  Thank you, Your Honor.  No further

16   questions at this time.

17            THE COURT:  All right.  Redirect?

18            MR. ARKOW:  No, Your Honor.

19            THE COURT:  All right.  Thank you very much, ma'am.

20   You're excused.

21            MR. ARKOW:  Your Honor, may we have a brief side

22   bar on the witness scheduling issue in light of --

23            THE COURT:  Go right ahead, ma'am.  You're excused.

24            MR. ARKOW:  In light of the matter that we raised

25   this morning regarding the witness schedule and given the
```

```
 1    time of the day, I wanted to raise something with the Court.

 2              THE COURT:  Well, do you have another witness who

 3    would be brief?

 4              MR. ARKOW:  No.

 5              THE COURT:  All right.  Well, then we're gonna have

 6    to excuse the jury for the day and we can take up the matter.

 7    We're not gonna hold them while we talk about these matters.

 8    Everyone please rise for the jury.  Go right out, ladies and

 9    gentlement.  Please remember the admonition we discussed.

10    Have a good evening.  See you at 9 o'clock tomorrow morning.

11                         (Jury not present.)

12              THE COURT:  Please be seated.  We're outside the

13    presence of the jury.

14              MS. CARTER:  Your Honor, we wanted to call

15    Ms. Harper and get her on and off because she has medical

16    appointment tomorrow that may actually incapacitate her for

17    rest of the trial.

18              THE COURT:  I see.

19              MS. CARTER:  We're hoping tomorrow to call

20    Ms. Vargas first thing, but we believe that it will be a long

21    witness.  We're hoping to get her on and off.  However, we

22    have reason to believe that the same thing that happened this

23    morning, they may try to have it happen again tomorrow.

24    We're hoping that that doesn't happen and we can proceed that

25    way.  If not, we'll call another witness and take it up with
```

1     the Court outside the presence of the jury, but that's

2     currently our plan.

3                THE COURT:  What is the problem with the Riverside

4     court?

5                MS. CARTER:  It's an Indio proceeding, Your Honor.

6     My understanding is the problem is that the plaintiffs have

7     subpoenaed her for a time slightly after our subpoena in

8     their civil case and they want to try to get their case

9     going.  So they are trying to transport her down there even

10    though they know she is under subpoena in this court in this

11    criminal matter.

12               THE COURT:  Are these private individuals

13    transporting her?

14               MS. CARTER:  I believe they're investigators from

15    an investigating company and we have addressed it with them.

16               THE COURT:  You can inform them that they'll have a

17    contempt hearing here in this court if they interfere with

18    this trial.

19               MS. CARTER:  Yes, Your Honor.

20               THE COURT:  All right.  Anything from any other

21    counsel?  Mr. Schwartz.

22               MR. SCHWARTZ:  Yes, Your Honor.  I guess two

23    housekeeping matters.  One, I understand that sometimes

24    counsel have to juggle witnesses and their needs, but both

25    sides including defense have a number of Desert Hot Springs

1  police officers subpoenaed and depending on whether they

2  testify either in my case-in-chief or rebuttal, I would like

3  to try to coordinate with the prosecution so we don't have a

4  bunch of officers sitting here and nobody patrolling Desert

5  Hot Springs.

6           THE COURT:  Exactly.

7           MR. SCHWARTZ:  So I put the offer out there for the

8  prosecution if we can try to coordinate.  We also told the

9  City Attorney we would try our best to coordinate with them

10 so they can have proper coverage of the City's safety needs.

11 And the second issue is just counsel was good enough to

12 remind me, I'm not sure the terms the Court used, but we had

13 agreed to be out of session every Friday for half a day.

14          THE COURT:  Oh, I didn't know it was every Friday.

15 Well, hopefully, we'll be --

16          MR. SCHWARTZ:  The Sabbath is every Friday,

17 Your Honor.

18          THE COURT:  Well, let's try to move this along.

19          MR. SCHWARTZ:  I understand, but we had made that

20 stipulation between the parties and we had put it before the

21 Court back in November.  The Court was agreeable.  Every week

22 is a Friday night so it's not just one.

23          THE COURT:  It's incumbent upon everybody to move

24 this along.  I mean we don't want interfere with the jury

25 either.  I mean these people are volunteering their time and

1    all others are being paid.  All right.  9:00 tomorrow,

2    please.

3              MR. SCHWARTZ:  Thank you, Your Honor.

4              (Proceedings were concluded at 5:20 p.m.)

1

2                    CERTIFICATE OF REPORTER

3

4    COUNTY OF LOS ANGELES        )

5                                 )  SS.

6    STATE OF CALIFORNIA          )

7

8    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

9    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

15   OF MY STENOGRAPHIC NOTES.

16

17

18   DATE: JANUARY 7, 2013_____

19

20      /s/  LAURA MILLER ELIAS

21   LAURA MILLER ELIAS, CSR 10019

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25