1           UNITED STATES OF AMERICA
            UNITED STATES DISTRICT COURT
2           CENTRAL DISTRICT OF CALIFORNIA
                 WESTERN DIVISION
3
                    - - -
4           HONORABLE TERRY J. HATTER, JR.
         UNITED STATES DISTRICT JUDGE PRESIDING
5                   - - -

6

   UNITED STATES OF AMERICA,          )
7                                      )
                 PLAINTIFF,            )
8                                      )
   VS.                                 )   CASE NO.:
9                                      )   CR 10-00163-TJH
   ANTHONY SCLAFANI,                   )
10                                     )
                 DEFENDANT.            )
11                                     )
                                       )
12   _____)

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             WEDNESDAY, FEBRUARY 8, 2012

17                LOS ANGELES, CALIFORNIA

18

19

20

21

22

23         LAURA MILLER ELIAS, CSR 10019
          FEDERAL OFFICIAL COURT REPORTER
          312 NORTH SPRING STREET, ROOM 453
24         LOS ANGELES, CALIFORNIA 90012
                PH:  (213)620-0890
25

```
 1

 2
      APPEARANCES OF COUNSEL:
 3
      ON BEHALF OF PLAINTIFF:
 4

 5              BY:  MARGARET CARTER
                     STEVEN M. ARKOW
 6              ASSISTANT UNITED STATES ATTORNEY

 7              1100 UNITED STATES COURTHOUSE
                312 NORTH SPRING STREET
 8              LOS ANGELES, CA 90012

 9
      ON BEHALF OF DEFENDANT:
10
                SILVER, HADDEN, SILVER, WEXLER & LEVINE
11
                BY:  MICHAEL D. SCHWARTZ, ESQ.
12                   MICHAEL SIMIDJIAN, ESQ.

13              1428 SECOND STREET
                SUITE 200
14              SANTA MONICA, CA 90012

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              INDEX

 2    WITNESSES FOR
      THE GOVERNMENT:
 3
                         DIRECT       CROSS      REDIRECT      RECROSS
 4
      MEYER, GREG
 5
      BY:  MR. ARKOW      5                         80
 6    BY:  MR. SCHWARTZ              56

 7    WHITE, JAMAL

 8    BY:  MR. ARKOW     89                      153, 162
      BY:  MR. SCHWARTZ            132
 9
      DECKER, DENNIS
10
      BY:  MS. CARTER    165
11    BY:  MR. SCHWARTZ            219

12
      EXHIBITS    RECEIVED      EXHIBITS     RECEIVED
13
      17           15            7            28
14    8            30            9A           31
      9B           31            9C           32
15    9D           32            9E           33
      9F           33            9G           35
16
      20           36            9            37
17    72 & 50      43            9H           50
      30           108           31           110
18    33           121           65           126

19    226          161           1            170
      32           172           25-27        192
20    56           197           78           199
      38-45        203           46           209
21

22

23

24

25
```

```
 1      LOS ANGELES, CALIFORNIA; WEDNESDAY, FEB. 8, 2012; 9:45 A.M.
                                    - - -
 2

 3              THE COURT:  Please be seated, ladies and gentlemen.

 4      I apologize for our Los Angeles traffic.  It's what happens.

 5      Let me ask you as I must has anything about this matter come

 6      to your attention since you were here yesterday?  If so,

 7      please raise a hand.  I see no hands having been raised.

 8      We're going to continue with the government case at this

 9      time.

10              The government may call its next witness.

11              MR. ARKOW:  Yes, Your Honor.  The government calls

12      Greg Meyer.

13              THE COURT:  Very well.  Would you come right up on

14      the witness stand to be sworn.

15                          (Witness sworn.)

16              THE CLERK:  Please have a seat.  State and spell

17      your name for the record.

18              THE WITNESS:  My name is Greg Meyer, G-r-e-g

19      M-e-y-e-r.

20              THE COURT:  Mr. Meyer, do you have a middle name?

21              THE WITNESS:  Monroe.  M-o-n-r-o-e.

22              THE COURT:  You may proceed, Mr. Arkow.

23              MR. ARKOW:  Yes, Your Honor.

24

25
```

```
 1                       DIRECT EXAMINATION
 2    BY MR. ARKOW:
 3    Q.   Mr. Meyer, how are you currently employed?
 4    A.   I'm a consultant on law enforcement issues, particularly
 5    use of force issues.
 6    Q.   How long have you been a consultant on those issues?
 7    A.   Over 22 years.
 8    Q.   Are you familiar with what a taser gun is?
 9    A.   Yes.  I actually have 32 years of experience with
10    tasers.
11    Q.   Can you give at this point just a brief description of a
12    taser gun, and then we'll go into a little more detail later
13    in your testimony?
14              THE COURT:  Well, before you do that, where do you
15    office, Mr. Meyer?
16              THE WITNESS:  In Glendale, California.
17              THE COURT:  All right.  Go ahead.
18              MR. ARKOW:  Would the Court want me to ask more
19    questions about Mr. Meyer's background at this time?
20              THE COURT:  Well, depends upon how you intend to
21    utilize this witness.
22    BY MR. ARKOW:
23    Q.   Can you just briefly describe what a taser gun is?
24    A.   Taser is an electronic controlled weapon that's a
25    hand-held device that police officers use to control someone
```

1  who is resisting or combative.  It delivers an electrical

2  charge that when it's effective, it causes the person to be

3  temporarily incapacitated so that they can be handcuffed.

4  Q.   I want to go back to your background, your education and

5  your experience with taser guns.  Let's start with your

6  education.  Where did you go to college?

7  A.   Went to college at the University of Texas and Cal-State

8  Long Beach and Cal-State Los Angeles.  I got my bachelor's

9  degree at Cal-State Long Beach in 1979 and my master's degree

10 in public administration in 1991.

11          THE COURT:  Did you go to University of Texas

12 Austin?

13          THE WITNESS:  Yes.  In fact I'll be there next

14 week.

15          THE COURT:  Doesn't belong in Texas.

16          THE WITNESS:  Pardon me, sir?

17          THE COURT:  It doesn't belong in Texas.

18          THE WITNESS:  Do I belong in Texas?

19          THE COURT:  No.  Austin doesn't belong in Texas.

20          THE WITNESS:  Oh, sorry.  My bad ears.

21          THE COURT:  Very much like Berkeley in the '60s.

22          THE WITNESS:  I'll let you know when I get back

23 next week.  I haven't been there in a while.

24 BY MR. ARKOW:

25 Q.   In connection with your master's degree, did you write a

1    thesis or a paper that had to deal with tasers?

2    A.   Yes.  I wrote my master's thesis.  It was published in

3    1991.  It was entitled Nonlethal Weapons versus Conventional

4    Police Tactics:  The Los Angeles Police Department

5    Experience.  And tasers was one of the tools and tactics that

6    I examined for effectiveness and for injuries to officers and

7    suspects.

8    Q.   What is your background specifically in law enforcement?

9    I believe you mentioned the Los Angeles Police Department.

10   Particularly as it relates to your knowledge and experience

11   with tasers.

12   A.   I retired after 30 years in law enforcement.  I retired

13   from the Los Angeles Police Department almost six years ago

14   where I was captain of the police academy.  Early in my

15   career back in 1979, 1980, I was assigned to research various

16   nonlethal weapons alternatives for the LAPD.  We looked at 13

17   different things and taser was one of the items that we

18   ultimately tested and adopted for field use.  So I've kind of

19   been with that subject for, as I said, more than 32 years and

20   I kind of stayed close to it over these years because it's

21   pretty interesting.

22   Q.   Do you still continue in any capacity with the

23   Los Angeles Police Department?

24   A.   I continue as a reserve officer for them.  I volunteer

25   some time.  Part of it's advising the Department on use of

1    force issues.

2    Q.   And have you ever taught taser training classes for

3    either taser users or other taser instructors?

4    A.   Yes.  I did that quite a bit in the 1990s for one of the

5    early taser companies called Taser Tron and I did that as

6    part of my duties with the LAPD early on when we adopted

7    tasers and other agencies wanted to replicate our policy and

8    our training programs so we helped them out with that

9    material.

10   Q.   What associations do you belong to or activities do you

11   participate in that's related to your knowledge of tasers?

12   A.   I'm on the National Advisory Board of the For the

13   Science Research Center in Minnesota.  I teach on the subject

14   of lethal and nonlethal force for an organization called

15   Americans for Effective Law Enforcement which is a

16   Chicago-based research firm which puts on seminars for law

17   enforcement and attorneys on a variety of subjects including

18   use of force.  I'm on the faculty advisory committee and

19   publications review panel for that organization.

20         Let's see.  I'm a member of the International

21   Association of Chiefs of Police.  Myself and one other person

22   co-authored that agency's model policy on electronic weapons

23   used for law enforcement.  Their most recent iteration of

24   that was about two years ago.  I'm a member of the Police

25   Executive Research Forum which is a Washington DC based law

```
 1    enforcement executive firm.  I participated in 2005 and 2010

 2    on various iterations of their recommended guidelines on

 3    electronic control weapons.  And in fact, what a week, two

 4    weeks from now, I'll be in Washington DC at a conference for

 5    PERF P-E-R-F that's focused on taser issues.

 6    Q.    Does PERF stand for Police Executive Research Forum?

 7    A.    It does.

 8    Q.    And you used the term electronic controlled weapons or

 9    electronic control devices.  And taser is an example of a

10    electronic control weapon or device?

11    A.    It is.  Taser is an electronic control weapon,

12    electronic control device or conducted energy device.  You

13    hear different terminology out there, but it kinda all means

14    the same thing.

15    Q.    Stun gun is that another term that people sometimes use?

16    A.    Stun gun is a little bit more generic.  There are many,

17    many types of stun guns out there.  A little hand held, you

18    have to touch it to a person, type devices that are not

19    tasers, but operate on the same electrical principals.

20            THE COURT:  Mr. Arkow, are you offering this

21    witness as an expert?

22            MR. ARKOW:  Yes, Your Honor.  On operation and

23    deployment and certain data features of a taser device.

24            THE COURT:  Mr. Schwartz, do you care to voir dire

25    or will you just wait for cross-examination?
```

```
 1            MR. SCHWARTZ:  Cross is fine, Your Honor.
 2            THE COURT:  Very well.  You may continue.
 3   BY MR. ARKOW:
 4   Q.   Have you ever been certified as a taser instructor?
 5   A.   Yes.  Several times.  I've certified many taser
 6   instructors.  I have been certified on several taser devices
 7   over the years.
 8   Q.   And we have been using the term taser.  Is taser a brand
 9   name?
10   A.   It is.
11   Q.   So is there a company called taser?
12   A.   The current iteration of the company is called Taser
13   International.  They make the brand name Taser.  And for law
14   enforcement purposes, that's just about the only game in
15   town.  There is a competitor, but they haven't really
16   penetrated the marketplace very much.
17   Q.   And the word taser t-a-s-e-r?
18   A.   Yes.
19   Q.   Do the letters of that company named Taser stand for
20   anything?
21   A.   Well, the taser inventor back in the 1970s named it
22   taser.  It was after what he called Thomas A. Swift's
23   electronic rifle.  He grew up in the '30s and there was a
24   series of books by Victor Appleton called Tom Swift.  Tom
25   Swift and his wonderful machine this, Tom Swift and his
```

1    fantastic that.  And there was one book called Tom Swift and

2    his electronic rifle.  So Jack Kover, the inventor, decided

3    to call his device when he invented it in the mid-1970s a

4    taser making that acronym.

5    Q.   You testified that you have been certified as a taser

6    instructor.  To get that certification, do you have to take a

7    certain course from the Taser International company?

8    A.   You have take a -- you have to take a certification

9    course from a certified taser instructor or a master

10   instructor which I have done several times.  Yes, you have to

11   take a course not necessarily from the company, but from

12   someone who has been certified as a taser instructor

13   certified by the company.

14   Q.   And what are the subject matters that are taught in this

15   course that you have taken to become yourself certified as a

16   taser instructor?

17   A.   Just briefly they teach you what the device is, what its

18   parts are, how it works, what the various advantages and

19   disadvantages are.  What the risks and the dangers of it are.

20   How to use it.  Cautions about when not to use it in certain

21   circumstances and how to maintain it.  And how to avail

22   yourself of the documentation that's from a little computer

23   chip inside the taser that you can get a printout of when

24   it's used and for how long it was used at any given incident.

25   That sort of thing.  Some of the tactics for using it

1  effectively.  Some of the tactics for when it doesn't work
2  right.  Typical law enforcement weapons training course.
3  Q.   Does that include also any warnings about when not to
4  use the taser under certain conditions?
5  A.   Yes.
6  Q.   And what are those warnings?
7  A.   Well, there's several.  You know, some of them might be
8  pretty obvious.  One is if you taser someone that's in a body
9  of water like a swimming pool or a lake, they become
10  disabled, they might drown so you don't want to do that
11  unless you're ready to rescue them real quick.  You don't
12  want to taser somebody off of a high place like a second or
13  third story porch because they might fall and become
14  seriously hurt or even die from the fall.
15         They warn you against tasering very old or very
16  young people just nobody has done any medical research on
17  tasers with respect to very old or very young people even
18  though a number of very old and very young people have been
19  tasered without any negative effects, but there's not been
20  any formal research on it so that's on the warning list.  You
21  don't want to taser someone near gasoline or flammable gas
22  source for obvious reason that the electricity might ignite
23  the flammable source.  Those are the basic ones.
24  Q.   What about avoiding tasering a subject on certain parts
25  of the subject's body?

A.    Oh, there's warnings you want to -- I haven't explained
how the taser works yet, but part of the way that the taser
works is it'll shoot out two little darts, little
straightened out fish hooks, if you will.  They're attached
to wires back to the power source.  You're advised against
tasering having a dart go into someone's face.  You might
hurt the eye and to the front of the neck, female breasts,
genitals.  Those types of sensitive areas you try not to fire
the darts at.

Q.    You were describing some of the training and the
warnings that you received in the taser certification class;
is that correct?

A.    Yes.

Q.    And how do the uniform patrol officers in police
departments that use tasers, how would the patrol officers
and the personnel of those police departments that are issued
tasers to their officers, how are they trained?

A.    Patrol officers would receive training from usually
someone in their own department that's been certified as an
instructor.  They would go through a four, maybe an
eight-hour class.  I know LAPD user's class is still four
hours.  And they would learn to use the device.  They would
see a Power Point.

        They would do some exercises hopefully under some
stress to try to replicate how to use the weapon in a field

1    environment.  And on many occasions the officers themselves

2    would actually receive a jolt from the taser so they know

3    what it feels like in case it was ever used against them and

4    they know what the subject that they're tasing is going

5    through when they receive the electricity.

6    Q.   Upon the completion of that course, would the officer

7    receive a certification that the officer's been trained in

8    how to operate the taser and those areas that you have

9    covered?

10   A.   Yes.  If the instructor follows the Taser International

11   company's protocol, then they would issue a training

12   certificate that certifies that the officer was trained on a

13   certain date and it's valid for a year or two, whatever

14   period they choose before they have to be recertified again

15   to carry the device.

16           MR. ARKOW:  Can I ask the clerk if Government's

17   Exhibit 17 marked for identification be placed before the

18   witness?  And also this witness will be referring to

19   Exhibit 9 and exhibits in the nine series as well.

20           THE COURT:  Very well.

21   BY MR. ARKOW:

22   Q.   Do you have Exhibit 17, the folder in front of you?  If

23   you can open it up?  You were talking about the taser

24   certification issued when the officer completes the course.

25   Do you recognize what's in Exhibit 17?

```
 1    A.    Yes.

 2    Q.    What is that?

 3    A.    That appears to be a taser user certification

 4    certificate that was issued on November 27th, 2004 to an

 5    officer named Tony Sclafani.

 6              MR. ARKOW:  I move Government's Exhibit 17 into

 7    evidence and it's also subject to the parties stipulation

 8    Government Exhibit 84.

 9              THE COURT:  It will come in.

10                   (Exhibit 17 admitted.)

11    BY MR. ARKOW:

12    Q.    Just putting on the monitor Government Exhibit 17, maybe

13    we can just zoom in a little bit, is that the same exhibit

14    you have in front of you, Mr. Meyer?

15    A.    It appears to be.

16              MR. ARKOW:  And with the Court's permission, may I

17    read from Government's Exhibit 84, the stipulation regarding

18    Desert Hot Springs business records and specifically

19    Government Exhibit 17?

20              THE COURT:  Go right ahead.

21              MR. ARKOW:  From time to time, we'll be reading

22    from appropriate portions of the stipulation with the Court's

23    permission.  Government Exhibit 17 which is a Taser

24    International Taser X26 certification dated November 27, 2004

25    declaring defendant Anthony Sclafani as a certified user.
```

1    This is from a stipulation regarding Desert Hot Springs

2    Police Department business records.  Let me read.

3            United States of America and defendant Anthony

4    Sclafani hereby stipulate and agree to the following facts:

5            The following exhibits were obtained from the

6    Desert Hot Springs Police Department and are records that

7    were made at or near the time of the occurrence or the matter

8    set forth therein.  Were made by or from information

9    transmitted by a person with knowledge of those matters.

10   Were kept in the course of a regularly conducted business

11   activity.  Were made by and in the course of a regularly

12   conducted business activity as part of a regular practice.

13   Q.   And since you have left the Los Angeles Police

14   Department, have you been involved as a consultant that you

15   have described in court cases?

16   A.   Yes, quite a few.

17   Q.   Just approximately if you can give the range of the

18   number of cases either testifying or that you have worked as

19   a consultant to give the jury a sense of your activity?

20   A.   I have been involved since 1989, you mean just since I

21   left the Department or all the consulting that I have done in

22   court cases on these matters?

23   Q.   Whichever number you have ready.

24   A.   The number in my head has to do with since I have been

25   doing this kind of consulting work and expert witness work

1    since 1989, I have been involved in about 160 cases.

2    Probably 90 percent of them were use of force either lethal

3    or nonlethal force cases.  I've testified more than 30 times

4    in depositions.  I have testified more than 30 times in

5    federal and state and local courts in California and in other

6    states.  I think that probably answers the question.

7    Q.   And have you specifically testified about the use and

8    deployment and operation of a taser gun?

9    A.   Yes, many times.

10   Q.   And what are some of the subject matters that you have

11   testified regarding the use, the activation and deployment of

12   a taser gun?

13   A.   I've testified about how it works, I've demonstrated in

14   some courts how it works.  I have testified about and I have

15   also rendered opinions in many cases about whether the use of

16   the taser device was proper or improper.  You know, that sort

17   of thing.

18   Q.   Can you give now a more detailed description of actually

19   how a taser gun operates and how the fish hook probes that

20   you described, how that is propelled from the taser gun?

21   A.   Sure.  Again, the taser is a hand held device.  It's

22   battery operated.  There's what we call a probe pack or

23   cartridge pack that goes on the business end of the device.

24   Inside that it contains some very small wires and a couple of

25   probes.  Picture miniature torpedos coming out of the torpedo

1   tube from a submarine for example.  Only they're really small
2   and the probes themselves are much less than a quarter inch
3   thick and the -- there is a little straightened out fish hook
4   type device.  It's got the little fish hook on it at the end
5   of the probe.
6         When you pull the trigger on the taser and it
7   starts the electricity, some compressed nitrogen, there's a
8   little explosion inside the device and it causes the two
9   darts to fly out of the front of the device, the little
10  torpedo tubes if you will and over the course of distance,
11  the darts will spread apart.  For example, at seven feet
12  distance from the subject, seven feet from the face of the
13  device, the darts will spread out one foot and attach to the
14  clothing or to the skin of a person.
15        If you successfully get both of the probes to
16  attach to either the clothing or the skin and the clothing is
17  close enough to the body, then the spark will jump.  You'll
18  get what's called an ON.  If you get good enough dart spread
19  to involve at least some of the muscle groups in the body,
20  you'll get what's called neuromuscular incapacitation which
21  makes the person basically freeze up.  If they're standing,
22  ideally they'll freeze up, they'll shake a little bit,
23  they'll fall to the ground and officers will run over and
24  handcuff them.  That's the short explanation of how it works
25  with the probes.

1           Do want me to give them the drive stun also?

2   Q.    Yeah.   Can you explain what that term drive stun is?

3   A.    Another tactic you can use with taser at close quarters,

4   at contact range is either with the dart cartridge on the

5   device or more usually with the dart cartridge off the

6   device, you can touch the taser to the person on their body

7   and pull the trigger and some very localized electricity will

8   be delivered to whatever part of the body that you're

9   touching.   It's painful.   That's what police call a pain

10  compliance device.   Police use all sorts of pain compliance

11  devices and tactics that are intended to put some pain on a

12  person and in that way persuade them to stop resisting and

13  allow themselves to be controlled and handcuffed.

14          The taser drive stun when you put it around

15  different parts of the body and just have that very localized

16  pain, typically will not incapacitate the person and have

17  them fall on the ground like it will with the darts if you

18  have a good connection with the darts.   It's a different

19  tactic that you can use with the same device.

20  Q.    If someone is drive stunned to their body, that could

21  cause the person to fall over also?

22  A.    It typically would not.   Typically would not, but it

23  could if it was in conjunction with maybe you're trying to

24  pull them down and you or another officer drive stuns them,

25  it might cause the person to react in a way that helps make

1   it easier to take them to ground.  But if I was drive stunned

2   right here, right now and I would have been right here, it

3   would not cause me to fall to the ground.  It would just

4   cause me to go ow.

5          THE COURT:  When you say right here, could you tell

6   us?

7          THE WITNESS:  In the upper chest.  I just used that

8   for an example.

9   BY MR. ARKOW:

10  Q.   The probes that are propelled from the taser gun, how

11  fast does the wire and probes approximately travel through

12  the air to the person's body?

13  A.   The muzzle velocity is about 200 feet per second.  That

14  means the speed they're coming out of the face of the device

15  when the darts are launched and, of course, the speed falls

16  off with distance.

17  Q.   Are there different types of models that are made by the

18  taser company?

19  A.   Yes.  They make actually five different models, actually

20  there's two of them they have stopped making, but are still

21  in use out there.  So over the last, let's see, 12 years,

22  almost 13 years now, they have introduced, that company has

23  introduced five different successive models.

24  Q.   Are you familiar with the model that's known as the X as

25  in the letter X26?

```
 1   A.   Yes.  That's the most often model that's out there.
 2   That's their most successful model in terms of how many
 3   hundreds of thousands of them were distributed into law
 4   enforcement hands starting in 2003.
 5            MR. ARKOW:  With the Court's permission, may the
 6   witness be shown what's been marked for identification as
 7   Government Exhibit 6 that was the taser gun that was used
 8   during the opening?
 9            THE COURT:  Certainly.  If you would just present
10   that to the witness.
11   BY MR. ARKOW:
12   Q.   And Mr. Meyer, I want you to first tell the jury that
13   taser is in the safety mode?
14   A.   It's in its holster and the safety is on and it's
15   unloaded so pretty safe unless you turn the safety off and
16   pull the trigger and touch it to someone.  That's about all
17   you could do with this one right here.
18   Q.   So when you say unloaded, what does that mean?
19   A.   That means that there is no cartridge on the front of
20   the device that would contain the darts.  You can only use
21   this one in drive stun mode like I was talking about a minute
22   ago unless you loaded it with dart cartridge.
23   Q.   So if I asked you to push the trigger to activate that
24   taser, not yet, there's no chance any darts are gonna project
25   out of that taser?
```

1  A.    There's no darts that are loaded into to project.  If I

2  pulled the trigger right now nothing would happen anyway

3  because the safety is on.

4  Q.    Before I ask you to do that, let me ask you to confirm

5  is that a Taser X26 model that you have been talking about as

6  the one that's most common for law enforcement?

7  A.    Yes.  They have introduced some newer models in the last

8  two-and-a-half years, but this is the one that's very much

9  most widely used out there.  Of all the law enforcement

10  tasers that are out there currently, I think it's safe to say

11  that well over 90 percent, probably over 95 percent of them

12  in the world are this model, the X26.

13  Q.    For purposes of your testimony here today, I want you to

14  focus on the capabilities and operation of the Taser X26

15  because that's what relevant to this case.  So your answers

16  so far when you talk about a taser, have those applied to the

17  Taser X26 model?

18  A.    Yes.

19  Q.    As I continue to ask you any questions about the

20  operation of tasers, if I don't say it each time Taser X26,

21  will you bear in mind that's with regard to how the Taser X26

22  that was in use as of February 2005, how tasers operate for

23  that model?

24  A.    Yes, I will.

25  Q.    And can you tell us, so that's the Taser X26 model

```
1    that's connected with the Government Exhibit 17, the Taser

2    X26 certification?

3              MR. SCHWARTZ:  Objection.  Foundation as the

4    question is worded.

5              THE COURT:  Well, it's overruled.  You may review

6    that exhibit.

7              THE WITNESS:  Yes, it is.

8    BY MR. ARKOW:

9    Q.   Now, can you using the Taser X26, Government Exhibit 6,

10   can you explain to the jury how it is activated at least now

11   without the cartridge and without any probes being deployed?

12   With the Court's permission, you will be able to activate the

13   device and demonstrate the electricity sparking.

14   A.   Oh, okay.  Great.  I can do that.  This is a Taser X26.

15   It's unloaded.  There is no cartridge on the front.  It has

16   the battery pack is here in the handle.  It slides upwards.

17   On the side here is a safety.  If I release the safety, let

18   me do this so everyone can see it.  Point it up here.

19   Release the safety, you should be able to see a little laser

20   light up there.  There's a little laser light built into this

21   flashlight here.  The purpose of the laser light is to assist

22   the officer with aiming if they're going to fire the darts.

23              If they were to fire darts, the top dart, there's

24   two darts, the top dart would go where the laser is, the

25   bottom dart would go at an eight-degree downward angle
```

1    relative to the top dart.  So at seven feet distance, the

2    spread between the two darts would be expected to be about

3    one foot.  With 14 or 15 feet, about two feet.  And at

4    21 feet, you would expect about a three-foot spread.

5             And then I just turned the safety back off.  When

6    the safety is on, whether or not the darts are loaded into

7    the device, if I said on, I meant off.  When the safety is

8    off, when the device activated as it is now, I can pull the

9    trigger, which I will and what you're going to see, you're

10   going to see some electricity jumping between the two probes

11   on the front of the device and you're going to hear the

12   static discharge of the electricity into the air.  You're

13   gonna hear it pulse 19 times a second and you're gonna hear

14   it run for five seconds.  And then it's going to

15   automatically shut itself off.  So I took my finger off the

16   trigger, I let it run its cycle.  That's what we call a

17   standard cycle.  Standard cycle is five seconds.  The device

18   automatically shuts itself off.  Do you want me to go through

19   the other options?

20   Q.   Can the cycle be less than five seconds?

21   A.   Yes.  Now I'm gonna do it again, only I'm gonna turn it

22   off very early in the cycle.  I turned it off by just

23   activating the safety switch again.  The other option is I

24   can hold my finger down on the trigger and it will run for

25   more than five seconds.  I override the five-second shock.

1    Until I release my finger off the trigger, and then it shuts

2    off and now I have turned it off again.

3            MR. ARKOW:  Let the record reflect that during this

4    demonstration, the witness has been activating the taser and

5    there were three demonstrations of activating the taser.

6            THE COURT:  The record will so reflect.

7    BY MR. ARKOW:

8    Q.    You mentioned that when the taser is activated, the

9    electricity discharges 19 pulses per second?

10   A.    Yes.

11   Q.    Can you explain what you mean by that?

12   A.    That clicking sound you heard, if you were able to graph

13   that and count it up, you would hear 19 of those popping

14   sounds over a one-second period.  That's the way is designed

15   is to deliver a high voltage, lower amperage pulsating

16   current.

17   Q.    Approximately how high is the voltage?

18   A.    The nominal voltage is 50,000 volts.  When you fire the

19   device, you're projecting 45 to 50,000 volts.  When it

20   attaches to a human target an X26 actually delivers about

21   1200 volts of electricity and again low amperage pulsating

22   current.  And it's designed to interfere with the nerves that

23   are under the skin and it is designed to confuse the body

24   which is usually receiving its electrical signals from the

25   brain.

1          Now, with the taser you introduce to some part of

2     the body an outside electrical signal that confuses the body

3     and it's -- that's why it becomes incapacitated.  The body

4     even though the brain is telling it to do something, it can't

5     do it because there's this outside electricity interfering

6     and causing confusion and hopefully if the person is

7     standing, it's causing them to fall down and get handcuffed.

8     Q.   When you say the taser is causing the interference or

9     the confusion, is the fact the taser is overriding the body's

10    neuromuscular system?

11         THE COURT:  Well, ask it differently.

12    BY MR. ARKOW:

13    Q.   Can you explain when you say interfering, is it to the

14    level the taser over powers the body's own natural

15    voluntarily neuromuscular reactions?

16    A.   That's fair.  Over powers or overrides the signals that

17    are typically sent through the muscles and other parts of the

18    body.  It just confuses them by using this outside force.

19    Q.   Now, I want to ask you about certain parts or components

20    of the taser.  With the Court's permission, may the witness

21    be provided with Government Exhibit 7 and 8?  I believe the

22    FBI case agent has them in his possession if he could

23    approach?

24         THE COURT:  Certainly.

25    BY MR. ARKOW:

1  Q.   If you can look at Government Exhibit 7, are both of

2  those contained in clear plastic?

3  A.   Yes, they are.

4  Q.   Taking them in order, Government Exhibit 7, do you have

5  that one?

6  A.   Yes.

7  Q.   Do you recognize the contents of that exhibit?

8  A.   I do.

9  Q.   You can open that clear plastic bag if that will help

10  examine the contents and also explain to the jury what the

11  contents are.  How do you recognize what's in that exhibit?

12  A.   Because I provided them to you, provided it to you.

13  Q.   What is it?

14  A.   This is a taser dart cartridge.  This particular one

15  because it's blue is a training cartridge.  It contains the

16  wires and the darts and the little torpedo tubes that I spoke

17  of earlier and it attaches to the face of the device.

18         MR. ARKOW:  I would move Government Exhibit 7 into

19  evidence.

20         THE COURT:  You may do so, but tell us is there

21  some difference between the training cartridge and any other?

22         THE WITNESS:  It's a quality control thing.  The

23  company sells the training cartridges somewhat cheaper than

24  the actual cartridges that are used in law enforcement work.

25  There's just less quality control on these basically, but

```
 1   they function the same.
 2                    (Exhibit 7 was admitted.)
 3             THE COURT:  Go ahead.
 4   BY MR. ARKOW:
 5   Q.   Now, from where you're seated in the witness stand, it
 6   might be hard to see the details of what that cartridge is
 7   from where you're seated, but did you also take closeup
 8   pictures of these different components including that
 9   cartridge or cartridge like that in connection with preparing
10   for your testimony?  Did you take photos of a cartridge?
11   A.   I think I did.  Either movies or photos or both.
12   Q.   So we'll be able to turn to that if you want to talk a
13   little more about the detail, but that's a physical example
14   of a taser cartridge; is that correct?
15   A.   Yes, it is.
16             THE COURT:  Well, don't ask your witness if
17   something is corrects.  That indicates that you're leading.
18   BY MR. ARKOW:
19   Q.   Is that a physical replica of a taser cartridge?
20   A.   Well, it is taser cartridge.  I don't know what else to
21   say.
22   Q.   Now, can you put that exhibit back in its exhibit bag?
23   And if you can look to the contents of Government Exhibit 8,
24   tell the jury whether you recognize it and also you can open
25   that and examine the contents?
```

1    A.    Yes, I recognize it.  I also provided this to you some

2    weeks ago.

3    Q.    And what are the contents?

4    A.    This is an expended taser cartridge, one that has been

5    fired.  And I'm just going to remove the little protective

6    cover here and so it's all bunched up, but what you have here

7    is probably a 21 footer, let me check.  This is a 21-foot

8    cartridge meaning that the probes can fire out 21 feet.

9    That's the maximum length of the wires which are now bunched

10   up.  When fired, they fired out 21 feet.  And inside the

11   little torpedo tubes are the probes.  There is another one in

12   there also.  There is the probe and here is the little

13   quarter inch or three-eighths of an inch, whatever it is,

14   straightened out fish hook is how we most commonly refer to

15   these because that's what people can relate to.  The other

16   one popped out.

17   Q.    When you said the wires bunched up, what is the

18   significance of the wires bunching up?  What does that mean?

19   A.    It just means that after I fired it, I gathered it up

20   and put it in a little plastic bag and after I secured these

21   little darts in here so that, you know, be easier to handle.

22            MR. ARKOW:  I move Government Exhibit 8 into

23   evidence.

24            THE COURT:  It will come in.

25                    (Exhibit 8 was admitted.)

BY MR. ARKOW:

Q.   And you could put the contents of that exhibit back into the plastic bag.  In preparation of your testimony, did you take photographs of the different components of the Taser X26 in assisting you to explain to the jury how a taser operates and what it's made of?

A.   I believe I took photographs.  I recall making a little movie of it.  I probably took photographs also.

Q.   Do you have in front of you exhibit folders that are marked government exhibits for identification 9 A through H?

A.   Yes, I do.

Q.   Can you look through each of those exhibits?

A.   I'm sorry.  Actually, goes through 9 J.

Q.   Let's look first at 9 A through H.

A.   Okay.

Q.   And tell the jury if you recognize the contents of those exhibits?

A.   Yes.  Nine A or no, nine.  Okay.  You just want me to talk about 9A; right?

Q.   Well, you started with 9.  What is 9?

A.   Nine is a DVD that I made for you a few weeks ago that is labeled as containing some photographs and two videos that I made to explain the taser parts and how it works, that kind of things.  That's a DVD.

Q.   And is your signature and date on that DVD?

1    A.    Yes.   And then 9A, I did take this photograph.   This is

2    a photograph of the various taser component parts.   Want me

3    to explain what they are?

4    Q.    Did you also put the taser components parts on a video

5    to explain them?

6    A.    Yes.

7    Q.    So we'll hold off.   And in terms of that video in

8    meantime since you recognize 9A, move Government Exhibit 9A

9    into evidence?

10             THE COURT:   It will come in.

11                  (Exhibit 9A was admitted.)

12             THE WITNESS:   Nine B is a photo I took of the two

13   Duracell camera batteries is what's used to power the taser.

14             MR. ARKOW:   Move Government Exhibit 9B into the

15   evidence.

16             THE COURT:   It will come in.

17                  (Exhibit 9B was admitted.)

18             MR. ARKOW:   Permission to publish 9B?

19             THE COURT:   Go right ahead.

20             MR. ARKOW:   If you could identify just very briefly

21   what's in the picture and if you recognize it and with the

22   Court's permission display that.

23             THE WITNESS:   That's 9B.   As I said a minute ago,

24   that's the photograph of the two Duracell camera batteries

25   that are inside of the taser and the power module that's the

```
 1    power source for the taser.
 2    BY MR. ARKOW:
 3    Q.   Next Exhibit 9C.
 4    A.   I thought it was B.  You said next?  Oh, okay.  Thank
 5    you.  Yes, and 9C is another photograph of probably pretty
 6    similar to 9A where I laid out the various component parts
 7    and took that photograph.
 8              MR. ARKOW:  I move Government Exhibit 9C into
 9    evidence.
10              THE COURT:  It will come in.
11                   (Exhibit 9C was admitted.)
12    BY MR. ARKOW:
13    Q.   Turn to 9D.
14    A.   Nine D is a closeup photograph of an unused, the live,
15    if you will, taser cartridge or regular cartridge.
16              MR. ARKOW:  Move Government Exhibit 9D into
17    evidence.
18              THE COURT:  It will come in.
19                   (Exhibit 9D was admitted.)
20    BY MR. ARKOW:
21    Q.   Turn to Government's Exhibit 9E for identification.
22    A.   Nine E is that same live cartridge only now it's
23    standing on its end and you can see the front of the face of
24    the cartridge.
25              MR. ARKOW:  Move Government Exhibit 9E into
```

1   evidence.

2              THE COURT:  It will be admitted.

3                   (Exhibit 9E was admitted.)

4   BY MR. ARKOW:

5   Q.   Turn to Government's Exhibit 9F?

6   A.   Nine F is an expended taser cartridge most likely the

7   same one I just showed in Exhibit No. 8 a few minutes ago.

8              MR. ARKOW:  Move Exhibit 9F into evidence.

9              THE COURT:  It will be admitted.

10                  (Exhibit 9F was admitted.)

11  BY MR. ARKOW:

12  Q.   Looking at what's depicted in Government Exhibit 9F on

13  the monitor, are some of the wires to use your term bunched

14  or how would you describe what the wire configuration is both

15  in the cartridge unit receptacle and what appears to be

16  outside the cartridge?

17  A.   In the cartridge before it's fired, it's just tightly

18  wound by a machine so that the wire all fits inside that

19  small cartridge.  After it's fired out, then typically it's

20  gathered up like that, you bunch it up like that if you're

21  going to save it.

22  Q.   And is part of evidence collection, well, what's the

23  significance of the fact that the wires inside the cartridge

24  appear to be wrapped around within the cartridge?  Does it

25  look like the wire, the entirety of the length of the wire

1    has been expended?

2    A.   It looks like it.  If you're talking about the wires

3    appearing to be wrapped around the metal probes?

4    Q.   Can you -- on your monitor you are able to point and

5    tell the jury which wire you're referring to.

6    A.   I see a couple of wires.  Does it mark?

7    Q.   Those?

8    A.   I was actually looking kind of the loopy one that's on

9    the top.  It just means that after they're bunched up, they

10   looped around the probes a little bit.  I mean they're not

11   that way in the cartridge before it's fired, they're not that

12   way after it's fired.  Seems to be an artifact of bunching

13   the wires together and some of them got looped around there.

14   Q.   After a taser has been deployed and used, can you look

15   at the wires propelled from the taser to tell how far the

16   taser probes shot out of the taser gun muzzle to the target?

17   A.   You probably could if you preserved that evidence.  If

18   you didn't bunch up the wires like this.  For example, if the

19   wires in this case of this cartridge are 21 feet long and you

20   fired at a person at a five foot range and then the wires

21   that came out only went five feet, no, I don't know.  I don't

22   know if they would all come out or not now that I think about

23   it.  You might be able to tell based on how long the straight

24   wires were versus how long the bunched wires up were or you

25   might not.  I do not know.

1    Q.   And are officers are trained in evidence collection how

2    to package the wires after a taser has been used and the

3    wires have been projected?

4    A.   Some are and there is various ways to do it.  I mean the

5    way that I did it there is a common way inserting the probes

6    back into the little torpedo tubes, if you will, and then

7    bunching up the wires and maybe putting them in a plastic bag

8    like this or in a box.  If your agency retains the expended

9    wires for evidence.  Some do, some don't.

10   Q.   Can you turn to Exhibit 9G and tell us if you recognize

11   that?

12   A.   This is just a closeup photo of the expended cartridge

13   and the bunched up wires again and the probes.  And the two

14   little yellow rectangles is what we call the blast doors.

15   Those are what falls off when the wires are projected out.

16   It's just like the cover for the cartridge.  It comes off in

17   two pieces.

18         MR. ARKOW:   I move Government Exhibit 9G into

19   evidence.

20         THE COURT:  It will come in.

21              (Exhibit 9G was admitted.)

22   BY MR. ARKOW:

23   Q.   How is a taser gun worn or holstered by a police

24   officer?

25   A.   Many officers carry it on their equipment belt in a

1    little holster similar to the one in Exhibit 6.  It will

2    attach to the police equipment belt.  Some officers keep them

3    in their car, some officers slip it in their pocket.  There's

4    a variety of ways.

5             MR. ARKOW:  May the witness be shown what's been

6    marked for identification Government Exhibit 20?

7             THE COURT:  He may.

8    BY MR. ARKOW:

9    Q.   If you can open the folder of Exhibit 20 and look at the

10   photograph that's depicted, do you recognize what's in that

11   photo?

12   A.   That appears to be a one of the more popular taser

13   holsters attached to some sort of equipment belt.  Very

14   similar to the one that's here in Exhibit 6, maybe identical.

15            MR. ARKOW:  Move Exhibit 20 into evidence.

16            THE COURT:  It will come in.

17                 (Exhibit 20 was admitted.)

18            MR. ARKOW:  With the Court's permission, I would

19   want to read from a portion of the stipulation concerning

20   this exhibit.

21            THE COURT:  You may.

22            MR. ARKOW:  This is from Government Exhibit 84, the

23   stipulation on the business records and other items.

24                 Government Exhibit 20 which is a true and accurate

25   photograph of the taser holster of defendant Anthony

```
 1    Sclafani.

 2              THE COURT:  Is that the stipulation you have agreed

 3    to?

 4              MR. SCHWARTZ:  Yes, Your Honor.

 5              THE COURT:  Ladies and gentlemen, as I have told

 6    you, once the parties have stipulated and the Court has

 7    indicated it will receive the stipulation, you as the judges

 8    of the facts are free to treat it as any other evidence.

 9              Go ahead.

10              MR. ARKOW:  With the Court's permission, I would

11    publish Government Exhibit 20.

12              THE COURT:  Very well.

13    BY MR. ARKOW:

14    Q.   Now, you can put all the photos back in their folder.

15    A.   Photos are in.

16    Q.   And government Exhibit 9, that was the video that you

17    had prepared and saw your name and initials on that?

18    A.   Yes.

19              MR. ARKOW:  I move Government Exhibit 9 into

20    evidence.

21              THE COURT:  It will come in.

22                   (Exhibit 9 was admitted.)

23    BY MR. ARKOW:

24    Q.   Do the taser probes have to penetrate or physically

25    touch a person's skin for a taser to have its effect that you
```

1   described, the neuromuscular incapacitation?

2   A.   No.  The probes often just attach to the clothing, the

3   outer clothing of a person.  And if the tip of the probes are

4   less than two inches from the skin, the voltage will cause

5   the electricity to jump to the skin.  I say two inches.  It

6   could be one inch for each dart or one-and-a-half inches for

7   one dart and a half inch for the other.  As long as the

8   cumulative gap between the probes and the skin is less than

9   two inches, the connection should be made.

10  Q.   And when you were giving the example of the taser gun

11  being used in the drive stun method, what kind of pain does

12  the person getting the drive stun of the taser feel?

13  A.   Most people describe it as a very intense but localized

14  pain, wherever they're being touched with the device.  Some

15  people don't feel any pain and they describe it differently.

16          MR. ARKOW:  May I have a moment, Your Honor?

17          THE COURT:  You may.

18  BY MR. ARKOW:

19  Q.   And when the darts are hitting a person's body and there

20  is an electrical circuit, what's the feeling that the

21  person feels when the taser gun is activated and the darts

22  are in that person?

23  A.   Again, most people describe it as a pain.  Not as many

24  people seem to describe it as pain as with the drive stun,

25  but you would say it hurts.  It's startling.  It's an

1    electrical shock.  And most people recall that, you know,

2    their body shakes, that they can't do what they want and that

3    they fall down if they're standing up.

4    Q.   What happens if only one of the two probes hits the

5    person's body?

6    A.   It would depend on where the other probe was whether

7    it's in the clothing or whether it missed all together.  It

8    would depend to some extent on if it missed all together,

9    what kind of a surface are we standing on whether there would

10   be any electricity conducted or not.  Mostly if one probe

11   misses and one probe hits, there's no effect at all unless

12   you got a little bee sting puncture wound from the probe that

13   hit.

14   Q.   And that's because the probe penetrates the skin?

15   A.   If the probe penetrates the skin, it's very similar to a

16   bee sting in terms of what it looks like and how it acts.

17   Q.   Are there times when the two probes can hit a person's

18   body, but the electrical circuit is not completed?

19   A.   There can be a malfunction where the electricity is not

20   delivered for, you know, a variety of reasons.  There could

21   be a short in the wires, there could be a short at the face

22   of the device where the probes were launched, there could be

23   a worn out battery.  There could be a number of reasons why

24   it doesn't work.

25   Q.   What sort of a mark may be left on a person's body when

1    the taser gun is used in drive stun mode?

2    A.    The drive stun mode if it's on them for, you know, more

3    than a second or so and that's not precise, that's just an

4    estimate, if it's on them for more than just a brief moment

5    and it's held on them for maybe a few seconds, you'll see

6    little red welts, some little swelling, a little

7    discoloration and redness there.  And, you know, the last

8    time I had that done to me, it kind of disappeared over about

9    a 12-day or two-week period.

10   Q.    And if someone gets drive stunned, is there always a

11   mark that's left on the person's body?

12   A.    I wouldn't say that.  I think there is probably

13   occasions where very brief touches do not leave marks.

14   Q.    You testified earlier that the taser device has an

15   internal computer or memory chip?

16   A.    Yes.

17   Q.    Can you explain to the jury what this internal computer

18   does and why it's important?

19   A.    It has an internal clock and a device that records every

20   time the trigger is pulled based on date and time and how

21   much battery power there was, what the internal temperature

22   of the device was.  And probably most significantly how long

23   the cycle was.  Whether it was a standard five-second cycle

24   or whether it was a shorter or a longer cycle and that

25   enables you to analyze things like how long it was on, how

1    many seconds or minutes were in between each cycle and that

2    sort of thing.

3    Q.   And is this information stored in the internal computer

4    in the taser?

5    A.   Yes.

6    Q.   And is there a way to retrieve or get access to the

7    information that's stored in this internal computer?

8    A.   Yes.  There is a little computer attachment you can put

9    on it and it will download into a laptop or personal computer

10   the data that's stored inside, and then you can print it out

11   and it will give you a record of the uses.

12   Q.   And is there a term or how would you refer to the data

13   that is printed out and gives you that record, how do you

14   refer to that?

15   A.   Various terms.  I usually call it a taser download

16   printout.

17   Q.   Will the taser download printout show an activation if

18   the taser is used in drive stun method?

19   A.   The computer does not -- in the X26 is not able to

20   distinguish whether it was used in a drive stun mode or

21   launching the probes.  It only can tell you that the trigger

22   was pulled and the device was activated for that period of

23   time.

24   Q.   So if it's used in drive stun mode, it will be recorded

25   on the internal computer?

```
 1    A.    Yes.

 2    Q.    And it will reflect it on this download report?

 3    A.    Yes.

 4    Q.    And if it's -- if the taser is used in the dart or probe

 5    deployment, it will also reflect --

 6              THE COURT:  Please, what it will do?

 7    BY MR. ARKOW:

 8    Q.    Will the internal computer record if the taser is used

 9    in the probe deployment method?

10    A.    Yes, just the same.  Any time the trigger is pulled, the

11    computer will record the activation and its duration and its

12    time.

13              MR. ARKOW:  May the witness be shown what's marked

14    for identification as Government Exhibit 72, and then also

15    Government Exhibit 50 I'll be referring to.

16              At this time, Your Honor, I would like to read from

17    the party's stipulation Government Exhibit 84 regarding these

18    two exhibits.

19              THE COURT:  Go right ahead.

20              MR. ARKOW:  Government Exhibit 72 is a Taser

21    International download report for defendant Anthony

22    Sclafani's taser showing taser activations on February 24,

23    2005.  And Government Exhibit 50 is a Taser International

24    download report for defendant Anthony Sclafani's taser

25    showing taser activations on February 25, 2005.
```

1          Move Government Exhibit 72 and 50 into evidence.

2          THE COURT:  Mr. Schwartz, is that the stipulation

3     agreed to on behalf of your client?

4          MR. SCHWARTZ:  Yes, Your Honor.

5          THE COURT:  Both received.  Both exhibits will be

6     received as well.

7              (Exhibits 72 and 50 were admitted.)

8          MR. ARKOW:  With the Court's permission, I'll have

9     published Government Exhibit 50.  Well, let's do 72 first.

10         THE COURT:  Go right ahead.

11    BY MR. ARKOW:

12    Q.   Do you recognize the type of document which is

13    Government Exhibit 72, the download report?

14    A.   Yes.

15    Q.   Looking at the columns on this document and the

16    information that's contained, can you tell the jury what type

17    of information is on this report?

18    A.   Well, the serial number of the taser is there in the

19    upper left and it indicates it's Model No. 26.  On the left

20    about five lines down, it says record date range.  That means

21    that what are the dates that were involved in this particular

22    download printout request when whoever downloaded it selected

23    the date range.

24    Q.   What is the date range?

25    A.   The date range on this one is just February 24th, 2005.

1    And the report was created there generated on May 17, 2005

2    and it shows the name of the sergeant that conducted the

3    download into the computer.  And then at the bottom it shows

4    what the recorded firing data and it shows three sequences.

5    And then it has the columns for Greenwich meantime, local

6    time, the duration of the activation, the internal

7    temperature of the device at the time in centigrade at the

8    time that it was activated and the percentage of battery

9    power that was remaining in the device at the time it was

10   activated.

11   Q.   And on the far left column, it has the letters SEQ.

12   What does that stand for?

13   A.   Sequence.  It's a sequence number.

14   Q.   What does that refer to?

15   A.   Just, in this case, there is a sequence of three

16   activations number one, two and three.  Sometimes somebody

17   might download an entire year worth of data and get pages and

18   pages.  This particular download printout only focuses on

19   that local date of February 24th, 2005.

20   Q.   Then the next two column the Greenwich meantime and the

21   local time, can you explain what that refers to?

22   A.   Greenwich meantime is somewhere over in, what is it

23   England?  It's somewhere over there.  I can't remember.  It's

24   an international date time reference and then local time are

25   usually what, eight hours from Greenwich meantime I believe.

```
 1   Don't hold me to that.  I haven't thought about that for a
 2   while.  But local time is typically the approximate local
 3   time where we have the taser, California in this case.
 4           I would just add that the times are not always very
 5   reliable because the clock times in little computers drifts a
 6   little bit and unless you synchronize to the standard time
 7   source, you don't synchronize the taser to a standard time
 8   source every few months, the actual time might drift away,
 9   but that may be too much to talk about right now.  I don't
10   know if it's an issue for you or not.
11   Q.   Is that drift like similar to a wrist watch that also
12   might have time drift?
13   A.   Wrist watch or your laptop or your personal computer at
14   home has time drift.  It's just the nature of the technology
15   as I have been told by engineers that really understand these
16   things.
17   Q.   The local time looking at sequence two, 2146.  Is that
18   military time?
19   A.   Yes.  These are expressed in military time.  2146 means
20   9:46 p.m.
21   Q.   And then 2147 what does that refer to?
22   A.   9:47 p.m.
23   Q.   Next column duration.  What does that refer to?
24   A.   That's how many seconds the device was activated for
25   before it was turned off or it turned itself off.
```

1    Q.    So looking at this download report for defendant Anthony

2    Sclafani taser activations on February 24, 2005, looking at

3    Sequence 2 and 3, what does that tell you about the use of

4    the taser by Defendant Sclafani's taser?

5    A.    Sequence 2 tells me there was an activation that lasted

6    for three seconds at about 9:46 and 30 seconds that evening

7    according to the taser's clock time.   And Sequence No. 3

8    tells me there was a five second activation at about 9:47 and

9    12 seconds local time.   And it also tells me that in between

10   Sequence 2 and Sequence 3, there was a 37-second gap where

11   the taser was not being activated.   You might do the math

12   yourself and think that it's a different time, but if you

13   want, I can explain the math because it's not self-apparent.

14   Q.    Well, now that you have raised that, what do you mean by

15   that?

16   A.    Well, the time of the activation that's recorded on the

17   printout is at the end of the activation.   It's when it's

18   shut off not when it started.   So for example, Sequence 2 the

19   three-second activation to know when it started, you would

20   have to look at the 21:46:30, 9:46 p.m. and 30 seconds and

21   take three seconds off of that and know that it started at

22   9:46 and 27 seconds and it ended at 9:46 and 30 seconds.

23         And then on Sequence 3, you see 2147 or 9:47 and

24   12 seconds, there's a five-second cycle.   You would have to

25   subtract the five seconds from the 12 and you would come up

```
1   with 21:47:07.  So the difference between the 21:46:30 and

2   the 21:47:07 is 37 seconds which indicates that the taser was

3   not active during that 37-second gap in between those two

4   sequences.

5   Q.    Can you now turn to Government Exhibit 50?

6           With the Court's permission, I want to publish

7   Exhibit 50 for the jury to follow?

8           THE COURT:  Go right ahead.

9   BY MR. ARKOW:

10  Q.    From the stipulation this is a download report for

11  defendant Anthony Sclafani's taser.  For what date period?

12  A.    This record date range is for February 25th, 2005.

13  Q.    And does this download report have the same categories

14  of information that you explained on the earlier download

15  report?

16  A.    Yes.

17  Q.    And looking at the time and the activations on Defendant

18  Sclafani's download report for February 25, 2005, what are

19  you able to tell me from looking at this?

20  A.    There are five sequences reported.  Two of them are

21  one-second activations that would usually indicate a test.

22  An officer will occasionally and particularly at the

23  beginning of their shift, for example, test the taser

24  briefly.  They're unload the cartridge from it.  They'll turn

25  the safety off, they'll pull the trigger and then immediately
```

1    reactivate the safety and turn it off.  You'll see a

2    one-minute record that indicates oh, okay I just want to make

3    sure my battery is working.  I just want that I can hear some

4    clicking sounds so it's literally a test.  And I someone

5    actually wrote the words test there in the margin for

6    whatever reason.  So there's two apparent tests there.

7              The third, fourth and fifth sequences occurred

8    local time 1815 or during the minute of 1815 which is 6:15 in

9    the evening.  Again, I can't vouch for whether the clock has

10   correct time or not.  The taser clock says 6:15 in the

11   evening.  And there's three five-second cycles are reported.

12   They're on Sequence 3, 4 and 5 during that minute.

13   Q.   The columns for temperature and battery both are in this

14   download report.  Are those in the normal ranges in which a

15   taser gun can operate effectively?

16   A.   Yes, they are.

17   Q.   You can put that exhibit to the side.  Prior to your

18   testimony, did you prepare a video that demonstrated how a

19   taser gun actually deploys taser probes and hits a target?

20   A.   Yes.

21   Q.   Was that on the DVD Exhibit 9 that you put that video?

22   A.   Yes.

23   Q.   And was your demonstration a fair and accurate

24   demonstration of how a taser is activated and how the taser

25   target deploys when firing at a target?

```
 1              THE COURT:  That's compound now.
 2  BY MR. ARKOW:
 3  Q.   Was your video demonstration that you put on
 4  Government's Exhibit 9, a fair and accurate demonstration of
 5  how a taser was activated?
 6  A.   I hope it was.  I try to be fair and accurate when I do
 7  my work.
 8              MR. ARKOW:  I would like to, with the Court's
 9  permission, publish and show Exhibit 9J, which is the
10  demonstration of the taser.
11              THE COURT:  You may do so.
12              (Exhibit 9J played for the jury.)
13              MR. ARKOW:  With the Court's permission, I want to
14  publish and play for the jury the video demonstration that
15  was on the same exhibit.  It's already been admitted.  This
16  is referenced as Exhibit 9I.  This is the components of the
17  taser.
18              THE COURT:  Go right ahead.
19                (Exhibit 9I played for the jury.)
20  BY MR. ARKOW:
21  Q.   When a taser is deployed, are there some things known as
22  AFIDS that are also shot out?
23  A.   Yes.  AFIDS is a taser's name for what they call
24  anti-felon identification tags.  What they really are is
25  little tiny, smaller than a quarter inch, maybe more like an
```

 1   eighth of an inch multi-colored dots, little pieces of

 2   plastic dots that have in very tiny writing the serial number

 3   of the particular taser cartridge that those darts were fired

 4   from.  And some agencies gather those in the evidence

 5   collection process also.

 6   Q.   Do you have in front of you in the file folders

 7   Exhibit 9H marked for identification?

 8   A.   Yes.

 9   Q.   Do you recognize what's depicted in that exhibit?

10   A.   That's a photograph of a Taser X26 that's loaded with a

11   probe, a cartridge.

12         MR. ARKOW:  I move Government Exhibit 9H into

13   evidence and ask that it be published.

14         THE COURT:  It will come in and you may publish.

15              (Exhibit 9H was admitted.)

16   BY MR. ARKOW:

17   Q.   What model is that?

18   A.   Taser model X26.

19         MR. ARKOW:  I would ask the witness be shown what's

20   marked for identification Government Exhibit 54.  I believe

21   the case agent has that exhibit, if he may approach?

22         THE COURT:  He may.

23         MR. ARKOW:  In connection with that exhibit, I

24   would like to read from stipulation.

25         THE COURT:  Go right ahead.

1          MR. ARKOW:  Government Exhibit 24 is a Taser X26

2    cartridge referenced in Government 53 and used on Angelica

3    Vargas on February 25th, 2005.  And Government Exhibit 53 is

4    a Desert Hot Springs Police Department property control

5    record for one taser cartridge booked under the name Sclafani

6    relating to the use of force on Angelica Vargas with the

7    handwriting quote "keep this taser per Eddie Smith June 22nd,

8    2009." End quote.  Was added to this exhibit, Government

9    Exhibit 53 by Desert Hot Springs Police Department records

10   supervisor who is responsible for evidence control at Desert

11   Hot Springs Police Department at the direction of Commander

12   Edwin Smith on or about June 22nd, 2009 in response to a

13   subpoena by the government.  I would move Government Exhibits

14   53 and 54 into evidence.

15          THE COURT:  Mr. Schwartz, again, is that the agreed

16   upon stipulation?

17          MR. SCHWARTZ:  Yes, Your Honor.

18          THE COURT:  It will be received.  And 53 and 54

19   will also come in.

20   BY MR. ARKOW:

21   Q.   Mr. Meyer, looking at Government Exhibit 54, what is

22   that?

23   A.   This is an expended taser cartridge.  It's a 25-foot

24   cartridge and I don't see the wires, but I do see two probes.

25   Q.   Can you lift up the contents of that exhibit, the taser

1    cartridge so the jury can see?

2    A.    Two probes are up here.  This actually is a cartridge.

3    The name of it will have XP on it.  That means that these

4    probes are slightly longer than the probes that I was showing

5    earlier from the 21-foot cartridge.  XP stands for extra

6    penetration.  It will penetrate more clothing or skin and at

7    a longer range up to 25 feet.

8    Q.    You were talking about the spread, what does the spread

9    refer to?

10    A.    Spread has to do with the two probes, you know, remember

11    from the laser, the top one goes where the laser goes, the

12    bottom one goes eight degrees south so to speak of that.  And

13    over the course of say 21 feet, they'll spread out about

14    three feet.  Seven feet, about one foot.

15    Q.    What if the taser is shot at a person's body from a

16    distance less than seven feet?  How does that affect the

17    spread?

18    A.    There is a couple of variables.  For example, if you

19    fired it just two feet away, just two feet away from the

20    cartridges to the person, you would get a four-inch spread.

21    Wouldn't be a particularly good neuromuscular incapacitation

22    in most cases, but it could have some effect.

23          But where things get complicated is that the spread

24    ratios, the one foot for every seven feet traveled, get

25    complicated because those are based on a person just kind of

```
 1   standing straight up, kind of a vertical plane.  I'm standing
 2   and firing the taser.  You're standing over there receiving
 3   the taser, sorry about that, and you're standing up.  My
 4   intention, of course, is to make you fall down.
 5        Where it gets complicated is in a real life,
 6   dynamic situation if someone is running or moving or bending
 7   their body in a certain way, the darts are gonna go where the
 8   physics say the darts should go.  My two-foot example where
 9   you would only expect a four-inch spread between the two
10   probes, if the person was leaning forward as I'm
11   demonstrating right now, I'm going to get a bigger spread on
12   my body if it hits, say, my chest or my arm just because of
13   the physics of it.
14        Probes might only be four inches apart, but they're
15   gonna strike parts of my body while I'm bent.  They're gonna
16   cause an apparent, much wider spread between the probes.  So
17   it's difficult to say unless you have a video or some other
18   kind of evidence exactly how far away an officer was when
19   they launched the probes, if you don't know all of those
20   variables about how a person's body might be positioned when
21   the probes hit them.
22        MR. ARKOW:  No further questions.
23        THE COURT:  All right.  We're gonna take a morning
24   recess at this time.  Everyone please rise for the jury.
25             (Jury not present.)
```

1          THE COURT:  We're outside the presence of the jury.

2     Any matters any counsel wish to raise?  Government have

3     anything?  Ms. Carter?

4          MS. CARTER:  We may have a witness issue need to

5     raise with the Court.  I don't know the current status of it.

6     Can I check on that during the break and inform your clerk if

7     we need to speak to you before the jury?

8          THE COURT:  Yes.  All right.  We'll take about ten

9     minutes.

10          THE CLERK:  Court is in recess.

11                    (Recess taken.)

12          THE COURT:  We're outside the presence of the jury.

13          Ms. Carter, you have something?

14          MS. CARTER:  Yes, Your Honor.  Unfortunately, the

15     government is asking the Court today to issue a bench warrant

16     for Angelica Vargas.  She came to the courthouse this

17     morning, but didn't want to come inside the building to

18     testify and is talking about basically saying she doesn't

19     want to testify pursuant to her subpoena.

20          THE COURT:  We'll issue a bench warrant.  No bail.

21          MS. CARTER:  Thank you, Your Honor.  Your Honor,

22     may we also ask the Court to transmit whatever paperwork to

23     the U.S. marshals and hopefully execute it right away.

24          THE COURT:  Do it forthwith.  As soon as

25     Ms. Skipper can.

1          All right.  Anybody else have anything?  If not,

2    you have something?

3          MR. SCHWARTZ:  No, Your Honor.

4          THE COURT:  Let's bring the jury back and let's

5    have our witness Mr. Meyer return to the witness stand.

6                    (Jury present.)

7          THE COURT:  Please be seated, ladies and gentlemen.

8    I notice some of you might be a bit chilly.  The only problem

9    is we'll tell our landlord the GSA, General Services

10   Administration, wonderful landlord.  If they do anything,

11   probably be too hot.  Other thing may not do anything at all.

12   Let's see what we can do to warm it up a little bit.

13         Mr. Meyer, would you repeat your name for the

14   record and spell your last name?

15         THE WITNESS:  Yes.  My name is Greg Meyer.  G-r-e-g

16   M-e-y-e-r.

17         THE COURT:  You understand you are still under oath

18   in this matter?

19         THE WITNESS:  Yes, Your Honor.

20         THE COURT:  You may commence cross-examination,

21   Mr. Schwartz.

22         MR. SCHWARTZ:  Thank you, Your Honor.

23

24

25

```
 1                        CROSS-EXAMINATION
 2    BY MR. SCHWARTZ:
 3    Q.   Good morning, sir.
 4    A.   Good morning.
 5    Q.   You have been doing consulting work regarding tasers and
 6    use of force for about 30 years?
 7    A.   Well, 30, 31.  Something like that.
 8    Q.   And some part of that consulting work kind of overlapped
 9    when you were actually working for Los Angeles Police
10    Department as a captain and also other assignments; correct?
11    A.   Oh, yes.
12    Q.   And you started your career with LAPD?
13    A.   I didn't hear.
14    Q.   Did you start your career with LAPD?
15    A.   I started as a reserve officer with LAPD in 1976.
16    Q.   Work your way up to a sergeant?
17    A.   Sergeant, detective, lieutenant, captain.
18    Q.   And you testified a few moments ago that you have been
19    qualified as an expert for use of force in various courts of
20    law; correct?
21    A.   I believe I said something like that, yes.
22    Q.   You have testified as an expert regarding uses of force
23    in federal court previously?
24    A.   I have.
25    Q.   And in state court?
```

1    A.    I have.

2    Q.    And in this particular case, the government contacted

3    you to have you testify regarding tasers; correct?

4    A.    Yes.

5    Q.    The mechanics of them?

6    A.    Yes.

7    Q.    And their deployment?

8    A.    Yes.

9    Q.    And they told you specifically you would not be

10   testifying as a force expert in this case; right?

11   A.    Yes.

12   Q.    And didn't give you any materials regarding specific

13   facts of this case, did they?

14   A.    Other than the taser download printouts I saw that would

15   be correct.

16   Q.    Now, when they first contacted you, they being the

17   government, did you give them a copy of what we call your

18   C.V. or curriculum vitae?

19   A.    I'm sure I did.  I always d0.

20   Q.    And that would have your entire background which

21   includes your use of force expertise; correct?

22   A.    Yes.

23   Q.    And you have testified on uses of force of police

24   officers in general, but specifically also expertise in use

25   of tasers of police officers; correct?

1    A.    Yes, I have that expertise.

2    Q.    And you actually testified in federal court and given

3    opinions about the appropriateness or inappropriateness as

4    you testified on direct of uses of force?

5              MR. ARKOW:   Objection.   Beyond the scope of direct

6    of this witness's testimony.

7              THE COURT:   Overruled.   I'll allow a little bit

8    more.   Go ahead.

9              THE WITNESS:   Yes, I have.

10   BY MR. SCHWARTZ:

11   Q.    And regarding this particular case, you testified on

12   direct that if an officer used a taser in the drive stun

13   mode, depending on certain variables in place, it could leave

14   a mark; correct?

15   A.    Yes.

16   Q.    Now, would it leave two marks the way the darts would or

17   just one welt?

18   A.    It would typically leave two.   You know I can get more

19   complicated than that, but generally it would typically leave

20   two.

21   Q.    You said that when you were asked by counsel the times

22   that you would expect it would probably not leave a mark is

23   when there is a very brief touching of that taser in drive

24   stun mode to a person's skin?

25   A.    Yes.

1    Q.    I think the term of art you used was very brief

2    touching?

3    A.    I believe that's the words I used, yes.

4    Q.    Now, the normal cycle is press you the trigger on the

5    taser as you demonstrated a few moments ago and you took your

6    finger off the trigger, it would be five seconds?

7    A.    Yes.

8    Q.    And that's -- the taser is actually designed for that

9    five-second cycle unless the person manually makes it a

10   shorter cycle or a longer cycle?

11   A.    Correct.

12   Q.    And so when you describe the very brief period of time

13   as when a drive stun would not leave a mark, this would be

14   less than five seconds; correct?

15   A.    It would be.

16   Q.    Safe to say even less than three seconds?

17   A.    Correct.  I mean I have seen marks at two seconds.  I

18   mean it would take some scientific experimentation to figure

19   out what the numbers are, but there's, there's some pretty

20   good welts at two seconds.  I've had them on my own body.

21   Q.    And it's part of your background, you have been

22   certified as an instructor, taser instructor; correct?

23   A.    Several times, yes.

24   Q.    You also have instructed others in the use and becoming

25   instructors; is that right?

1    A.    Yes.

2    Q.    You also testified and I just want to clarify that most

3    departments in your experience assign an officer or someone

4    who is taser instructor certified to train their own

5    officers?

6    A.    Yes.

7    Q.    And most of the time the officers in a specific

8    department are trained by someone they worked with or someone

9    in the department who went through the same certification

10   process you would have gone through to be an instructor?

11   A.    Yes.

12   Q.    And is that certification process is that regulated by

13   any particular body or organization?

14   A.    I don't know if regulate is the word.  I mean the taser

15   company has an instructor certification process.  I mean no

16   government agency regulates how long it is if that when you

17   mean.

18   Q.    Is there an organization in California called POST?

19   A.    Oh, yes.  California Peace Officers Standards and

20   Training Commission.

21   Q.    And does that organization somewhat regulate or guide

22   officers in different certifications in their training for

23   different, I guess, parts of police work?  I'll get more

24   specific in a moment.

25   A.    Yes.

1   Q.   And is one of the areas that POST regulates regarding

2   officers' training, certification for being certified in the

3   use of a taser?

4   A.   I'm not aware that they do that.  Well, that would be

5   news to me if POST has a taser certification program.

6   Q.   Well, POST doesn't have a program, but to your knowledge

7   based on your experience does POST have any coordination with

8   Taser International in certifying officers in the use of

9   taser?

10  A.   I didn't hear.  I'm sorry.

11  Q.   Sure.  Does POST have any coordination with Taser

12  International in the certification of police officers in the

13  State of California to be certified on the use of tasers?

14  A.   I'm not aware they do.  If there is something there, it

15  would be news to me.

16  Q.   So when an officer is certified to use a taser, that

17  certification comes from the trainer or the instructor who

18  certifies that for the department?

19  A.   Yes.

20  Q.   And that's through Taser International?

21  A.   Yes.

22  Q.   And you described in your work you testify as a witness

23  in uses of force both lethal and nonlethal?

24  A.   Yes.

25  Q.   And would a taser be considered a nonlethal use of force

```
 1    based on your knowledge and expertise?
 2    A.   Well, yes.
 3    Q.   And would a taser based on how officers are trained in
 4    using tasers to pass a certification course, can a taser be
 5    used as a control device in certain circumstances?
 6    A.   Yes.
 7    Q.   You mentioned on direct it could be used as a control
 8    device with a combative suspect?
 9    A.   Yes.
10    Q.   And it could be used as a control device with a
11    resistant suspect?
12    A.   Yes.
13    Q.   And it also could be used as a control device with a
14    fleeing suspect who is trying to get away from the officers?
15    A.   Yes.
16              THE COURT:  Even though it's cross-examination, you
17    should pose your questions as questions.
18    BY MR. SCHWARTZ:
19    Q.   Now, is it part of your experience and expertise in the
20    field of police work for 30 years that a suspect who is
21    fleeing is considered to be resisting an officer?
22    A.   Yes.
23    Q.   And based on your training and experience with tasers
24    and the certification process, are officers trained to
25    utilize a taser rather than go what we call hands on with a
```

1  suspect?

2         MR. ARKOW:  Objection.  Beyond the scope of direct.

3         THE COURT:  Oh, it's overruled.  You may continue.

4         THE WITNESS:  Yes, in appropriate circumstances

5  that's correct.

6  BY MR. SCHWARTZ:

7  Q.   Can you explain it for the jury, I used the colloquial

8  term "hands on".  Can you explain what that means to the

9  jury?

10  A.   Going hands on in the way I believe Mr. Schwartz was

11  asking about it, when a person is fleeing from an officer,

12  that can mean catching up to them and grabbing them.  It

13  could mean tackling them, taking them to the ground in some

14  way and getting them handcuffed just with your bare hands.

15  Q.   You've had some connection with tasers and their

16  development over of the last 30 years; correct?

17  A.   Yes.

18  Q.   And you've researched that development or that evolution

19  of the taser's use over the last 30 years as part of your

20  expertise; correct?

21  A.   Yes.

22  Q.   And in those 30 years of tracing the evolution, the

23  science has evolved; correct?

24  A.   Oh, yes.

25  Q.   And the actual tasers themselves have evolved when they

```
 1    first came on the market 30 years ago to today's date?

 2    A.   Yes, several times.

 3    Q.   And the policies for different department to your

 4    knowledge and expertise have also evolved; correct?

 5    A.   Yes.

 6    Q.   Even in the last ten years, policies have evolved in

 7    different departments based on court cases, based on

 8    different eyewitness accounts of how tasers are used;

 9    correct?

10    A.   That's generally correct.

11    Q.   And has it been your experience in your consulting work

12    and expertise over 30 years that the departments have changed

13    their taser policies based on this evolution?

14             MR. ARKOW:  Objection.  Vague as to change.

15             THE COURT:  Sustained.

16    BY MR. SCHWARTZ:

17    Q.   Based on your expertise and experience with the

18    evolution of tasers, have the training in the uses of how to

19    use or deploy a taser or when to use or deploy a taser has

20    that also evolved in the officers' own specific training of

21    the use and deployment of tasers?

22             MR. ARKOW:  Same objection as to use of evolve.

23             THE COURT:  Well, if you understand the question,

24    you may answer it.

25             THE WITNESS:  I understand it.  Yes, policies and
```

```
 1    training have evolved over the course of time based on
 2    experience and court decisions and some changes in use of
 3    force law from the United States Supreme Court 22 years ago.
 4    It's evolved for a number of reasons over a period of time.
 5    BY MR. SCHWARTZ:
 6    Q.    Now, you stated earlier that the last six years you have
 7    been retired from LAPD; is that right?
 8    A.    Almost six years, yes.
 9    Q.    Congrats.  And that six years you've still been doing
10    consulting work; right?
11    A.    Yes.
12    Q.    So you still kept track of tasers and their use and
13    deployment and things of that nature in the last six years?
14    A.    I don't know if I keep track of.  I stay close to the
15    subject.  It's one of my lifetime areas of interest.
16    Q.    Now, you testified just a moment ago that since tasers
17    introduction on to the market and the use of different police
18    agencies that their deployment and use and their tactics of
19    use have evolved in 30 years?
20    A.    That's fair, yes.
21    Q.    And the six years that you have been a consultant as
22    opposed to actually be active captain of the LAPD, has there
23    also been an evolution of how tasers are utilized and
24    deployed by different departments based on the variables you
25    mentioned earlier?
```

1          MR. ARKOW:  Your Honor, objection on the term

2    changed.

3          THE COURT:  Sustained.

4          MR. SCHWARTZ:  I believe I used the word evolved,

5    but I'll just ask it more directly.

6    Q.   Have you seen any difference in the policies of how an

7    officer should be able to deploy a taser in the field when

8    faced with a circumstance that may call for it in the six

9    years that you have been consulting?

10         MR. ARKOW:  Same objection.

11         THE COURT:  Do you understand the question?

12         THE WITNESS:  I do.

13         THE COURT:  Overruled.  You may answer.

14         THE WITNESS:  Yes.  It's a continuing evolution

15   process.  I'm actually involved around the country at several

16   levels with that evolution as we move forward and things

17   change.

18   BY MR. SCHWARTZ:

19   Q.   Now, I used that six-year window of just over six years

20   when began consulting work, I guess, full time as opposed in

21   conjunction with your time at LAPD in the last few questions;

22   correct?

23   A.   I thought so.

24         THE COURT:  I'm going to strike the question and

25   answer.

1           MR. SCHWARTZ:  That's fine, Your Honor.

2    Q.   And going back to 2005 before you retired, I'm going to

3    ask you the same question I asked just a moment ago, but an

4    extra year backwards.  So from 2005 onwards in your expertise

5    and experience keeping track of this subject matter as you

6    have, has there been any evolution of training of officers in

7    how to use and deploy tasers?  Difference between 2005 and

8    today's date in the deployment in the field?

9           MR. ARKOW:  Objection.  Relevance as to what

10   happened after 2005.

11          THE COURT:  Sustained.

12   BY MR. SCHWARTZ:

13   Q.   Let me know if I'm wrong --

14          THE COURT:  Well, you're not testifying so you

15   can't be right or wrong.

16   BY MR. SCHWARTZ:

17   Q.   Is there a difference based on your expertise and

18   training of how officers are trained to use a taser in the

19   field back in 2005 as compared to today's date?

20          MR. ARKOW:  Same objection.

21          MR. SCHWARTZ:  May I be heard, Your Honor?

22          THE COURT:  No.  You can answer it if you can.

23          THE WITNESS:  Yes.  As I said, it's an ongoing

24   process.  It has been for more than 30 years.  It was six

25   years ago.  It was five years ago.  It's an evolutionary

```
 1    process as we learn more about the device and how to use it
 2    and as we're informed by cases and court decisions, the
 3    training changes.
 4    BY MR. SCHWARTZ:
 5    Q.   Now, do you still have the exhibit that's the actual
 6    taser itself up there on the stand?
 7    A.   I do.
 8    Q.   And is that marked?
 9    A.   The holster has a mark on it as Plaintiff's Exhibit 6.
10         MR. SCHWARTZ:  Your Honor, I would ask if Mr. Meyer
11    could give one more demonstration of actual use of that drive
12    stun mode not against his body just with the electrodes
13    going.
14         THE COURT:  Certainly.
15         THE WITNESS:  Short cycle?  A five-second cycle?
16    Long cycle?
17    BY MR. SCHWARTZ:
18    Q.   Five-second cycle.
19    A.   Standard cycle?
20    Q.   Yes, please.
21         Now, you held it up near the microphone?
22    A.   I didn't mean to.  I was trying to make sure I wasn't
23    pointing it at anybody in particular.
24    Q.   The clicking sound we heard just now, is that a loud
25    sound if it's not near a microphone?
```

1    A.    Is it a loud sound what?

2    Q.    If it's not being held next to a microphone.

3    A.    Oh, yes.  It's relatively loud.

4    Q.    And is there a difference between the sound a taser

5    makes when it's in drive stun mode as you just demonstrated

6    and when the darts are actually deployed in a person?

7    A.    Depends on if the drive stun is connected to the person

8    or is just static discharging in the air like I just

9    demonstrated.

10   Q.    I apologize.  If an officer were to deploy the darts and

11   those darts both made effective contact with the person,

12   would you hear the same sound that we just heard now?

13   A.    No.  It would get very quiet.

14   Q.    And based on your expertise and experience, if the

15   officer deployed those darts and one of those darts did make

16   contact, would it complete the circuit as you described

17   earlier?

18   A.    Uh, typically not.

19   Q.    And if it did not complete the circuit, would you hear,

20   would it be a quiet sound as you just described or the loud

21   clicking sound we just heard?

22   A.    If the circuit's not complete, you would hear the loud

23   clicking sound.

24   Q.    Now, you mentioned on direct there's a number of

25   variables with the darts making proper contact in order for

1    the circuit to be completed?

2    A.    Yes.

3    Q.    And some variables would be the thickness of the

4    clothing that's being worn?

5    A.    Yes.

6    Q.    And some variables or one variable may be the position

7    of the person that's being tased?

8    A.    Yes.

9    Q.    If they're bending over or if they're in some kind of

10   position other than standing straight up?

11   A.    Yes, that might affect the spread of the probes.

12   Q.    Now, based on your training and experience, could both

13   darts actually hit the target being a person, but not have a

14   good enough contact to close the circuit for a good

15   connection?

16   A.    I'm sorry.  Could you ask it one more time?

17   Q.    Sure.  Could both probes, both darts hit the target

18   which is a person, but not make a good enough contact to have

19   that closed circuit of a connection?

20   A.    Oh, yes, that happens.

21   Q.    And if that happens, would you hear the loud clicking

22   sound you just described?

23   A.    Yes.

24   Q.    Even though both probes seem to make contact?

25   A.    That can happen.

1    Q.   Based on your training and experience are officers

2    trained that if both probes make contact, but you hear that

3    clicking sound which means it's not a closed circuit to still

4    deploy the taser or pull the trigger because the darts could

5    make better contact depending on the circumstance?

6    A.   Yes, that can happen and officers are trained about

7    that.

8    Q.   So if the subject being tased is moving and both darts

9    hit, has it been your experience that sometimes with the

10   movement of the body one dart can actually penetrate better

11   to close the circuit?

12   A.   That can happen, especially if it's hung up in the

13   clothing and the clothing is moving about, the circuit might

14   open and close because of the movement.

15   Q.   And would that be why officers are trained that if they

16   think they've got a good contact with two of them, but

17   they're hearing that clicking sound to keep trying and may be

18   a variable that allows those two darts or one of those to

19   make better contact?

20   A.   I'm not sure what you mean by keep trying.

21   Q.   Pulling the trigger so it would have an effect.

22   A.   Oh, yes, I mean if you're not getting the contact that's

23   desired, you have several options.  One of which is to pull

24   the trigger again to see if it will contact this time.  If

25   that's what you're asking, yes.

```
1    Q.   Now, you testified on direct that with a proper contact

2    from both darts and a closure of the circuit, you should

3    incapacitate the person for the five seconds or whatever

4    amount of time that the officer is pulling the trigger.

5              THE COURT:  Are you asking if that what's he said?

6              MR. SCHWARTZ:  Yes.

7              THE WITNESS:  If there is effective contact and a

8    decent probe spread, then yes.

9    BY MR. SCHWARTZ:

10   Q.   And you mentioned earlier or -- strike that.

11             If the person was standing up who was being tased

12   and it was effective contact and closure of the circuit would

13   you expect that person to fall down?

14   A.   Yes.

15             Your Honor, I apologize.  I need like a two-minute

16   personal break.

17             THE COURT:  Certainly.  We'll be in a brief recess.

18                       (Recess taken.)

19             THE COURT:  We're back on the record now.  You may

20   continue with your cross-examination, Mr. Schwartz.

21             MR. SCHWARTZ:  Thank you, Your Honor.

22   Q.   If the taser is aimed holding it as you demonstrated

23   which is, I guess, straight the way we seen a gun is usually

24   held, that red dot, that laser, that's where that top dart's

25   gonna go; correct?
```

A.   Yes.

Q.   And you would expect if held that way, the bottom dart would go vertical to that; correct?

A.   I don't know vertical is the right word because you can cant your wrist every which way not necessarily vertical. What it does is it diverges out.  No matter how you're holding it, the bottom dart diverges out in eight degrees away from the top dart.

Q.   So you said that depending on how you hold it, if you're holding it straight so the top of the taser gun is going straight up toward the ceiling, parallel to the ceiling, and I'm demonstrating now with my hand is being held straight and the fist on my hand is not being turned any which way, but my knuckles are facing the witness in a vertical angle, it's held in this way, where would you expect the bottom dart to land?

A.   In that circumstance you would expect the bottom dart to be vertically underneath the top dart some spread amount depending on how far away the device was fired from.

Q.   And if it's being held perpendicular as I just demonstrated so it's not held straight up and down vertically, but horizontally, where would you expect the second dart to land?

A.   You would expect the second dart to land however many inches to the right of the top dart, which was the laser

1    dart, again, depending on how far away you are.

2    Q.    If the person who is being tased is laying on the ground

3    and the person doing the tasing has a taser deployed two feet

4    or less away from that person, would you expect a long spread

5    of those darts or a small spread?

6    A.    All things being equal, you would expect a four-inch

7    spread at a two-foot distance.  And that's if both darts hit

8    a part of the body that was basically on the same plane.

9    Q.    Same plane do you mean that they're level with each

10   other?

11   A.    Not a curvy part of the body is best I can describe it.

12   Q.    And a four-inch spread based on your training and

13   experience, would that be a spread that would work well to

14   close the circuit?

15   A.    That would close the circuit?

16   Q.    Correct.

17   A.    Oh, yes.

18   Q.    Would it be a spread that would work well to affect a

19   muscular disruption?

20   A.    It may or may not depending on what part of the body was

21   involved.  For a short spread like that, just four inches,

22   you would definitely want to be involving a major muscle

23   group to get some desired effect as opposed to just the fatty

24   part of the body.

25   Q.    You were shown Exhibits 50 and 72 earlier which were

1    taser downloads.  Do you recall that?

2    A.   Yes.

3            MR. SCHWARTZ:  And Your Honor, may I publish

4    Exhibit 50?

5            THE COURT:  Go right ahead.

6    BY MR. SCHWARTZ:

7    Q.   Draw your attention, Mr. Meyer, to the computer screen.

8    Do you recognize that as being Exhibit 50 that you testified

9    to about earlier?

10   A.   Yes.

11   Q.   Now, you testified about the time drift of the inner

12   clock on the taser.  Do you recall that?

13   A.   Yes.

14   Q.   And would that time drift, would that mean that the

15   drift of time would be relative to the Greenwich Meantime or

16   the local time?

17   A.   No.  The -- both the Greenwich meantime and the local

18   time can drift.  It's relative to real time like the U.S.

19   Navy Observatory time or whatever society decides is real

20   time.

21   Q.   But the drift shouldn't affect the computer chip's

22   memorialization of the actual duration of the deployment

23   should it?

24   A.   No, it shouldn't.  I mean, the clock says 6:15 at night

25   and some seconds.  18:15 at night and some seconds.  You

1     know, it might be a quarter to nine or something, who knows.

2     But within the -- in this case the three sequences there,

3     three, four, and five, you wouldn't expect any drift.  You

4     would expect that that printout accurately tells how much

5     time there was in between each activation.

6     Q.    And looking down at this exhibit, Sequence No. 3, the

7     local time reads 18:15:16.  Do you see that?

8     A.    I do.

9     Q.    And you described it earlier, does that 18:15:16 depict

10    the end of that deployment or the beginning?

11    A.    The end.

12    Q.    And it's a differential of five seconds based on the

13    duration of the deployment next to it; correct?

14    A.    Correct.

15    Q.    So the first deployment according to this record would

16    be 18:15:11; is that correct?

17    A.    Yes.

18    Q.    Now, going back to Sequence No. 5, that has a local time

19    of 18:15:51; is that correct?

20    A.    Yes.

21    Q.    And that would be the end of that five-second

22    deployment; correct?

23    A.    Yes.

24    Q.    So between those three sequences if I'm calculating

25    correctly, would there be a difference between 18:15:11 and

1    18:15:51?

2    A.   I guess I didn't hear the question.

3    Q.   I'll word it differently.  I apologize.

4         Based on what you see in front of you, would this

5    show that from the beginning of the first sequence to the end

6    of the last sequence three, four and five was 40 seconds?

7    A.   Yes.

8         MR. SCHWARTZ:  And, Your Honor, may I publish

9    Exhibit 72 to the witness?

10        THE COURT:  Go right ahead.

11   BY MR. SCHWARTZ:

12   Q.   And Exhibit No. 72, you're familiar with that from

13   seeing that a few moments ago or a few minutes ago on direct

14   examination; is that correct?

15   A.   Yes.

16   Q.   And again looking at this exhibit, looking at Sequence

17   No. 2, has a three-second duration.  You see that?

18   A.   Yes.

19   Q.   And on the No. 21:46:30 that would be when that

20   three-second duration ended; is that correct?

21   A.   Yes.

22   Q.   And underneath that Sequence No. 3, that 21:47:12 would

23   be when that five-second sequence ended; is that correct?

24   A.   Yes.

25   Q.   So between those two sequences, there would be a total

1    of 35 seconds?

2    A.   45.

3    Q.   45.   That's why I went to law school.   So from the

4    beginning of that Sequence No. 2 to the end of Sequence No. 3

5    is 45 seconds?

6    A.   Yes.

7              MR. SCHWARTZ:   Have just a moment, Your Honor?

8              THE COURT:   You may.

9    BY MR. SCHWARTZ:

10   Q.   Mr. Meyer, do you have in front of you still that set of

11   photographs, the nine series of photographs?

12   A.   I do.

13             MR. SCHWARTZ:   Your Honor, may I publish 9A to the

14   witness?

15             THE COURT:   Go right ahead.

16   BY MR. SCHWARTZ:

17   Q.   I'm showing you what's been entered into evidence as

18   Exhibit 9A of the government and you recognize that from

19   seeing that previously this morning?

20   A.   Yes.

21   Q.   And the different items in this photograph are different

22   items or parts of the taser; is that correct?

23   A.   Yes.

24   Q.   Specifically, a Taser X26?

25   A.   Yes.

1    Q.    And you see where my pen is pointing on the photograph?

2    A.    Yes.

3    Q.    That would be the darts you have been talking about?

4    A.    Darts or probes.

5    Q.    And where my pen is pointing now, would that be the

6    wires?

7    A.    Yes.

8    Q.    And as part of an officer's training in the deployment

9    and use of a taser, are they also trained to gather up those

10   different parts into evidence if they deploy the taser; is

11   that correct?

12   A.    Some agencies have a policy to do that, some don't.

13   Sometimes it depends on the nature of the incident and the

14   depth of the investigation.  It's all over the map as to

15   whether they collect those or don't.

16   Q.    In your 30 plus years of consulting work and expert work

17   with tasers, have you worked with Taser International?

18   A.    I have done some expert witness work for them.  I have

19   done some consulting at no charge.  I don't charge them for

20   my time other than my expert witness work on some of their

21   meetings.  Sometimes they ask me to go teach or speak, I

22   guess, at their national instructor conference around the

23   country occasionally.  And I don't charge them for that

24   except for plane flight, a hotel, a little bit to eat so

25   that's the -- the short answer is yes, I have done some

1    consulting for them.

2    Q.    And you testified earlier you have kept abreast of the

3    evolution of the science of tasers; correct?

4    A.    I have tried to.

5    Q.    Now, are you aware of any kind of a testing of the darts

6    themselves to see by the testing of the darts and the carbon

7    on them, if the person doing the testing can tell how long

8    that deployment was?

9    A.    I have heard of that process.  I have not participated

10   or been trained in it.

11   Q.    But as part of your expertise, you are aware of the

12   process?

13            MR. ARKOW:  Objection.  Vague as to the word aware.

14            THE COURT:  Asked and answered in any regard.

15   Let's move on.

16            MR. SCHWARTZ:  Nothing further at this time,

17   Your Honor.  Thank you.

18            THE COURT:  Recross?  Redirect rather.

19            MR. ARKOW:  Yes, Your Honor.

20            THE COURT:  All right.

21                      REDIRECT EXAMINATION

22   BY MR. ARKOW:

23   Q.    Mr. Meyer, do you have in mind the beginning of your

24   cross-examination where he asked questions about a mark that

25   a taser gun would leave on a person's body or skin after the

drive stun method of taser deployment has happened?

A.   Yes.

Q.   What are some of the variables or factors that would determine whether a mark is left on a person's body when a drive stun is used?

A.   When a drive stun is used?  First of all, it will depend on whether there was a connection.  If the face of the device got close enough to the clothing or the skin to have the circuit actually involve the body.  Second, it will depend on the amount of time.  If you just left a drive stun on for a brief, split second versus leaving it on for five whole seconds, you're going to have a radically different mark or injury left there.

Third, for your longer activations, more than let's say a second, for example, if you're able to hold the drive stun on the body for an extended period of time at least several seconds what will typically happen is you will see abrasions and irregular marks because nobody just sits there and takes it for, let's say, five seconds, a standard cycle. People are going to react to the pain, if they feel the pain. They're going to move around and it's gonna cause the face of the device to be grinding around in the skin a little bit and so you'll see different marks here and there.  You'll see some little abrasions from the device dragging around the place where it's contacted.  So, you know, there is a number

1    of variables involved interpreting drive stun marks.

2    Q.    What about the person's body and the skin pigmentation?

3    Is that a factor?

4    A.    That could be a factor in interpreting the marks also.

5    It might be harder on some colors of skin to see the marks

6    than on others.

7    Q.    What about if a person's skin is touched directly during

8    the drive stun mode versus whether the person has clothing on

9    him or her when the drive stun mode is being used?

10   A.    That shouldn't matter typically unless the clothing is

11   super thick and you're having a hard time making a circuit.

12   That shouldn't matter in terms of the marks that you get from

13   the electricity itself because the voltage causes the

14   electricity to jump through the clothing.  That could factor

15   in talking about if you're doing the drive stun on clothing

16   as opposed to bare skin that could factor in based on that

17   grinding effect, the abrasions if the device is being moved

18   around to try to keep it on a person who is trying to get

19   away from it for example.  So there wouldn't be the injury

20   from the electrical, it would be different.  It would be the

21   injury from the experiencing the device being forcibly

22   pressed on you.

23   Q.    And how would the mark be different if the person's skin

24   was touched directly versus if the person had some clothing?

25   A.    I wouldn't expect it would be very different at all.

Q.   Would the arc between the electrical prongs be affected

by whether the drive stun is applied directly to the person's

skin or whether there was some clothing on the person?

A.   Would the arc be affected?

Q.   Yes.

A.   The arc will jump through and it will leave marks if

there is more than a momentary contact.  Maybe I'm not

understanding the issue here, the question.

Q.   Is there a welting that's caused on the skin?

A.   Yes.  Typically, the electricity going on there will

cause a little redness and welting, a little raised skin from

the shock.

Q.   And will whether there's welting on the skin be affected

by whether the skin is touched directly or whether there is

some clothing?

A.   Again, it could be and again, it's more of a function of

how hard and if it's being pressed against and whether it's

being, you know, twisted or contorted.  That's the best I can

answer.

Q.   And you said that the skin pigmentation of a person will

also affect whether the mark that's left is visible.

          THE COURT:  You're asking him did he say that?

BY MR. ARKOW:

Q.   Did you say that?  Will that be a factor?

A.   I said something like that, yes.  That could be a factor

```
 1   in interpreting the marks.
 2   Q.   And how will the skin pigmentation affect that?  If the
 3   skin was darker or lighter, what would be your expected
 4   ability to see a mark?
 5   A.   Yeah, the discoloration effect will show up more on a
 6   lighter-skinned person than a darker-skinned person.  You
 7   might have difficulty seeing the coloration difference, the
 8   redness, if you will, on a darker-skinned person.
 9             MR. ARKOW:  May I have a moment, Your Honor?
10             THE COURT:  You may.
11             MR. ARKOW:  No further questions.
12             THE COURT:  Is there to be any recross?
13             MR. SCHWARTZ:  No, Your Honor.  Thank you.
14             THE COURT:  Thank you very much.
15             THE WITNESS:  Thank you, Your Honor.
16             THE COURT:  You are excused, Mr. Meyer.
17             Ladies and gentlemen, we're going to take the noon
18   recess at this time and ask that you come back at 1:55, that
19   is an hour-and-a-half from now.  Everyone please rise for the
20   jury.
21                     (Jury not present.)
22             THE COURT:  We're outside the presence of the jury.
23   A matter has come to my attention that I want to raise with
24   counsel.  We have a particular juror, I believe it's Juror
25   No. 9, Mr. Meneshian who evidently is quite unhappy.  No one,
```

```
 1    according to him, no one in the Jury Commissioner's Office or
 2    Clerk's Office generally spoke to him about the problem that
 3    he has with his employment.  Evidently, he works on
 4    commission alone and he will be without any remuneration
 5    during the service here.  I intend to call him now and ask
 6    him about that.
 7              And if he appears to be really unhappy, I don't
 8    think he is going to serve either side very well and it would
 9    be my intention then to excuse him from this matter and then
10    Alternate No. 1 would become Juror No. 9.
11              Any counsel wish to be heard before I do call
12    Mr. Meneshian in?  Does the government wish to be heard?
13              MR. ARKOW:  No, Your Honor.
14              THE COURT:  Mr. Schwartz?
15              MR. SCHWARTZ:  No, Your Honor.  Thank you.
16              THE COURT:  All right.  You do wish to be heard?
17              MR. ARKOW:  No, I don't.  I was going to find out
18    if we wanted to confer.
19              THE COURT:  Do you wish to confer?  Go ahead.  Go
20    right ahead.
21              MR. ARKOW:  Nothing further.  The government
22    doesn't have anything further from what the Court intended to
23    do.
24              THE COURT:  All right.  Let Mr. Meneshian, Juror
25    No. 9 come in.  Mr. Meneshian, I have been told that you are
```

```
1    having some problems serving as a juror; is that right?
2              MR. MENESHIAN:  Right.
3              THE COURT:  Would you tell us what those problems
4    are?
5              MR. MENESHIAN:  Yeah, I don't -- get my work, I get
6    paid by commission not salary.  So if I'm not working, I'm
7    losing money.  That's the bottom line.  So depending on how
8    long I'm gonna be here, I'm not going to be getting paid.  I
9    work on sales.
10             THE COURT:  Well, you understand that all jurors
11   are making sacrifices in order to serve?
12             MR. MENESHIAN:  I understand that.
13             THE COURT:  And is it your position, though, you
14   cannot serve fairly for both sides here given your economic
15   problems?
16             MR. MENESHIAN:  Well, that's a different issue.
17   You're asking me if I can be fair to both sides, I can, but
18   this is a personal matter, my issue.
19             THE COURT:  And the personal matter gonna interfere
20   with your serving fairly, isn't it?
21             MR. MENESHIAN: I would guess so, yeah, but, you
22   know, yeah.
23             THE COURT:  Well, I don't like to have unhappy
24   jurors and I don't know why the matter wasn't taken up within
25   the Jury Commissioner's Office, but I think we'll all be
```

```
 1    better served by having you go upstairs to the jury assembly
 2    room and speak to them.
 3              MR. MENESHIAN:  Okay.  I appreciate that.
 4              THE COURT:  All right.  You're excused from this
 5    matter.
 6                        (Juror exits courtroom.)
 7              THE COURT:  I had been told by staff that he's
 8    quite unhappy.  He had wanted to talk to me directly and I
 9    have not spoken to him until just now and I think we're all
10    better served by replacing him.
11              Any counsel have any matters to take up at this
12    time?
13              MR. ARKOW:  Not from the government.
14              THE COURT:  All right.  Mr. Schwartz?
15              MR. SCHWARTZ:  Logistically, Your Honor, I'm not
16    sure if the Court can do this or not, but the computer screen
17    by the witness blocks our entire view of the witness's face
18    from counsel table.  That's why I'm over here.  I can barely
19    see the face.
20              THE COURT:  They just recently changed that.  I
21    told them I thought it was going to be a problem.
22              MR. SCHWARTZ:  To be quite frank with the Court
23    wasn't so concerned other percipient witnesses I may be.
24              THE COURT:  This is as far down as it will go.
25    Does that still pose a problem?  We'll see what we can do.
```

1          MR. SCHWARTZ:  Thank you, Your Honor.

2          THE COURT:  Thank you for bringing it to our

3     attention.  All right.  Resume at 2 o'clock then.

4                    (Lunch Recess.)

5          THE COURT:  Good afternoon.  We're again outside

6     the presence of the jury.  Any matters any counsel wish to

7     raise?

8          MR. ARKOW:  Not from the government.

9          THE COURT:  All right.  We'll bring the jury back

10    and you should know the jurors wanted to come back early

11    because they would like to see this case move along as would

12    I.

13                    (Jury present.)

14         THE COURT:  The government may call its next

15    witness.

16         MR. ARKOW:  Yes, Your Honor.  The government calls

17    Jamal White.

18         THE COURT:  Thank you.  Sir, would you come

19    straight ahead.  Come right up on the witness stand and be

20    sworn, please.

21         THE CLERK:  Please raise your right hand.

22                    (Witness sworn.)

23         THE CLERK:  Please have a seat.  State and spell

24    your name for the record.

25         THE WITNESS:  My name is Jamal White.  J-a-m-a-l

```
 1    W-h-i-t-e.

 2              THE COURT:  Mr. White, do you have a middle name?

 3              THE WITNESS:  Lamont L-a-m-o-n-t.

 4              THE COURT:  Thank you.  Go ahead, Mr. Arkow.

 5                         DIRECT EXAMINATION

 6    BY MR. ARKOW:

 7    Q.   Mr. White, where do you currently reside?

 8    A.   I reside in San Bernardino, California.

 9    Q.   Do you live with anybody?

10    A.   I stay with my grandfather.

11    Q.   And are you a student now?

12    A.   Um, yes, I attend school.

13    Q.   What are you studying?

14    A.   Study human services and psychology.

15              THE COURT:  Where is that, sir?

16              THE WITNESS:  At the University of Phoenix

17    San Bernardino, California.

18    BY MR. ARKOW:

19    Q.   And what kind of program is that?

20    A.   Bachelor's.

21              THE COURT:  Is that an online college?

22              THE WITNESS:  No, sir.  It's on campus.  They also

23    have an online college also.

24              THE COURT:  Where do you attend?

25              THE WITNESS:  San Bernardino, California.
```

```
 1   BY MR. ARKOW:
 2   Q.   Do you go physically to a campus in San Bernardino to
 3   attend classes?
 4   A.   Yes, I do.
 5   Q.   Directing your attention to the year 2005, what city did
 6   you live in?
 7   A.   Desert Hot Springs, California.
 8   Q.   And did you recall what street address you lived in?
 9   A.   66900 Iron Wood Drive.
10   Q.   And was that a house or an apartment?
11   A.   Apartment 306.
12   Q.   And at the time in 2005 when you were living in that
13   Apartment 306, were you employed?
14   A.   Yes, I was.
15   Q.   What was your job then?
16   A.   I worked with temporary service called SPS.  And I did
17   catering and banquets.  We set up the catering and worked in
18   the banquets.
19   Q.   And what was your job?
20   A.   I was a caterer.
21   Q.   In that Apartment 306, did you share that apartment with
22   any other individual?
23   A.   Yes.  I shared that apartment with Ms. Karen Harper.
24   Q.   And the apartment complex, how would you describe it?
25   Was it small?  Large?  You remember approximately how many
```

1    units?

2    A.    It was a large apartment unit, large apartment complex.

3            MR. ARKOW:  Can the witness be shown what's

4    previously been admitted Government Exhibit 63?

5            THE COURT:  Certainly.

6            MR. ARKOW:  If it's easier, Your Honor, we can

7    display it through the computer laptop.

8            THE COURT:  Why don't you do that.

9            MR. ARKOW:  You could follow along on the monitor

10   and should be Government Exhibit 63.

11   Q.    Do you see -- do you recognize what's in that

12   photograph?

13   A.    The pictures I see right here, it's only one picture I

14   believe and this is my apartment complex.  This is my

15   apartment.

16   Q.    And what floor did you live on with Ms. Harper?

17   A.    I stayed on the second floor right there.  Second floor.

18   Q.    Do you remember an incident in February 2005 when police

19   officers from the Desert Hot Springs Police Department came

20   to that apartment at night and arrested you on a parole

21   violation?

22   A.    Yes, I do.

23   Q.    On the ride back to the police station, were you pepper

24   sprayed by one of the officers?

25   A.    The officer that transported me had pulled over and

```
 1    pepper sprayed me.
 2    Q.    And then when you got to the Desert Hot Springs Police
 3    Department station, were you tasered?
 4              MR. SCHWARTZ:  Objection.  Leading.
 5              THE COURT:  Sustained.  You can ask him what
 6    happened when he got there.
 7
 8    BY MR. ARKOW:
 9    Q.    Well, let's get into that by backing up.  At the
10    apartment there when you were there that night, was it dark
11    outside when the police officers came to your apartment?
12    A.    Yes, sir.
13    Q.    And in general what were you doing in the apartment when
14    the police officers came?
15    A.    We were sitting on the couch.  Me and Ms. Harper were
16    sitting on the couch watching television.
17    Q.    Who had come back to the apartment first that night, you
18    or Ms. Harper?
19    A.    I normally get off earlier than Ms. Harper.  I was
20    already at the apartment before she got there.
21    Q.    And when police officers came to your apartment, how
22    were you dressed?
23    A.    I just got off like I said.  I had my work shoes, my
24    work pants.  I took my work shirt off so I had like a tank
25    top on and that was about it.
```

1   Q.   Were you fighting with Ms. Harper?

2   A.   No.  We were sitting on the couch.

3   Q.   Were you -- was there a loud noise coming from your

4   apartment unit?

5   A.   No, sir.

6   Q.   Now, at some point when the police came to your door,

7   how did you know the police were at your door?

8   A.   When they banged on the door, they banged real hard and

9   as they banged real hard, I answered who is it and they said

10  the police and I opened the door.

11  Q.   And when you asked who is it, did you use that language

12  or did you use some maybe we'll call it more colorful

13  language?

14  A.   I used some colorful language.

15  Q.   Without saying the expletive, do you remember what you

16  said when you heard the banging at the door?

17  A.   I said who the fuck is it.

18  Q.   And then what did you hear if anything on the other side

19  of the door?

20  A.   It's the fucking police.

21  Q.   And who was on the other side of the door?

22  A.   Two Desert Hot Springs police officers.

23  Q.   Can you describe to the best of your recollection each

24  of the officers on the other side?

25  A.   It was two officers.  One was he had darker hair, dark

```
 1    hair.  I believe he was a sergeant or a corporal by the
 2    stripes on his shirt.  The other officer was thinner than him
 3    also smaller and his hair was lighter like a light brown.
 4    That's the best of my description I can give you at that
 5    time.
 6    Q.   At some point did you learn the name of the officer who
 7    you described as having the darker hair and being bigger or
 8    taller?
 9    A.   I seen his name tag and I couldn't pronounce his name.
10    I'm going to say I called him Scalabrini.  I thought it was
11    Italian last name, quite different.
12    Q.   Did the officers ask you to provide your identification?
13    A.   Yes, sir.
14    Q.   And did you provide your identification?
15    A.   Yes, I gave them my identification.
16    Q.   At some point, did the officers ask you or did they find
17    out if you were on parole?
18    A.   Well, they asked me was I on parole or on probation and
19    I told them I was on parole.  And this is prior to me handing
20    my identification card.  Then the process of them running my
21    name, I guess they find out I had a parole violation or
22    parole hold.
23    Q.   What was parole violation or parole hold for?
24    A.   I had not reported to my officer for that week.  I
25    had -- I didn't report that week.  I was supposed to report
```

```
 1    that week and I didn't.

 2    Q.    Was that also called absconding?

 3    A.    Yes, sir, that's what it's called.

 4    Q.    Do you have a criminal record?

 5    A.    I do have a criminal record.

 6    Q.    You were convicted in 2007 for burglary?

 7              THE COURT:  Again, that's leading.

 8    BY MR. ARKOW:

 9    Q.    Do you have a conviction in 2007 for burglary?

10    A.    Yes, sir.

11    Q.    Are you on parole or probation now for any offense?

12    A.    I just discharged parole December 22nd.

13    Q.    Of what year?

14    A.    Of two thousand -- well, pardon me.  I just discharged

15    parole 2012 of this year which would be January 22nd of 2012.

16    Q.    Currently not on probation or parole?

17    A.    Not on probation or parole at this time.

18    Q.    And going back to the night where the police came to

19    your house and you were arrested for the parole violation,

20    after you handed your ID, did the officers make any other

21    requests of you?

22    A.    They asked me to step outside.

23    Q.    Did you step outside?

24    A.    Yes, I had stepped outside.

25    Q.    Did you comply with their request to step outside?
```

1    A.    Yes, sir.

2    Q.    Did you resist in any way?

3    A.    Not at all.

4    Q.    And when you stepped outside, where did you go?  And if

5    referring to the picture or photographs of your apartment in

6    Government Exhibit 63 is helpful, can you tell the jury where

7    you were when you stepped outside?

8    A.    At the top right there is my front door.  It's a screen

9    that you can look right there, it's a screen.  I opened up

10   the screen in order to hand my ID to the officers.

11   Q.    I tried to make a mark on the monitor on my screen.  Is

12   where the mark is that where the screen on your door was?

13   A.    That's where the screen door would have been, yes.  The

14   screen door is still on there.  Look in the picture, the

15   screen door is right there.

16   Q.    So tell us what happened when you stepped outside?

17   A.    Well, I stepped outside, they patted me down and

18   handcuffed me.

19   Q.    And were both officers outside with you at the time?

20   A.    Yes, sir.

21   Q.    And then what happened after that?

22   A.    The officers had asked me to sit down so I sat down on

23   the porch, the porch part right there would be like the first

24   step.

25   Q.    Where I'm indicating?

1    A.    On that porch part.  Maybe the first step right after

2    that.  The first step right after that, the porch.

3    Q.    Let me just switch and try to put this document on a

4    different screen.  So now we have Government Exhibit 63.

5    This is the photograph of your apartment; right?

6    A.    Yes, sir.

7    Q.    So I'm gonna point with my pen you were sitting on the

8    apartment, where did you say you were after you were

9    handcuffed?

10   A.    I was handcuffed on the top, I don't know what you call

11   it, the patio, I guess, the top right there.

12   Q.    Where my pen is pointing at right now?

13   A.    Where your pen is pointing at.

14   Q.    One or two officers at that time?

15   A.    Both officers were on there with me.  One officer I

16   guess cuffed me.  One officer did cuff me and I was told to

17   sit down while another officer went to the residence or

18   looked inside the residence to, I guess, to see who else was

19   in the apartment.

20         THE COURT:  Well, don't guess.  Tell us if you

21   know.

22         THE WITNESS:  To see who else was up in there.

23   BY MR. ARKOW:

24   Q.    Then at some point did one of the officers go inside the

25   apartment to talk with Ms. Harper?

1    A.    Well, they had looked inside the apartment.  They had

2    walked inside, but I can't say they fully went inside.

3              MR. SCHWARTZ:  Objection, Your Honor.

4    Nonresponsive.

5              THE COURT:  Sustained.  Ask it again.

6    BY MR. ARKOW:

7    Q.    Did one of the officers at any point go inside the

8    apartment to talk to Ms. Harper?

9    A.    They spoke to Ms. Harper, yes, sir.

10             THE COURT:  Just a minute.  You say they?

11             THE WITNESS:  Well, one of the officers spoke with

12   Ms. Harper, yes, sir.

13   BY MR. ARKOW:

14   Q.    Do you remember which of the officers spoke with

15   Ms. Harper?

16   A.    Uh, Mr. -- I can't pronounce his last name.  It would be

17   the sergeant.  The one who had the stripes on his shirt.

18   Q.    The sergeant with the stripes on his shirt with the

19   Italian name you can't pronounce went into the apartment.  Is

20   that what you're saying?

21   A.    Yeah, he spoke with Ms. Harper.

22   Q.    And then where was the other officer during that time?

23   A.    I was on -- I was sitting on the patio so I guess, well,

24   I was sitting on the patio so he was there with me.

25             THE COURT:  Who was there with you?

```
 1            THE WITNESS:  The second officer was sitting by --
 2   he was sitting over there with me, not sitting there, but
 3   standing on the patio while I was sitting down.
 4   BY MR. ARKOW:
 5   Q.   When you were with the other officer on the patio, were
 6   you resisting that other officer in any way?
 7   A.   Not at all.
 8   Q.   Did the taller officer with the dark hair and Italian
 9   name was he ever called out to assist the officer with you
10   while you were on the patio?
11   A.   No.
12   Q.   At some point did the taller officer with the sergeant's
13   stripes did he come out of the apartment after talking with
14   Ms. Harper?
15   A.   He came out of the apartment and we went to the car.
16   He's the one I rode with back to the police station.
17   Q.   When you left your apartment, how did you get from your
18   apartment to the car?
19   A.   We walked down the stairs to the front part of the
20   apartment complex and the cruisers were right there in the
21   front.
22   Q.   Approximately how long a distance or how long a walk was
23   that from your apartment unit 306 to the patrol car?
24   A.   Approximately, less than two minutes, about two minutes.
25   Q.   But it took -- the patrol car wasn't directly in front
```

1    of your apartment?

2    A.    No, not in front my apartment unit.  In front of the

3    apartment complex was a parking lot in back.

4    Q.    On the walk from your apartment unit to the patrol car,

5    did you resist the officer in any way?

6    A.    Not at all.

7    Q.    And was it -- who was the officer that brought you from

8    your apartment to the patrol car of the two officers you

9    described?

10   A.    Well, I rode with the sergeant so I was walking with the

11   sergeant.

12   Q.    What happened when you got to the patrol car being

13   driven by the sergeant?

14   A.    Well, when I got in the patrol car with the sergeant, I

15   was, you know, I was very upset.

16   Q.    Why were you upset?

17   A.    Because I got arrested, when I was -- I got arrested.  I

18   was at home hanging out with my girl and I got arrested.

19   Q.    Did the police officers tell you why they came to your

20   apartment in the first place?

21   A.    It was a loud noise.  It was music up under me.  You

22   know our apartment complex has a lot of -- we had a lot of

23   people, you know, who partied during the week.  I mean it was

24   just a loud noise and they came and knocked on my door and so

25   I was upset because I was like could have been anybody.  I

```
 1    just so happened at that time to be that they knocked on the
 2    door and I had a parole violation.
 3    Q.   How did you show that you were upset?
 4    A.   I did a whole lot of cussing.  I used a lot of colorful
 5    words.
 6    Q.   You cursed at the sergeant officer?
 7    A.   Yes, sir.
 8    Q.   And what did the sergeant officer say back to you?
 9    A.   He did a little cussing, too.  He used a few colorful
10    words his self.
11    Q.   And at some point you got in his patrol car?
12    A.   Yes.
13    Q.   And were you handcuffed the entire time from your
14    apartment unit to being escorted to the patrol car?
15    A.   Yes, I was.
16    Q.   And then once you were put in the patrol car, did you
17    remain handcuffed?
18    A.   Yes, I was cuffed the whole time to the police
19    department.
20    Q.   And when you were in patrol car, did you -- were you
21    cursing at the sergeant officer in the car?
22    A.   Yes.  Yes, I was.
23    Q.   When you say cursing, do you remember any examples of
24    how you were cursing at the sergeant?
25    A.   Well, I was speaking to him and I said stuff like he
```

```
 1    was --
 2                THE COURT:  Tell us.
 3                THE WITNESS:  I said um, he was a fake Mexican who
 4    wanted to be white.  No matter what he did, they weren't
 5    going to accept him.  I called him a few bitches and said
 6    fuck you.
 7    BY MR. ARKOW:
 8    Q.   And the sergeant how did he respond to your insults and
 9    curses and inappropriate behavior?
10    A.   Well, honestly, I can't tell you exactly what he said
11    back, but it was a little bit of dialogue going back and
12    forth and then the car stopped.
13    Q.   What happened when the car stopped?
14    A.   He walked around to my side.  Well, I'm right behind him
15    in the front seat, I mean the back seat of the car.  He
16    opened the door up and pepper sprayed me.
17    Q.   Can you explain how you were pepper sprayed?
18    A.   I was -- in the face.  I don't know exactly how was I
19    pepper sprayed?  I was pepper sprayed in the face.
20    Q.   When you were sitting in the back seat, what did the
21    sergeant officer do?
22    A.   He opened the back door of the car and he pepper sprayed
23    me.  He pulled a can of pepper spray out and pepper sprayed
24    me.
25    Q.   Prior to the sergeant officer pepper spraying you, were
```

1    you kicking the window in the patrol car?

2    A.    No, not at all.

3    Q.    Had you unbuckled your seat belt in the patrol car?

4    A.    Um, no, I didn't unbuckle my seat belt.

5    Q.    Had you made any threatening statements to the sergeant?

6    A.    I didn't threaten him.  You know, I just cussed at him a

7    lot so used a lot of inappropriate language towards him.

8    Q.    How far had the patrol car driven?

9    A.    We had just left my apartment complex.  So we didn't go

10   any place but right up the street from the apartment complex.

11   Maybe like right up the street before we crossed the first

12   block.

13   Q.    And when you were pepper sprayed, were you still

14   handcuffed behind your back?

15   A.    I was handcuffed the whole time.

16   Q.    And how far away was the sergeant officer from your face

17   when he pepper sprayed you?

18   A.    Well, he just opened the door, reached in and pepper

19   sprayed me.  So it was no distance.  It was just like maybe,

20   maybe, I don't -- I can't give you accurate distance, but it

21   was like it was effortless to just open up the door and put

22   the hand in the car and pepper spray me.  I was sitting right

23   behind him in the car.

24   Q.    Were there -- did the sergeant give any warning before

25   he opened up the door and pepper sprayed you?

1    A.    Not at all.

2    Q.    How did it feel when you were pepper sprayed in your

3    eyes?

4    A.    When I got pepper sprayed, naturally, I was gagging

5    because I couldn't breathe and I couldn't see.  I was

6    blinded.

7    Q.    And what was your reaction to your nose and face?

8    A.    Well, I was gagging and so I was spitting up trying to

9    you know breathe in the back of the car so I might have spit

10   up in the back of the car just to breathe.

11   Q.    Did the back seat have some spit up?

12   A.    Yes.  I was bending over just, you know, hacking so I

13   can clear my air passage.  I'm sure I spit up in the back

14   seat of the car.

15   Q.    And then after the sergeant officer pepper sprayed you,

16   then what did he do?

17   A.    He shut the door and we continued to go to our

18   destination.

19   Q.    Did the sergeant officer do anything to decontaminate

20   your eyes from pepper spray?

21   A.    Not that I recall.

22   Q.    Did the pepper spray continue to burn as you were

23   driving to the station?

24   A.    Yes, sir.

25   Q.    Were you complaining about the pepper spray?

1    A.    Yes, I was.

2    Q.    Did you also continue to curse at the sergeant?

3    A.    Yes, I did.

4    Q.    Now, at some point did you arrive at the Desert Hot

5    Springs Police Department station?

6    A.    Yes, we did.

7    Q.    Do you know if anyone, if any other officer was riding

8    along or following the patrol car that you were in at any

9    point in time?

10   A.    Well, there was no other -- it was no other officer who

11   was a passenger and it was no other, um, nobody else who had

12   got arrested and was a passenger.  Just me and the officer

13   inside the car.  And I can't tell you if anybody was actually

14   following us.  I didn't see anybody follow us.

15   Q.    When you -- so at some point did you get to the police

16   department station?

17   A.    Yes.

18   Q.    And does the sergeant, what does the sergeant officer do

19   when he drives into the station?

20   A.    When he drives into the station, he opens my door to let

21   me out.

22   Q.    Did you get out?

23   A.    Yes, I get out.

24   Q.    Did you resist in any way?

25   A.    Not at all.  I get out and I'm still handcuffed.  He

```
1     pushed me to the side car, the back part of the car.  Looks

2     inside the car and he sees the area where I spit up at in the

3     car.

4     Q.   That's the back seat of the car dirty and soiled from

5     your having spit up?

6     A.   Yes.

7     Q.   And does the sergeant officer tell you anything about

8     the spit up?

9     A.   He tells me that I'm going to clean it up.

10    Q.   Who is going to clean it up?

11    A.   Told me I was gonna clean it up.

12    Q.   What did you say?

13    A.   I told him F you.  You shouldn't have pepper sprayed me.

14    I'm not cleaning anything up.

15    Q.   Did you say anything about that you were still

16    handcuffed?

17    A.   Well, I was handcuffed.  I didn't say anything about me

18    being handcuffed.  I was handcuffed.

19    Q.   But did you say anything about being able to clean it up

20    given that you were handcuffed?

21              MR. SCHWARTZ:  Objection.  Leading.

22              THE COURT:  It's overruled.  You may answer.

23              THE WITNESS:  Um, yes, sir.

24    BY MR. ARKOW:

25    Q.   What did you say to the sergeant officer?
```

1    A.    I can't clean anything up while I'm handcuffed.

2    Q.    Then were you at some point escorted in from the patrol

3    car in this parking area into the station itself?

4    A.    Yes.

5    Q.    And do you remember who escorted you from the patrol car

6    into the station?

7    A.    Um, the sergeant escorted me from outside to the, um,

8    inside of the, um, police department.

9    Q.    Did the sergeant officer do it alone?

10   A.    Yes, sir.

11   Q.    Were there any other officers assisting the sergeant

12   officer in escorting you from the patrol car at the station

13   into the inside of the station?

14   A.    No, sir.

15         MR. ARKOW:   Ask the witness be shown what's marked

16   for identification as Government Exhibit 30 and 31.

17         THE COURT:   Very well.

18   BY MR. ARKOW:

19   Q.    Looking first at Government Exhibit 30, do you see the

20   contents of what's in that file folder?  Is it a photograph?

21   A.    Yes, sir.

22   Q.    Do you recognize what's depicted in that photograph?

23   A.    That's the um, that's the um, the bench I was sat on

24   when I came through that door.  The door right there inside

25   the police station in DHS.

1    Q.   So this is a fair and accurate depiction of the door

2    that you came into the police station and then the bench that

3    you were put on?

4    A.   Yes, sir.

5         MR. ARKOW:  I would move Government's Exhibit 30

6    into evidence.

7         THE COURT:  It will come in.

8              (Exhibit 30 was admitted.)

9         MR. ARKOW:  Ask for permission to publish.

10        THE COURT:  Go right ahead.

11   BY MR. ARKOW:

12   Q.   Can you see on your TV monitor or the bigger monitor the

13   photograph that's now on the screen?  Can you see it?

14   A.   Okay.  Yes, I can.

15   Q.   I'm going to try to point with my pen on the photograph.

16   A.   Okay.

17   Q.   Where I'm pointing to now, this outside exit door, what

18   is that area in relation to what you have described as when

19   you came into the station?

20   A.   Outside where the car is at or when I was walking inside

21   the door?

22   Q.   Well, where I'm pointing to now.  Let's say I'm pointing

23   to this patrol car.

24   A.   Okay.

25   Q.   Is that patrol car, that patrol car is outside the

```
 1   station; right?
 2   A.   Right.
 3   Q.   Is that generally the area where you were escorted from
 4   the patrol car into the station?
 5   A.   Yes, sir.
 6   Q.   And then is this the door that the sergeant officer
 7   brought you in?
 8   A.   That's the doorway.
 9   Q.   And then where my pen is now, is that the bench that you
10   referred to?
11   A.   I was sat down right there on that bench.
12   Q.   Who sat you on that bench?
13   A.   The sergeant.
14   Q.   Still handcuffed behind your back?
15   A.   Yes, sir.
16          THE COURT:  Would you push that monitor down,
17   please.  We're going to try to get it moved.  Thank you.
18   BY MR. ARKOW:
19   Q.   Now, can you look at Government Exhibit 31?
20   A.   Okay.
21   Q.   Now, after the sergeant officer sat you on the bench,
22   let me put up Government Exhibit 31 again.  Did the sergeant,
23   do you see in the photograph that there are handcuffs
24   attached to the bench?
25   A.   Yes, I do.
```

```
 1    Q.    Did the sergeant handcuff you to the bench?

 2              THE COURT:  Just a minute.  Have you offered 30 and

 3    31?

 4              MR. ARKOW:  I have offered only 30 and this is, I

 5    moved 30 I believe into evidence.  I went back to 30.  I had

 6    him looking at 31.  So this is still Exhibit 30.

 7    Q.    Did the sergeant officer handcuff you to this bench?

 8    A.    No, I wasn't handcuffed to the bench.

 9    Q.    Now, looking at Exhibit 31, do you recognize what's

10    depicted in that photograph?

11    A.    It's the inside --

12              THE COURT:  Do you recognize?

13              THE WITNESS:  Yes.

14    BY MR. ARKOW:

15    Q.    What is it?

16    A.    The inside of the police department Desert Hot Springs.

17    Q.    Is this a fair and accurate depiction of the inside of

18    the Desert Hot Springs Police Department when you were

19    arrested that night?

20    A.    Yes.

21              MR. ARKOW:  I move Government 31 into evidence.

22              THE COURT:  It will come in.

23                   (Exhibit 31 was admitted.)

24              MR. ARKOW:  With the Court's permission publish

25    that.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  Fine.

2     BY MR. ARKOW:

3     Q.   Is this pretty much the same view as what we saw in

4     Government Exhibit 30?

5     A.   Yes.

6     Q.   And where my pen is pointing is that the bench?

7     A.   Yes, it is.

8     Q.   At any point, did the sergeant officer handcuff you to

9     that bench?

10    A.   I wasn't handcuffed to the bench.

11    Q.   But you were still handcuffed behind your back?

12    A.   The handcuffs were still placed on me.

13    Q.   When you say placed on you, show us how?

14    A.   Initially, right behind my back.

15          THE COURT:  He's so indicated.  Let's move on.

16    BY MR. ARKOW:

17    Q.   When you entered the station with the officer, the

18    sergeant officer, were there other officers also present in

19    the station in that area?

20    A.   Yes, sir.

21    Q.   What were they doing?

22    A.   Walking around just doing, I guess, the daily police

23    work they do.

24    Q.   Were they paying any attention to you?

25    A.   Well, I was in there.  I can't tell you if they were or

1    not.  I was there.

2    Q.   Were any of them involved in dealing with you?

3    A.   No, sir.

4    Q.   Were you trying to get any of those officers' attention?

5    A.   I tried to get all the officers' attention.  I was

6    letting them know that the sergeant had just pepper sprayed

7    me and I was handcuffed.  And I thought that was a coward

8    move and he told me to shut up.

9    Q.   Who told you to shut up?

10   A.   The sergeant told me to shut up.

11   Q.   You know approximately how many other officers were in

12   this area of the station when you were on the booking bench

13   at this time?

14   A.   I saw two officers.

15   Q.   Were you still talking with the sergeant officer while

16   you were on the bench?

17   A.   Yeah, I was still using colorful words with him also.

18   Q.   You were cursing at him?

19   A.   Yes, sir.

20   Q.   And was the sergeant officer responding to you?

21   A.   He told me to shut up.

22   Q.   And did you shut up?

23   A.   No, I didn't.

24   Q.   And then what happened?

25   A.   I was tased while I was sitting on the bench.

1    Q.    Who tased you while you were sitting on the bench?

2    A.    The sergeant.

3    Q.    How did that happen?

4    A.    I was sitting on the bench talking to the other officers

5    about how he pepper sprayed me and he told me to shut up.  I

6    told him to shut up.  I told him it was a coward move what he

7    did when I was handcuffed.  He shot me with a taser gun.

8    Q.    How far away was the sergeant officer when he shot you

9    with the taser gun?

10    A.    It wasn't a substantial distance.  It wasn't

11    face-to-face, but it wasn't substantial distance.  I can't

12    give you it to you in measure feet and things.  I don't know

13    for sure, but it wasn't, we weren't that far apart.

14    Q.    I'm going to point at Government Exhibit 32, were you

15    sitting on the bench when you were tased by the sergeant

16    officer?

17    A.    Yes, sir.

18    Q.    And where was your back in relation to this wall behind

19    the bench?

20    A.    My back would be against the wall.

21    Q.    And where were you facing?

22    A.    I was facing -- my back is against the wall and I'm

23    facing -- I'm facing, I'm facing the sergeant.

24    Q.    And was the sergeant directly in front of you when he

25    tased you?

1    A.    Yes, sir.

2    Q.    How did that feel when you were tased?

3    A.    Oh, initially, I want to say I blacked out.  Like I just

4    fell down.  I blacked out.  It was painful.

5              THE COURT:  So you fell down?

6              THE WITNESS:  Yes, sir.

7              THE COURT:  Off the bench?

8              THE WITNESS:  Yes, sir.

9    BY MR. ARKOW:

10   Q.    You were still handcuffed behind your back?

11   A.    Yes, sir.

12   Q.    And what was the next thing you remember after you fell

13   down?

14   A.    That I was told to get back up.

15   Q.    Now, where were you when you were told to get back up?

16   A.    On the ground.

17   Q.    Do you remember how you were on the ground, how you were

18   positioned?

19   A.    On my side.

20   Q.    And who told you when you were on the ground to get back

21   up?

22   A.    Sergeant told me to get back up.

23   Q.    The same sergeant who tased you?

24   A.    Yes, sir.

25   Q.    Did the sergeant tell you what was going to happen to

1    you if you didn't get back up?

2    A.   I was told to get back up unless I wanted to be tased

3    again.

4    Q.   Who told you that?

5    A.   The sergeant.

6    Q.   And what did you do?

7    A.   I tried to get back to my feet.

8    Q.   Were you able to get back to your feet in that position?

9    A.   Not at all.  I was still handcuffed.

10   Q.   Why couldn't you get back up?

11   A.   Because I couldn't lift myself off the ground.  I was

12   handcuffed.  I needed my hands to help me back up.

13   Q.   So when the sergeant officer said get back up or I'll

14   tase you, then what happened?

15   A.   I tried my best to get up and then I guess I got some

16   assistance up.  I don't want to say I guess.  I got some

17   assistance up.  I'm trying to do my best to get up.

18   Q.   Do you remember being tased again in that area of the

19   station?

20   A.   I can only tell you about getting tased one time and

21   that's when I was sitting on the bench.

22           THE COURT:  You said that you got assisted up?

23           THE WITNESS:  Yes, sir.

24           THE COURT:  By whom?

25           THE WITNESS:  I couldn't tell you.  I got -- I was

1    on the ground and I was trying to catch my breath.  I don't

2    know who helped me up.  I couldn't tell you exactly.

3              THE COURT:  Could you tell us how many people?

4              THE WITNESS:  No, sir.  I couldn't tell you how

5    many people it could have been.

6              THE COURT:  All right.

7              THE WITNESS:  I can't honestly tell you how many

8    people helped me.

9    BY MR. ARKOW:

10   Q.   At the time you were tased, were there other officers in

11   that area of the station?

12   A.   Yes, sir.

13   Q.   Do you remember approximately how many other officers

14   you saw in that area?

15   A.   Well, I seen two before, but I can't tell you how many

16   was there when I got tased.  And after I got tased, I kind of

17   like just got quiet.  I was kind of, I was all right.  I

18   complied with their orders at that time.

19   Q.   What was their orders at that time?

20   A.   Oh, I was not saying anything to him because I try to

21   make a plea to the other officers that I seen that I was

22   pepper sprayed when I was handcuffed and things like that.

23   And when I make that plea, he shot me while I was on the

24   bench with a taser so wasn't no need for me to plea any more.

25   Q.   And then at some point, were you put back on the bench?

1    A.    Yes, I was.

2    Q.    Prior to being tased, were you spitting at the sergeant

3    officer?

4    A.    No, sir.

5    Q.    Prior to being tased, were you throwing your arms at the

6    sergeant officer?

7    A.    No, sir.

8    Q.    Prior to being tased, did you try to touch or put your

9    hands on the sergeant officer?

10   A.    No, sir.

11   Q.    Prior to being tased, did you try to stand up from the

12   booking bench?

13   A.    No.

14   Q.    When you were on the ground and the sergeant officer

15   ordered you to get up, did you respond to the sergeant

16   officer about that?

17   A.    I can't tell you I did respond to him.  Honestly, I

18   can't tell you that.  I have no recollection.

19   Q.    Prior to being tased, did you do anything else besides

20   cursing at and mouthing off to the sergeant officer?

21   A.    No.

22   Q.    Now, after you got put back on the booking bench were

23   you handcuffed to the booking bench at any point after that?

24   A.    Never handcuffed to the booking bench.

25   Q.    After you got put back on the booking bench, how long

1    did you sit there?

2    A.   I can't honestly give you a time how long I was sat

3    there.  It seemed like all night, but I know that's not how

4    it was.

5    Q.   Well, I'm referring to when you were put back up and you

6    got on the booking bench and you say it seemed like all night

7    you were sitting on the booking bench?

8    A.   It seemed like all night.  A lot of activity from that

9    bench, but I know that can't be the case.  I can't honestly

10   give you a time frame on how long I was sitting on the bench

11   after I was placed back on it.

12   Q.   And what were you doing when you were sitting on the

13   booking bench?

14   A.   I was sitting on the booking bench asking can I get some

15   water because I couldn't breathe and I couldn't swallow.  I

16   was asking can I get some water.  I was thirsty.

17   Q.   Who were you asking water for?

18   A.   Whoever walked by me.  Sergeant was there.  I asked him

19   for water.  Any of the other officers that were out there, I

20   was asking them can they get me some water also.

21   Q.   Did the sergeant officer respond to your request for

22   water?

23   A.   Told me to shut up.

24   Q.   And did you talk back to him?

25   A.   I told him I just wanted something to drink after.  At

1    that point, no, I didn't use any colorful words to him after

2    that.

3              THE COURT:  Let's stop for just a moment.

4    BY MR. ARKOW:

5    Q.   When you were placed back on the bench in this booking

6    area of the station, I believe you testified that you were

7    asking other officers for water?

8    A.   Yes.

9    Q.   And what, if anything, did those officers do to respond

10   to your request for water?

11   A.   I got no assistance with my request.

12   Q.   When you were placed back on the bench in the booking

13   area, what did the sergeant officer do?

14   A.   Well, I couldn't honestly tell you.  They walked off.

15   Everybody was walking around the station at that time.  I

16   don't know exactly what he was doing.

17   Q.   Did the sergeant officer leave the booking bench area?

18   A.   Did he walk off from me?

19   Q.   Did he walk off from you?

20   A.   Yes.

21   Q.   And the other officers, were they also walking off from

22   you, walking away from you?

23   A.   Yes.

24   Q.   Were the other officers standing guard or watching over

25   you when you were placed back on the bench in the booking

1    area?

2    A.    No, sir.

3    Q.    So you sat on the bench in the booking area?

4    A.    Yes.

5    Q.    And then at some point were you taken away from the

6    bench in the booking area?

7    A.    I was placed inside of a cell and uncuffed and I stayed

8    there until they fingerprinted me.

9    Q.    And on this picture, the monitor might be far away from

10   you, but where were the cells in relation to the booking

11   bench where my pen is pointing to on the screen?  Can you in

12   words describe where the holding cells were in this area of

13   the station?  Was there more than one holding cells first of

14   all?

15   A.    I believe on the left right past the door.  Keep going

16   right that's one holding cell I believe.  If you go right

17   across from the bench, that should be a holding cell.  There

18   was three holding cells in there.  I don't know exactly where

19   they're placed, but I know that was one holding cell and I

20   was placed in the holding cell by myself.

21   Q.    Were there other inmates at the Desert Hot Springs

22   Police Department station at this time?

23   A.    Yes, sir.

24   Q.    How do you know that?

25   A.    When the officer, officer had tased me when I fell down,

1    a lot of people came to -- other people who had got arrested

2    that night came to the window and they were told to sit down

3    and the window was covered.  So there was people in there.

4    Q.   Came to what window are you referring to?

5    A.   Came to the window that you can look in and out of, I

6    guess observation window.  I don't know what the name of it

7    is.  It's right on the doors of the cells.

8         MR. ARKOW:  Can the witness be shown what's been

9    marked for identification as Government's Exhibit 33?

10        THE COURT:  Yes.

11   BY MR. ARKOW:

12   Q.   Can you look at the photograph in that exhibit and tell

13   the jury if you recognize it?

14   A.   Yes.

15   Q.   What is it?

16   A.   A holding cell.

17   Q.   Is that one of the holding cells in the booking area

18   where you were at the station that night?

19   A.   Yes, sir.

20        MR. ARKOW:  I move Government Exhibit 33 into

21   evidence and ask permission to publish.

22        THE COURT:  It may come in and you may publish.

23             (Exhibit 33 was admitted.)

24   BY MR. ARKOW:

25   Q.   You were describing earlier that there was a window on

the holding cell.  So where my pen is pointing is that the
window that the inmate who is on the other side of that
holding cell can see out into this booking area?

A.   Yes.

Q.   And this area now where my pen is pointing at the lower
portion of the photograph is this the booking area?

A.   Well, it's holding cells.  I would say yes.

Q.   When you referred to a window, that's what you were
referring to each holding cell had a window like where my pen
is pointing now in Government Exhibit 33?

A.   Yes.

Q.   And at some point did you also see other inmates in the
holding cells at the station that night?

A.   After I went through the booking process, I was placed
with the other inmates.

Q.   So if we can back up on the time line, after you were on
the bench and you stayed there for a while, then where did
you go after that?

A.   After I left the bench, I was placed inside of a holding
cell by myself and I was uncuffed and just sat there.  Went
through the booking process and I was lead to another holding
cell with other inmates.

Q.   You refer to the time when you were placed in the
holding cell.  Did you see the sergeant officer, did you have
any interaction with him when you were placed in this holding

1    cell initially?

2    A.   When he placed me -- he was the one that placed me

3    inside the holding cell and he uncuffed me.

4    Q.   He uncuffed you?

5    A.   Yes.

6    Q.   Was there any other officers assisting him when he was

7    uncuffing you?

8    A.   They didn't assist him uncuff me.  They were just going

9    about their business inside of the police station.

10   Q.   And did you say anything to the sergeant officer after

11   he placed you inside the holding cell?

12   A.   I asked can he get me some water because I was thirsty.

13   Q.   And did the sergeant officer respond to your asking for

14   water?

15   A.   He told me to back up and get in the cell and I asked

16   him could I get some water.  He told me to back up again and

17   get in the cell.

18   Q.   And did he have a taser in his hand when he told you

19   that?

20   A.   Well, he kind of made a gesture towards his taser when

21   he told me that.

22   Q.   Can you describe that?

23   A.   He told me to back up -- he just told me to back in the

24   cell and he had his hand on his taser and I backed into the

25   cell.

1   Q.   And did the sergeant officer close the cell door?

2   A.   He closed it and locked it.

3   Q.   When you were brought into the cell, did you resist in

4   any way?

5   A.   Not at all.

6   Q.   And did the sergeant officer need any other officers to

7   assist him in putting you in the cell?

8   A.   No.

9   Q.   And then you were in the cell?

10  A.   Yes, sir.

11  Q.   And were you handcuffed?

12  A.   No.  He took the cuffs off me before he put me in the

13  cell.

14  Q.   And do you know approximately how long you were in the

15  cell before the next thing happened to you?

16  A.   I couldn't give you an approximation of how long I was

17  placed in there.

18  Q.   And then at some point you're taken out of the cell?

19  A.   I was taken out of the cell, yes, sir.

20  Q.   Do you know who takes you out of the cell?

21  A.   No, sir.

22  Q.   Was it the sergeant officer?

23  A.   Not at all.

24  Q.   And was it more than one officer that took you out of

25  the cell or just one officer?

1    A.    One officer unlocked the door and I went through a

2    booking process.  Just one officer.

3    Q.    That officer wasn't assisted by any other officers in

4    taking you out of the cell?

5    A.    No, sir.

6    Q.    And that officer who took you out of the cell, did he

7    take you through this what you call the booking process?

8    A.    Yes.

9    Q.    What did booking process consist of?

10   A.    I was fingerprinted, asked a few questions and they took

11   a picture of me.  And after that they put me into another

12   holding cell to be transported to the county jail.

13   Q.    The officer who did the booking process, was he doing it

14   alone with you or were there other officers involved in

15   booking you, taking you through the booking process?

16   A.    Well, I don't know if one guy fingerprinted me, the next

17   guy took a picture of me, but I went through a course of

18   answering questions and things.  I can't honestly tell you if

19   there was more than one person who took me from place to

20   place.

21   Q.    Not more than one officer was dealing with you at a

22   time?

23   A.    Right.

24   Q.    Were you handcuffed during this part of the booking

25   process?

1    A.    No, I wasn't.

2    Q.    Was part of the booking process did you say you were

3    photographed?

4    A.    Yes, sir.

5         MR. ARKOW:  I would ask the witness be shown what's

6    been marked as Government's Exhibit 65.

7         THE COURT:  Very well.

8         MR. ARKOW:  With the Court's permission, I would

9    ask to read from the stipulation Government Exhibit 84.

10         Government Exhibit 65 is a true and accurate

11   photocopy of the Desert Hot Springs Police Department booking

12   photograph of Jamal White on February 24, 2005.

13         I would ask that Government Exhibit 65 be admitted

14   into evidence.

15         THE COURT:  Is that the stipulation agreed to,

16   Mr. Schwartz?

17         MR. SCHWARTZ:  Yes Your Honor.

18         THE COURT:  That will be received.  Go ahead.

19              (Exhibit 65 was admitted.)

20         MR. ARKOW:  With the Court's permission, can I put

21   Government Exhibit 65 on the monitor?

22         THE COURT:  Yes.

23   BY MR. ARKOW:

24   Q.    Do you recognize who is in that photograph?

25   A.    Yes, sir.

1    Q.    That was taken when you were at the station?

2    A.    Yes.

3    Q.    Directing your attention to part of your T-shirt that

4    I'm pointing to on the left shoulder, do you see how that

5    looks like it has a certain color to the white T-shirt?

6    A.    Yes, sir.

7    Q.    Was that -- do you know what that was?

8    A.    That's where -- that's the pepper spray.

9    Q.    Pepper spray from what?

10   A.    When the officer pulled over and pepper sprayed me.

11   Q.    And then directing your attention to the bottom of the

12   photograph, the stomach area of your T-shirt, gonna try to

13   focus in, do you see at the bottom of the photograph, do you

14   see something on the white shirt?

15   A.    Yes, sir.

16   Q.    What is that?

17   A.    Those are the holes in my shirt from the taser when the

18   officer tased me.

19   Q.    After you were booked, then where did you go?

20   A.    After I was booked, I went into the holding cell with

21   the rest of the inmates to be transported.

22   Q.    Transported to where?

23   A.    I was transported to Desert Regional Center in Palm

24   Springs, California for medical attention.  They had to look

25   at me.

1    Q.   When you were transported, do you know which officer

2    transported you?

3    A.   It was -- this officer is unknown to me.  I don't know

4    if he was a transport officer, but I don't know exactly who

5    that officer was.

6    Q.   Was it more than one officer that transported you from

7    the Desert Hot Springs station to the medical center?

8    A.   Just one officer transported me.

9    Q.   And when you got to the medical center, what did the

10   officer do with you?

11   A.   Um, I was placed inside of a room and a doctor came to

12   look at me.

13   Q.   And was it just one officer who took you from the car

14   into the room with the doctor looking at you?

15   A.   Yes, sir.

16   Q.   Do you know if you got any treatment at the medical

17   center?

18   A.   I believe I did get treatment at the medical center.  I

19   did.

20   Q.   Did you complain at the medical center?

21   A.   Yes, I did.

22   Q.   What were you complaining about?

23   A.   I complained that the police had pepper sprayed and

24   tasered me while I was handcuffed and that I was thirsty.  I

25   couldn't breathe and I was dehydrated.

1    Q.    Did you get any water or something for that dehydration?

2    A.    No, I didn't.

3    Q.    Then after you left the medical center at some point?

4    A.    Yes.

5    Q.    With the same officer who brought you?

6    A.    Yes, sir.

7    Q.    And then where did you go?

8    A.    They transported me to down to Indio county jail.

9    Q.    And then you were booked into that jail?

10   A.    They booked, well, they held me.  I was then transported

11   to Chino.  Being on parole, I went to Indio overnight and

12   then went straight to Chino.

13   Q.    And as result of this case, this arrest did you plead

14   guilty and were you convicted of certain charges?

15   A.    After I got released, I had to go to court for this case

16   right here.

17   Q.    Did that result in your being convicted for this case

18   right here?

19   A.    Yeah, I got convicted.  Yes, I got convicted.

20   Q.    What were the charges?

21   A.    Drunk in public.

22   Q.    And did you also plead to the parole violation for not

23   reporting?

24   A.    Well, I did 45 days on patrol violation and my parole

25   officer let me go after 45 days.

```
1   Q.   Were you ever charged for this incident with resisting

2   arrest?

3   A.   No.

4   Q.   At any time during this evening when you were arrested,

5   either at the apartment or in patrol car ride or at the

6   station, did you ever resist a police officer?

7   A.   No, I didn't.

8   Q.   During the patrol car ride, did you ever kick at the

9   window of the patrol car?

10  A.   No, I didn't kick at any window at all.

11  Q.   Did you ever spit at the sergeant who arrested you?

12  A.   No.

13        MR. SCHWARTZ:  Asked and answered.

14        THE COURT:  All right.  It will stay in.

15  BY MR. ARKOW:

16  Q.   Did you ever kick at the sergeant in the booking area of

17  the jail?

18  A.   Not at all.

19  Q.   Did you do anything else to the sergeant other than

20  curse at him and mouth off during this incident?

21  A.   No.  I was, I used a lot of colorful language and I

22  believe if I had did anything else to the sergeant --

23        THE COURT:  Well, did you do anything?

24        THE WITNESS:  No sir.

25        THE COURT:  Go ahead.
```

```
1              THE WITNESS:  Not at all.
2              MR. ARKOW:  May I have moment, Your Honor?
3              THE COURT:  Yes.
4    BY MR. ARKOW:
5    Q.   I want to go back to the point in time after you were
6    tased and you were placed back on the bench in the booking
7    area, do you remember that?
8    A.   Yes.
9    Q.   You stayed on that bench in the booking area for some
10   period of time.  It felt like I think your words were all
11   night?
12   A.   Just the whole ordeal seemed like forever.
13   Q.   Well, I want you to focus specifically on the time after
14   you were tased and you were somehow you got up or they helped
15   you back up to the bench.  Okay?
16              From that time that you were back on the bench
17   until the time that the sergeant officer uncuffed you and put
18   you in the holding cell, do you have that time frame in mind?
19   A.   Okay, yes.
20   Q.   Could you estimate approximately how long you were on
21   the bench?  And if you could do it in terms of was it
22   seconds?  Was it a minute range?  Was it five minutes?  Just
23   some approximation of how long that you were left on the
24   booking bench after you had been tased and put back on the
25   bench.
```

1    A.    It wasn't seconds or minutes.  Like five or ten minutes.

2    It was a while.  I can't give you an honest like if it was

3    20 minutes to 45 minutes.  I was sitting there, I was sitting

4    out there by myself for a while.

5              MR. ARKOW:  No further questions.

6              THE COURT:  Cross-examination, Mr. Schwartz.

7              MR. SCHWARTZ:  Thank you.

8                        CROSS-EXAMINATION

9    BY MR. SCHWARTZ:

10   Q.    Afternoon, Mr. White.

11   A.    Good afternoon.

12   Q.    First time you testified in court?

13   A.    Yes, sir.

14   Q.    I'm gonna try to go back over this event in

15   chronological order.  Do you understand?

16   A.    Yes, sir.

17   Q.    If I go out of order at times and you get confused, just

18   tell me.  Fair enough?

19   A.    Okay.

20   Q.    Now, you answered questions by the prosecution for the

21   last hour or more; correct?  Whatever time this afternoon?

22   A.    Yes, sir.

23   Q.    And at times when he asked you for a question that

24   called for a yes or no answer; is that right?

25   A.    Yes, sir.

1    Q.    You answered yes or no?

2    A.    Yes.

3    Q.    And at times he asked you for your opinion.  Do you

4    recall that?

5                MR. ARKOW:  Objection.  Misstates the question.

6                THE COURT:  Sustained.  Let's ask it differently.

7    BY MR. SCHWARTZ:

8    Q.    Well, there were times he asked you how you felt about

9    something; is that right?

10   A.    I can't recall.  You have to --

11   Q.    I'll give you an example, sir.  There were times

12   specifically when he asked for your opinion, he asked you how

13   it felt when the darts were inside if that hurt or not.  Do

14   you remember that?

15   A.    Okay.

16   Q.    Do you remember him asking you that question a few

17   moments ago?

18   A.    I can't recall that question.

19   Q.    And you don't recall telling him that it hurt just a few

20   moments ago?

21   A.    No, I can't recall that question.

22   Q.    And there were times when Mr. Arkow asked you what you

23   recall about the event; is that right?

24   A.    Yes, sir.

25   Q.    And you told him what you could recall; right?

1    A.   Yes, sir.

2    Q.   Let me ask you this.  It's true that the honest answer

3    if you don't recall something is I don't remember; right?

4    A.   Yes, sir.

5    Q.   So if you answer a question confidently, that's because

6    that's your memory; right?

7    A.   I'm sure it is, yes, sir.

8    Q.   And if you didn't remember something, you would say I

9    don't remember because that's the honest answer; right?

10   A.   Yes, sir.

11   Q.   Now, prior to testifying today, you were interviewed

12   several times by investigators in this case; correct?

13   A.   Yes, sir.

14   Q.   About two or three months after this event back in 2005,

15   specifically May of 2005, you were interviewed by an Internal

16   Affairs investigator; right?

17   A.   I don't recall if it was May 2005, but it was shortly

18   after this event happened.

19   Q.   And it's safe to say and correct me if I'm wrong --

20        THE COURT:  Well, ask him a question.

21   BY MR. SCHWARTZ:

22   Q.   This event was more fresh in your mind a couple of

23   months after the event when you were interviewed that first

24   time than it would be today; is that right?

25   A.   Yes, sir.

1   Q.   And that interview took place in your apartment;

2   correct?

3   A.   Yes, sir.

4   Q.   And it was just one interview; is that right?

5   A.   It was one interviewer?

6   Q.   Yes.

7   A.   Just one interviewer, yes.

8   Q.   And he asked you questions about this event; is that

9   right?

10   A.   Yes, he did.

11   Q.   And you tried to be honest as you could be with your

12   answers; right?

13   A.   I didn't want to speak to this interviewer at all and I

14   made myself clear with him.

15           MR. SCHWARTZ:  Objection.  Move to strike.

16   Nonresponsive, Your Honor.

17           THE COURT:  It will remain.  Go ahead.

18   BY MR. SCHWARTZ:

19   Q.   The answers you did give this interviewer you were as

20   honest as you could; right?

21   A.   I didn't want to speak with him and I told him I didn't.

22   He said it would just take a minute of my time.

23           MR. SCHWARTZ:  Objection.  Move to strike.

24   Nonresponsive.

25           THE COURT:  Stricken.

1          MR. SCHWARTZ:  Ask you respond to the question,

2    sir.  It's a very simple question.

3    Q.   The answers you did give this interviewer, you tried to

4    respond as honestly as possible; correct?  That's yes or no.

5          THE COURT:  You don't attempt to tell a witness how

6    to respond.  You have any problem with the witness, you

7    inquire through the Court.  Just ask another question.

8    BY MR. SCHWARTZ:

9    Q.   The answers you gave that investigator back in 2005, you

10   were trying to give as honest an answer as you could;

11   correct?

12   A.   Yes, I did.

13   Q.   Now, when that investigator asked you questions back in

14   2005 that we just talked about, if you didn't remember

15   something, you would have told him that; correct?

16   A.   Yes.

17   Q.   Because that's the honest answer if you don't remember

18   something; right?

19   A.   Right.

20   Q.   That investigator asked if he could record the

21   interview, did he not?

22   A.   I can't recall if he asked if he could record it, but I

23   recall myself telling him I don't want to speak with him.

24   Q.   Do you recall telling the investigator you refused to be

25   recorded?

1    A.    I recall telling the investigator I didn't want to speak

2    with him at all because I didn't know who he was.

3    Q.    Now, do you recall telling that investigator that when

4    the officers first came in your apartment back in

5    February 2005, they threw you against the wall?

6    A.    Not at all.

7    Q.    You don't recall saying that?

8    A.    I've never made that statement before.

9    Q.    And do you recall telling the investigator that my

10   client stopped his patrol car when was 10 to 20 yards east of

11   Palm Drive?

12            MR. ARKOW:   Objection.   Improper impeachment.

13            THE COURT:   Overruled.

14   BY MR. SCHWARTZ:

15   Q.    Do you recall telling the investigator that?

16   A.    Ten -- I told him that -- I told him 10 or 20 yards east

17   of Palm Drive?   That's what I said?

18   Q.    I'm asking if you recall saying that.

19   A.    I never said that.

20   Q.    You recall telling that investigator back in 2005 that

21   my client stopped that car, the patrol car, got out and

22   sprayed you with pepper spray once?

23   A.    Yes, sir.   I did mention that.

24   Q.    And do you recall telling the investigator that shortly

25   after my car sprayed you while that car was first stopped,

```
 1    you threw up in the car at that point in time?
 2    A.   No, sir.
 3    Q.   You recall telling that investigator that right after
 4    you threw up in the car while it was still stopped on the way
 5    to the station still on the street that my client tased you
 6    for the first time?
 7    A.   No, sir.
 8    Q.   You never said that?
 9    A.   No, sir.
10    Q.   You recall telling that investigator back in 2005 that
11    you were shot two more times with the taser gun by my client
12    for a total of three?
13    A.   I was shot twice with the taser by the officer.
14    Q.   Do you recall telling the investigator back in 2005 that
15    it was a total of three times?
16    A.   No, I did not.
17    Q.   Do you recall telling that investigator back in 2005
18    that you were positive it was three times?
19    A.   No, I did not.
20    Q.   You just said a moment ago you were shot two times by
21    the taser; right?
22    A.   Yes, I'm positive I was shot twice.
23    Q.   Do you recall telling us when Mr. Arkow asked you the
24    question just a few minutes that you could only tell him that
25    you were tased one time and that was on the bench?  Do you
```

1  recall just saying that statement, that quote just a few

2  minutes ago?

3  A.   Yes, I did say that.

4  Q.   You recall Mr. Arkow asked you the question again and

5  you made the same statement a second time just a few minutes

6  ago?

7  A.   Yes, I did.

8  Q.   Now, you were also interviewed by the FBI several times

9  in this case before today's date; correct?

10 A.   Yes, sir.

11 Q.   And do you recall being interviewed by the FBI back

12 December 2008?

13 A.   I can't recall if it was December 2008, but I don't know

14 exactly the dates.

15 Q.   Now, do you recall when you were interviewed by the FBI

16 back in 2008 that you told the FBI agent that my client had

17 stopped the car between the time you were placed in the car

18 by your apartment and the time you made it to the station and

19 at some point in between there, he stopped the car and pepper

20 sprayed you?

21 A.   Yes, sir.

22 Q.   And do you recall telling that to the agent back in 2008

23 that when my client drove you to the station, he parked the

24 car in the parking lot and got you out of the car in the

25 parking lot of the police station.  Do you recall telling the

1    agent that back in 2008?

2    A.    Yes, sir.

3    Q.    And do you recall telling the agent back in 2008 after

4    my client got you out of the car in the parking lot, he tased

5    in the parking lot when you were up against the car?

6    A.    Yes, sir.

7    Q.    And you recall telling the agent that my client tased

8    you in the back when you were up against the car?

9    A.    Yes, sir.

10   Q.    And you recall telling the agent back in 2008 that after

11   that tasing, you then walked into the police station.   You

12   recall telling the agent that?

13   A.    Yes, sir.

14   Q.    You were placed on that bench that you described with

15   the pictures on the monitor.   You recall telling the agent

16   that?

17   A.    Yes, sir.

18   Q.    Now, when you were placed on the bench and you sat on

19   the bench, you were still mouthing off to the officer; right?

20   A.    Yes, sir.

21   Q.    And there were other officers present; is that correct?

22   A.    Yes, sir.

23   Q.    And you testified a moment ago that you were complaining

24   to those other officers present that you had been pepper

25   sprayed for no reason; is that right?

1    A.    Pepper sprayed and tased for no reason.

2    Q.    Well, you recall testifying just a few minutes ago that

3    you complained to those officers that you had been pepper

4    sprayed for no reason?  You recall saying that?

5    A.    Yes, sir.

6    Q.    You didn't mention tased a few minutes ago, did you?

7    A.    I can't remember, but I was pepper sprayed and tased.

8    That's when I was told shut up by the officer.

9    Q.    And you recall testifying just a few minutes ago that

10   you complained to those officers that you had been pepper

11   sprayed and it was a cowardly thing to do and you hadn't done

12   anything to warrant it?

13   A.    Yes, sir.

14   Q.    And you complained to them that you needed water because

15   you had been pepper sprayed?

16   A.    I was pepper sprayed and tased and I did complain to the

17   officers that were in there, yes, sir.

18   Q.    You recall a few minutes ago you didn't mention being

19   tased.  You said you complained about being pepper sprayed?

20   A.    The question probably wasn't asked to me and I'm saying

21   that's what I complained about the officers, I complained to

22   the officers about.

23   Q.    Now, as you sat on the bench complaining to the officers

24   about being pepper sprayed at some point --

25             MR. ARKOW:  Objection.  Misstates the testimony.

1          THE COURT:  Rephrase it, please.

2     BY MR. SCHWARTZ:

3     Q.   As you sat on the bench and complained to the officers

4     either about being pepper sprayed or pepper sprayed and

5     tased, at some point the officer came over, the sergeant and

6     told you to shut up; right?

7     A.   Yes, sir.

8     Q.   And you kept mouthing off; is that right?

9     A.   Yes, sir.

10    Q.   And he tased you after you kept mouthing off; is that

11    right?

12    A.   Not quite, but yes, sir.

13    Q.   When you say not quite but yes, explain it for us.  What

14    do you mean?

15    A.   I made a plea to the officer that the officer had tased

16    me and pepper sprayed me while I was handcuffed and that was

17    a cowardly move.  But when he told me to shut up, I told him

18    to shut up and that's when I got tased.

19    Q.   And you were on the bench; right?

20    A.   Yes, sir.

21    Q.   He was standing over you; right?

22    A.   He was standing in front of me, yes, sir.

23    Q.   As you described there are holding cells across from the

24    bench; is that right?

25    A.   Yes, sir.

1    Q.    And there are other officers in that area with you;

2    right?

3    A.    There were officers, yes, sir.

4    Q.    Now, you're saying that area between the holding cells

5    and the bench is an area where people can walk back and

6    forth; right?

7    A.    You have to show me.

8    Q.    Do you have still have those pictures up there with you?

9    A.    Yes, sir.

10   Q.    If I can turn your attention, sir, to what's marked as

11   Exhibit 31.  Do you have that in front of you?

12   A.    Yes, sir.

13             MR. SCHWARTZ:  Your Honor, may I publish

14   Exhibit 31?

15             THE COURT:  Go right ahead.

16   BY MR. SCHWARTZ:

17   Q.    And what's on the monitor, is that what you're looking

18   at the hard copy of No. 31?

19   A.    Yes, sir.

20   Q.    And you identified that as the booking area from your

21   experience in Desert Hot Springs Police Department; is that

22   right?

23   A.    This is the booking area, yes.

24   Q.    Where I have my pen pointed, what is that?

25   A.    That's the bench.

1    Q.   And is that the bench you were sitting on when you were

2    tased?

3    A.   Yes, sir.

4    Q.   And is this area that I'm going over with my pen is that

5    the booking area that you were talking about?

6    A.   Yes.

7    Q.   Not a large area, is it?

8    A.   Not at all.

9    Q.   As a matter of fact, the picture makes it look larger

10   than it really; is that correct?  Can't remember?

11             MR. ARKOW:  Objection.

12             THE WITNESS:  I don't know.

13   BY MR. SCHWARTZ:

14   Q.   You recall it being a small area; correct?

15   A.   It was, the booking area was a small area.

16   Q.   You noted or testified there were several officers in

17   that booking area besides my client?

18   A.   I seen other officers, yes, sir.

19   Q.   And you didn't notice what they were doing at the time?

20   A.   I believe going about their duties.  I couldn't honestly

21   tell you.

22   Q.   No specifics as to what they were doing each one?

23   A.   No, sir.

24   Q.   And where on this bench were you seated?  And I'll put

25   my pen on it and I'll move it slowly down the bench.  Can you

 1    tell me to stop where you remember being seated?  You recall

 2    at all on the bench where you were seated?

 3    A.    This is seven years ago, sir.  I couldn't honestly tell

 4    you if I was at the end or the beginning of the bench.

 5    Q.    You recall where my client was standing when he tased

 6    you?

 7    A.    It was seven years ago, sir.  I couldn't honestly tell

 8    you where your client was standing when he tased me.

 9    Q.    And do you recall how close he was when he tased you?

10    A.    Well, you want me to give it to you in feet or inches?

11    Q.    If you can estimate.

12    A.    I'm not good at estimating, but the area was small and

13    he was right in front of me.  He told me shut up.  I told him

14    to shut up.  I got tased and he shot me with the taser.  I

15    don't know how far.  He wasn't as far as you and me were.

16              THE COURT:  Indicating about 25 feet.

17    BY MR. SCHWARTZ:

18    Q.    Was he as close to you as madam court reporter typing on

19    her machine is next to you?

20    A.    Maybe that distance, maybe give or take.

21              THE COURT:  Indicating approximately four feet.

22              THE WITNESS:  Give or take this far away.

23    BY MR. SCHWARTZ:

24    Q.    That's approximately; correct?

25    A.    Give or take.

1   Q.   And when he tased you, did he have his arm extended or

2   drawn back?  How was his arm holding the taser when he tased

3   you?

4   A.   Sir, when he told me shut up and I told him to shut up,

5   I never seen his arm.  Maybe if I had seen it, I might have

6   tried to dodge it or something.  He tased me.  I don't know

7   if how his arm was extended or in the holster.  I couldn't

8   tell you.

9   Q.   When you told him to shut up right before you were

10  tased, you were looking at him?

11  A.   I was looking at the officers and I was pleading with

12  the officers that he shot me with the taser and pepper

13  sprayed me when I was handcuffed and that was a cowardly

14  move.  He told me to shut up.  I told him to shut up and I

15  was pleading with the other officers in there to help me.

16  Q.   So when you told my client to shut up, you were not

17  looking at him; is that correct?

18  A.   I probably looked at him and say you shut up and after

19  that I was still pleading.

20  Q.   You said you probably looked at him.  Do you recall

21  looking at him?

22  A.   Sir, I couldn't honestly tell you if I'm looking at him.

23  I know I'm just pleading for help.

24  Q.   Now, when the FBI interviewed you, you tried to be

25  honest with that interview, too; correct?

1   A.   Yes, sir.

2   Q.   And as accurate as you could; right?

3   A.   Yes, sir.

4   Q.   And if didn't remember something, you would have told

5   them that; right?

6   A.   The incident happened seven years ago, sir so whatever I

7   remembered at one point in time if I didn't remember, I

8   wouldn't -- I didn't exaggerate it.  I just didn't remember

9   it at all.

10  Q.   So if something you didn't remember at all based on

11  questioning you received from the FBI, you would have told

12  them you don't remember that at all?

13  A.   Yes, sir.

14  Q.   Now, you recall back in 2008 you told the FBI that there

15  were no racial remarks made at that time you were tased by my

16  client in the holding cell or holding area?  You recall

17  telling him that?

18  A.   Yes, sir.  Yes, sir, I did.

19  Q.   Do you recall telling the FBI that you had mentioned

20  this incident to your parole officer?

21  A.   Yes, I did.

22  Q.   At the time your parole officer was Sanchez was the last

23  name?

24  A.   Uh, yes, I believe it's Mr. Sanchez.  Mr. Sanchez was my

25  parole officer at that time.

1    Q.    Told him all about this, didn't you?

2    A.    Yes, I did.

3    Q.    And when you told Mr. Sanchez all about this --

4          MR. ARKOW:  Objection.  Vague as to all about this.

5    Move to strike the last response, too because it was vague.

6          THE COURT:  It will be stricken.

7    BY MR. SCHWARTZ:

8    Q.    Did you tell Mr. Sanchez that you were tased by an

9    officer from Desert Hot Springs Police Department back in

10   February of 2005?

11   A.    Well, I spoke with Mr. Sanchez when I got out of prison.

12   I was sent to prison behind this.  When I got out of prison,

13   I spoke to Mr. Sanchez due to the events that happened and

14   wanted to know why I wasn't kept in prison any longer and I

15   told him what happened.

16   Q.    Well, when you told him what happened, did you describe

17   being tased for no apparent reason?

18   A.    Yes, sir.

19   Q.    Did you describe that my client had stopped his car in

20   between when you were arrested at your apartment and the

21   police department and had pepper sprayed you without

22   provocation?

23   A.    Mr. Sanchez had a police report.  He asked me questions

24   and I explained it to him, yes, sir.

25   Q.    So did you tell Mr. Sanchez what I just asked you that

1    you were pepper sprayed en route to the police station for no

2    reason?  Did you tell Mr. Sanchez that?

3    A.    I might have said something to that extent, yes, sir.

4    Q.    And did you tell Mr. Sanchez that in the parking lot of

5    the police station you were tased for no apparent reason?

6    A.    Yes, sir.

7    Q.    You tell Mr. Sanchez that inside the area of the booking

8    area itself while sitting on the bench you were tased for no

9    apparent reason?

10         MR. ARKOW:   Objection.  Vague as to time when he

11   talked to Mr. Sanchez.

12         THE COURT:   Can you give us a time foundation.

13   BY MR. SCHWARTZ:

14   Q.    Do you recall when this conversation took place with

15   Mr. Sanchez?

16   A.    When I was released from prison, I had to go see

17   Mr. Sanchez as part of the protocol for inmates getting out

18   of the prison.

19         THE COURT:   Was that after the 45 days you

20   received?

21         THE WITNESS:   Yes, sir.  Directly after I was

22   released, I had to go it see Mr. Sanchez.

23   BY MR. SCHWARTZ:

24   Q.    So you saw Mr. Sanchez about 45 days after this incident

25   back in February 2005?

1   A.   Give or take because if I got out on a Saturday, I

2   couldn't see him until Monday.

3   Q.   Within two months of the incident is that safe to say?

4   A.   That's safe to say.

5   Q.   And you were treated at the Desert Regional Medical

6   Center; is that right?

7   A.   Yes, sir.

8   Q.   And you made sure you showed them any marks you may have

9   had from the tasing; right?

10   A.   I didn't have to show them.  That's what I went there to

11   get treated for.

12   Q.   Do you recall pointing out any marks to the staff or the

13   doctor who saw you?

14   A.   I didn't point out any marks.  They knew where the marks

15   were at.  I was trying to get some water.

16   Q.   So did they examine your back?

17   A.   That was seven years ago.  I could not tell what they

18   examined and the treatment they gave me.

19   Q.   And do you recall being interviewed by the FBI back in

20   February of 2010, about a year ago?

21   A.   Yes, sir.

22   Q.   And that interview Special Agent Novak was in the room

23   with you; correct?

24   A.   Where was this meeting at?

25   Q.   Do you recall where the meeting was at?

1    A.   Well, I'm trying to recall.  The meeting was here in

2    this courthouse?

3           THE COURT:  If you don't recall, you don't recall.

4    Let's have another question, please.

5    BY MR. SCHWARTZ:

6    Q.   And do you recall telling the FBI agents back in 2010 a

7    second time that there were no racial comments made to you

8    when you were tased by my client?

9           MR. ARKOW:  Objection, Your Honor.  The witness

10   testified he didn't recall.

11          THE COURT:  He didn't recall where it took place.

12   That's overruled.  You may answer if you can.

13          THE WITNESS:  I'm not sure, sir.

14   BY MR. SCHWARTZ:

15   Q.   Do you recall telling the agents back in February of

16   2010, about a year ago, that your pants did not fall down at

17   all during this incident?

18          MR. ARKOW:  Objection.  February 2010 was not a

19   year ago.

20          MR. SCHWARTZ:  Strike that.  About two years ago.

21          THE WITNESS:  My pants didn't fall down?

22          MR. SCHWARTZ:  Correct.

23          THE WITNESS:  I have no clue.  I try to keep my

24   pants up.  I have no idea, sir.

25   BY MR. SCHWARTZ:

1    Q.    As you sit here today, do you recall your pants falling

2    down during this incident?

3    A.    I have no idea what you speaking on.

4    Q.    I'll be more specific.  When you were tased here while

5    you were sitting on the bench, you fell to the floor;

6    correct?

7    A.    Yes, sir.

8    Q.    While on the floor, you were told to get up; is that

9    right?

10   A.    Yes, sir.

11   Q.    And the darts were still in you; right, taser darts?

12   A.    Uh, if you want me to, this is seven years ago once

13   again, sir.  And I'm sure the darts had tased.  I don't know

14   if they took them out of me or they were still in me.  I

15   couldn't honestly tell you.

16   Q.    While you were on the floor right after you were tased

17   before you got up with assistance, did your pants fall down?

18   A.    I honestly couldn't tell you if my pants fell down, sir.

19   Q.    Now, would that be something that you would have

20   recalled?

21   A.    Well, did they pull my pants down?  I don't know what

22   you -- no, I didn't tell them.  I don't know what you

23   speaking on.

24   Q.    Doesn't ring a bell; correct?

25   A.    Well, my pants were ripped when I got to Chino and I had

```
1    holes in my shirt.  And I don't know what you trying, where
2    I'm going with this one right here, but my pants were ripped.
3    Q.   I'm just asking a question if you remember it or not.
4    A.   I don't remember my pants being down.
5    Q.   Now, the tasing that you told the FBI agents about in
6    the parking lot of the police station and the tasing that
7    place here on the bench in the police station, about how much
8    time transpired between the two, if you recall?
9    A.   I can't be honest with you about the time.  This is
10   seven years ago, sir.
11           MR. SCHWARTZ:  Have just a moment, Your Honor,
12   please?
13           THE COURT:  Take your time.
14           MR. SCHWARTZ:  We have nothing further at this
15   time, Your Honor.  Thank you.
16           THE COURT:  Redirect.
17                       REDIRECT EXAMINATION
18   BY MR. ARKOW:
19   Q.   At the beginning of your cross-examination defense
20   counsel was asking you about a time that you were interviewed
21   by an investigator from an Internal Affairs department.  Do
22   you remember that interview?  You remember those questions?
23   A.   I remember the gentleman that came by to talk to me
24   about the incident.
25   Q.   As far as you knew, that gentleman was hired by what
```

1    agency or what department or what?

2    A.   He told me he was sent out from the Desert Hot Springs

3    Police Department.

4    Q.   So you understand that investigator to be someone who

5    was working for the police department?

6              MR. SCHWARTZ:  Objection.  Leading.

7              THE COURT:  Sustained.

8    BY MR. ARKOW:

9    Q.   Did you understand that person who wanted to interview

10   you to be working for the Desert Hot Springs Police

11   Department?

12             MR. SCHWARTZ:  Objection.  Leading and speculation

13   and lack of foundation.

14             THE COURT:  It's already been answered in any

15   regard.  Let's have another question.

16   BY MR. ARKOW:

17   Q.   What were the circumstances of that interviewer from the

18   police department trying to interview?

19             MR. SCHWARTZ:  Objection.  Circumstances, vague.

20             THE COURT:  Rephrase, please.

21   BY MR. ARKOW:

22   Q.   How did this person from the police department contact

23   you?

24   A.   He came over to my apartment.

25   Q.   And when you came over to your apartment, what did you

1  say?

2  A.    Told him I wasn't interested in speaking with anybody

3  from the Desert Hot Springs Police Department.

4  Q.    Why not?

5  A.    The incident just happened.  I had just got tased and

6  pepper sprayed.

7  Q.    Did you allow that person in your apartment?

8  A.    I did allow him up in there, but I told him I didn't

9  want to speak to him.

10  Q.    And at some point did you ask him to leave the

11  apartment?

12  A.    I tried to get him to leave the whole time he was there.

13  Q.    Did that person from the police department who was

14  trying to interview you ask for certain records from you?

15  A.    He asked -- he told me that if I give him my medical

16  charts that he would give me a police report.  And once I

17  handed my medical chart, I never seen anything or I never

18  heard from the gentleman again.  So I was kind of like, I was

19  just kind of like wanted to lay off that whole incident

20  because I didn't want to get anybody else around me caught up

21  in that incident.

22  Q.    What do you mean?

23  A.    Well, Ms. Harper was going through the process of

24  adopting children and by this incident happening and me

25  staying there and being a parolee and people coming to the

1    house from the Desert Hot Springs Police Department, I just

2    figured that wasn't a good look.  And I just, you know, just

3    whatever to sort of to do to just leave me alone.  Once he

4    took my paperwork and never came back and held on to his side

5    of the bargain, I was cool with the whole situation after

6    that.  I really didn't want to further that along with

7    speaking with him any longer or any more.

8    Q.    What do you mean by the expression not a good look, what

9    were you referring to?

10   A.    Well, what he did as far as being me on parole and them

11   coming over to my house to constantly interview me while she

12   is trying to adopt children, I didn't think that would

13   benefit her in her adoption process.

14   Q.    Her referring to Ms. Harper?

15   A.    Yes, sir.

16   Q.    And what paperwork or records did you give this

17   interviewer from the police department?

18   A.    I gave him my medical charts.  I had to go to Desert

19   Regional Hospital in Palm Springs to get my medical charts so

20   I can make a civil complaint.  And he told me that he can

21   give me a police report if I gave him my medical chart and I

22   never seen my medical chart or the police report.

23   Q.    Was that your only copy of your medical chart?

24   A.    Yes, sir.

25   Q.    Did you ever get a copy back?

1    A.    I got a copy years later.

2    Q.    How did you get the copy?

3    A.    I had to go through, uh, I went through a process of

4    calling the hospital and having the hospital fax them to

5    another hospital for me to get them.

6    Q.    You didn't get the medical records back from the police

7    department?

8    A.    Never.

9    Q.    Now, directing your attention to part of your testimony

10   during cross-examination where you were asked about the

11   interview you gave to the FBI in 2008 where you said there

12   were no racial remarks during the incident.  What did you

13   mean there were no racial remarks?

14   A.    I can't recall the sergeant ever saying like anything

15   about my race, my ethnicity or anything like that.  Never

16   said anything about, you know, I'm saying my color or

17   anything so it was nothing racial.  It was more or less just

18   disrespectful comments, you know, that I was making just

19   being, just being inappropriate with some of my comments.

20   Q.    But your comments were making ethnic remarks against the

21   sergeant officer?

22          THE COURT:  You're asking?

23   BY MR. ARKOW:

24   Q.    Did you make comments regarding the sergeant's -- did

25   you make ethnic comments directed at the sergeant?

UNITED STATES DISTRICT COURT

```
1    A.   Say the word.
2              THE COURT:  Did you make?
3              THE WITNESS:  I made a remark, yes, sir.
4    BY MR. ARKOW:
5    Q.   But was the remark an ethnic slur against the sergeant?
6    A.   Not at all.
7    Q.   Did you make any remarks about the sergeant being
8    Italian?
9    A.   I mentioned something about him being Italian.  I called
10   him like a fake Italian.
11   Q.   Did you make any remarks about the physical appearance
12   of the sergeant or about his weight?
13   A.   I can't recall if I said he was a fat dude or nothing
14   like that.  I couldn't recall that.  I was just upset and I
15   said a whole lot of things.
16   Q.   Now, you were asked during your cross-examination about
17   interviews with the FBI where you mentioned how many times
18   you were tased.  Do you have those questions in mind?
19   A.   Yes, sir.
20   Q.   How many times do you remember being tasered during that
21   night and where were you when you were tasered?
22   A.   I can honestly remember two times I was tased.  Once was
23   outside and once was when I was going inside and sat on the
24   bench.  If they had asked me about the tasing the other
25   times, I said I couldn't honestly tell them.  It was two for
```

1    sure possibly three.

2    Q.   Have you always told the FBI -- when you say the first

3    time outside, where outside specifically are you referring?

4    A.   When he took me out the car and I had to spit in the

5    back of the car trying to breathe.

6    Q.   When you say he took you out of the car, are you

7    referring to the sergeant officer?

8    A.   Yes, sir.

9    Q.   When you say took you out of the car is this in the

10   parking lot that's part of the station just outside the door

11   to the booking area?

12   A.   Right.  Yes, sir.

13   Q.   And that was the first time -- was that the first time

14   you were tased?

15   A.   Yes, sir.

16   Q.   And when was the second time you were tased?

17   A.   Second time was when I was brought in and I was telling

18   the other officers what had happened in the parking lot and

19   what happened on the way there.  And then I was sitting on

20   the bench and he tased me you know when he told me to shut up

21   and I told him to shut up.

22   Q.   And then you fell to the ground?

23   A.   Yes, sir.

24   Q.   Could you have been tased any other times when you were

25   on the ground?

```
 1   A.   Anything could have happened, but honestly I couldn't
 2   tell you if I was tased or not.
 3           MR. ARKOW:  One moment, Your Honor.
 4           THE COURT:  Certainly.
 5           MR. ARKOW:  No further questions.
 6           THE COURT:  Anything further of this witness?
 7           MR. SCHWARTZ:  May counsel confer with counsel?
 8           THE COURT:  Go right ahead.
 9           MR. SCHWARTZ:  Your Honor, we have no further
10   questions.  At this time I would like to read a stipulation
11   into the record by both parties.
12           THE COURT:  You may do so, but you're excused, sir.
13   Thank you.
14           MR. SCHWARTZ:  Actually, Your Honor, I apologize.
15   The government may have a couple questions for this witness
16   regarding the exhibit that's part of the stipulation.  We
17   don't have any further questions at this time, but the
18   government might regarding stipulation.
19           THE COURT:  You're suggesting that the government
20   may want to reopen their redirect?  Just one minute, please.
21   Go ahead.
22           MR. SCHWARTZ:  Thank you, Your Honor.
23           Defendant Anthony Sclafani and plaintiff United
24   States of America hereby stipulate and agree to the
25   following:
```

1              1.   Defendant's Exhibit 226 consists of redacted

2     medical records pertaining to Jamal White on February 25th,

3     2005 that were obtained from Desert Regional Medical Center

4     that were made for purposes of medical diagnosis or treatment

5     and describing medical history or past or present symptoms,

6     pain, sensations at or near the time of the occurrence of the

7     matter set forth therein.

8              2.   Defendant's Exhibit 226 is admissible under the

9     Federal Rule of Evidence 803 (4) and may be admitted into

10    evidence.

11             3.   The parties respectfully request the

12    information be read to the jury at the appropriate time of

13    the trial and stipulation be admitted into evidence.

14             THE COURT:  All right.  Mr. Arkow, is that

15    stipulation that you have agreed to?

16             MR. ARKOW:  Yes.

17             MR. SCHWARTZ:  I would ask, Your Honor, if I could

18    hand 226 to the clerk and have it admitted into evidence.

19             THE COURT:  It will be received into evidence.

20                  (Exhibit 226 was admitted.)

21             MR. SCHWARTZ:  Thank you.

22             No further questions at this time subject to

23    redirect.

24             MR. ARKOW:  Can I ask a final question regarding

25    what's been raised by this exhibit?

```
 1              THE COURT:  A question?
 2              MR. ARKOW:  Maybe two questions.
 3              THE COURT:  All right.  Let's try to finish.
 4                   REDIRECT EXAMINATION (REOPENED)
 5    BY MR. ARKOW:
 6    Q.   Do you know how many approximately how much time had
 7    passed from the time you were tased at the station in the
 8    booking area until the time that you were treated at the
 9    hospital?
10    A.   I honestly can't recall.
11    Q.   Can you put some approximation?  Was it a matter of
12    minutes?  Half hour?
13    A.   The time I was tased on the bench to the time I was
14    transferred to the hospital?
15    Q.   And the time you actually met with the medical
16    personnel?
17    A.   For me to say I was looking at a clock, I wouldn't be
18    telling the truth.  I couldn't honestly give you a time
19    frame.  I couldn't honestly tell you.
20              THE COURT:  Was it a matter of hours?
21              THE WITNESS:  It was hours, but I couldn't tell you
22    if it was two hours or three hours.
23              THE COURT:  Thank you.  You're excused.
24              MR. ARKOW:  Could I ask just one question?
25              THE COURT:  No, you had your two.  You're excused.
```

1          Let's take a late afternoon recess.  Please rise

2    for the jury.  Ten or 15 minutes.

3                    (Jury not present.)

4          THE COURT:  Outside the presence of the jury.

5          Any matters counsel wish to take up?  Ms. Carter.

6          MS. CARTER:  Yes, Your Honor.  I wanted to inform

7    the Court that I believe that Ms. Vargas has been arrested

8    pursuant to this Court's warrant and I believe she is

9    available.  The government would like to call her as its next

10   witness.  Would this Court like to question her or have her

11   appear before we do so in connection with the warrant or how

12   would Your Honor like to proceed?

13         THE COURT:  We'll have to have her come in.  I've

14   got to recall the warrant or determine just exactly why she

15   did not show up, so we'll have her in outside the presence of

16   the jury.  Is she available now?

17         MS. CARTER:  Yes, Your Honor.

18         THE COURT:  All right.  Tell me your name, please.

19         MS. VARGAS:  Angelica Vargas.

20         THE COURT:  Ms. Vargas, did you receive a subpoena

21   from this Court?  You must answer out loud.

22         MS. VARGAS:  Yeah.

23         THE COURT:  Why didn't you honor that subpoena?

24         MS. VARGAS:  I didn't.

25         THE COURT:  Well, I understand that you came here

```
 1    and then you left; is that right?
 2              Perhaps we ought to have somebody from the panel
 3    represent Ms. Vargas.
 4              MS. CARTER:  The government has no objection to
 5    that.  We can continue with our case and call her at a later
 6    time.
 7              THE COURT:  Yes, I think we better do that.  Take
 8    her out to one of the witness rooms and we'll see if we can
 9    reach whoever is on duty to come up and see her.
10              MS. CARTER:  Would the Court mind explaining to
11    Ms. Vargas that she is still --
12              THE COURT:  Oh, yes.  You're still here pursuant to
13    the subpoena and you're still under arrest.  I have not
14    recalled the warrant because I frankly don't understand why
15    you walked away from the order of the Court, and I'm gonna
16    have a lawyer appointed to talk to you and we'll see where we
17    are.  All right.  She is still in custody.
18              You have another witness that you can go forward
19    with in about ten minutes?
20              MS. CARTER:  Yes, Your Honor.  The next witness the
21    government is planning to call is in custody.  I believe that
22    we have to notify the marshals for him to be brought to
23    court.
24              THE COURT:  Is this the one you talked about
25    previously?
```

```
 1              MS. CARTER:  Correct.  Mr. Dennis Decker.
 2              THE COURT:  That may take a little bit of time.
 3    All right.  We're in recess.  See if we can move this along.
 4                         (Recess taken.)
 5              THE COURT:  We're outside the presence of the jury.
 6    Any matters counsel wish to take up before we bring the jury
 7    in?
 8              MS. CARTER:  No, Your Honor.
 9                         (Jury present.)
10              THE COURT:  Who is the government's next witness?
11              MS. CARTER:  Your Honor, the government calls
12    Dennis Decker.
13              THE COURT:  Mr. Decker, would you rise to be sworn?
14              THE CLERK:  Please raise your right hand.
15                         (Witness sworn.)
16              THE CLERK:  Please have a seat.  State and spell
17    your name for the record.
18              THE WITNESS:  Dennis Decker.  D-e-n-n-i-s
19    D-e-c-k-e-r.
20              THE COURT:  Do you have a middle name?
21              THE WITNESS:  Paul.  P-a-u-l.
22              THE COURT:  Go ahead, please.
23                         DIRECT EXAMINATION
24    BY MS. CARTER:
25    Q.   Mr. Decker, were you transferred from state custody to
```

1    the United States marshal's custody to testify in this case?

2    A.    Yes, I was.

3    Q.    Are you currently serving time on a felony sentence?

4    A.    Yes, I am.

5    Q.    Does that felony have anything to do with the abuses of

6    force by Desert Hot Springs police officers or events in this

7    case?

8    A.    No, it doesn't.

9    Q.    Did you ever work for the Desert Hot Springs Police

10   Department?

11   A.    Yes.

12   Q.    When did you begin working for the Department?

13   A.    At the end of 1998.

14   Q.    For how long did you work at the Department?

15   A.    Until the end of 2006.

16   Q.    What was the first position you had at Desert Hot

17   Springs Police Department?

18   A.    I was a dispatcher.

19   Q.    Tell us what a dispatcher at the Desert Hot Springs

20   Police Department does?

21   A.    Handles radios calls and telephone calls from business

22   lines and 911 lines.

23   Q.    What position did you have at the Desert Hot Springs

24   Police Department in February 2005?

25   A.    I was a police officer.

Q.   What duties did a police officer have or what duties did

you have as a Desert Hot Springs police officer?

A.   I was a school resource officer at one point, I worked

patrol and worked various different task forces within the

Department.

Q.   Were you a school resource officer in February 2005?

A.   Yes.

Q.   What does a school resource officer do?

A.   I was assigned to the schools in the city to handle any

report calls that were taken, to be taken at the schools.

Q.   What were your duties as a patrol -- you mentioned

patrol.  What did that mean in the course of your duties as a

police officer?

A.   I would handle radio calls taking various reports

throughout the city.

Q.   Did you have any experience with the Desert Hot Springs

Police Department before you started working as a dispatcher

there in 1998?

A.   No.

Q.   Did you have any other prior law enforcement experience

before you started with Desert Hot Springs Police Department?

A.   Yes.

Q.   Can you describe that experience for the jury?

A.   I started as a police explorer with Banning Police

Department in '84 to '89 and from '90 to '93, I worked for

1    the Riverside County Sheriff's Department.

2    Q.   In what capacity did you work for the Riverside County

3    Sheriff's Department?

4    A.   I was a correctional deputy.

5    Q.   And what is a police explorer?

6    A.   It's a program for juveniles to learn about the law

7    enforcement job.

8    Q.   How old were you when you were a police explorer?

9    A.   Between 14 and 18.

10   Q.   And when you went on to become a corrections officer,

11   what does a corrections officer do?

12   A.   I worked in the county jail.

13   Q.   Did a person named Anthony Sclafani work at the Desert

14   Hot Springs Police Department in February 2005?

15   A.   Yes.

16   Q.   What was his position at that time?

17   A.   He was a patrol sergeant.

18   Q.   Can you tell us where a sergeant falls relative to a

19   police officer in the chain of command at the Desert Hot

20   Springs Police Department in February 2005?

21   A.   Well, an officer would answer directly to the sergeant.

22   Q.   Did Anthony Sclafani ever supervise you while you were a

23   police officer at Desert Hot Springs?

24   A.   Yes, he did.

25   Q.   Did you supervise you in February 2005?

1    A.    Yes.

2    Q.    Do you see Anthony Sclafani in the courtroom today?

3    A.    Yes.

4    Q.    Can you please point him out for the Court and describe

5    where he is sitting in the courtroom and what he is wearing?

6    A.    He is in the middle with the light blue shirt and

7    light-colored tie.

8              THE COURT:   Indicating for the record the defendant

9    here Mr. Sclafani.

10   BY MS. CARTER:

11   Q.    Does Defendant Sclafani look the same now as he sits in

12   court today as he did when you were working with him in

13   February 2005?

14   A.    No.

15   Q.    Can you describe what he looked like in February 2005

16   versus now?

17   A.    He had a mustache and he looked a little bit heavier.

18   Q.    What's your best approximation of how much he weighed in

19   February 2005?

20   A.    210 maybe.

21   Q.    In approximately February 2005, did you see an incident

22   where Defendant Sclafani tased a black male arrestee in

23   Desert Hot Springs Police Department jail?

24   A.    Yes.

25   Q.    I would like to now turn your attention to what's been

1  marked for identification as Exhibit 1.  Do you recognize

2  what's depicted in the diagram in Exhibit No. 1?

3  A.   Yes.

4  Q.   What is depicted in that diagram?

5  A.   It's a map of the Desert Hot Springs Police Department

6  jail area.

7  Q.   Does it fairly and accurately represent the jail portion

8  of the Desert Hot Springs Police Department as it was

9  configured in February 2005?

10  A.   Yes.

11        MS. CARTER:  Your Honor, I move that Exhibit No. 1

12  be received into evidence.

13        THE COURT:  It will come in.

14             (Exhibit 1 was admitted.)

15        MS. CARTER:  Request permission to publish it for

16  the jury.

17        THE COURT:  Go right ahead.

18  BY MS. CARTER:

19  Q.   Describing on the diagram, Mr. Decker, where were you

20  when you first saw the black male arrestee who was tased by

21  Defendant Sclafani in February 2005?

22  A.   Between the bench and the -- where it says trash.

23  Q.   And what were you doing when you came into that area?

24  A.   Assisting with booking.

25  Q.   Were you just returning to the station or had you been

1  at the station for some time?

2  A.   I was just returning then.

3  Q.   Where was the black male arrestee when you first

4  observed him?

5  A.   He was sitting on the bench.

6  Q.   Is the bench that you're talking about in the -- just in

7  the middle of the diagram and labeled bench in the diagram?

8  A.   Yes, it is.

9  Q.   And is it just behind where I made a pink dot on the

10  diagram?

11  A.   Yes, it is.

12  Q.   I would now like to direct your attention to Exhibits 30

13  through 32.

14         Your Honor, I believe 30 and 31 are already in

15  evidence.

16         THE COURT:  That's right.

17  BY MS. CARTER:

18  Q.   Mr. Decker, can you look in particular at Exhibit

19  No. 32.  Do you recognize what's depicted in that photograph?

20  A.   There is not a 32.

21         THE COURT:  You don't have 32?

22         THE WITNESS:  No, sir.

23         THE COURT:  All right.  He now has it.  Ask it

24  again.

25  BY MS. CARTER:

1   Q.   Do you recognize what's depicted in that photograph in

2   Exhibit 32?

3   A.   Yes.

4   Q.   What is it?

5   A.   It's the bench and the booking area and the watch

6   commander's door into the watch commander's office.

7   Q.   Is that bench the same one that we have just been

8   talking about depicted on the diagram?

9   A.   It appears so.

10  Q.   And you were familiar with that bench from the time that

11  you were working at the Desert Hot Springs Police Department;

12  correct?

13  A.   Yes.

14  Q.   And does the photograph fairly and accurately describe

15  how that bench area looked in February 2005?

16  A.   Yes, it does.

17       MS. CARTER:  Your Honor, I move that Exhibit 32 be

18  received in evidence.

19       THE COURT:  It will come in.

20            (Exhibit 32 was admitted.)

21       MS. CARTER:  And I request permission to publish

22  Exhibit No. 30 for this witness.

23       THE COURT:  Go right ahead.

24  BY MS. CARTER:

25  Q.   Can you please tell the jury, Mr. Decker, what's

1    depicted in this picture Exhibit No. 30?

2    A.   It's also the booking area of the jail.

3    Q.   What's behind this door here where I'm making a mark on

4    the screen with a red sign?

5    A.   The watch commander's office.

6    Q.   And what is out this open door just to the left of the

7    watch commander's office under the clock?

8    A.   Offices and the dispatch.

9    Q.   Now, to the right of the watch commander's office there

10   appears to be another doorway.  What's through that doorway?

11   A.   That goes out to the parking lot where the patrol cars

12   park.

13   Q.   Can you describe for the jury whether or not that door

14   was normally kept open or closed when arrestees were in the

15   jail?

16   A.   Closed.

17   Q.   What about police cars in that parking area right

18   outside the door?  Were they normally kept running or not

19   running when arrestees were in the jail?

20   A.   Not running.

21   Q.   Were police cars normally kept locked or unlocked in

22   that parking area when arrestees were in the jail?

23   A.   Usually unlocked.

24   Q.   Did officers typically leave keys in the cars in that

25   parking area?

1    A.    No.

2    Q.    Now, the bench that's in the middle right-hand side of

3    this photograph, it appears to have handcuffs hanging off it.

4    What are those handcuffs?

5    A.    To secure the inmate to the bench.

6    Q.    And were handcuffs on that bench in February 2005?

7    A.    No.

8    Q.    Could an officer handcuff a subject to the bench in

9    February 2005?

10   A.    Yes.

11            MS. CARTER:  I would now like to publish Exhibit 31

12   for the jury, please.

13            THE COURT:  Go right ahead.

14   BY MS. CARTER:

15   Q.    Now, on the left-hand side in the center of the

16   photograph is this the same bench we have been discussing?

17   A.    Yes.

18   Q.    And this door here where it appears that you can see a

19   window on it, between this lower cabinet and the sink, what

20   is that a door to?

21   A.    To a jail cell.

22   Q.    And what about this door here also with a window just to

23   the left of that, what is that a door to?

24   A.    A jail cell.

25            MS. CARTER:  I would like permission to publish

1    Exhibit 32 for the jury.

2              THE COURT:  Go right ahead.

3    BY MS. CARTER:

4    Q.   Now, what's this opening door in the center of the

5    photograph looking into?

6    A.   That's a door entering into the watch commander's

7    office.

8    Q.   And is this in the lower right-hand corner the same

9    bench we have been discussing?

10   A.   It appears so.

11   Q.   Now, you mentioned previously that when you walked into

12   the station, you saw the black male arrestee tased by

13   Defendant Sclafani sitting on the bench.  What was the black

14   male arrestee doing when he was sitting on the bench?

15   A.   He was yelling and he was cursing and just being

16   disruptive.

17   Q.   What was he yelling and cursing about?

18   A.   He had been pepper sprayed and his eyes were burning.

19   Q.   Other than yelling and cursing was he doing anything

20   else to be disruptive?

21   A.   No.

22   Q.   Was he handcuffed at the time?

23   A.   Yes.

24   Q.   At this time can you describe whether you saw any signs

25   that this man had been pepper sprayed?

1    A.    Yes.

2    Q.    What signs did you see?

3    A.    He had a red substance on his face and clothes caused by

4    the pepper spray.

5    Q.    Could you see pepper spray around his eyes?

6    A.    I believe so.

7    Q.    Did you smell anything that indicated that this person

8    had been pepper sprayed?

9    A.    From what I remember.

10    Q.    What did you smell?

11    A.    Pepper spray.

12    Q.    And at that time did officers at Desert Hot Springs

13    Police Department carry pepper spray with them?

14    A.    Yes.

15    Q.    Did you hear the -- did you hear whether the man sitting

16    on the bench said anything about the defendant at this time?

17    A.    Yes.

18    Q.    What did he say?

19    A.    He was calling him names, making fun of his weight.

20    Q.    What kind of names did he call him?

21    A.    I believe he called him a fat Italian or something to

22    that effect.

23    Q.    Where was the defendant at this time if you know?

24    A.    In the sergeant's office or watch commander's office.

25    Q.    And how did you know he was in the sergeant's office or

```
 1   watch commander's office?
 2   A.    The door was open and he was talking through the door.
 3   Q.    What kinds of things was the defendant saying through
 4   the door of the watch command are's office?
 5   A.    He was telling the subject to be quite and not to be
 6   talking.
 7   Q.    What was the defendant's tone of voice when he was
 8   telling these things to the black male arrestee on the bench?
 9   A.    I believe he was angry at the guy sitting on the bench.
10   Q.    Did the defendant curse at all?
11   A.    Yes.
12   Q.    What did the defendant say?
13   A.    Told him to shut the fuck up.
14   Q.    At this time was there anyone else in the station
15   besides you, the defendant and the arrestee?
16   A.    Yes.
17   Q.    Who was in there?
18   A.    I believe it was Officer Drew, Matt Drew.
19   Q.    Where was Officer Drew?
20   A.    He was with the man on the bench.
21   Q.    When you say he was with the man on the bench, was
22   Officer Drew also sitting on the bench or was he somewhere
23   else in that area?
24   A.    No, he was just standing with the man on the bench.
25   Q.    Can you describe the length of time when the
```

1    conversation between the defendant and the man on the bench,

2    how long did that go on, that back and forth where they were

3    yelling back and forth to each other?

4    A.    Couple minutes maybe.

5    Q.    Did defendant appear to get more angry or less angry

6    over those couple of minutes?

7    A.    More angry.

8    Q.    What makes you say that?

9    A.    He kept coming in and out of the watch commander's

10   office telling him to be quiet and at one point he came out

11   and tasered the subject in the drive stun mode.

12   Q.    Where was the defendant standing when he tasered the man

13   on the bench in the drive stun mode?

14   A.    Right next to the bench coming through the office door.

15   Q.    Do you know where on the man on the bench's body the

16   taser made contact?

17   A.    Somewhere on his upper chest area.

18   Q.    Was the man on the bench still sitting on the bench at

19   the time the defendant tased him in the drive stun mode?

20   A.    Yes.

21   Q.    Where was the defendant standing at the time he tased

22   the man on the bench?

23   A.    He was standing right outside of that open door in the

24   watch commander's office.

25   Q.    Was he standing in front of the man on the bench?

1     A.    I believe he was standing to the side of him.

2     Q.    At any point in the prior interchange before defendant

3     actually tased the man on the bench, did defendant ever go

4     stand in front of him when they were going back and forth and

5     yelling at each other?

6     A.    I don't recall.

7     Q.    Now, prior to defendant tasing the man on the bench in

8     the drive stun mode, was the man on the bench still

9     handcuffed?

10    A.    Yes.

11    Q.    Prior to defendant tasing the man on the bench in drive

12    stun mode was the man on the bench spitting at the defendant?

13    A.    Not that I observed.

14    Q.    Was the man on the bench kicking the defendant?

15    A.    Not that I saw.

16    Q.    Did the man on the bench try to get up before defendant

17    tased him in the drive stun mode?

18    A.    Not that I saw.

19    Q.    Did the man on the bench try to head butt the defendant

20    prior to being tased by the defendant in the drive stun mode?

21    A.    Not that I saw.

22    Q.    Was the man on the bench physically out of control in

23    any way prior to the defendant tasing him in the drive stun

24    mode?

25    A.    He was loud and disruptive that way.

1    Q.   Other than being loud and disruptive and refusing to be

2    quiet was the man on the bench doing anything else out of

3    control before the defendant tased him in the drive stun

4    mode?

5    A.   Not that I observed.

6    Q.   Was the man on the bench doing anything else that wasn't

7    compliant with what the defendant was telling him to do other

8    than he didn't be quiet when defendant told him to be quiet?

9    A.   Not that I saw.

10   Q.   What happened to the man on the bench when he was tased?

11   A.   He fell to the floor in front of the bench.

12   Q.   And after he fell to the floor, what did he do?

13   A.   Rolled around complaining that he had hurt his arm or

14   wrist area I guess.  He still had handcuffs on.

15   Q.   Did the man appear to be in pain as he rolled on the

16   ground?

17   A.   From what I recall.

18   Q.   What did the defendant do after the man on the bench

19   fell to the floor and started rolling on the ground in pain?

20   A.   I don't recall.

21   Q.   Did the defendant say anything to the man at this time

22   about getting up?

23   A.   Yes.

24   Q.   What did he say about that?

25   A.   He ordered him to get back up to sit up on the bench.

1    Q.   What was his tone of voice when he ordered him to get

2    back up?

3    A.   Angry.

4    Q.   Was he yelling?

5    A.   Yes.

6    Q.   Did the man that is now laying on the ground respond?

7    A.   Yes.

8    Q.   What did he say?

9    A.   He continued to curse and call Sergeant Sclafani names.

10   Q.   Did he say anything about whether or not he could get

11   up?

12   A.   I don't recall.

13   Q.   Was there anything about his position at that time that

14   would have made it difficult for him to get up?

15   A.   Well, he was still handcuffed behind his back.

16   Q.   Was the arrestee kicking at this time?

17   A.   He was.  He was kind of thrashing around on the floor.

18   I don't believe he was kicking at anybody.

19   Q.   Did he appear to be thrashing on the floor in an attempt

20   to knock the defendant over or otherwise injure the

21   defendant?

22   A.   No.

23            MR. SCHWARTZ:  Objection.  Speculation.

24            THE COURT:  That's overruled.

25   BY MS. CARTER:

1    Q.   What did the defendant do then after the man on the

2    ground said something about an injury from the fall?

3    A.   I don't recall.

4    Q.   Did the defendant say anything to the man about tasing

5    him again?

6    A.   Yes.

7    Q.   What did he say?

8    A.   I don't recall his exact words.

9    Q.   What was the substance of what the defendant said if you

10   remember?

11   A.   That if he didn't get up, he would get tased again.

12   Q.   Did the man on the ground get up?

13   A.   No.

14   Q.   What happened next?

15   A.   Sergeant Sclafani tased him with the darts of the taser

16   gun.

17   Q.   What did the arrestee do when defendant tased him with

18   the darts?

19   A.   Started screaming and thrashing around on the floor.

20   Q.   Did the arrestee convulse?

21   A.   Yes.

22   Q.   And when you said he started screaming, what was he

23   screaming?

24   A.   I don't recall his exact words.

25   Q.   Was he screaming words or was he just crying out?

1    A.    Crying out more so.

2    Q.    And did the arrestee appear to be in pain at this time?

3    A.    Yes.

4    Q.    What did the defendant do next?

5    A.    He had me and the other officer lift him up on to the

6    bench.

7    Q.    Did you or anyone else handcuff the arrestee to the

8    bench at this time?

9    A.    Not that I recall.

10   Q.    Did anyone do anything else to physically restrain the

11   arrestee at this time?

12   A.    Not that I recall.

13   Q.    Did the defendant tell you anything about the need to

14   physically restrain the arrestee at this time?

15   A.    Not that I recall.

16   Q.    Did the defendant stay in the booking area at this

17   point?

18   A.    I believe he went back into his office.

19   Q.    Was there anything you saw from the time you entered the

20   station and first saw the arrestee handcuffed on the bench

21   until the time that defendant went back into his office after

22   the tasings that would have indicated to you any legitimate

23   law enforcement reason for the defendant tasing the arrestee?

24   A.    No.

25   Q.    Around the same time in February 2005, did you respond

```
1    to the scene of an accident where a Hispanic woman had

2    rear-ended an empty school bus?

3    A.   Yes.

4    Q.   Were you the arresting officer on that call?

5    A.   No, I wasn't.

6    Q.   Do you know who was?

7    A.   Officer Matt Gutting.

8    Q.   Why did you respond to the call?

9    A.   Because it involved a school bus and at the time I was

10   assigned to the schools.

11   Q.   And the Hispanic woman who rear-ended the empty school

12   bus, was she arrested at the scene?

13   A.   Yes.

14   Q.   Did you make the arrest?

15   A.   No.

16   Q.   Who did?

17   A.   Officer Matt Gutting.

18   Q.   Do you know what she was arrested for?

19   A.   For driving under the influence.

20   Q.   Did you see the Hispanic female arrestee later that

21   night?

22   A.   Yes.

23            MS. CARTER:  And with Your Honor's permission, I

24   would like to publish again Exhibit No. 1, the diagram?

25            THE COURT:  Go right ahead.
```

1    BY MS. CARTER:

2    Q.   Can you show us where you were on the diagram and

3    describe it verbally where you were when you first saw the

4    Hispanic female arrestee that night?

5    A.   I walked in through the back door where it says pillar

6    and she was laying in the middle of the floor where it says

7    booking area.

8    Q.   When you were coming back into the jail from the parking

9    area through the doorway by the pillar, why were you coming

10   back to the station at that time?

11   A.   Sergeant Sclafani had called me on the radio to return

12   to the station.

13   Q.   Did he personally call you on the radio?

14   A.   Yes.

15   Q.   When you walked into the jail door through this doorway

16   by the pillar and you saw the Hispanic female arrestee laying

17   in the center of the booking area, what was she doing?

18   A.   She was laying on her stomach.  She was crying and kind

19   of carrying on.

20   Q.   When you say carrying on, what do you mean?

21   A.   Well, she was intoxicated and so you could tell that she

22   on top of being intoxicated was going through some kind of

23   pain because she was crying.

24   Q.   Was she handcuffed?

25   A.   Yes.

1    Q.   Did you observe any evidence at that time that the

2    Hispanic female arrestee had been tased?

3    A.   Not that I recall.

4    Q.   Do you recall seeing any taser darts when you walked in

5    at this time?

6    A.   Yes.

7    Q.   What did you see in that regard?

8    A.   She had her shirt was ripped and she had the wires from

9    the darts coming off her of her back.

10   Q.   Where was her shirt ripped?

11   A.   I don't recall exactly where.  I just recall that it was

12   ripped.

13   Q.   Did you see at that time whether her breasts had been

14   exposed?

15   A.   Yes.

16   Q.   Were they or were they not exposed at that time?

17   A.   Yes, they were.

18   Q.   Did you observe any evidence at that time that the

19   female arrestee had been pepper sprayed?

20   A.   Yes.

21   Q.   What did you observe?

22   A.   Well, I smelled it.

23   Q.   Was the pepper spray that you smelled the night of the

24   school bus accident weaker or stronger than the pepper spray

25   that you had smelled before with the black male arrestee?

1    A.    It was stronger with the female.

2    Q.    Were there any other signs that the female arrestee had

3    been pepper sprayed?

4    A.    Not that I can recall.

5    Q.    Were the doors of the jail open or closed at that time?

6    A.    They were open.

7    Q.    Did that include the door that you just walked through

8    here by the pillar?

9    A.    Yes.

10   Q.    Did that include any other doors in the jail?

11   A.    Yes.

12   Q.    Which other doors were opened?

13   A.    The door going to dispatch and then the back door near

14   the desk with the chair.

15   Q.    And is that the door that leads to an area in the lower

16   right that's marked to report room?

17   A.    Yes.

18   Q.    Did you see any pepper spray on the female arrestee's

19   face or clothes?

20   A.    Yes.

21   Q.    Where did you see pepper spray?

22   A.    Around her face, her neck and on her shirt.

23   Q.    Are you familiar with the expression clown or clown face

24   with regard to people that have been pepper sprayed?

25   A.    No.

1    Q.   You have never heard anybody call anybody that in the

2    course of your time at Desert Hot Springs Police Department?

3    A.   No.

4    Q.   Did you notice the smell of vomit at this time?

5    A.   Not that I recall.

6    Q.   Now, you have described that her shirt was ripped

7    exposing her breasts.  Can you tell us anything else about

8    the condition of her clothing?

9    A.   She was wet.

10   Q.   Did you see Defendant Sclafani when you walked in and

11   saw the Hispanic female laying on the floor?

12   A.   Yes.

13   Q.   Where was Defendant Sclafani when you first walked in?

14   A.   He was standing with the woman that was on the floor.

15   Q.   Now, when you say he was standing with her, how close

16   was he to her?

17   A.   Right next to her.

18   Q.   Was there anyone else there?

19   A.   Yes.

20   Q.   Who else was there?

21   A.   Officer Gutting.

22   Q.   Where was he standing?

23   A.   I believe that he was also standing right there with

24   Sergeant Sclafani and the female.

25   Q.   Over the Hispanic female?

1    A.    Yes.

2    Q.    Did you see any, well, first of all, do you know what

3    AFIDS are?

4    A.    Not offhand.

5    Q.    Are you familiar with the type of plastic confetti that

6    comes out of taser when it's fired?

7    A.    Yes.

8    Q.    Did you see any of that plastic confetti on the floor of

9    the station?

10    A.    Not that I recall.

11    Q.    What about in this doorway?

12    A.    Not that I saw.

13    Q.    Did you see Officer Gutting trying to pick up plastic

14    confetti?

15    A.    Not that I recall.

16    Q.    Did you see him trying to wind up taser cables?

17    A.    Not that I recall.

18    Q.    Were the taser cables still attached to the darts?

19    A.    Yes.

20    Q.    Were the taser cables unwound on the floor there with

21    the Hispanic female?

22    A.    They were still attached to her and no, they weren't

23    wound up.

24    Q.    When you walked into the station and saw the Hispanic

25    woman on the floor and the defendant and Officer Gutting

1    standing right next to her, did Defendant Sclafani give you

2    any instructions?

3    A.    Yes, he did.

4    Q.    What did he tell you?

5    A.    He told me to relieve Officer Andrea Heath in dispatch.

6    Q.    Why or did he tell you why?

7    A.    No, he didn't tell me why.

8    Q.    At some later point did you find out why you needed to

9    relieve Officer Heath?

10   A.    Yes.

11   Q.    Why was that?

12   A.    So she could take photographs of the prisoner.

13   Q.    In the course of your work as a Desert Hot Springs

14   police officer were you taught anything about photographing

15   someone who had been tasered?

16   A.    Yes.

17   Q.    What were you taught about that?

18   A.    The darts and the wounds caused by the darts.

19   Q.    Are you aware of any reason it would be Officer Heath

20   who would photograph this arrestee as opposed to one of the

21   other officers?

22   A.    Because she was a female.

23   Q.    What did you do after Defendant Sclafani told you to go

24   relieve Officer Heath?

25   A.    I went in dispatch and relieved Officer Heath.

1    Q.    From dispatch can you tell the jury whether there is a

2    way you can see what's going on in the holding cells?

3    A.    Yes.

4    Q.    Can you explain for them how you if you're in dispatch

5    can see what's going on in the holding cells in the jail?

6    A.    There were small black and white video monitors.

7    Q.    And what did the monitors show?

8    A.    There were, I believe, there were four of them.  There

9    were one for each cell and then one for an overall view of

10   the booking area.

11   Q.    Did you see whether Officer Heath photographed the

12   Hispanic woman who you had seen lying on the ground when you

13   first walked in?

14   A.    Yes.

15   Q.    How could you see that?

16   A.    Through one of the video monitors.

17   Q.    Do those monitors record, Mr. Decker?

18   A.    At the time no, they didn't.

19   Q.    They're just for monitoring?

20   A.    Yes.

21   Q.    What cell was the Hispanic woman in at the point that

22   she was photographed by Officer Heath?

23   A.    Holding cell three.

24   Q.    I would now like to ask you to look in the folders in

25   front of you at Exhibit 25 through 27 and Exhibit 33.  Just

1    let me know when you have had a chance to look at them.

2    A.    Okay.

3    Q.    What do they depict?

4    A.    Holding cell three.

5    Q.    And do they fairly and accurately represent how holding

6    cell three in the Desert Hot Springs Police Department jail

7    looked in February 2005?

8    A.    Yes.

9              THE COURT:  33 is already admitted and the others

10   will come in.

11             (Exhibits 25 through 27 were admitted.)

12             MS. CARTER:  May I publish Exhibit 1?  Oh, I have

13   it published.  Thank you, Your Honor.

14   Q.    Can you point out holding cell three on the diagram?

15   A.    It's on the -- be right above where it says to report

16   room.

17   Q.    It's labeled in fact holding cell three; correct?

18   A.    Yes.

19             MS. CARTER:  Now, I would like to publish what's in

20   evidence as Exhibit 25.

21             THE COURT:  Go right ahead.

22   BY MS. CARTER:

23   Q.    Now, you just testified that this is one of the pictures

24   of holding cell three.  What view is this of holding cell

25   three?

1    A.   I would say that's from the -- from the door going out

2    to the dispatch area.

3    Q.   Would this also be the view from the booking area

4    generally?

5    A.   Yes.

6         MS. CARTER:  Now, I would like to publish

7    Exhibit 26 which is in evidence.

8         THE COURT:  Go ahead.

9    BY MS. CARTER:

10   Q.   What view is this of holding cell three?

11   A.   The outside door.

12        MS. CARTER:  Now, I would like to publish

13   Exhibit 27 which is in evidence.

14        THE COURT:  Go right ahead.

15   BY MS. CARTER:

16   Q.   What view is this of holding cell number three in

17   Exhibit 27?

18   A.   The inside of the cell.

19   Q.   What are those walls and that bench made out of?

20   A.   Out of brick.

21   Q.   And the cell door, what is it made out of?

22   A.   Out of metal.

23   Q.   Now, are those same materials that are used in the other

24   holding cells in the Desert Hot Springs Police Department

25   jail as of February 2005?

1    A.    Yes.

2    Q.    Are they thick metal doors or thin metal doors used on

3    the holding cells?

4    A.    Thick.

5              MS. CARTER:  I would now like to publish what's in

6    evidence as Exhibit 33.

7              THE COURT:  Go right ahead.

8    BY MS. CARTER:

9    Q.    What's this view of holding cell three?

10   A.    That's from the, from the doorway leading out to

11   dispatch.

12   Q.    Now, you had previously testified that Exhibit 25 you

13   thought might be from the view point from the dispatch

14   hallway.  Is it Exhibit No. 33 that's in fact from the

15   dispatch hallway?

16   A.    Yes.

17   Q.    It's more straight on; correct, than Exhibit No. 25?

18   A.    Correct.

19   Q.    Now, as you were looking at the Hispanic woman being

20   photographed by Officer Heath in the monitors in dispatch,

21   did the Hispanic woman in any way appear noncompliant with

22   Officer Heath as she was taking the photos?

23   A.    Not that I observed.

24   Q.    Did the Hispanic woman try to escape past Officer Heath

25   at any point?

1    A.    Not that I observed.

2    Q.    Did the Hispanic woman run at Officer Heath at any

3    point?

4    A.    Not that I observed.

5    Q.    Whose camera did Officer Heath use?

6    A.    Officer Matt Gutting.

7    Q.    How did you know that?

8    A.    He would later tell me that it was his camera.

9    Q.    Now, you described earlier that you received training at

10   Desert Hot Springs Police Department about photographing

11   people who had been tased.  Did you receive any training on

12   what was supposed to happen with those photographs?

13   A.    Yes.

14   Q.    What was that training?

15   A.    They were to be downloaded into the report.

16   Q.    What report are you referring to?

17   A.    Well, whatever the photographs, whatever report they

18   would go to, they would be downloaded into the case.

19   Q.    And who would be responsible for putting the downloaded

20   photographs into the report for the case?  Would it be the

21   photographing officer or the arresting officer or someone

22   else?

23   A.    I would think that it would be the arresting officer,

24   the one that's handling the report.

25   Q.    Did you receive any training on what to do with spent

1    taser cartridges when someone had been tased?

2    A.    Yes.

3    Q.    What did you learn about that?

4    A.    They were to be collected and booked into evidence.

5    Q.    And who was supposed to do that according to your

6    training collect and book the cartridges into evidence?

7    A.    The officer that -- that discharged their taser.

8    Q.    How long after the tasing is that supposed to be done

9    where the officer who discharged the taser would collect the

10   spent cartridges and book them into evidence?

11   A.    Once the prisoner that's been tased is under control and

12   the officer is able to safely gather the taser darts.

13   Q.    Was it supposed to be done weeks or months after the

14   tasing?

15   A.    No.

16   Q.    What about several days after the tasing?

17   A.    No.

18              MS. CARTER:  May I have a moment, Your Honor?

19              THE COURT:  Take your time.  Just be at ease,

20   ladies and gentlemen.

21              MS. CARTER:  Your Honor, I would now like to read

22   from Exhibit 84 the stipulation which was entered into

23   between the parties regarding business records.

24              THE COURT:  Go right ahead.

25              MS. CARTER:  The portion I'm reading pertains to

1    Exhibit No. 56.  It reads Government Exhibit 56 which is a

2    Desert Hot Springs Police Department case audit printout for

3    05-783 showing the chronological history for entries made by

4    Desert Hot Springs Police Department personnel on the Desert

5    Hot Springs Police Department police records management

6    system or RMS pertaining to the arrestee reports of related

7    documents for Angelica Vargas.

8              THE COURT:  Is that the stipulation you have agreed

9    to, Mr. Schwartz?

10             MR. SCHWARTZ:  Yes, Your Honor.

11             THE COURT:  Thank you.  It will be received.

12             MS. CARTER:  Now I would like to enter into

13   evidence Exhibit No. 56 referenced in the stipulation.

14             THE COURT:  Yes, it will come in.

15                  (Exhibit 56 was admitted.)

16             MS. CARTER:  I would like permission to publish

17   that for the jury.

18             THE COURT:  Go right ahead.

19             MS. CARTER:  If you'll wait one moment, Agent

20   Novak, I'll provide the page number.  That would be page

21   number 3 of the exhibit.  If you could expand this area where

22   it says quantity two changed to three.

23   Q.   Mr. Decker, do you see references on this exhibit to

24   three spent taser cartridges and two spent taser cartridges?

25   A.   Yes.

1  Q.   Do you also see that there are some lines here that say

2  two spent taser cartridges quantity two changed or quantity

3  three changed to two, then the line below three spent taser

4  cartridges quantity two changed to three?

5  A.   Yes.

6  Q.   Can you describe whether in your experience it's usual

7  or unusual to change the number of taser cartridges reported

8  in a case audit form after the taser cartridges are booked?

9  A.   Well, if there was a mistake in typing the report, it

10 could be changed.

11 Q.   How usual is it to change it once and then change it

12 back again?

13 A.   I don't know.

14 Q.   This is a case audit report form.  Is that how you would

15 generally refer to them?

16 A.   Yes.

17 Q.   Have you ever changed the quantity in a case of spent

18 taser cartridges in a case audit report form from one

19 quantity to another quantity and back to the first quantity

20 again?

21 A.   Not that I recall.

22 Q.   Before this investigation, have you ever heard of that

23 being done at the Desert Hot Springs Police Department?

24 A.   No.

25 Q.   While Officer Heath was photographing the Hispanic woman

1   who appeared to have been tased, did you stand outside

2   holding cell number three with Matt Gutting?

3   A.   Say it again, please.

4   Q.   While the Hispanic was being photographed by Officer

5   Heath, did you stand outside holding cell number three with

6   Matt Gutting?

7   A.   No.

8   Q.   I would like to direct your -- well, first of all, I

9   would like to read from the stipulation of Exhibit 84, the

10  portion that pertains to Government's Exhibit 78.

11          THE COURT:  Go right ahead.

12          MS. CARTER:  Government Exhibit 78 which is a Taser

13  International download report for Desert Hot Springs Police

14  Department Dennis Decker's taser showing taser activations on

15  February 25th, 2005.

16          THE COURT:  Is that the stipulation you have agreed

17  to as well?

18          MR. SCHWARTZ:  Yes, Your Honor.

19          MS. CARTER:  I would ask that Exhibit 78 be

20  received in evidence.

21          THE COURT:  It will come in.

22              (Exhibit 78 was admitted.)

23          MS. CARTER:  Request that it be published for the

24  jury.

25          THE COURT:  Go right ahead.

BY MS. CARTER:

Q.    And can you please highlight the portion underneath the words recorded firing data.  Now, Officer Decker or Dennis Decker, you can look at the monitor or you can look at the hard copy in the folder in front of you, do you recall firing your taser at any time this night of the accident with the empty school bus?

A.    No, I don't.

Q.    At any point did you tase the Hispanic woman who you walked in and saw lying on the floor?

A.    No.

Q.    Did you use your taser to make a taser sound outside holding cell number three while Officer Heath was taking photographs of the Hispanic woman?

A.    Not that I recall.

Q.    Have you ever used your taser to make that taser sound as a warning to a suspect?

A.    Yes.

Q.    Was there anything that you would have needed to warn this Hispanic woman about at the time that Officer Heath was taking her photographs in holding cell number three?

A.    No.

Q.    What about at any point that night of the school bus accident?

A.    Not that I recall.

1    Q.    You recall using your taser to make a taser sound to

2    intimidate the Hispanic woman in holding cell three?

3    A.    I don't recall doing that, no.

4    Q.    At any point did you speak with Matthew Gutting about

5    the photographs that Officer Heath took of the Hispanic

6    woman's taser injury?

7    A.    Yes.

8    Q.    What did he say to you about that?

9    A.    That they were, that the photographs were erased from

10   his camera.

11   Q.    Did you see the Hispanic woman again that night after

12   Officer Heath photographed her?

13   A.    Yes.

14   Q.    Where did you see her?

15   A.    In the lobby of the police station.

16   Q.    Is that lobby depicted on the diagram in Exhibit 1 that

17   we have been looking at or is it in a different part of the

18   station?

19   A.    I believe it's in a different part of the station.

20   Q.    What was the Hispanic woman doing when she was sitting

21   in the lobby?

22   A.    She was talking to Officer Heath.

23   Q.    At any point that night did you hear defendant say

24   anything about the Hispanic woman sitting in the lobby?

25   A.    Yes.

1    Q.    What did you hear him say about that?

2    A.    To get her out of the station, to call somebody or get

3    somebody to come get her.

4    Q.    What was the defendant's demeanor when he said get her

5    out of the station?

6    A.    He was angry.

7    Q.    Did he make just one statement about getting her out of

8    the station or did he talk about it for a while?

9    A.    He talked about it for a while.

10   Q.    Was he angry the whole time?

11   A.    Yes.

12   Q.    Can you describe for the jury whether it was unusual at

13   that time to have arrestees and members of the public sitting

14   and waiting in the Desert Hot Springs Police Department

15   lobby?

16   A.    No, it wasn't unusual.

17   Q.    I would like now to direct your attention to the folders

18   in front of you that have exhibits 38 through 45 for

19   identification.  Just let me know when you finish.

20   A.    Okay.

21   Q.    Do you recognize what's depicted in these photographs?

22   A.    Yes.

23   Q.    What's depicted in them or what do they show?

24   A.    The jail door entrance in the parking lot area where the

25   patrol cars are kept.

```
 1   Q.   Is that parking lot area right outside the jail door
 2   entrance?
 3   Q.   Do these photographs fairly and accurately show how the
 4   Desert Hot Springs Police Department jail door area and
 5   parking lot area looked in February 2005?
 6   A.   Yes.   There's some changes.   Some of the pictures from
 7   when I was there.
 8   Q.   What are the changes?
 9   A.   There's some type of a tower or something that's been
10   built on the side of the building.
11   Q.   And is the tower you're referring to the one that's
12   depicted in Exhibit 43 for identification, Exhibit 44 for
13   identification and I think that's it, just in those two?
14   A.   Yes.
15   Q.   Other than that tower that's in Exhibit 43 and 44 for
16   identification, do these photos fairly and accurately
17   represent how the Desert Hot Springs Police Department jail
18   door area and the parking lot area looked in February 2005?
19   A.   Yes, they do.
20        MS. CARTER:   Your Honor, I move to admit Exhibits
21   38 through 45.
22        THE COURT:   They will come in.
23        (Exhibits 38 through 45 were admitted.)
24        MS. CARTER:   And I request permission to publish
25   Exhibit 38.
```

1          THE COURT:  Go right ahead.

2   BY MS. CARTER:

3   Q.   This doorway here that kind of frames the picture from

4   which we're looking out into what appears to be a parking

5   area what doorway is that?

6   A.   That's the jail door.

7   Q.   What is this parking area right outside?

8   A.   That's where the officers bring the prisoners to bring

9   them into the jail.

10  Q.   Now, this wall that we see directly outside the jail

11  door was that wall there in February 2005?

12  A.   Yes.

13  Q.   This parking area right outside the jail door, how is

14  access in and out of that immediate parking area controlled?

15  A.   By electric gates.

16  Q.   How many electric gates are there?

17  A.   Three.

18  Q.   How do those gates open and close?

19  A.   Remote control that operates them.

20  Q.   In February 2005 did City workers also have remote

21  controls that operated those gates?

22  A.   Yes.

23  Q.   To your knowledge did anyone else have remote controls

24  that would operate those gates?

25  A.   No.

1    Q.   I would now like to turn briefly to Exhibit 1, the

2    diagram that's already in evidence if I may, Your Honor?

3            THE COURT:  Go right ahead.

4    BY MS. CARTER:

5    Q.   Now, I realize this diagram is only part of the Desert

6    Hot Springs Police Department station jail, but can you point

7    out where the three gates that control the parking lot

8    outside the jail door, where are those located?  And if you

9    can point to those and describe them on the diagram, please

10   do so.  And if they're outside the picture, can you describe

11   for the jury where in relation to the diagram they would?

12   A.   Well, the first one would be down below the where it

13   says to report room, that would be the first gate.

14   Q.   Now, is that in the lower right-hand corner of the

15   document where I have just made a mark?

16   A.   Yes.

17   Q.   And where -- when you say that's the first gate, what do

18   you mean by that?

19   A.   That's the entrance gate to the parking lot.

20   Q.   Where is the next gate that controls the parking area?

21   A.   It would be in the -- on the far side of the page where

22   the south arrow is, it would be right about there.

23   Q.   So again on the right side part way up the diagram about

24   level with the south arrow and where I have just indicated

25   the dot?

1    A.    Yes.

2    Q.    And what about the third remote control gate that

3    controls that area?

4    A.    It would be up in the upper left-hand corner where it

5    says gate.    That would be the exit gate.

6    Q.    And is that where I have just made a third dot on the

7    diagram?

8    A.    Yes.

9          MS. CARTER:   Now, I would like permission to

10   publish Exhibit No. 41 which is in evidence?

11         THE COURT:   Go right ahead.

12   BY MS. CARTER:

13   Q.    What does this picture show, Mr. Decker?

14   A.    That's right outside of the jail door just basically

15   facing the exit gate.

16   Q.    And the exit gate that we see here on this picture is

17   that the first, second or third gate that you described just

18   a moment ago?

19   A.    The third.

20   Q.    And the one that appears on the diagram in Exhibit

21   No. 1?

22   A.    Yes.

23   Q.    Now, the walls that we see here on either side of the

24   gate are those also brick walls?

25   A.    Yes.

```
 1    Q.   And this orange pillar blocking our view is that the
 2    pillar that's marked as pillar on the diagram in Exhibit
 3    No. 1?
 4    A.   Yes.
 5              MS. CARTER:  Your Honor, I would like permission to
 6    publish Exhibit 44.
 7              THE COURT:  You may.
 8    BY MS. CARTER:
 9    Q.   Mr. Decker, can you tell us where the jail door is in
10    relation to the part of the parking area that's depicted in
11    this photo?
12    A.   Be on the right, right side of the page out of view.
13    Q.   And is it in this lower right-hand area where the
14    parking lot cuts in a bit?
15    A.   Yes.
16    Q.   Just above that area that we have just been talking
17    about is this vertical object that I have just depicted with
18    a line that's on the right-hand side of the page in the upper
19    three-fourths of the page.  Is that the tower that was not
20    there in February 2005?
21    A.   Yes.
22    Q.   Now, down this brick wall there appears to be something
23    in the wall right about where the last car is if we're
24    talking about the car furthest from the jail door area.  Do
25    you see where I've kind of indicated on the photograph?
```

1    A.    Yes.

2    Q.    And I didn't do it that precisely, but there appears to

3    be a dark area in the wall.  Do you see where that is?

4    A.    Yes, I do.

5    Q.    What is that?

6    A.    That's a doorway through the wall.

7    Q.    How is it controlled?

8    A.    By key.

9    Q.    Who has those keys?

10   A.    I believe all the officers have one.

11   Q.    Was that gate kept locked or unlocked in February 2005?

12   A.    It was kept locked.

13          MS. CARTER:  I now would like to publish what's in

14   evidence as Exhibit 46.

15          THE COURT:  Go right ahead.  Well, just minute.

16   You indicate that 46 is in evidence?

17          MS. CARTER:  Oh, I'm sorry, Your Honor.  Can we

18   please take this off the screen?

19   Q.    Mr. Decker, can you look at Exhibit 46 for

20   identification which is in the folder in front of you.  I may

21   have gotten ahead of myself.  What is depicted in Exhibit

22   No. 46 for identification?

23   A.    It's the jail door.

24   Q.    Is it the jail door to the Desert Hot Springs Police

25   Department jail door?

1   A.   Yes, it is.

2   Q.   And does that fairly and accurately depict how that jail

3   door looked in February 2005?

4   A.   Yes.

5           MS. CARTER:  Your Honor, may Exhibit 46 be received

6   into evidence?

7           THE COURT:  It will come in.

8               (Exhibit 46 was admitted.)

9           MS. CARTER:  May I publish it for the jury?

10          THE COURT:  Go right ahead.

11          MS. CARTER:  Thank you, Your Honor.

12  Q.   Now, looking at the jail door area in Exhibit No. 46,

13  the door appears to be propped open with something.  Do you

14  see that?

15  A.   Yes.

16  Q.   What's it propped open with?

17  A.   With an ashtray.

18  Q.   Is that how when the jail doors are opened, they have to

19  be kept opened?

20  A.   Yes, that particular door.

21  Q.   What happens if there is nothing there to prop it open?

22  A.   It shuts.

23  Q.   And what do we see as we look through that doorway, and

24  to the best of your ability and I realize it's a bit darker

25  looking inside?

1   A.   Right inside the door on the right corner is the bench

2   and that goes into the booking area.

3   Q.   Mr. Decker, in all of the time you worked at the Desert

4   Hot Springs Police Department from 1998 to 2006, do you ever

5   recall an arrestee escaping from the parking area?

6   A.   No.

7   Q.   Did the Hispanic woman arrestee that you saw on the

8   floor with taser darts in her and Defendant Sclafani and

9   Matthew Gutting standing over her, did she appear to if she

10  had not been tased, if she was not lying handcuffed on the

11  floor, did she appear to be physically capable of jumping the

12  brick wall we had just talked about?

13  A.   No.

14  Q.   Why is that?

15  A.   She was a short, heavyset build.  The wall is probably,

16  I don't know, seven or eight feet tall.

17  Q.   Mr. Decker, are you familiar with the terms meat eaters

18  and lettuce eaters in connection with your work at the Desert

19  Hot Springs Police Department?

20          MR. SCHWARTZ:  Objection, Your Honor.  I would like

21  to be heard.

22          THE COURT:  Let's not go into this at this point.

23  Is it really necessary for you to continue?

24          MS. CARTER:  Your Honor, I believe this is my last

25  couple of questions for this witness.  We can certainly break

```
 1   now if Your Honor would like to, but that was my last area of
 2   questioning.  Otherwise, I'm finished with my direct
 3   examination.
 4          THE COURT:  Appears that we're going to have to
 5   have a side bar.  Excuse us, ladies and gentlemen.  Counsel,
 6   come to the side bar with the reporter.
 7       (Following proceedings were held at the side bar:)
 8          THE COURT:  Mr. Schwartz.
 9          MR. SCHWARTZ:  This is -- there was almost a series
10   of questioning at that stage at the investigation meat eaters
11   and lettuce eaters.  Lots of innuendo who was a lettuce eater
12   and what that meant and why they were called those different
13   names.  And my client at times by different officers was
14   called a meat eater or not.  This was part and parcel of
15   other officers being investigated in another case and it's
16   not being -- trying to label it as having a propensity for
17   violence, heavy-handed with use of force, no relevance to
18   this particular -- these two incidents being offered.  It's
19   innuendo and propensity evidence.
20          THE COURT:  What's the offer?
21          MS. CARTER:  Your Honor, I would submit it's
22   relevant to the culture of the Department during the time
23   that this was happening.  In the defense opening statement
24   they talked a lot how about this was a rookie probationary
25   sergeant who was coming in trying to learn the lay of the
```

```
1    land, that kind of thing.  So I think it is relevant.  I

2    think, Your Honor, that ultimately there will be lots of

3    officers testifying in this trial both the government's or

4    former officers testifying both in the government's case and

5    in the defense case.  I think it's relevant to the bias of

6    the witnesses.

7              MR. SCHWARTZ:  As far as opening statement

8    Your Honor, he wasn't a probationary officer and that doesn't

9    go to part of the culture.  This opens up a whole other set

10   of facts in cases whether this culture did actually exist and

11   to testify about it whether officer procedures because of

12   these questions about proper procedures being followed with

13   regards to photographs, regards to documents, evidence.  Also

14   much -- these people knew my client at that time and he will

15   be testified as being angry.  May have well have known for

16   several months or not.  It's nothing to do to offset fitting

17   into a group or not fitting into a group.

18             THE COURT:  All right.  You've made your record,

19   but I'm going to overrule the objection.

20                       (Side bar concluded.)

21             THE COURT:  Back on the record.  Go ahead.

22   BY MS. CARTER:

23   Q.   Mr. Decker, have you heard the terms meat eaters and

24   lettuce eaters in connection with your work as a Desert Hot

25   Springs police officer?
```

1    A.    Yes.

2    Q.    What are meat eaters and lettuce eaters?

3    A.    Meat eaters were referred to officers that would go out

4    and actively look to engage with suspects.  Lettuce eaters

5    were ones that were, tended to talk things through rather

6    than using force.

7    Q.    Which were you, Mr. Decker during your time at the

8    police department?  A meat eater or a lettuce eater?

9    A.    I was called lettuce eater.

10   Q.    Who were the meat eaters?

11   A.    There were several officers that were referred to as

12   meat eaters.

13   Q.    Who were they?

14   A.    Henderson, Gil, Collard, Sergeant Sclafani, and there

15   were a couple others I can't recall their names.

16   Q.    When you say Sergeant Sclafani, you're referring to the

17   defendant?

18   A.    Yes.

19   Q.    And when you say Gil, what was that person's full name?

20   A.    Radames Gil.

21   Q.    What about Collard, what was his full name?

22   A.    John Collard.

23   Q.    Who were the other lettuce eaters?

24   A.    Sergeant Henson, Gus Paiz, Matt Gutting, Ray Voeltz.

25   There were a couple others.  I can't recall their names.

1    Q.   Was Eddie Cole a meat eater or lettuce eater?

2    A.   He was a lettuce eater.

3    Q.   Was Andrea Heath a meat eater or a lettuce eater?

4    A.   Lettuce eater.

5    Q.   And who would tend to use these terms meat eaters or

6    lettuce eaters?  Were these terms that you used often in the

7    office?

8              THE COURT:  Just a minute.  There's two questions

9    now.

10             MS. CARTER:  May I rephrase, Your Honor?

11             THE COURT:  Please.

12   BY MS. CARTER:

13   Q.   Were these terms meat eater and lettuce eater, were they

14   used more by the officers who talked about as being the meat

15   eaters or more by the officers you talked about being the

16   lettuce eaters?

17   A.   By the ones that were referred to as the meat eaters.

18   Q.   When they used that -- those terms, did they mean the

19   term lettuce eater, did they mean it as a compliment or as an

20   insult?

21   A.   An insult.

22   Q.   And was being a meat eater a compliment or an insult?

23   A.   That was a compliment.

24             MS. CARTER:  No further questions at this time,

25   Your Honor.

```
 1              THE COURT:  Cross-examination, Mr. Schwartz.
 2              MR. SCHWARTZ:  Thank you, Your Honor.
 3                      CROSS-EXAMINATION
 4    BY MR. SCHWARTZ:
 5    Q.   You began your career, sir, in Desert Hot Springs in
 6    1998?
 7    A.   Correct.
 8    Q.   As a dispatcher?
 9    A.   That's correct.
10    Q.   And the terms that were just discussed by you and
11    counsel on direct, meat eaters and lettuce eaters, were those
12    terms around when you began as dispatcher?
13    A.   No.
14    Q.   You labeled yourself as one of the lettuce eaters;
15    correct?
16    A.   Yes.
17    Q.   Now, that -- those two terms did they come about through
18    what happened on a call to service for a burglary call?
19    A.   I don't recall when they came about.
20    Q.   Do you recall a call where yourself as one of the
21    lettuce eaters and Officer Paiz and Officer Gutting and
22    another officer had surrounded a house on a burglary call and
23    the suspect got away?
24              MS. CARTER:  Objection.  Vague as to time.
25              THE COURT:  Let's have a time if you can.
```

BY MR. SCHWARTZ:

Q.   You stopped working at Desert Hot Springs in 2006;
correct?

A.   Yes.

Q.   When did you start as a police officer in Desert Hot
Springs?

A.   2001.

Q.   And sometime between 2001 and 2005, those four years, do
you recall a call that you were on specifically yourself and
Officer Paiz and Officer Gutting and a fourth officer where
-- Andrea Heath -- where the suspects got away where you
surrounded a house?

A.   Yes.

Q.   And do you recall that -- was your lieutenant then
Henderson?

A.   I believe so.

Q.   And then Henderson and Sergeant Gil actually went to
that call and caught the suspects?

A.   Yes.

Q.   Do you recall they called the four of you lettuce
eaters?

A.   That's correct.

Q.   That's about the time those terms of art began?

A.   I don't recall when they began, but it was during that
time.

1    Q.    Now, back in 2001, you were a patrol officer?

2    A.    Yes.

3    Q.    And you go through a probationary period as a patrol

4    officer?

5    A.    Yes.

6    Q.    That was about one year?

7    A.    Yes.

8    Q.    And based on your experience with Desert Hot Springs as

9    a probationary officer, could you have been let go or

10   terminated off probation?

11   A.    Yes.

12   Q.    That's if you didn't pass probation; right?

13   A.    That's correct.

14   Q.    And you would have no right of appeal to that, would

15   you, that you knew about?

16   A.    Not that I know.

17   Q.    So had your performance been inadequate during that

18   one-year probationary period, you could have been let go?

19            MS. CARTER:  Objection.  Vague.

20            THE COURT:  Overruled.  You may answer.

21            THE WITNESS:  I believe so.

22   BY MR. SCHWARTZ:

23   Q.    Now, back in 2005 and specifically February 2005, you

24   were a police officer at Desert Hot Springs; correct?

25   A.    Yes.

1    Q.    And you were assigned as an RSO?

2    A.    SRO.

3    Q.    SRO.  School resource officer; right?

4    A.    Yes.

5    Q.    And what were your shift hours during that time as a

6    school resource officer?

7    A.    They varied.

8    Q.    What days of the week would you work?

9    A.    Monday through Friday.

10   Q.    And you said they varied.  Can you tell us more

11   generally if they were one set of hours or did they vary week

12   to week?

13   A.    They varied week to week.

14   Q.    And the first incident that the government talked to you

15   about dealt with a black male arrestee that was in the

16   station; correct?

17   A.    Yes.

18   Q.    That was in February 2005?

19   A.    Correct.

20   Q.    Now, you were not part of that arrest?

21   A.    No.

22   Q.    But you were present in the booking area of the station

23   when the black male was present sitting on the bench?

24   A.    Yes.

25   Q.    Was he handcuffed to your knowledge?

```
 1    A.    Yes.

 2    Q.    It was behind his back?

 3    A.    That's correct.

 4    Q.    And you said he was complaining about being pepper

 5    sprayed; is that right?

 6    A.    Yes.

 7    Q.    You saw the signs of pepper spray on his person?

 8    A.    Yes.

 9    Q.    And was he complaining loudly?

10    A.    Yes.

11    Q.    Was he using curse words?

12    A.    Yes.

13    Q.    And were you the only other officer besides my client

14    that was around the booking area at that time?

15              MS. CARTER:  Objection.  Misstates prior testimony.

16              THE COURT:  Overruled.  He is asking the question.

17              THE WITNESS:  No, there was another officer there.

18    BY MR. SCHWARTZ:

19    Q.    Now, was that arrestee trying to get your attention to

20    your knowledge particularly?

21    A.    Not to my knowledge.

22    Q.    Do you recall what you were doing in the booking area

23    during this time while the arrestee was on the bench

24    complaining about being pepper sprayed?

25    A.    Assisting with the booking process.
```

220

1    Q.   Of that arrestee?

2    A.   Yes.

3    Q.   And do you recall what you were doing in assisting the

4    booking process?  What particular things were you doing?

5    A.   At that point I was just standing there, standing by.

6    Q.   Now, the arrestee complained about being pepper sprayed;

7    right?

8    A.   Yes.

9    Q.   He didn't complain about being tasered at that point,

10   did he?

11   A.   No.

12   Q.   He complained more than once about being pepper sprayed?

13   A.   Yes.

14   Q.   But at that point before the first tasing you said you

15   saw, there was no complaint by the arrestee of being tased?

16   I'll go back and ask the question.

17          You described seeing at least one tase of the

18   arrestee while he was sitting on the bench; correct?

19   A.   Yes.

20   Q.   Happened in what's called the drive stun; is that right?

21   A.   Yes.

22   Q.   And you described seeing that particular tasing?

23   A.   Yes.

24   Q.   Before that tasing you described seeing, did the

25   arrestee complain of being tased?

```
 1   A.    No.
 2   Q.    When you saw that tasing take place, the drive stun, you
 3   described it on direct as in the arrestee's chest area; is
 4   that correct?
 5   A.    Yes.
 6   Q.    Now, the arrestee was wearing a shirt; right?
 7   A.    I believe so.
 8   Q.    And the tasing as you describe it takes place over the
 9   shirt of the arrestee in that chest area?
10   A.    I don't recall.
11   Q.    Now, you have been trained on tasers; right?
12   A.    Yes.
13   Q.    And you passed a certification course on tasers?
14   A.    Yes.
15   Q.    And you know the difference between a drive stun and
16   using those darts?
17   A.    Yes.
18   Q.    And the drive stun you were trained was a pain
19   compliance technique or could be; correct?
20   A.    Yes.
21   Q.    In order to be used as a pain compliance, your training
22   it would be applied to the person's skin area; correct?
23   A.    Yes.
24   Q.    Or if the person had a very light shirt on, very thin
25   shirt on; correct?
```

1    A.    Yes.

2    Q.    And if applied to that area, it would leave a welt;

3    correct?

4    A.    Not always.

5    Q.    Well, if it's applied for any duration of time more than

6    like a second, it would most likely leave a welt based on

7    your experience?

8    A.    Most likely.

9    Q.    And if applied to a shirt area, it would leave a mark on

10   the shirt; correct?

11   A.    Possibly.

12   Q.    For anything more than a second based on your training?

13   A.    Right.

14   Q.    And the arrestee was sitting on the bench when he was

15   tased in drive stun?

16   A.    Yes.

17   Q.    And how close are you standing to the arrestee and my

18   client when you saw the drive stun?

19   A.    Within feet.

20   Q.    It was within feet.  Can you give us a number of feet?

21   A.    Three feet.  Two, three feet.

22   Q.    And you saw my client tase him with that drive stun?

23   A.    Yes.

24   Q.    Now, when the taser is on an officer's holster, it's got

25   a cartridge on the end of it that can be used with the

1    prongs; right?

2    A.    Yes.

3    Q.    And to use the drive stun, you have to physically,

4    actually take the cartridge off; is that right?

5    A.    Right.

6    Q.    And which hand was my client holding the taser in when

7    he drove that drive stun into the arrestee?

8    A.    Well, I don't recall.

9    Q.    Well, do you recall seeing my client take off the

10   cartridge when he drive stunned the arrestee?

11   A.    No, I don't recall that either.

12   Q.    Well, based on your training and experience, does the

13   cartridge have to be off to use the drive stun function?

14   A.    Yes.

15   Q.    And after my client drive stunned that arrestee, based

16   on your recollection, the arrestee fell to the floor?

17   A.    Yes.

18   Q.    So the drive stun was not just for one second.  Is that

19   safe to say?

20   A.    I don't recall how long it was for.

21   Q.    As you stood there and watched that, you described there

22   was nothing you saw on the part of the arrestee to provoke

23   the drive stun?

24   A.    No.

25   Q.    As a police officer sworn to serve in Desert Hot

```
 1    Springs, if you saw somebody use excessive force, another

 2    officer, you're supposed to report it; right?

 3    A.   Yes.

 4    Q.   You didn't report that, did you?

 5    A.   No.

 6    Q.   And you gave multiple interviews to the FBI in this

 7    case; is that right?

 8    A.   Yes.

 9    Q.   And you remember telling the FBI agents that the reason

10    you did not report the tasing of that arrestee is because you

11    didn't see the whole thing?

12    A.   Yes.

13    Q.   And therefore you couldn't tell if the arrestee had done

14    something to provoke it?

15    A.   Yes.

16    Q.   If you had seen everything and saw nothing to provoke

17    it, that would require reporting; is that right?

18    A.   Yes.

19    Q.   And since you didn't see the whole thing, you felt it

20    would not be proper to report it; is that right?

21    A.   Correct.

22    Q.   Now, at the time this event occurred, you were no longer

23    a probationary officer?

24    A.   No.

25    Q.   You had been there for a few years, safe to say; right?
```

1    A.    Yes, sir.

2    Q.    And my client was a relatively new sergeant there; is

3    that right?

4    A.    Yes.

5    Q.    Only for several months to your knowledge?

6    A.    To my knowledge, yeah.

7    Q.    And during those several months that my client was a new

8    sergeant up until the time of that incident just described in

9    February of 2005, your assignment was as school resource

10   officer; right?

11   A.    Among other tasks, yes.

12   Q.    The other tasks, did you work a lot of overtime?

13   A.    Yes.

14   Q.    So while you were a school resource officer, my client

15   was not your direct supervisor while you were serving in that

16   capacity, was he?

17   A.    Sometimes he was.

18   Q.    If he happened to be on shift as a watch commander?

19   A.    Correct.

20   Q.    But he was not your assigned sergeant when you were a

21   school resource officer for all your shifts?

22   A.    No.

23   Q.    And so you didn't know him that well at that time, did

24   you?

25   A.    No.

1   Q.   And you remember describing him to the FBI as a ranter?

2   A.   Yes.

3   Q.   And by those words did you mean that he would be loud

4   and he would rant or get angry often?

5   A.   Yes.

6   Q.   As a matter of fact, he always seemed angry, didn't he?

7   A.   Yes.

8   Q.   And was always somewhat yelling at people, wasn't he?

9   A.   Yes, sir.

10  Q.   Including officers?

11  A.   Yes, sir.

12  Q.   And as a sergeant, did he have the job specifically to

13  review reports that officers wrote in their arrests?

14  A.   Yes.

15  Q.   Now, if an officer, based on your experience at Desert

16  Hot Springs, if an officer makes an arrest, he writes a

17  report.  Would that report normally go to the sergeant who

18  was his supervisor at the time of the arrest?

19  A.   Not always.

20  Q.   Whatever sergeant happened to be working that shift when

21  the report was finished?

22  A.   Yes.

23  Q.   And in the first instance we just spoke about with the

24  arrestee on the bench, you did not witness any pepper spray;

25  is that right?

1    A.    No.

2    Q.    You just saw the signs of it that it had been done

3    previously?

4    A.    Yes.

5    Q.    So after the drive stun and the person fell to the

6    floor, my client stood over him; is that correct?

7    A.    Yes.

8    Q.    Told him to get up?

9    A.    Yes.

10   Q.    And the person couldn't get up; right?

11   A.    No.

12   Q.    And where were you standing at this time?

13   A.    Just somewhere within the booking area.  I don't recall

14   exactly where.

15   Q.    And do you recall were you watching what was going on?

16   A.    Yes.

17   Q.    And at some point after my client told the arrestee to

18   get up, he tased the arrestee a second time?

19   A.    Yes.

20   Q.    And at least from what you saw, you didn't see anything

21   specifically to provoke the tase?

22   A.    No.

23   Q.    And you did mention that my client was standing over the

24   arrestee when he tased him; right?

25   A.    Yes.

228

```
1    Q.   He was closer to the arrestee than you were?

2    A.   I believe so, yes.

3    Q.   And the arrestee you said at that time before he was

4    tased on the floor was thrashing about; right?

5    A.   Yes.

6    Q.   That included his legs were thrashing, too; is that

7    right?

8    A.   That's correct.

9    Q.   Was he hobbled at that time?

10   A.   No.

11   Q.   And could you describe for the jury your experience what

12   hobbling is?

13   A.   It's a small rope with hooks on the end that wrap around

14   the ankles and then connect to the handcuffs that are behind

15   the back.

16   Q.   Now, the arrestee was on the floor and as you described

17   thrashing around.  Based on your training and experience, if

18   an officer was kicked by an arrestee could that injure the

19   officer?

20   A.   Yes.

21   Q.   Are officers trained that arrestees are able to still

22   kick an officer could be considered dangerous?

23   A.   Sure.

24   Q.   And especially there may be some sensitive areas of the

25   officer's body if the arrestee kicked that could make the
```

1    officer incapacitated.  Have you been trained on that?

2    A.   Yes.

3    Q.   Now, when the arrestee was thrashing around, both in

4    legs are thrashing as well as upper body; is that correct?

5    A.   I believe so, yeah.

6    Q.   His arms weren't thrashing because they were handcuffed;

7    right?

8    A.   Right.

9    Q.   His upper body was moving; is that correct?

10   A.   Yes.

11   Q.   And his legs were kicking up and down and thrashing;

12   right?

13   A.   Yes.

14   Q.   And he was told to stop, wasn't he?

15   A.   Yes.

16   Q.   And while he was kicking up and down and thrashing that

17   way and told to stop, he didn't stop, did he?

18   A.   No.

19   Q.   And an arrestee who is kicking that way, it would be

20   dangerous if an officer to lean down to try to control him as

21   he's still kicking, wouldn't it?

22   A.   Could be.

23   Q.   The officer could be kicked in the face?

24   A.   Possibly.

25   Q.   He could get kicked in the groin area?

1   A.   Yes.

2   Q.   And that's the reason why an officer would tell that

3   arrestee to stop kicking that way; correct?

4   A.   Right.

5   Q.   And the officer would expect the arrestee to comply with

6   those lawful orders, wouldn't he?

7   A.   Yes.

8   Q.   And you didn't see that arrestee comply with his orders,

9   did you?

10   A.   No.

11   Q.   And then after the arrestee did not comply and kept

12   thrashing that's when you saw the second tase?

13   A.   Yes.

14   Q.   And did you see the prongs actually connect to the

15   arrestee?

16   A.   I don't recall.

17   Q.   How close were you standing to the arrestee and my

18   client when you saw that second tase?

19   A.   I don't recall where I was standing.  I was in the room.

20   Q.   It's a small room; right?

21   A.   Yes, sir.

22   Q.   And aside the fact that the actual room to walk around

23   was small, there were objects up against the walls of the

24   room; right?

25   A.   Yes, sir.

1    Q.   The bench that you described; right?

2    A.   Yes.

3    Q.   And on the other side of that door that lead to the

4    watch commander's office and the hallway, there was a

5    actually desk or console; is that right?

6    A.   Yes.

7    Q.   And it had a computer station on it?

8    A.   Yes.

9    Q.   And that was used in the booking process?

10   A.   Yes.

11   Q.   And if I'm facing that computer station which is against

12   that wall which is the left of the doorway, there was a

13   chair, wasn't there?

14   A.   Yes.

15   Q.   That's the chair was on the left side of that computer

16   station if I'm facing the station; is that right?

17         MS. CARTER:  Objection.  Beyond the scope.

18         THE COURT:  That's overruled.  You may continue.

19         MR. SCHWARTZ:  Did you hear the question, sir?

20         THE WITNESS:  Yes.

21         THE COURT:  Ask it again.

22   BY MR. SCHWARTZ:

23   Q.   The person that's facing that computer station in the

24   booking area, to the left of that station is a chair; is that

25   right?

1    A.    Yes.

2    Q.    That's where the arrestee would sit to be booked; is

3    that correct?

4    A.    Yes.

5    Q.    And opposite that computer station on the other side of

6    the room, was there some kind of a counter?

7    A.    Yes.

8    Q.    And that counter was used to do paperwork on by the

9    officers?

10   A.    Yes.

11   Q.    And that counter have a pointy edge like the counter I'm

12   pointing to where the podium is or where counsel is talking

13   from?

14   A.    I believe so.

15   Q.    Was the edge metal at the pointy edge or what was it

16   made out of?

17   A.    It was like a formica countertop.

18   Q.    And based on your training and experience, if a person

19   hit their head or a part of on their body on the edge could

20   they be injured?

21            MS. CARTER:  Objection.  Calls for speculation.

22            THE COURT:  Sustained.

23   BY MR. SCHWARTZ:

24   Q.    Now, we just spoke about the console with the computer

25   on one side of the room and the counter on the other side.

1    In between those two pieces of furniture or those two items,

2    is that where the arrestee was on the floor thrashing about?

3    A.    Yes.

4    Q.    And kicking about?

5    A.    Yes.

6    Q.    In between those two items --

7              MS. CARTER:  Objection.  Misstates the testimony.

8              THE COURT:  Overruled.  He can ask.

9    BY MR. SCHWARTZ:

10   Q.    And if you recall, where was Sergeant Sclafani at that

11   point when the person was thrashing about on the floor?  Was

12   he on the side where the counter was?

13             THE COURT:  You already asked him where.

14             MR. SCHWARTZ:  I'm getting more specific to those

15   items we just mentioned, Your Honor.

16             THE COURT:  Ask one question at a time.

17   BY MR. SCHWARTZ:

18   Q.    The arrestee was in the middle of the counter and the

19   console; correct, on the floor?

20   A.    He was in the middle of the room.  Where the computer is

21   would have been on the other, you know, to the head of him.

22   Q.    And was Sergeant Sclafani was he on the side of the

23   arrestee towards the counter or on the side towards the

24   computer?

25             MS. CARTER:  Objection.  Vague as to time.

1          THE COURT:  Can we have a better foundation?

2     BY MR. SCHWARTZ:

3     Q.   When the arrestee was thrashing about on the floor

4     before being tased that second time, was Sergeant Sclafani --

5     on which side of the arrestee was he on?

6     A.   On his right side.

7     Q.   On the arrestee's right side?

8     A.   Yeah, towards the sergeant's office.

9          MR. SCHWARTZ:  I would ask permission to publish

10    No. 1, Exhibit 1?

11         THE COURT:  Yes.

12         MR. SCHWARTZ:  And that's on the screen.

13    Q.   This is the booking area.  I made a little mark.  Do you

14    see that?

15    A.   Yes.

16    Q.   And the arrestee -- was the arrestee about where I

17    placed that mark?

18    A.   Yes.

19    Q.   That's when he is thrashing about on the floor?

20    A.   Yes.

21    Q.   And on the second mark I'm making on here, would that be

22    the counter?

23    A.   Yes.

24    Q.   And the third mark I'm making here, would that be the

25    console with the computer station?

```
 1   A.    Yes.
 2   Q.    And next to that over here the fourth mark, would that
 3   be where the chair was about?
 4   A.    Yes.
 5   Q.    And the fifth mark is labeled on the diagram as a table.
 6   Do you see that?
 7   A.    Yes.
 8   Q.    So Sergeant Sclafani was standing on this side of the
 9   arrestee?
10   A.    That's correct.
11   Q.    Sixth mark.  Where were you standing, if you recall?
12   A.    I don't recall.
13   Q.    And that second tasing after the thrashing about, you
14   didn't report that tasing either, did you?
15   A.    No.
16   Q.    And you didn't see the whole thing of that tasing
17   either, did you?
18   A.    No.
19   Q.    And you didn't have the same vantage point as Sergeant
20   Sclafani had with regards to the arrestee and his thrashing
21   about, did you?
22   A.    No.
23         THE COURT:  We're going to stop at this point.
24   Ladies and gentlemen, I remind you of the admonition not to
25   discuss the matter among yourselves or anyone else.  See you
```

```
 1    at 9:00 a.m.
 2                     (Jury not present.)
 3              THE COURT:  Please be seated.  Outside the presence
 4    of the jury.  You may step down at this time.  Return
 5    tomorrow, please.
 6              MS. CARTER:  Your Honor, while the U.S. marshals
 7    are in the courtroom, we would just ask that Mr. Decker, of
 8    course, be brought back tomorrow.
 9              THE COURT:  Yes.  Be back tomorrow 9:00 a.m.
10              Thank you.
11              Any counsel have any matters to take up at this
12    time?  Ms. Carter?
13              MS. CARTER:  Yes, Your Honor.  I believe we still
14    have the open issue of Ms. Vargas.  I have obviously been in
15    here and I am not sure what the status is of the panel
16    attorney or whether anyone, he or she, has had a chance to be
17    appointed and then speak with Ms. Vargas.  I would ask the
18    Court, though, that we inquire about her because obviously we
19    need to figure out whose custody she should be in tonight or
20    should she be released.  And is there an expectation she'll
21    be here this morning or tomorrow morning.
22              THE COURT:  No.  Actually, the agents who have her
23    in custody should take her to the marshal and she's going to
24    have to be booked.  Michael Belter has been appointed as
25    counsel to represent her.
```

1          MS. CARTER:  That's Michael Belter?

2          THE COURT:  B-e-l-t-e-r.  16 North Marengo Suite

3    619 Pasadena.  Phone number 626-200-7406.  Evidently there's

4    been email and fax to him, but no return yet.  So he should

5    be in touch with the clerk so we know what's going on.

6          MS. CARTER:  Your Honor, the government will make

7    an attempt to reach Mr. Belter and try to inquire for the

8    Court and try to encourage him to contact the Court's clerk.

9          THE COURT:  Be helpful.

10          MS. CARTER:  I have also been just informed by

11    Agent Novak that the FBI agents in whose custody Ms. Vargas

12    is now, I believe they require an order from this court that

13    she be remanded to the marshal's custody in order for them to

14    make that happen.  And so I would ask that this Court just

15    formally order that she be remanded so that we can deliver

16    her.

17          THE COURT:  I don't understand why if the warrant

18    is being executed, they executed it and turned her over to

19    the booking authorities.

20          MS. CARTER:  Yes, Your Honor.  May I have a moment?

21          THE COURT:  You may.

22          MS. CARTER:  I don't think the government has

23    anything further now.

24          THE COURT:  All right.  9:00 tomorrow then.

25          (Proceedings were concluded at 5:40 p.m.)

1          CERTIFICATE OF REPORTER

2

3    COUNTY OF LOS ANGELES      )

4                              )  SS.

5    STATE OF CALIFORNIA        )

6

7    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

8    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

9    DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

10   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

11   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

12   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

13   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

14   OF MY STENOGRAPHIC NOTES.

15

16

17   DATE: JANUARY 7, 2013 _____

18

19   _____ /s/  LAURA MILLER ELIAS _____

20   LAURA MILLER ELIAS, CSR 10019

21   FEDERAL OFFICIAL COURT REPORTER

22

23

24

25