1               UNITED STATES OF AMERICA
                UNITED STATES DISTRICT COURT
2               CENTRAL DISTRICT OF CALIFORNIA
                     WESTERN DIVISION
3
                         - - -
4               HONORABLE TERRY J. HATTER, JR.
            UNITED STATES DISTRICT JUDGE PRESIDING
5                        - - -

6
    UNITED STATES OF AMERICA,          )
7                                      )
                     PLAINTIFF,        )
8                                      )
    VS.                                )   CASE NO.:
9                                      )   CR 10-00163-TJH
    ANTHONY SCLAFANI,                  )
10                                     )
                     DEFENDANT.        )
11                                     )
                                       )
12  _____)

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              THURSDAY, FEBRUARY 9, 2012

17              LOS ANGELES, CALIFORNIA

18

19

20

21

22              LAURA MILLER ELIAS, CSR 10019
23            FEDERAL OFFICIAL COURT REPORTER
              312 NORTH SPRING STREET, ROOM 453
24            LOS ANGELES, CALIFORNIA 90012
                   PH:  (213)620-0890
25

```
 1

 2
        APPEARANCES OF COUNSEL:
 3
        ON BEHALF OF PLAINTIFF:
 4

 5                 BY:  MARGARET CARTER
                        STEVEN M. ARKOW
 6                 ASSISTANT UNITED STATES ATTORNEY

 7                 1100 UNITED STATES COURTHOUSE
                   312 NORTH SPRING STREET
 8                 LOS ANGELES, CA 90012

 9
        ON BEHALF OF DEFENDANT:
10
                   SILVER, HADDEN, SILVER, WEXLER & LEVINE
11                 BY:  MICHAEL D. SCHWARTZ, ESQ.
                        MICHAEL SIMIDJIAN, ESQ.
12
                   1428 SECOND STREET
13                 SUITE 200
                   SANTA MONICA, CA 90012
14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
1                              INDEX

2   WITNESSES FOR
    THE GOVERNMENT:
3
                     DIRECT       CROSS       REDIRECT     RECROSS
4
    DECKER, DENNIS
5
    BY:  MS. CARTER                           49
6   BY:  MR. SCHWARTZ            6                          70

7
    DREW, MATTHEW
8
    BY:  MR. ARKOW      81                    119
9   BY:  MR. SCHWARTZ           103

10

11
    EXHIBITS    RECEIVED     EXHIBITS     RECEIVED
12
    34          19           35           20
13
    36          22           37           23
14
    58          78           69           78
15
    205-23     114           205-2309     114
16

17
    ANGELICA VARGAS
18  STATUS CONFERENCE.........................125

19

20

21

22

23

24

25
```

UNITED  STATES  DISTRICT  COURT

```
 1    LOS ANGELES, CALIFORNIA; THURSDAY, FEB. 9, 2012; 9:15 A.M.
 2                               - - -
 3              THE COURT:  Please be seated.  We're outside the
 4    presence of the jury.  Are there any matters that counsel
 5    wish to take up?
 6              MR. ARKOW:  Not from the government.
 7              THE COURT:  You don't have anything with regard to
 8    your proposed witness?
 9              MS. CARTER:  I can address that, Your Honor.  I
10    believe that either Mr. Belter --
11              THE COURT:  Mr. Nicolyasen I understand is going to
12    be coming in.  Did you talk with him?
13              MS. CARTER:  I did.  I spoke with him last night.
14    My understanding he plans to meet with her this morning and
15    then try to come in around the time this Court might be
16    taking the morning recess around 10:15 or 10:30 to give us an
17    update.
18              THE COURT:  Fine.  Anything from the defense at
19    this time, Mr. Schwartz?
20              MR. SCHWARTZ:  For the record, Your Honor, long
21    after the jury had left, Mr. Arkow did report to me this
22    morning that as he was leaving the building last night I
23    think out by the loading dock area, about 7:30 at night long
24    after the jury had left, he was approached by somebody.  He
25    couldn't really tell if it was a juror or not.
```

1        The person asked for directions how to get out of

2   here so to speak and Mr. Arkow gave him directions and that's

3   fine.  I just want to put it on the record.  We don't have to

4   make an inquiry.  It was very de minimis, if it was a

5   conversation at all.  He can't recall if it is a juror so it

6   is on the record and be aware of that.

7        THE COURT:  Thank you for that.

8        Mr. Arkow, what about that?

9        MR. ARKOW:  Yes, Your Honor.  In fact it's a more

10  limited contact than that.  I parked in the magistrate lot

11  with my car and I was coming through the loading dock.  I

12  wouldn't say the person approached me.  I would say that I

13  was just coming through the door and the person was leaving

14  the corridor and said how do I get out of here.  And I was

15  the only person around and I pointed to the loading dock door

16  that I had just come from.

17        I don't think I even verbalized anything and I just

18  kept walking on my way.  But there was a possible resemblance

19  to juror, I believe, No. 11, but I didn't stare.  I didn't

20  turn around.  I didn't have any dialogue.  And out of an

21  abundance of caution, I just wanted to point this out.

22        THE COURT:  This was about 7:30?

23        MR. ARKOW:  I definitely know it was 7:30 because I

24  have to sign in after hours and I looked at the time when I

25  was coming back.

1          THE COURT:  All right.  Thank you for that.

2          MR. ARKOW:  Yes, Your Honor.

3          THE COURT:  I don't understand why a juror would be

4    here that late in the evening.

5          All right.  Could we have the witness back on the

6    witness stand?  Let's bring the members of the jury in

7    please.

8                    (Jury Present.)

9          THE COURT:  Please be seated.  Ladies and

10   gentlemen, let me ask you if anything about this matter has

11   come to your attention since you were here yesterday,

12   anything at all, raise a hand.  I see no hands raised.

13         We're gonna continue with the cross-examination of

14   the witness.

15         Mr. Decker, would you repeat your full name and

16   spell your last name for the record.

17         THE WITNESS:  Dennis Paul Decker D-e-c-k-e-r.

18         THE COURT:  You understand you are still under oath

19   in this matter?

20         THE WITNESS:  Yes.

21         THE COURT:  Let's proceed, Mr. Schwartz.

22         MR. SCHWARTZ:  Thank you, Your Honor.

23              CROSS-EXAMINATION (RESUMED)

24   BY MR. SCHWARTZ:

25   Q.   Mr. Decker, when we left off yesterday we were

1  discussing the incident towards the end of that discussion of
2  the man, the arrestee who was on the bench who was tased by
3  Sergeant Sclafani.  You recall that?
4  A.   Yes.
5  Q.   And you talked about that the second tasing, before the
6  second tasing that arrestee was on the floor thrashing and
7  kicking; correct?
8  A.   Yes.
9  Q.   And you had talked about based on your training and
10 experience that could be considered a danger to the officers;
11 right?
12 A.   Yes.
13 Q.   And that kicking could injure the officer; right?
14 A.   Right.
15 Q.   And based on your training and experience, that kind of
16 thrashing and kicking in defiance of an order to stop by an
17 officer, would that consider to be combative?
18       MS. CARTER:  Objection.  Calls for speculation.
19 Incomplete hypothetical.
20       THE COURT:  Sustained.
21 BY MR. SCHWARTZ:
22 Q.   The thrashing and the kicking that you saw that evening
23 on the floor by the arrestee went on for more than a few
24 seconds; correct?
25 A.   Yes.

```
 1    Q.   And you described it could have been dangerous to the
 2    officer that was standing nearby; correct?
 3              MS. CARTER:  Objection.  Calls for speculation.
 4              THE COURT:  Why don't you rephrase it.
 5    BY MR. SCHWARTZ:
 6    Q.   The kicking that you saw based on your training and
 7    experience could injure an officer; right?
 8    A.   Correct.
 9    Q.   And the kicking you saw based on your training and
10    experience which could injure an officer, could be combative
11    based on your training and experience?
12              MS. CARTER:  Objection.  Vague.  Incomplete
13    hypothetical.
14              THE COURT:  Do you understand the question?
15              THE WITNESS:  Yes.
16              THE COURT:  Go ahead and answer.
17              THE WITNESS:  Yes, that's possible.
18              THE COURT:  Well, I'm gonna strike that as almost
19    anything is possible.  Ask another question.
20    BY MR. SCHWARTZ:
21    Q.   As described yesterday, the person on the ground, the
22    arrestee was told to stop kicking; correct?
23    A.   Yes.
24    Q.   And he continued to kick anyway; is that right?
25    A.   Yes.
```

1    Q.    And he was told to stop kicking more than once; right?

2    A.    Yes.

3    Q.    And he kicked in defiance of those orders; correct?

4    A.    Yes.

5    Q.    And based on your training and experience, that kicking

6    in defiance of those orders would be combative based on your

7    training and experience?

8              MS. CARTER:  Objection.  Vague and calls for

9    speculation.

10             THE COURT:  That's sustained.

11   BY MR. SCHWARTZ:

12   Q.    While that arrestee was kicking in defiance of those

13   orders, Sergeant Sclafani was standing very close to him,

14   wasn't he?

15   A.    Yes.

16   Q.    Basically almost right over him; right?

17   A.    That's correct.

18   Q.    And he was telling him to stop; is that right?

19   A.    Yes.

20   Q.    Now, were you trained as part of a Desert Hot Springs

21   Police Department training to deal with combative subjects?

22   A.    Yes.

23             MS. CARTER:  Objection.  Vague.

24             THE COURT:  That's overruled.

25   BY MR. SCHWARTZ:

1    Q.    Were you trained to deal with resisting subjects?

2    A.    Yes.

3    Q.    And could you describe for us your training -- strike

4    that.

5            Were you trained that if the subject is given a

6    lawful order that they were supposed to comply?

7    A.    Yes.

8    Q.    And if a subject is kicking and being combative and the

9    officer, based on your training, told him to stop kicking,

10   that would be a lawful order based on your training?

11   A.    Yes.

12   Q.    And if that person continued to kick, based on your

13   training, would that be noncompliance?

14            MS. CARTER:  Objection.  Speculation and incomplete

15   hypothetical.

16            THE COURT:  Sustained.

17            Mr. Decker, had the individual who was kicking been

18   tasered just before kicking?

19            THE WITNESS:  Yes, sir.

20            THE COURT:  Go ahead.

21   BY MR. SCHWARTZ:

22   Q.    Now, you went through a series of photographs with

23   counsel yesterday.  You remember that?

24   A.    Yes.

25   Q.    There were photographs of the jail area?

```
 1    A.    That's correct.
 2    Q.    If I could turn in front of you, there should be some
 3    photographs in a manilla envelope.  Open the one that has
 4    number 30.  You have that in front of you?
 5    A.    Yes.
 6              MR. SCHWARTZ:  May I publish 30 to the jury?
 7              THE COURT:  Go right ahead.
 8    BY MR. SCHWARTZ:
 9    Q.    And the photograph you're looking at is that photograph
10    on the screen No. 30?
11    A.    Yes, it is.
12    Q.    Now, where I'm pointing with my pen on the photograph,
13    what is that?
14    A.    That's a window into the watch commander's office.
15    Q.    And back in 2005 was there a window in the watch
16    commander's office that looked out into the booking area?
17    A.    Yes.
18    Q.    Was it covered with anything?
19    A.    I believe it was covered with plywood.
20    Q.    And it was covered -- was it covered in plywood in such
21    a way you could not see out that window if you were standing
22    in the watch commander's office?
23    A.    I believe so.
24    Q.    Next to that window was a desk; right?
25    A.    Yes.
```

```
 1    Q.    Do you remember how wide that desk was?

 2    A.    Oh, it was -- I don't remember exactly how wide it was,

 3    but it was in a sectional.

 4    Q.    Would it be as wide as counsel table?

 5    A.    Yes.

 6              THE COURT:  Wide which way?

 7              MR. SCHWARTZ:  Width going this, way Your Honor.

 8              THE COURT:  Approximately three-and-a-half, four

 9    feet.

10              MR. SCHWARTZ:  Thank you.

11    Q.    Was that three-and-a-half to four-foot wide table or

12    desk rather, was it butted up against that window?

13    A.    Yes.

14    Q.    That was a sectional you said; right?

15    A.    Yes.

16    Q.    Like an L-shape it went around to the wall, too?

17    A.    Yes.

18    Q.    So in order to be able to look out the window, you had

19    to stand behind the desk; is that right?

20    A.    Correct.

21    Q.    Unless you climbed up on the desk; is that right?

22    A.    Correct.

23    Q.    But back in 2005 when you stood behind or climbed on the

24    desk, you couldn't see out the window because it had plywood;

25    is that right?
```

1    A.    That's right.

2    Q.    Now, you worked at Desert Hot Springs as a dispatcher

3    and then a police officer from 1998 to 2006; is that right?

4    A.    Yes.

5    Q.    And you're very familiar with that Department; correct?

6    A.    Yes.

7    Q.    You're very familiar with how the Department was laid

8    out; is that correct?

9    A.    Yes.

10   Q.    And before you were a dispatcher, you were an explorer;

11   right?

12   A.    Not with Desert Hot Springs.

13   Q.    Different department?

14   A.    Yes.

15   Q.    Now, obviously, you're in custody; is that correct?

16   A.    Yes.

17   Q.    And the case you're in custody for had nothing to do

18   with being a police officer, did it?

19   A.    No.

20   Q.    Nothing to do with your work as a police officer, did

21   it?

22   A.    No.

23   Q.    Nothing to do with this case, did it?

24   A.    No.

25   Q.    Turning your attention to the other incident that was

1  discussed with you yesterday by counsel, do you recall back

2  in 2005 about a day after the incident with the arrestee,

3  there was a call for a driver who had rear-ended a school

4  bus?

5  A.   Yes.

6  Q.   And you responded to that call?

7  A.   Yes.

8  Q.   And one of the reasons you responded was because it was

9  a call of a school bus in a traffic collision; correct?

10 A.   Yes, correct.

11 Q.   There may have been kids involved?

12 A.   Correct.

13 Q.   At the time you were a school resource officer?

14 A.   That's correct.

15 Q.   But also at the time because there may have been kids

16 involved, you were responding just for the reason there may

17 be a need to have more than one officer there?

18 A.   That's correct.

19 Q.   And do you recall who dispatched that call?

20 A.   Andrea Heath.

21 Q.   And was Andrea Heath was she a dispatcher or police

22 officer back in 2005?

23 A.   She was a police officer.

24 Q.   Did she work a lot of dispatch, too?

25 A.   Yes.

```
 1   Q.   And did she work mostly dispatch even though she was a
 2   police officer back in 2005?
 3   A.   I believe so.
 4   Q.   And you know who Andrea Heath is; right?
 5   A.   Yes.
 6   Q.   And you worked with her for several years; right?
 7   A.   Yes.
 8   Q.   And so you have a specific recollection that she was the
 9   dispatcher; is that correct?
10   A.   Yes.
11   Q.   And did you actually go out to the call?
12   A.   Yes.
13   Q.   And were you there at the scene of the collision?
14   A.   Say again.
15   Q.   Were there at the scene of the collision?
16   A.   Yes.
17   Q.   And the handle officer for that call was Matthew
18   Gutting?
19   A.   I believe so.
20   Q.   Now, at the time of that call, Matthew Gutting was a
21   relatively new officer?
22   A.   Yes.
23   Q.   Still on probation if you know?
24   A.   I don't know.
25   Q.   And Andrea Heath was not at that scene at that call, was
```

1   she?

2   A.   No.

3   Q.   She was in dispatch to your knowledge; right?

4   A.   To my knowledge.

5   Q.   Because you heard her over dispatch dispatching the

6   call?

7   A.   Correct.

8   Q.   And you never saw her at the scene, did you?

9   A.   Not that I recall.

10   Q.   And the person who is involved in the traffic collision,

11   to your knowledge were they arrested for a DUI?

12   A.   Yes.

13   Q.   And we say DUI what is that term, that acronym?

14   A.   Driving under the influence.

15   Q.   Did you have an occasion to see that person arrested at

16   the scene?

17   A.   Yes.

18   Q.   And did she look intoxicated to you?

19   A.   Yes.

20   Q.   So intoxicated she couldn't do the field sobriety test

21   with the officer?

22          MS. CARTER:   Objection.   Vague as to time.

23          THE COURT:   Sustained.

24   BY MR. SCHWARTZ:

25   Q.   When you saw this woman at the scene of the traffic

1   collision, you were there with Matthew Gutting; is that

2   correct?

3   A.   Yes.

4           MS. CARTER:  Objection.  Misstates the evidence.

5           THE COURT:  Well, you may answer as he has.  Go

6   ahead.  Overruled.

7   BY MR. SCHWARTZ:

8   Q.   You were there with Matthew Gutting at the scene of the

9   traffic collision; correct?

10  A.   Yes.

11  Q.   And was there another officer there besides yourself and

12  Matthew Gutting?

13  A.   Not that I recall.

14  Q.   And were you there for the entire arrest at the scene of

15  the traffic collision or did you leave before Mr. Gutting was

16  done arresting the DUI driver?

17  A.   I don't recall.

18  Q.   Did you see Matthew Gutting conducting any field

19  sobriety tests on the driver?

20  A.   No, not that I recall.

21          MR. SCHWARTZ:  Your Honor, may I inquire of the

22  Court if Government's Exhibit 32 has been received into

23  evidence and published previously?

24          THE COURT:  It has.

25          MR. SCHWARTZ:  May I publish it to the witness?

1           THE COURT:  Yes.

2

3    BY MR. SCHWARTZ:

4    Q.    Look for No. 32 in that manilla folder.  Now, do you

5    have it in front of you?

6    A.    Yes.

7    Q.    Now, what's depicted based on your knowledge and

8    experience of the Desert Hot Springs Police Department in

9    this photograph?

10   A.    It's a picture of the booking bench and an open door

11   into the watch commander's office.

12   Q.    Now, looking in the watch commander's office, is this

13   the window you described before?

14   A.    Yes.

15   Q.    And across that window is there a desk?

16   A.    Yes.

17   Q.    Now, even though at the time in 2005 based on your

18   memory that window was boarded up, were you also there

19   working when that window was a mirrored window?

20   A.    No.

21           MR. SCHWARTZ:  Your Honor, may I inquire of the

22   Court if Government's Exhibit 34 has been published

23   previously and received.  If not --

24           THE COURT:  It has not.

25           MR. SCHWARTZ:  May I ask the witness to look at

1  Government's Exhibit No. 34?

2  Q.   And let me know, sir, when you have that in front of

3  you.

4  A.   Okay.

5  Q.   And you recognize what's in Government's Exhibit No. 34?

6  A.   Yes.

7  Q.   What is it?

8  A.   It's the doorway leading, leading out of the booking

9  area into the report writing room.

10          MR. SCHWARTZ:  May I publish that to the witness

11  and the jury, Your Honor?

12          THE COURT:  Well, it needs to be admitted first.

13          MR. SCHWARTZ:  May it be admitted, please?

14          THE COURT:  Yes, it is.

15              (Exhibit 34 was admitted.)

16  BY MR. SCHWARTZ:

17  Q.   Now, you said the doorway leading from the jail into the

18  report writing room.  And I'm going to point to several

19  things on the photograph if you can identify them for us.

20  This door?

21  A.   That was Sergeant Gill's office.

22  Q.   And was he in detectives at the time?

23  A.   Yes.

24  Q.   Would that be the detective's office then?

25  A.   Yes.

```
 1   Q.   And this doorway with the exit sign over it, what's that

 2   doorway leading to or from?

 3   A.   Leading from the jail.

 4   Q.   And so where this light switch is here, what room would

 5   that be?  Can you recall?

 6   A.   I would say it's in the booking area.

 7            MR. SCHWARTZ:  Your Honor, may I have the witness

 8   look at Exhibit No. 35?

 9            THE COURT:  Of course.

10   BY MR. SCHWARTZ:

11   Q.   Let me know, sir, when you've had a good chance to look

12   at it.

13   A.   Okay.

14   Q.   Now, what does that depict in 35?

15   A.   The hallway in between the booking area and the report

16   writing room.

17            MR. SCHWARTZ:  Your Honor, may I publish this to

18   the jury?

19            THE COURT:  It will be admitted and you may publish

20   it.

21                   (Exhibit 35 was admitted.)

22   BY MR. SCHWARTZ:

23   Q.   With my pen I'm pointing to a doorway.  What's in that

24   doorway?

25   A.   The detective's office.
```

1    Q.    That was Sergeant Gill's office at the time 2005?

2    A.    No, that was Detective Connolly's office.

3    Q.    And going down the hallway towards the exit sign, where

4    would that lead to?

5    A.    To the evidence room and to the report writing room.

6    Q.    And going down the hall away from the exit sign this

7    way, is that towards the jail?

8    A.    Yes.

9    Q.    Now, at the time you described in these incidents 2005,

10   did the Desert Hot Springs Police Department and jail share a

11   building with city hall?

12   A.    Yes.

13   Q.    And was there access within the Desert Hot Springs

14   Police Department to city hall offices?

15   A.    Yes.

16   Q.    And if a person were to walk through this door that

17   would lead to the jail which is down at the bottom of the

18   picture through this hallway, was there a way at that time

19   2005 for the person to get into city hall offices?

20   A.    Yes.

21   Q.    Now, did Desert Hot Springs Police Department back in

22   2005 also share the parking lot with city hall employees?

23   A.    Yes, they did.

24   Q.    As you described yesterday, those city hall employees

25   also had some kind of device to open up the gates; correct?

1    A.    Yes.

2    Q.    Remote control?

3              THE COURT:  Is that the question?

4              MR. SCHWARTZ:  Yes.  I'm sorry.

5    Q.    Had a remote control device; correct?

6    A.    Yes.

7              MR. SCHWARTZ:  If I can ask the witness,

8    Your Honor, please look at Exhibit No. 36.

9              THE COURT:  Go right ahead.

10   BY MR. SCHWARTZ:

11   Q.    Let me know, sir, when you had a good chance to look at

12   it.

13   A.    Okay.

14   Q.    And what's depicted in Government Exhibit No. 36?

15   A.    That's the door leading out to the hallway to city hall.

16             MR. SCHWARTZ:  Your Honor, may I publish No. 36 to

17   the jury, please?

18             THE COURT:  It will be received and you may

19   publish.

20                  (Exhibit 36 was admitted.)

21             MR. SCHWARTZ:  Thank you.

22   Q.    Now, the door I'm pointing to in the photograph, what

23   does that lead to?

24   A.    Leads to the hallway that lead to city hall offices.

25   Q.    And going away from the door down the hallway, where did

1    that go?

2    A.    It would go toward the booking area, the jail.

3    Q.    And this doorway with the room next to it over it here,

4    what was that room?

5    A.    The report writing room.

6    Q.    Now, back in 2005, was the watch commander's office with

7    that window that was boarded up, was that also used as a

8    report writing room?

9    A.    No.

10   Q.    Was there a separate report writing room?

11   A.    Yes.

12          MR. SCHWARTZ:  Your Honor, may I have the witness

13   look at Exhibit No. 37?

14          THE COURT:  Go right ahead.

15          THE WITNESS:  Okay.

16   BY MR. SCHWARTZ:

17   Q.    What is depicted in 37?

18   A.    It appears to be a report writing room.

19   Q.    And do you recognize that as what the report writing

20   room back in 2005?

21   A.    Yes.

22          MR. SCHWARTZ:  Your Honor, may I publish this to

23   the jury and have it be admitted?

24          THE COURT:  It will be admitted and you may publish

25   it.

```
 1                  (Exhibit 37 was admitted.)

 2             MR. SCHWARTZ:  Thank you.

 3    Q.   And I'm pointing my pen to the sign on the door.  It

 4    says report room?

 5    A.   Yes.

 6    Q.   And inside that doorway were there computers, we can't

 7    see them here, but were there computers inside that room?

 8    A.   Yes.

 9    Q.   And were those computers to be utilized by officers in

10    the Desert Hot Springs Police Department to work on reports?

11    A.   Yes.

12    Q.   Now, was this the same room that was used for dispatch

13    at the time?

14    A.   No.

15    Q.   Was there a different room for dispatch?

16    A.   Yes.

17    Q.   Was that room further down the hallway?

18    A.   Yes.

19    Q.   Now, from the report room or report writing room, was

20    there any way to see inside the booking area or the jail?

21    A.   No.

22    Q.   There were no windows, no corridors leading to the jail;

23    correct?

24    A.   No.

25             THE COURT:  You're asking if that's correct and he
```

```
 1  said no.
 2          MR. SCHWARTZ:  Rephrase the question.  Thank you,
 3  Your Honor.
 4  Q.   There were no windows leading from the report room into
 5  the booking area; is that correct?
 6  A.   That's correct.
 7  Q.   And there were no monitors in the report room where a
 8  person sitting there can monitor the booking area; is that
 9  correct?
10  A.   Correct.
11  Q.   Now, going back to the second incident that was
12  discussed with the DUI arrestee that rear ended the school
13  bus, after you left the scene of that arrest, you were still
14  on patrol; is that correct?
15  A.   Yes.
16  Q.   You still were subject to answer calls; is that right?
17  A.   Yes.
18  Q.   Now, when you worked patrol at Desert Hot Springs Police
19  Department was it a busy station?
20  A.   Yes, it was.
21  Q.   And the officers would go from call to call to call?
22  A.   Correct.
23  Q.   Was it common for officers to have 20 to 30 calls a
24  night?
25  A.   Yes.
```

```
 1   Q.   Even more than that at times?

 2   A.   At times.

 3   Q.   And was it common for officers to be very behind on

 4   their reports?

 5   A.   Yes.

 6   Q.   They had so many calls?

 7   A.   Correct.

 8   Q.   Sometimes a day behind?

 9   A.   That's correct.

10   Q.   Sometimes even longer than that depending on how busy

11   they were?

12   A.   Yes.

13   Q.   Was it common for officers to have -- be behind even 50

14   reports in a given week?

15   A.   Yes.

16           MS. CARTER:  Objection.  Calls for speculation.

17           THE COURT:  Well, it's overruled.  The answer will

18   stand.

19   BY MR. SCHWARTZ:

20   Q.   Now, back in February of 2005, the second incident, you

21   said that you first saw the arrestee in the station.  She was

22   lying on her stomach on the floor?

23   A.   Yes.

24   Q.   And she was handcuffed behind her back?

25   A.   That's correct.
```

1  Q.   And you had seen signs that she had been tased; is that
2  right?
3  A.   Yes.
4  Q.   You said you saw the darts and the wires?
5  A.   Correct.
6  Q.   Now, were you there for the tasing at all?
7  A.   No.
8  Q.   And did you take part in the tasing of Ms. Vargas, the
9  arrestee?
10  A.   No.
11  Q.   Did you at any time while in that booking area of the
12  station kick Ms. Vargas?
13  A.   No.
14  Q.   At any time call her names?
15  A.   No.
16  Q.   Any time taunt her with a taser?
17  A.   Not that I recall.
18  Q.   Any time threaten her with a taser?
19  A.   No.
20  Q.   You have a white binder in front of you, sir.
21  A.   Yes.
22        MR. SCHWARTZ:  Your Honor, may I ask the witness to
23  turn inside the white binder to Exhibit 206 and it was Bates
24  Stamped on the bottom right 000-305.
25        THE COURT:  Certainly.

 1            MR. SCHWARTZ:  Let me know, sir, when you have that

 2   page?

 3   A.    Okay.

 4   Q.    Do you recognize what that is?

 5   A.    It's a CAD incident report.

 6            THE COURT:  Excuse me a minute.  What exhibit was

 7   that again?

 8            MR. SCHWARTZ:  Exhibit 206 Bates stamp 305.

 9            THE COURT:  Thank you.

10            MS. CARTER:  Your Honor, this exhibit is 95 pages

11   long.

12            THE COURT:  What's the objection?

13            MS. CARTER:  The objection is foundation.  Sounds

14   like defense counsel is just asking him about one page.  I'm

15   not sure I follow that this witness has foundation about this

16   document.

17            THE COURT:  About the page that's been asked about?

18            MS. CARTER:  Well, I believe this document is not

19   in evidence.

20            THE COURT:  No, it's not.  We're dealing with one

21   page; is that right, Mr. Schwartz?

22            MR. SCHWARTZ:  At the moment, yes, Your Honor.

23            THE COURT:  Do you want to lay a foundation with

24   regard to that one page?

25            MR. SCHWARTZ:  That's fine, Your Honor.

1    Q.   Do you notice that it seems to resemble what is called a

2    CAD incident report; is that right?

3    A.   Yes.

4    Q.   Are you familiar with CAD incident reports?

5    A.   Yes.

6    Q.   How so?

7    A.   From working in dispatch and working in the police

8    department.

9    Q.   And how long were you a dispatcher at Desert Hot Springs

10   Police Department?

11   A.   Several years.

12   Q.   And in those several years as a dispatcher, did you have

13   a good chance to see what we have called CAD incident

14   reports?

15   A.   Yes.

16   Q.   And how were those reports made, the papers you are

17   looking at.  How was that made in the course of business?

18   A.   It's inputted by the dispatcher into the computer and

19   the computer generates the CAD incident report.

20   Q.   And is that called a RIM system?

21   A.   I believe so.

22   Q.   And when you were a dispatcher, would you input

23   information on a given call that you received into the

24   system?

25   A.   Yes.

1   Q.   And you would also input the information of what

2   happened on that call into the system?

3   A.   Yes.

4   Q.   And at some point when the call was finished in some

5   form or another, you would input that as well?

6   A.   Correct.

7   Q.   Now, the paper you're looking at, does that resemble an

8   accurate depiction of a printout of what a CAD report would

9   be?

10              MS. CARTER:  Objection to the word accurate.

11              THE COURT:  Sustained.  Do you need some time?

12              MS. CARTER:  May I confer with counsel?

13              THE COURT:  Yes, you may.

14              All right.  We're back on the record.

15              MR. SCHWARTZ:  Your Honor, at this time I ask leave

16   of the Court to read a stipulation into the record by the

17   parties.

18              THE COURT:  Go right ahead.

19              MR. SCHWARTZ:  Defendant Anthony Sclafani and the

20   United States of America hereby stipulate and agree that

21   following documents were obtained from the Desert Hot Springs

22   Police Department and are records that:

23              1.  Were kept in the course of a regularly

24   conducted business activity.

25              2.  Were made at or near the time of the matter

1   recorded in them.

2          3.  Were made by or from information transmitted by

3   a person with knowledge.

4          4.  Were made in the regular practice of that

5   business activity to make that statement of memorandum, court

6   record of data compilation.

7          And five are the original or duplicate of the

8   records.

9          And specific No. 3, the DHS PD CAD incident report

10  05022-4001 to 05022-4105 regarding call takers Kayla

11  Kittridge, Carol Firestone and Andrea Heath, Exhibit 205.

12         And No. 4 DHS PD CAD incident report 05022-5001,

13  05022-547, 05022-5049, 05022-5088 regarding call takers Kayla

14  Kittridge, Ty Viamona, Carol Firestone and Andrea Heath.

15  Defense Exhibit 206.

16         THE COURT:  Ms. Carter?

17         MS. CARTER:  Your Honor, the government has entered

18  into the stipulation regarding those foundational matters.

19  However, the government objects to this exhibit based on the

20  fact that defendant hasn't established the relevance all of

21  the pages in it or this witness's personal knowledge of this

22  report.

23         THE COURT:  Stipulation will be received.

24         With regard to the objection, it's overruled at

25  this time.

1          MR. SCHWARTZ:  Thank you, Your Honor.

2    Q.   The page in front of you which is under Bates stamp at

3    the bottom, if you could just reference 0305?

4    A.   Yes.

5    Q.   Now, you just testified that you were not present or did

6    not take any part in kicking Ms. Vargas; is that correct?

7    A.   Correct.

8    Q.   And you never tased Ms. Vargas; is that correct?

9    A.   Correct.

10   Q.   And do you recall where you were on February 26th

11   between 6:02, 13 hours in the evening and 6:35, 18 hours in

12   the evening?

13          MS. CARTER:  Objection.  Relevance.

14          THE COURT:  Sustained.

15   BY MR. SCHWARTZ:

16   Q.   The document in front of you, you have noted is what you

17   see as a CAD incident; is that right?

18   A.   Yes.

19   Q.   And would that report have information regarding --

20   strike that.

21          Do you see on that document in front of you

22   underneath it says unit time.  Do you see that line?

23   A.   Yes.

24          MS. CARTER:  Objection.

25          THE COURT:  What's your objection?

```
 1          MS. CARTER:  I'll withdraw it for now.  I'm sorry.

 2

 3   BY MR. SCHWARTZ:

 4   Q.   And it says Unit 204; is that right?

 5          MS. CARTER:  Objection.  Your Honor, I believe

 6   counsel is reading from the document that is not in evidence.

 7          THE COURT:  I have received that portion.

 8          MS. CARTER:  I'm sorry, Your Honor.  Which portion

 9   has been received?

10          THE COURT:  03 to 05.  You may continue.

11          MR. SCHWARTZ:  Thank you, Your Honor.

12          May I publish it to the jury now, Your Honor?

13          THE COURT:  You may.

14   BY MR. SCHWARTZ:

15   Q.   Do you see where it says unit times 204?

16   A.   Yes.

17   Q.   And next to it says Dennis Decker?

18   A.   Yes.

19   Q.   Actually, it's Decker, Dennis.  You see that?

20   A.   Yes.

21   Q.   And would that have been your unit number on that date?

22   A.   Yes.

23   Q.   And next to where it says Decker, Dennis, it says

24   dispatch.  Do you see that?

25   A.   Yes.
```

```
1    Q.   And it says 18:09:10.  Do you see that?

2    A.   Yes.

3    Q.   Now, for the layperson, would that 6:09 and ten seconds

4    of the evening?

5    A.   Yes, it would.

6    Q.   And then it says en route.  Do you see that?

7    A.   Yes.

8    Q.   And for it says a time of 18:09:10.  Do you see that?

9    A.   Yes.

10   Q.   And for a layperson would that be 6:09 and ten seconds

11   in the evening?

12   A.   Yes.

13   Q.   And next to that it says on scene.  Do you see that?

14   A.   Yes.

15   Q.   And that's got a time of 16 -- 18:16:30.  You see that?

16   A.   Yes.

17   Q.   Now, where it says on scene, how did the information of

18   that time get on to a CAD report?

19   A.   The dispatcher would have to input it.

20   Q.   And does this report have on it who the dispatcher was?

21   A.   Yes.

22   Q.   And who was that?

23   A.   Andrea Heath.

24   Q.   Now, it says call taker and it says Heath, Andrea.  You

25   see that?
```

```
 1    A.    Yes.

 2    Q.    Now, based on your experience as a dispatcher in the

 3    system itself, would a dispatcher have to put their name onto

 4    every call they dispatched?  How does it work?

 5              THE COURT:  Well, you have two questions.

 6              MR. SCHWARTZ:  Strike that.

 7    Q.    First question is would a dispatcher have to physically

 8    enter in their name on every call they received as a

 9    dispatcher?

10    A.    No.

11    Q.    And when would that name be inputted on the calls they

12    received?

13    A.    They would have to put in their password which would

14    automatically bring their name up to the document.

15    Q.    And you said put in their password.  Did each dispatcher

16    have their own password?

17    A.    Yes.

18    Q.    And was it common for a dispatcher to use other

19    dispatcher's passwords?

20    A.    Yes.

21    Q.    So they would use each other's passwords?

22    A.    There were times, yes.

23    Q.    Where it says dispatcher, does that mean that the call

24    was actually dispatched?

25    A.    I believe so.
```

1   Q.   And it says Heath, Andrea?

2   A.   Yes.

3   Q.   And when the person dispatched the call, the dispatcher

4   at that time, did they have to physically enter in their ID

5   or their password?

6   A.   No.

7   Q.   That also pop up automatically?

8   A.   Yes.

9        THE COURT:  Mr. Decker, have you testified that

10  each dispatcher had his or her own password?

11       THE WITNESS:  Yes, sir.

12       THE COURT:  Did you further testify that sometimes

13  they would use other passwords?

14       THE WITNESS:  Can I clarify?

15       THE COURT:  Yes.  I would like some clarification

16  for the jury.

17       THE WITNESS:  If the dispatcher was logged on and

18  leave the room and another officer would come in there to

19  relieve the dispatcher, it would not be uncommon for that

20  dispatcher to leave their password in there for the officer

21  to input.  So he would be using someone else's password, but

22  it would just be because of being left on the computer so

23  they could work.

24       THE COURT:  Thank you.  Go ahead.

25       MR. SCHWARTZ:  Thank you, Your Honor.

Q.   And based on your last question and answer, sir, at
times when an officer would relief the dispatcher, they would
utilize that dispatcher's password; correct?

A.   Yes.

Q.   Because it's already on the computer; is that right?

A.   Yes.

Q.   But if somebody was coming on to be the new dispatcher
on a shift, so the shift was switching and a brand new
dispatcher, they would normally enter in their own password,
wouldn't they?

          MS. CARTER:  Objection.  Calls for speculation.

          THE COURT:  Overruled.  You may answer if you have
knowledge.

          THE WITNESS:  I believe so.

BY MR. SCHWARTZ:

Q.   So the example when the Court asked you the question
about an officer coming in to relieve the dispatcher that was
not an officer who would be serving as the dispatcher for the
entire shift, that was strictly the convenience of having to
just leave a dispatcher for a moment?

          MS. CARTER:  Objection.  Calls for speculation.

          THE COURT:  Overruled.  Again, if you have
knowledge, you may answer.

          THE WITNESS:  I believe so.

BY MR. SCHWARTZ:

1  Q.   Sometimes the dispatcher had to leave the room for

2  whatever reason?

3  A.   Yes.

4  Q.   For brief periods of time?

5  A.   Yes.

6  Q.   Go to the bathroom?

7  A.   Yes.

8  Q.   Maybe serve other functions in the department for a

9  moment?

10 A.   Yes.

11 Q.   Maybe even answer a desk call?

12 A.   Yes.

13 Q.   Now, looking at this CAD report, you see a date on this

14 report.  I'm putting my finger of when this report, this

15 dispatch or this incident was that's depicted in the CAD

16 report?

17 A.   Yes.

18 Q.   Would that be right here where I'm pointing?

19 A.   Correct.

20 Q.   Incident comments says 415.  Tell us what that means?

21 A.   It's a disturbance.

22 Q.   Now, underneath under time, the first time says 18:02:13

23 and then there is an event depicted.  What would that

24 represent on the CAD report?

25 A.   The time that the call was received by the dispatcher.

1    Q.   And 18:09:10 seconds also has an event in the event

2    column.  What would that show?

3    A.   That would show the officer that the dispatcher

4    dispatched to answer that call.

5    Q.   And at 18:16:30 seconds, there is also an event listed

6    in the event column.  What would that show?

7    A.   That would show the time the officer arrived on the

8    scene.

9    Q.   And next to the 204, that represents the officer;

10   correct?

11   A.   Correct.

12   Q.   Which was you at that time?

13   A.   Yes.

14   Q.   And the 1097 what does that mean?

15   A.   On scene.

16   Q.   And at 18:35:18 which is the fourth time, what does that

17   represent?

18   A.   That would be the officer's disposition on the call.

19   Q.   And can you tell that by looking in the event column?

20   A.   Yes.

21   Q.   And 18:35:18, the fifth item listed for that time, what

22   does that depict?

23   A.   That the call was closed.

24   Q.   Now, under Item No. 2 at 18:09:10 68180 Calle Blanco

25   Desert Hot Springs, do you know what that location is?

```
 1    A.    Not offhand.

 2    Q.    It's not the address for the Department; right?

 3    A.    No.

 4    Q.    Counsel asked you yesterday, showed you some case

 5    audits.  Do you recall that?

 6    A.    Yes.

 7    Q.    And showed one of the case audits with some changes

 8    done, Matthew Gutting's case audit.  Do you recall that?

 9    A.    Yes.

10    Q.    And counsel asked you if you recall, that you hadn't

11    seen changes like that before; is that correct?

12    A.    Correct.

13    Q.    Now, in your experience was it common for you to review

14    other officers' case audits?

15    A.    No.

16    Q.    You reviewed maybe your own; correct?

17    A.    To my knowledge the officers couldn't review a case

18    audit at all.

19    Q.    Once you entered the information, you didn't see it

20    after that?

21    A.    Well, a case audit was only accessible by a supervisor.

22    Q.    So when you testified yesterday that you had never seen

23    those kinds of changes, you have no experience to see those

24    changes, would you?

25    A.    Not on that document, no.
```

1    Q.    Basically, your own experience you haven't made changes;

2    is that is correct, the type you saw on this document?

3    A.    Correct.

4    Q.    You also testified yesterday that you had a conversation

5    with Matthew Gutting after these events with Ms. Vargas, the

6    driver of the DUI car; is that correct?

7    A.    Yes.

8    Q.    And he related to you that somehow the photographs had

9    gotten erased?

10   A.    Yes.

11   Q.    He also told you in that same conversation that he was

12   afraid because he had done the same thing on a different case

13   file by mistake; right?

14   A.    No.

15   Q.    Never said that?

16   A.    No.

17   Q.    Do you recall being interviewed in this case back in

18   2007 by the FBI?

19   A.    Vaguely.

20   Q.    It was a while ago; correct?

21   A.    Yes.

22   Q.    And when you were interviewed by the FBI as you have

23   done yesterday and today, you were as honest as you could;

24   correct?

25   A.    Correct.

```
 1    Q.   And if you didn't recall something, you would have
 2    responded to their question saying I don't recall just like
 3    you yesterday and today; correct?
 4    A.   Yes.
 5    Q.   But if you did recall something, that was your memory;
 6    is that right?
 7    A.   Correct.
 8    Q.   Do you recall telling the FBI agents back in 2007 that
 9    Matthew Gutting related to you that he was worried about the
10    lost photographs in the Vargas case and another case?
11    A.   I don't recall.
12    Q.   Now, did you talk to either my client or Matthew Gutting
13    after the incident about the incident?
14    A.   Yes.
15    Q.   You spoke to Matthew Gutting; correct?
16    A.   Yes.
17    Q.   And he was laughing when he spoke to you?
18    A.   Correct.
19    Q.   He said how funny it was to watch my client kick
20    Ms. Vargas into the parking lot?
21              MS. CARTER:  Objection.  Hearsay.
22              THE COURT:  That's hearsay.  Sustained.
23              MS. CARTER:  And I move to strike the question.
24              THE COURT:  Question and any partial answer will be
25    stricken.
```

UNITED STATES DISTRICT COURT

1    BY MR. SCHWARTZ:

2    Q.   Just a moment ago, you testified that you did not recall

3    telling the FBI that Matthew Gutting was worried about losing

4    the photographs in the Vargas case and another case.  Do you

5    recall that?

6    A.   I don't recall that.

7    Q.   Would it refresh your memory to see the FBI report of

8    your comments?

9    A.   Possibly.

10         MR. SCHWARTZ:  May counsel have the report shown to

11   the witness, please?

12         THE COURT:  Would you show it to the government

13   first and then to the clerk.

14         MS. CARTER:  May we have a moment, Your Honor?

15         THE COURT:  You may.  Just be at ease, ladies and

16   gentlemen.  Bring it to the clerk.

17         MR. SCHWARTZ:  Thank you, Your Honor.

18         If you can please read, sir, the part on that that

19   has brackets around it and underlined.  If you need to read

20   anything else for context, that's also fine.

21         THE COURT:  That's a report, FBI report dated when?

22         MR. SCHWARTZ:  The report is dated August 27th,

23   2007, Your Honor, and the contact date was August 24, 2007.

24         THE COURT:  All right.  He has read it.

25   BY MR. SCHWARTZ:

```
 1   Q.   Does that refresh your memory of telling the FBI back in
 2   2007 that Matthew Gutting was worried about losing the
 3   photographs in that case and in another case?
 4   A.   No.
 5   Q.   Doesn't refresh your memory?
 6   A.   No, sir.
 7   Q.   So you have no recollection one way or the other of what
 8   you said?
 9   A.   Not as far as the -- it says another case.  I don't
10   recall that.
11   Q.   Now, when you did interview for the FBI back in 2007,
12   the events were fresh in your mind; correct?
13   A.   Not -- I don't recall if they were fresh in my mind then
14   or not.
15   Q.   More fresh in your mind then they would be today?
16           MS. CARTER:  Objection.  Asked and answered.
17           THE COURT:  Sustained.
18   BY MR. SCHWARTZ:
19   Q.   You also testified yesterday that given Ms. Vargas'
20   build, you felt she would not be able to hop or jump over
21   that wall in the parking lot; correct?
22   A.   Correct.
23   Q.   To your knowledge when you worked there nobody escaped
24   Desert Hot Springs Police Department jail; is that right?
25   A.   Correct.
```

Q.   Now, you also testified it was common for officers to

leave their cars running in the parking lot?

          MS. CARTER:  Objection.  Misstates the testimony.

          THE COURT:  Sustained.

BY MR. SCHWARTZ:

Q.   You testified yesterday that officers would leave their

cars running in the parking lot?

          MS. CARTER:  Objection.  Misstates the testimony.

          THE COURT:  It's overruled.  He is asking.

          THE WITNESS:  The question again, please.

BY MR. SCHWARTZ:

Q.   Based on your experience in Desert Hot Springs, would

officers sometimes leave their cars running in the parking

lot when they went into the jail?

A.   Sometimes.

Q.   And they would leave their doors unlocked; correct?

A.   Sometimes.

Q.   And the parking lot for Desert Hot Springs Police

Department at that time shared a common lot with city hall

employees; is that right?

A.   Correct.

Q.   And although there was a remote control to open and

close the gates, the city hall employees also had the same

remote control; is that right?

A.   Yes.

```
1    Q.   And if you're standing inside the jail, there would be

2    no way to know if a city hall employee was opening or closing

3    that gate, would there?

4    A.   No.

5    Q.   And in this case based on your training and experience

6    as a Desert Hot Springs police officer, would it be allowable

7    for an arrestee to by herself go into that parking lot while

8    still under arrest and in custody?

9            MS. CARTER:  Objection.  Vague.  Incomplete

10   hypothetical.

11           THE COURT:  Well, do you understand the question?

12           THE WITNESS:  No.

13           THE COURT:  Sustained.

14   BY MR. SCHWARTZ:

15   Q.   You described yesterday that to your knowledge nobody

16   ever escaped from Desert Hot Springs Police Department; is

17   that right?

18   A.   Correct.

19   Q.   Now, you also described yesterday in the photographs

20   there was a door from the jail area, the booking area outside

21   into the parking lot; correct?

22   A.   Yes.

23   Q.   And while you've had an arrestee in custody as a Desert

24   Hot Springs police officer, to your knowledge for policy

25   would you be allowed to have that arrestee go out by
```

```
 1    themselves unattended into the parking lot?
 2    A.    No.
 3    Q.    Now, if that arrestee was in your custody and they were
 4    running out into the parking lot, would that also present a
 5    problem for policy?
 6              MS. CARTER:  Objection.  Vague.  Calls for
 7    speculation.
 8              THE COURT:  Sustained.
 9    BY MR. SCHWARTZ:
10    Q.    Now, as a Desert Hot Springs police officer, when you
11    had an arrestee in your custody, were you responsible for
12    that arrestee's well-being?
13    A.    Yes.
14              MS. CARTER:  Objection.  Vague.
15              THE COURT:  Well, you can rephrase it.
16    BY MR. SCHWARTZ:
17    Q.    When you were a Desert Hot Springs police officer, you
18    made arrests?
19    A.    Correct.
20    Q.    And during those arrests, there were times you would
21    take somebody down to the station; is that right?
22    A.    Correct.
23    Q.    And you would book them; correct?
24    A.    Yes.
25    Q.    And they would be considered in your custody; is that
```

1    right?

2    A.    Yes.

3    Q.    And while they were in your custody, you had to make

4    sure they didn't hurt themselves; is that right?

5    A.    Yes.

6    Q.    And make sure they didn't hurt anybody else; is that

7    right?

8    A.    Yes.

9    Q.    And while you were standing, as a Desert Hot Springs

10   police officer, if you were standing in the booking area,

11   would you have any knowledge of if any city hall employees

12   would be outside in the parking lot?

13         MS. CARTER:  Objection.  Vague and calls for

14   speculation.

15         THE COURT:  No, it's overruled.  You may answer.

16         THE WITNESS:  No, you wouldn't.

17         MR. SCHWARTZ:  May I have just a moment, please

18   Your Honor?

19         THE COURT:  Of course.

20   BY MR. SCHWARTZ:

21   Q.    In this case, Mr. Decker, you were interviewed by the

22   FBI a number of times; is that right?

23   A.    Yes.

24   Q.    Even as recently as last week; is that right?

25   A.    Correct.

```
 1   Q.    Twice last week; is that correct?

 2   A.    Correct.

 3   Q.    Also the past November back in 2011?

 4   A.    Yes.

 5   Q.    And previous to that at least several times?

 6   A.    Yes.

 7              MR. SCHWARTZ:  Nothing further at this time,

 8   Your Honor.

 9              THE COURT:  Redirect at this time.

10              MS. CARTER:  Thank you, Your Honor.

11                       REDIRECT EXAMINATION

12   BY MS. CARTER:

13   Q.    Mr. Decker, on cross-examination defense counsel asked

14   you about how the terms meat eaters and lettuce eaters got

15   started.  Do you recall?

16   A.    Yes.

17   Q.    And he asked you whether it might have been in

18   connection with a burglary suspect who got away from some of

19   the lettuce eaters and were later found by two of the meat

20   eater officers.  Do you recall that?

21   A.    Yes.

22   Q.    Do you recall who the officers were that found the

23   burglary suspect?

24   A.    Sergeant Gil and Lieutenant Henderson.

25   Q.    And did you later learn where they had found him?
```

```
 1    A.   Yes.

 2    Q.   Where did they find him?

 3    A.   Under a wheelbarrow in the backyard of a nearby

 4    residence.

 5    Q.   Do you recall either of those officers bragging to you

 6    about kicking the person when they found him?

 7              MR. SCHWARTZ:  Objection.  Hearsay.

 8              THE COURT:  It's overruled.  You may answer.

 9              THE WITNESS:  Yes.

10    BY MS. CARTER:

11    Q.   Do you recall either of those persons bragging to you

12    about kicking the wheelbarrow or dropping the wheelbarrow on

13    the person when they found them?

14    A.   Yes.

15    Q.   When they were bragging to you about kicking the

16    burglary suspect, about hitting him and dropping a

17    wheelbarrow on him, did they articulate anything that seemed

18    to you to be a legitimate law enforcement reason for either

19    kicking the burglary suspect or hitting him or dropping a

20    wheelbarrow on him?

21              MR. SCHWARTZ:  Objection.  Relevancy and hearsay.

22              THE COURT:  Well, it's compound, but you may

23    rephrase it.

24    BY MS. CARTER:

25    Q.   Do you recall when these officers were bragging to you
```

1    about what they had done to the burglary suspect whether they

2    had articulated any legitimate law enforcement reason for

3    kicking the person?

4    A.    No.

5    Q.    Do you recall them articulating any legitimate law

6    enforcement reason for kicking the wheelbarrow that he was

7    hiding under?

8    A.    No.

9    Q.    Do you recall them articulating any legitimate law

10   enforcement reason for hitting the person with the

11   wheelbarrow?

12   A.    No.

13   Q.    Now, on direct examination you talked about after the

14   first tasing by the defendant of the black male arrestee when

15   defendant tased him in the drive stun mode that the arrestee

16   convulsed and rolled on the ground in pain.  Do you recall

17   that?

18   A.    Yes.

19   Q.    And then on cross-examination, defense counsel asked you

20   whether after that first tasing by the defendant of the black

21   male arrestee in the drive stun, whether the arrest was

22   thrashing and kicking on the ground.  Do you recall that?

23   A.    Yes.

24   Q.    Can you describe for the jury what the black male

25   arrestee was doing on the ground after this defendant tased

1    him in the drive stun mode?

2    A.   He was thrashing his body back and forth complaining and

3    moaning and moving around on the floor.

4    Q.   Was he kicking?

5    A.   I don't know that was actually kicking, but his legs

6    were moving.

7    Q.   Did he appear to be kicking at any of the officers

8    present in the room?

9    A.   Not that I recall.

10   Q.   Did you perceive any risk or danger to Defendant

11   Sclafani at that time?

12           MR. SCHWARTZ:  Objection.  Speculation.

13           THE COURT:  Sustained.

14   BY MS. CARTER:

15   Q.   Based on your training and experience, did you perceive

16   any risk or danger to Defendant Sclafani at that time based

17   on what the black male arrestee was doing on the floor after

18   he was drive stunned by the defendant?

19           MR. SCHWARTZ:  Objection.  Speculation.

20           THE COURT:  Overruled.  You may answer.

21           THE WITNESS:  Not that I recall.

22   BY MS. CARTER:

23   Q.   If you had perceived that, or if Officer Drew had

24   perceived that, what would your training and experience have

25   indicated that you or Officer Drew would have done?

1          THE COURT:  Well, you're gonna have to change that

2     with regard to Officer Drew.

3          MS. CARTER:  Yes, Your Honor.

4     Q.   If you had perceived any risk or danger to Defendant

5     Sclafani at that time, would you have intervened?

6     A.   Yes.

7     Q.   Based on your training and experience that you have

8     received as a Desert Hot Springs police officer, would you

9     have expected Officer Drew to intervene if there was any risk

10    or danger?

11    A.   Yes.

12         MR. SCHWARTZ:  Objection.  Speculation.

13         THE COURT:  It's overruled.  The answer will stand.

14    BY MS. CARTER:

15    Q.   Now, we have just been talking about the first or when

16    the first time you saw defendant tased, the black male

17    arrestee in the drive stun mode.

18         And now I want to direct your attention to the

19    second time that you saw defendant tase the black male

20    arrestee with the darts.  Do you recall what I'm talking

21    about?

22    A.   Yes.

23    Q.   After that second tasing using the darts, was the black

24    male arrestee moving on the ground?

25    A.   Yes.

```
 1    Q.   Was there more motion the second time that defendant
 2    tased the black male arrestee or the first time?
 3    A.   The second time.
 4    Q.   Was it after the first tasing or the second tasing that
 5    the defendant ordered you and Mr. Drew to go into the
 6    arrestee, pick him up and put him on the bench?
 7    A.   The second one.
 8    Q.   And did you lean closer to the arrestee after the second
 9    tasing when you helped him get back on the bench?
10    A.   Yes.
11    Q.   Did the arrestee make any move to kick you, Officer Drew
12    or the defendant at that time?
13    A.   No.
14    Q.   Did you perceive any risk or danger based on your
15    training and experience that the black male arrestee was
16    going to kick you, Officer Drew or the defendant at that
17    time?
18    A.   Not that I recall.
19    Q.   When defendant told you to get him up after that second
20    tasing, did the defendant express any concern that you,
21    Officer Drew or the defendant might get kicked by the
22    arrestee?
23    A.   Not that I recall.
24    Q.   Would you have pick up the arrestee if he were kicking
25    in a way that you thought he could kick you?
```

1    A.    No, probably not.

2    Q.    Did he resist -- did the black male arrestee resist you

3    in any way when you did move in closer to pick him up?

4    A.    No.

5    Q.    Now, we have talked about defendant, you and an Officer

6    Drew being present when defendant tased the black male

7    arrestee.  Were there other officers in the jail at that

8    time?

9    A.    None that I recall.

10   Q.    Do you recall people in the station at that time?

11   A.    No, just the dispatcher.

12   Q.    Could you see from the booking area whether there were

13   other officers in the dispatch area or the report room?

14   A.    You could see if you were looking.

15   Q.    But if you were in the booking area at the jail door

16   which is where you were, could you see everybody who was in

17   the station?

18   A.    No.

19   Q.    Based on your training and experience, Mr. Decker, do

20   you recall whether any officers were coming and going and

21   possibly in and out of the area during the time that the

22   defendant tased the black male arrestee?

23   A.    No, I don't recall.

24   Q.    Did the arrestee, based on your training and experience,

25   if an arrestee had tried to kick out the windows of your

56

```
 1    police car on the way to the jail, would you have just sat

 2    him on the bench by the jail door when you arrived in the

 3    booking area and walk away?

 4                MR. SCHWARTZ:  Objection.  Lack of foundation.

 5                THE COURT:  Sustained.

 6    BY MS. CARTER:

 7    Q.   Mr. Decker, does your training and experience include

 8    what to do in transporting arrestees to the jail?

 9    A.   Yes.

10    Q.   How many arrestees have you transported to the jail in

11    the course of your time as a law enforcement officer?

12    A.   Many.

13    Q.   Have you ever had an arrestee try to kick out the

14    windows of your police car on the way?

15    A.   Yes.

16    Q.   Based on that training and experience, Mr. Decker, if an

17    arrestee had been trying to kick out the windows of your

18    police car on the way to jail, when you got to the jail,

19    would you have just sat him on the bench near the jail door?

20                MR. SCHWARTZ:  Objection.

21    BY MS. CARTER:

22    Q.   And then just walk away?

23                MR. SCHWARTZ:  Objection.  Improper hypothetical

24    and also foundation.

25                THE COURT:  Sustained.
```

1  BY MS. CARTER:

2  Q.   When you arrived at the station the night that the black

3  male arrestee was tased by Defendant Sclafani, you testified

4  that he was sitting on the bench in handcuffs but not

5  handcuffed to the bench; is that correct?

6  A.   Correct.

7  Q.   Based on your training and experience is that what you

8  would do with someone who had been trying to kick out the

9  windows of your police car on the way to station?  Would you

10  leave them handcuffed sitting on the bench, but not

11  handcuffed to the bench?

12           MR. SCHWARTZ:  Objection.  Improper hypothetical.

13  Lack of foundation.

14           THE COURT:  Well, it's overruled.  Do you

15  understand the question?

16           THE WITNESS:  Yes.

17           THE COURT:  You may answer it.

18           THE WITNESS:  It would depend on the individual's

19  demeanor after the -- coming into the station.

20  BY MS. CARTER:

21  Q.   If the individual had both kicked out the windows of

22  your police car and then mouthed off when they got to the

23  station, would you have left them just sitting on the bench

24  handcuffed and walked away?

25           MR. SCHWARTZ:  Objection.  Improper hypothetical.

```
 1   Speculation.
 2              THE COURT:  Overruled.  You may answer it.
 3              THE WITNESS:  No.
 4   BY MS. CARTER:
 5   Q.   On cross-examination defense asked you a lot about
 6   furniture in the booking area where the black male arrestee
 7   had fallen to the floor after defendant had tased him in
 8   drive stun mode.  Do you recall that?
 9   A.   Yes.
10   Q.   Based on your training and experience, was there a
11   danger or risk that night that either the arrestee or the
12   defendant would knock into any of the corners of the items of
13   furniture?
14              MR. SCHWARTZ:  Objection.  Speculation.
15              THE COURT:  That's overruled.  You may answer.
16              THE WITNESS:  No.
17   BY MS. CARTER:
18   Q.   Defense counsel also asked you on cross-examination
19   whether you reported this incident.  Do you recall that?
20   A.   Yes.
21   Q.   Can you describe for us whether the culture at the
22   Desert Hot Springs Police Department in February 2005 was one
23   where officers were expected to report excessive force or
24   whether they were expected to keep them quiet?
25              MR. SCHWARTZ:  Objection.  Speculation.  Relevance.
```

```
1              THE COURT:  It's overruled.  You may answer.

2              THE WITNESS:  Expected to keep them quiet.

3    BY MS. CARTER:

4    Q.   And why was that?

5    A.   It was just the way the Department was.

6    Q.   Who at Desert Hot Springs Police Department would you

7    have reported the incident to if you had reported it?  Well,

8    let me rephrase it.  Who at Desert Hot Springs Police

9    Department would be the person you were supposed to report it

10   to in the chain of command if you had reported this incident?

11   A.   Would have been to my supervisor at the time.

12   Q.   Who was your supervisor at the time?

13   A.   I believe it was Sergeant Cole.

14   Q.   Who investigated Internal Affairs investigations at the

15   Desert Hot Springs Police Department in February 2005?

16   A.   I believe those were handled internally usually by a

17   sergeant, Sergeant Gil.

18   Q.   Can you describe the relationship between Sergeant Gil

19   and the defendant in February 2005?

20              MR. SCHWARTZ:  Objection.  Speculation.  No

21   foundation.

22              THE COURT:  Sustained.

23   BY MS. CARTER:

24   Q.   Do you know, Mr. Decker, what relationship sergeant --

25   I'm sorry.  Let me rephrase it.
```

1          Do you know, Mr. Decker, what relationship the

2   defendant had with Radames Gil in February 2005?

3          MR. SCHWARTZ:  Objection.  Speculation.  Lack of

4   foundation.

5          THE COURT:  He is being asked.  That's overruled.

6   You may answer whether you know.

7          THE WITNESS:  From what I recall, they got along

8   well.

9   BY MS. CARTER:

10  Q.   And what was that perception of yours based on?

11  A.   Well, only on the working relationship.

12  Q.   Did you see the two of them together in the course of

13  your work as a Desert Hot Springs police officer?

14  A.   At times.

15  Q.   Did you see how they interacted together?

16  A.   Yes.

17  Q.   When you say they got along well, what exactly do you

18  mean?

19  A.   They seemed to get along well with one another.  Didn't

20  seem to be any problems with them, between them.

21  Q.   Would you say that Gil was one of the people that

22  defendant was closest to in the office at the time?

23          MR. SCHWARTZ:  Objection.  Speculation.  Lack of

24  foundation.

25          THE COURT:  You're asking for his perspective?

UNITED STATES DISTRICT COURT

```
 1              MS. CARTER:  Yes, Your Honor.

 2              THE COURT:  That's overruled.  You may answer.

 3              THE WITNESS:  The question again, please.

 4  BY MS. CARTER:

 5  Q.    Based on what you observed, would you say that Gil was

 6  one of the people that defendant was closest to in the office

 7  in February 2005?

 8  A.    Yes.

 9  Q.    You were also asked on cross-examination about not

10  having seen what happened between the defendant and the black

11  male arrestee before you walked into the station and saw the

12  black male arrestee sitting on the booking bench and mouthing

13  off.  Do you recall that?

14  A.    Yes.

15  Q.    No matter what had happened before you walked in that

16  jail door, would it be consistent with policy and your

17  training to tase a handcuffed arrestee just because they were

18  mouthing off?

19  A.    No.

20  Q.    No matter what had happened before you walked in that

21  jail door, would it be consistent with policy and with your

22  training to tase an arrestee out of anger?

23  A.    No.

24  Q.    Defense counsel asked you this morning on continued

25  cross-examination whether you responded to the scene of that
```

```
 1  school bus accident because there may have been the need for
 2  more than one officer.  Do you recall?
 3  A.   Yes.
 4  Q.   When you got to the scene, could you tell what exactly
 5  was happening?
 6  A.   I don't recall.
 7  Q.   Was Officer Gutting there alone at the time you got to
 8  the scene?
 9  A.   I don't recall.  I wasn't at the scene very long.
10  Q.   Was there a need for you at the scene when you got
11  there?
12  A.   No.
13  Q.   When you got to the scene, was the Hispanic female who
14  had been arrested already in Officer Gutting's car?
15  A.   Yes.
16  Q.   So at that time you didn't observe her demeanor or any
17  field sobriety tests?
18            THE COURT:  Well, you're --
19            MS. CARTER:  I'll rephrase.
20  Q.   At that time you didn't observe any field sobriety
21  tests?
22            THE COURT:  It's leading.
23  BY MS. CARTER:
24  Q.   Did you observe any field sobriety tests when you got to
25  the scene?
```

1    A.    No.

2    Q.    Were you in a position to observe the Hispanic female's

3    demeanor when you got to the scene?

4    A.    No.

5    Q.    Was she physically under control when you got to the

6    scene?

7    A.    From what I recall.

8    Q.    Did Officer Gutting say anything to you about her

9    resisting prior to you getting to the scene?

10   A.    Not that I recall.

11   Q.    Did Officer Gutting say anything to you about whether

12   she had expressed remorse for the accident?

13   A.    Not that I recall.

14   Q.    When you arrive on the scene of the school bus accident,

15   let me back up a bit.

16           Was there a specific call for backup to the school

17   bus accident?

18   A.    I don't recall there being one.

19   Q.    So why exactly did you respond?

20   A.    To assist if there is any assistance needed, traffic

21   control, et cetera.

22   Q.    Were you too busy to respond that night?

23   A.    No.

24   Q.    In your experience with the department would it be

25   common for officers not to respond to a fellow officer's

1    explicit call for backup because they were too busy?

2    A.    No.

3    Q.    Once you got to the school bus scene, did you radio in

4    to dispatch to say that you were on the scene?

5    A.    I don't recall if I did.  That would have been normally

6    what would happen.

7    Q.    Can you tell us whether you would normally also radio to

8    tell dispatch that you were on route to a scene?

9    A.    Yes.

10   Q.    And what would dispatch ordinarily do with that

11   information?

12   A.    They would type into the call.

13   Q.    Is that type of information supposed to appear on those

14   CAD reports that defense was asking you about?

15   A.    Yes.

16   Q.    Have you seen CAD reports where you responded to a call,

17   but were not listed as responding to a call?

18   A.    Yes.

19   Q.    Defense counsel asked you on cross-examination about

20   whether defendant was a ranter.  Do you recall that?

21   A.    Yes.

22   Q.    Whether he commonly yelled at people.  Do you recall

23   that?

24   A.    Yes.

25   Q.    Do you recall before the -- let me rephrase.

1          Do you ever recall before the incident with the

2   school bus accident, where defendant thereafter tased the

3   Hispanic female arrestee, defendant going on a rant about an

4   arrestee or member of the public sitting in the lobby of the

5   Desert Hot Springs Police Department?

6   A.   Not that I can recall.

7   Q.   Do you ever recall the defendant after that incident

8   where he tased the Hispanic female arrestee going on a rant

9   about an arrestee or member of the public sitting in the

10  Department lobby?

11  A.   No, not that I can recall.

12          MS. CARTER:  I would like to publish Exhibit 56

13  with the Court's permission.

14          MS. CARTER:  May I have a moment, Your Honor?

15          THE COURT:  Yes.  And yes, you may publish it.

16          MS. CARTER:  May I also have a moment, Your Honor?

17          THE COURT:  Yes.  Do you have much more of this

18  witness?

19          MS. CARTER:  No, Your Honor.  Probably about ten

20  minutes.  Can I ask that the second page of the exhibit be

21  displayed.

22          THE COURT:  Certainly.

23  BY MS. CARTER:

24  Q.   About midway down the page, Mr. Decker, there is a

25  column that has the entry 39 or there's several rows that

1    have the entry 39 in the column labeled by.  Do you see where

2    I am pointing to or where I have described?

3    A.    Yes.

4    Q.    Do you know what the code 39 pertains to in this

5    instance?

6    A.    No.

7    Q.    What are these numbers that are in case audit forms

8    under the by column?  Do you know what those are generally?

9    A.    The numbers are the officer or supervisor's identifying

10   numbers.

11   Q.    So each of those numbers in the by column belongs to a

12   particular officer or supervisor; is that correct?

13   A.    Yes.

14   Q.    But you're not -- and you don't know off the top of your

15   head who 39 is; is that right?

16          THE COURT:  That's asked and answered.  Let's

17   please move on.

18   BY MS. CARTER:

19   Q.    Do you know whether in February 2005, Matthew Drew was a

20   supervisor?

21   A.    No, he wasn't.

22   Q.    What about in March or April 2005?

23   A.    No.

24          MS. CARTER:  I would now like to display with the

25   Court's permission the fifth page of the document?

```
 1              THE COURT:  Go right ahead.

 2

 3   BY MS. CARTER:

 4   Q.   About halfway down the page where I have made an overly

 5   large mark, there is a row where the number 41 appears in the

 6   by column.  Do you see where I'm talking about?

 7   A.   Yes.

 8   Q.   Do you know what the 41 is?  Which officer, supervisor

 9   that number pertains to?

10   A.   I don't recall.

11              MS. CARTER:  I would like to display the next page

12   of the document, please.

13              THE COURT:  Go right ahead.

14              MS. CARTER:  I'll withdraw.  I'll move on.

15              Now, I would like to display with the Court's

16   permission, Exhibit 1, the diagram.

17              THE COURT:  Go right ahead.

18   BY MS. CARTER:

19   Q.   I believe on cross-examination.  Mr. Decker, defense

20   counsel asked you whether the dispatch room was farther down

21   the hallway report room.  Do you recall that?

22   A.   Yes.

23   Q.   Are dispatch and the report room on the same hallway?

24   A.   No.

25   Q.   Are they each down a different hallway?
```

1    A.    Yes.

2    Q.    And we can clear that exhibit.  Mr. Decker, have you

3    ever heard of an arrestee escaping into the city hall offices

4    from the jail area?

5    A.    No.

6    Q.    Have you ever heard of anyone getting in to the city

7    hall parking areas -- let me rephrase.

8          Have you ever heard of any arrestee at the Desert

9    Hot Springs jail getting into the city hall or city employees

10   parking area from the jail?

11   A.    No.

12   Q.    Have you ever been in a situation where you perceived of

13   a threat of an arrestee getting into the city hall offices

14   from the jail?

15   A.    Not that I can recall.

16   Q.    Have you ever been in a situation where you perceived of

17   a threat of an arrestee getting out of the parking area

18   because the city hall employee opened the gates?

19   A.    No.

20   Q.    Were the city hall -- do the city hall employees in the

21   building that houses the Desert Hot Springs jail, do they

22   work at night?

23   A.    Sometimes.

24   Q.    Would you say that more city hall employees are working

25   at night or during the day?

69

```
 1            MR. SCHWARTZ:  Objection.  Speculation.

 2            THE WITNESS:  During the day.

 3            THE COURT:  Let the answer stand.

 4   BY MS. CARTER:

 5   Q.   On cross-examination defense counsel asked you about

 6   officers being behind on reports at the station.  Do you

 7   recall that?

 8   A.   Yes.

 9   Q.   Did Defendant Sclafani ever talk to you about being

10   behind on reports?

11   A.   Yes.

12   Q.   What kinds of things did he say to you about that?

13   A.   He would encourage me to catch up on reports.

14   Q.   You worked for a number of sergeants not just the

15   defendant when you were working different shifts at the

16   Desert Hot Springs Police Department?

17            THE COURT:  Are you asking him that?

18            MS. CARTER:  I'll rephrase it, Your Honor.

19   Q.   Did you work just for defendant as a sergeant -- well,

20   I'll rephrase it again.

21            Was defendant the only sergeant you reported to

22   during your time as a Desert Hot Springs police officer?

23   A.   No.

24   Q.   Did defendant talk to you more or less than other

25   sergeants about getting caught up on your reports?
```

1    A.    I would say less.

2    Q.    Did you ever hear defendant reprimanding other officers

3    about being behind on their reports?

4    A.    Yes.

5    Q.    Based on what you were told by the defendant and what

6    you heard defendant say to other officers, was defendant

7    aware in February 2005 of the requirement to write timely

8    reports?

9             MR. SCHWARTZ:  Objection.  Speculation.

10            THE COURT:  Sustained.

11   BY MS. CARTER:

12   Q.    Did defendant make these comments to you or others about

13   writing timely reports around the time of February 2005 or

14   before?

15   A.    I don't recall.

16            MS. CARTER:  May I have a moment, Your Honor?

17            THE COURT:  You may.

18            MS. CARTER:  I have nothing further at this time.

19            THE COURT:  Is there to be any recross?

20            MR. SCHWARTZ:  Yes, Your Honor.  Five minutes.

21            THE COURT:  Go ahead.

22                      RECROSS-EXAMINATION

23   BY MR. SCHWARTZ:

24   Q.    Mr. Decker, you were interviewed by the FBI just last

25   week; correct?

```
 1   A.    Yes.
 2   Q.    And just last week you told the FBI in your interview
 3   that the reason you did not report the incident of the
 4   arrestee who was tased on the bench was because you did not
 5   see the whole thing; correct?
 6   A.    Correct.
 7   Q.    Was the reason you gave; right?
 8   A.    Yes.
 9   Q.    And yesterday under oath you gave the same reason; is
10   that right?
11   A.    Yes.
12   Q.    You didn't see the whole thing, did you?
13   A.    No.
14          MS. CARTER:  Objection.  Vague as to time.
15          THE COURT:  That's overruled.  He may answer.
16   BY MR. SCHWARTZ:
17   Q.    You didn't see the whole thing, did you?
18   A.    No.
19   Q.    And you didn't feel it would be appropriate to report an
20   excessive force allegation if you did not see the whole
21   thing; correct?
22          MS. CARTER:  Objection.  Vague.
23          THE COURT:  That's overruled.  You may answer.
24          THE WITNESS:  No.
25          MR. SCHWARTZ:  I'll rephrase the question,
```

1   Your Honor.

2   Q.   Is it correct that you did not feel it appropriate to

3   report an excessive force allegation because you did not see

4   the whole thing?

5         MS. CARTER:  Same objection.

6         THE COURT:  That's vague.  Sustained.

7   BY MR. SCHWARTZ:

8   Q.   And when you said you did not see the whole thing, you

9   didn't have the vantage point my client did at the time, did

10   you?

11         MS. CARTER:  Objection.  Vague.

12         THE COURT:  Sustained.

13   BY MR. SCHWARTZ:

14   Q.   During the first tase which you described as a drive

15   stun against the arrestee on the bench, do you recall that?

16   A.   Yes.

17   Q.   You did not have the same vantage point as my client did

18   when that tase occurred ; is that correct?

19         MS. CARTER:  Objection.  Vague.

20         THE COURT:  You can answer it if you can.

21         THE WITNESS:  No.

22   BY MR. SCHWARTZ:

23   Q.   And during the second tase that were with the darts, the

24   prongs into the arrestee when he was on the floor, do you

25   recall that?

1    A.    Yes.

2    Q.    Again, you did not have the same vantage point my client

3    had of where the arrestee was and where his legs were as

4    relating to my client at that time, did you?

5    A.    I don't believe so.

6    Q.    You said you don't believe so?

7    A.    No.

8    Q.    And counsel asked you on redirect if you recall any

9    specific incidents of my client ranting about an arrestee

10   being in the lobby.  Do you recall that?

11   A.    Yes.

12            MS. CARTER:  Objection.  Misstates the testimony.

13            THE COURT:  It's overruled.  Let's move on.

14            THE WITNESS:  Yes.

15   BY MR. SCHWARTZ:

16   Q.    Now, my client you describe as a ranter; is that right?

17   A.    Yes.

18   Q.    He ranted about a lot of things in the Department;

19   right?

20   A.    Yes.

21   Q.    Including arrestees; right?

22   A.    Correct.

23   Q.    Including officer conduct; correct?

24   A.    Correct.

25   Q.    And because he ranted about so many different things not

```
1    one sticks out in your mind; is that right?
2            MS. CARTER:  Objection.
3            THE COURT:  What's the objection?
4            MS. CARTER:  That it's vague.  It's vague as to
5    time.
6            THE COURT:  Sustained.  You can rephrase.
7    BY MR. SCHWARTZ:
8    Q.   I'll go back to 2005.  I'll go specifically to February
9    of 2005.  Before the incident you described the arrestee on
10   the bench, between January 1st of 2005 until that incident,
11   you don't have a specific recollection of my client ranting
12   about an arrestee in the lobby, do you?
13   A.   No.
14   Q.   During that time frame, you did work with my client on
15   more than one occasion?
16   A.   Yes.
17   Q.   And my client would rant about many different things on
18   those occasions?
19   A.   Yes.
20   Q.   And because my client his normal demeanor would be angry
21   or ranting, you don't have any specific recollection of what
22   he was ranting about on those occasions?
23           MS. CARTER:  Objection.  Vague and misstates the
24   testimony.
25           THE COURT:  Sustained on the first objection.
```

1    BY MR. SCHWARTZ:

2    Q.    During the time frame I just mentioned January,

3    February 2005, you were a school resource officer; right?

4    A.    Yes.

5    Q.    And who would you report to as your sergeant on that

6    assignment?

7    A.    I believe it was Sergeant Cole.

8    Q.    And the times that my client was your supervisor would

9    be when you worked overtime; is that correct?

10   A.    Yes.

11   Q.    So before on recross or redirect rather you described

12   Sergeant Cole as your direct supervisor; is that right?

13   A.    Yes.

14   Q.    Was he the senior sergeant at that time to your

15   knowledge?

16   A.    Yes.

17         MR. SCHWARTZ:  Nothing further at this time,

18   Your Honor.  Thank you.

19         THE COURT:  Thank you.

20         No, we're not gonna have any more.  You're excused,

21   sir.  Wait just a minute.  We're going to take a morning

22   recess at this time.  Everyone please rise for the jury.

23                     (Jury not present.)

24         THE COURT:  We're outside the presence of the jury.

25   We're working on getting Ms. Vargas transferred over the MDC

1    and hopefully have the mental health person see her.  The

2    problem is that normally in this kind of situation the Bureau

3    of Prisons requires 30 days and we don't that.  We just want

4    some quick assessment.  Very well may be she may not be

5    available tomorrow to testify.  We're working on trying to

6    get a report maybe today or tomorrow.

7                 Any counsel have anything before we bring the jury

8    back?

9                 Ms. Carter, you have something?

10                MS. CARTER:  Your Honor, I just wanted to let the

11   Court know that the government plans to read from a

12   stipulation and publish a couple of exhibits referenced

13   therein and read those, and then call its next witness.

14                THE COURT:  All right.  Mr. Arkow?

15                MR. ARKOW:  Yes, Your Honor.  Just briefly there

16   seems to be another occurrence of a juror contact.  The

17   government's potential rebuttal witness informed me just

18   moments ago that sometime one of the jurors, we haven't

19   identified which one, sits in the back row was in the lobby

20   area near Spring Street.  And was looking to go out and

21   turned around and said, oh, can I get out these doors?  And

22   the person who might be the government's rebuttal witness

23   said, I don't know.  I go in the other way or go through Main

24   Street.  That was the extent of the contact.

25                THE COURT:  Well, if that's all that took place, I

```
 1    don't think we need to voir dire the juror, but thank you for
 2    that.  Let's bring the members of the jury back.
 3                     (Jury present.)
 4              THE COURT:  Please be seated, ladies and gentlemen.
 5              Ms. Carter, you had some stipulations you would
 6    like to read.
 7              MS. CARTER:  Yes, Your Honor.  I want to read from
 8    the stipulation at Exhibit 84.  The portions of it which
 9    pertain to Exhibits 58 and 69.
10              THE COURT:  All right.
11              MS. CARTER:  Government's Exhibit 58 which is a
12    redacted copy of the Desert Hot Springs Police Department
13    Supplement One Police Report prepared by Defendant Anthony
14    Sclafani regarding his use of force on Angelica Vargas on
15    February 25th, 2005.
16              And Government's Exhibit 69 which is a redacted
17    copy of the Desert Hot Springs Police Department Supplement
18    One Police Report prepared by Defendant Anthony Sclafani
19    regarding his use of force on Jamal White on February 24th,
20    2005.
21              And I would like to move now that Exhibits 58 and
22    69 be received in evidence.
23              THE COURT:  Mr. Schwartz.
24              MR. SCHWARTZ:  Correct, Your Honor.  That's fine.
25              THE COURT:  Thank you.  That stipulation will be
```

```
 1    received.
 2                  (Exhibits 58 and 69 were received.)
 3              MS. CARTER:  May I publish the first page?
 4              THE COURT:  And you're offering both 68 and 69 now?
 5              MS. CARTER:  58 and 69, Your Honor.
 6              THE COURT:  Thank you.  58 and 69.  Okay.
 7              MS. CARTER:  May I publish the first page of
 8    Exhibit 58 by displaying it on the monitor and reading it
 9    aloud for the jury?
10              THE COURT:  That's 58?
11              MS. CARTER:  Correct, Your Honor.
12              THE COURT:  All right.  Go ahead.
13              MS. CARTER:  And if you can zoom in to the top half
14    to begin with.  Beginning with charges:  PC 148 A(1)
15    resisting or delaying a peace officer.
16              Assignment:  On Friday, February 25th, 2005, I was
17    assigned to patrol as the on-duty watch commander.  Details:
18    As part of my normal duties, I am responsible to conduct
19    regular safety checks of the occupants inside the jail at the
20    Desert Hot Springs Police Department.  I walked to the
21    holding cell where Vargas was being held.
22              Please blow up the latter half of the document.
23              I opened the cell door.  I applied a half-second
24    burst of pepper spray to Vargas' face.  The pepper spray had
25    an immediate effect on Vargas.  Because Vargas had been
```

1    pepper sprayed, the jail door was opened to air the room out.

2    I deployed my Taser X-26.  I deployed my taser and Vargas was

3    stuck with the darts.  I reactivated the taser for a second

4    deployment.  Vargas was photographed by Officer Gutting prior

5    to her being released.

6            And then under evidence item listed as one,

7    quantity one, description one deployed taser cartridge.

8    Below that it reads, that the above-listed evidence was

9    booked in at the Desert Hot Springs Police Department under

10   Property Control Report No. 5849.

11           I would like the Court's permission to publish

12   Exhibit 69 by displaying it and reading it for the jury.

13           THE COURT:  Go right ahead.

14           MS. CARTER:  Display the first page of 69 and

15   please magnify the upper half of the document.

16           Assignment:  On Thursday, February 24th, 2005, I

17   was assigned to patrol as the on-duty watch commander.

18           Details:  I responded to assist Officer Drew on a

19   possible domestic violence call at 66900 Iron Wood Drive

20   Apartment 306.  Upon my arrival, I spoke with White.  Shortly

21   after the contact, Officer Drew informed me that White was

22   parolee at large and the Department of Corrections had issued

23   a warrant for his arrest.  I took custody of White and placed

24   him into my patrol car.  I pulled my patrol car over to the

25   curb and exited my unit.  I opened the rear door.  I used

1    one-second burst of pepper spray to his face.  This had an

2    immediate effect on White.

3         Once at the station, I placed White in the booking

4    area.  I approached him and attempted to handcuff him to the

5    stationary bench in the jail.  I deployed by Taser X-26.

6    White was stuck with the darts giving him one five-second

7    cycle.  This had an immediate effect on White.

8         Can you display the lower one-third or fourth of

9    the document beginning with evidence?

10        Again, reading from the document, Evidence:  Item

11   one, quantity one.  Description:  One deployed taser

12   cartridge.  The above-listed evidence was booked in at the

13   Desert Hot Springs Police Department under Property Control

14   Report No. 5846.

15        Disposition:  I request this case be forwarded to

16   Officer Drew's initial report.

17        At this time the government will call its next

18   witness.

19        THE COURT:  Who is your next witness to be?

20        MR. ARKOW:  The government calls Matthew Drew.

21        THE COURT:  Very well.  Would you come right up on

22   the witness stand to be sworn, sir?  Straight ahead.

23        THE WITNESS:  Yes, Your Honor.

24        THE CLERK:  Please raise your right hand.

25                    (Witness sworn.)

```
 1              THE CLERK:  Have a seat.  State and spell your name
 2    for the record.
 3              THE WITNESS:  Matthew Drew D-r-e-w.
 4              THE COURT:  And do you have a middle name,
 5    Mr. Drew?
 6              THE WITNESS:  Yes, Your Honor.  Lincoln.
 7    L-i-n-c-o-l-n.
 8              THE COURT:  Thank you.  Go ahead, Mr. Arkow.
 9                     DIRECT EXAMINATION
10    BY MR. ARKOW:
11    Q.    What city do you currently reside in?
12    A.    La Quinta, California.
13    Q.    And are you employed?
14    A.    Yes.
15    Q.    How are you employed?
16    A.    Armed security.
17    Q.    Prior to the job you have now in private security, had
18    you been employed as a police officer in California?
19    A.    Yes.
20    Q.    What positions did you hold?
21    A.    Police officer.
22    Q.    In which police departments, and approximately do you
23    remember the range of years that you served if there was more
24    than one department?
25    A.    There was a total of three departments.  Desert Hot
```

1    Springs 2001 to 2007, Indio from 2007 to 2009 and Cathedral

2    City from 2009 to 2010.

3    Q.    When you were at Desert Hot Springs Police Department,

4    what was your assignment or did you have different

5    assignments during the time you were there from 2001 to 2007?

6    A.    Yes.

7    Q.    What were your different assignments?

8    A.    Other than patrol officer, it was canine.

9    Q.    What does canine mean?

10   A.    Uh, work with a dog.

11   Q.    When you were first joined Desert Hot Springs Police

12   Department, had the Department issued taser guns to its

13   officers?

14   A.    If I recall correctly, when I first joined, they had not

15   got tasers.

16   Q.    At some point while you were a police officer at Desert

17   Hot Springs, the Department did issue tasers to the officers?

18   A.    Yes.

19   Q.    And before you were able to carry and use tasers, were

20   you required to attend training at the Department regarding

21   the use of tasers and the policy on taser use?

22   A.    Yes.

23   Q.    Who were the -- was it training conducted by officers

24   from the Desert Hot Springs Police Department?

25   A.    Yes.

```
1    Q.    Who were the officers who conducted the taser training?
2    A.    Officer Collard and Sergeant Gill.
3    Q.    And Collard, what is his first name?
4    A.    John.
5    Q.    And Gill, what was his first name?
6    A.    Radonamous.
7    Q.    Did other officers attend the training with you?
8    A.    I believe so, yes.
9    Q.    Was the training mandatory that an officer had to attend
10   the taser use and taser policy training before being issued
11   to carry a taser?
12   A.    Yes.
13   Q.    Did you know an officer or a sergeant at Desert Hot
14   Springs Police Department at the time the tasers were issued
15   named Anthony Sclafani?
16   A.    Yes.
17   Q.    Would you recognize Mr. Sclafani if you saw him today?
18   A.    Yes.
19   Q.    I would ask that you look around the courtroom to see if
20   you recognize an individual that you know is Anthony
21   Sclafani.
22   A.    He is the gentleman sitting in the suit with a red and
23   striped tie.
24          THE COURT:  Indicating for the record Defendant
25   Sclafani.
```

BY MR. ARKOW:

Q.   How did you know Defendant Sclafani?

A.   Uh, just knew him through work, that he worked there as one of the sergeants.

Q.   And was Defendant Sclafani required to attend the mandatory training on tasers before he was able to carry a taser?

MR. SCHWARTZ:  Objection.  Foundation. Speculation.

THE WITNESS:  Yes.

THE COURT:  Sustained.  Strike the answer at this time.

BY MR. ARKOW:

Q.   To your knowledge were all officers required to attend the taser training before being issued their taser?

A.   Yes.

Q.   As part of that training were you taught about circumstances when a taser can be used on an individual?

A.   Yes.

Q.   Were you trained whether an officer can use a taser on an individual because the individual was mouthing off or shouting obscenities at the officer?

A.   I don't recall that.

Q.   Were you trained -- were you told that officers can use a taser if an individual was mouthing off?

```
 1    A.    That I recall, no.

 2    Q.    To clarify the training was you could not use a taser

 3    for that purpose?

 4    A.    That I recall specifically, no.  There is a lot of

 5    different instances that can occur.

 6    Q.    Did you receive training as far as the aftercare

 7    treatment for persons who received taser shocks?

 8    A.    Yes.

 9    Q.    And what was that training?

10    A.    How to properly treat the wound, photograph it and

11    document it in the report.

12    Q.    And what were the requirements for photographing?

13    A.    Take pictures and include the pictures with the report.

14    Q.    And when would you -- how would you include the pictures

15    with the report?

16    A.    Well, at that time I believe they were attached to the

17    original report.

18    Q.    And at that time I want to focus your attention for the

19    time period February of 2005.  So can you have that time

20    period in mind?

21    A.    Yes.

22    Q.    And when would the photographs required to be taken?

23    A.    I believe shortly, well, right after the aftercare.

24    Q.    When would aftercare be required to be done?

25    A.    As soon as the -- if the darts were removed.
```

```
1    Q.   And then you mentioned about a report that -- what was

2    the requirements that the Department had about writing

3    reports documenting the use of tasers?

4    A.   From what I recall, it was document the use of force in

5    the report and also we had a specific use of force report

6    that was completed.

7    Q.   And what were the requirements for how soon you had to

8    document the use of force in the report and in the separate

9    document?

10   A.   I'm not understanding that question.

11   Q.   Was there a time by which you had to document the use of

12   force in the police report?

13   A.   A specific amount of time for you to document it?  Is

14   that what you're asking?

15   Q.   Yes.

16   A.   No.  It was in the report when the report was written.

17   Q.   And what was the requirements for when the report needed

18   to be written?

19   A.   Misdemeanors were usually within ten days and felonies

20   were as soon as they could be written.

21   Q.   I want to direct your attention to a specific incident.

22   Do you recall an arrest that occurred in February of 2005

23   while you were on patrol as a canine handler in which you and

24   Defendant Sclafani responded to an apartment complex on Iron

25   Wood Drive in Desert Hot Springs and arrested a male
```

1   individual for a parole violation?

2   A.   No.

3   Q.   Do you have any recollection of that incident?

4   A.   Other than the last time that we had met and I read the

5   report, other than that, I don't remember anything about the

6   incident.

7   Q.   So as you sit here today, do you remember something

8   about that incident?

9   A.   No.

10  Q.   Is there anything that would help refresh your memory of

11  this incident that I have referred to?

12  A.   A copy of the report I wrote.

13           MR. ARKOW:  I would ask that the witness be shown

14  what's marked for identification Government's Exhibit 68.

15           THE COURT:  Very well.  I take it the defense has a

16  copy of this, Mr. Schwartz?

17           MR. SCHWARTZ:  Yes, Your Honor.

18           MR. ARKOW:  It's Exhibit 68.

19  Q.   If you could open up the document in that exhibit and

20  let me ask you, do you recognize the content of that

21  document?  Do you recognize what type of document that is?

22  A.   Yes.

23  Q.   What is that document?

24  A.   It's a police report.

25  Q.   Can you tell who wrote that police report?

```
 1    A.   I did.

 2    Q.   How can you tell?

 3    A.   At the bottom where it says prepared by it has my ID

 4    number and my name.

 5    Q.   What's your ID number?

 6    A.   It was 039.

 7    Q.   Does it have your full name at the bottom of the report?

 8    A.   Yes.

 9    Q.   I'm gonna ask you to read the report to yourself and

10    after then reading it, tell us whether that refreshes your

11    memory about this arrest.

12              Have you had an opportunity to read the report?

13    A.   Yes.

14    Q.   Is that your arrest report?

15    A.   Yes.

16    Q.   Has reading that arrest report helped refresh your

17    memory?

18    A.   Yes.

19    Q.   Did you respond to an incident for domestic disturbance

20    at an apartment on Iron Wood on February 24th, 2005?

21    A.   Yes.

22    Q.   And when you arrived at the apartment, what did you do?

23    A.   I conducted a record check on the male subject who was

24    listed as Jamal White, and the records check revealed he had

25    a parole warrant for his arrest.
```

1    Q.   Upon finding that the individual had a parole warrant,

2    what did you do next?

3    A.   He was placed under arrest for the parole warrant and

4    also for being under the influence of a controlled substance.

5    Q.   Did you take -- the individual arrested Mr. White, did

6    you take his pulse?

7    A.   From what I recall, yes.

8    Q.   Is there anything in your arrest report which would

9    refresh your memory as to whether you took his pulse?  And I

10   would direct your attention to approximately the middle of

11   the page next to the second bullet point.

12            THE COURT:  Well, don't tell us just what you read

13   there.  Tell us whether your recollection has actually been

14   refreshed.

15            THE WITNESS:  Yes, Your Honor, it has.

16            THE COURT:  Ask your question now.

17   BY MR. ARKOW:

18   Q.   Did you take the individual's pulse rate?

19   A.   Yes.

20   Q.   And where were you took the individual's pulse rate?

21   A.   It doesn't -- from reading the report, it doesn't say

22   specifically.  I would say I was probably in the doorway of

23   the apartment.

24            THE COURT:  Do you recall that?

25            THE WITNESS:  I don't recall.

BY MR. ARKOW:

Q.   Were you at the apartment somewhere at or near the apartment complex when you took the individual's pulse rate?

A.   Yes.

Q.   You were at the scene of the incident when -- were you at the scene of the incident when you took the individual's pulse rate?

A.   Yes.

Q.   And can you show the jury how you took the individual's pulse rate demonstrating using your hands or wrist?

A.   You take their wrist using your fingers, using your stopwatch, start it and you time it for 60 seconds, and then that's how you get their pulse rate estimation.

Q.   And were you able to take Mr. White's pulse rate doing that?

A.   Yes.

Q.   Was Mr. White docile when you were with him?

A.   From what I recall, yes.

Q.   Was Mr. White resisting your taking his or checking his pulse rate?

A.   Not that I recall, no.

Q.   And if he had been resisting, you would have noted that in your report?

A.   Yes.

         THE COURT:  You're asking him.

BY MR. ARKOW:

Q.   Would you have noted if Mr. White was resisting you at the time that you were taking his pulse?  Would you have noted that in your report?

A.   Yes.

Q.   And did you note in your report whether Mr. White was resisting?

A.   No.

Q.   And was any other officer with you at the scene?

A.   Um, sergeant Sclafani.

Q.   And what was, uh -- was -- Mr. Sclafani was a sergeant at the time?

A.   Yes.

Q.   Did you, uh, ask Mr. White for his identification?

A.   Yes.

Q.   And did Mr. White comply and give you his identification?

A.   Yes.

Q.   Did Mr. White resist in any way in giving you his identification?

A.   That I recall, no.

Q.   Did you, uh, give any other orders to Mr. White during the time that you were at the scene?

A.   No.

Q.   Did you ask Mr. White to step outside the apartment at

1    any point?

2    A.    I don't recall, no.   It's not in the police report so I

3    don't recall if I did or didn't.

4    Q.    Did Mr. White comply with any orders you gave him?

5    A.    That I recall, yes.

6    Q.    Did Mr. White comply with any orders that, um -- that

7    defendant gave to Mr. White at the arrest scene?

8    A.    That I recall, yes.

9    Q.    When you -- you said you handcuffed Mr. White?

10   A.    Once he was placed under arrest, yes.

11   Q.    When you placed Mr. White under arrest, was he

12   combative?

13   A.    That I recall, no.

14   Q.    When you placed Mr. White under arrest, did he resist

15   arrest in any way?

16   A.    Not that I recall, no.

17   Q.    If Mr. White had resisted arrest, would you have noted

18   that in your arrest report?

19   A.    Yes.

20   Q.    And having read your arrest report, did you find any

21   mention in your arrest report?

22            THE COURT:   Well, just a minute.   The arrest report

23   is not in evidence.   It was given to him to attempt to

24   refresh his recollection and only for that purpose.

25            Now, do you want to put it in evidence?

1          MR. ARKOW:  Well, let me try to rephrase.

2     Q.    Having read your arrest report, does it refresh your

3     recollection as to whether there was any indication that

4     Mr. White resisted arrest?

5     A.    Yes.

6     Q.    And how has it refreshed your memory?

7     A.    It's -- the report was written on that night so . . .

8     Q.    And did Mr. White resist arrest in any way?

9     A.    I don't recall, no.

10    Q.    Did Mr. White do anything at the scene when you were at

11    the apartment or when he was, um -- well, at the scene of the

12    apartment that would justify using force against him?

13    A.    Not that I recall, no.

14    Q.    At some point after Mr. White was handcuffed, where did

15    Mr. White go?

16    A.    He was transported to the Desert Hot Springs Police

17    Department.

18    Q.    Was there anything that you're aware of that Mr. White

19    did between the time he was handcuffed at the apartment and

20    being transported to the Desert Hot Springs Police Department

21    that would justify using any force against Mr. White?

22          MR. SCHWARTZ:  Objection.  Lack of foundation.

23          THE COURT:  Sustained.

24    BY MR. ARKOW:

25    Q.    To your knowledge, did you -- were you still with

1    Mr. White when Mr. White was, uh, being taken from the

2    apartment to the patrol car?

3    A.   No.

4    Q.   Who was with Mr. White?

5    A.   Sergeant Sclafani.

6    Q.   And did, uh, Sergeant Sclafani escort Mr. White alone to

7    the patrol car?

8    A.   Yes.

9    Q.   And what did you do?

10   A.   I stayed at the apartment to talk with the female.

11   Q.   Was there any reason for you to go with Sergeant

12   Sclafani to escort Mr. White to the patrol car?

13   A.   No.

14   Q.   If you had had any concerns that Mr. White was being

15   combative or aggressive, would you have assisted Sergeant

16   Sclafani to escort Mr. White to the patrol car?

17   A.   Yes.

18   Q.   Was Mr. White throughout the entire time that you were

19   with Mr. White being compliant and cooperative?

20   A.   From what I recall, yes.

21   Q.   Did you follow Sergeant Sclafani in Sergeant Sclafani's

22   patrol car?

23   A.   No.

24   Q.   Where did you go?

25   A.   I stayed at the apartment to speak with the female.

```
 1    Q.   Do you know approximately how long you stayed at the
 2    apartment to speak with the female?
 3    A.   No.
 4    Q.   Can you put, uh, some approximate range of time?  Was it
 5    a matter of one minute, several minutes, ten minutes, half an
 6    hour?
 7    A.   I don't recall how long.  I was speaking with her
 8    regarding the original call which was a domestic disturbance.
 9    Q.   Could it have been as long as a half an hour?
10    A.   Could have been.
11    Q.   Could it have been as long as an hour?
12    A.   I -- it could have been.  I don't recall how long I was
13    there.
14    Q.   Could it have been as long as an hour -- two hours?
15    A.   However long it took to complete the investigation, and
16    I don't remember how long I was there.
17    Q.   Do you have a -- on that night, did you have a way to
18    communicate by radio with other officers on patrol?
19    A.   Yes.
20    Q.   And did you know if, uh, Sergeant Sclafani that night
21    had a way by his radio to communicate with you?
22    A.   Yes.
23    Q.   Did you receive any communications from Sergeant
24    Sclafani after Sergeant Sclafani escorted Mr. White to his
25    patrol car?
```

1    A.    No.

2    Q.    Did you hear anything on, uh -- would you also be able

3    to receive communications from the police department dispatch

4    center?

5    A.    Yes.

6    Q.    How would you receive those communications?

7    A.    By radio.

8    Q.    And where did you carry your radio?

9    A.    On my belt.

10   Q.    And would an officer in the field be able to communicate

11   to the dispatch center using his radio?

12   A.    Yes.

13   Q.    Um, after Mr. White was arrested, did you hear on your

14   radio anything about whether, uh, Mr. White displayed

15   aggressive behavior on the car ride back from the apartment

16   where he was arrested to the police department station?

17   A.    That I recall, no.

18   Q.    Were you ever called by dispatch to provide backup

19   assistance to Sergeant Sclafani in transporting Mr. White to

20   the police department station?

21   A.    Not that I recall, no.

22   Q.    At some point, did you return to the police department

23   station later that night?

24   A.    Yes.

25   Q.    Do you recall Mr. -- seeing Mr. White at the station

1    when you returned?

2    A.    No.

3    Q.    Were you the arresting officer for this?

4    A.    Yes.

5    Q.    Do you recall any interactions you had with Mr. White at

6    the police department station later than night?

7    A.    A blood draw for the, uh, eleven five arrest.

8    Q.    Anything else that you had interactions with Mr. White?

9    A.    That I recall, no.

10   Q.    Did Mr. White resist during the blood draw?

11   A.    Not that I recall.

12   Q.    Let me just ask you, uh, to go back to the time when you

13   said you were still at the apartment talking to the female.

14   What were you talking with the female about?

15   A.    The original call.  It was a domestic disturbance.

16   Q.    And . . .  what was -- what necessitated the length of

17   that conversation to be of some duration that you don't

18   remember how long?

19              MR. SCHWARTZ:  Objection.  Vague.

20              THE COURT:  Sustained.

21   BY MR. ARKOW:

22   Q.    Do you remember what you were talking with that -- uh,

23   the female occupant about?

24   A.    No, I just -- regarding the domestic disturbance, what

25   was specifically said I don't recall.

1    Q.    And did she say whether there was any domestic

2    disturbance?

3    A.    I believe she told us no.

4    Q.    When you say us, were you talking to her alone at any

5    point?

6    A.    I was there with her by myself.

7    Q.    So when you said she told us --

8    A.    I -- sorry, I misphrased that.  She told me.

9    Q.    Were you also present when the female told, um, you in

10   the presence of Defendant Sclafani that there was no domestic

11   disturbance?

12   A.    I don't recall that.

13   Q.    Did you know an officer at Desert Hot Springs Police

14   Department also around the same time in February of 2005

15   named Matthew Gutting?

16   A.    Yes.

17   Q.    How did you know him?

18   A.    Uh, he was a friend of mine and fellow officer.

19   Q.    And how would you characterize your friendship with him?

20   A.    Just a friend.

21   Q.    How long have you known him?

22   A.    At that point, not very long.  Maybe . . . a year.

23   Q.    And you're still friends with him until today?

24   A.    Yes.

25   Q.    Did you have any knowledge of an incident also around

1    February 2005 where an Hispanic woman was arrested by Officer

2    Gutting for a DUI, driving under the influence, because of an

3    accident with a bus, and that female Hispanic was pepper

4    sprayed and tased at the police department jail?

5    A.   I don't recall that.

6    Q.   So did you have any involvement with the incident the

7    way that I've described?  Do you have any knowledge of that

8    incident?

9    A.   No.

10   Q.   Any reason that you would have worked on that case,

11   worked on that arrest or worked on anything subsequent to

12   that arrest?

13   A.   I could have, but I don't have the report here so I

14   can't tell you if I did or didn't.

15   Q.   So you have no memory of that event.

16   A.   No.

17          MR. ARKOW:  I'd ask that Government's Exhibit 56 be

18   placed before the witness.

19          THE COURT:  56?

20          MR. ARKOW:  Yes, Your Honor.

21          THE COURT:  All right.  It's been previously

22   admitted.

23   BY MR. ARKOW:

24   Q.   Do you have that in front of you?

25   A.   Yes.

1   Q.   And that is a case audit for a certain case, 05783.  Do

2   you see that?

3   A.   Yes.

4        MR. ARKOW:  Okay.  If we can just focus on the top.

5   Q.   What is a case audit?  Do you -- are you familiar with

6   this type of document?

7   A.   I believe it's, uh, a way to track through who logs in

8   or who makes any changes to reports.

9        MR. SCHWARTZ:  Your Honor, I'm going to object that

10  it's a compound question, and it was a compound answer.

11       THE COURT:  Sustained.  Strike the question and

12  answer.

13  BY MR. ARKOW:

14  Q.   Did you -- have you seen case audits like this before?

15  A.   Yes.

16  Q.   And -- and what is the purpose of a case audit printout?

17  What does it show?

18  A.   It shows, uh, again, what officers wrote the report, any

19  changes that are made and what changes are made in the

20  report.

21  Q.   Can -- does it show when the changes are made?

22  A.   Yeah, it has the date and time, yes.

23  Q.   And those are the first two columns on the left?

24  A.   Yes.

25  Q.   And then the third column, the body column that has a

1  two or three digit code, what does that refer to?

2  A.   That's their, uh, ID number, officer's ID number.

3  Q.   And your ID number was three nine?

4  A.   Yes.

5  Q.   And this particular case audit, if you go to the entry

6  column, can you tell which individual was arrested for

7  this -- pertaining to this case audit?

8  A.   It looks -- by looking at this, it looks like Alicia

9  Vargas versus Angelica.

10  Q.   I want to direct your attention to -- and it's also on

11  the overhead if it's easier on the monitor for you to follow.

12  But it's stamped at the bottom of the page S 08713.  And do

13  you see the entries that are dated starting April 19th, 2005

14  at 11:27 a.m.?  So that's -- now, that's 39.  That means that

15  that's your code?

16           MR. SCHWARTZ:  Objection, leading.

17           THE COURT:  Sustained.

18  BY MR. ARKOW:

19  Q.   Do you see the entry on the time that I just indicated?

20  A.   Yes.

21  Q.   And who was the officer who accessed the police report

22  for Angelica Vargas?

23  A.   I believe by looking at that number it's not an officer

24  cause there's not a zero in front of it.

25  Q.   What number do you see?

1    A.    I see a 39.

2    Q.    And didn't you testify that your number was 39?

3              MR. SCHWARTZ:  Objection.  Misstates the testimony.

4              THE COURT:  That's overruled.

5              You may answer.

6              THE WITNESS:  Yes.

7    BY MR. ARKOW:

8    Q.    Does this indicate that you accessed the Angelica Vargas

9    police report on the date and time that the case audit shows?

10   A.    No.

11   Q.    What does this show that it has here, Number 39?

12   A.    I believe if I recall correctly, 39 was one of the, um,

13   records people's ID number.

14   Q.    Do you know which records' person?

15   A.    I believe it was, uh, Carolyn Firestone.

16   Q.    And what was your, uh, ID number?

17   A.    Mine was zero three nine.  If -- if it was an officer's

18   ID, you would have a zero in front of it.

19   Q.    Would you have reason to, uh, print out the narratives

20   or supplements or any reports from the Angelica Vargas, uh,

21   incident?

22   A.    No.

23   Q.    Now, directing your attention to the entry just above

24   the 39, the one -- well, there's more than one, on April 16,

25   2005, do you see -- do you see those entries where the

1    officer code is zero four one?

2    A.    Yes.

3    Q.    And next to that column, the entry under the reading

4    display case locked, do you see that?

5    A.    Yes.

6    Q.    What does case locked mean?

7    A.    That means that a supervisor had locked the report.

8    Q.    Can only a supervisor lock the report?

9    A.    Yes.

10    Q.    And which supervisor was the code zero four one?

11    A.    I believe it was Sergeant Gill's number.

12    Q.    Do you know if Sergeant Gill had any involvement with

13    the Angelica Vargas incident?

14    A.    I -- not without reading a report.  I wouldn't recall if

15    he did or didn't.

16            MR. ARKOW:  One moment, Your Honor.

17            THE COURT:  Mm-hmm.

18            MR. ARKOW:  No further questions.

19            THE COURT:  Any questions?

20            MR. SCHWARTZ:  Yes, Your Honor.

21            THE COURT:  Go ahead, Mr. Schwartz.

22            MR. SCHWARTZ:  Okay.

23                     CROSS-EXAMINATION

24    BY MR. SCHWARTZ:

25    Q.    Good morning.

1    A.   Good morning.

2    Q.   You've got the exhibits still in front of you.

3    Exhibit 56 that counsel was just asking you about?

4    A.   Yes, sir.

5    Q.   And on the bottom right-hand side the Bates stamp of

6    SO1783?

7    A.   Yes.

8    Q.   Where counsel's referring you to one quarter of the page

9    down where there's a series of entries underneath the section

10   that says by of 39?

11   A.   Yes.

12   Q.   And you said that 39 to your knowledge was the ID number

13   of Caroline Firestone?

14   A.   Yes.

15   Q.   And she was a records' clerk?

16   A.   Yes.

17   Q.   Was she a record supervisor?

18   A.   Uh, at that time, I think she was -- I know she did

19   records.  I don't know what her exact title was.

20   Q.   And next to that was this entry of 39.  The first one

21   says view; is that right?

22   A.   Yes.

23   Q.   The seconds says printed narrative of Matthew Gutting;

24   is that right?

25   A.   Yes.

1   Q.   The third says printed supplement, one of Matthew

2   Gooding's; is that right?

3   A.   Yes.

4   Q.   And the fourth says printed supplement two of Tony

5   Sclafani; is that right?

6   A.   Yes.

7   Q.   And the fifth says printed supplement three of Matthew

8   Gutting; is that right?

9   A.   Yes.

10  Q.   Counsel asked you a moment ago if an officer would have

11  a reason, especially yourself, to print the reports of

12  another officer; is that right?

13  A.   Yes.

14  Q.   And you said it depends on what's going on in the case;

15  is that right?

16  A.   Yes.

17  Q.   But a records clerk would have a reason to print

18  reports, wouldn't she?

19  A.   Yes.

20  Q.   The records clerk is someone processing those reports

21  that would be sent to a DA's office; correct?

22  A.   Yes.

23  Q.   And they'd be stored in the records department?

24  A.   Yes.

25  Q.   And that's why a records clerk would print those

1    reports?

2    A.    Yes.

3    Q.    Now, you noted that officers have a zero in front of

4    their numbers to denote that they're officers.

5    A.    Yes.

6    Q.    On this page, there's a series of different entries

7    under the column "by" to have zeros; is that right?

8    A.    Yes.

9    Q.    And that would tell you based on your knowledge that

10   those were officer entries?

11   A.    Yes.

12   Q.    So your number was zero three nine; correct?

13   A.    Yes.

14   Q.    Not three nine.

15   A.    Correct.

16   Q.    And was your number sometimes 39 K at that time because

17   you were a canine?

18   A.    I believe at first -- yeah, once I was canine, I was

19   changed to 39 K.

20   Q.    Now, while this is going on, counsel asked you a number

21   of questions about an incident, and he showed you a report to

22   refresh your memory.  When you wrote that report, the events

23   were fresh in your mind?

24   A.    Yes.

25   Q.    And you've been trained to write reports to refresh your

```
 1    memory?

 2    A.    Yes.

 3    Q.    And you put in those reports basic things, the pertinent

 4    information for you to refresh your memory?

 5    A.    Yes.

 6    Q.    And that pertinent information is for a cased to be

 7    filed possibly in a prosecutor's office?

 8    A.    Yes.

 9    Q.    And regarding that call, you did not transport the

10    arrestee, Mr. White, to the station, did you?

11    A.    No.

12    Q.    Because you were a canine handler.

13    A.    Yes.

14    Q.    And the back of your patrol car had a cage; is that

15    right?

16    A.    Yes.

17    Q.    There's a dog in the cage; right?

18    A.    Yes.

19    Q.    So even though you were the arresting officer, you could

20    not be the transporting officer.

21    A.    Yes, that's correct.

22    Q.    And do you recall that after that call, you actually

23    dispatched to another call with your canine?

24    A.    Uh, I don't recall that, but, um, I'm sure that's --

25               THE COURT:   That's okay.
```

```
 1              THE WITNESS:  -- correct.
 2   BY MR. SCHWARTZ:
 3   Q.   If you don't recall, that's your answer.  Now, shortly
 4   after the incident that counsel had been discussing with you
 5   in the apartment back in February of 2005, were you
 6   interviewed by Internal Affairs?
 7   A.   I recall at some point.  I don't remember exactly when.
 8   Q.   Do you recall you gave statements?
 9   A.   Yes.
10   Q.   Were the statements more -- were the events of that date
11   of February of 2005 more fresh in your mind then than they
12   are now?
13   A.   Absolutely.  Yes.
14   Q.   Okay.  And you noted a moment ago when I asked you this
15   that you don't recall if you were sent to a call directly
16   after my client left the scene of the Ironwood Apartments
17   with the arrestee in the car.  Do you recall answering that
18   one?
19   A.   Yes.
20   Q.   Would it refresh your memory to see a copy of the
21   Internal Affairs summary of your statement?
22   A.   Yes.
23              MR. SCHWARTZ:  Can counsel show the witness a copy
24   of the report, Your Honor?
25              THE COURT:  Show it to the government first,
```

```
 1    please.

 2    BY MR. SCHWARTZ:

 3    Q.   Do you have a copy in front of you?

 4    A.   Yes.

 5    Q.   Can I turn your attention to the second page?  And the

 6    second to last paragraph on that page, can you read it,

 7    please, to yourself?

 8    A.   Drew --

 9    Q.   To yourself.

10    A.   Oh, I'm sorry.

11    Q.   Now, having read that, does that refresh your memory

12    whether you were actually dispatched to another call right

13    after my client transported the arrestee from Ironwood

14    Apartments to the police department?

15    A.   Yes.

16    Q.   Were you --

17              THE COURT:  Wait just a minute.

18              You just read that; is that right?

19              THE WITNESS:  Yes, Your Honor.

20              THE COURT:  Now, does that really refresh your

21    recollection of what happened afterwards or are you just

22    reading that?

23              THE WITNESS:  It's just what I read, Your Honor.

24              THE COURT:  Well, strike that then.

25              MR. SCHWARTZ:  That's fine, Your Honor.
```

BY MR. SCHWARTZ:

Q.   Can I turn your attention -- is there a white notebook
in front of you?

A.   Yes.

Q.   And can I turn your attention to Exhibit No. 205 in that
notebook?  And on the bottom right-hand corner of those pages
to Bates stamps numbers 000238 and 000239.

THE COURT:  What exhibit again?

MR. SCHWARTZ:  205, Your Honor.

THE COURT:  Thank you.

BY MR. SCHWARTZ:

Q.   Okay.  Do you have those pages in front of you?

A.   Yes.

MR. ARKOW:  May I have a moment, Your Honor, to
locate the exhibit?

THE COURT:  Of course.  What are the Bates numbers?

MR. SCHWARTZ:  000238 and 000239.

THE COURT:  Thank you.

MR. SCHWARTZ:  And if I may, Your Honor?

THE COURT:  Go ahead.

MR. SCHWARTZ:  I already read into the record a
stipulation which covered both Exhibits 205 and 206.

THE COURT:  Yes.

MR. SCHWARTZ:  Thank you.

BY MR. SCHWARTZ:

```
 1    Q.   And do you recognize what you're looking at which is
 2    Exhibit No. 205, the bottom Bates stamps of 238 and 239?
 3    A.   Yes.
 4    Q.   What is it?
 5    A.   It's an incident report.
 6    Q.   And are you familiar with incident reports?
 7    A.   Yes.
 8    Q.   How so?
 9    A.   Uh, we -- it's every incident that's -- an officer is
10    dispatched to, it's on one of these.
11    Q.   It's on one of these.  Is this the printout that occurs
12    after an incident report gets printed out?
13    A.   Yes.
14    Q.   And on this particular one, what's the date on this one?
15    The date of the incident depicted in the report.
16    A.   February 24th, 2005.
17            MR. SCHWARTZ:  And may I have just a moment,
18    please, Your Honor?
19            THE COURT:  Of course.
20    BY MR. SCHWARTZ:
21    Q.   Now, do you see under unit times, it says 203 K?
22    A.   Yes.
23    Q.   Next to that, it says Officer Matthew Drew?
24    A.   Yes.
25    Q.   Would that be you?
```

1    A.    Yes.

2    Q.    203 K, was that your call sign?

3    A.    Yes.

4    Q.    Now, was that different than the ID number discovered

5    before of 039?

6    A.    Yes.

7    Q.    And would you have the same call sign on every shift

8    that you worked at Desert Hot Springs?

9    A.    Yes.

10   Q.    And the K stands for canine?

11   A.    Yes.

12   Q.    And on this call, does this have you being dispatched at

13   21 colon 45 colon one second hour?

14   A.    Yes.

15   Q.    And then there is a column that says on route.  Do you

16   see that?

17   A.    Yes.

18   Q.    And that's the same time for being en route; is that

19   right?

20   A.    Yes.

21   Q.    Does that mean that you acknowledge that you dispatched,

22   and does that mean that you were on the way?

23   A.    Yes.

24   Q.    And there's a column that says on scene.  Do you see

25   that?

```
 1   A.    Yes.

 2   Q.    Is that 21 colon 46 colon 50?

 3   A.    Yes.

 4   Q.    And there's a column that says clear.  Do you see that?

 5   A.    Yes.

 6   Q.    Is that 22 colon 10 colon 36?

 7   A.    Yes.

 8   Q.    Now, you reviewed your report a moment ago.  Do you

 9   still have it up there?

10   A.    Yes, I do.

11   Q.    And what was the date of the incident that you assisted

12   Mr. Sclafani in arresting the subject at Ironwood Apartments?

13   A.    February 24th of 2005.

14   Q.    And what was the time that you arrested him, if you can

15   remember?  Do you remember that?

16   A.    Not without looking at it.

17   Q.    Would it refresh you to look at your report?

18   A.    Yes.

19   Q.    Please do.

20              THE COURT:  He's looked at it.

21   BY MR. SCHWARTZ:

22   Q.    Does that refresh your memory?

23   A.    By looking at the report, yes.

24              THE COURT:  Well, does it really?

25              THE WITNESS:  No.
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Thank you.

 2              MR. SCHWARTZ:  All right.  Your Honor, may I to

 3    publish Exhibit 205 with Bates stamp pages 23 and 2309?

 4              THE COURT:  Go ahead.

 5              MR. SCHWARTZ:  Thank you.  May I ask that it be

 6    admitted?

 7              THE COURT:  Yes.

 8         (Exhibit 205, Bates Stamp pages 23 and 2309 admitted.)

 9    BY MR. SCHWARTZ:

10    Q.   And looking at these bates stamps, under events, there's

11    a whole series of different things listed; is that correct?

12    A.   Yes.

13    Q.   There's different times next to the event that's listed;

14    is that right?

15    A.   Yes.

16    Q.   And can you tell from this CAD report how long you

17    stayed at that call?

18    A.   Yes.

19    Q.   How long?

20    A.   Uh, approximately, it looks like . . .  35 minutes?

21    Q.   So when it says on scene, that's what you would tell

22    dispatch when you actually arrived at the scene; is that

23    right?

24    A.   Yes.

25    Q.   And clear, would that be when you actually left the
```

1   scene or were you still on the scene when you cleared?

2   A.   Clear means when you leave the scene, yes.

3   Q.   Now, going down to the event, there's a series of times

4   when it ways 203 K, that was your call sign?

5   A.   Yes.

6   Q.   The first time it says it, it says 203 K on route at

7   21:45:01.  That's when you let dispatch know you were on

8   route?

9   A.   Yes.

10  Q.   And down underneath that, it says 20 K -- the next one,

11  203 K, 10:17.  What does that mean?

12  A.   That's when we arrive on the scene.

13  Q.   And the next time, it says 203 K, and it says 10-27.

14  What does that mean?

15  A.   It's a license check or a records check.

16  Q.   And did the name Houston or word Gibson come up with a

17  date?  What does that indicate to you based on your training

18  and training?

19  A.   That's the person that was ran.

20  Q.   And based on your training and experience, who was

21  actually requesting that records check?

22  A.   Myself.

23  Q.   And the next 203 K at 21:49:27 seconds, it says a wanted

24  check.  What does that mean?

25  A.   When they're checked for wants and warrants.

```
 1   Q.   And at 21:49:27, again, the next one says 203 K,
 2   criminal history check.  What does that mean?
 3   A.   That's an actual records check on.
 4   Q.   And at 21:49:27, underneath that one, 203 K, it says
 5   missing persons check.  What does that mean?
 6   A.   That's when they check the missing persons system and
 7   make sure they're not a missing person.
 8   Q.   And at 21:50:08 is another series of entries that says
 9   203 K.  Do you see those?
10   A.   Yes.
11   Q.   And are those intimations you're getting back from those
12   checks or are you requesting further checks?
13   A.   I believe it's returns.
14   Q.   And the next time we see 203 K, it will take us down to
15   the very bottom.  Do you see that?
16   A.   Yes.
17   Q.   And that's at 22:10:32.  You see that?
18   A.   Yes.
19   Q.   It says 10-08.  Do you see that?
20   A.   Yes.
21   Q.   What does that mean?
22   A.   That's what I cleared the screen.
23   Q.   Now, according to this CAD report, you were not the only
24   officer on scene, were you?
25   A.   No.
```

1    Q.    And going down to the bottom of that page at 22:10:21

2    the third one up, it says 207-10.  Do you see that?

3    A.    Yes.

4    Q.    And based on the CAD report, would 207 have been John

5    Collins?

6    A.    Yes.

7    Q.    A call sign; is that correct?

8    A.    Yes.

9    Q.    And does 10 indicate that's when he cleared the scene?

10   A.    Yes.

11   Q.    And underneath him, it says 22:10:27.  Do you see that?

12   A.    Yes.

13   Q.    And it says 209 under call sign 10-8.  Do you see that?

14   A.    Yes.

15   Q.    And according to the CAD report, that would have been

16   Bryan Quaho?

17   A.    Yes.

18   Q.    And does that indicate when he cleared the scene?

19   A.    Yes.

20   Q.    So as -- and you cleared the scene after those two

21   officers according to the CAD report?

22   A.    Yes.

23   Q.    Showing you the second page of that which is Bates

24   stamped 239, there's only one entry on that page.  Do you see

25   that?

1    A.    Yes.

2    Q.    And under time, it says 22:10:32.  Do you see that?

3    A.    Yes.

4    Q.    And it says the event was 203 K closed, disposition AR.

5    What does that mean?

6    A.    It means incident is closed.  AR means arrest report.

7    Q.    And according to what you've seen here based on your

8    training and experience, who would be the officer that would

9    be conducting that arrest?

10   A.    Myself.

11   Q.    And if you arrested somebody at this scene, would you

12   have taken him back to the Hot Springs Police Department and

13   booked him?

14   A.    Yes.

15   Q.    Will you be involved in that booking process?

16   A.    Yes.

17   Q.    Now, previously to that call, you had actually been on a

18   call with Sergeant Sclafani.  That was the person arrested at

19   the Ironwood Apartments.  Do you remember that?

20   A.    Yes.

21   Q.    And would it be common since you were the arresting

22   off -- the handling officer in that case that when you got

23   back to the station and when you had opportunity, you would

24   still assist in the end of the booking process of that

25   Ironwood call?

1    A.    Yes.

2    Q.    So it was not uncommon, was it?

3    A.    Not at all.

4    Q.    So the last time you saw the arrestee at the Ironwood

5    apartments is when he was leaving the scene and being walked

6    to the patrol car; right?

7    A.    Yes.

8    Q.    And you didn't see him again after that until you went

9    back to the Hot Springs Police Department; right?

10   A.    Yes.

11   Q.    And that was not until after this entire call, the one

12   we just saw in the CAD report, after that; right?

13   A.    Yes.

14              MR. SCHWARTZ:  Can I have just a moment,

15   Your Honor?

16              THE COURT:  Yes.

17              MR. SCHWARTZ:  Nothing further at this time

18   Your Honor.  Thank you.

19              THE COURT:  Briefly, Mr. Arkow.

20                      REDIRECT EXAMINATION

21   BY MR. ARKOW:

22   Q.    Mr. Drew, on the incident report that you were just

23   looking at on the incident following the arrest of the

24   individual at the Ironwood Apartments, what officers were

25   working that night?

 1              MR. SCHWARTZ:  Objection.  Lack of foundation.

 2              THE COURT:  He may answer if he has knowledge.

 3              Do you recall?

 4              THE WITNESS:  I don't recall.

 5    BY MR. ARKOW:

 6    Q.    Did you testify about the incident report and the times

 7    that the other officers were cleared?

 8    A.    Yes.

 9    Q.    And was one of the those officers John Collard?

10    A.    Yes.

11    Q.    And was one of those officers yourself?

12    A.    Yes.

13    Q.    And was one of those officers Eddie Cole?

14    A.    I don't recall Eddie Cole being on there but . . .

15    Q.    When you looked at the incident report, did it reflect

16    that Eddie Cole was on the incident?

17              MR. SCHWARTZ:  Objection.

18              THE COURT:  He can ask it.

19              THE WITNESS:  I don't remember seeing it.

20    BY MR. ARKOW:

21    Q.    Do you have that in front of you, Exhibit 206, page 238?

22              THE COURT:  It's in evidence.

23              THE WITNESS:  By looking at that, yes.

24    BY MR. ARKOW:

25    Q.    Okay.  And was Brian Quaho working that night?

1   A.   Yes.

2   Q.   And also Defendant Sclafani?

3   A.   He's not listed on that paper.

4   Q.   Well, not just from the paper but from your memory of

5   having just arrested the individual at the Ironwood with

6   Defendant Sclafani, does that --

7   A.   Then yes.

8   Q.   And on the time that you spent at that incident after

9   the Ironwood, can you calculate from the incident report how

10  long you were there?  If you look, it says you were on

11  scene . . .

12           THE COURT:   What is this?

13           MR. ARKOW:   This is the Defendant Exhibit 205, page

14  238.

15  Q.   Does it show that you were on scene at 21:46?

16  A.   Yes.

17  Q.   Okay.  And then you were cleared at 22:10?

18  A.   Yes.

19  Q.   Does that indicate that you were there for 25 minutes?

20  A.   Approximately, yes.

21  Q.   And you were dispatched to that scene at 21:45; is that

22  right?

23  A.   Yes.

24  Q.   That means you would have left the Ironwood Apartments

25  by 21:45?

1    A.    If that's what it says, yes.

2    Q.    Do you have any reason to dispute the accuracy?

3    A.    Yes.  A lot of times, it's not that accurate.  It's

4    usually off a little bit.

5    Q.    By how much?

6    A.    It's hard to say or it's usually -- it's usually off.

7    It could be off a minute, two minutes.

8    Q.    But within a minute or two.

9    A.    It's usually within a minute or two, yes.

10   Q.    So would you have to leave the Ironwood Apartments

11   talking to the female occupant by the time you were on route

12   to this second incident?

13   A.    I don't understand the question.

14   Q.    Would you have left the Ironwood Apartments talking to

15   the female occupant prior to leaving in route to this second

16   incident?

17              MR. SCHWARTZ:  Objection.  Vague.

18              THE COURT:  Do you understand the question?

19              THE WITNESS:  I believe so yes, I would have had to

20   have left to be in route.

21   BY MR. ARKOW:

22   Q.    So that would have put a timeline on when you left

23   talking with that female occupant at that Ironwood address.

24   A.    Yes.

25   Q.    But at some point, you did return to the police station

```
 1    that night?
 2    A.   Yes.
 3    Q.   And did you see Mr. White, the individual you arrested
 4    at the Ironwood Apartments, at the police station?
 5    A.   I don't recall that but . . .
 6    Q.   Did you ever see Defendant Sclafani tase Mr. White at
 7    the police department station?
 8    A.   No.
 9              THE COURT:  Do you need some time?
10              MR. ARKOW:  Yes, Your Honor.  I need to confer.
11    BY MR. ARKOW:
12    Q.   Directing your attention to when you returned to the
13    police station later that night after you arrested Mr. White,
14    do you have that time frame in mind?
15    A.   Vaguely.
16    Q.   Do you recall seeing Defendant Sclafani at the police
17    station that night?
18    A.   I don't remember.  No.
19    Q.   Do you recall anything about Defendant Sclafani's
20    interaction with Jamal White at the police station that
21    night?
22    A.   No.
23    Q.   Do you recall having any conversations with Defendant
24    Sclafani later that night about his interactions with Jamal
25    White?
```

1    A.    I don't recall that, no.

2              MR. ARKOW:  May I have one moment, Your Honor?

3              THE COURT:  Yes.

4    BY MR. ARKOW:

5    Q.    So just if I could wrap this up, do you recall anything

6    as to what happened with Defendant Sclafani and Mr. White at

7    the station that night?

8    A.    No.

9              MR. SCHWARTZ:  Objection.

10             THE COURT:  The answer will stand.

11             MR. ARKOW:  No further questions.

12             THE COURT:  Okay.  Anything further?

13             MR. SCHWARTZ:  No, thank you.

14             THE COURT:  Thank you, sir.  You're excused.

15             THE WITNESS:  Thank you, Your Honor.

16             THE COURT:  Ladies and gentlemen, we've gone a

17   little bit past where we've indicated.  Hopefully, counsel

18   and Court will be more attentive to time in the future.  I

19   remind you of the admonition not to discuss the matter among

20   yourselves or with anyone.  Have a good evening.  We'll see

21   you at 9:00 tomorrow morning.

22             Will everyone please rise for the jury.

23                      (Jury not present.)

24             THE COURT:  All right, please be seated.  We're

25   outside the presence of the jury.

1          Any matters any counsel wish to take up?

2          Ms. Carter.

3          MS. CARTER:  Your Honor, I just want to apologize

4    about the time.  I -- we didn't realize that -- that we

5    needed to cut things off.  I -- we weren't sure if maybe

6    Your Honor had decided to go longer to accommodate some of

7    the jurors.

8          THE COURT:  I told the jury that we would go until

9    12.

10          MS. CARTER:  Again, the government apologizes.

11          THE COURT:  It's not necessary.  We just need to

12    watch the time and move it along.  All right.

13          At 9:00 tomorrow, we'll be expecting some kind of

14    report from a health expert over at the MDC regarding

15    Ms. Vargas.  As I understand it, the health expert wants to

16    talk to Mr. Nicolaysen first.

17          Is that right, Ms. Skipper?

18          THE CLERK:  Yes.

19          THE COURT:  Hopefully, we'll get that done this

20    evening so we'll have some report in the morning.

21          MR. SCHWARTZ:  Thank you, Your Honor.

22          THE CLERK:  This court is adjourned.

23       (Proceedings with the jury concluded at 12:25 p.m.)

24          THE COURT:  Good afternoon.

25          We're outside of the presence of the jury.  And I

UNITED STATES DISTRICT COURT

```
1    just can't believe that we're the largest federal district in
2    the nation and we can't seem to find defense counsel anywhere
3    including the public defender who is on his or her way here.
4    But do we have our healthcare specialist.  Thank you so much.
5    I really appreciate it.
6            Would you come to the lectern, please, and tell us
7    your name, ma'am?
8            DR. SHELTON:  Good afternoon.  My name is
9    Dr. Samantha Shelton.
10           THE COURT:  And Doctor, I really appreciate your
11   doing this.  It's a strange sort of situation frankly, but
12   let me ask, did you have an opportunity to talk with
13   Ms. Vargas?
14           DR. SHELTON:  Yes, Your Honor.  I was able to talk
15   to Ms. Vargas for approximately 15 to 20 minutes.
16           THE COURT:  Do you have a sense of whether she
17   would be able to testify?
18           DR. SHELTON:  Well, Your Honor, let me just be
19   clear that it was a limited interaction.
20           THE COURT:  And I understand that.
21           DR. SHELTON:  But based on my opinion and based our
22   interactions, I think she is able to testify in court.
23           THE COURT:  All right.  I appreciate that.  I was
24   hoping that we would have defense counsel here while you were
25   making your oral report to us, but we have it on the record
```

1    and know there is much more that could be added to it.

2              Any counsel have anything?

3              MR. ROSENSWEIN:  Jeffrey Rosenswein from the

4    Federal Public Defender's Office.

5              THE COURT:  We have been waiting.

6              You haven't had an opportunity to see Ms. Vargas,

7    have you.

8              MR. ROSENSWEIN:  No, sir.

9              THE COURT:  Well, perhaps what you should do, the

10   doctor is here.  She's done sort of a cursory evaluation

11   because she hasn't had much time to spend, about 15 minutes

12   with her in all.  And I thought maybe you ought to step out

13   in the hall and speak to the doctor, and then you might want

14   to speak to Ms. Vargas and see where we are.

15             MR. ROSENSWEIN:  Yes.

16             THE COURT:  Appreciate your coming over.  If you

17   would do that, then Doctor, would you be willing to speak to

18   the federal public defender?  And thank you very much for

19   your report.  I appreciate it.  Just have her have a seat.

20             MS. CARTER:  Your Honor, I just heard from general

21   counsel Mr. Benshmoul from MDC.  He has been able to reach

22   Mr. Nicolaysen.  He is leaving or has left MDC and is on his

23   way across the street to be here.

24             THE COURT:  Well, thank you for that and helping

25   expedite that matter for us.  We'll just be in recess until

1    then.

2                        (Recess taken.)

3              THE COURT:  We're again outside the presence of the

4    jury.  We still have our public defender.  I take it you have

5    turned the matter over to Mr. Nicolaysen.

6              Doctor, did you get a chance to speak with

7    Mr. Nicolaysen?

8              DR. SHELTON:  Yes, I did, Your Honor.

9              THE COURT:  Thank you.

10             Mr. Nicolaysen, you were in the one place where we

11   couldn't reach you.  You had to leave your phone probably in

12   the locker.

13             MR. NICOLAYSEN:  I just want to thank the Court for

14   its patience and everyone else.  I was seeing other clients

15   at MDC.

16             THE COURT:  The one place where we couldn't reach

17   you by your cell phone.

18             MR. NICOLAYSEN:  I have conferred with my client.

19   I understand the clinician at MDC likewise had a preliminary

20   opportunity.  Based on my discussions with the MDC

21   psychologist, there appear to be preliminary indications that

22   my client would be competent to testify, although no formal

23   diagnosis has been done.

24             I've spoken with my client.  I do feel that before

25   being called as a witness, it would be prudent to have a

meeting with the government and still go through some

preparatory dialogue to confirm in everyone's mind she's in a

suitable position to take the stand.  She can address

Your Honor now and at least it appears there are no clinical

factors that would prevent testimony.

With that in mind, I ask Your Honor to consider

releasing my client and I have advised her that if Your Honor

is inclined to consider that and address her in regard to

what arrangements she would make to come here tomorrow and

assure the Court of her commitment to the subpoena.

But now that we can be at least preliminarily

assured there's not a mental health factor that could cause

her not to obey the subpoena and she has the capacity to obey

the subpoena, I think we're at the stage where Your Honor can

inquire of her directly and perhaps be satisfied that she can

give you the right assurances and release her today so she

can show up tomorrow voluntarily.

THE COURT:  All right.  Ms. Vargas, would you come

to the lectern there and speak into the microphone.

Remember the conversation we were trying to have

yesterday when you first came into court?  You must answer

out loud.

MS. VARGAS:  Yes.

THE COURT:  And I asked you why you didn't obey the

subpoena.  You remember that?  Do you remember it, ma'am?

```
 1            MS. VARGAS:  Yes, I do.

 2            THE COURT:  And you just remained silent.

 3            MS. VARGAS:  I was here, but every day I'm

 4   subpoenaed, seems like it.  So if I'm not gonna go home,

 5   fine.  Other than that, I'll just go to the hospital or

 6   something, my family house.  If I have to come every day,

 7   then I just rather not say anything anymore because it's not

 8   funny.

 9            THE COURT:  No, none of it's funny, but court

10   orders are not meant to be funny.  You understand you have to

11   obey a court order, don't you?  You understand that, don't

12   you, ma'am.

13            MS. VARGAS:  And I have been here.

14            THE COURT:  I'm not sure that this witness should

15   be released to tonight.

16            MS. VARGAS:  I have been here.  I have been coming

17   whenever they say.  It's just . . .

18            THE COURT:  Well, I understand that you came

19   yesterday morning, but you refused to come inside the court

20   and you left; is that right?

21            MS. VARGAS:  I was here.

22            THE COURT:  Are you pursuing a lawsuit of your own

23   in Indio?

24            MS. VARGAS:  No, I'm not.

25            THE COURT:  Are you a witness in the case out
```

1    there?

2                MS. VARGAS:  I'm not here for that.  This is okay.

3                MS. CARTER:  Your Honor, would the Court want

4    government counsel to update the Court in regard to the

5    litigation status in the other proceeding?

6                THE COURT:  Perhaps.

7                MS. CARTER:  Your Honor, it's our understanding

8    that Ms. Vargas is not a plaintiff in that case.  She is a

9    witness in the case.  She's been called -- it's our

10   understanding she has been called by the plaintiffs in that

11   case to establish a pattern and practice, and they are

12   getting into the substance of the allegation in Count II of

13   this criminal matter in that case, but only insofar as

14   Ms. Vargas is a witness.

15               THE COURT:  I see.  Would you mind telling me who

16   the parties are in that case?

17               MS. CARTER:  Yes, Your Honor.  The plaintiffs in

18   the case are Edward David Moore, Sherry Freud, Laticia Moore

19   Alicia Young, Lisa Meyer and the defendants in the case are

20   the City of Desert Hot Springs, Anthony Sclafani, the

21   defendant in this case, Michael Vill, Matthew Drew, David

22   Henderson, Steven O'Connor, Walter McKinley, Matthew Gutting

23   as Doe 1, David Hoffman as Doe 2 and Does 3 through 30.

24               THE COURT:  You know when that case was commenced

25   in trial?

1          MS. CARTER:  I believe the trial has been going on

2     for some time, for a couple of weeks now.

3          THE COURT:  Yes.

4          MR. SCHWARTZ:  I have been in some communication

5     with Joseph McMillian, the City Attorney out there on that

6     case and my understanding is that Ms. Vargas' testimony is

7     not as a percipient witness at all regarding this incident,

8     and her testimony, the ruling was she can only testify out

9     there to any kind of pepper spray usage not tasers.

10    Specifically, there's no tasers in that civil case.

11         The judge ruled there's to be no evidence of tasers

12    in that case only pepper spray, that was all.  Additionally,

13    I believe that testimony may be going much more towards the

14    Monel issue in state court as the Court is aware.  So it

15    would be limited for those purposes and really not for the

16    purpose of my client's responsibility.

17         THE COURT:  Thank you for that.

18         MS. CARTER:  Your Honor, may I clarify?

19         THE COURT:  Yes certainly.

20         MS. CARTER:  I believe that Ms. Vargas did give a

21    deposition in the --

22         THE COURT:  Ma'am.

23         MS. VARGAS:  I'm done with this case.  Lock me up

24    in a little hole as long as you guys want.  Go ahead and lock

25    me up in a little hole.  I have been trying and everything.

```
 1   I'm not going to say anything no more.  Keep me in a little
 2   square box, fine.  I'm done.  I'm not gonna speak any more.
 3   I'm not trying to be rude or anything, but that's okay.
 4           THE COURT:  Go ahead.
 5           MS. CARTER:  Sorry, Your Honor.  The tasing was
 6   described in detail.  The entire incident that's the subject
 7   of Count II was described in Ms. Vargas' deposition and
 8   Mr. Sclafani's civil attorney was present at that deposition
 9   and cross-examined Ms. Vargas.
10           THE COURT:  Fine.  Thank you.  Mr. Nicolaysen.
11           MR. NICOLAYSEN:  I think we're at a crossroads
12   where the issue of her testimony involves a strategic
13   consideration as to whether the government indeed wants to
14   call her.
15           THE COURT:  Exactly.  I would think so.
16           MR. NICOLAYSEN:  I would ask the Court to take into
17   consideration the fact that we have the weekend coming up.
18   The government and I are going to need to meet in this very
19   context.
20           THE COURT:  Well, I think you can do that this
21   afternoon.
22           MR. NICOLAYSEN:  We will do that.
23           THE COURT:  We can finalize it one way or the other
24   tomorrow morning.  If the government intends to call her and
25   she's going to testify, then she may do so.  If the
```

1    government wishes to withdraw the subpoena, they can let me

2    know that, too.  We can do all of this so we don't get into

3    the weekend.

4            MR. NICOLAYSEN:  Your Honor, I thank the Court for

5    that.  I understand I have kept people waiting today because

6    I was at MDC.  Is there an opportunity we can accomplish all

7    of that by 5:00 to save my client another night of

8    incarceration?

9            THE COURT:  I'm afraid not.

10           MR. NICOLAYSEN:  Understood.

11           THE COURT:  Ms. Carter.

12           MS. CARTER:  I think the government should meet

13   with Mr. Nicolaysen and hopefully Ms. Vargas this afternoon

14   to determine most importantly whether Ms. Vargas is willing

15   now that she is -- at least we have a preliminary idea she is

16   capable of honoring the subpoena, if she is willing to honor

17   the subpoena even if ordered.  And hopefully that will be the

18   case and we can proceed with her testimony first thing in the

19   morning and hopefully complete it.

20           Although I have conferred with defense counsel, he

21   and I both believe there is a risk that it could take longer

22   than three hours of court time.  He and I both have agreed

23   that we could -- if the jurors can do it with this late

24   notice, that he and I could go both to 2:00 if absolutely

25   necessary instead of noon as we have planned.  We also

 1    discussed whether it might be possible to do a Monday

 2    session.  I realize that's still -- it still brings the

 3    weekend as a cause for concern, but at least it's better than

 4    Tuesday.  We have talked briefly about that.

 5         If this Court determines tomorrow morning that this

 6    witness is unavailable, however, because she is unwilling to

 7    honor the subpoena even if ordered by this Court to do so, at

 8    that point, Your Honor, the government would seek to have her

 9    declared unavailable by the Court and to seek to admit her

10    videotaped deposition in the civil case.

11         THE COURT:  All right.  Well, put your heads

12    together with Mr. Nicolaysen and see just you do want to do.

13         MR. NICOLAYSEN:  In light of the possible use of

14    Rule of Evidence 804 and given the fact there is prior sworn

15    testimony on the subject matter at hand, I do ask that we

16    might be able to resolve this today.  If could we take a half

17    hour, I'm very respectful to impose on everyone.

18         THE COURT:  I'm sorry.  I can't.  Others are

19    expecting me out in Riverside.  I should have left some time

20    ago, but it just can't be helped.  You'll have to get it done

21    between you and the government and Ms. Vargas this evening.

22    And depending upon the outcome of that, we can try to

23    complete it all tomorrow.  And very frankly, I don't

24    understand if indeed this witness is willing to testify, why

25    it should take that long if we just deal with the elements of

1    the offense and not all the minutia that keeps coming into

2    this trial.  No reason for it to take that long.  None.

3    Thank you for your help again.

4              We'll stand adjourned until 9:00 a.m. tomorrow.

5              THE CLERK:  Court is adjourned.

6              (Proceedings were concluded at 3:30 p.m.)

```
1              CERTIFICATE OF REPORTER

2


3    COUNTY OF LOS ANGELES      )

4                               )  SS.

5    STATE OF CALIFORNIA        )

6

7    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

8    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

9    DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

10   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

11   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

12   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

13   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

14   OF MY STENOGRAPHIC NOTES.

15

16


17   DATE: JANUARY 7, 2013 _____

18


19   _____ /s/  LAURA MILLER ELIAS ____

20   LAURA MILLER ELIAS, CSR 10019

21   FEDERAL OFFICIAL COURT REPORTER

22

23

24

25
```