1                    UNITED STATES OF AMERICA
                    UNITED STATES DISTRICT COURT
2                 CENTRAL DISTRICT OF CALIFORNIA
                        WESTERN DIVISION
3
                            - - -
4                HONORABLE TERRY J. HATTER, JR.
             UNITED STATES DISTRICT JUDGE PRESIDING
5                            - - -

6
     UNITED STATES OF AMERICA,          )
7                                       )
                     PLAINTIFF,         )
8                                       )
     VS.                                )   CASE NO.:
9                                       )   CR 10-00163-TJH
     ANTHONY SCLAFANI,                  )
10                                      )
                     DEFENDANT.         )
11                                      )
                                        )
12   _____)

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 FRIDAY, FEBRUARY 10, 2012

17                  LOS ANGELES, CALIFORNIA

18

19

20

21

22                LAURA MILLER ELIAS, CSR 10019
23              FEDERAL OFFICIAL COURT REPORTER
                312 NORTH SPRING STREET, ROOM 453
24              LOS ANGELES, CALIFORNIA 90012
                    PH:  (213)620-0890
25

```
 1

 2
        APPEARANCES OF COUNSEL:
 3
        ON BEHALF OF PLAINTIFF:
 4

 5                 BY:  MARGARET CARTER
                        STEVEN M. ARKOW
 6                 ASSISTANT UNITED STATES ATTORNEY

 7                 1100 UNITED STATES COURTHOUSE
                   312 NORTH SPRING STREET
 8                 LOS ANGELES, CA 90012

 9
        ON BEHALF OF DEFENDANT:
10
                   SILVER, HADDEN, SILVER, WEXLER & LEVINE
11                 BY:  MICHAEL D. SCHWARTZ, ESQ.
                        MICHAEL SIMIDJIAN, ESQ.
12
                   1428 SECOND STREET
13                 SUITE 200
                   SANTA MONICA, CA 90012
14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                              INDEX

2    WITNESSES FOR
     THE GOVERNMENT:
3
                      DIRECT        CROSS        REDIRECT      RECROSS
4

5    GUTTING, MATTHEW

6    BY:  MS. CARTER    24                         155
     BY:  MR. SCHWARTZ              127                          165
7

8


9
     EXHIBITS    RECEIVED       EXHIBITS        RECEIVED
10
     2           30             15              61
11
     51          107            206             132
12                              (Pg. 000297)

13


14   ANGELICA VARGAS
     STATUS CONFERENCE...............................167
15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1    LOS ANGELES, CALIFORNIA; FRIDAY, FEB. 10, 2012; 9:30 A.M.

 2                          -  -  -

 3         THE COURT:  We are still outside the presence of

 4    the jury and are still missing one juror.  I thought we could

 5    get whatever matters that we can out of the way.

 6         Mr. Nicolaysen, the clerk indicates you think

 7    there's some significance of United States versus Yheda.

 8         MR. NICOLAYSEN:  The Yheda opinion is the most

 9    recent 9th Circuit analysis of Federal Rule of Evidence 804.

10    It deals with a different aspect of 804 than what we have

11    here.  It has to do with a deported witness to the degree the

12    government caused unavailability by allowing deportation

13    which is 804 (a)(5).  Clearly, we don't have that situation.

14    I wanted to let the Court know how recently the 9th Circuit

15    visited the unavailability standard under 804 here

16    respectfully 804 (a)(2) and I'll articulate that in just a

17    moment.

18         The interrelation between the Sixth Amendment and

19    the right of confrontation of the accused under Crawford

20    versus Washington, the unavailability standard is uniquely

21    set forth only in the Rules of Evidence and that balancing is

22    very central knowing the Circuit's approach.  I thought it

23    might be productive to include that in today's discussion,

24    and I'll leave it to defense counsel on that.  But permit me,

25    if I may, Your Honor, to proceed by proffer as to where we
```

1    are.

2          After yesterday's proceedings adjourned, the

3    government counsel and the case agent and I went to Roybal

4    and to cut to the chase see where we stand with Ms. Vargas'

5    inclination to testify.  We were not productive, Your Honor.

6    She has not cooperated in regard to affirming her commitment

7    to testify and did not engage in any substantive discussion

8    as to the matters that would be covered on direct

9    examination.

10          It is my position as her counsel to respectfully

11   ask this Court to excuse her from being a witness, excuse her

12   from taking the stand and allow the unavailability analysis

13   under 804 to go forward by proffers.  My goal is to allow

14   Your Honor to know the circumstances.  Nothing more would be

15   gained by putting her on the stand and demonstrate in the

16   presence of the jury and this Court her refusal to testify

17   and subject herself to contempt.

18          While I can certainly respect and appreciate the

19   defense attorney, as I am one as well, wanting to see a

20   government witness, if you will, self-destruct in front of

21   the jury, nothing is gained procedurally and we simply put

22   her in the cross-hairs of litigation strategy.  My goal is to

23   avoid that.

24          We have an individual who is in all likelihood

25   simply not going to submit to the jurisdiction of the Court

1    and not obey a command to testify.  I think that's quite

2    predictable that's what going to happen.  I ask the Court why

3    go through the exercise in futility if it's not going to gain

4    anything.  I think the focus would be better directed to the

5    Rule 804 standard to see what degree she then qualifies as an

6    unavailable witness.

7          We do have, as the Court knows, prior sworn

8    testimony in a deposition that covers the subject matter at

9    hand, and I would ask the Court to consider and now I will

10   defer to government counsel since it is their case, ask the

11   Court to consider that that former testimony which was

12   subject to cross-examination constitutes and meets the

13   requirement under 804 (b)(1) as prior testimony that can be

14   an alternative option to use here in this trial.

15         And therefore, just in wrapping up, I would ask she

16   be excused from testifying, deemed unavailable and that upon

17   the completion of the playing of the deposition which would

18   then complete her contribution as a witness in this trial,

19   she be released from the subpoena and released from custody.

20         THE COURT:  All right.

21         MS. CARTER:  I agree with counsel we've got signs

22   to conclude she would not testify.  Based on the research

23   that I have done in the last two days about the 804 (a) and

24   (b) standards, I think that she's already made very clear

25   that she does not intend to testify.  We might be able even

1    at this point to declare her unavailable, however, I would

2    suggest that a better practice and just to make sure that we

3    really tested her unwillingness to testify, a better practice

4    might be for this Court when she arrives to question her

5    outside the presence of the jury and perhaps even order her

6    to testify and ask her now that you have been ordered, do you

7    still refuse.

8           If she does still refuse, Your Honor, then I think

9    she is unavailable within the meanings of 804(a)(2), and at

10   that point, Your Honor, I think that we would request the

11   admission of the videotaped deposition in the civil case, the

12   Moore case under 804(b)(1).  And I think, Your Honor, that it

13   meets the standards there because this same defendant was

14   represented by counsel in that case.  The counsel did have an

15   opportunity to cross-examine Ms. Vargas.  The exact same

16   matters that she would testify here today she testified

17   about.

18          THE COURT:  Just let me ask you which counsel had

19   the opportunity to cross-examine?

20          MS. CARTER:  It was not defendant's criminal

21   counsel Mr. Schwartz or Mr. Simidjian.  It was civil counsel

22   Joseph McMillian who continues to represent --

23          THE COURT:  Doesn't that provide us with a wrinkle?

24          MS. CARTER:  Well, I think, Your Honor, and I'm

25   happy to brief this for the Court.  We're actually hoping to

1    possibly file something today about this if this becomes an

2    issue.  I believe that it doesn't have to be unity of counsel

3    because if that was the test, then a defendant or an adverse

4    party could keep out former testimony at any time just by

5    switching counsel.

6              THE COURT:  Well, not necessarily, but here we're

7    talking about a civil case deposition and a criminal trial.

8              MS. CARTER:  There is also precedence.

9              THE COURT:  If you can provide that.

10             MS. CARTER:  I will provide that.  The Coone case

11   is what I'm particularly thinking of which involves the

12   Rodney King matter, and in that case former testimony from

13   the civil proceeding was used in the criminal trial.  There

14   are plenty of precedents where civil deposition testimony,

15   civil trial testimony is used in a criminal proceeding.

16             THE COURT:  Well, I can imagine it might be, but

17   still you would have to look at the circumstances.

18             MS. CARTER:  Certainly, Your Honor.

19             THE COURT:  And if there were an objection by

20   criminal defense counsel in any of those cases, I would like

21   to know.

22             MS. CARTER:  Certainly, Your Honor.  I believe that

23   it has been litigated in those cases because that's kind of

24   how we get to the point where it's mentioned in a published

25   decision and, Your Honor, I think that there are several

1    factors.  One is that the issues are similar.  They don't

2    have to be identical, but they do have to have a similarity

3    and that the defendant's counsel in the other proceedings has

4    same motivation to cross-examine as in this proceeding.  And

5    I think, Your Honor, again, that we would meet those tests

6    there because the issues that Ms. Vargas testified about in

7    her civil deposition are exactly the same.  And I have

8    actually marked and included today for all counsel and for

9    the Court and a copy for the Court's trial book, a copy of

10   the transcript of the civil deposition.

11           With regard to the motive to cross-examine, we can

12   also meet that test, Your Honor, because the deposition of

13   Ms. Vargas was taken in September 2011 right before trial of

14   this case was about to begin.  I believe at the time it was

15   scheduled for November of 2011 and then, of course, it was

16   later continued to our present trial date.  But it was

17   certainly substantial time after the indictment in this case.

18   Defendant was well aware that Ms. Vargas would be a witness

19   for the government.  Well aware of her story.  Discovery had

20   been produced in large part at that time, and in addition,

21   Your Honor, the defendant when he was deposed --

22           THE COURT:  Wait a second.  You're saying in

23   addition.  What does the fact that she had been deposed in a

24   civil case with similar kinds of matters involved with wholly

25   different standards of proof involved, what does that have to

 1    do with the defense of this case?

 2            MS. CARTER:  Well, Your Honor, I think that

 3    804(b)(1) provides that as long as the motive to

 4    cross-examine was there, the testimony can come in.  It

 5    doesn't have to be identical.  It doesn't have to be the

 6    exact cross-examination that this criminal counsel would use.

 7    It's permitted in even when there may have been strategic

 8    reasons not to cross-examine at all as long as the motive was

 9    there.

10            And I think, Your Honor, the purpose behind that is

11    to avoid the situation where you have an unavailable witness

12    and the only alternative is no testimony at all.  Obviously,

13    we would all prefer live testimony and that's why 804 only

14    comes into effect if the witness is unavailable.  What

15    804(b)(1) does is gives us an alternative, not the best

16    option, but a second best alternative certainly better than

17    no testimony at all.

18            THE COURT:  But is the second best for the

19    prosecution or second best for the defense?

20            MS. CARTER:  I think it is both, Your Honor.  The

21    government was not a party in the civil case.  There are

22    certainly many questions that I would have liked to have

23    asked, many of things I would have liked to have cleared up

24    if I had been present, but I think that it's certainly better

25    than no testimony at all.  And I'm willing to kind of live

```
 1    with the record as it stands because the alternative is
 2    nothing.
 3              THE COURT:  Okay.
 4              MS. CARTER:  One other thing I would like to add
 5    just about the motive to cross-examine, Your Honor, is I
 6    think it's telling that the defendant when he was deposed in
 7    the civil case invoked his Fifth Amendment rights.  I think
 8    that makes it very clear he had this proceeding very much in
 9    mind in his prosecution of the -- or in defense of the civil
10    matter.
11              THE COURT:  All right.  Thank you.
12              MR. NICOLAYSEN:  May I address, Your Honor, on the
13    Rule 804?
14              THE COURT:  Well, but before you do, I want to hear
15    from Mr. Schwartz.
16              MR. SCHWARTZ:  Thank you, Your Honor.  I'll try to
17    address what counsel just brought up.  I would like to start
18    almost at the end and go to the beginning because counsel
19    brought up a similar motive on behalf of Mr. McMillian in the
20    cross-examination.  We have a declaration, which we got very
21    late last night, from Mr. McMillian who is in the midst of
22    that trial out in Indio.  I can give a brief summary.
23              We can lodge it with the Court with the Court's
24    permission if the Court would like to see the declaration,
25    but as an officer of the court, I did have communication with
```

him briefly last night to be quite frank by way of text as

opposed to speaking with him.  And Mr. McMillian when he was

a part of that deposition back in September did not have any

of the discovery in this case.  There was a protective order.

He had none of the FBI 302 interviews.  He had no interviews

of Ms. Vargas.  All he had was he had seen, and again, as an

officer of the court, I don't remember if he said he had in

his possession or had seen it, but I know he had at least

seen --

THE COURT:  He's the attorney who did the

cross-examination?

MR. SCHWARTZ:  Correct.  He had seen the Internal

Affairs investigation.  I don't think he had a good look at

it from what he told me, but again, if he was here, he would

tell the Court specifically about how well he had it.  But he

had none of the criminal investigation at his disposal.  My

client did not speak to him about this case because there was

a protective order and my client did not want to tell him or

speak about things that may come out in conversation that

were part of the protective order.  So they had no

conversations about the facts.

Mr. McMillian in his direction states that he

didn't have adequate preparation or acumen to cross-examine

Ms. Vargas.  He did not have a similar motive.  She's there

in that -- she was there for the purpose of a Monel issue in

1  that case and that's really it.  And that case dealt with a

2  pepper spray issue not a taser issue.  If you look at his, at

3  the actual deposition --

4       THE COURT:  The case that's going on now in Indio

5  only deals with pepper spray?

6       MR. SCHWARTZ:  Correct.  And if you look at the

7  deposition, he asked all of seven pages and that is how many

8  questions are on seven pages out of, I can't remember how

9  many, but it must be about a hundred or a little bit less.

10      THE COURT:  Hundred or a little but less what?

11      MR. SCHWARTZ:  88 pages.  So moreover his

12 motivation was markedly different because his motivation was

13 really to just to see what she would testify to since he had

14 no idea what she was going to say since he had no materials

15 with which to cross-examine her used at a Monel hearing which

16 in that case, I can offer to the Court I know was bifurcated

17 and that it was to be heard after the main case-in-chief.

18      I understand that he may have had a

19 quasi-representation of my client along with about four other

20 or more officers as well as the City.  My client had no

21 communications with him as an attorney/client relationship is

22 involved about this case, about the facts of Ms. Vargas'

23 testimony or anything to that nature.  So the last point the

24 government made as far as my client invoking his Fifth

25 Amendment rights that is because obviously that deposition

```
 1    would take place before the trial and things could be taken

 2    out of context, things of that nature.  So in a civil

 3    deposition, that's was the advice he took.  Has nothing to do

 4    with Mr. McMillian having any degree of similarity in his

 5    cross-examination or motivation or any materials that would

 6    really make him a competent attorney to properly

 7    cross-examine a witness who end up being in a criminal case.

 8              THE COURT:  All right.  Thank you.

 9              MR. SCHWARTZ:  Also, Your Honor, with leave of the

10    Court, I could also address other issues pertaining to the

11    804, I believe it's (b)(2), about the issue that we're

12    discussing here about whether it's a similar motive and

13    similar circumstances if the Court would like as well as I

14    think the Yheda case, which I thank counsel alerting to us

15    that this morning, both government counsel.

16              I can also offer that in the deposition itself,

17    which I went over with a fine tooth comb last night, there is

18    multiple hearsay in the deposition.  There are things that

19    are irrelevant.  Things that are more prejudicial than

20    probative that she said.  There are no real objections to any

21    of these things which is because, again, Mr. McMillian's

22    motivation was very different than a criminal attorney

23    cross-examining.  To try to redact some of that may be

24    extremely difficult, especially in a video as opposed to just

25    on paper.
```

1          And, again, without any kind of -- there are also

2    many times when the attorney for in the civil case gave his

3    own opinions as opposed to asking questions, gave his opinion

4    about the answer to the question, gave his opinions as the

5    form of a question.  All would be prejudicial.  His opinions

6    have no bearing and no right to be in the middle of a

7    criminal case and he obviously has a motive, which is money

8    for his client, in making those opinions and those statements

9    during that deposition.

10          THE COURT:  All right.  Thank you.  Mr. Nicolaysen.

11          MR. NICOLAYSEN:  Your Honor, thank you.

12          Looking beyond 804 which I addressed previously, I

13   would ask the Court to consider renewing the psychological

14   evaluation of my client after Your Honor has engaged her in a

15   discourse with the Court upon her arrival here.  While

16   preliminary indications yesterday do seem to suggest that she

17   has the capability to respond and to understand, nonetheless,

18   the 15-to-20-minute dialogue with the therapist at MDC

19   touched on, it was not only very brief, but touched on

20   innocuous subjects that are entirely different from the

21   subject matters here which would seem trigger extraordinarily

22   high levels of anxiety and emotional reactions that are

23   unique to these circumstances.

24          And which may bring into play the types of

25   variables that a trained clinician would look to in

```
 1   determining competency within a very specific framework.
 2   That is she may be competent with day-to-day life on the
 3   street, but not competent for the specific purposes that
 4   bring her here to this court.
 5              THE COURT:  Well, with all deference to the
 6   psychologist who really aided us on an emergency basis and
 7   indicated that she could only see her for about 15 minutes,
 8   she said she couldn't make any qualified evaluation with
 9   regard to whether this person and the other reasons for not
10   testifying, but that she felt she were capable, but given the
11   unique circumstances here, she is not willing to offer any
12   opinion.  Now, I'm quite willing to let them do the ordinary
13   kind of evaluation.  It takes about 30 days.
14              MR. NICOLAYSEN:  My concern as her counsel is that
15   if Your Honor directs her to the witness stand and we walk
16   into a potential criminal contempt for which there are
17   incarceration penalties, it's a very dangerous path to go
18   down.  Before anything of that sort happens, I think the
19   Court, certainly all of us want to be absolutely certain that
20   she is on that witness stand with all of the required mental
21   faculties that make her capable of properly complying with
22   the directive to testify such that she should be subjected to
23   penalties for not doing so.  We're not yet at a point where
24   we know for a fact that she has that capability.
25              THE COURT:  Well, I agree with you, but I intend to
```

```
 1    interrogate her when she's brought in here which I understand
 2    is almost immediate.  But as I say, I'm also willing to have
 3    a full evaluation done and say further that takes about
 4    30 days.
 5            MR. NICOLAYSEN:  Well I would ask the government to
 6    reconsider her as a witness.  I realize Your Honor is not in
 7    a position to it make that decision for them, but if the
 8    option is that the only way around having her on the stand,
 9    if Your Honor is disinclined find her unavailable, and
10    therefore she will be put on the stand, then I would
11    respectfully request that we reopen the competency
12    evaluation.
13            THE COURT:  Well, anybody else wish to be heard?
14            Ms. Carter, you have something else?
15            MS. CARTER:  Your Honor --
16            THE COURT:  Excuse me one minute.  Go ahead.
17            MS. CARTER:  I have the briefing previously
18    mentioned provide to the Court and to defense counsel.
19            THE COURT:  Surely.
20            MS. CARTER:  In addition I just wanted to mention
21    that Mr. McMillian did represent this defendant at his own
22    deposition, so I just wanted to mention that in kind of in
23    response to some of the comments by defense counsel.
24            THE COURT:  Yeah, I understand.  Thank you.
25            MR. SCHWARTZ:  Just to clarify --
```

1        THE COURT:  I understand Ms. Vargas is being

2  brought from Roybal and she's not in a holding cell

3  downstairs.  I just don't understand what goes on around

4  here.

5        Yes, go ahead.

6        MR. SCHWARTZ:  Just to clarify, Mr. McMillian was

7  the attorney who sat in while my client invoked at the

8  deposition.  That was with Mr. McMillian asking his criminal

9  defense attorney if that would be the case and Mr. McMillian

10  had no conversations with my client about the criminal case.

11  I spoke to him before that deposition and he had no

12  conversation about Ms. Vargas' testimony, FBI 302s or

13  anything of that nature.

14        THE COURT:  Mr. Schwartz, I don't even get to that

15  point.  I mean you as an officer of this court have indicated

16  to me that he didn't have the full discovery in this matter

17  and that's enough.

18        MR. SCHWARTZ:  Thank you, Your Honor.

19        THE COURT:  All right.  Unless there's something

20  further, I don't know if it might not be in the best interest

21  of everybody and particularly the jury to proceed with

22  another witness and take this up at 12 o'clock.

23        MR. NICOLAYSEN:  I will inform Your Honor that I am

24  here at the Spring Street courthouse all day today.  I would

25  appreciate it if I may have Your Honor's permission, I need

```
 1    to handle another matter that's also in lockup downstairs.  I
 2    have the interpreter.  Judge Snyder is hoping we can do a
 3    change of plea on that other matter at noon.  May I have
 4    permission to be her court at noon?
 5              THE COURT:  At noon?
 6              MR. NICOLAYSEN:  At 12 o'clock.  I will coordinate
 7    with Judge Snyder's clerk and I'm sure she's very
 8    understanding.  I just need to make that call.  Should I go
 9    ahead and talk to Catherine Jeang and put that on hold until
10    we have resolved our matter?
11              THE COURT:  I would appreciate it if you would.
12              MR. NICOLAYSEN:  I'll be happy to do that.
13              MS. CARTER:  Your Honor, I apologize for continuing
14    to jump up.
15              THE COURT:  No, that's all right.
16              MS. CARTER:  I did just want to clarify two issues.
17    One with regard to the issue of redacting potential hearsay
18    or other colloquies that may be appropriate to redact in the
19    deposition.  I also watched the video again last night and
20    played with the redacting and I think we can easily --
21              THE COURT:  Edit the video?
22              MS. CARTER:  Correct, or stop and start it and then
23    provide to the court reporter by reading aloud a listing of
24    the excerpts that were actually played for the Court.  That
25    would be my proposal.  It's kind of the most expedient way to
```

UNITED STATES DISTRICT COURT

```
1    do it.  Obviously --
2              THE COURT:  I don't know the reporter would handle
3    that.
4              MS. CARTER:  Well, what I propose is that I would
5    just read aloud at the conclusion that I have played excerpts
6    at this time stamp to this time stamp so that it's clear for
7    the record what was played.
8              THE COURT:  All right.
9              MS. CARTER:  And then, obviously, though, the
10   defense and I need to confer about which portions they have
11   concerns about and we have not done that, but I believe --
12   I'm prepared to do that and I believe that they are as well
13   because I know that they have reviewed it carefully last
14   night.
15             And then the last issue I just wanted to raise is
16   that the 302s in this case were not produced pursuant to a
17   protective order according to my understanding.  Those could
18   have been shared with the counsel in the civil case.
19             THE COURT:  Well, the fact that they could have
20   been is not really the pertinent issue here.  Were they
21   shared?
22             MS. CARTER:  Well, Your Honor, I think it actually
23   is the pertinent issue under the case law because it's the
24   opportunity to cross-examine that's the issue.  And what the
25   defense actually chooses to do or not to do is not.  And I
```

```
 1   think that's probably the right objective inquiry because
 2   otherwise again the defense could manipulate the Rule 804
 3   (b)(1) standard for their desired result.
 4            THE COURT:  Sure if the defense had some notion of
 5   how your proposed witness was gonna react to testifying here,
 6   but I don't understand that you're suggesting that they did
 7   know.
 8            MS. CARTER:  Well, I think, Your Honor, what I'm
 9   suggesting is that they had the same motivation to
10   cross-examine and that they may have made different choices
11   here than there because of different counsel or different
12   postures of the case, but perfect identity is not required --
13            THE COURT:  Mr. Schwartz, would you remain seated.
14            MS. CARTER:  But perfect identity is not required
15   under the law.
16            THE COURT:  All right.  I understand what you're
17   saying.  Mr. Schwartz.
18            MR. SCHWARTZ:  Thank you, Your Honor.  Can I
19   address what counsel just noted for the Court?  In the civil
20   case in the Moore case, the civil attorneys for the Moore
21   case sought to subpoena the government 302s and all those
22   reports that may have gone with them such as police reports
23   and things of that nature that we received from discovery
24   from the government and U.S. Attorney's Office and myself
25   included in the subpoena.  We fought the subpoena.  We lost
```

1    in the state court with the trial court.  We took it to the

2    state appellate court.  We won the appellate court.  The

3    appellate court reversed the trial court's order and said

4    that those matters were only given to us as defense counsel

5    in the criminal case pursuant to the discovery obligations of

6    the government.  They were not subject to the civil subpoena

7    powers of -- in the state court and therefore they were

8    considered protected under that.

9            Along with that when these were first subpoenaed or

10   around that same time from by civil attorney and we were

11   looking to try to combat that in state court to try to

12   clarify what was pursuant to the protective order of this

13   Court and what was not, I did have a conversation with

14   Mr. Arkow.  I asked him if the government would like to have

15   an opinion on that so that way when we responded first by

16   letter and then actually by motions work to Mr. Perez's

17   office, I could tell Mr. Perez that it was the position of

18   both counsel and the government these are under protective

19   order.

20           And Mr. Arkow informed me that he did want to get

21   involved.  This was a civil subpoena from an outside party to

22   our office.  He was not going to interpret the protective

23   order one way or the other.  And we took the stance

24   throughout those proceedings that all those materials were

25   covered by the protective order.  It does say on the bottom

```
 1    of many of the 302s that they are the property of the FBI.

 2            THE COURT:  I don't think all the 302s say that,

 3    but let's not have any more of this right now.  Otherwise,

 4    we're just losing time where the jury could be in here.  We

 5    can take it up again at noon.

 6            MR. SCHWARTZ:  Thank you, Your Honor.

 7            THE COURT:  Does the government have a witness

 8    available?

 9            MS. CARTER:  Yes, Your Honor.

10            THE COURT:  All right.  Let's bring the jury back,

11    please.

12                    (Jury present.)

13            THE COURT:  Please be seated, ladies and gentlemen.

14            Let me ask you as I must has anything about this

15    matter come to your attention since you were here yesterday?

16    If so, please raise a hand.  I see no hands having been

17    raised.  And I thank you for your patients.  We had some

18    matters of law that we had to take care of.  We're gonna

19    continue with the government's case now and the government

20    may call its next witness.

21            MS. CARTER:  The government calls Matthew Gutting.

22            THE COURT:  Would you come right up on the witness

23    stand to be sworn, please?  Straight ahead.

24            THE CLERK:  Please raise your right hand.

25                    (Witness sworn.)
```

```
 1              THE CLERK:  Please have a seat.  State and spell
 2     your name for the record.
 3              THE WITNESS:  First name is Matt M-a-t-t.  Last is
 4     Gutting G-u-t-t-i-n-g.
 5              THE COURT:  Well, is it Matt or Matthew?
 6              THE WITNESS:  It's Matthew, sir.
 7              THE COURT:  And do you have a middle name?
 8              THE WITNESS:  Yes, sir.  James.
 9              THE COURT:  Go ahead please, Ms. Carter.
10                      DIRECT EXAMINATION
11     BY MS. CARTER:
12     Q.   Who is your current employer, sir?
13     A.   The City of Indio Police Department.
14     Q.   What's your job there?
15     A.   Investigator.
16              THE COURT:  Is that a sworn position?
17              THE WITNESS:  Yes, sir.
18     BY MS. CARTER:
19     Q.   Did you ever work for Desert Hot Springs Police
20     Department?
21     A.   Yes, I did.
22     Q.   During what time period did you work for Desert Hot
23     Springs Police Department?
24     A.   2004 to 2007.
25     Q.   In February 2005, what was your position at Desert Hot
```

1    Springs Police Department?

2    A.    Police officer.

3    Q.    Do you know someone named Anthony Sclafani?

4    A.    Yes, I do.

5    Q.    How do you know that person?

6    A.    Uh, he was my watch commander and supervisor at Desert

7    Hot Springs.

8    Q.    Was he watch commander and supervisor in February of

9    2005?

10   A.    Uh, no, I don't believe so.

11   Q.    What was Anthony Sclafani's position -- was Anthony

12   Sclafani working at Desert Hot Springs Police Department in

13   2005?

14   A.    Yes, he was.

15   Q.    February 2005?

16   A.    Yes.

17   Q.    What was his position there?

18   A.    Uh, sergeant.

19   Q.    Would you recognize Anthony Sclafani if you saw him

20   today?

21   A.    Yes, I would.

22   Q.    Do you see Anthony Sclafani sitting in the courtroom

23   today?

24   A.    Yes, I do.

25   Q.    Can you point him out for the jury and describe where he

```
 1   is sitting and what he is wearing?
 2   A.   Uh, he's sitting to my right.  It looks like a black or
 3   dark blue suit with a purple tie.
 4            THE COURT:  Is he standing?
 5            THE WITNESS:  Yes, he is.
 6            THE COURT:  I'm color blind.
 7            THE WITNESS:  He just stood up for us.
 8            THE COURT:  Yes, indicating for the record
 9   Defendant Sclafani.  Go ahead.
10   BY MS. CARTER:
11   Q.   How often do you speak to the defendant now?
12   A.   Once in a while.
13   Q.   How often is once in a while?
14   A.   Maybe once a week or so.
15   Q.   Have you ever spoken to him about this case?
16   A.   Yes.
17   Q.   When was the last time you spoke to him about this case?
18   A.   Um, probably, geez, I don't remember.  It was a couple
19   weeks ago maybe.  I talked to him a little bit in the hallway
20   and that's about it.
21   Q.   In your about once week a conversations with the
22   defendant, about how often in the last year have you
23   discussed this case?
24   A.   A few times.
25   Q.   Have you ever discussed with defendant how -- what
```

```
 1    you've told, uh, FBI investigators in this case?
 2    A.   Uh, briefly, yes.
 3    Q.   Have you ever discussed with the defendant how you were
 4    gonna testify today?
 5    A.   I told him I was gonna be truthful.
 6    Q.   Did you make statements to the Internal Affairs
 7    investigator about the subject matter of this case?
 8    A.   Yes, I did.
 9    Q.   Did you tell the defendant what you had told the IA
10    investigator?
11    A.   I don't believe so.
12              MR. SCHWARTZ:  Objection.  Vague as to time.
13              THE COURT:  All right.  Let's have a better
14    foundation.
15    BY MS. CARTER:
16    Q.   Did you ever talk to the defendant about what you had
17    told the IA investigator about the events that are the
18    subject matter of this case?
19    A.   The IA from 2005?
20    Q.   Yes.
21    A.   Uh, I'm not sure.  I don't remember.  Possibly.  I don't
22    know.
23    Q.   Did you write reports about the subject matter of this
24    case?
25    A.   Yes, I did.
```

```
1    Q.   Have you ever told defendant what you wrote in your

2    reports?

3    A.   No.  He was my -- he was the approving supervisor for

4    that report so I believe he read it and I -- we briefed what

5    happened on that day so I think he approved the report.

6    Q.   When you say briefed what happened on that day, what do

7    you mean?

8    A.   Any time there's some sort of use of force, we have to

9    let them know what happened.  Notify my supervisor.

10   Q.   So you told defendant about the events that you

11   described in your reports?

12   A.   Yes.

13   Q.   Did defendant tell you whether he had made any reports

14   about the events that are the subject matter of this case?

15   A.   I don't remember.

16   Q.   In approximately February 2005, did you respond to the

17   scene of an accident with a Hispanic woman had rear-ended an

18   empty school bus?

19   A.   Yes, I did.

20   Q.   What time of day did it happen?

21   A.   Around 2:00ish I believe.  2:00 or 3:00 I believe in the

22   afternoon.  I don't recall.

23   Q.   Were you specifically dispatched to handle the call?

24   A.   Yes, I was.

25   Q.   Do you know the name of the arrestee from that incident?
```

```
 1    A.   Yes, I do.

 2    Q.   What is that person's name?

 3    A.   Angelica Vargas.

 4    Q.   Can you give us a physical description of Angelica

 5    Vargas?

 6    A.   No.  Hispanic female, her late 20s, early 30s, I

 7    believe.

 8    Q.   What was her build?

 9    A.   Uh, hefty.

10    Q.   How tall was she?

11            THE COURT:  Excuse me.  How tall was she?

12            MS. CARTER:  Yes.

13            THE WITNESS:  I'm not sure.

14    BY MS. CARTER:

15    Q.   When you say she was hefty, can you give us an

16    approximation of how much she weighed?

17    A.   175, 180 maybe.  There should be a description on the

18    police report.

19    Q.   Was she taller than you or shorter than you?

20    A.   Probably shorter than me.  Say, maybe, I would be

21    guessing maybe five two, five three.

22            THE COURT:  Don't guess.  Is that your best

23    estimate?

24            THE WITNESS:  That's my best estimate.  Five two or

25    five three.
```

```
 1              MS. CARTER:  Your Honor, at this time I would like
 2    to read from the stipulation at Exhibit 84.
 3              THE COURT:  Certainly.
 4              MS. CARTER:  The portion regarding Exhibit 2.
 5              THE COURT:  Very well.
 6              MS. CARTER:  Government's Exhibit 2 is a true and
 7    accurate photocopy of the Desert Hot Springs Police
 8    Department booking photograph of Angelica Vargas on
 9    February 25th, 2005.
10              And I move, Your Honor, that Exhibit 2 be received
11    in evidence.
12              THE COURT:  All right.  Is that the stipulation you
13    two reached and agreed upon?
14              MR. SCHWARTZ:  Yes.
15              THE COURT:  All right, it will be received.
16                   (Exhibit 2 admitted.)
17    BY MS. CARTER:
18    Q.   Is this a photograph of Angelica Vargas when you
19    arrested her on February 25th at the scene of the school bus
20    accident?
21    A.   I don't recall that photo, but that does look like her.
22    Q.   You were the arresting officer; correct?
23    A.   Yes, I was.
24    Q.   You would have been the officer who took the booking
25    photo?
```

```
1    A.    No, not necessarily.

2    Q.    You would have been the officer who made it a part of

3    your report?

4    A.    Yes.

5    Q.    Going back to the scene of the accident, what did you

6    first see when you responded?

7    A.    When I first responded, I saw a four-door vehicle that

8    rear-ended a school bus, and it was tucked underneath the

9    rear of the school bus.

10   Q.    Were there any children on the school bus?

11   A.    No, there wasn't.

12   Q.    Could you see the driver of the vehicle that was tucked

13   underneath the school bus?

14   A.    Yes, I could.

15   Q.    And what did you see with regard -- was that driver

16   Angelica Vargas?

17   A.    Yes, it was.

18   Q.    And what was Angelica Vargas doing at that time when you

19   first arrived on the scene?

20   A.    She was passed out behind the wheel.

21   Q.    How could you tell she was passed out?

22   A.    She wasn't responding to me when I was asking questions

23   and she was passed -- slumped over, unresponsive.

24   Q.    Was her shirt torn?

25   A.    I don't recall.
```

```
 1    Q.   Was she wet?
 2    A.   No, not that I remember.
 3    Q.   Did you see any injuries on her?
 4    A.   Immediately, no.
 5    Q.   Now, at some point, did Ms. Vargas speak to you?
 6    A.   Yes, she did.
 7    Q.   What point was that?
 8    A.   I remember when I was transporting her into the station
 9    that's when she made her first comment to me.  And then she
10    was telling me that her --
11    Q.   Just a moment.  So you're saying Ms. Vargas did not
12    speak to you at the scene?
13    A.    Not that I remember.  I remember her in the back of the
14    car she spoke to me, but not at the scene from what I
15    remember.
16    Q.   Did she speak to you at the scene about being sorry
17    about hitting the school bus?
18    A.   I remember her saying that.  I just don't remember where
19    I was when she said that.  If that was in the car or in the
20    back of my unit at the scene or I'm not sure where it
21    happened.  I remember her saying that.
22    Q.   Did you speak to the driver of the school bus?
23    A.   Yes, I did.
24    Q.   Did the driver of the school bus say anything to you
25    about Ms. Vargas being sorry about hitting the school bus?
```

```
 1              MR. SCHWARTZ:  Objection.  Hearsay.
 2              THE COURT:  Sustained.
 3              MS. CARTER:  Your Honor, it goes to this witness's
 4    state of mind and what he did next.
 5              THE COURT:  Very well.  I'll change the ruling.
 6    You may answer.
 7              THE WITNESS:  As from what I remember, he did say
 8    that.  That the driver did contact him and said something
 9    about being sorry for hitting him.
10    BY MS. CARTER:
11    Q.   Now, after you saw Ms. Vargas in the driver's seat of
12    the car, at some point did she wake up and respond to you?
13    A.   Yes, she did.
14    Q.   What happened at that point?
15    A.   I was gonna do FST, the Field Sobriety Test on her, but
16    she was unable to walk.  She couldn't stand up.  So for her
17    safety, I just put her in the back of my unit.
18    Q.   Why did it appear to you that she couldn't stand up?
19    A.   Because I had to hold her up.
20    Q.   Could you discern based on what you observed at the
21    scene why she was unable to stand up?
22    A.   That she was too intoxicated to stand up.
23    Q.   Did you see any injuries on her that would have
24    indicated that she couldn't stand up because she was injured?
25    A.   Not at the moment, no.
```

UNITED STATES DISTRICT COURT

1    Q.   Did Ms. Vargas fall down when she tried to get out of

2    the car?

3    A.   Yes, she did.

4    Q.   And did you have to pick her up?

5    A.   I was holding on to her, kind of escorting her out, and

6    that's when she fell and I had to pick her back up.  I don't

7    think she fell completely to the ground from what I remember.

8    Q.   After you picked her back up, what happened next?

9    A.   I handcuffed her and put her in the back of my unit.

10   Q.   Did she resist you in any way?

11   A.   No.  I just had to escort her because she's --

12   basically, she couldn't walk by herself so I had to escort

13   her on her own.

14   Q.   At that point had she at least attempted to follow all

15   of your commands to the best of her ability given her

16   intoxication?

17   A.   I just told her walk to the car.  I didn't really give

18   her any -- too many commands.  I just brought her straight

19   from the car to my car.

20   Q.   And she did not resist you in any way?

21   A.   No.

22   Q.   Was she belligerent at that time?

23   A.   No.

24   Q.   Was she agitated at that time?

25   A.   No.

```
 1    Q.    Was she cooperative at that time?
 2    A.    Like I said, I didn't really give her too many commands
 3    to see if she was cooperative, I just kind of handled it and
 4    put her in the back of my unit.
 5    Q.    Did any other officer stop by to assist you with the
 6    arrest?
 7    A.    I think Sergeant Duffy showed up just to check on me,
 8    but I can't remember what he did or I don't remember who
 9    showed up.
10    Q.    Was Sergeant Duffy dispatched to the scene?
11    A.    I don't remember if he was or not.
12    Q.    Had you called for backup at the scene?
13    A.    I don't think so.
14    Q.    Did you need backup at the scene?
15    A.    I wasn't very good at DUIs and traffic collisions so I
16    might have asked for backup.  I don't remember if I did or
17    didn't.
18    Q.    Did you need any backup to handle Angelica Vargas at the
19    scene?
20    A.    No.
21    Q.    Did Dennis Decker show up at some point?
22    A.    I don't think so.  I don't remember.
23    Q.    Was Dennis Decker the school resource officer at the
24    time?
25    A.    I believe so.
```

1  Q.   Would he have assisted at an accident involving a school
2  bus in that capacity?
3  A.   Yes, he could have.
4  Q.   Were any other officers specifically dispatched to the
5  scene?
6  A.   Not -- I don't remember.
7  Q.   You mentioned that Sergeant Duffy had stopped by at some
8  point.  Was it common for Desert Hot Springs Police
9  Department officers to stop by a scene undispatched if they
10  were available to do so?
11  A.   Yeah.
12  Q.   Was it common for even a Desert Hot Springs Police
13  Department sergeant to stop by a scene undispatched if he or
14  she was available to do so?
15  A.   Yes.  I'm sorry.  Did you say it was uncommon or was it
16  common?
17  Q.   Was it common?
18  A.   It was common.
19  Q.   Are you familiar with something called a CAD report?
20  A.   Yes.
21  Q.   Do you know whether officers stopping by like this
22  undispatched would generally appear on a CAD report?
23  A.   Uh, no.
24  Q.   You don't know or it would not appear?
25  A.   If they didn't put -- if the dispatcher enters that in,

1    if they didn't put that to dispatch, then it shouldn't be on

2    the CAD report.

3    Q.   Was it common for officers stopping by a scene who had

4    not been specifically dispatched to not appear on CAD

5    reports?

6    A.   No.

7    Q.   What do you mean?

8    A.   If I got your question right, if the sergeant or if the

9    supervisor was not dispatched out there, would they be on the

10   CAD report?

11   Q.   Right.

12   A.   No.  Well, I'm sorry.  If they were dispatched, yes, but

13   if they showed up unannounced and undispatched, they would

14   not be on the CAD report.

15   Q.   Thank you.

16   A.   I'm sorry.

17   Q.   Did you drive Angelica Vargas to the station at some

18   point?

19   A.   Yes, I did.

20   Q.   About how long after the initial -- your initial arrival

21   on the scene did you drive Angelica Vargas to the police

22   station?

23   A.   Say about approximately 20 minutes maybe, 20 or

24   30 minutes.

25   Q.   Did she throw up in your patrol car on the way to the

```
 1   station?
 2   A.    Yes, she did.
 3   Q.    What was your reaction to that?
 4   A.    I almost threw up myself.  It was pretty bad.
 5   Q.    Were you annoyed about it?
 6   A.    It's expected.
 7   Q.    Why is it expected?
 8   A.    A person in my opinion that intoxicated is most likely
 9   gonna throw up.
10   Q.    And in this case it was so bad that you almost threw up?
11   A.    Yes.
12   Q.    What happened when you arrived at the police station
13   with Angelica Vargas on February 25th?
14   A.    After I took her out my patrol car, I put her into one
15   of the holding cells in the police department.
16   Q.    Did you take her booking photo before you did that?
17   A.    No.
18   Q.    Why not?
19   A.    Uh, she was too intoxicated to stand.  She was -- wasn't
20   able to follow commands or anything so I couldn't fingerprint
21   her or photograph her.  So I just put her straight into the
22   cell and let her sober up and then I was gonna take care of
23   the process after that.
24   Q.    When you say she wasn't able to follow commands, what do
25   you mean?
```

1    A.    Well, I asked her if she could stand in one place so I

2    could take her fingerprints and she wasn't able to.

3    Q.    What did she do instead?

4    A.    She just sat there and I continuously had to hold her

5    up.

6    Q.    Was she resisting any of your commands?

7    A.    No.

8    Q.    Was she just too drunk to follow your commands?

9    A.    Yes.   In my opinion, yes.

10   Q.    Now, at the time -- at the time you first brought her to

11   the station and escorted her, did you help Angelica Vargas

12   walk into the cell?

13   A.    Uh, yes, I did.

14   Q.    Was that something you had to do?

15   A.    Yes.

16   Q.    Did you see any injuries on Angelica Vargas at that

17   time?

18   A.    Not that I remember.   I didn't pay attention.

19   Q.    Well, this was a person whose car was tucked under a

20   school bus; correct?

21   A.    Right.

22   Q.    And somebody who had just been in an auto accident is

23   that somebody you would normally check for injuries?

24   A.    I should have.

25   Q.    And you -- and did you notice any injuries on Angelica

1   Vargas?

2   A.   No.

3   Q.   Up until the point that you put Ms. Vargas in the cell

4   when you got back to the station, had you seen her limping at

5   any point?

6   A.   No, because she couldn't walk so I was escorting her so

7   I wouldn't notice if she had a limp or not.  She could have.

8   I don't know.

9   Q.   Did you notice a limp?

10  A.   No.  I was carrying her in so I don't remember.  I

11  didn't notice.

12  Q.   Were you carrying her in or were you assisting her to

13  walk?

14  A.   I wasn't carrying her in, but I was holding her up by

15  underneath her arms and pretty much escorting her in.

16  Q.   Did she resist you when you had your hands on her,

17  holding her under her arms?

18  A.   No.

19  Q.   What did you do after you assisted her into the cell?

20  A.   We locked the cell door and I went to write a report.

21  Q.   When was the next time you had any contact with

22  Ms. Vargas?

23  A.   I don't know the time frame.  It was quite a while

24  afterwards.  I couldn't even give you a time frame.

25  Q.   When you said you went to write reports, did you write

```
 1    the report from Angelica Vargas' arrest?

 2    A.    I don't remember which report I was writing.

 3    Q.    When was the next time you had contact with Ms. Vargas

 4    after you went to start writing reports?

 5    A.    Uh, when I observed her running out of the jail cell.

 6    Q.    Well, where were you when you went to write reports?

 7    A.    In report writing.

 8    Q.    So you were nowhere where you could see a jail cell;

 9    correct?

10    A.    Correct.

11    Q.    At what point did you come back into the booking area,

12    if at all?

13    A.    When I heard yelling and screaming and somebody banging

14    on the cell door wall, and then Sergeant Sclafani tell the

15    female to stop banging her head against the wall.  And that's

16    when I got up and I said, well, that's my prisoner.  I should

17    handle it.  And as soon as I got up to find out what was

18    going on, that's when I saw her running out the door.

19    Q.    How did you know it was your prisoner?

20    A.    I recognized her.

21    Q.    Well, you were in the report room when you heard all of

22    this; correct?

23    A.    Yes.

24    Q.    So how did you know it's your prisoner?

25    A.    Well, probably the only one in there maybe.  I don't
```

```
 1    remember if she was the only one in there or I don't know.
 2    Q.   You don't know why you thought it was your prisoner?
 3    A.   I believe she's the only one in the prison at the time.
 4    I'm not sure.
 5    Q.   Well, are you guessing about that?  Do you know whether
 6    there was anyone else in the prison?
 7    A.   I wouldn't be guessing, but also the sergeant, the
 8    officer should handle the stuff, and then let the sergeant do
 9    his thing.  So we're responsible for our own prisoners.
10    Q.   But you can't remember why you thought it was your own
11    prisoner as you sit here today?
12    A.   I couldn't remember.
13            THE COURT:  It's asked and answered.  Let's move
14    on, please.
15    BY MS. CARTER:
16    Q.   Now, at this time were the doors to the jail open?
17    A.   Now, which doors?  Are you talking the actual jail doors
18    or the surrounding doors?
19            MS. CARTER:  May I publish Exhibit 1, the diagram,
20    Your Honor?
21            THE COURT:  Of course.
22    BY MS. CARTER:
23    Q.   Do you see this doorway here by where it says pillar
24    where I have just made a mark?
25    A.   Yes, I do.
```

1    Q.   What door is that in the Desert Hot Springs Police

2    Department jail?

3    A.   That goes from the booking area to the outside.

4    Q.   You see this doorway here in the lower part of the

5    diagram by a portion that says to report room?

6    A.   Yes, ma'am.

7    Q.   What is that doorway?

8    A.   That's the door from booking to a couple offices and

9    report writing.

10   Q.   And do you see this doorway here by an area on the

11   diagram that says to dispatch with an arrow?

12   A.   Yes, ma'am.

13   Q.   What is that doorway?

14   A.   The doorway to dispatch from booking.

15   Q.   Were any of those doorways open when you first brought

16   Angelica Vargas into the jail?

17   A.   I don't remember if they were open or not.

18   Q.   Do you remember when the doorway to the report room --

19   whether the doorway to the report room was open when you went

20   through that doorway to write reports?

21   A.   Uh, possibly.  I probably would have left it open.

22   Q.   Why is that?

23   A.   Uh, just so I could hear a prisoner or somebody coming

24   through or something.  I might have just left it open.

25             THE COURT:  I'm gonna strike that.  You say

```
 1   possibly and you might have.  Do you have a recollection of
 2   doing it?
 3              THE WITNESS:  No, I don't, sir.
 4   BY MS. CARTER:
 5   Q.   Was it common for you to leave doors to the jail area
 6   open from the hallway into the report room?
 7   A.   You're not supposed to, but it's possible it could have
 8   been open.
 9              THE COURT:  Again, I'm going to strike that.
10              THE WITNESS:  I don't remember.  I don't know.
11              THE COURT:  That's your answer, you don't know.
12   BY MS. CARTER:
13   Q.   Is it common for that doorway to be left open from the
14   jail area to the hallway leading to the report room?
15              MR. SCHWARTZ:  Objection, Your Honor.  Relevance as
16   to time.  Is this common as to the present time or back in
17   2005?
18              THE COURT:  All right.  Let's have the time
19   foundation.
20              MS. CARTER:  I'll rephrase.
21   Q.   In February 2005 was it common that doorway from the
22   booking area to the hallway leading to the report room open
23   in your experience?
24   A.   Without a prisoner, yes, it's common.  With a prisoner
25   in there, no, it's not common.
```

1    Q.   So it would not be common to leave the doorway open just

2    so you could hear someone in the jail?

3    A.   No.

4    Q.   Do you have any recollection as to why you sitting in

5    the report room could have heard what was happening in the

6    jail on February 25th, 2005?

7    A.   Because the doors were open at that time.

8    Q.   Now you do recall the door being open?

9    A.   After reading -- after -- I'm sorry.  I'm getting

10   confused with the questions.  At that time, yes, it was open,

11   the doors were open, but it was not common to.

12   Q.   So did you leave that doorway open when you went to --

13   after you put Angelica Vargas in the cell when you went to

14   write reports?

15   A.   Initially, no, but afterwards yes.

16   Q.   When you say initially no, when you first went from

17   assisting Angelica Vargas into her cell to go down the hall

18   and write reports, you did not leave that doorway open?

19   A.   No.

20   Q.   Could you typically hear what was going on in the jail

21   cells all the way in the report room if that door was closed?

22   A.   Yeah, you could.

23   Q.   How is that?

24   A.   That's a very small Department, very small area.

25   Q.   Then why did you say you thought that you might have

1    left the doorway open in order to hear what was going on in

2    jail cells if you didn't need to leave the door open to hear?

3    A.   You could get a better, you could hear better if the

4    door was opened obviously.  If it's closed, then you can't

5    probably hear as much maybe.  I couldn't explain it.

6    Q.   Okay.  So you said initially you closed the door when

7    you went to write reports, but at some point later you opened

8    it.  At what point was that?

9    A.   It was -- we ended up leaving all the doors open.

10   Initially I thought it was from -- I thought she vomited.  I

11   thought it was from the clothes smelling like vomit that we

12   opened up the doors.  There was another reason why we left

13   the doors open, and it was between that time frame after I

14   booked her in to when I was writing reports.

15   Q.   Who is we left the doors open?

16   A.   Uh, Sergeant Sclafani and I.

17   Q.   So you and Sergeant Sclafani opened the doors, the

18   doorway between the jail area and the report room?

19   A.   I don't remember who opened them.

20   Q.   Why do you say we, you and Sergeant Sclafani opened the

21   doors?

22   A.   Because we were the only two there at the time.

23   Q.   Do you recall whether you and Sergeant Sclafani opened

24   those doors?

25   A.   I don't know which one of us did.  I don't know.

1    Q.    But one of you did.  Is that your testimony?

2    A.    Right.

3    Q.    Okay.  And which doors are you talking about?

4    A.    The door to the watch commander's room, I believe the

5    door to dispatch, too, the door to the outside and most

6    likely the door to report writing.  We pretty much left them

7    all open.

8    Q.    You just described four doorways; is that correct?

9    A.    Yes.

10   Q.    And I had only previously made three marks when I was

11   discussing the diagram with you.  Do you recall that?

12   A.    Yes, I do.

13   Q.    Is the fourth doorway you just described where I've now

14   made a fourth mark, uh, right between where it says bench and

15   table and then says to the left watch commander?

16   A.    Yes.

17   Q.    Now, you mentioned that you thought that you might have

18   opened the doors because of a vomit smell?

19   A.    Right.

20   Q.    Had Angelica Vargas been vomiting in her cell?

21   A.    Uh, not that I remember, no.

22   Q.    So what is this vomit smell you're talking about?

23   A.    The vomit that was on her clothes when she threw up in

24   the back of my unit.

25   Q.    Did anyone provide Ms. Vargas with clean clothes when

1    she got to the jail?

2    A.    I don't recall.  We did have jumpsuits, but I don't

3    remember.

4    Q.    Do you recall leaving her sitting there in clothes with

5    vomit on them in the jail cell?

6    A.    I don't recall that.

7    Q.    Do you recall what clothes she was wearing when you put

8    her in the jail cell?

9    A.    The clothes she was wearing at the time of the arrest.

10   I don't know what clothes they were.

11   Q.    So the vomit-covered clothes?

12   A.    I don't know.

13   Q.    I thought you said she had vomit on her clothes from

14   vomiting in your car?

15   A.    Yeah, but I don't know if we changed her out.  I

16   don't -- I don't remember.

17   Q.    You just testified that she was wearing the same

18   clothing when you assisted her in the cell.  Don't you recall

19   that?

20         THE COURT:  Just a minute.  Are you designating

21   this witness as an adverse witness?

22         MS. CARTER:  Your Honor, we may ask for that at

23   some point.

24         THE COURT:  Well, until you get to that point,

25   let's stop the leading.

```
 1              MS. CARTER:  Yes, Your Honor.
 2   Q.   So to deal with the smell of vomit on an arrestee's
 3   clothes, you and defendant opened all four doors to the jail
 4   booking area?
 5   A.   That's right.  Initially, that's what I initially stated
 6   in my interview before, but after the reading the reports
 7   afterwards, we opened them up because of the pepper spray.
 8              THE COURT:  It's been asked and answered and it's
 9   leading.
10              MS. CARTER:  Yes, Your Honor.
11   Q.   Did you ever hear Angelica Vargas vomiting in her cell?
12   A.   No.
13   Q.   Did anyone say anything to you about Angelica Vargas
14   vomiting in her cell?
15   A.   No.
16   Q.   Did you ever hear the defendant say anything about
17   Angelica Vargas vomiting in her cell?
18   A.   No.
19   Q.   Did you ever hear the defendant say this bitch won't
20   stop throwing up?
21   A.   No, I don't recall that.
22   Q.   Is there a policy at Desert Hot Springs Police
23   Department when an officer should get medical assistance for
24   an arrestee?
25   A.   Mmm, there probably was, but I don't recall what it was.
```

1    Q.    Now, you mentioned that you had -- did you initially

2    make statements that you'd open all the doors to the jail

3    area because Ms. Vargas smelled like vomit?

4    A.    That was my initial statement, yes.

5    Q.    When did you make those statements?

6    A.    Uh, I believe to Agent Novak during the interview.

7    Q.    When did you have an interview with Agent Novak?

8    A.    Uh, January 2010, I believe.

9    Q.    After you told Agent Novak in January 2010 that you and

10   the defendant had opened all the doors to the jail area

11   because Ms. Vargas smelled like vomit, did you change your

12   reason for why you'd opened the doors?

13   A.    Yes, I did.

14   Q.    What was the new reason for why you opened all the

15   doors?

16   A.    Because there was the smell of pepper spray.

17   Q.    Why did you tell Agent Novak it was because she smelled

18   like vomit?

19   A.    He asked me about an incident that happened five years

20   prior and wouldn't let me read a police report so that was

21   off strictly memory.

22   Q.    Did you have any memory at the time you talked to Agent

23   Novak of any smell of pepper spray that night?

24   A.    It was vague.  I don't recall that day.

25   Q.    Did you smell pepper spray when you were in the report

```
 1   room writing reports?
 2   A.   I don't remember that, but according to my report,
 3   that's what happened.
 4          THE COURT:  I'm going to strike the second part of
 5   it.  Anything after I don't remember that.
 6   BY MS. CARTER:
 7   Q.   Did you ever smell pepper spray in the jail after you
 8   put Angelica Vargas into the cell when you first arrived at
 9   the jail?
10   A.   Independently, no, I don't remember.
11   Q.   Now, you testified that you believed you had mentioned
12   pepper spray after reviewing one of your reports.
13   A.   Yes, ma'am.
14   Q.   What report?
15   A.   My police report and Sergeant Sclafani's police report.
16   Q.   When did you review Sergeant Sclafani's police report?
17   A.   When I was given the paperwork by my attorney.
18   Q.   Before you read Sergeant Sclafani's report after your
19   attorney gave it to you, did you have any memory of any --
20   smelling any pepper spray?
21   A.   No.  I was able to read my police report and in my
22   police report I believe I put in my police report that I did
23   smell pepper spray.
24          THE COURT:  Just a minute.  Ask the question again,
25   please.
```

```
 1    BY MS. CARTER:
 2    Q.    Before your attorney gave you Defendant Sclafani's
 3    police report to read, did you remember smelling pepper spray
 4    in the jail that night?
 5    A.    I don't remember.
 6    Q.    You said you believed your own report has some mention
 7    of pepper spray which refreshed your recollection.  Is that
 8    your testimony?
 9    A.    Yes, ma'am.
10    Q.    Which report?
11    A.    My use of force report.
12              THE COURT:  Why did you write a use of force
13    report?
14              THE WITNESS:  Oh, because I used force on the
15    subject also.
16    BY MS. CARTER:
17    Q.    Do you recall where in your use of force you mentioned
18    smelling pepper spray?
19    A.    Somewhere in there.  I don't know.
20    Q.    Would it refresh your recollection to view a copy of
21    your report?
22    A.    Yes, it would.
23              MS. CARTER:  May I approach the witness to show him
24    something to refresh his recollection?
25              THE COURT:  Show counsel first.  You may approach
```

```
 1    the clerk.
 2              MS. CARTER:  Thank you, Your Honor.
 3              THE COURT:  Would you tell us what that is that you
 4    just gave to the clerk?
 5              THE WITNESS:  Uh, this is my supplemental report.
 6              MS. CARTER:  Would you like me to do so?
 7              THE COURT:  Yes, I'm asking you.
 8              MS. CARTER:  I just provided the witness with a
 9    copy of his supplemental police report describing his use of
10    force against Angelica Vargas.
11              THE COURT:  All right.  Is there a date on that,
12    Mr. Gutting?
13              THE WITNESS:  Yes, sir.
14              THE COURT:  What is the date?
15              THE WITNESS:  April 7, 2005.
16              THE COURT:  Thank you.  Go ahead.
17
18    BY MS. CARTER:
19    Q.   Can you review that report and let me know when you're
20    finished?
21              THE COURT:  Just read it to yourself, please.
22              THE WITNESS:  Okay.
23    BY MS. CARTER:
24    Q.   Does that refresh your recollection about where in your
25    report you mentioned smelling pepper spray?
```

1    A.    It's not on this report.

2    Q.    It's not on that report?

3    A.    No.

4          MS. CARTER:  May I approach your clerk again,

5    Your Honor, to get the document?

6          THE COURT:  Of course, yes.

7    BY MS. CARTER:

8    Q.    Now, that report was dated in April of 2005; correct?

9    A.    Yes, ma'am.

10   Q.    How -- and the incident that we have been talking about

11   with Angelica Vargas that occurred in February 2005; correct?

12   A.    Correct.

13   Q.    When did you write your first report for the Angelica

14   Vargas arrest?

15   A.    I don't remember.  Somewhere between February and April.

16   Q.    Was there a policy at the time at the Desert Hot Springs

17   Police Department about writing timely reports?

18   A.    I don't recall.  Possibly.

19         THE COURT:  Well, strike the possibly.

20   BY MS. CARTER:

21   Q.    Would it refresh your recollection about when you wrote

22   your reports to see copies of your reports?

23   A.    Yes, it would.

24         MS. CARTER:  Your Honor, may I show to refresh this

25   witness's recollection copies of three reports that I will

```
 1    first show to the defense counsel?
 2              THE COURT:  And those reports are dated?
 3              MS. CARTER:  I'm sorry.  There is copies of four
 4    reports and I'm gonna ask this witness about the dates.  May
 5    I describe their dates after I ask him a question?
 6              THE COURT:  Just be at ease, ladies and gentlemen.
 7              Mr. Schwartz, are you seeing those for the first
 8    time?
 9              MR. SCHWARTZ:  No, Your Honor.
10              MS. CARTER:  May I approach your clerk, Your Honor?
11              THE COURT:  You may.  The witness has the reports.
12    You want to direct him to any particular portions.
13    BY MS. CARTER:
14    Q.   Can you please glance, well, can you please review the
15    date portion and any other portion you may need to refresh
16    your recollection about when you wrote the reports?
17    A.   Okay.
18    Q.   How many reports are there?
19    A.   Uh, two.
20    Q.   Are there -- are there just two?
21    A.   Sorry.
22    Q.   Are there two reports and two supplements there?
23    A.   Yes, there is.
24    Q.   Does reviewing them refresh your recollection about when
25    you wrote each of your reports?
```

```
 1   A.    Uh, the dates on here.
 2              THE COURT:  Well, I know there are dates on there.
 3   Has your recollection been refreshed as to when you wrote
 4   them, however, without reading the dates?
 5              THE WITNESS:  Well, these are when they were
 6   submitted, sir.  I don't -- I could have wrote it between
 7   that.  I don't know when I wrote them.  I know when I
 8   submitted them is the date on here.
 9              THE COURT:  These are not in evidence.  You can't
10   talk about the dates.
11   BY MS. CARTER:
12   Q.    Does reviewing these refresh your recollection about
13   when you submitted your report?
14   A.    Yes, it does.
15   Q.    Can you -- when did you submit each of your four
16   reports?
17              THE COURT:  Turn them over and tell us.
18              THE WITNESS:  All right.  April 6th on two of them
19   and April 7th on that one.
20              THE COURT:  2005?
21              THE WITNESS:  2005.
22              MS. CARTER:  Your Honor, may I approach your clerk
23   to get the records and then I'll describe them for the
24   record?
25              THE COURT:  Of course.
```

```
 1            MS. CARTER:  I just showed the witness a narrative
 2    supplemental report dated April 6th, 2005.  A second report
 3    titled narrative dated 4-6-2005.  A third report titled
 4    supplement one dated April 7, 2005, and a fourth report
 5    entitled supplemental three dated 4-7-2005.
 6            THE COURT:  Thank you.
 7    BY MS. CARTER:
 8    Q.   Did you write these reports after you had already
 9    discussed the incident with defendant?
10    A.   Yes.
11    Q.   Did you mention the defendant's use of force in any of
12    your reports?
13    A.   Yes, I did.
14    Q.   Which report?
15    A.   I'm not sure.
16    Q.   Do you recall where you mentioned it?
17    A.   One of the reports that you showed me, uh, it did say
18    something about the pepper spray, about the subject being
19    pepper sprayed or redness on her face.  I wouldn't go too
20    much into his use of force that would be on --
21            THE COURT:  Just minute.
22    BY MS. CARTER:
23    Q.   Did you mention defendant as having used force against
24    Angelica Vargas in any of your reports?
25    A.   I don't recall.  I might have.  I don't know.
```

```
 1   Q.   Would it refresh your recollection to review your

 2   reports again?

 3   A.   Yes, it would.

 4              MS. CARTER:  May I approach your clerk, Your Honor?

 5              THE COURT:  You may.

 6              At ease, again, ladies and gentlemen.

 7              THE WITNESS:   Okay.

 8   BY MS. CARTER:

 9   Q.   Did reviewing them refresh your recollection about --

10              THE COURT:  Excuse me one second.  We're back on

11   the record now.  When we're on the record, the only talking

12   takes place in the bar of this court.  If you want to talk,

13   step outside.  Go ahead.

14   BY MS. CARTER:

15   Q.   Did reviewing your reports refresh your recollection

16   about whether in any of your reports you mention defendant as

17   having used force against Angelica Vargas?

18   A.   Uh, briefed on here it does say that.

19   Q.   How did you mention defendant having used force against

20   Angelica Vargas in your report?

21   A.   Can I read this verbatim?

22              THE COURT:  No, you can't.  Are you offering this

23   report?

24              MS. CARTER:  No, Your Honor.

25              THE COURT:  Turn it over.
```

1          THE WITNESS:  It says on here that I found --

2          THE COURT:  I don't care what it said there.  Ask a

3   question with regard to his recollection.

4          MS. CARTER:  Yes, Your Honor.

5   Q.   You recall mentioning redness on Angelica Vargas' face

6   from pepper spray.  Do you recall that?

7   A.   Yes, ma'am.

8   Q.   Did you mention that defendant had caused the pepper

9   spray redness on Angelica Vargas' face?

10  A.   No.

11  Q.   Did you mention Defendant Sclafani having used force

12  against Angelica Vargas in any way, other way in your report?

13  A.   No other way than that.

14         MS. CARTER:  Your Honor, may I approach your clerk

15  to retrieve the documents?

16         THE COURT:  Of course.

17

18  BY MS. CARTER:

19  Q.   Now, you testified you had already talked to Defendant

20  Sclafani about this incident at the time you wrote your

21  reports; is that right?

22  A.   Yes.

23  Q.   Why didn't you mention it in your reports?

24  A.   That we discussed it?

25  Q.   No.  Why didn't you mention Defendant Sclafani's use of

1    force against Angelica Vargas?

2    A.   Because he is responsible for his own report on use of

3    force.  I don't write a use of force report on his use of

4    force.

5    Q.   Isn't it your responsibility -- is it your

6    responsibility as the arresting officer to describe in your

7    own use of force report whatever it is you see even if it's

8    use of force by another officer?

9    A.   No.  He is responsible for his own use of force.

10   Q.   So when you're describing the facts of an event in your

11   own use of force report, you don't have to mention the other

12   things that were happening at that time including another

13   officer's use of force?

14   A.   No, it's mentioned in his report.  It's gonna be

15   attached to the initial report so there's no reason for me to

16   rewrite what he already wrote.

17   Q.   Is there any reason to mention he was even there?

18   A.   No.

19   Q.   Did you mention that he was even there?

20   A.   I don't believe so, no.

21            MS. CARTER:  May I have a moment, Your Honor?

22            THE COURT:  You may.

23            MS. CARTER:  Your Honor, I now at this time would

24   like to read from the portion of the stipulation at Exhibit

25   84 regarding Government's Exhibit 14.

```
 1              THE COURT:  Very well.  It's the same stipulation,
 2     is it not?
 3              MS. CARTER:  It is the same stipulation.  I had
 4     mentioned to the Court Exhibit 14, but I'm actually going to
 5     be reading from the portion regarding Exhibit 15.
 6              THE COURT:  Very well.
 7              Mr. Schwartz, any objection?
 8              MR. SCHWARTZ:  No objection, Your Honor.
 9              MS. CARTER:  Government Exhibit 15 which was a
10     Desert Hot Springs Police Department Policy Section 344
11     regarding report preparation in effect on February 24th, 2005
12     and February 25th, 2005.  And I move that Exhibit 15 be
13     received into evidence and I would request permission to
14     publish if it is so received.
15              THE COURT:  It may come in and you may publish.
16                   (Exhibit 15 was admitted.)
17              MS. CARTER:  Thank you, Your Honor.
18              And I would like to blow up the Section 344.11
19     report preparation.
20              THE COURT:  Go ahead.
21     BY MS. CARTER:
22     Q.   Were you trained on policies like these at the Desert
23     Hot Springs Police Department when you were an officer at the
24     Desert Hot Springs Police Department?
25     A.   Yes, I was.
```

```
1    Q.   Are you familiar with this document, how it appears?

2    Have you seen documents like this before?

3    A.   Yes, I have.

4    Q.   Where have you seen them?

5    A.   In a policy manual.

6    Q.   Did you have a copy of this policy manual when you were

7    a Desert Hot Springs Police Department officer?

8    A.   Yes, I did.

9    Q.   Were you responsible for following the policies in it?

10   A.   Yes, I was.

11   Q.   Now, do you see this last paragraph of the magnified

12   portion beginning with or reading, "All reports shall

13   accurately reflect the identity of the persons involved, all

14   pertinent information seen, heard or assimilated by any other

15   staff and any actions taken.  Employees shall not repress,

16   conceal or distort the facts of any reported incident nor

17   shall any employee make a false report orally or in writing."

18   Do you see that section?

19   A.   Yes, I do.

20   Q.   In your in reports about this incident, you didn't

21   describe all the people that were present, did you?

22   A.   Yes, I did.

23   Q.   You didn't describe Defendant Sclafani being present in

24   the use of force situation?

25   A.   No.  I said this is in the supplement or this is in
```

```
 1    regards to Officer Sclafani's or Sergeant Sclafani's initial

 2    or use of force report.

 3    Q.    You made a reference to his use of force report?

 4    A.    Yes.

 5    Q.    But your use of force didn't mention defendant at all,

 6    did it?

 7    A.    No.

 8    Q.    Did you mention any other officers being present?

 9    A.    Uh, Officer Heath, I believe, I put in there.

10    Q.    What regard do you mention her?

11    A.    Taking photographs.

12    Q.    You mention any other officers interacting with Angelica

13    Vargas that night?

14    A.    No.

15    Q.    Now, at some point you said that you heard banging while

16    you sat in the report room?

17    A.    Yes, ma'am.

18    Q.    What exactly did you hear?

19    A.    Uh, somebody banging on the cell, on the cell jail door.

20    Q.    Well, what did you hear exactly?

21    A.    I heard somebody pounding on it and screaming and

22    yelling.

23    Q.    Well, did you hear -- you couldn't --

24              THE COURT:  Well --

25              MS. CARTER:  -- see whether it was jail door.
```

```
 1              THE COURT:  You're asking.
 2              MS. CARTER:  I'm sorry, Your Honor.
 3   Q.   Could you see whether someone was actually pounding on
 4   the jail door?
 5   A.   No.
 6   Q.   Did you just hear banging?
 7   A.   Heard banging and yelling.
 8   Q.   How long did the banging go on?
 9   A.   I don't remember.  A few seconds.  I don't know.
10   Q.   How long did the yelling go on?
11   A.   Kind of the same.  It was kind of simultaneously.
12   Q.   What yelling did you hear?
13   A.   I couldn't remember the exact words, but I just heard a
14   bunch of yelling and banging on the door.
15   Q.   Could you hear who was yelling?
16   A.   It was a female yelling, so at the time I assumed it was
17   my prisoner.
18   Q.   From what you heard, did you perceive a need for medical
19   attention for your prisoner?
20   A.   No.
21   Q.   From what you could perceive, did it sound like your
22   prisoner was hurting herself?
23   A.   At the time I wasn't sure.
24   Q.   At some point did you leave the report writing room and
25   go into the booking area?
```

1    A.    Yes, I did.

2    Q.    Where was Defendant Sclafani when you entered the

3    booking area?

4    A.    Uh, he was standing by, uh, the exit door that went from

5    booking to the sally port.

6          MS. CARTER:  May I please display the diagram,

7    Exhibit 1 in evidence?

8          THE COURT:  Go right ahead.

9    BY MS. CARTER:

10   Q.    When you say he was standing by the exit door to the

11   sally port or you testified that he was standing by the exit

12   door to the sally port, what's the sally port area that

13   you're describing?  Can you describe it for us on the

14   diagram?

15   A.    It's where the police cars were parked and the entryway

16   that's where we park our vehicles and bring the prisoners

17   from, uh, kind of a parking lot to the booking area.  That

18   would be the sally port.

19   Q.    When you say sally port, do you mean this entire gray

20   area that's depicted on the diagram?

21   A.    I would pretty much say the area that's boxed off and

22   around that area.

23   Q.    So this boxed off area by the pillar?

24   A.    By the pillar, yes.

25   Q.    Was defendant inside the jail at the doorway?

```
 1    A.    No, he was by the trash can.

 2    Q.    Here where I'm marking?

 3    A.    Yeah, around there.

 4    Q.    What was he doing?

 5    A.    Uh, telling the prisoner to come back.

 6    Q.    Was he standing there?

 7    A.    Yeah, he was standing there.

 8    Q.    Where was Angelica Vargas at this point if you know?

 9    A.    Uh, kind of between the area of the box and the police

10    cars.  Past the pillar, kind of right in the middle.

11    Q.    Right here?

12    A.    Yes.

13    Q.    Now, you testified earlier that you had been in the

14    report room, you heard banging and you heard some yelling and

15    it lasted a few seconds.

16    A.    Yes.

17    Q.    At that time did you hear the defendant say anything?

18    A.    He was telling -- he was telling the female to stop

19    banging her head against door.  Said you're gonna hurt

20    yourself by banging your head against the door.

21    Q.    Did you hear any cell doors open?

22    A.    No.

23    Q.    From the time that you heard defendant say stop banging

24    your head to the time that you arrived and saw him standing

25    by the trash can, how long was that?
```

1    A.    So there's actually two incidents where I had heard

2    banging.  The first time she was banging, she was banging on

3    the walls, the defendant came and told her to stop banging

4    her head against the wall.

5    Q.    Well, I'm asking you from the time the defendant said

6    stop banging to the time that you ran out and saw him

7    standing by the trash can, how long did that take?

8    A.    Couple seconds.

9    Q.    What was Angelica Vargas doing when you saw her in this

10   area depicted by the X closest to the police department -- I

11   mean the police car?

12   A.    Uh, she was running towards the gate.

13   Q.    It's your testimony she was running that way?

14   A.    Well, she's actually kind of running diagonal, kind of

15   towards the wall, but to the left towards the gate.

16   Q.    So this way?

17   A.    Yeah, little bit more angled towards the wall to the

18   left.  She was running between the police cars in that

19   direction.

20   Q.    This way?

21   A.    A little bit to the left more.  Right about there.

22   Q.    How does that look?

23   A.    Better.

24   Q.    For the record, I've just drawn a mark from an X that's

25   approximately that I had previously drew approximately

1  halfway between the figure of a police car, the police car
2  that's furthest to the right and a box that intersects a
3  circle that says pillar on it, and I drew the line from that
4  X between the two figures of the police cars.
5              THE COURT:  The record will so reflect.
6  BY MS. CARTER:
7  Q.   What did you do -- well, first, where were you when you
8  first saw all of this?
9  A.   When I came out of the -- was walking out of report
10 writing, the second or the second time after she was banging
11 her head against the door, that's when I ran out there and I
12 heard the door open.  And I went out there to see what was
13 going on and it was kind of all simultaneously.  When I came
14 out of the door, I saw her running out and I ran after her.
15 Q.   So you just testified you heard the door open.  I
16 thought you had previously a couple questions ago testified
17 you never heard the door open.
18 A.   Well, I tried to explain that.  The first time when I
19 heard the banging, there was no -- I did not hear the cell
20 door open.  It was the second time that she was told to stop
21 that's when I heard the door open.
22 Q.   Did you hear her being told to stop after the first
23 banging incident?
24 A.   Yes.
25 Q.   And then the banging did stop?

1    A.   For a couple minutes it did.

2    Q.   So the second one is when you responded?

3    A.   Yes, ma'am.

4    Q.   Why did you respond the second time and not the first

5    time?

6    A.   It was my prisoner.  I felt like I was responsible for

7    her so I went to go check on it so Sergeant Sclafani didn't

8    have to.

9    Q.   Well, it was your prisoner the first time, too, wasn't

10   it?

11   A.   Yeah, but he was in the area and just told her to stop,

12   and then I just continue writing reports, and it sounded like

13   he handled it.

14   Q.   How long was the first banging?

15   A.   Uh, it was short, probably 10, 15 seconds.

16   Q.   The second banging was only a couple seconds; correct?

17   A.   Yes.

18        THE COURT:  Well, that's leading any time you ask a

19   witness if something is correct.

20        MS. CARTER:  Yes, Your Honor.  I apologize.

21   Q.   Where exactly were you when you heard this cell door

22   open?

23   A.   Um, I don't know exactly.  I was somewhere between

24   report writing and the detective bureau office probably,

25   around there.

```
 1   Q.   How could you hear that?

 2   A.   Because they're old doors.  They're pretty squeaky.  You

 3   could hear the doors open.

 4   Q.   Did you hear defendant say anything at the time that the

 5   doors opened?

 6   A.   To stop banging your head against the door.

 7   Q.   Do you hear anything thereafter?

 8   A.   Uh, not that I recall, no.

 9   Q.   So where were you exactly when you first saw Angelica

10   Vargas in the position marked by the X?

11   A.   I was almost right about, a little bit below where it

12   says booking area.  Right outside the door.

13   Q.   Right here by the chair?

14   A.   Yeah.  Probably almost in the middle kinda.  I'm not

15   sure exactly where I was.

16   Q.   You're not sure exactly.

17   A.   I was looking out the door and I could see her.  I

18   wasn't paying attention to where I was.

19   Q.   What did you do?

20   A.   Uh, chased after her to the threshold, right at the door

21   to the outside.

22   Q.   And then what did you do once you reached the threshold?

23   A.   Uh, just pointed my taser at her.

24   Q.   What happened when you deployed your taser?

25   A.   Uh, I missed.
```

1    Q.    What do you mean when you say you missed?

2    A.    I missed her.

3    Q.    You missed her entirely?

4    A.    Uh, with both darts, yes.  One dart struck her.  The

5    other dart hit the wall.

6    Q.    Did one dart strike her or did both darts miss her?

7    A.    As far as I know, one dart struck her.  I don't know if

8    it made contact with her or not, but one dart did possibly

9    hit the back area.

10              MS. CARTER:  May I have a moment?

11              THE COURT:  You may.  I'm gonna strike possibly hit

12   the back area.

13   BY MS. CARTER:

14   Q.    Do you see where on her body the dart struck her?

15   A.    On the back right shoulder, yeah, her back right

16   shoulder.

17   Q.    At that time did you let your taser run for its full

18   cycle?

19   A.    No, I shut it off immediately.

20   Q.    When you say immediately, after how many seconds?

21   A.    After I realized that I missed her, probably a second or

22   two.

23   Q.    Then what happened?  Well, let me ask you this.  What

24   happened to Angelica Vargas when one of your darts hit her

25   and one of them missed her according to your testimony?

1    A.    Uh, she went down to the ground like she -- I could tell

2    the taser didn't activate and it didn't make contact with

3    her, but she ended up going to the ground.  She was kind of

4    like kneeling down on the ground and kind of falling.

5    Q.    How did you tell that the taser didn't activate or

6    didn't -- when you say activate, what do you mean?

7    A.    Like it didn't make contact and that she wasn't affected

8    by the taser.

9    Q.    How could you tell she wasn't affected by the taser?

10   A.    Because I saw the second dart spin out -- spiral out of

11   control and hit the wall.  Therefore, there was nothing to

12   make -- for her to make contact with and it would not have

13   worked properly.

14   Q.    How long after the dart -- the one dart hit her, did she

15   fall to the ground?

16   A.    Mmm, a few steps, around there.  She continued walking

17   to the wall for a few steps and then went down to the ground.

18   Q.    How long did that take?

19   A.    Did what take?

20   Q.    For her to fall.

21   A.    It was kinda of a slow motion.  Not immediately.  It was

22   just kinda fell slowly.

23   Q.    Can you estimate in seconds how long it took?

24   A.    A second or two.

25   Q.    Then what happened?

```
 1    A.    And that's where I shut off my taser.  I went towards
 2    the -- went towards Mrs. Vargas and then I collected the
 3    darts and the little AFIDs, serial numbers that are from the
 4    taser and I wound everything up so nobody got tangled in the
 5    cords.
 6    Q.    How long did it take you to do all that?
 7    A.    It was probably like a minute.  It was pretty long.
 8    Q.    Did you do anything in that minute to secure Ms. Vargas
 9    from escaping?
10    A.    No, that's when, uh, Officer Collard came in to help.
11    Q.    Did you do anything in that minute to secure Ms. Vargas
12    from escaping?
13    A.    No.
14    Q.    Was she your prisoner?
15    A.    Yes, she was.
16    Q.    Why didn't you do anything to secure her from trying to
17    escape?
18    A.    Because I had somebody else helping me.
19    Q.    Who was that?
20    A.    Officer Collard.
21    Q.    What did Officer Collard do?
22    A.    Uh, picked her up and then took her back into the
23    booking area while I collected all the stuff for the taser.
24    Q.    None of your reports mention Officer Collard, do they?
25    A.    I don't believe so, no.
```

```
 1    Q.   When you say Officer Collard, what was that officer's
 2    first name?
 3    A.   John.
 4    Q.   Why didn't you mention him in any of your reports?
 5    A.   Because he just brought her into the cell.  It wasn't
 6    important.
 7    Q.   Why did you deem it not important?
 8    A.   Because he just brought her back into the cell.  There
 9    was no other use of force mentioned or taken so it wasn't
10    vital to the report.
11    Q.   Was he the person, though, who actually secured the
12    arrestee?
13    A.   I saw him bring her into the booking area.  I don't know
14    who put her into the cell.  I don't recall that.  I wasn't
15    there.
16    Q.   Why did you tase Ms. Vargas?
17    A.   She was escaping, trying to.
18    Q.   Did you feel that it was unsafe for her to be in this
19    area marked by the X?
20    A.   Unsafe for her or for us?
21    Q.   Either one.
22    A.   I believed that the gate could have been open and she
23    could have escaped and that's why she got tased to prevent
24    escape.
25    Q.   You didn't mention, though -- and that's why you used
```

```
 1    force.  Is that your testimony?
 2    A.   And she was noncompliant.
 3    Q.   How was she noncompliant?
 4    A.   Uh, she was running away.
 5    Q.   And that's why you used force?
 6    A.   Yes.
 7    Q.   But you didn't remember who or you didn't mention who
 8    brought her back in, did you?
 9    A.   I said Officer Collard did.
10    Q.   You didn't mention that in your reports, did you?
11    A.   No.
12    Q.   Did you mention it when you talked to the Internal
13    Affairs investigator?
14    A.   Mmm, I don't recall.
15    Q.   Would it refresh your recollection to see the report of
16    that interview?
17    A.   Yes, it would.
18              MS. CARTER:  Your Honor, may I show the witness to
19    refresh his recollection a document entitled Interview
20    Summary Matthew Gutting Police Officer Desert Hot Springs
21    Police Department.  It's Bates labeled S002935 through
22    S002938 and I'll show it to defendant.
23              THE COURT:  Is there a date?
24              MS. CARTER:  Not that I see, Your Honor.
25              THE COURT:  It's part of something larger?
```

1          MS. CARTER:  I apologize, Your Honor.  In the

2     narrative of the summary, it lists a date of interview as

3     April 22nd, 2005.

4          THE COURT:  Thank you.  All right.  You may

5     approach the clerk.  Just read that to yourself, please.

6          THE WITNESS:  Okay.

7     BY MS. CARTER:

8     Q.   Does that refresh your recollection about whether you

9     mentioned John Collard in your report?

10    A.   Yeah.

11    Q.   Did you mention John Collard in your interview with the

12    Internal Affairs investigator?

13    A.   No.  Just other officers that I didn't recognize at the

14    time.

15    Q.   Did you tell the Internal Affairs investigator that you

16    didn't recognize any of the other officers that were there

17    when you tased Angelica Vargas?

18    A.   According to this, I did, yeah.

19         THE COURT:  Well, forget according to this.  Do you

20    recall doing so?

21         THE WITNESS:  Yes.

22         MS. CARTER:  Your Honor, may I approach your clerk

23    to retrieve the document?

24         THE COURT:  You may.

25    BY MS. CARTER:

```
1    Q.   Were you new in the Department at the time of
2    February 25th, 2005?
3    A.   About four months in, three or four months in.
4    Q.   Did you tell the Internal Affairs investigator that you
5    didn't recognize any of the other officers because you were
6    new in the Department?
7    A.   Yes.
8              THE COURT:  When did you begin service with that
9    Department?
10             THE WITNESS:  I believe it was in November I
11   believe.
12             THE COURT:  What year?
13             THE WITNESS:  2004.
14             THE COURT:  Go ahead.
15   BY MS. CARTER:
16   Q.   Did you know John Collard in February 2005?
17   A.   Yes, I did.
18   Q.   Did you recognize John Collard in February of 2005?
19   A.   Yes, I did.
20   Q.   How did you know John Collard?  Can you describe whether
21   you knew John Collard in any way other than working with him
22   at the Desert Hot Springs Police Department?
23   A.   Yes, I knew him before.
24   Q.   How did you know him?
25   A.   Uh, his stepdaughter was one of my friends and dated one
```

1    of my other friends.

2    Q.    How often did you socialize with him before you got the

3    job at the Desert Hot Springs Police Department?

4    A.    I think I just met him once.

5    Q.    Did he tell you to apply for the job at the Desert Hot

6    Springs Police Department?

7    A.    No.

8    Q.    He didn't tell you to -- where you were working before

9    Desert Hot Springs Police Department?

10   A.    Cabazon Tribal police.

11   Q.    Was that police department disbanding at around the time

12   you came to Desert Hot Springs Police Department?

13   A.    That was rumored it was.

14   Q.    Did you talk to John Collard about that before you

15   started working at Desert Hot Springs Police Department?

16   A.    Yeah, I spoke to him once.

17   Q.    Did he suggest to you that you should come work at

18   Desert Hot Springs Police Department?

19   A.    He could have.  I don't remember.  A lot of people told

20   me to apply there.

21   Q.    Did you know that John Collard worked at Desert Hot

22   Springs Police Department before you even started working

23   there?

24   A.    Yes, I did.

25   Q.    And you could recognize him before you even started

1    working there?

2    A.    Yes, I could.

3    Q.    Why did you tell Internal Affairs officer that you

4    couldn't recognize any of the other officers there?

5    A.    I don't think it was a matter of recognize them because

6    I didn't know who they were.  It could have been I didn't

7    recognize who was out there because I was focused on

8    something else and not everybody around me.

9    Q.    So you weren't focused on getting Angelica Vargas back

10   in the jail?

11   A.    No, I was.  After I tased her that's -- or tased at her,

12   my focus was on her.

13   Q.    Not on -- was your focus then not on winding up the

14   cables and collecting the AFIDs?

15   A.    No, at the time I just remember somebody coming up and

16   taking her up, picking her up and taking her back to the

17   cell.  At the time I didn't remember.  Then it was later

18   learned that it was John Collard.  At the time I did not

19   recall who it was.

20   Q.    At what time you didn't recall who it was?

21   A.    At the time of the investigation, I didn't remember who

22   brought her in.  But after reading some of the reports and

23   talking to other people, it was learned that it was John

24   Collard that brought her in.

25   Q.    Well, you were there that night?

1    A.    Yes, I was.

2    Q.    Did you see John Collard bring her into the jail?

3    A.    I saw somebody bring her in.  At the time I didn't

4    remember who it was.  It was later learned that it was

5    Collard.

6    Q.    So when you said that somebody -- that John Collard was

7    helping you, at the time did you know that John Collard was

8    helping you?

9    A.    I didn't know it was him.  I knew somebody did.  I just

10   didn't know it was John at the time.  I later learned that it

11   was John.

12            THE COURT:  All right.  Thank you.  This line is

13   completed.  Let's take a mid-morning recess.  Everyone rise

14   for the jury, please.  We'll call you back in 15 minutes.

15                  (Jury not present.)

16            THE COURT:  We're outside the presence of the jury.

17            Any counsel have any matters to take up at this

18   time?

19            MS. CARTER:  No, Your Honor.

20            MR. SCHWARTZ:  No, Your Honor.  Thank you.

21            THE COURT:  Well, I do.  How much more do you have

22   of this witness, Ms. Carter?

23            MS. CARTER:  I would say 20 to 30 minutes.

24            THE COURT:  I don't see how you expect to even

25   finish this one witness in the morning.

```
 1              MS. CARTER:  Your Honor, I do apologize for the

 2     slowness of it.  I think part of that is in part the

 3     witness's memory.

 4              THE COURT:  Doesn't take so much time to show the

 5     lack of memory.  Take about 15 minutes.

 6                          (Recess taken.)

 7              THE COURT:  We're again outside the presence of the

 8     jury.  Are there any matters that counsel wish to take up

 9     before we bring the jury back?

10              MS. CARTER:  Your Honor, I looked through my notes

11     for this examination, and I do have more to cover.  I

12     understand that this Court wants to move it along, but I just

13     wanted to let the Court know that this is an important

14     witness from the government's perspective, and it's --

15              THE COURT:  I understand.

16              MS. CARTER:  -- one of the ones we're going to take

17     a while with.  I just wanted to let the Court know about it

18     and apologize.

19              THE COURT:  Let's bring the jury back, please.

20                          (Jury present.)

21              THE COURT:  Would you repeat your name for the

22     record and spell your last name, please.

23              THE WITNESS:  Sure.  Matt Gutting.  Last name is

24     G-u-t-t-i-n-g.

25              THE COURT:  And you understand you're still under
```

```
 1   oath in this matter.
 2              THE WITNESS:  Yes, sir.
 3              THE COURT:  Okay.  Let's continue, Ms. Carter.
 4                   DIRECT EXAMINATION (RESUMED)
 5   BY MS. CARTER:
 6   Q.   From the time that Mrs. Vargas fell after you tased her
 7   until John Collard picked her up and helped her inside, how
 8   much time passed?
 9   A.   20, 30 seconds maybe.
10   Q.   And after Ms. Vargas fell, was she resisting Officer
11   Collard in any way?
12   A.   Not that I saw, no.
13              MS. CARTER:  Can I have permission to display
14   Exhibit 1, the diagram, for the jury and the witness?
15              THE COURT:  Go ahead.
16   BY MS. CARTER:
17   Q.   Where exactly were you when you fired your taser?
18   A.   Right outside the threshold of the door from booking
19   into the outside, a little bit to the right of the pillar and
20   behind.  Right outside the door.
21   Q.   How far were you from her?
22   A.   About 15 feet maybe.
23   Q.   So this you -- estimate this distance here but beyond
24   the pillar to here as 15 feet?
25   A.   No, I was right outside the door.  I was just right
```

```
 1   outside that door from booking.
 2   Q.   From when you -- was defendant still by the trash can at
 3   that point?
 4   A.   I'm not sure.  He would have been behind me so I
 5   wouldn't have seen where he was at.
 6   Q.   You ran past the defendant --
 7   A.   From what I remember, I ran past him.
 8   Q.   -- before you tased her.
 9   A.   Yes, ma'am.
10   Q.   And you were just outside of the door; is that correct?
11   A.   Yes.
12   Q.   So was defendant just inside the door?
13   A.   He must have been inside somewhere.
14   Q.   When you -- from the time period you first saw Angelica
15   Vargas outside, was she running straight-away from you or did
16   she ever stop running?
17   A.   I just saw the back of her running coming at the angle
18   that I told you about.
19   Q.   From the time you first saw her outside until the time
20   that she fell because you had hit her with a taser dart, she
21   was running.
22   A.   Yes.
23             MR. SCHWARTZ:  Objection.  Misstates the evidence.
24             THE COURT:  Well, the record speaks for itself.
25             Let's move on.
```

```
 1              THE WITNESS:  I don't know if she fell from my
 2    taser.
 3              THE COURT:  Just a minute.
 4    BY MS. CARTER:
 5    Q.   Did you see the defendant tase Ms. Vargas?
 6    A.   No.
 7    Q.   Did you ever see defendant chasing Ms. Vargas?
 8    A.   Not that I remember, no.
 9    Q.   Do you recall mentioning in your supplemental report
10    about the use of force in this case other means of force that
11    were used before Ms. Vargas was carried back into the jail
12    area?
13    A.   Do I recall any use of force?  I got confused by your
14    question.
15    Q.   Do you recall whether any other means of force was used
16    against Mrs. Vargas between the time you fired your taser at
17    her and the time that she was carried back into the jail
18    cell?
19    A.   Pepper spray, yes.
20    Q.   She was pepper sprayed between the time you fired your
21    taser and the time she was carried back into the jail?
22    A.   Oh, no, I'm sorry.  No.
23    Q.   So between -- let's get the time period clear.
24    A.   Okay.
25    Q.   From the time period after you fired your taser until
```

1    the time period that Ms. Vargas was carried back into the

2    jail area, were any other means of force used that you saw?

3    A.   No.

4    Q.   Do you recall mentioning in your supplemental use of

5    force report about this other means of force after you had

6    tased her and before she was carried back into the jail area?

7    A.   No.

8    Q.   Would it refresh your recollection to review your report

9    on that issue?

10   A.   Yes.

11        MS. CARTER:  Your Honor, may I show the witness to

12   refresh his recollection his report titled Supplement Three

13   and dated April 7th, 2005.

14        THE COURT:  Yes.  You may do so to attempt to

15   refresh.

16        MS. CARTER:  Yes, Your Honor.

17   Q.   Can you review this to yourself and specifically the

18   last sentence of the third paragraph?

19   A.   Okay.

20   Q.   Does reviewing this document refresh your recollection

21   as to whether you mentioned --

22        THE COURT:  Just a minute.

23        Would you turn that over now.

24        THE WITNESS:  Yes, sorry.  Okay.

25   BY MS. CARTER:

```
 1    Q.   Does reviewing this document refresh your recollection

 2    as to whether you mentioned other means of the force between

 3    the time you tased her and the time she was carried back into

 4    her cell in your use of force report?

 5    A.   I remember putting that, yes.

 6    Q.   What other means of force were you talking about?

 7    A.   The actual tasing.

 8    Q.   Your tasing?

 9    A.   Yes.

10    Q.   Why did you use the word other when you had described

11    your own tasing of Ms. Vargas earlier in your supplemental

12    report?

13    A.   Miswording, I don't know.  There was another use of

14    force, yes.  I was mentioning my taser.

15         MS. CARTER:  Your Honor, may I approach your clerk

16    to retrieve the document?

17         THE COURT:  Of course.

18    BY MS. CARTER:

19    Q.   Now, at some point, you mentioned that you saw red

20    pepper spray on Angelica Vargas's face.

21    A.   I saw redness to her face.

22         THE COURT:  Well, just a minute.

23         Are you asking?

24    BY MS. CARTER:

25    Q.   Do you recall mentioning at some point in you testimony
```

1    this morning seeing red pepper spray on Angelica Vargas's

2    face?

3    A.   Uh, just redness to her face.

4    Q.   At what point did you first see redness to Angelica

5    Vargas's face?

6    A.   Probably after she was brought in and taken back into

7    custody and put in the cell.

8    Q.   Do you recall the point at which first you saw red

9    pepper spray on Angelica Vargas's face?

10   A.   No.

11   Q.   Did you know that the redness on her face was pepper

12   spray?

13   A.   Yes.

14   Q.   How did you know?

15   A.   Uh, because I could smell it.

16   Q.   Did you observe any other injuries at this time?

17   A.   That's when I looked at, uh, if the taser made contact

18   with her, and I noticed the redness on her back shoulder.

19   Q.   When did you look at her to see whether the taser had

20   made contact?

21   A.   It was after, after everything happened.

22   Q.   Where was Ms. Vargas when you looked at her?

23   A.   I think in the jail -- the jail cell.

24   Q.   Did you ever at any point see Ms. Vargas lying on the

25   floor of the booking area handcuffed?

```
 1    A.    No.
 2    Q.    Did you ever at any point see Ms. Vargas handcuffed?
 3    A.    Not that I remember, no.
 4    Q.    What memory do you have, if any, of Ms. Vargas getting
 5    back from when you -- when she fell after being tased by you
 6    till the time you at some point saw her in the jail cell?
 7    A.    How much time went by?
 8    Q.    No.  What memory do you have of how she got from where
 9    she fell when you tased her to the jail cell where you later
10    saw her?
11    A.    Uh, I don't have any memory really.  I don't recall
12    that.
13    Q.    Was that something you were focused on?
14    A.    I was collecting the evidence from the taser.
15            THE COURT:  And so is that a no?
16            THE WITNESS:  Yeah.  No, sir.
17    BY MS. CARTER:
18    Q.    Now, those AFIDs, what are their purpose?
19    A.    The AFIDs are serialized with the actual cartridge
20    number that's attached to the taser.  So when you actually
21    use a taser, it's kind of like confetti that pops out, and
22    they're all serialized with that cartridge number.  So we're
23    supposed to pick up those cartridges and the AFIDs to match
24    'em up to show which taser was used, and I was collecting
25    those in evidence for the use of force report.
```

 1   Q.   In this case, did you know which taser had been used?

 2   A.   I assume mine did because I'm the one that fired the

 3   taser.

 4   Q.   Did you know yours had been used because you fired it?

 5   A.   Yes.

 6   Q.   Why were you focused on collecting the AFIDs at that

 7   time?

 8   A.   Because that's what we're supposed to do.

 9   Q.   At some point, did Andrea Heath photograph Ms. Vargas's

10   injuries?

11   A.   Yes, she did.

12   Q.   At what point did that happen?

13   A.   Uh, after the fact.  I couldn't give a time frame.  It

14   was sometime after that after she was taken back in custody.

15   Q.   Did you tell Andrea Heath to take photographs?

16   A.   Yes, I did.

17   Q.   Was defendant present when you told Andrea Heath to take

18   photographs?

19   A.   I don't remember.

20   Q.   Where were you when you told Andrea Heath to take

21   photographs?

22   A.   I think in the booking area.

23   Q.   So Andrea Heath had come in -- had Andrea Heath come

24   into the booking area at some point?

25   A.   She must have.  I honestly can't remember if she was in

```
 1    the booking or not.  I can't remember when I asked her to
 2    take the photos.
 3    Q.   Why did you tell Andrea Heath to take the photographs?
 4    A.   Because it was female.
 5    Q.   Why would that make a difference?
 6    A.   Just stay away from liability and, uh, allegations.
 7    Q.   If this had been a male arrestee, would you have taken
 8    the photographs yourself?
 9    A.   Yes, I would.
10    Q.   Why is that?
11    A.   Because a lot less allegations that a male would
12    complain about another male taking his picture rather than a
13    female.
14    Q.   Would you have taken the photographs yourself because
15    you were the arresting officer?
16    A.   Yes.
17    Q.   Did you give Andrea Heath your camera to take
18    photographs?
19    A.   I believe so.
20    Q.   How many photographs did she take?
21    A.   Mmm, I'm not sure.
22    Q.   Can you give us an estimate?
23    A.   Six or seven maybe.
24    Q.   What -- at some point, did Andrea Heath return your
25    camera to you after taking photographs of Ms. Vargas?
```

1    A.   Yes.

2    Q.   When did she do that?

3    A.   Probably after she took the photos.

4    Q.   Did she do it that night?

5    A.   I'm not sure.

6    Q.   At what point did you determine that Andrea Heath had

7    taken six or seven photographs of Ms. Vargas?

8    A.   After reviewing the photos.

9    Q.   When did you do that?

10   A.   I'm not sure.

11   Q.   How did you review the photos?

12   A.   Uh, either the computer or the actual camera.  I'm not

13   sure.

14   Q.   What was your normal practice about getting pictures

15   from a camera to your computer?

16   A.   I would download them into the RIM system which is our

17   computer system where we write reports and attach photos.

18   Q.   What were the those photographs of?

19   A.   One was of her, one of the taser mark, and then the

20   other ones were some bruising on her thighs because there was

21   bruising.

22   Q.   Was where the taser mark?

23   A.   From the looks of the photo, it looked like on the

24   left -- the left chest area from what I remember.

25   Q.   Were there photographs of taser marks on Ms. Vargas's

1    back?

2    A.    I don't remember.

3    Q.    Do those photographs exist today?

4    A.    No.

5    Q.    Do any of them exist?

6    A.    I think one or two do.

7    Q.    What happened to the rest of them?

8    A.    Uh, I deleted them.

9    Q.    Why did you do that?

10   A.    Uh, because the injuries were not consistent with the

11   use of force that occurred, and I determined that they were

12   from a different incident that happened before so I didn't

13   put them in the evidence.

14   Q.    How did you determine -- what are you talking about?

15   What incident that happened before?

16   A.    In the picture, she had yellowish bruising like old

17   bruising on her thighs, and when I asked her what happened,

18   she said that her husband assaulted her in Arizona.

19   Q.    When did you ask her what happened?

20   A.    I think this was afterwards.  I think it was after the

21   photos were taken or something like that.  I don't remember

22   exactly when I asked her.

23   Q.    Did you ask her specifically about those bruises?

24   A.    I asked her, and I asked Heath, also.

25   Q.    And what did Heath say?

1    A.   Heath said they were from an incident when she was

2    assaulted by her husband.

3             THE COURT:  Who was this that said that?

4             THE WITNESS:  Uh, the -- Angelica Vargas and also

5    Andrea Heath, Officer Heath.

6    BY MS. CARTER:

7    Q.   So at that point, you just deleted the photos; is that

8    right?

9    A.   The ones with the bruising from that, yes.

10            THE COURT:  But didn't those same photographs show

11   indication of some bruising from tasers?

12            THE WITNESS:  No, they were -- the ones that I

13   viewed were all like old bruising.  You could tell they'd

14   been there for a few days maybe, and they were like purple

15   and yellowish around it so it was kind of healing, but it

16   didn't have anything with taser marks or anything like that.

17            THE COURT:  Go ahead.

18   BY MS. CARTER:

19   Q.   Did Andrea Heath tell you that Ms. Vargas had complained

20   about an injury to her ankle?

21   A.   I don't recall that.

22   Q.   Going back just briefly to when you were picking up the

23   AFIDs after you had tased Angelica Vargas, what did you do

24   with those AFIDs?

25   A.   I collected the AFIDs and the darts and booked 'em into

1  evidence.

2  Q.    You booked the AFIDs into evidence?

3  A.    I believe so, yeah.

4  Q.    How would that have been recorded on the case audit

5  form?

6  A.    I don't know, there could have been a couple of

7  different ways.  I'm not sure.

8  Q.    Tell us what the couple of different ways were.

9  A.    I could have put a taser cartridge into evidence and

10  just put the AFIDs in there or I could have detailed it out

11  with taser cartridge with AFIDs and darts.  If I detailed it,

12  it'd be put in there.  If not, the AFIDs could still be

13  booked into evidence without being noted on the evidence

14  portion.

15  Q.    If -- did you book -- how did you book the AFIDs into

16  evidence in this case?

17  A.    Uh, in the other ones, you would just take the rubber

18  glove, and you'd take the actual cartridge, and you'd put

19  them all in a rubber glove together along with the darts

20  inside the taser cartridge, the spent taser cartridge, and

21  then you'd throw the AFIDs into there.

22  Q.    Did you then book that rubber glove with the AFIDs, the

23  cartridge and the darts into evidence as one item of

24  evidence?

25  A.    I don't recall how I booked it.

1    Q.   You packaged it, though, in a plastic glove with the

2    AFIDs, the cartridges and the darts together.

3    A.   On that specific occasion, I'm not sure, but that's my

4    normal -- that was my normal practice to do it.

5    Q.   And if you were following your normal practice, how then

6    would you have booked it into evidence?

7    A.   Like I explained it.  With rubber glove and the darts

8    inside the taser cartridge.

9    Q.   As a single item of evidence or as multiple items?

10   A.   I could have done a single item.

11   Q.   How would have described it on the CAD -- or, I'm sorry,

12   in the case audit form if you were following your normal

13   practice?

14   A.   As a spent taser cartridge.

15   Q.   Now, just before you tased Angelica Vargas, was she

16   running?

17   A.   Uh, not at a sprint, but she was like jogging away

18   kinda, kind of like a jog.

19   Q.   Was she running with a limp?

20   A.   Not that I remember.

21   Q.   Was her shirt torn at that point?

22   A.   I don't recall.

23   Q.   Was she wet?

24   A.   I don't remember.

25   Q.   Did you see the red pepper spray on her face?

1    A.    No, I just saw the back of her.

2    Q.    Did you smell pepper spray at that time?

3    A.    I don't know if I smelled it at that time.  I'm not

4    sure.

5    Q.    Did you smell vomit at that time?

6    A.    I don't believe so.

7    Q.    Did you notice vomit on her clothes?

8    A.    Like I said, I only saw behind so I wouldn't see the

9    front of her.

10   Q.    Now, when you saw her later in the cell and asked her

11   about the injury, the bruising you had seen in the pictures,

12   at that time, what was she wearing?

13   A.    I don't remember.

14   Q.    Was her shirt torn?

15   A.    I don't remember what she was wearing so I wouldn't

16   know.

17   Q.    Was she wet?

18   A.    I don't remember.

19   Q.    Do you remember seeing pepper spray on her face at that

20   time?

21   A.    I believe there was just a little bit of redness from

22   what I remember.

23   Q.    At any point did you see any officer hose Ms. Vargas

24   down?

25   A.    No.

```
 1    Q.    Have you ever seen an officer hose someone down who's
 2    been pepper sprayed?
 3    A.    They would hose -- if they're covered in pepper spray,
 4    that'd be -- that wouldn't be out of the ordinary.
 5            THE COURT:  Have you ever seen it done?
 6            THE WITNESS:  No.  I've seen people use a hose
 7    around the face and stuff, but hosing the entire person down,
 8    I've never seen that before.
 9    BY MS. CARTER:
10    Q.    Using a hose on someone's face, would that be out of the
11    ordinary in what you would see -- what you've seen in your
12    experience as a Desert Hot Springs police officer?
13    A.    No.
14    Q.    Was the policy about decontaminating someone who has
15    been sprayed with pepper spray hosing their face?
16    A.    From I remember, it's provide treatment, and that would
17    be the treatment.
18    Q.    Was the policy about treating someone who had been
19    sprayed with pepper spray providing them with decontaminate
20    for the pepper spray?
21    A.    It could be.  I don't remember what the policy was back
22    then.
23    Q.    Do you know what decontaminate for pepper spray is.
24    A.    We -- I don't know if we had any at the time, but I do
25    know what it is.
```

1   Q.   What is it?

2   A.   It's an actual spray -- it's another spray that you put

3   on the face that counteracts the actual pepper spray.

4   Q.   And you didn't know whether the department had any of

5   that spray at the time of February 2005?

6   A.   No.

7   Q.   Did you know where decontaminate spray was kept in

8   February of 2005?

9   A.   No.

10  Q.   Did you carry decontaminate spray in February of 2005?

11  A.   I didn't carry any.  Water works just as well.

12  Q.   And to treat someone with water, it would be common to

13  hose a person's face who had been sprayed with pepper spray.

14  A.   Yeah.

15        MS. CARTER:  Your Honor, may I have a moment?

16        THE COURT:  You may.

17        MS. CARTER:  I'm sorry, Your Honor.  May I inquire

18  whether the witness still has a document up there that was

19  provided to refresh his recollection?

20        THE COURT:  I thought they were collected.

21        Thank you.

22        MS. CARTER:  Thank you.  Sorry about that.

23  Q.   Do you recall testifying earlier this morning that you

24  didn't see the defendant tase Ms. Vargas?

25  A.   Right.

1    Q.   Do you recall telling the IA investigator that -- let me

2    rephrase.  Did you tell the Internal Affairs investigator

3    back in 2005 that defendant fired one taser cartridge at

4    Ms. Vargas?

5    A.   I don't recall telling them that.  I could have, I just

6    don't remember it.

7    Q.   Do you recall telling the Internal Affairs investigator

8    that Sergeant Sclafani fired the taser at Vargas while he was

9    standing inside the jail door?

10   A.   I don't remember that.

11   Q.   Do you recall telling the Internal Affairs investigator

12   that there were photographs of taser wounds that you thought

13   you had downloaded but were unable to locate?

14   A.   Right.

15   Q.   So were there taser -- were there photographs of taser

16   injuries in addition to the one you described of the taser

17   injury on Ms. Vargas's breast?

18   A.   There should have been one of her left breast or I'm not

19   sure which one and her back.  Those are the only two photos

20   that I recall.

21   Q.   So you recall a photograph of a taser injury on

22   Ms. Vargas's back.

23   A.   Yes.

24   Q.   What happened to that photograph?

25   A.   I thought I booked it in.  I don't think that was one of

1    the ones I deleted, I know that.

2    Q.   Did you later learn that it had disappeared?

3    A.   Yeah, I did.

4    Q.   Now, I just asked you a few questions about whether you

5    recalled some comments to the Internal Affairs investigator

6    about defendant firing a taser at Ms. Vargas.  Would it

7    refresh your recollection about what you told the Internal

8    Affairs investigator to review a copy of your report?

9    A.   Yeah.

10             MS. CARTER:  Your Honor, may I approach this

11   witness with a copy of the Internal Affairs interview summary

12   that he has previously reviewed describing an interview on

13   April 22nd, 2005?

14             THE COURT:  Go ahead.

15             THE WITNESS:  Okay.

16   BY MS. CARTER:

17   Q.   Please review it to yourself, specifically the bottom of

18   page two and the top of page three, and then let me know when

19   you're ready.

20   A.   Okay.

21   Q.   Does this refresh your recollection about whether you

22   talked to an Internal Affairs investigator about defendant

23   tasing Ms. Vargas?

24   A.   Yes.

25   Q.   You told the Internal Affairs investigator that

1    defendant fired one taser cartridge at Ms. Vargas.

2              THE COURT:  Well, ask it differently, please.

3    BY MS. CARTER:

4    Q.   Did you tell the Internal Affairs investigator that

5    Sergeant Sclafani had fired one taser cartridge at

6    Ms. Vargas?

7    A.   Yes.

8    Q.   Did you tell the Internal Affairs investigator that the

9    defendant was standing inside the jail door when he fired the

10   taser at Ms. Vargas?

11   A.   Yes.

12   Q.   Did you tell the Internal Affairs investigator that the

13   defendant fired his taser cartridge after you did?

14   A.   I don't remember saying that.

15   Q.   Would you please -- uh, would it refresh your

16   recollection to review your report?

17   A.   What part is that on, do you know?

18   Q.   It's the top of page two going into page two.  And just

19   let me know when you're ready.

20   A.   Yeah, I don't see where it says anything about --

21             THE COURT:  Have you read it yet?

22             THE WITNESS:  Yeah.

23   BY MS. CARTER:

24   Q.   Does it refresh your recollection about whether you

25   described your tasing Ms. Vargas first and then Sergeant

1   Sclafani tasing Ms. Vargas?

2   A.   That's not the way I read it.  It doesn't look like that

3   unless I'm mistaken.

4             THE COURT:  Well, it's not about what you've read.

5             Is your recollection refreshed?

6             THE WITNESS:  No.  No.

7             THE COURT:  Go on.

8             MS. CARTER:  Yes, Your Honor.

9             THE COURT:  Ms. Skipper, would you please take that

10  back.

11  BY MS. CARTER:

12  Q.   Turning back to the photographs that were erased, were

13  you ever questioned by Sergeant Gill about those photographs?

14  A.   Yes, I was.

15  Q.   What was your understanding of why you were questioned

16  about erasing photographs related to Angelica Vargas's

17  injuries?

18  A.   I don't remember how the question arose, but he just

19  questioned me about it.

20  Q.   Do you remember roughly when this happened?

21  A.   No.

22  Q.   Was it 2005?

23  A.   I believe so.

24  Q.   Was it before or after you spoke to the Internal Affairs

25  investigator?

1    A.    I don't remember.

2    Q.    Were you reprimanded for deleting the photographs of

3    Angelica Vargas's injuries?

4    A.    I think he gave me a verbal reprimand.

5    Q.    What was your understanding of why he reprimanded you?

6    A.    It was not a good thing to do.  It's an error my part.

7    Q.    Why was it an error on your part and not a good thing to

8    do?

9    A.    Feeling the ramifications from it now so . . .

10   Q.    Did you tell Sergeant Gill when he questioned you that

11   there were three photographs of taser injuries?

12   A.    I don't remember what I told him.

13   Q.    Would it refresh your recollection as to the date that

14   you spoke with Sergeant Gill to review Sergeant Gill's report

15   of that conversation?

16   A.    Okay.

17   Q.    Would it refresh your recollection as to whether you

18   mentioned to Sergeant Gill that there were three photographs

19   of taser injuries to review Sergeant Gill's report of his

20   conversation with you?

21   A.    It might not help my recollection, but if it's what I

22   told him, that's what I told him.

23            MR. SCHWARTZ:  Move to strike as nonresponsive.

24            THE COURT:  It will be stricken.

25   BY MS. CARTER:

1    Q.    Do you think it might help your recollection?

2    A.    If I see it, maybe.  I don't know.

3              MS. CARTER:  Your Honor, I would request permission

4    to show the witness a memo authored by Sergeant Radonamas

5    Gill dated April 18, 2005 regarding Case No. 05-783-dash

6    photos.  And I'm going to show this to defense counsel.

7              THE COURT:  Thank you.

8              MS. CARTER:  May I approach your clerk, Your Honor?

9              THE COURT:  You may.

10   BY MS. CARTER:

11   Q.    I would ask you to please review this two-page document,

12   specifically the date header and first paragraph of the first

13   page and the paragraphs on the middle of the second page, and

14   let me know when you've had a chance to do that.

15   A.    Okay.

16   Q.    Does this refresh your recollection about when Sergeant

17   Gill talked to you about deleting the photographs of Angelica

18   Vargas's injury?

19   A.    Yes.

20   Q.    When did he talk to you about that?

21   A.    After the incident.  Can I look at the date again?  I

22   didn't look at the date.

23   Q.    Well, then if it refreshes your recollection, can you

24   tell us what your recollection is about when you spoke to

25   him?

1    A.   I just don't remember exactly when I talked to him.

2    Q.   Was it in April of 2005?

3    A.   If I can look at the date again, I can confirm it.

4         THE COURT:  Well, you can read it, yes.

5         THE WITNESS:  I'm sorry, Your Honor.  I didn't look

6    at the date.

7         THE COURT:  Why don't we just stop this.  Let's

8    move on with something else, please.

9    BY MS. CARTER:

10   Q.   Does this refresh your recollection about whether you

11   told Sergeant Gill that there were three photographs of taser

12   injuries?

13   A.   Yes.

14   Q.   Do you recall that you told Sergeant Gill there were

15   three photographs of taser injuries?

16   A.   According to my report, yes.

17   Q.   Where --

18   A.   I do not recall that.

19   Q.   Where were the taser injuries?

20   A.   I believe one on the chest, one on the back, and I'm not

21   sure about that third one.

22        MS. CARTER:  Your Honor, may I approach your clerk

23   to retrieve the document?

24        THE COURT:  You may.

25   BY MS. CARTER:

```
1    Q.    How long would you estimate that it took from the time
2    that you fired your taser until the time, uh, Ms. Vargas was
3    carried back into her cell?
4    A.    I don't know.  Maybe -- like I said before, maybe
5    30 seconds by the time she was brought all the way back into
6    her cell?  Around there?  20 or 30 seconds, maybe?
7              MS. CARTER:  May I have a moment Your Honor?
8              THE COURT:  Of course.
9              MS. CARTER:  Your Honor, I would like to read from
10   the stipulation at Exhibit 84 the portions pertaining to
11   Government's 50 and 51.
12             THE COURT:  I don't believe it's necessary to read
13   it.  Just ask him and --
14             MS. CARTER:  Your Honor --
15             THE COURT:  -- if there's any objection --
16             MS. CARTER:  I ask permission to do so only because
17   the parties have stipulated as to what these documents are.
18   I think it might be helpful to the jury to hear the
19   stipulations as to what these are.
20             THE COURT:  Go ahead.
21             MS. CARTER:  Government's Exhibit 50 which is a
22   taser international download for Defendant Anthony Sclafani's
23   taser showing taser activations on February 25th, 2005.
24   Government Exhibit 51 which is a taser international download
25   report for Desert Hot Springs Police Department, Officer
```

1    Matthew Gutting's taser showing taser activations on February

2    25th, 2005.

3           And Your Honor, I believe Exhibit 50 is already in

4    evidence, and at this time, I would move Exhibit 51 into

5    evidence.

6           THE COURT:  Yes, 50 is in.  I take it there's no

7    objection.

8           MR. SCHWARTZ:  No, Your Honor.  Thank you.

9           THE COURT:  All right, 51 will come in as well.

10                (Exhibit 51 admitted.)

11          MS. CARTER:  And I would like to first publish

12   Exhibit 51 for the jury.

13          THE COURT:  Go right ahead.

14   BY MS. CARTER:

15   Q.   Have you seen forms like this before?

16   A.   Yes, I have.

17   Q.   What are these types of forms?

18   A.   That's our taser download forms.

19   Q.   Now, I'd like to magnify the portion under recorded

20   firing data.  Now, this document indicates that you fired

21   your taser at 18 hours 12 minutes 18 seconds for three

22   seconds.  Is that -- do you recall firing your taser for

23   three seconds at Angelica Vargas before you turned it off?

24   A.   Yeah, by the time the trigger was activated and it

25   shoots out, it took maybe a second to travel to her.  I don't

```
 1   know how long it would take, but by the time I realized that

 2   the taser darts did not connect, it could have been three

 3   seconds.

 4   Q.   So that time, 18:12:18, that 6:12 p.m.; correct?

 5   A.   Yes.

 6   Q.   Was it approximately 6:12 p.m. that you tased Angelica

 7   Vargas?

 8   A.   Around there, yes.

 9        MS. CARTER:  Your Honor, I'd like to display for

10   the jury Exhibit 50.

11        THE COURT:  Go right ahead.

12        MS. CARTER:  And I'd like to magnify the portion

13   under recorded firing data.

14   BY MS. CARTER:

15   Q.   Now, based on your experience with these forms, does

16   this taser download show three five-second tasings, three

17   minutes after you tased Angelica Vargas?

18   A.   Yes.

19   Q.   And those three tasings, the duration of it encompassed

20   approximately 40 seconds; is that correct?

21   A.   That would be 15 seconds.  The duration?

22   Q.   I'm sorry, I'll restate the question.  The time period

23   that elapsed from the first -- end of the first tasing to the

24   end of the third -- I'm sorry.  I'll restate again to be

25   perfectly clear.  Does the time period elapsed from the end
```

1    of the first five-second tasing at 18:15:16 seconds to the

2    time period shown at the end of the third five-second tasing

3    at 18:15:51 -- and I think I have to restate it one more

4    time.   I believe that's the start of the first tasing at

5    18:15:16 seconds to the end of the third five-second tasing

6    at 18:15:51 seconds.

7              That's approximately 35 seconds; correct?

8    A.    Correct.

9    Q.    Did you perceive any -- do you recall perceiving

10   anything that happened that night, February 25th,

11   approximately three minutes after you tased Angelica Vargas

12   that could explain three separate five-second tasings?

13   A.    No.

14   Q.    I'd like to now direct your attention to Exhibit No. 56.

15             MS. CARTER:   Could I ask for Exhibit No. 56 to be

16   placed in front of this witness?

17             THE COURT:   Certainly.

18             MS. CARTER:   And I believe this is already in

19   evidence so I would like permission to publish this for the

20   jury.

21             THE COURT:   It is in evidence, and you may publish

22   it.

23             MS. CARTER:   We'll start with the first page.

24             THE COURT:   Tell me how much more time you think

25   you're gonna take so I can inquire of the jury if they wish

```
 1    to remain to see if we can possibly finish this witness.

 2              MS. CARTER:  Say 20 to 25 minutes, Your Honor.

 3              THE COURT:  All right.

 4              And I take it that there will be cross-examination.

 5              MR. SCHWARTZ:  Yes, Your Honor.

 6              THE COURT:  And what is your estimate?

 7              MR. SCHWARTZ:  About a half hour.  Maybe a little

 8    more, Your Honor.

 9              THE COURT:  Ladies and gentlemen, would you prefer

10    to just go home now or would you like to see if we can

11    complete this witness?  You want to confer with each other?

12    Let's say we won't go beyond 1:00 o'clock regardless.  All

13    right.

14              MS. CARTER:  May I have a moment, Your Honor?

15              THE COURT:  Of course.

16              MS. CARTER:  Your Honor, I believe a few pages are

17    out of order with the originals.  If the witness can read

18    from the monitor, I'll proceed.

19              THE COURT:  Let's try that.

20    BY MS. CARTER:

21    Q.   Do you know what this document is?

22    A.   That's a CAD report.

23    Q.   Is this a CAD report or a case audit?

24    A.   I'm sorry, a case audit.  You're correct.

25    Q.   Is this the case audit for the Vargas arrest?
```

1   A.   Yes.

2         MS. CARTER:  Now, I'd like to turn to the third

3   page of the exhibit, please.  I'm sorry.  Let's first go to

4   the second page.  Can you please magnify?  Is that the second

5   page?  Can you please magnify the last couple lines of the

6   document?

7   Q.   Turning your attention to that very last row of the

8   document, 03-25-2005, where you see the number 054 under the

9   by column, what is 054 if you know?

10  A.   That's my ID number.

11  Q.   Does that indicate that you did the event that's listed

12  then in the entry column just to the right?

13  A.   Yes.

14  Q.   Now, created property record, three spent taser

15  cartridges, what does that mean?

16  A.   That I probably booked in three spent taser cartridges

17  into evidence.

18  Q.   Did you do this on March 25th, a month after the tasing?

19  A.   I must have.

20        MS. CARTER:  Can we display the next page, and can

21  you magnify the top one third?

22  Q.   Now, do you see the two entries that are eight and nine

23  down page three of this document where it says two spent

24  taser cartridges, quantity three changed to two and then

25  three spent taser cartridges, quantity two changed to three?

1    A.    Yes.

2    Q.    Did you -- are you also the officer who made those

3    entries, Officer Number 54?

4    A.    According to that, I am, but I don't recall that.

5    Q.    Do you recall changing the quantity of spent taser

6    cartridges that you booked into evidence in this case?

7    A.    No.

8    Q.    Do you recall any reason why you might have done that in

9    this case?

10   A.    No, cause I would have just booked my own into evidence.

11   I don't know why I would have booked anybody's else's in

12   there so I don't know where that came from.  I don't remember

13   doing that.

14   Q.    As the arresting officer, you wouldn't have booked other

15   spent taser cartridges into evidence?

16   A.    I normally just did my own and nobody else's.

17   Q.    How many taser cartridges did you use that night?

18   A.    Just one.

19         MS. CARTER:  Well, let's take off this

20   magnification.  And I'd ask you to magnify a few lines in the

21   center of the document, the one that says State of California

22   down where it says type, misdemeanor arrest changed to

23   accident case.

24   Q.    Now, looking at the two entries just below the State of

25   California added to case entry that's halfway down the

1    page --

2    A.    Mm-hmm.

3    Q.    -- it again reads two spent taser cartridges, quantity

4    three changed to two, three spent taser cartridges, quantity

5    two changed to three.  Is that your officer number next to

6    those two entries?

7    A.    Yes, it is.

8    Q.    Why did you change the quantity again later on March

9    25th, 2005?

10   A.    I don't know.  I can't explain that.

11          MS. CARTER:  Now, I would like to take that off and

12   move to the next page.  Yes, page four of the exhibit.  And

13   let's -- well, let me --

14   Q.    Before we do that, let me just ask you, can you tell

15   from looking at this page the date when your reports were

16   finalized in this case?  Well, let me withdraw the question.

17   You testified earlier you wrote your reports on this case on

18   April 6th and April 7th, 2005.  Do you recall that?

19   A.    Yes.

20   Q.    Does this document show entries that correspond to work

21   on reports on those two dates?

22   A.    Yes, it does.

23   Q.    And does this report show work on reports by you on

24   those two dates?

25   A.    It has my ID number all over it so . . . yeah.

1    Q.   And can you explain to the jury what that indicates

2    about what you were doing with regard to the reports in this

3    case on those two dates?

4    A.   A couple of 'em say the narrative was spell checked.  It

5    was, uh, spell checked again.

6    Q.   Were you finalizing your reports on those two dates?

7    A.   Uh, looks like I was if I was doing the spell check on

8    it.

9    Q.   Once the arresting officer finalizes their reports, what

10   happens to the reports next in the ordinary course of report

11   writing at Desert Hot Springs Police Department?

12   A.   Uh, the report gets submitted to a supervisor, and they

13   approve it and log it.

14   Q.   Who was the supervisor in this case?  Can you tell?

15   A.   No.  I don't know whose ID is 060.  I'm not sure.  I

16   don't know -- I don't remember who that was.

17   Q.   Did Sergeant Sclafani review the reports in this case?

18   Not looking at the document but to the best of your

19   recollection.

20   A.   Um, I -- I don't remember who -- the initial use of

21   force report and accident report you're talking about?  Is

22   that the report you're talking about?

23   Q.   Well, which sergeants to the best of your recollection

24   reviewed your reports?

25   A.   It would have been my watch commander would reviews --

1    uh, approved 'em.

2    Q.    And who was your watch commander through this incident?

3    A.    At the time the accident happened, it was Sergeant

4    Duffy.  I don't know who -- I don't know who approved the

5    report.

6    Q.    Is the watch commander who reviews the report the one

7    who is working -- or supervising you when the report is

8    completed?

9    A.    Yeah, that's the way it's normally supposed to go, but

10   it . . .  it can change.  It can vary who approves a report.

11   If one supervisor has more reports than the other, somebody

12   else might approve it and log it, I don't know.  It all

13   depends.

14   Q.    You testified earlier this morning, though, that

15   Sergeant Sclafani reviewed your report -- was the supervisor

16   who reviewed your reports, and that's why you discussed your

17   reports with him.

18   A.    The use of force portion, yeah.  The accident, I'm not

19   sure who --

20   Q.    So Sergeant Sclafani, was he the one who reviewed your

21   use of force report?

22   A.    Yes.

23   Q.    Do you see Sergeant Sclafani's officer number indicated

24   on this document?

25   A.    What was his ID number?

1    Q.   Do you know what his ID was?

2    A.   I don't remember it.  I haven't been there for five

3    years, six years almost.

4              MS. CARTER:  Now, I'd like to turn you to page six

5    of the document and magnify the last seven lines.

6    Q.   This entry six or seven lines from the bottom that says

7    case locked, what does that mean?

8    A.   I think either you're not supposed to go in, and you can

9    no longer make changes to it.

10   Q.   And why is that?

11   A.   Uh, for court purposes.

12   Q.   For what purposes?

13   A.   Court purposes?

14   Q.   What court purposes are those?

15   A.   Just case integrity in general so nobody can go in and

16   make changes afterwards.

17   Q.   Can you explain to the jury why it's important for case

18   integrity that changes are not made to reports after a case

19   is locked in this system?

20   A.   Yeah, it's to make sure nobody changes anything that

21   didn't happen or just make sure no one messes with the

22   report, basically.

23   Q.   Who locks cases?

24   A.   Uh, I believe just the sergeants can or supervisors can.

25   Q.   And do you know who 041 is who locked this case?

1  A.   I think it's Sergeant Gill, Radonamas Gill.

2          MS. CARTER:  I'd like to turn to the next page of

3  the document.  I believe it's page seven of the document.

4  And please magnify the top ten lines or so.

5  Q.   Now, there's entry here on 04-16-2005 three lines from

6  the top that has your officer code and says case unlocked.

7  What does that mean?

8  A.   That the case was unlocked.

9  Q.   Can you explain for the jury how is it that you, a

10 police officer, not a sergeant, could have unlocked a case in

11 the system?

12 A.   Remember I couldn't -- I wouldn't be able to do that.

13 Q.   Do you know why the entry case unlocked is listed next

14 to your officer code?

15 A.   Somebody could have logged on under my name.  I don't

16 have the authority to lock that or unlock it.

17         MR. SCHWARTZ:  Objection.  Move to strike.

18         Speculation.

19         THE COURT:  It's overruled.  Motion to strike is

20 denied.

21 BY MS. CARTER:

22 Q.   Could -- someone logging on with your officer number,

23 would they have permission to unlock a case using your

24 officer number?

25 A.   I don't know how that would work.

1    Q.    Do you recall unlocking this case audit after, uh -- or

2    this case after it had first been locked?

3    A.    I wouldn't be able to unlock it.  Only a supervisor

4    would.

5    Q.    Do you recall this case being unlocked by anyone after

6    previously being locked?

7    A.    I have no idea about it.

8    Q.    Are you saying that you did not unlock this case?

9    A.    Yes.

10            THE COURT:  That's asked and answered.

11   BY MS. CARTER:

12   Q.    Now, underneath that entry, there was an entry that

13   reads -- there are two entry that read supplemental three of

14   Matthew Gutting changed comma original date 04-07-2005, and

15   they have your officer number by them.

16   A.    Mm-hmm.

17   Q.    Did you change your supplement three use of force report

18   in this case after this case was initially locked in this

19   system?

20   A.    No.  I couldn't have unlocked it so there was -- I

21   couldn't have changed that.

22   Q.    Did someone else change your use of force report after

23   the case was initially locked in the system?

24   A.    After reading it, it doesn't look like it was -- it

25   looks like the initial report that I wrote.  I don't think

1  anybody changed anything.  I don't know what this thing's

2  about right here.

3  Q.   Do you remember clearly word for word what your report

4  looked like when you initially wrote it in April of 2005?

5  A.   No.

6       MS. CARTER:  You can clear the document.

7  Q.   After -- at the point that you saw Ms. Vargas in her

8  cell, was she cooperative?

9  A.   Uh, from what I remember, yes, she was.

10 Q.   Did she resist you in any way?

11 A.   Not me, no.

12 Q.   Did she resist Officer Heath in any way while she was

13 taking photographs?

14 A.   I don't know.  I wasn't in the cell with them.  I don't

15 know what happened.

16 Q.   Were you aware of her resisting any other officers after

17 you tased her?

18 A.   I didn't see her resisting, no.

19 Q.   What did you do after Officer Heath photographed

20 Ms. Vargas?

21 A.   I believe I talked to Ms. Vargas for a second, for

22 couple seconds, and then I went back to report writing or

23 handled calls.  I can't remember exactly what I did.

24 Q.   At some point, were you able to book Ms. Vargas?

25 A.   No.

1    Q.    You never booked Ms. Vargas?

2    A.    In the County jail, no.

3    Q.    At some point, did you go through the booking process

4    for the initial arrest with Ms. Vargas?

5    A.    Yeah, she was cited and released.

6    Q.    What's that mean, to cite someone and release them?

7    A.    Uh, to give' em a ticket for the violation, and, uh,

8    they're out of custody.

9    Q.    And why did you cite Ms. Vargas and release her in this

10   case?

11   A.    It was just a misdemeanor.

12   Q.    Was there any reason to hold Ms. Vargas?

13   A.    No.  Just to sober -- make sure she sobers up.  That's

14   why she was kept for at least four hours.

15   Q.    Was there any other reason that Ms. Vargas was held in

16   jail the night of February 25th, 2005?

17   A.    Aside from the DUI?  No.  And obstructing, no.

18   Q.    Well, was the DUI a misdemeanor offense?

19   A.    Yes, it was.

20   Q.    Would that have been a reason to hold someone in jail?

21   A.    For four hours, yes.

22   Q.    What would be the purpose of holding them for four

23   hours?

24   A.    Like I said, to sober up.

25   Q.    Would there be any other purpose in holding them?

```
 1   A.    That'd depend on what the crime was.  They might be

 2   awaiting transport to the County jail for another crime or

 3   like I said, just so they could sober up and for their

 4   safety.

 5   Q.    In Ms. Vargas's case, was there any other reason to hold

 6   her in jail the night of February 25th, 2005 other than

 7   having her sober up for four hours?

 8   A.    For the 148 also that we charged her with, but that's a

 9   citable offense so we released her.

10   Q.    Oh.  But what was the 148?

11   A.    The obstruction -- obstructing justice for a police

12   officer.  I'm sorry.

13   Q.    Why did she get cited with that?

14   A.    Uh, cause she ran out of the jail cell and tried to

15   basically escape.

16   Q.    Did you hold her after that?

17   A.    No, but she was cited for it.

18   Q.    So that wasn't a reason to hold her in -- was that a

19   reason to hold her in jail?

20   A.    I'm getting confused with your -- why would you not want

21   to hold somebody?  I mean, we can't let somebody drunk out on

22   the street so that's why we held her in jail.

23   Q.    Did you hold her in jail because of the 148 citation?

24   A.    For both the 640 -- or the DUI and also the obstructing.

25   Q.    You held her in jail because of the 148 citation or did
```

```
 1   you cite her and release her on the 148?

 2   A.    We cited her after she sobered up and released her.

 3   Q.    Now, that 148 charge for obstructing and delaying a

 4   police officer, that charge was ultimately dismissed, wasn't

 5   it?

 6           MR. SCHWARTZ:  Objection.  Lack of foundation,

 7   relevance.

 8           THE COURT:  He may answer if he has knowledge.

 9           THE WITNESS:  No, I don't know.

10   BY MS. CARTER:

11   Q.    Were you ever called to testify against Ms. Vargas on

12   any such charge?

13   A.    No.

14   Q.    Did anyone ever contact you telling you that the

15   District Attorney's office was prosecuting Ms. Vargas on that

16   charge?

17   A.    No.

18           THE COURT:  You need to wrap up in the next five

19   minutes.

20           MS. CARTER:  Yes, Your Honor.

21   Q.    At some point, did you make Angelica Vargas clean up the

22   throw-up from your police car?

23   A.    Yes.

24   Q.    Why did you do that?

25   A.    Because I wasn't gonna do it.
```

1    Q.    At what point did you make her do it?

2    A.    Um, probably a couple hours afterwards, I believe.  I

3    don't remember.

4    Q.    After what?

5    A.    After she was arrested.

6    Q.    Where did you make her clean up the throw-up?

7    A.    Out of the back of the car.

8    Q.    Where was the car?

9    A.    Parked right in front of the sally port.

10   Q.    Was there any other officer with you when you went with

11   her to have her clean up the throw-up in your car?

12   A.    I don't remember.

13   Q.    Was Ms. Vargas handcuffed when you told her to clean up

14   the throw-up in your car?

15   A.    No.

16   Q.    Was she restrained in any way when you had her clean up

17   the throw-up in your car?

18   A.    No, we just watched her.

19   Q.    Who's we?

20   A.    Well, I watched her.

21   Q.    Was anyone else there?

22   A.    Not that I remember, no.

23   Q.    Was this before or after you tased her?

24   A.    I think it was before, but I'm not a hundred percent on

25   it.

```
 1    Q.   You think it was a couple hours after the initial
 2    arrest.
 3    A.   Around there, I'm not exactly sure.
 4    Q.   How long was it before she was finally released?
 5    A.   I don't even know that.  I don't think I was there when
 6    she got released.
 7    Q.   At the point when you took her out to the parking area
 8    to clean up the throw-up in the car, she was able to walk out
 9    there -- was she able to walk out there?
10    A.   Yes.
11    Q.   Was she limping?
12    A.   I didn't even pay attention to that.  I don't know.
13    Q.   Was she able to clean up the throw-up from your car?
14    A.   Kinda.  She was still intoxicated so . . .  I ended up
15    helping her.
16    Q.   What did you give her -- when you say you ended up
17    helping here, where exactly did you get with relationship to
18    the car?
19    A.   I think I hosed out the back seat.
20    Q.   And where was Ms. Vargas at that time?
21    A.   Mmm, I think she was back in her cell, I don't remember.
22    I don't think she was outside.
23    Q.   At the time that you took her out there to clean up the
24    throw-up in your car, was she being compliant?
25    A.   Yeah, she was apologetic to me for throwing up in the
```

```
1    car.
2    Q.    What did she say about that?
3    A.    She said she was sorry for hitting the school bus and
4    sorry for throwing up in my car.  And that's when she went on
5    about her husband, too.
6    Q.    Did she comply with all your --
7              Move to strike that last sentence.
8              THE COURT:  The last part will be stricken.
9    BY MS. CARTER:
10   Q.    What, uh -- did she comply with all of your orders
11   regarding cleaning up the car?
12   A.    Yeah.
13   Q.    What did you give her to clean up the car?
14   A.    Towels.
15   Q.    At the time that you took her out to clean the throw-up
16   out of your car, were you worried she was gonna escape in the
17   parking area?
18   A.    Well, you never know what they're gonna do so I kept a
19   good eye on her.
20   Q.    Did she --
21   A.    So I stayed there and watched her.
22   Q.    Did she give any sign at anytime that she was going to
23   escape from the parking area?
24   A.    Not to me, no.
25   Q.    And the time that she was cleaning up the throw-up from
```

1  your car in the parking area and the time when you tased her

2  in the parking area, did all the gates in the parking area

3  operate the same way?

4  A.   Mmm, how do you mean?

5  Q.   Had the operation of the gates changed at anytime

6  between the time when you tased her and the time she was

7  cleaning up the throw-up from your car in the parking area?

8  A.   The gates open when somebody comes in and out.  It's on

9  a sensor.  So they can open in and out whenever, and they can

10 be locked open, and it all depends on the situation.

11 Q.   And the gates that night, were they open or closed?

12 A.   I don't remember.

13 Q.   Did the operate on a sensor or did they operate on a

14 remote control?

15 A.   Uh, both, I think.

16 Q.   In the time period between when Ms. Vargas was tased and

17 when you had her go clean up throw up in the parking area,

18 had anybody gone outside to all the patrol cars to make sure

19 they were locked and not running?

20 A.   I don't know.

21 Q.   Are you aware of anything like that?

22 A.   No.

23 Q.   Now, you testified that you briefed with the defendant

24 shortly after this incident.

25 A.   Correct.

```
1    Q.   Why was that?

2    A.   I had to let my supervisor know at the time about the

3    use of force, so I had to let him know.

4    Q.   At that time did he say anything to you about having

5    problems with Ms. Vargas?

6    A.   I don't remember if he did or not.

7    Q.   How long did your conversation with him last?

8    A.   I don't know.

9               THE COURT:  One more question.

10   BY MS. CARTER:

11   Q.   In January of 2010, did you refuse to have any further

12   meetings with the government to talk about the events in this

13   case?

14   A.   Yes.

15              THE COURT:  Thank you.

16              Cross-examination, please.

17                        CROSS-EXAMINATION

18   BY MR. SCHWARTZ:

19   Q.   Morning.

20   A.   Morning, sir.

21              THE COURT:  Well --

22   BY MR. SCHWARTZ:

23   Q.   Good afternoon.  The events that you were discussing

24   with counsel happened seven years ago?

25   A.   Yes, sir.
```

1    Q.   And as you sit here today, do you have a good

2    recollection of any of them?

3    A.   No.

4    Q.   And as a police officer with Desert Hot Springs Police

5    Department, were you trained to write reports?

6    A.   Yes, I was.

7    Q.   And was part of that training to write reports that

8    could refresh recollection?

9    A.   Correct.

10   Q.   Were you trained to put every single fact of the case in

11   the report?

12   A.   As best as I could.

13   Q.   Every fact that was relevant to the prosecution and to

14   refresh recollection?

15   A.   Yes.

16           MS. CARTER:  Objection.  Asked and answered.

17           THE COURT:  Well, I'm going to let it stand.  Move

18   on.

19   BY MR. SCHWARTZ:

20   Q.   In order that -- currently you work for the Indio Police

21   Department?

22   A.   Yes, sir.

23   Q.   What's your assignment?

24   A.   Uh, gang investigator.

25   Q.   And is that only with Indio or was there a task force?

1    A.   Only with Indio.

2             MS. CARTER:  Objection.  Relevance.

3             THE COURT:  Sustained.

4    BY MR. SCHWARTZ:

5    Q.   Are you currently also doing cross-work with the FBI?

6             MS. CARTER:  Objection.  Relevance.

7             THE COURT:  Sustained.

8    BY MR. SCHWARTZ:

9    Q.   Back in 2005, specifically February of 2005, you had

10   been a police officer about four months?

11   A.   Yes.

12   Q.   Did that include the training time as a police officer

13   like with an FTO?

14   A.   Yes, it did.

15   Q.   Can you explain what an FTO is?

16   A.   Field training officer.

17   Q.   And can you explain what you would do with an FTO and

18   how long as part of that training?

19   A.   The FTO -- with my FTO officer, I would handle calls

20   with him, write reports with him, be -- basically, be my

21   babysitter for three months or however long it takes for me

22   to adapt to being police officer.

23   Q.   At the time of this case we have been discussing which

24   was back in February 2005, how long had been on your own as a

25   patrol officer?

```
 1   A.    Probably about a month or two maybe.

 2   Q.    Brand new?

 3   A.    Brand new.  Besides my experience at the tribal police

 4   before, I had been there for four months.

 5   Q.    So very inexperienced as a patrol officer?

 6   A.    In that capacity, yes.

 7   Q.    And how busy was Desert Hot Springs for a patrol officer

 8   at that time back in 2005?

 9            MS. CARTER:  Objection.  Vague.

10            MR. SCHWARTZ:  I'll be more specific, Your Honor.

11            THE COURT:  All right.

12   BY MR. SCHWARTZ:

13   Q.    As a patrol officer in Desert Hot Springs in 2005, did

14   you have a lot of calls usually per shift?

15            MS. CARTER:  Objection.  Vague.

16            THE COURT:  It's overruled.  You may answer.

17            THE WITNESS:  Very busy.

18   BY MR. SCHWARTZ:

19   Q.    Can you estimate, and this is only an estimate, the

20   number of calls you would average per shift at that time

21   2005?

22   A.    As a shift and not individually, I would probably say

23   over a hundred, 120, maybe.

24   Q.    And as an individual?

25   A.    50 or 60 possibly, depending on the day.
```

```
1   Q.   Was it common to be behind in your write reporting?

2   A.   Yes.

3   Q.   Common to be very behind in reports?

4   A.   Yes.

5   Q.   You have a white notebook in front of you?

6   A.   Yes.

7   Q.   Could you please turn to Exhibit 206 and on the bottom

8   right-hand corner there's a Bates stamp of 000297.

9            And, if it may please the Court, Your Honor, this

10  exhibit has already been stipulated to for foundation

11  purposes and authentication.

12           THE COURT:  Very well.

13           MR. SCHWARTZ:  Thank you.

14           THE WITNESS:  Okay.

15  BY MR. SCHWARTZ:

16  Q.   Do you recognize what that document is Bates stamp page

17  000297?

18  A.   Yes.

19  Q.   What is it?

20  A.   That's an instant verification of the CAD report.

21  Q.   Can you tell which CAD report that is that relates to

22  yourself in this case?

23  A.   That's the actual incident that happened, the traffic

24  accident.

25  Q.   The one with Ms. Vargas?
```

1    A.    Yes.

2    Q.    And on that report there is a list you on the report as

3    being the officer with the unit time?

4    A.    Correct.

5    Q.    Does it list that?

6    A.    Yes.

7    Q.    And the unit would be 212.  Is that your call handle?

8    A.    That's my call sign, yes.

9          MR. SCHWARTZ:  And may I publish the report,

10   Your Honor?

11         THE COURT:  Go right ahead.

12         MS. CARTER:  Your Honor I'm not sure this page has

13   been received in evidence.

14         MR. SCHWARTZ:  May I have it admitted?

15         THE COURT:  Yes, it will be received.

16         (Exhibit 206 page 000297 was admitted.)

17   BY MR. SCHWARTZ:

18   Q.    I would ask you, you went over the incident with counsel

19   for quite a while this morning.  You said you recalled

20   yourself being present at the scene of the traffic collision

21   with Ms. Vargas; correct?

22   A.    Yes.

23   Q.    Do you know an officer named Andrea Heath at Desert Hot

24   Springs?

25   A.    Yes, I do.

1    Q.    Do you know what she looks like?

2    A.    Yes.

3    Q.    Who she is?

4    A.    Yes.

5    Q.    Was she present at the scene of the traffic collision?

6    A.    No, not that I remember.

7    Q.    Now, if you look down at this report, do you see who was

8    the call taker for that particular call out?

9    A.    Andrea Heath.

10   Q.    And who was the dispatcher?

11   A.    Andrea Heath.

12   Q.    And you don't her ever being there as a police officer

13   as part of that investigation at the scene?

14   A.    No.

15   Q.    Now, at that time which was February 2005, the shift you

16   were working, who was your watch commander for the shift you

17   worked?

18   A.    Sergeant Duffy.

19   Q.    And he would be the one who normally would review your

20   reports?

21   A.    Yes.

22   Q.    Now, when you first got to that scene, where was

23   Ms. Vargas again?

24   A.    Uh, slumped over in the front driver's seat.

25   Q.    And you noted that she seemed to be intoxicated?

1    A.    Yes.

2    Q.    Could you smell the odor of alcohol?

3    A.    Yes.

4    Q.    And was she able to articulate very well to you?

5    A.    No.

6              MS. CARTER:  Objection.  Vague.

7              THE COURT:  It's overruled.

8    BY MR. SCHWARTZ:

9    Q.    You asked her out of the car?

10   A.    I'm sorry?

11   Q.    You asked her to get out of the car?

12   A.    Yes.

13   Q.    And could she do that on her own?

14   A.    No, she was unresponsive.

15   Q.    And you testified you had to actually help her get into

16   your patrol car?

17   A.    Yes.

18   Q.    And then you drove to the station?

19   A.    Correct.

20   Q.    And she vomited some point in the car?

21   A.    Yes.

22   Q.    And you said that was kind of normal.  That's what you

23   testified to earlier?  Am I correct?

24   A.    Yeah.

25   Q.    Have you had a chance in your years of a police officer

```
 1   to drive other DUI offenders or drunken offenders in your

 2   patrol car?

 3   A.   Yes.

 4   Q.   And they normally vomit sometimes?

 5   A.   Yeah.

 6   Q.   When you got to the station, you took her out of the

 7   patrol car?

 8   A.   Yes.

 9   Q.   You put her in a cell?

10   A.   Yes.

11   Q.   And you went to go write at least some report; is that

12   correct?

13   A.   Some report.  I don't know which one it was.

14   Q.   Now, you went to the report writing room?

15   A.   Yes.

16   Q.   And that's a different room than the watch commander's

17   office; correct?

18   A.   It is.

19   Q.   Not even next to each other, are they?

20   A.   No.

21   Q.   Now, on that shift your watch commander as you just

22   stated was Sergeant Duffy; correct?

23   A.   Yes.

24   Q.   Sergeant Sclafani came in for the next shift; is that

25   right?
```

1    A.    The night shift, yes.

2    Q.    Which would be several hours after the arrest of

3    Ms. Vargas?

4              MS. CARTER:  Objection.  Misstates the evidence.

5              THE COURT:  Ask it again if it does.

6

7    BY MR. SCHWARTZ:

8    Q.    Do you recall when you arrested Ms. Vargas the time of

9    the actual arrest?

10   A.    Around 2:30ish.  I don't recall.

11   Q.    When did the night shift normally start back in 2005 in

12   February?

13   A.    6:00 p.m.

14   Q.    And Sergeant Sclafani to your memory was the night shift

15   sergeant at that time; correct?

16   A.    Yes, sir.

17   Q.    So when you arrested Ms. Vargas and brought her back to

18   the station, Sergeant Sclafani would not have been there as

19   the night shift sergeant, would he?

20   A.    No.

21   Q.    And you don't recall seeing him when you actually came

22   back to the Department with Ms. Vargas under arrest, do you?

23   A.    Yes.

24   Q.    That's when you went to the report writing room?

25   A.    Yes, it is.

1   Q.   And for quite some time, at least an hour or two, it was

2   very quiet in the Department, wasn't it?

3   A.   I believe so.  I don't remember.

4   Q.   Nothing sticks out as being unusual; correct?

5   A.   No.

6   Q.   Now, at some point while you're in the report writing

7   room, you heard banging on a door of the cell; correct?

8   A.   Right.

9   Q.   Now, it's a very small Department?

10  A.   Yes.

11  Q.   So if somebody was yelling in a cell, even if the doors

12  were closed in the areas that counsel showed you, could a

13  person still hear?

14  A.   Yes.

15  Q.   And somebody was yelling, the person could still hear?

16  A.   Yes.

17  Q.   And the first set of banging, you didn't get up; right?

18  A.   No.

19  Q.   Not until the second set; is that right?

20  A.   Right.

21  Q.   Because after the first set, you heard my client

22  Sergeant Sclafani tell the person to stop?

23  A.   Yes.

24  Q.   The person stopped; right?

25  A.   Right.

1    Q.    No reason to get up?

2    A.    No.

3    Q.    But then they banged again a second time; right?

4    A.    Yes.

5    Q.    And could you hear screaming as well?

6    A.    Yes.

7    Q.    Sound like a female voice?

8    A.    It was a female voice.

9    Q.    And that's why according to who was under arrest, you

10   assumed it would be your arrestee?

11   A.    Right.

12   Q.    It was female?

13   A.    Yes.

14   Q.    That's when you got up to help out the sergeant; right?

15   A.    Correct.

16   Q.    She should have been your responsibility to have to

17   quiet down?

18   A.    She was.

19   Q.    And that's when you came into the actual booking area,

20   you seen the door open that leads out to the sally port and

21   the parking lot.

22   A.    Yes.

23   Q.    And at that point, you saw Ms. Vargas already out the

24   door.

25   A.    Correct.

1    Q.   And Sergeant Sclafani was standing somewhere near that

2    doorway.

3    A.   From what I remember, yes.

4         THE COURT:  These are all statements by you.  Even

5    though it's cross-examination and you're able to lead, you're

6    doing very effectively it appears, why don't you at least ask

7    questions.

8         MR. SCHWARTZ:  I apologize, Your Honor.  I didn't

9    think you wanted to hear correct all the time.  I'll try to

10   phrase them like a question.  I apologize.

11   Q.   If you recall, Sergeant Sclafani was just inside that

12   doorway; is that correct?

13   A.   Yes.

14   Q.   And you see Sergeant Sclafani in the courtroom as we sit

15   here today; correct?

16   A.   Yes.

17   Q.   Now, at the time was Sergeant Sclafani skinny or

18   heavy-set?

19   A.   He was heavy-set.

20   Q.   About how much would you estimate his weight if you

21   could?

22   A.   I'm sorry.  About 280.

23   Q.   And was that muscle or other kind of --

24   A.   Other.

25   Q.   And he was standing in that -- near that doorway?

1   A.   Yes.

2   Q.   And you actually ran past him; is that right?

3   A.   Yes.

4   Q.   You fired your taser?

5   A.   Right.

6   Q.   And you said one dart you thought it looked like it hit

7   Ms. Vargas in the back; is that right?

8   A.   Yes.

9   Q.   The other dart you said it looked like it hit the wall;

10  is that right?

11  A.   It spiraled out of control and hit the wall.

12  Q.   And have you been trained that if you don't have both

13  darts in the person, it would be ineffective?

14  A.   Yes.

15  Q.   Have you been trained that when it's ineffective, one --

16  either both darts are not in or some other reason, there

17  would be a clicking sound?

18  A.   Right.  A loud clanking sound.

19  Q.   Did you hear that?

20  A.   Yes, I heard it.

21  Q.   Now, shortly after one of those darts may have hit

22  Ms. Vargas and the other one hit may have hit the wall, I

23  presume Ms. Vargas starts to slow down in whatever trot she

24  was trotting; is that right?

25  A.   She slowly went to the ground.

```
 1            MS. CARTER:  Objection.  Misstates the evidence.
 2            THE COURT:  Overruled.
 3   BY MR. SCHWARTZ:
 4   Q.   And she ended up on the ground; is that right?
 5   A.   Yes, sir.
 6   Q.   She didn't go to the ground right when you saw the dart
 7   hit her, did she?
 8   A.   No.
 9   Q.   It was a little bit of time after; is that correct?
10   A.   Yes, a short time after.
11   Q.   Between five and ten seconds maybe?
12   A.   Probably less than that.
13   Q.   And you were very focused on Ms. Vargas; is that right?
14   A.   Yes.
15   Q.   And focused on your taser and those darts to Ms. Vargas;
16   is that right?
17   A.   Correct.
18   Q.   And you didn't see my client at that time; correct?
19   A.   No.
20   Q.   He was somewhere behind you.
21   A.   He was behind me.
22   Q.   Couldn't tell how close he was to you?
23   A.   No, I have no idea where he was.
24   Q.   You didn't turn around to look, did you?
25   A.   No.
```

```
1    Q.    Now, at that time in the Desert Hot Springs Police

2    Department was there a problem with the ventilation of the

3    department?

4    A.    I don't remember that.

5    Q.    And at that time at Desert Hot Springs -- strike that.

6           You noted on direct that you could smell some

7    pepper spray at that time which is right after the tasing of

8    Ms. Vargas; is that right?

9    A.    According to my statements before, yes.

10   Q.    And was it common to open the doors of the outside of

11   the Department if somebody was pepper sprayed to air out the

12   Department?

13   A.    Yes.

14   Q.    In your time at Desert Hot Springs, did you yourself

15   sometimes open the doors to air out the Department if

16   somebody had been pepper spray in jail cells?

17   A.    And for other reasons, too.

18   Q.    Now, counsel showed you two different exhibits that

19   showed taser downloads.  You remember that?

20   A.    Yes.

21   Q.    And she described them as tasing.  You remember that?

22   A.    Yes.

23   Q.    Now, looking at those two exhibits, could you tell

24   whether those were actual tasings or just simply activations?

25   A.    Just activations.
```

UNITED STATES DISTRICT COURT

1    Q.   There's no way in looking at that exhibit to know if

2    somebody was actually tased, is there?

3    A.   No.

4    Q.   The exhibits show just that the taser was actually

5    activated; is that right?

6    A.   Correct.

7    Q.   And the times of those activations on those two exhibits

8    both were from different tasers to your recollection; is that

9    right?

10   A.   Uh, she showed me one from mine and one from Sclafani's.

11   Q.   Those are two different tasers; right?

12   A.   Yes.

13   Q.   And in your training and experience, each taser has its

14   own time clock in that individual taser?

15   A.   Yes.

16   Q.   And there's no way of knowing whether your taser was

17   synchronized with the exact same time as Sergeant Sclafani's,

18   is there?

19   A.   No.

20   Q.   Now, with normal practice would an officer going on

21   patrol try to synchronize his clock in his taser to his

22   partner's clock?

23   A.   No.

24   Q.   Or to his sergeant's clock?

25   A.   No.

1    Q.    Now, you also spoke on direct that you have had some

2    conversations over the years with my client; is that correct?

3    A.    Yes.

4    Q.    And the average may be once a week, sometimes more,

5    sometimes less?

6    A.    Correct.

7    Q.    And you never discussed the actual facts of this case

8    since the time of Ms. Vargas' arrest and since the time the

9    report had been written, had you?

10   A.    No.

11   Q.    You've discussed the procedural aspects of where the

12   case was at; is that correct?

13   A.    Yes.

14   Q.    About having to come to court?

15   A.    Yes.

16   Q.    And you also discussed people still at Desert Hot

17   Springs; right?

18   A.    Uh, yeah.

19   Q.    He was still working there and you weren't?

20   A.    Right.

21   Q.    Counsel also asked you -- strike that.

22          You noted on direct that Ms. Vargas was being held

23   both for a DUI and for you said a 148 obstructing or

24   resisting a police officer; is that correct?

25   A.    Yes, sir.

1    Q.    And she asked you if she was held for those purposes.

2    You remember that?

3    A.    Yes.

4    Q.    And you knew that she was held to sober up; is that

5    correct?

6    A.    Right.

7    Q.    Now, at the time back in February of 2005 at the Desert

8    Hot Springs Department, could you hold any prisoner for more

9    than six hours there?

10   A.    No, they had to be transported pretty much.

11   Q.    It was not considered a long-term holding facility, was

12   it?

13   A.    No.

14   Q.    If an arrestee had to sober up, could you could hold the

15   arrestee at least up to six hours to try to get them to sober

16   up?

17   A.    Until we noticed that she seems fit and she was able to

18   leave on her own and that she'd sobered up, she could take

19   care of herself, it might take a little more than four hours,

20   it might take a little less.

21   Q.    And counsel asked you if you received any phone calls

22   from the prosecutor telling you that the 148 charged was

23   dropped.  Do you remember that?

24   A.    Yes.

25   Q.    And you received no phone calls; is that correct?

```
 1    A.    I don't remember.  I didn't get any phone calls.

 2    Q.    Based on your training and experience, charges are

 3    dropped all the time in plea bargaining, aren't they?

 4    A.    Yes.

 5    Q.    And are you always called and notified when charges are

 6    dropped as a result of a plea bargain from an arrestee you

 7    have?

 8    A.    No.

 9    Q.    You are hardly ever called, aren't you?

10    A.    Right.

11    Q.    You also noted on direct that Andrea Heath was asked to

12    take the photographs of Ms. Vargas; is that correct?

13    A.    Yes, sir.

14    Q.    And do you recall or whether you asked Ms. Heath to do

15    that or whether my client did?

16    A.    I believe I did.

17    Q.    And you said that was because Vargas was a female?

18    A.    Right.

19    Q.    And more for her privacy interests; is that correct?

20    A.    Yes.

21    Q.    She would have to show Ms. Heath possibly parts of her

22    body she may feel embarrassed to show a male officer?

23    A.    Exactly.

24    Q.    Is that procedure to have a female photograph another

25    female if possible?
```

1    A.    If possible, yes.

2    Q.    Now, you also noted that the one photograph of

3    Ms. Vargas' breast that looked like a taser mark; is that

4    right?

5    A.    Correct.

6    Q.    Now, are you a trained taser expert?

7    A.    No.

8    Q.    And are you certified as an instructor?

9    A.    No.

10   Q.    And are you sure that's a taser mark or is that just a

11   guess?

12   A.    It was an assumption.

13   Q.    Now, when you tased Ms. Vargas, at the time you tased

14   her, did you see any prongs in Ms. Vargas at the time you

15   tased her?

16   A.    Uh, just one from my mine.  It was in her back right

17   shoulder.

18   Q.    I'll go backwards.  Right before you activated your

19   taser to actually tase Ms. Vargas, at that moment in time,

20   did you notice any prongs already in her, not yours, but any

21   other prongs already in her?

22   A.    No.

23   Q.    Was there any wires already strung out towards

24   Ms. Vargas?

25   A.    No.  If there was, I wouldn't have run over there.

1    Q.   And you said you went through the booking area and

2    that's when you saw Ms. Vargas already at the door; is that

3    correct.

4    A.   Yes, sir.

5    Q.   When you went through the booking area, did you notice

6    any of those AFIDs that were described on the record on the

7    floor of the booking area?

8    A.   No.  My attention was straight towards her.  I didn't

9    even notice anything around me at all.

10   Q.   Did you notice any prongs or darts on the floor?

11   A.   No.

12   Q.   Any cartridges on the floor?

13   A.   No.

14   Q.   Now, AFIDs are very small; right?

15   A.   Right.

16   Q.   But the cartridges are not so small, are they?

17   A.   No.

18   Q.   And a cartridge is something that you could have -- you

19   would have seen if it was in front of you, wouldn't you?

20   A.   I would have stepped on it if it was.

21   Q.   And you didn't step on any, did you?

22   A.   No.

23   Q.   You didn't see, did you?

24   A.   No.

25   Q.   Now, when Ms. Vargas was in Desert Hot Springs Police

1    Department, did you ever kick her?

2    A.    No.

3    Q.    Did you ever taser -- strike that.  You testified that

4    you activated your taser one time toward Ms. Vargas; is that

5    correct?

6    A.    Yes.

7    Q.    Did you tase her more than one time or just simply

8    missed?

9    A.    I just tased her once and missed.

10   Q.    Did you laugh and taunt Ms. Vargas and then try to tase

11   her again and again?

12   A.    No.

13   Q.    And counsel asked you about Ms. Vargas escaping out that

14   back door.  Do you remember that?

15   A.    Yes.

16   Q.    Now, back in Desert Hot Springs in 2005 when you ran and

17   you saw Ms. Vargas out that book door, based on your training

18   and experience as a police officer for that police

19   department, did you feel you could allow her to remain in the

20   parking lot unattended like that?

21   A.    No.

22   Q.    Did you feel you could allow her to just run around the

23   parking lot even if she couldn't hop a wall?

24   A.    No.

25   Q.    Did you feel you could allow her to be in the parking

1    lot even if there were no other patrol cars in the parking

2    lot?

3    A.    No.

4    Q.    Do you recall if you there were patrol cars in the

5    parking lot?

6    A.    I don't recall that.

7    Q.    Why could you not allow her to be in that parking lot in

8    the unattended way you saw her back in February 2005?

9    A.    Well, if another officer came by and the gate opened,

10   she could run out the gate or if we had unsecured vehicles

11   around there, she could gain access to our vehicles.  There's

12   those two reasons.

13   Q.    You also knew at the time she was inebriated; correct?

14   A.    Yes.

15   Q.    And are you responsible for her safety as well?

16   A.    Yes.

17   Q.    Responsible for her hurting herself as well?

18   A.    Yes, I am.

19   Q.    And if she ran to that parking lot, were you worried at

20   the time that she could also hurt herself?

21   A.    Yes.

22   Q.    Was that parking lot shared by City employees?

23   A.    Yes, it was.

24   Q.    And are you responsible for their safety and securing

25   that parking lot, too, at the time?

1   A.   Yes.

2   Q.   Is that also a consideration?

3   A.   Yes.

4        MR. SCHWARTZ:   May I have a moment to confer,

5   Your Honor?

6        THE COURT:   Of course.

7   BY MR. SCHWARTZ:

8   Q.   Now, counsel asked you about giving interviews to the

9   FBI.  You remember that?

10  A.   Yes, I do.

11  Q.   And did she ask you if you refused to cooperate with

12  them?

13  A.   Yes.

14  Q.   And what was your response again?

15  A.   I believe I said I wasn't gonna give any more

16  interviews, something of that nature.

17  Q.   Any more interviews; is that correct?

18  A.   Yes.

19  Q.   How many had you given previous to that response to

20  them, to the FBI?

21  A.   Well, one or two.  I can't remember.

22  Q.   At least a couple; is that correct?

23  A.   Yes.

24  Q.   And why did you tell them that you were not gonna give

25  any more interviews?

1    A.    Because I was basically being accused of lying and

2    covering for Sclafani.

3    Q.    Were you lying and covering for my client?

4    A.    No.

5    Q.    Would you do that?

6    A.    No.

7    Q.    Would you risk your career for my client?

8    A.    Absolutely not.

9    Q.    Now, when were you accused of that?  Was it the first,

10   second or after the first several interviews?

11   A.    It was --

12          MS. CARTER:  Objection.  Misstates the evidence.

13          THE COURT:  Sustained.

14   BY MR. SCHWARTZ:

15   Q.    Do you recall within the course of those interviews you

16   described, when you were accused of that?

17          MS. CARTER:  Objection.  Same objection.

18          THE COURT:  Sustained.

19   BY MR. SCHWARTZ:

20   Q.    Do you have any independent recollection of how many

21   interviews you gave?

22   A.    I believe three.

23   Q.    And were you accused of lying or obstructing or covering

24   for my client in the first interview?

25   A.    No.

1   Q.   What about the second?

2   A.   Yes.

3   Q.   You gave a third one after that anyway?

4   A.   I met with one of the agents and two AUSAs before the

5   grand jury interview, so that would be the third one I

6   believe.

7   Q.   That's when you decided not to give any more?

8   A.   Right.

9        MR. SCHWARTZ:  Nothing further at this time,

10  Your Honor.  Thank you.

11       THE COURT:  Well, it's looking like we may have to

12  just put this over.  I don't think the government can get

13  finished.

14       MR. ARKOW:  We're willing to let cross go on if it

15  would wrap things up for them for this witness.

16       THE COURT:  Well, let's try.  Go ahead.

17       MS. CARTER:  Thank you, Your Honor.  May I confer

18  with counsel for one moment?

19       THE COURT:  Yes.

20       MS. CARTER:  Your Honor, unfortunately, I think we

21  have a matter that needs to be heard at side bar.

22       THE COURT:  Just give us one minute, please.

23               (Jury not present.)

24       THE COURT:  The following proceedings are outside

25  the presence of the jury and the witness.

UNITED STATES DISTRICT COURT

1          MS. CARTER:  Your Honor, in light of the fact that

2     this witness stated that he answered questions with the FBI

3     before a grand jury interview before he was called into the

4     grand jury, I've informed the defense counsel that I think I

5     need to make it clear to the jury that he didn't testify in

6     the grand jury.  He refused to answer the questions posed to

7     him on the grounds they would incriminate him, the answers

8     would incriminate him.

9          THE COURT:  What's the objection to that?

10         MR. SCHWARTZ:  I believe he stated that was part of

11    the interview process.  He decided he would not cooperate

12    anymore.  I had no expectation he would mention the grand

13    jury.  It's not about that kind of testimony.

14         THE COURT:  Well, I know it may have been

15    inadvertent on your part if you knew that that was gonna be

16    one of his answers, but it was your question.

17         MR. SCHWARTZ:  I understand.  Second of all, I'm

18    not sure why the fact that he testified or not at the grand

19    jury would be relevant to this at all.  He refused to

20    cooperate.  I think that's his right to invoke.  Also his

21    right only after he conferred with his own attorney, not

22    myself, that he decided to invoke.

23         THE COURT:  I understand, but it's somewhat

24    confusing.  He initially said once or twice.  Then all of a

25    sudden when prompted by you, he got up to three, and then

```
 1    attempted to explain what the three were, and one of those

 2    three consisted of testifying before the grand jury.  So yes,

 3    I'm going to allow the government to go ahead and ask.

 4              MR. SCHWARTZ:  Thank you, Your Honor.

 5              THE COURT:  All right.  Fine.

 6              Would you return to the witness stand, sir?

 7              THE WITNESS:  Yes, sir.

 8              THE COURT:  We can bring the jury back.

 9                    (Jury present.)

10              THE COURT:  Please be seated, ladies and gentlemen.

11              THE WITNESS:  Matt Gutting spelled G-u-t-t-i-n-g.

12              THE COURT:  You understand you're still under oath

13    in this matter?

14              THE WITNESS:  Yes, Your Honor.

15              THE COURT:  Redirect Ms. Carter.

16                    REDIRECT EXAMINATION

17    BY MS. CARTER:

18    Q.  Mr. Gutting, on cross-examination you testified about a

19    third interview with the FBI prior to testifying in front of

20    the grand jury.  Do you recall?

21    A.  Yes.

22    Q.  And were you questioned later that day in front of the

23    grand jury investigating this case?

24    A.  Uh, not about the case, no.

25    Q.  Did you refuse to answer questions about this case on
```

1    the grounds that the answers might tend to incriminate you?

2    A.    Yes.

3    Q.    That was in January 2005, January 25th, 2005?

4    A.    2010 you mean?

5    Q.    I'm sorry.  Was that in January of 2010?

6    A.    I'm not sure exactly when it was.  I think it was a

7    couple years ago, though.

8    Q.    Would it refresh your recollection to see the first page

9    of the transcript of your testimony in front of the grand

10   jury?

11   A.    Okay.

12            THE COURT:  For what purpose?

13            MS. CARTER:  To refresh his recollection about the

14   date of his testimony.

15            THE COURT:  I don't think it's necessary.

16   BY MS. CARTER:

17   Q.    After you invoked your right not to incriminate yourself

18   in the grand jury, did you thereafter meet with a defense

19   investigator named Mr. Crompton?

20   A.    Yes.

21   Q.    And you talked to him about the events in this case;

22   correct?

23   A.    Correct.

24   Q.    At the time you knew he was working for defendant's

25   lawyers; correct?

1    A.   Yes.

2              THE COURT:  Well, I take it that you are now

3    treating this witness as an adverse witness; is that correct?

4              MS. CARTER:  If I may, Your Honor.

5              THE COURT:  You may.  That means, ladies and

6    gentlemen, she has a right to lead and ask if something's

7    correct.  It's cross-examination in effect because the

8    witness has been deemed by the Court to be adverse to this

9    party.  Go ahead.

10   BY MS. CARTER:

11   Q.   Before you were scheduled to testify in the grand jury,

12   did you have a conversation in the hallway with Agent Novak?

13   A.   Yes, I did.

14   Q.   And in that conversation you told him that you knew it

15   was wrong to make Angelica Vargas clean up the vomit out of

16   your car; correct?

17   A.   Yes.

18   Q.   Now, you have to ID taser injuries in the course of your

19   work; correct?

20   A.   Yes.

21   Q.   And you did that in this case; correct?

22   A.   Yeah.

23   Q.   That's why you decided to erase some pictures and keep

24   others; correct?

25   A.   Right.

1    Q.    And one of the pictures you decided to keep was a

2    picture of Ms. Vargas' breast; correct?

3    A.    It was the upper chest area.  It wasn't the entire

4    breast.

5    Q.    And you did that because you saw what appeared to you to

6    be a taser mark on her breast?

7    A.    Yes.

8    Q.    And identifying taser marks is something you do in any

9    case where a taser is used; correct?

10   A.    I was very new at tasers so I wasn't an expert at all.

11   Q.    Even though you weren't an expert, you had to identify

12   taser marks in the course of any case where you or someone

13   else used a taser; correct?

14   A.    We had to do our best to identify it.

15   Q.    And in this case you identified three taser injuries;

16   correct?

17   A.    What I believed to be taser marks, yes.

18   Q.    Now, you testified on cross-examination that you didn't

19   see Defendant Sclafani when you first brought Ms. Vargas into

20   the jail.  Do you recall that?

21   A.    Yes.

22   Q.    But you testified on direct that we, yourself and

23   defendant, opened all the jail doors because of the pepper

24   spray smell; correct?

25   A.    That wasn't when I brought her in.

1    Q.   But you knew that defendant was in the jail?

2    A.   At some point he was.

3    Q.   Did you ever consider lesser alternatives to tasing

4    Ms. Vargas in the parking lot?

5    A.   Not really.

6    Q.   Weren't you trained to consider all options before using

7    force on a subject?

8    A.   Yeah.

9    Q.   You didn't do that here.

10   A.   No.  It's under our discretion and that's why we got the

11   tasers to prevent officers and subjects that are being tased.

12   Q.   So is it your testimony that you got the taser so you

13   wouldn't have to consider other means to stop a subject?

14   A.   No, it's just a tool.

15   Q.   But there are other tools, aren't there?

16   A.   Yes, there are.

17   Q.   You didn't consider any of them, did you?

18   A.   Either hands-on or a taser.

19   Q.   You didn't consider any other use of force here, did

20   you?

21   A.   I considered hands-on or a taser.

22   Q.   By hands-on couldn't you have just grabbed her?  She was

23   out in the parking lot?

24   A.   Could have.

25   Q.   And you described her as having a slow jog.  Aren't you

```
 1    a lot faster than her?
 2    A.   I don't know about that.
 3    Q.   She was very overweight, wasn't she?
 4    A.   Yeah.
 5    Q.   She is short, has shorter legs than you?
 6    A.   I have seen big people run pretty fast.
 7    Q.   And she had been very, very drunk earlier that night;
 8    correct?
 9    A.   Earlier, yes.
10    Q.   Totally unable to walk without your assistance earlier
11    that day?
12    A.   Earlier, yes.
13    Q.   Could you have tried to give her verbal commands?
14    A.   Yes.
15    Q.   You didn't though, did you?
16    A.   No.
17    Q.   Did you at any point -- you didn't attempt at any point
18    to just put your larger physical body in front of her to cut
19    off her direction, did you?
20    A.   No.  I would have been playing catch up.  I was running
21    from behind her not in front of her.
22    Q.   Well, you caught up to the defendant and passed him,
23    didn't you?
24    A.   Yeah.
25    Q.   And this is an overweight short woman who had been drunk
```

1    earlier that night, isn't it?

2    A.    Yeah.

3    Q.    What happens when you taser a running, drunk, overweight

4    woman?

5    A.    Depends if the taser makes contact or not.  There's

6    different side effects.

7    Q.    If the taser is effective on the person, doesn't a

8    running, drunk, fat woman fall over like a log?

9    A.    It depends on the individual basis.  I don't know what

10   her effect would have been.

11   Q.    You don't know what the effect of tasing someone was?

12   A.    Yeah, but everybody reacts to it differently.  It's

13   supposed to paralyze them and immediately fall and drop to

14   the ground.

15   Q.    Most people are supposed to be paralyzed, immediately

16   fall like a log to the ground; correct?

17   A.    Yes.

18   Q.    And if they're running, they can hurt themselves;

19   correct?

20   A.    Correct.

21   Q.    And you testified on cross that you are supposed to

22   consider her safety as well as the safety of others in

23   deciding how to address the situation; correct?

24   A.    Like I said before, she wasn't running.  She was -- it

25   was a slow jog.  So after her being tased, probably wouldn't

1    have had much of an effect if there was contact.

2    Q.   You didn't consider her safety when you tased her,

3    though, did you?

4    A.   Yes, I did.

5    Q.   When the body is paralyzed by a taser, a person can't

6    put their arms out to catch themselves, can they?

7    A.   No, no.

8    Q.   And they can't kind of roll into the fall to kind of

9    break their fall, can they?

10   A.   I don't know.  I don't what other people's experiences

11   are.

12   Q.   Wasn't the most likely scenario when you tased

13   Ms. Vargas that she would fall flat on her face on the

14   pavement at running speed or at jogging speed?

15   A.   I don't know how she would have fell.

16   Q.   You didn't consider that before you tased her?

17   A.   It crossed my mind, yeah.

18   Q.   And when it crossed your mind, wasn't -- didn't you

19   conclude that the most likely outcome was she would fall flat

20   on her face --

21   A.   Well, I knew --

22   Q.   On the pavement?

23   A.   -- she was running fast enough.

24           THE COURT:  Just a minute.  The reporter can't take

25   down both of you at the same time.  Just wait until you hear

UNITED STATES DISTRICT COURT

 1   the question and please wait until you hear the answer.  All

 2   right.

 3   BY MS. CARTER:

 4   Q.   When it flashed through your mind Ms. Vargas' safety,

 5   didn't you then conclude that the most likely thing to happen

 6   when you tased her was that she would fall flat on her face

 7   on the pavement with nothing to break her fall?

 8   A.   I thought about it made her stop running is what crossed

 9   my mind.

10           MS. CARTER:  I would like to show the page of

11   Defense Exhibit 206 page 297.  May I display it for the jury

12   on the monitor?

13           THE COURT:  Yes, certainly.

14   BY MS. CARTER:

15   Q.   This CAD report that the defense asked you about on

16   cross-examination, it doesn't list any other officers but

17   you, does it?

18   A.   Correct.

19   Q.   It doesn't list Sergeant Duffy?

20   A.   No.

21   Q.   It doesn't list Dennis Decker?

22   A.   No.

23           MS. CARTER:  May I have a moment, Your Honor?

24           THE COURT:  Of course.

25   BY MS. CARTER:

1    Q.    Now, you testified on direct that Ms. Vargas fell one to

2    two seconds after you tased her.  Do you recall that?

3    A.    Yeah.

4    Q.    Then defense asked you on cross-examination whether it

5    was five to ten seconds that it took her to fall after you

6    tased her.

7    A.    He actually said more than that.  I estimated the time.

8    Q.    Did it take longer than one to two seconds to see her

9    fall after you tased her?

10   A.    It was a slow fall so I didn't time it.

11   Q.    But she wasn't doing anything else other than falling

12   after you tased her, was she?

13   A.    Well, she took a couple steps and then slowly fell.

14             MS. CARTER:  May I have a moment, Your Honor?

15             THE COURT:  Yes.

16   BY MS. CARTER:

17   Q.    Ms. Vargas wasn't resisting you or other officers after

18   you tased her?

19   A.    No.

20             MS. CARTER:  No further questions.

21             THE COURT:  Something further?

22             MR. SCHWARTZ:  Yes, Your Honor.

23             THE COURT:  Very briefly.

24

25

RECROSS-EXAMINATION

BY MR. SCHWARTZ:

Q.   When you had that meeting with the U.S. Attorney and the FBI before the grand jury, did you ask them if you could see your reports and your Internal Affairs statements to refresh your memory?

A.   Yes.

Q.   And did they tell you no?

A.   Correct.  Told me no.

Q.   And did you tell them that you couldn't remember things well and that was your fear going in front of the grand jury?

A.   Yes.

Q.   That you needed them to refresh your memory?

A.   Yes.  This is so long ago, that's what I asked for.

Q.   They told you no; is that correct?

          THE COURT:  Well, I'm not gonna allow you to lead now since this is a witness favorable to you.

          MR. SCHWARTZ:  May be debatable, Your Honor.

Q.   So what did they tell you?

A.   I asked them if I get a copy of my report and also my Internal Affairs investigation because it happened more recently and it was more detail than my actual report and they actually gave me a copy of the police report before, but the Internal Affairs investigation they would not allow me to view because they would have to have access to it also, so I

1    called my attorney at that time.

2    Q.    And that's when you decided -- did you feel you could

3    refresh your recollection properly with what they gave you?

4    A.    Yes, that's why I asked for it.

5    Q.    Did you feel that without the Internal Affairs report,

6    you could properly refresh your recollection?

7    A.    I don't think I could.  It would refresh my memory quite

8    a bit.  It would have been very helpful.

9    Q.    Did you feel comfortable testifying without refreshing

10   your recollection with that Internal Affairs report?

11   A.    No.

12   Q.    And do you know if through your attorney you offered to

13   sit down again with the government even after the grand jury

14   if you were given reports?

15             MS. CARTER:  Objection.  Leading.

16             MR. SCHWARTZ:  I asked do you know, Your Honor.

17             THE COURT:  All right.  It's overruled.  You may

18   answer.

19             THE WITNESS:  Can you repeat it, sir?

20   BY MR. SCHWARTZ:

21   Q.    Do you know if through your attorney you offered to sit

22   down with the government again even after the grand jury?

23   A.    Yes, we did.

24   Q.    And what was the requirements that you asked for to sit

25   down with the government, if you know?

```
1    A.   I know couple of them that my attorney be present and
2    that we could record all the interviews and to get copies of
3    all my reports.
4    Q.   And did they agree to that to your knowledge?
5    A.   Not to my knowledge, they didn't.
6              MR. SCHWARTZ:  Nothing further at this time.
7              THE COURT:  Thank you.
8              MS. CARTER:  May I ask two questions, Your Honor?
9              THE COURT:  No.
10             Thank you.  You may be excused at this point.
11             Thank you for your patience, ladies and gentlemen.
12   Hopefully, you'll look forward to a restful weekend or you
13   can get some work done for those of you who had to miss it.
14   And remember the admonition not to discuss the matter among
15   yourselves or with anyone.  And sadly, you have to come back
16   on Valentine's Day, and that'll be at 9:00 a.m.
17             Everyone, please rise for the jury.
18                       (Jury not present.)
19             THE COURT:  Please be seated.  We're outside the
20   presence of the jury.  We're gonna take about five minutes,
21   and then we'll take up the matter involving Ms. Vargas.
22                       (Recess taken.)
23             THE COURT:  We're outside the presence of the jury.
24   And now have the matter dealing with Ms. Vargas.
25   Mr. Nicolaysen, do you wish to be heard.
```

UNITED STATES DISTRICT COURT

1          MR. NICOLAYSEN:  Again, I thank the Court for the

2     opportunity.  I have spoken again with Ms. Vargas since our

3     last proceeding on this matter earlier today.

4          THE COURT:  Yes.

5          MR. NICOLAYSEN:  She respectfully declines to be a

6     witness and asks the Court to excuse her from doing so.  And

7     I have discussed with government counsel what suitable

8     alternative might exist.  I was inclined to ask the Court to

9     order a Rule 15 F.  There are observances that make that

10    impossible today so it could not be accomplished.  My concern

11    is that if she is kept in custody and the government wants to

12    call her, a witness convicted of nothing will be in custody

13    until Tuesday, which would be almost an entire week of

14    incarceration.

15          And I would ask Your Honor to consider releasing

16    her and allowing her to be responsible for her appearance.

17    If she is not here on Tuesday, clearly, that is a violation,

18    but that also brings back the issue of unavailability which

19    can be assessed on Tuesday from the prospective of using the

20    deposition that was discussed earlier today.  I just think it

21    becomes a manifest injustice when as a result of scheduling

22    issues primarily an individual in this situation is kept

23    incarcerated for almost a week.  I find professionally that

24    that's abhorrent and should be avoided.

25          I ask Your Honor consider releasing her and

1    revisiting the 804 issue first thing Tuesday morning.

2              THE COURT:  All right.  Any counsel wish to be

3    heard?  Ms. Carter.

4              MS. CARTER:  Thank you, Your Honor.

5              Your Honor, we obviously share Mr. Nicolaysen's

6    concerns about holding her.  We do, however, have concerns

7    about being in a situation on Tuesday where we have no

8    witness, particularly, if this Court is not inclined to let

9    us proceed in really the only other way that we could if she

10   was truly unavailable, which was through the deposition

11   testimony.

12             I think that if the Court is not inclined to let us

13   proceed in that way, we would ask at the very least either

14   that she be held over the weekend until she can complete her

15   testimony or at the very least that there be intensive

16   monitoring.

17             I don't know if ankle bracelets are available for

18   this type of a bench warrant situation, but I think we would

19   need to know where she was so we could make sure we had a

20   witness on Tuesday.

21             THE COURT:  I think perhaps Pretrial Services could

22   help us in this regard.

23             MR. NICOLAYSEN:  Your Honor, I join government

24   counsel.  I think it's a sensible approach.  If I may just

25   supplement the recommendation 18 U.S.C. 3134 is the material

1    witness statute.  We can designate my client as a material

2    witness by stipulation if government is so inclined, which

3    does invoke the jurisdiction of Pretrial Services.

4           And I think the idea of an ankle bracelet if it can

5    be affixed today gives the type of surveillance and quick

6    response capacity that we all agree is a necessary element of

7    trying to control a difficult situation and she can be

8    released, but a prompt response, the GPS tracking is then

9    available.  I would ask the Court to consider that and I'm

10   prepared to enter into an oral stipulation under the statute.

11          THE COURT:  All right.  Defense wish to be heard at

12   all?

13          MR. SCHWARTZ:  Not at this time, Your Honor, based

14   on counsel's representation.

15          THE COURT:  Fine.  Then why don't we try to call

16   upstairs to Pretrial Services.  Get one of their supervisors

17   down here.  I think that is the more prudent thing to do

18   because very frankly, I don't see another alternative.  I am

19   privy now to the transcript of the proceedings in Indio and

20   the deposition attached to those proceedings rather, and it's

21   clear to me that the motives are not the same.

22          I mean we have a lawyer there in Indio who is

23   defending against a Monel issue.  He's not even defending

24   necessarily the officers who are there, but his first

25   question really had to do with and he identifies himself I'm

```
 1    an attorney for the City not for these officers, but for the
 2    City and appropriately so.  He is attempting to show that
 3    there is no policy or pattern there.  And add that to the
 4    fact that this attorney did not have full discovery, it would
 5    be inappropriate I think for this Court to proceed with this
 6    deposition.  It would be unfair to the defense to do so and
 7    I'm not going to so.
 8         We do have this other alternative and perhaps,
 9    maybe over the weekend, Ms. Vargas will rethink whether she
10    will testify or not.  And I take it Mr. Nicolaysen, you've
11    talked to her?
12         MR. NICOLAYSEN:  And may I bring her forward,
13    Your Honor?
14         THE COURT:  Yes, please.  I'm not sure that I want
15    to interrogate her any further today, but let her have this
16    time over the weekend.  Understand that she's not before
17    state court.  She's here in the federal court.  We're
18    certainly concerned about you and you should not think that
19    someone is going to bring harm to you by your testifying.
20    And from what I can see and in your deposition, too, you have
21    been through a lot, an awful lot.
22         And I understand some of your concerns, but at the
23    same time I think you need to reconsider obeying the lawful
24    order of the court, the federal court, not the state court.
25    Two different jurisdictions all together.  And I'm not gonna
```

```
 1    ask you anything today.  Just want to say to you that I want
 2    you to think about it over the weekend because I am going to
 3    release you if we can provide some monitoring to make sure
 4    that you show up on Tuesday because I don't want to have
 5    issue a bench warrant.
 6             I don't want to see you held any longer and it just
 7    is not right.  And fortunately you have a good attorney here
 8    who is representing you and concerned about your rights.  You
 9    have heard the government who originally subpoenaed you
10    indicate the same kind of concern.  So as I say, not ask you
11    to express any view point whatsoever here today, but I just
12    want you to think about it over the weekend and think about
13    what may be in your own best interest because you don't want
14    to get into any criminal trouble with the court.
15             All right.  You may be seated now, and we're gonna
16    wait until we can get someone here from Pretrial Services.
17    We'll just be in a brief recess until we do hear from
18    Pretrial, should be in the next few minutes.
19                      (Recess taken.)
20         THE COURT:  All right.  We're again outside the
21    presence of the jury and hearing in regard to Ms. Vargas.
22    Mr. Nicolaysen.
23             MR. NICOLAYSEN:  Yes, and I greatly thank the Court
24    for its time and counsel.  Here's where we are.  Pretrial
25    Services has come to Your Honor's court.  The supervisor of
```

1     electronic monitoring unit has been here.

2              THE COURT:  Thank you.

3              MR. NICOLAYSEN:  With the intention of interviewing

4     my client to screen her and approve her as eligible for

5     release with conditions that include an electronic bracelet.

6     The communication hasn't been successful and I'll ask if

7     Pretrial can come forward and lay the appropriate record.  It

8     appears that while elements of the material witness statute

9     18 USC 3144 can be fulfilled, if I may have a second to put

10    that on the record.

11             We do have five elements.  The testimony is

12    material to this criminal proceeding, that has to be a

13    finding we do have that on record already.  The second

14    requirement that it is impracticable to secure the witness's

15    presence by subpoena and we've covered that and for all the

16    reasons already on the record.

17             The third requirement is that the Court order the

18    arrest of the individual and then the individual is subject

19    to bail conditions under 3142.  Ms. Vargas is already in

20    custody.  That has already been fulfilled.  And the fourth

21    condition is the setting of conditions of release.

22             The fifth and final is that a Rule 15 deposition is

23    not a practicable alternative here and that is also true for

24    the reasons we've discussed over the weekend it's not an

25    option and to take a deposition on Monday is self-defeating.

1          So the statute itself can be fulfilled in regard to

2     the District Court's findings that need to be made, but

3     unfortunately we just don't seem to have the communication

4     that's needed and I'll ask if Your Honor can entertain

5     feedback from Pretrial.

6          THE COURT:  Yes, please.

7          MS. PURCELL:  Good afternoon, Your Honor.

8     Elizabeth Purcell on behalf of Pretrial Services.

9          THE COURT:  Yes, thank you so much for coming down

10    in a hurried fashion.

11         MS. PURCELL:  No problem.  I spoke with the witness

12    and she indicated that she has multiple addresses she could

13    possibly stay at, however, she wasn't really definitive on

14    any one address and she indicated that she would not

15    necessarily be staying there even if instructed by the Court.

16         THE COURT:  Let's see.

17         MR. NICOLAYSEN:  Perhaps with Your Honor's

18    intervention, the authority of the Court, we can just cut to

19    chase and get this done.  I can't accept the idea that my

20    client has to be in custody, although, I do respect and

21    legally speaking, it is appearing to become inevitable, but I

22    would still like to give it another shot.  May I bring my

23    client up to the lectern.

24         THE COURT:  Yes, certainly.

25         Ms. Vargas, is there some reason why you can't

1    cooperate?  We're trying to secure your release here.  Don't

2    you want to be released?

3              THE WITNESS:  Sure, but I don't want to be let go

4    in one place.  If I have to go somewhere, I want to go

5    somewhere.

6              THE COURT:  Well, was it explained to you that you

7    can go to certain places?

8              THE WITNESS:  Okay.

9              THE COURT:  I just want to make sure that you

10   return on Tuesday morning.  I had understood that you were

11   staying with your mother.  Is there some reason why you can't

12   stay with her for the weekend and then come back here and

13   Tuesday can be released from even the monitoring?

14             THE WITNESS:  Okay, that's fine.

15             THE COURT:  Do you want to sit down and try to

16   cooperate with Pretrial Services?  Pretrial Services doesn't

17   work for the government.  They don't work for the defendant

18   here.  They work for this Court.  We're trying to fashion

19   some way for you to be released.  I don't want to see you

20   standing there in shackles.  I want to see you here.  So will

21   you try to cooperate with her?  I mean it's for your benefit.

22             THE WITNESS:  Okay.  Well . . .

23             THE COURT:  Why don't you sit down and chat with

24   her and give her the information that you need so that you

25   can be released.

 1          MR. NICOLAYSEN:  May I have Your Honor's permission

 2     to have the marshals and pretrial and my client go to the

 3     witness room so she's not in the presence of defense.

 4          THE COURT:  Right, that makes more sense.  And why

 5     do we need the shackles on the hands?  Let's get those off,

 6     please.

 7          MR. NICOLAYSEN:  Your Honor, if I may represent to

 8     the Court, logistically the government has agreed to arrange

 9     for her to be picked up on Tuesday morning and brought her.

10     So if the Court is amenable to the bail release, it does not

11     require us to be dependent on her showing up.  The government

12     will pick her up.

13          THE COURT:  That's fine.  Then I'm prepared to

14     release her on her own recognizance and work these things

15     out.

16          MR. NICOLAYSEN:  And so we won't need a third

17     party.  Just her signing the bond form will be enough.

18          THE COURT:  That's right.  But I thought you were

19     gonna go out to a witness room?

20          MR. NICOLAYSEN:  Thank you, Your Honor, very much.

21          THE COURT:  Thank you for your efforts.  Let's see

22     what happens.  We'll be in recess.

23                    (Recess taken.)

24          MR. SCHWARTZ:  Your Honor, may we ask the Court

25     with regard to the observance, is it necessary for us to be

1    here?

2              THE COURT:  In fact I was thinking about that.

3              MR. SCHWARTZ:  We don't have to be here for the

4    actual release.

5              THE COURT:  That's correct.

6              MR. NICOLAYSEN:  Your Honor, we need a moment to

7    get Ms. Vargas here.

8              THE COURT:  Take your time.  Come back in,

9    Ms. Vargas.  Well, what do we have, Mr. Nicolaysen?

10             MR. NICOLAYSEN:  Your Honor, I'm sorry we're

11   turning this courtroom into the chambers of Congress as we

12   all chat on the side.  I cannot thank the Court enough for

13   being so amenable to this difficult situation.  We have

14   satisfied Pretrial's need for information.  We are prepared

15   to enter into a stipulated curfew arrangement, however, it

16   needs to be a little bit more restrictive than just

17   traditional curfew because I respect and want to factor in

18   government's counsels' concerns into this.

19             There's curfew by which she is required to be home

20   from a certain time at night until a certain time in the

21   morning.  Other than that, she's free to move around.  The

22   second is home detention where she has to be home at all

23   times except for approved appointments where she can go

24   during the time.  The most restrictive is home confinement

25   where she's home at all times except for court.

1          I respectfully ask for curfew which means she has

2     to be home from let's say from 10:00 p.m. to 7:00 in the

3     morning, but the government appropriately doesn't want too

4     much freedom during the day and would like parameters of

5     movement, a radius of some kind.  I respect that.

6          Pretrial needs guidance from, Your Honor because it

7     has to be put into the terminology of the bond.  I don't

8     object to whatever radius.  I don't want my client homebound

9     between now and Tuesday.  I'm concerned that's overly

10    restrictive.

11         THE COURT:  Ms. Vargas, are you willing to comply

12    with some reasonable conditions that allow us to release you?

13    Do you want to come up there and tell me are you willing to

14    comply to some reasonable conditions?

15         THE WITNESS:  Sure.

16         THE COURT:  Let me hear from Pretrial Services,

17    though as to what we could possibly do.

18         MS. PURCELL:  There's several different options,

19    Your Honor.  With technology we can put a zone where we can

20    define a specific area that she is allowed to be in then that

21    way trigger an alert if she walks outside of that area.

22         THE COURT:  How large a zone are we talking about?

23         MS. PURCELL:  We can go as large as you need to the

24    entire Central District.

25         THE COURT:  I don't think you know how large the

1    Central District of California is.  It covers seven counties,

2    and from what I have heard about your problems with your

3    husband, you're not going to be over to Arizona and we're

4    just talking about until Tuesday.  So I don't think you would

5    have any plans.

6            And clearly if we can't work out something, I mean,

7    you would be here so we're trying to fashion some reasonable

8    accommodation for you to be released and assure you come back

9    on Tuesday morning.  So is there some particular places that

10   you feel you need to go from your mother's house where you're

11   staying?  Would you need to go more than say 50 or a hundred

12   miles away from your mother's house in the time between now

13   and next Tuesday?

14           THE WITNESS:  I don't know.  It doesn't matter.

15   Seem like they made the decision.  It was up to me, I'll

16   stay.

17           THE COURT:  What do you mean you'll stay?  You'll

18   stay at home.  Wouldn't you rather stay at home than stay in

19   jail, wouldn't you?

20           THE WITNESS:  Home?

21           THE COURT:  Well, where are you staying with your

22   mother?  Wouldn't you rather be there than in jail?  What do

23   you think?

24           THE WITNESS:  It doesn't matter.  You're the judge.

25           THE COURT:  But I'm trying to find out what you

1    think.  Wouldn't you rather be out of jail than in jail?

2         THE WITNESS:  Well, I'm not gonna have my freedom.

3         THE COURT:  You're not going to have what?

4         THE WITNESS:  I'm not gonna sit there and be able

5    to go wherever I want.  Would I rather be home or in jail?

6         THE COURT:  Yes.

7         THE WITNESS:  I would be rather be home doing my

8    thing.

9         THE COURT:  Well, we're trying to fashion some

10   conditions.

11        THE WITNESS:  I don't want to sit and them be all

12   up in my own business.

13        THE COURT:  Well, we can probably help you do that

14   if we can be assured that you're going to return here on

15   Tuesday morning.  We can arrange for you to be able to leave

16   your mother's home during the day.  Make sure that you return

17   at a certain hour when you shouldn't be out all night anyway.

18   None of us should.

19        So do you want to be released or not?  Is the food

20   better here in the jail than it is at home?

21        THE WITNESS:  What?

22        THE COURT:  Is the food better here at the jail?

23        THE WITNESS:  Doesn't matter.

24        THE COURT:  Do you have any children, ma'am?

25        THE WITNESS:  No.

1          THE COURT:  Is there anybody in your life that

2    matters to you?  Your mother?  Wouldn't she prefer to have

3    you at home with her rather than in jail?

4          MR. NICOLAYSEN:  Your Honor, the agent has spoken

5    with my client's mother.  She's willing to have my client

6    live with her.  She understands the situation at hand.

7          THE COURT:  Glad to hear that.  Fashion some

8    conditions then of curfew and be reasonable hours and you'll

9    just have to be in during those curfew hours at your

10   mother's, and then they'll make arrangements to drive you

11   back here on Tuesday and then hopefully this will be behind

12   you.  I think you would want to have that behind you and not

13   to have to face the possibility of having some contempt

14   hearings and be in jail an extensive amount of time.

15          You're a young woman and all.  You've got to get

16   hold of yourself.  You've got your whole life in front of

17   you.  Really, there are people trying to help you, but you

18   have to help yourself.  That's where it starts.  When I ask

19   you if there is anybody who matters to you?  I would like you

20   to say yes, I matter to myself.  Don't you matter to

21   yourself?  You should.  How old are you?

22          THE WITNESS:  33.

23          THE COURT:  You're such a young woman.  You can

24   have a better future than this.  I would like to see you just

25   really work at being more positive about yourself.  How far

1    have you gone in school?  Did you finish high school, did

2    you?  If you didn't, that would be something to achieve.

3    There's GED courses and different kinds of things that are

4    out there for you.

5              Will you return on Tuesday?

6              THE WITNESS:  I am sure.

7              THE COURT:  I'll hold you to your word.  No reason

8    why you should not come back and get this behind you.  You

9    just looking ahead after Tuesday.  Life is gonna get better.

10   We all have problems.  There's no reason why you can't deal

11   with yours, solve them and there be some happiness in your

12   life.  But you have to work at it.  I mean, you've got people

13   trying to help you, but as I said to you, you've got to help

14   yourself, too.

15             So can we arrange some practicable hours for curfew

16   and then arrange to bring you back here on Tuesday morning

17   and put this behind you?

18             All right.  Okay.  Why don't we do that.

19             MR. NICOLAYSEN:  Your Honor, Pretrial suggested

20   L.A. County as --

21             THE COURT:  It's a very large county.

22             All right.  Mr. Arkow.

23             MR. ARKOW:  Yes, Your Honor.  If I can suggest a

24   smaller radius more tied to what the Court was suggesting if

25   she has a home or her parent's home, her mother's home

```
1   because as a practical matter, I don't want this to be a
2   situation where we're setting something up to fail.
3           The monitoring system if she is outside of the
4   radius given the practicality of the way things are going to
5   work, it isn't going to notify Pretrial Services in enough
6   time for then Pretrial Services to notify the actual
7   arresting authority.  By that time, I don't think we'll be in
8   a situation where we can secure her appearance so. . .
9           THE COURT:  She's already going to make a promise
10  to me that she's going to come back.  I'm holding her to her
11  word and proceed in that fashion.  She is free hopefully to
12  do positive things during the day, and then she'll be at home
13  with her mother in evening and see her back here on Tuesday
14  morning.  Let's just work out those details.
15          All right.  You have given me your word.
16          MR. ARKOW:  Your Honor, one other matter.  Again,
17  it's kind of getting into the technicalities of it.  Should
18  there be an issue over the weekend in order for us to act on
19  it, we do not have arrest powers.  Therefore, we would need
20  to get a warrant.
21          THE COURT:  Well, again, I'm not really concerned
22  about that.
23          MR. ARKOW:  Okay.
24          THE COURT:  I expect her to keep her word to me.
25  She's said sure, she would do it and I'm going to give her a
```

1    chance to do it.  That's all.  If she doesn't show up, that's

2    too bad.  For some reason, I have faith that she's going to

3    so let's see.

4         All right.  My law clerk was mentioning that

5    Pretrial needs a curfew time.  I think 9:00 p.m. is certainly

6    a good enough time.  There's no reason to be out there in the

7    dark running into trouble with people and all.  Just get

8    yourself home and try to relax and just take it easy.  Start

9    trying to plan ahead positively what you're going to do with

10   your life.

11        MR. NICOLAYSEN:  Your Honor, what time in the

12   morning would you want her to be authorized to leave.

13        THE COURT:  I think, well, do you get up early?

14   You want to go out early?  Let's say 8 o'clock.  8:00 a.m. to

15   9:00 p.m. you're free to do things and I hope those are

16   positive kinds of things.  Go to the library.  Start doing

17   some reading.  Start thinking about yourself.  Think about

18   what your future is gonna be.  It can be better.

19        MR. NICOLAYSEN:  So, Your Honor, just to clarify so

20   that we all understand, she needs to be at her residence, her

21   mother's residence from 9:00 p.m. to 8:00 a.m. and she needs

22   stay within L.A. County.

23        THE COURT:  Yes.

24        MR. NICOLAYSEN:  Your Honor, this will be a

25   personal recognzance bond.

1          THE COURT:  Oh, yes.  We don't need anything other

2    than her to sign for herself.  I'm not asking anybody else to

3    do it.  Don't let me down.  Okay?  Don't let yourself down.

4          Okay.  We'll see you Tuesday morning.  Thank you.

5          MR. NICOLAYSEN:  Your Honor, what time on Tuesday

6    morning are we reconvening?  The order is for her to be her

7    at 9:00 a.m. on Tuesday.

8          THE COURT:  I understand the agent is going to

9    provide transportation and all.  You don't have to worry

10   about missing the bus or anything else.

11         MR. NICOLAYSEN:  Also, just to put on the record,

12   release to Pretrial Services to facilitate her release.

13         THE COURT:  That will be the order.

14         MR. ARKOW:  Your Honor, I think it's getting into

15   the details, but since the agents will be picking her up, can

16   we have the location and the time that the agents can expect

17   to find her on Tuesday?

18         THE COURT:  Well, Pretrial has the location where

19   she is to be.  We'll get that from them.  That shouldn't be a

20   problem.

21         MR. NICOLAYSEN:  Your Honor, thank you very much

22   for the Court's time.

23         THE COURT:  No, not at all.  I'll see you Tuesday

24   morning.

25         (Proceedings were concluded at 3:00 p.m.)

UNITED STATES DISTRICT COURT

1                        CERTIFICATE OF REPORTER

2

3    COUNTY OF LOS ANGELES       )

4                                )  SS.

5    STATE OF CALIFORNIA         )

6

7    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

8    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

9    DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

10   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

11   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

12   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

13   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

14   OF MY STENOGRAPHIC NOTES.

15

16

17   DATE: JANUARY 7, 2013_____

18

19   ____ /s/  LAURA MILLER ELIAS____

20   LAURA MILLER ELIAS, CSR 10019

21   FEDERAL OFFICIAL COURT REPORTER

22

23

24

25