UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

- - -

HONORABLE TERRY J. HATTER, JR.
UNITED STATES DISTRICT JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| PLAINTIFF, | ) |
| | ) |
| VS. | ) CASE NO.: |
| | ) CR 10-00163-TJH |
| ANTHONY SCLAFANI, | ) |
| | ) |
| DEFENDANT. | ) |
| | ) |
| | ) |
| _____ | ) |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

THURSDAY, FEBRUARY 16, 2012

LOS ANGELES, CALIFORNIA

LAURA MILLER ELIAS, CSR 10019
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 453
LOS ANGELES, CALIFORNIA 90012
PH:  (213)620-0890

```
 1

 2
      APPEARANCES OF COUNSEL:
 3
      ON BEHALF OF PLAINTIFF:
 4

 5               BY:  MARGARET CARTER
                      STEVEN M. ARKOW
 6               ASSISTANT UNITED STATES ATTORNEY

 7               1100 UNITED STATES COURTHOUSE
                 312 NORTH SPRING STREET
 8               LOS ANGELES, CA 90012

 9
      ON BEHALF OF DEFENDANT:
10
                 SILVER, HADDEN, SILVER, WEXLER & LEVINE
11
                 BY:  MICHAEL D. SCHWARTZ, ESQ.
12                    MICHAEL SIMIDJIAN, ESQ.

13               1428 SECOND STREET
                 SUITE 200
14               SANTA MONICA, CA 90012

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
1                              INDEX

2    WITNESSES FOR
     THE DEFENSE:
3
                       DIRECT      CROSS      REDIRECT      RECROSS
4
     MEYER, GREG
5
     BY:  MR. SCHWARTZ    12
6    BY:  MR. ARKOW                   16

7    FORT, NORMAN

8    BY:  MR. SCHWARTZ    20                      56
     BY:  MS. CARTER                   46                      60
9
     HINZ, ANDREW
10
     BY:  MR. SCHWARTZ    63                      76
11   BY:  MR. ARKOW                   71

12   TREGARTHEN, DANIEL

13   BY:  MR. SCHWARTZ    77                     102
     BY:  MS. CARTER                   84                     109
14
     PAIZ, GUS
15
     BY:  MR. SCHWARTZ   122                     145
16   BY:  MS. CARTER                  130                     149

17

18   EXHIBITS    RECEIVED      EXHIBITS      RECEIVED

19   207          67            205           162

20   206         162            92            162

21   203         163

22
     JURY INSTRUCTION DISCUSSION......................163
23

24

25
```

UNITED STATES DISTRICT COURT

```
 1   LOS ANGELES, CALIFORNIA; THURSDAY, FEB. 16, 2012; 9:35 A.M.

 2                         - - -

 3            THE COURT:  Good morning.

 4            We're outside the presence the jury.

 5            Any matters that counsel wish to take up?

 6   Ms. Carter.

 7            MS. CARTER:  Yes, Your Honor.

 8            Your Honor, I'm assuming that your information

 9   distributed from the doctor at White Memorial is the last

10   estimate we have on Ms. Vargas?

11            THE COURT:  She is seeing a new psychologist today.

12   We won't get information on that until sometime later today.

13   I don't know when.

14            MS. CARTER:  Thank you for that information,

15   Your Honor.  The government anticipates resting very early

16   this morning.  We would ask the Court for permission to

17   reopen our case-in-chief if Ms. Vargas competent to testify

18   and becomes available it do so during the course of the

19   trial.

20            THE COURT:  All right.

21            MS. CARTER:  In addition, Your Honor, the

22   government introduced at the close of the day on Tuesday

23   stipulation at Government's Exhibit 85.  It related to

24   different codes and terms used in some of the reports and

25   there was an oral modification by both counsel as it was
```

1    introduced.  Over the dark day, the parties have conferred

2    and have added to that stipulation and also corrected the

3    issue that was addressed in that oral modification and

4    covered have signed a new stipulation covering the same

5    subject matters again with some additions and that one

6    correction.

7         The government would inquire whether the Court

8    would prefer as parties do that it be substituted for the

9    current Exhibit 85.  Explain in front of the jury.  The jury

10   can hear both parties agree to the substitution.

11   Alternatively, of course, the government could mark it as a

12   new exhibit and introduce it in addition and then the jury

13   have the oral explanation that this was the more complete one

14   with the correction made before.  But the parties fear that

15   might be a little confusing and the substitution might be

16   more expedient.

17        THE COURT:  I'm confused.  I don't know whether the

18   jury would be or not, but I think you should do what you

19   suggested initially.

20        MS. CARTER:  Very well, Your Honor.  May I provide

21   to the clerk the new Exhibit 85, a copy for the exhibit

22   folders and also copies for Your Honor's and madam court

23   reporter's notebooks?

24        THE COURT:  Very well.

25        MS. CARTER:  And I believe that's all the

1    government has at this time.

2          THE COURT:  All right.  Mr. Schwartz, you have

3    these witnesses available that you wish?

4          MR. SCHWARTZ:  We do have several available,

5    Your Honor.  I believe they may be quick witnesses.  I was

6    expecting the government to have more of a case today.  We'll

7    put on what we can put on.  Try to move it along.

8          THE COURT:  Well, I had understood that witnesses

9    needed to be out of here this morning.

10          MR. SCHWARTZ:  Yes.  One of them is here.  One of

11    them is not.  The one who is not when we put him on, he'll

12    have to testify as he testifies.  The one who has to be out

13    by 11:00 is here and he'll be relatively quick.

14          Regarding what the government just addressed to the

15    Court regarding Ms. Vargas, just to make a record,

16    Your Honor, I have to say as an officer of the court, I

17    believe we understand and sympathize with the government's

18    quandary about the witness with regards to the witness

19    problems, and this was one that I have not seen in my years

20    to this extent.

21          THE COURT:  It is interesting.

22          MR. SCHWARTZ:  I understand and I'll also be blunt

23    with the Court, that the Court has as much a humanitarian

24    interest in Ms. Vargas as the witness interest and I admire

25    that and my client respects that.  It puts us in a bit of a

```
 1    quandary as well.  Only because normally at the end of
 2    government case, we make the motion to dismiss counts
 3    depending on enough evidence to go the jury.  And the problem
 4    here is if the government has leave to reopen their case
 5    after our case, then it's almost as if they're not closing
 6    their case and we can make that same motion.  And some of
 7    attorney's strategy in discussing things with their client
 8    about whether that client should or should not testify
 9    depends on how the government case stands at the end of their
10    case.
11              THE COURT:  Well, perhaps, I could give you some
12    guidance, though.  It appears to me and that's why I can't as
13    you know interfere in strategy on either side.  I frankly
14    don't understand the government's great interest in
15    presenting this proposed witness.  They have testimony from
16    others and there is enough as far as I'm concerned to go to
17    the jury.  So if you were making that motion, it would be
18    denied.  Of course, then if it were reopened and something
19    else came out as a result of Ms. Vargas' testimony, you're
20    free to renew it as you know, and then I would have to
21    reconsider it.
22              MR. SCHWARTZ:  I appreciate the Court's tentative
23    ruling.
24              THE COURT:  That's what it is.
25              MR. SCHWARTZ:  Just for the record, that at this
```

```
 1   juncture if the government rests, there's been no testimony
 2   as to the second tase outside my client's statement that
 3   there was a tasing that took place.  There's no testimony as
 4   to the illegality, the nonjustification, to any kind of the
 5   intent issue to willfully deprive somebody of their civil
 6   rights.  And in reality as Mr. Meyer testified and so did
 7   Detective Cole, tasings happened all the time without any
 8   kind of evidence that it was an impropriety outside of the
 9   fact that there were three activations.
10         THE COURT:  Well, you'll be able to argue that.
11   Clearly, as I have indicated to you, my proposed ruling would
12   be to allow this to go to the jury.
13         MR. SCHWARTZ:  Fair enough, Your Honor.
14         And other than that, some of our witnesses were
15   possible rebuttal witnesses and I'll have them available
16   today and tomorrow so it may go quicker than we planned, but
17   we'll put them on as quickly as we can.
18         THE COURT:  All right.  Let's bring the jury in.
19         MR. SCHWARTZ:  Thank you.
20         THE COURT:  Thank you.
21              (Jury present.)
22         THE COURT:  Please be seated.  We are having some
23   winter weather and you've also survived Valentine's Day.  Let
24   me ask you if anything about this has matter come to your
25   attention?  No hands being raised.
```

1    We're gonna continue now and complete the

2    government's case this morning, their case-in-chief.

3    Ms. Carter.

4    MS. CARTER:  Your Honor, at this time the

5    government would like to move into evidence a revised version

6    of Government's 85, a stipulation between the parties.

7    Orally modified by the parties at the end of the day on

8    Tuesday and has now been corrected and added to.

9    THE COURT:  Very well.

10   MS. CARTER:  Request permission to publish

11   Exhibit 85 for the jury and to read it aloud.

12   THE COURT:  You may do so.

13   MS. CARTER:  United States of America and Defendant

14   Anthony Sclafani hereby stipulate and agree that the

15   following terms and codes used in the records of the Desert

16   Hot Springs Police Department DHSPD had the following

17   meanings in February 2005.

18   There are three columns to the first table.

19   Computer-aided dispatch CAD, officer number, police records

20   management system RMS, officer number and meaning.

21   The first row reads S-5 for the CAD officer number,

22   056 RIMS officer number, Sergeant Anthony Sclafani,

23   defendant.

24   201 and 023 for Andrea Heath.

25   203-K and 39-K for Officer Matthew Drew, canine.

 1          204 for Officer Dennis Decker.

 2          207 for Officer John Collard.

 3          Turning the second page, the same table continues.

 4          209 for Officer Brian Kouakou.

 5          212 and 054 for Officer Matthew Gutting.

 6          004 for Lieutenant James Steiner.

 7          027 for Detective Eddie Cole.

 8          033 for Sergeant Ron Hall.

 9          041 Sergeant Radanomous Gill.

10          042 Officer David Hoffman.

11          046 Officer Ray Volts.

12          048 Officer Chris Costade.

13          052 Officer Roy Logan.

14          058 Officer David O'Dowd.

15          059 Detective Jim Henson.

16          060 Officer Jason Johnson.

17          066 Officer Patrick Biggers.

18          C-1 Chief.

19          39 Carolyn Firestone.

20          252 Nancy Allen.

21          358 Kayla Kittridge.

22          359 Kathleen Roacha.

23          CSO-4 Terry Sherman.

24          Susan Gee.

25          Susan Genera.

```
 1              There is a second table with two columns.  The
 2     first CAD term and the second meaning.  The rows read as
 3     follows.
 4              ENRT officer en route to scene.
 5              Turning to page 3:
 6              10-8 in service.  10-15 prisoner in custody.  10-19
 7     returning to or at police station.  10-27 check for driver's
 8     license.  10-29 check for warrants.  10-97 officer arrived on
 9     scene.
10              It is so stipulated and it is signed by the parties
11     and the defendant.
12              THE COURT:  All right.  Mr. Schwartz, is this the
13     stipulation that you have agreed upon on behalf of your
14     client.
15              MR. SCHWARTZ:  Yes, Your Honor.  Thank you.
16              THE COURT:  It will be received and the jury may
17     treat it as they would any other evidence.
18              MS. CARTER:  At this time the government rests
19     provisionally per the outside of the jury presence
20     discussion.
21              THE COURT:  Very well.  In other words, ladies and
22     gentlemen, the government is resting its case-in-chief with
23     the understanding that if necessary they can reopen briefly
24     and we'll move now to the defense case.  As I have indicated
25     to you as well, the defense doesn't have to put on a case at
```

```
 1   all.  They don't even have to cross-examine, which they have
 2   done, but if they choose to put on a case, then they have a
 3   right to do so.  And Mr. Schwartz, take it for the record.
 4             MR. SCHWARTZ:  Thank you, Your Honor.  And for the
 5   record, counsel's comments also outside the presence of the
 6   jury just for the record at this time.
 7             THE COURT:  Yes.  We can take that up outside the
 8   presence of the jury.
 9             MR. SCHWARTZ:  Thank you, Your Honor.  Get my first
10   witness.
11             THE COURT:  Okay.  Sir, would you come right up on
12   the witness stand to be sworn.
13             THE WITNESS:  Thank you, Your Honor.
14                       (Witness sworn.)
15             THE CLERK:  Please have a seat.  State and spell
16   your name for the record.
17             THE WITNESS:  My name is Greg Meyer.  G-r-e-g
18   M-e-y-e-r.
19             THE COURT:  Do you have a middle name?
20             THE WITNESS:  Middle name Monroe M-o-n-r-o-e.
21             THE COURT:  Go ahead, please Mr. Schwartz.
22             MR. SCHWARTZ:  Thank you, Your Honor.
23                      DIRECT EXAMINATION
24   BY MR. SCHWARTZ:
25   Q.   Good morning, Mr. Meyer.
```

1    A.    Good morning, sir.

2    Q.    Just a few questions to clarify your testimony of other

3    day.  You recall you testified about the taser had the inner

4    clock?

5    A.    Yes.

6    Q.    And that's related to the computer chip within it?

7    A.    I didn't hear.

8    Q.    That has some relationship to the computer chip that's

9    in the taser?

10   A.    Well, yeah, I mean, there is a clock in there and there

11   is a computer chip.  I think it's probably all integrated,

12   but I'm not engineer.

13   Q.    You spoke about the drift the taser clocks may have?

14   A.    Yes.

15   Q.    Much like a regular watch?

16   A.    Yes.

17   Q.    And would it be out of the ordinary based on your

18   training and experience and expertise to have two tasers

19   activated at the same time in the Department, but

20   simultaneously have different times on those clocks for the

21   downloads?

22            MR. ARKOW:  Objection.  Leading and vague.

23            THE COURT:  It's overruled if you understand the

24   question.

25            THE WITNESS:  Um, that could happen.  It would not

1   be unusual.

2   BY MR. SCHWARTZ:

3   Q.   Why is that?

4   A.   Well, if you have two officers using two tasers at the

5   same time or approximately the same time, one of the taser's

6   clocks might have at least a slightly different time than the

7   other one.  That just would not be unusual.

8   Q.   And when those tasers are then downloaded or the

9   computer chip part information is downloaded into a computer,

10  what happens to that inner clock of the taser when it's

11  downloaded into a computer?

12  A.   What happens to the clock?

13  Q.   Correct, on the taser itself.  Does it change at all?

14  A.   No.  Any prior taser activations that are recorded on

15  the computer chip do not change.  What happens when you

16  download the taser into a computer and then get a download

17  printout, is there is a program that you go through and it

18  indicates whether the clock is out of sync with the computer

19  time and it gives the person that's doing the download the

20  opportunity to push a button to synchronize the clock for

21  future purposes.

22  Q.   Is there any kind of a minimum or maximum

23  differentiation between the out of sync time from the taser

24  to the computer that will the computer screen to show it's

25  out of sync?

```
 1   A.   If the computer time is ten minutes or more different
 2   than the taser clock time for the taser that's being
 3   downloaded, there will be an alert screen on your computer
 4   screen that forces you to synchronize the taser to the
 5   computer that you're going the download on.  In some earlier
 6   versions, it may be less than 10 minutes.  It could 5 minutes
 7   of variance that forces the operator to resynchronize the
 8   clock, before you can proceed and make the download printout.
 9   BY MR. SCHWARTZ:
10   Q.   Now, you said some earlier versions.  Do you have any
11   idea if a 2005 version would be different than the 10-minute
12   differentiation that differentiates the code?
13   A.   The version that was used in this case according to
14   what's printed on the download printouts that I saw last week
15   is Version 15.5 of the download software.  I do not factually
16   know if that version gives you the warning and forces you to
17   work through it if there is a ten-minute discrepancy or if
18   there's a five-minute discrepancy.  It's going to be one of
19   those two things.  I just don't know the answer.
20   Q.   And when that warning would pop up on the computer
21   forcing that taser to be synchronized to the computer clock,
22   does that affect the time on the download that that operator
23   was now downloading at that time, would it affect future
24   times on downloads?
25   A.   It would affect future recordings of taser activations.
```

```
 1    The printout would still show the past taser activations at
 2    the times that were in effect when they were activated.  In
 3    other words, those synchronizing the clock during the
 4    download printout would not change any of the prior recorded
 5    times.
 6             MR. SCHWARTZ:  May I have just a moment please,
 7    Your Honor?
 8             THE COURT:  Of course.
 9    BY MR. SCHWARTZ:
10    Q.   And if the two different tasers are synced to two
11    different computers, would that affect whether those tasers
12    retain synched to the same time or not?
13    A.   It would be based -- the synchronization for each taser
14    would be based on the computer or PC clock time so it would
15    depend on whether the computer times were the same or
16    different.
17             MR. SCHWARTZ:  Nothing further at this time.
18             THE COURT:  All right.  Any questions?
19             MR. ARKOW:  Yes, Your Honor.
20                        CROSS-EXAMINATION
21    BY MR. ARKOW:
22    Q.   You mention when a person is doing a download report on
23    their computer for the taser activation, an alert screen
24    comes up on the computer?
25    A.   If there is a ten-minute discrepancy in the times or in
```

```
 1    an earlier version might have been a five-minute discrepancy
 2    in the times, then the alert screen comes up.
 3    Q.   And what is the purpose of the alert screen?
 4    A.   It's to the notify the person doing the download that
 5    the clock is some significant number of minutes out of sync
 6    and to force you to push a button that says synchronize the
 7    clocks.
 8    Q.   And when you say force you to push a button, does that
 9    mean the person doing the download report can't even continue
10    with the download report until the clocks are in
11    synchronization?
12    A.   Correct.  You cannot continue a program and you cannot
13    do a download printout until you have synchronized the clocks
14    if they are more than that number of minutes out of sync.
15    Q.   Even if the computer version doesn't have the alert
16    screen, will the person who is doing the download operation
17    see the times of the taser activation only see on the
18    computer the clock time on the computer and the internal
19    clock time of the taser?
20    A.   Yes.  It shows those things and it shows also how many
21    minutes and seconds and hours if necessary the discrepancy
22    is.
23    Q.   And in this case you don't know --
24               THE COURT:  You're asking.
25               MR. ARKOW:  Excuse me?
```

```
1              THE COURT:  You're asking.

2              MR. ARKOW:  Oh, I'm on cross-examination.

3              THE COURT:  Go ahead.

4              MR. ARKOW:  I could rephrase.

5    Q.   Do you ever any personal knowledge in this case whether

6    there was any discrepancy in synchronization on the tasers

7    that were downloaded in this case?

8    A.   No.

9    Q.   And if there was a discrepancy between the real time and

10   the internal check time on the tasers that were being

11   download, the person who was download operation would be made

12   aware in doing the download that there is a discrepancy in

13   the time?

14             MR. SCHWARTZ:  Objection.  Misstates the evidence.

15             THE COURT:  Well, he is asking.  You may answer.

16             THE WITNESS:  The computer screen during the

17   download process as you're moving forward through the

18   program, does provide that information to the person doing

19   the download, you know, if they happen to look at it or

20   choose to look at it if it's less than ten minutes, for

21   example, but, you know, it's dependent on whether they look

22   at it.  Unless they get the alert screen that forces them to

23   look at it and do something about it.

24   BY MR. ARKOW:

25   Q.   The two tasers that were downloaded for one of the
```

```
 1   incidents in this case, relating to an incident on
 2   February 25th, had both been synchronized recently on the
 3   same computer, would it be more likely that those taser
 4   downloads are in sync with the real time?
 5   A.   It would depend on what with we mean by recently.  Do we
 6   mean days?  Do we mean weeks?  It's difficult to answer is
 7   because, the reason it's difficult to answer is because the
 8   digital clock will typically drift a few minutes a month.
 9   Two or three minutes a month as a norm so it's difficult
10   without knowing what's meant by recently.
11               MR. ARKOW:  No further questions.
12               THE COURT:  Any further questions?
13               MR. SCHWARTZ:  No, Your Honor.
14               THE COURT:  You are excused.  You may call your
15   next witness.
16               MR. SCHWARTZ:  Thank you, Your Honor.
17               We call Mr. Norm Schwartz.  He is outside.
18               THE COURT:  Sir, come straight ahead.  Come right
19   up on the witness stand to be sworn.  Right up on the witness
20   stand, please.
21                    (Witness sworn.)
22               THE CLERK:  Please have a seat.  State and spell
23   your name for the record.
24               THE WITNESS:  My name is Norm Fort, F-o-r-t.
25               THE COURT:  Do you have a middle name Mr. Fort?
```

```
 1                    THE WITNESS:  Lee.

 2                    THE COURT:  Is Norm your given name?

 3                    THE WITNESS:  Yes, Norman.

 4                    THE COURT:  It's Norman.  Go ahead, please.

 5                    MR. SCHWARTZ:  Thank you, Your Honor.

 6                         DIRECT EXAMINATION

 7     BY MR. SCHWARTZ:

 8     Q.   Good morning, Mr. Fort.

 9     A.   Good morning.

10     Q.   Are you employed?

11     A.   I am.

12     Q.   How so?

13     A.   I'm in private practice as an independent forensic

14     consultant and my practice focuses primarily on alcohol and

15     drug-related matters.

16     Q.   And how long have you been in private practice?

17     A.   I have been in private practice for about 15 years.

18                    THE COURT:  Where do you office, sir?  Where is

19     your office?

20                    THE WITNESS:  Filmore, California.

21                    THE COURT:  Go ahead.

22     BY MR. SCHWARTZ:

23     Q.   And when you said private practice as a forensic

24     consultant, drug-and-alcohol-related, can you be more

25     specific and tell us what you normally are consulted on?
```

1   What do you do?

2   A.   Sure.  My practice includes both civil cases and

3   criminal cases and basically, it involves reviewing various

4   documents, may be medical documents, may be a police report

5   of some type.  A large part of my practice also includes

6   providing training to law enforcement personnel on

7   alcohol-related issues.  In any event, based on a review of

8   these various documents, then I consult with attorneys or

9   consult with the individuals that retained me initially just

10  to discuss some aspect of the case that would have to do with

11  alcohol or drugs.

12  Q.   And what was your position before you were a private

13  consultant?

14  A.   I was employed by the Sheriff's Department in Ventura

15  County for a little over 31 years and I had the opportunity

16  to work in all of the different areas of the crime laboratory

17  which ranged from attending autopsies, collecting the

18  evidence, toxicology, controlled substance, dry drugs, trace

19  evidence, serology, crime scene investigation.  For a number

20  of years, I was also involved in crime scene investigations.

21          And then the last 16 years of my employment was

22  devoted to the forensic alcohol program.  I was the forensic

23  alcohol supervisor in charge of that program.  And my

24  responsibilities included not only testing of biological

25  fluids both post-mortem as well as ante-mortem samples, but

```
1    also providing training to law enforcement and managing our
2    breath alcohol testing program.  Both the preliminary breath
3    testing program as well as the implied consent alcohol
4    testing program.
5    Q.   Do you have any specific degrees or certifications in
6    relation to the positions you have just outlined?
7    A.   I do.  My undergraduate degree is in divisional science
8    which allows me to choose two main areas of study and I chose
9    biology and chemistry.  After I completed my undergraduate
10   degree, I taught biology and chemistry at the high school
11   level for a short period of time.
12            THE COURT:  Where did you receive your
13   undergraduate degree, sir?
14            THE WITNESS:  Yes, my undergraduate was from
15   Arkansas State University and then my graduate degree, which
16   I actually obtained after I began my employment as a
17   criminalist in 1965, after that, I attended college in the
18   evenings and completed my graduate degree in criminalistics
19   and that was from Cal-State L.A., California State University
20   L.A.
21            THE COURT:  That was a master's degree?
22            THE WITNESS:  That was a master of science degree
23   in criminalistics, yes, Your Honor.
24   BY MR. SCHWARTZ:
25   Q.   And as part of your experience over these last more than
```

```
 1    40 years, have you had an opportunity to actually douse
 2    people with alcohol to see their reaction to the effects of
 3    alcohol at different levels of alcohol in their bodies?
 4    A.   I have.  I have in a very controlled environment, I have
 5    had the opportunity to conduct what are called controlled
 6    alcohol studies or probably more so now they're referred to
 7    as wet labs.  And basically what it entails is having
 8    individuals that volunteer to consume alcohol, and then in a
 9    very confined monitored environment, you can calculate based
10    on an individual's weight what alcohol would have to be
11    assumed to achieve a particular alcohol reading at some later
12    particular point.
13         So based on the weight, I would calculated the
14    amount that had to be consumed, and then you have a monitor
15    that's taking notes.  And then I would test the individuals
16    with various kinds of breath testing devices so I can get a
17    complete data curve of how the alcohol is absorbed,
18    distributed, eliminated, and then when drinking stops, I have
19    a nurse that would start collecting blood samples and
20    during -- it's usually about a four-hour study.
21         During this time, I'm also interviewing the
22    individuals, how do you feel now compared to how you felt
23    earlier.  Giving them field sobriety exercises, interviewing
24    them in depth about their medical history, drinking habits.
25    And then the data that's collected from that data, I create
```

1    charts that describe how that particular individual with all

2    of his or her uniqueness responds to the alcohol that's been

3    consumed in that environment.

4          So I have had the opportunity to do well over a

5    hundred studies, and then in the training that I provide to

6    law enforcement, as a part of that training, I also put on

7    wet labs and I have done, I don't how many, of these through

8    the years.  But I create the alcohol levels in volunteers and

9    then based on their training, the students evaluate these

10   doused subjects and try to determine from their behavior what

11   their alcohol is.  And then they take breath tests to compare

12   actual data against what they assessed the level to be from

13   other, from other indicators.

14   Q.   And based on the background you have just described and

15   your experience in testing individuals regarding their

16   alcohol levels, did you also test individuals regarding their

17   behavorial as well as mental reactions to stimuli at

18   different alcohol levels?

19          MS. CARTER:  Objection.  Vague.

20          THE COURT:  Do you understand the question, sir?

21          THE WITNESS:  Yes, Your Honor.

22          THE COURT:  It's overruled.  You may answer it.

23          THE WITNESS:  Yes.

24   BY MR. SCHWARTZ:

25   Q.   And you noted before that would interview different

1    individuals with their uniqueness; is that correct?

2    A.   Based on their uniqueness.  What you're looking at is

3    how that individual responds to the alcohol that's been

4    consumed, yes.

5    Q.   Now, based on your training and experience, a woman who

6    is about 180 pounds at a blood alcohol level of .22, would

7    you expect them to be affected in some capacity mentally by

8    the alcohol?

9             MS. CARTER:  Objection, Your Honor, to this

10   witness's qualifications as an expert in this area.

11            THE COURT:  Do you wish voir dire now or wait until

12   you actually cross-examine?

13            MS. CARTER:  I will do so now, if I may,

14   Your Honor.

15            THE COURT:  You may.

16            MS. CARTER:  Thank you, Your Honor.

17                     VOIR DIRE EXAMINATION

18   BY MS. CARTER:

19   Q.   Mr. Fort, you're not a medical doctor, are you?

20   A.   No, ma'am, I'm not.

21   Q.   You're not a psychiatrist, are you?

22   A.   No.

23   Q.   You're not a psychologist, are you?

24   A.   No.

25   Q.   You're not an expert on behavior, are you?

```
1    A.    No, I'm not.
2    Q.    You're not an expert on memory, are you?
3    A.    Not specifically, no.
4    Q.    You're not an expert on how different people might
5    perceive the same external stimuli, are you?
6    A.    Only as it relates to the affect of alcohol, but
7    certainly not in general, just related to alcohol.
8    Q.    Now, with regards to your studies related to how
9    different individuals might experience alcohol, were any of
10   those conducted in conjunction with a psychiatrist?
11   A.    No.
12   Q.    Were any of those conducted in conjunction with a
13   psychologist?
14   A.    No.
15   Q.    Were any of those conducted in conjunction with a
16   medical doctor of any kind?
17   A.    No.
18   Q.    Were -- do you know what peer review is, Mr. Fort?
19   A.    Surely.
20   Q.    Can you tell us what it is?
21   A.    Sure.  Peer review is actually just that.  The work that
22   a particular category has done, and in my case it would be
23   some type of some aspect of forensic alcohol, such as the
24   studies that I have done, some aspect of drug or drug effect.
25   But within that context, peer review means simply that other
```

```
 1    individuals in your field have reviewed your work, have

 2    reviewed your material and provided comments, provided

 3    assistance, provided suggestions, and then ultimately that

 4    work would be perhaps changed somewhat based on suggestions

 5    or simply it would be commented on.  And within the

 6    peer-review arena, it may be personal review.  It may be, for

 7    example, the conferences that we go to, other colleagues

 8    reviewing your work which has certainly been true in my case

 9    or if a work is published, really in order for that work,

10    that published work to I would say have more impact, if it's

11    a peer-reviewed article, sometimes, though not always, there

12    is more weight, I would say, that's given to the article then

13    just a published article.

14    Q.   Have any of your studies on how in wet labs been peer

15    reviewed by any medical doctors?

16    A.   I think the most important individual that's reviewed my

17    work is a PhD toxicologist not a medical doctor.  We don't,

18    in our field, we don't normally interact with medical

19    doctors.

20    Q.   So have any of your wet lab studies been peer reviewed

21    by any medical doctors?

22    A.   No.

23    Q.   Have any of your wet lab studies been peer reviewed by

24    any psychiatrist?

25    A.   No.
```

```
 1    Q.   Have any of your wet lab studies been peer reviewed by
 2    any psychologist?
 3    A.   No.
 4    Q.   Have any of your wet lab studies been peer reviewed by
 5    anyone who has any expertise on how the brain works?
 6    A.   Probably the only individual would be Dr. Marclen Burns.
 7    Q.   Is that the PhD toxicologist you previously referenced?
 8    A.   No, ma'am.
 9    Q.   Is Dr. Burns a medical doctor?
10    A.   No.  She's a behavorial scientist.
11    Q.   Is she an expert on how memory works?
12    A.   Uh, within the alcohol context, yes.
13    Q.   How many of your wet lab studies have been peer reviewed
14    by her?
15    A.   I think the only studies that she's reviewed were just a
16    presentation that I did at a conference and then discussing
17    that presentation.  She would not be the most significant
18    reviewer of my material.
19    Q.   The most significant reviewer of your material would be
20    toxicologists; correct?
21    A.   It's actually Dr. Wayne Jones, who is a PhD toxicologist
22    and one of the leading research toxicologists referring to
23    alcohol specialists.
24    Q.   Now, a toxicologist, that's a specialist of chemistry;
25    correct, not medicine?
```

A.   I don't -- I don't associate it with a specialty of

chemistry.

Q.   Well, would you associate it with any kind of medical

specialty?

A.   Toxicology is divided into fields of toxicology.

Forensic toxicology, which would be the field that I've

worked in is basically the only type of toxicology that I've

been exposed to.

Q.   Do you have any peer-reviewed publications in any

medical journals?

A.   I have -- none of my work has been published in

journals.  Only published as abstracts that were

presentations in colleges.

Q.   You have no peer-reviewed publications on your wet lab

studies; is that correct?

A.   No published peer-reviewed articles, no.

Q.   Now, in the informal peer review process that you've

previously described, have you had any peer reviewed from

opposing viewpoints to yours on your wet lab studies?

A.   Opposing viewpoints only in the sense that probably the

most valued toxicologists are also independent experts or

independent toxicologists.  In other words, not favoring one

particular category or another.

Q.   When you say independent, do you mean working for a

private practice firm like yours?

1    A.    No.   The individual I'm referring to Dr. Jones is

2    actually associated with a hospital in Sweden, but he is

3    very, very prolific author and presenter in the States and

4    other countries as well, but he is associated with the

5    hospital.

6    Q.    And has he ever given you a review in this informal peer

7    review context that you provide and expressed a viewpoint

8    that was opposed to yours that you found in your wet lab

9    studies?

10   A.    No.   I believe quite to the contrary.

11   Q.    And no one else has provided any opposing views to your

12   wet lab studies either?

13   A.    Only individuals at conferences that were not actually

14   reviewing my material, but have commented on the format being

15   less than what they would do or something like, but not a

16   peer-reviewed critique, no, ma'am.

17   Q.    Now, the bulk of your experience is in collecting and

18   analyzing samples of bodily fluids; isn't that correct?

19   A.    Not at all.   No, ma'am.

20   Q.    Was that a primary part of what you did as a forensic

21   chemist when you worked for the Ventura County Sheriff's

22   Department?

23   A.    Not really.   I mean probably during the day, a lot of my

24   work would have to do with setting up samples and starting

25   the process.   But I would tell you that the greater majority

1    of my working has been in the field either working at

2    sobriety checkpoints, I've put in well over a thousand hours

3    working in sobriety checkpoints.  And by working, I mean not

4    just standing in the road and watching cars, but rather being

5    a part of an evaluation, talking to the subjects that are

6    being evaluated, sobriety evaluation.  And then also within

7    that same tacit area, riding with law enforcement.  So again

8    I have exposure to subjects that may or may not have used

9    alcohol and having been affected by alcohol.  So I've got the

10   real life experience as well as the lab experience of doing

11   numerous controlled studies.  And then just on a routine

12   basis, either myself or someone assisting me, would analyze

13   body fluids for alcohol and other volatiles.

14   Q.   Another large part of what you do relates to breath

15   testing for alcohol; correct?

16   A.   Within the context of managing a program when I worked

17   at the laboratory, and then in the last 15 years more so

18   providing training to law enforcement.  I certified them in

19   the use of the preliminary breath testing equipment on the

20   roadside and I actually started that program back in 1986.

21   So a part of my activities does include not testing people,

22   but rather training and certifying law enforcement and also

23   attorneys because I teach through Ventura College or I did.

24   Attorneys attend as well, but as an instructor that is part

25   of my activities.

1   Q.   And when you provide this instruction, it's just on how

2   to use the breath testing machinery; correct?

3   A.   And specifically how to assess individuals for the

4   affects of alcohol.  In other words, we go through an entire

5   sobriety evaluation:  The interview, observation, field

6   sobriety exercises and discussion.  And then as a separate

7   category, I have the subjects that have been receiving the

8   training, have those individuals do the tests they've been

9   taught to do.  And then we collectively discuss the

10  experience and talk about alcohol how it affects the

11  individual and how those affects manifest.

12  Q.   And those assessments are based on your experience in

13  law enforcement in the field and your wet labs studies;

14  correct?

15  A.   No, ma'am, not at all.  I've never been a law

16  enforcement person.  I've always been a civilian and I've

17  never been in law enforcement, but really the value of what

18  I've done anecdotically really assists in the research that I

19  do.

20          MS. CARTER:  Objection.  Nonresponsive.  Move to

21  strike the last part.

22          THE COURT:  The last part will be stricken.

23  BY MS. CARTER:

24  Q.   You said that you were not a law enforcement person, but

25  you worked for 31 years in the crime lab of the Ventura

1    County Sheriff's Department?

2    A.    I did, but --

3    Q.    And isn't that where --

4           THE COURT:  Well, just a minute.  He hadn't

5    finished his answer.  Go ahead and finish.

6           THE WITNESS:  Our laboratory was managed by a PhD

7    criminalist and toxicologist right up until the last couple

8    of years so I obviously had no choice and no control over how

9    our crime laboratory interfaced with the law enforcement

10   community.

11   BY MS. CARTER:

12   Q.    Your client as of at that time of the crime lab, though,

13   was the Ventura County Sheriff's Department?

14   A.    Pardon me?

15   Q.    Your client, the crime lab's client was the Ventura

16   County Sheriff's Department, wasn't it?

17   A.    Our laboratory was under the auspices of the Ventura

18   Sheriff and we received evidence from all agencies all law

19   enforcement agencies in Ventura County as well as post-mortem

20   samples from the Medical Examiner's Office.  So my

21   responsibility would be to analyze the evidence that had been

22   submitted in another part of our laboratory.

23   Q.    And your assessments, your assessments of the affect of

24   alcohol on various individuals comes from your field

25   experience and your wet labs studies; correct?

A.   Not really.  I had attempted to answer that earlier, but my experiences anecdotally simply amplify the literature search and research that I do.  In other words, if I read something having to do with a particular behavior or a particular effect and in my anecdotal experiences control studies or in field studies, field experience I can see that same manifestation, it simply assists me in a better understanding of that particular issue.

Q.   Your assessments are not based on any medical or psychological training of your own, are they?

A.   No, ma'am.  I'm not a medical doctor or a psychologist or a psychiatrist, no.

Q.   And your assessments are not based on any peer reviewed publications of your own, are they?

A.   My assessments are certainly based in part on peer reviewed journals reviewing peer reviewed articles, but I have not published articles that were peer reviewed articles.  They have been peer reviewed, but I haven't published them.

Q.   And when you say they have been peer reviewed, you're talking about the informal process and the individual that you previously described; correct?

A.   I'm talking specifically about taking a collection of my work to a conference, couple of conferences, and having individuals that are highly respected in our field reviewing that bulk of my work and commenting on it, on two or three

```
 1   different occasions.  So to me that is definitely of value.
 2   Q.   And those people aren't psychiatrists, are they?
 3   A.   Dr. Jones is a PhD toxicologist.
 4   Q.   They're not psychiatrists, are they?
 5   A.   No.
 6   Q.   They're not neurologists, are they?
 7   A.   No.
 8   Q.   They're not psychologists, are they?
 9   A.   No.
10   Q.   They are not medical doctors of any kind, are they?
11   A.   I don't believe so, no.
12   Q.   Mr. Fort, before a journal is published as a peer
13   reviewed paper, they send it out for comments from experts
14   with opposing viewpoints; isn't that correct?
15   A.   Not the peer review process that I'm familiar with.
16   Q.   None of your studies have ever been sent out by a
17   journal to experts with opposing viewpoints for comments,
18   have they?
19   A.   No, not that I'm aware of.
20        MS. CARTER:  Thank you.  Your Honor, at this point
21   the government move that this witness not be permitted to
22   testify as an expert regarding the affect on memory or
23   recollection or mental status of alcohol on individuals.
24        THE COURT:  You wish to be heard, Mr. Schwartz?
25        MR. SCHWARTZ:  Yes, Your Honor.  May I ask witness
```

```
 1   more questions to lay more of a foundation?
 2            THE COURT:  Go right ahead.
 3
 4                 DIRECT EXAMINATION (RESUMED)
 5   BY MR. SCHWARTZ:
 6   Q.   In your wet lab studies when you worked with the crime
 7   lab in Ventura County, had you actually studied the affects
 8   of alcohol on memory and perception with those subjects that
 9   participate in your wet lab?
10   A.   Yes.
11   Q.   How many times have you done that?
12   A.   In all of the individuals that have been assessed within
13   the alcohol context, both in the field and in wet labs and in
14   the training I present, a part of that assessment has to do
15   with the mental process in terms of simply interviewing the
16   individuals and determining what the recall is compared to
17   the actual data.
18   Q.   And based on your training and experience is alcohol a
19   drug?
20   A.   It is, yes.
21   Q.   What type?
22   A.   Alcohol specifically is a central nervous system
23   depressant.
24   Q.   And have you had any kind of educational training or
25   field training regarding specifically alcohol as a depressant
```

```
1    what effect it has on memory and perception?

2            THE COURT:  Well, why don't you break it up.  It's

3    compound.

4            MR. SCHWARTZ:  Thank you, Your Honor.

5    Q.   Have you had any training, start with educational

6    training, about alcohol as a depressant as it relates to

7    memory and perception?

8    A.   Yes.  In my graduate program, pharmacology of substance

9    abuse which was taught by a doctor from USC, and then a

10   course, a graduate course in -- I can't remember the name of

11   the course.  It was toxicology taught by Dr. Irvine from

12   Riverside I believe.  But -- and then just the general

13   criminalist courses.  I had three graduate courses in

14   criminalistics and some part of those courses, because it

15   deals with the entire field of criminalistics, some part of

16   that training dealt with alcohol and the effects of alcohol

17   and within the category of effect, what are the effects of

18   alcohol and how are they manifest.

19           THE COURT:  The field work, if any.

20           MR. SCHWARTZ:  Thanks, Your Honor, for reminding

21   me.

22   Q.   And have you had any training with regard to your field

23   work and how alcohol as a depressant would affect memory and

24   perception in different individuals?

25   A.   Yes.  Again, that would come from my direct contact with
```

1    the individuals or on occasion interviewing individuals

2    simply to compare and account against more accurate data that

3    we have.

4    BY MR. SCHWARTZ:

5    Q.   Have you had any training, background and experience

6    educationally on how different levels of alcohol in the body

7    would affect memory and perception?

8    A.   Yes.

9    Q.   Describe that, please.

10   A.   Well, again, not only academic exposure and my graduate

11   program in criminalistics, but also in reviewing the

12   scientific articles that deal with all of the various aspects

13   of alcohol affects and how they may relate to general

14   behavior or to a specific behavior directed toward a

15   particular task.

16            THE COURT:  Have you ever testified as an expert in

17   either state court, well, let me ask you in state court

18   regarding these kinds of matters?

19            THE WITNESS:  Other than state court?

20            THE COURT:  Well, have you testified in state court

21   in this area?

22            THE WITNESS:  Oh, yes, sir.  I have been testifying

23   about alcohol and the effects in state court, California.

24            THE COURT:  Have you testified in federal court?

25            THE WITNESS:  I believe I have, Your Honor, yes.

```
1              THE COURT:  Where?

2              THE WITNESS:  In Los Angeles.

3              THE COURT:  In the Central District of California.

4              THE WITNESS:  I believe I have testified here.  I

5    don't recall a specific case, but when I was coming in today

6    I recognized this and the plays I had been in the past.

7    Pretty sure, I've got testified here.

8              THE COURT:  How recently?

9              THE WITNESS:  It would have been several years ago.

10             THE COURT:  I think we can cut this short.  I'm

11   going to deny the motion.  You may testify as a forensic

12   toxicologist, and in the long run, ladies and gentlemen,

13   you'll hear the final instructions that I give you.

14             When you deliberate, you'll decide how much weight

15   you give to the testimony, if any.  So let's move on.

16             MR. SCHWARTZ:  Thank you, Your Honor.

17             And an individual with a weight of about 180 pounds

18   with a blood alcohol level .22, would you expect that amount

19   of alcohol in her system to effect her ability to remember

20   accurately?

21             MS. CARTER:  Objection.  Vague and incomplete

22   hypothetical.

23             THE COURT:  Well, that's overruled.  If you feel

24   you have enough to pose an answer, you may do so.

25             THE WITNESS:  Sure.  At an alcohol level of .22, an
```

```
 1    individual's memory is definitely affected.  Various aspects

 2    of the memory are affected regardless of weight or gender or

 3    other factors that may come into play.

 4

 5    BY MR. SCHWARTZ:

 6    Q.   Based on your 40 plus years in both educational,

 7    background, training as well as your field training, would

 8    you expect a blood alcohol level with a .22 with that weight

 9    being able to affect that individual's ability to perceive

10    reality?

11              MS. CARTER:  Objection.  It's vague.

12              THE COURT:  Sustained.

13    BY MR. SCHWARTZ:

14    Q.   Do you know how a .22 amount of alcohol in a person's

15    bloodstream at a weight of 180 pounds for a female, do you

16    know if that would have an affect on that individual's

17    ability to perceive what's going around them realistically?

18              MS. CARTER:  Objection.  Vague.

19              THE COURT:  Yes.  Could we have some time factor

20    with regard to an hour after consumption, a day after

21    consumption, whatever.

22              MR. SCHWARTZ:  I'll try to break it down,

23    Your Honor.  I'm sorry.

24    BY MR. SCHWARTZ:

25    Q.   Let me ask you this, Mr. Fort.  You've also in your
```

 1    expertise been able to calculate a person's blood alcohol

 2    level based on reading at a given time and worked backwards;

 3    is that correct?

 4    A.    Yes.

 5    Q.    And you've also been able to extrapolate that reading to

 6    a future time on how much alcohol they would lose per hour;

 7    is that correct?

 8    A.    Yes.

 9    Q.    What's the average amount of alcohol that a person would

10    lose per hour if no further consumption of alcohol is

11    occurring in that hour?

12    A.    An individual eliminates alcohol at a rate of about .02

13    percent each hour.  Maybe a little less or maybe a little bit

14    more, but on an average about .02 percent each hour.

15          THE COURT:  So it's regardless of the person's

16    weight and height?

17          THE WITNESS:  Yes.  Those factors have to do with

18    what alcohol level will be created.  In other words, if an

19    individual at 200 pounds drinks five beers while reading

20    compared to an individual at a 100 pounds, they would

21    obviously get different alcohol levels.

22          But after their body expresses a certain blood

23    alcohol level .10 or .20 or whatever, that alcohol is being

24    eliminated at a pretty linear rate of about .02 per hour.

25    It's a function of, the enzymatic function of the liver

1   primarily.  So you see that elimination curve until they get

2   back down to zero.

3            THE COURT:  Go ahead.

4   BY MR. SCHWARTZ:

5   Q.   If an individual with a blood alcohol level .22 if that

6   alcohol was drawn at a time of 4 o'clock in the afternoon,

7   what would expect with no further consumption after the

8   alcohol was drawn, what do you expect her alcohol to be at

9   6:00 p.m.?

10  A.   Okay.  I'm sorry.  Repeat that.

11  Q.   Sure.  An individual whose blood alcohol was taken at

12  4 o'clock in the afternoon and the level was .22, no further

13  alcohol consumption.  What would you expect the blood alcohol

14  level to be two hours later at 6:00 p.m.?

15  A.   It would -- her alcohol levels would have dropped about

16  .04 in those two hours.  So you would be looking at if you

17  started with .22, a couple hours later it would be down to

18  about .18.

19  Q.   And based on your educational background and your

20  in-field training experience, would a .18 alcohol level

21  affect the individual's ability to perceive what's going an

22  around them?

23           MS. CARTER:  Objection.  Vague.

24           THE COURT:  Sustained.

25  BY MR. SCHWARTZ:

1   Q.   Would it affect your ability to perceive or listen to

2   commands or directions?

3   A.   It would adversely affect that entire process not only

4   of the listening to directives, but the analysis of the

5   directive and then a response to that directive, yes.

6   Q.   And why is that?

7   A.   It's specifically because of how alcohol affects the

8   brain in the nervous system.  The effect is from front to the

9   back of the brain which means that the smart part of the

10  brain and the mental processes are affected long before we

11  see the more common effects that we associate with alcohol

12  with being clumsy or staggering or that sort of thing.

13          So within this mental context, the adverse affect

14  of the alcohol, you had a whole -- a large number of factors

15  that are being adversely affected not just an isolated

16  factor, but a collection of factors are being adversely

17  affected.

18  Q.   And if an individual had a blood draw of .22 blood

19  alcohol at 5 o'clock in the afternoon, with no further

20  alcohol consumption, what would you expect their level to be

21  at 6 o'clock?

22  A.   They had a blood draw at 5 o'clock of .22?

23  Q.   Correct.

24  A.   At 6 o'clock it would be down to about .20.

25  Q.   Now, you noted a few moments ago that the effects of

1  alcohol in the system begin really in the brain and how the

2  brain works, but they don't manifest physically until after

3  they've already manifested in the brain; is that correct?

4  A.   Right.   Alcohol works from the front to the back from

5  the more sophisticated to the primitive part of your brain

6  which controls balance and coordination.

7  Q.   Based on your educational background, experience and

8  also your time in the field, is there a level of alcohol

9  generally speaking where you start seeing the effects on the

10  part of the brain you talked about?

11          MS. CARTER:  Objection.  Vague.  See the effects.

12          THE COURT:  Yes, that's --

13  BY MR. SCHWARTZ:

14  Q.   Is there a front part of the brain or is there a level

15  in the system generally speaking where you expect to see the

16  effects mentally on an individual before you see them

17  manifesting physically?

18          MS. CARTER:  Objection.  It's still vague.

19          THE COURT:  Do you understand the question?

20          THE WITNESS:  Yes, I did.

21          THE COURT:  Overruled.

22          THE WITNESS:  There really isn't a specific number

23  or a specific level, because as I think it was mentioned,

24  there's the effect, and then eventually, you will see a

25  manifestation of the effect.  But that's really determined by

```
 1   the circumstances and the individual's drinking habits or

 2   experience with alcohol.

 3            In other words, if you had an individual that very

 4   rarely drinks, only has a drink say on a birthday or

 5   anniversary, we would see the effect on the front part of the

 6   brain at a very low level.

 7            With a more accomplished drinker, there would be an

 8   effect, but the manifestation of it would be at a higher

 9   level in terms of learned behavior starting to deteriorate in

10   the individual's behaving in a somewhat more conspicuous

11   manner.

12            MR. SCHWARTZ:  May I have a just a moment,

13   Your Honor?

14            THE COURT:  Of course.

15   BY MR. SCHWARTZ:

16   Q.   Mr. Fort, based on your experience, what is the legal

17   limit for an alcohol level in the blood for a person to be

18   allowed to drive a car in the State of California?

19   A.   The statutory violation is at .08, decimal level eight

20   percent.

21   Q.   And have you testified as an expert regarding your

22   opinion about whether or not a person would be considered to

23   be impaired to drive in California based on the facts given

24   to you by counsel at trial?

25   A.   Well over a thousand times, yes.
```

```
 1    Q.   And based on your experience, would you expect to see
 2    some form of manifestation of impairment, for instance
 3    driving, at that level?
 4    A.   If the individual is actually subjected to that legal
 5    process, I would anticipate outward manifestations of the
 6    effect, yes.
 7    Q.   Why is that?
 8    A.   If the effects were not evident, in all likelihood the
 9    individual, unless an actual alcohol measurement was taken,
10    the individual would not be detected in terms of effect.
11            MR. SCHWARTZ:   Nothing further at this time,
12    Your Honor.
13            THE COURT:   Cross-examination, Ms. Carter.
14                      CROSS-EXAMINATION
15    BY MS. CARTER:
16    Q.   Mr. Fort, you testified before in my voir dire of you
17    that there was a data curve on how alcohol is absorbed and
18    eliminated by the body; isn't that correct?
19    A.   Yes.
20    Q.   Now, the data curve means that not everybody who you
21    look at either in your tests or in your field work absorbs
22    alcohol the same; correct?
23    A.   That's evidenced by the data that's expressed by means
24    of a curve.
25    Q.   The reason there is a curve, isn't there, because
```

1    different people have different results for having absorbed

2    alcohol so they'll fall in a different place along a curve;

3    correct?

4    A.   The time it takes for the alcohol to be absorbed, the

5    eventual alcohol reading, all of that will be evidenced by a

6    blood alcohol curve.  How the alcohol is eliminated is also a

7    part of the curve.

8    Q.   The fact that there is a curve means that different

9    individuals absorb alcohol differently; correct?

10   A.   It's absorbed in the same way, but it's absorbed at

11   different rates depending on a large number of factors.

12   Q.   It takes different people different amounts of time to

13   absorb alcohol; correct?

14   A.   Yes.

15   Q.   And that's why you see a data curve; correct?

16   A.   It's expressed, it can be expressed in that way, yes.

17   Q.   And otherwise everyone would just fall in the same place

18   and it would just be a point or line on a graph instead of a

19   curve on the graph; correct?

20   A.   If everybody was the same, you wouldn't have to study it

21   I suppose.

22   Q.   And people all eliminate alcohol at different rates as

23   well, don't they?

24   A.   That's a much more restricted physiological process

25   because it's enzymatically driven.  It's driven by ADH or

1   alcohol dyhdrogenayse, so because of that elimination

2   process, that's why we can say persons eliminate or burn off

3   alcohol at a rate of about .02, maybe a little bit lower.

4   Some individuals, if they have more experience with alcohol,

5   another enzyme system kicks in so it's a little bit higher,

6   but as a rule of thumb or an average about .02 an hour.

7   Q.   So as you put it, more experienced drinkers or

8   alcoholics would eliminate alcohol more quickly; correct?

9   A.   If they have the additional enzyme that comes into play

10  as they're actively using alcohol, you can see an elimination

11  rate maybe in the range of .03 perhaps.  Every once in awhile

12  you run into someone at .04 an hour, and then as soon as

13  they're deprived of the alcohol, that system goes away and

14  just ADH is affected.

15  Q.   So more experienced drinkers or alcoholics on average

16  eliminate alcohol from their system faster, don't they?

17  A.   If that additional enzyme system is active.

18  Q.   Which it is more likely to be with more a experienced

19  drinker or alcoholic; correct?

20  A.   Not necessarily.  You can be an alcoholic and not abuse

21  alcohol to the extent, but if you're acutely using alcohol

22  and saturating the system, basically, what comes into play

23  the ADH needs help in ridding the body of that material of

24  that toxic substance so other the enzyme system helps out.

25  Then when the alcohol exposure is eliminated, then that

1   system becomes inactive.

2   Q.   Heavy drinkers eliminate alcohol more quickly on

3   average, don't they, because of this extra system that you

4   have been describing?

5   A.   Heavy drinker as that would describe acute exposure to a

6   large amount of alcohol with time and it's actually a pretty

7   short period of time, you will see a higher elimination rate

8   maybe .03 or .04 per hour, yes.

9   Q.   Now, the defendant in this case is paying you to testify

10  here today, isn't he?

11  A.   I have been retained by Mr. Schwartz's law firm.

12  Q.   And he's paying you, the defense counsel is paying you

13  to testify today; correct?

14  A.   Certainly hasn't bought my testimony, but he is paying

15  for my time, consulting time and also my appearance at court,

16  yes.

17  Q.   What's your hourly rate for consulting time?

18  A.   Hourly rate for consulting is 175 an hour.

19  Q.   What's your hourly rate for court time?

20  A.   The court appearance is billed at a flat rate of 1500

21  per day.

22  Q.   Now, when the defense asked you to testify, they gave

23  you some materials related to a woman named Angelica Vargas;

24  correct?

25  A.   Yes.

1    Q.   In preparing for your testimony today, however, you

2    didn't interview Angelica Vargas, did you?

3    A.   No, I didn't.

4    Q.   You didn't see Angelica Vargas on the night of

5    February 25th, 2005, did you?

6    A.   No, I didn't.

7    Q.   You didn't observe her ability to follow instructions or

8    commands, did you?

9    A.   No, I didn't.

10   Q.   You didn't observe any of the things that she observed

11   on February 25th, 2005, did you?

12   A.   No.

13   Q.   And you didn't interview her to determine what it was

14   that she perceived about what happened to her on

15   February 25th, 2005, did you?

16   A.   No.

17   Q.   The only information that you have about February 25,

18   2005 is what the defense gave you; correct?

19   A.   That's correct, yes.

20   Q.   You don't know what Ms. Vargas's -- you don't know when

21   Ms. Vargas' blood was drawn, do you?

22   A.   I believe so, yes.

23            MS. CARTER:  May I have permission to publish

24   Exhibit 57 for the jury and the witness?

25            THE COURT:  Go right ahead.  You may.

UNITED STATES DISTRICT COURT

1      MS. CARTER:  One moment.  May I just have a moment

2  before that exhibit comes up?

3      THE COURT:  Yes.

4      MS. CARTER:  I would first like to publish for the

5  jury and the witness Exhibit 49 which is in evidence.

6      THE COURT:  Very well.

7      MS. CARTER:  Could you please highlight under

8  specimen day and time taken.

9  Q.   Was Exhibit 49 shown to you by the defense in

10  preparation for your testimony today?

11  A.   Yes, it was.  I have that in my materials here.

12  Q.   And it's because of this document, isn't it, that you

13  say that you have some knowledge of when Ms. Vargas' blood

14  was drawn; correct?

15  A.   It has the time of 16:59 on that document, yes.

16  Q.   That was the time defense gave you for when Ms. Vargas'

17  blood was drawn; correct?

18  A.   No.  That's a published forensic alcohol report from

19  Bio-Tox Lab and it's authored by Maureen Black, so it's not

20  something that was created by the defense.

21  Q.   This is what the defense gave you to tell you when

22  Ms. Vargas' blood was taken; correct?

23  A.   I received documents in the materials I was to review,

24  yes.

25      MS. CARTER:  May I now publish for the witness and

1     the jury Exhibit 57, please?

2               THE COURT:  Go right ahead.

3     BY MS. CARTER:

4     Q.   And can you please highlight the middle portion of the

5     page that has horizontal lines on it.  The defense didn't

6     show you Exhibit 57, which has a time of 1600 on 2-25-05 for

7     a blood sample from Angelica Vargas, didn't it?

8               MR. SCHWARTZ:  Counsel is reading the document.

9     Timeline is subject to interpretation.

10              MS. CARTER:  This document is in evidence.

11              THE COURT:  You can rephrase your question.

12    BY MS. CARTER:

13    Q.   The defense didn't show you Exhibit 57, which has a date

14    of February 25th, 2005, a time of 1600 and a description of

15    property blood sample for Angelica Vargas, did they?

16              MR. SCHWARTZ:  Same objection.

17              THE COURT:  That objection is overruled.

18              THE WITNESS:  I have that document in my materials,

19    yes, ma'am.

20    BY MS. CARTER:

21    Q.   And the time on this is different, isn't it, than the

22    time on the Biotox report?

23    A.   It's very poorly written time and I'm not sure what it

24    refers to, but it does appear to be -- I don't know it's 16

25    and then what looks like a W that could be interpreted as two

 1    zeros.

 2            MS. CARTER:  I would now like to publish for the

 3    jury and the witness Exhibit 56 which is in evidence.

 4            THE COURT:  Go right ahead.

 5            MS. CARTER:  And specifically 2, and if you could

 6    highlight the top one-quarter of the page.

 7    Q.    Defense didn't show you Exhibit 56, did they, which

 8    shows several entries in early March 2005 related to a blood

 9    sample?

10    A.    I don't believe I was given that chain of custody

11    document to review, no.

12    Q.    You can please clear the exhibit.  Can a person who has

13    blood alcohol level of between .16 and .22 have a more

14    accurate recollection of events than someone who is

15    deliberately lying?

16    A.    I can't answer that question.

17    Q.    Can a person who has blood alcohol level of between

18    point .22 and .16 have a better recollection of events than

19    someone who is deliberately hiding facts?

20            MR. SCHWARTZ:  Objection, Your Honor.  Speculation,

21    vague, relevance.

22            THE COURT:  Sustained.

23    BY MS. CARTER:

24    Q.    Do you recall previously testifying that alcohol can

25    eventually impair someone's mobility?

UNITED STATES DISTRICT COURT

1   A.   Yes, it does.

2   Q.   Can a blood alcohol level of between .16 and .22 make

3   someone so drunk that they couldn't stand on their own?

4   A.   It certainly can if you're not a very experienced

5   drinker.

6   Q.   Can a blood alcohol level of between .16 and .22 make

7   someone so drunk that they can't run on their own?

8   A.   It certainly could, yes.

9   Q.   Now, in preparing for your testimony today, the defense

10  didn't ask you about the affects of blood alcohol level on

11  mobility, did they?

12  A.   Uh, yes.  Not -- not specifically to address that

13  mobility as such, but to address the effect of alcohol on the

14  individual's, Ms. Vargas' behavior, yes.

15  Q.   The defense didn't want you to address the effects of

16  alcohol on Ms. Vargas's mobility, did they?

17  A.   I believe that's an incorrect statement.

18          THE COURT:  Well, it's supposed to be a question so

19  answer it.

20          THE WITNESS:  Okay.  There was no directive of that

21  nature.

22  BY MS. CARTER:

23  Q.   The defense didn't ask you about the effects of alcohol

24  on Ms. Vargas' mobility, did they?

25  A.   Yes, they did.

1   Q.   They didn't ask you about it on direct examination, did

2   they?

3   A.   I believe that was discussed in my consultations with

4   Mr. Schwartz.

5        THE COURT:   Well, I don't believe that was the

6   question.   Would you ask it again, please.

7   BY MS. CARTER:

8   Q.   The defense didn't ask you about the affect of alcohol

9   on Ms. Vargas' mobility on direct examination, did they?

10  A.   No.

11  Q.   If someone had a blood alcohol level of .22, could not

12  stand or walk on their own, would they be able to do so at a

13  blood level of .20?

14       MR. SCHWARTZ:   Objection.   Vague.

15       THE COURT:   Sustained.

16  BY MS. CARTER:

17  Q.   If someone couldn't walk, you had previously described

18  how alcohol might affect a person's ability to stand or walk

19  on their own.   Do you recall that?

20  A.   Within the context of the effect on the more primitive

21  part of the brain, yes.

22  Q.   And you testified that it could affect somebody's

23  ability to stand or walk on their own depending on various

24  factors, including whether someone was a heavy drinker;

25  correct?

1    A.    Correct, yes.

2    Q.    Now, if you knew that someone couldn't stand or walk on

3    their own at a blood alcohol level of .22 percent, would they

4    have impaired mobility at point -- is it likely that they

5    would have impaired mobility when the blood alcohol in their

6    system had dissipated to .20 or .18 percent?

7    A.    Yes.

8              MS. CARTER:  May I have a moment, Your Honor?

9              THE COURT:  Yes.  Take your time.  Just be at ease,

10   ladies and gentlemen.

11             MS. CARTER:  I have nothing further, Your Honor.

12             THE COURT:  Redirect.

13             MR. SCHWARTZ:  Yes, Your Honor.  Thank you.

14                    REDIRECT EXAMINATION

15   BY MR. SCHWARTZ:

16   Q.    Mr. Fort, counsel just asked you several questions about

17   the effects of alcohol on mobility.  Do you recall that?

18   A.    Yes.

19   Q.    And she asked you if you would expect first of all, she

20   asked you whether we discussed the effects of alcohol on

21   Ms. Vargas specifically and mobility.  Do you remember that?

22   A.    Yes.

23   Q.    That was discussed, wasn't it?

24   A.    It was.

25   Q.    And to be able to have a determination about the alcohol

```
 1   level affecting an individual's mobility, would you have to
 2   know as an expert that individual's history of alcohol
 3   consumption?
 4   A.   Be very helpful, yes.
 5   Q.   Not just recent history, but overall what their normal
 6   consumption would be over the course of their life?
 7   A.   Yes.
 8   Q.   Basically in the colloquial as counsel used --
 9            THE COURT:  Well, this is leading.
10   BY MR. SCHWARTZ:
11   Q.   You would have to know if they were a heavy drinker or a
12   light drinker?
13            MS. CARTER:  Objection.  Leading.
14            THE COURT:  It's compound so ask it again.
15            MR. SCHWARTZ:  That's fine, Your Honor.
16   Q.   The levels that counsel asked you to address, do you
17   recall she asked you to address if a person would have -- if
18   a person had a .2 and had a problem standing was the first
19   part of her question.  Do you recall that?
20   A.   Yes.
21   Q.   Now, have you witnessed people at those levels
22   physically driving a car?
23   A.   Surely.
24   Q.   Have you witnessed people at .22 or even greater running
25   in your training in the field?
```

```
 1   A.   I have.
 2   Q.   Have you witnessed people at .20 or greater driving a
 3   car?
 4   A.   Yes.
 5   Q.   And also having some form of mobility of running, so to
 6   speak, have you witnessed that at those levels?
 7   A.   Yes.
 8   Q.   And you noted that the alcohol begins to manifest itself
 9   in the front part of the brain, which is the thinking part of
10   the brain; correct?
11        THE COURT:  Well, you can ask him if it's correct.
12   BY MR. SCHWARTZ:
13   Q.   Does alcohol manifest itself in the front part of the
14   brain before it manifests itself in the back part of the
15   brain?
16        MS. CARTER:  Objection.  Leading.
17        THE COURT:  Well, it's overruled.  You can answer.
18        THE WITNESS:  Yes.
19   BY MR. SCHWARTZ:
20   Q.   Which is part is the part that deals with mobility and
21   motor functions in your experience, the front or the back?
22   A.   Back, the more primitive part.
23   Q.   Counsel asked you if you recall the question, if a
24   person was at .22 blood alcohol level and could not stand or
25   walk on their own.  Do you recall that question?
```

1    A.    Yes.

2    Q.    And would that be something that would be common based

3    on your experience based on that blood alcohol level?

4    A.    Yes.

5    Q.    Would the fact that person was in a traffic collision

6    just prior to not being able to walk on her own, would that

7    be a factor about a person's mobility?

8              MS. CARTER:  Objection.  Calls for speculation.

9              THE COURT:  Sustained.

10   BY MR. SCHWARTZ:

11   Q.    Would there be a difference between how an alcohol level

12   such as .22 or .20 would affect somebody who is considered a

13   heavy drinker in their motor functions and motor skills as

14   compared to somebody who is not a heavy drinker?

15             MS. CARTER:  Objection.  Vague and also asked and

16   answered.

17             THE COURT:  It's overruled.  If you understand the

18   question, you can answer it.

19             THE WITNESS:  Yes.

20   BY MR. SCHWARTZ:

21   Q.    What would be the differences you would expect to see?

22   A.    Individuals that have more experience with alcohol,

23   would manifest the effect of alcohol much less, the outward

24   manifestation because of accommodation or adaptation.  A

25   novice or a social drinker or an inexperienced drinker in the

```
 1    range around .20, probably wouldn't be interacting.

 2              THE COURT:  Well, is that the same conclusion you

 3    would reach with regard to whether that person who is a heavy

 4    drinker would be able to follow commands or not?

 5              THE WITNESS:  The adaptation has more to do with

 6    the physical manifestation, but alcohol adversely affects

 7    mental as well as physical.  In other words, it doesn't make

 8    you smarter.  It just makes the effect of alcohol outwardly

 9    more evident in terms of balance and coordination and so on,

10    but it doesn't improve judgment, information processing,

11    comprehension and so forth.

12              THE COURT:  Go ahead.

13    BY MR. SCHWARTZ:

14    Q.   Based on the Court's question, it does not improve

15    judgment and mental acuity, does it actually adversely affect

16    that?

17    A.   It does.

18    Q.   And was there a difference in your studies about the

19    higher the level, the more affects or adverse affects?

20              MS. CARTER:  Objection.  Vague.

21              THE COURT:  Sustained.

22              MR. SCHWARTZ:  Nothing further at this time,

23    Your Honor.  Thank you.

24              THE COURT:  Something further?

25              MS. CARTER:  Yes, Your Honor briefly.
```

```
 1                      RECROSS-EXAMINATION

 2   BY MS. CARTER:

 3   Q.    You mentioned on redirect that it would be helpful to

 4   know the history of someone's alcohol consumption when

 5   assessing how alcohol might affect their mobility.  Do you

 6   recall that?

 7   A.    Yes.

 8   Q.    Wouldn't it also be helpful to know someone's history of

 9   alcohol consumption to assess how alcohol might affect their

10   recollection of events or other mental functions?

11   A.    Yes.

12   Q.    Because a heavy experienced drinker would also manifest

13   less impairment of recollection and mental functioning,

14   wouldn't they?

15   A.    They would not less mental factors, but less evidence of

16   alcohol effect.  In other words, if the individual is

17   observed, their behavior would not suggest as much the effect

18   of alcohol, but their mental faculties would not be improved

19   by that level of alcohol.

20   Q.    They wouldn't manifest as much mental impairment, would

21   they, as a less experienced drinker?

22   A.    Maybe not manifest, but would the effect be as profound

23   as a novice or inexperienced drinker, probably not.  But it

24   would not be evidenced as such.

25               MS. CARTER:  Object and move to strike the last
```

```
 1   portion as speculation.
 2           THE COURT:  The last portion will be stricken.
 3   BY MS. CARTER:
 4   Q.   If you knew that someone was unable to walk or stand on
 5   their own at a .22 blood alcohol level, wouldn't that make it
 6   more likely that they would be unable to run at a blood
 7   alcohol level of .20 or .18 all else being equal?
 8   A.   If that diminished behavior was due to alcohol effect, a
 9   lessening of one or two points would not remove that effect.
10   It would be basically the same.
11           MS. CARTER:  No further questions, Your Honor.
12           THE COURT:  Anything further of this witness?
13           MR. SCHWARTZ:  No.  Thank you, Your Honor.
14           THE COURT:  Thank you.  You are excused, sir.
15           THE WITNESS:  Thank you, Your Honor.
16           THE COURT:  We'll take a morning recess at this
17   time.  Everyone please rise.
18                     (Jury not present.)
19           THE COURT:  Outside the presence of the jury.
20           Any matters any counsel wish to take up at this
21   time?  If not, take about ten minutes.
22           MR. SCHWARTZ:  Thank you, Your Honor.
23                      (Recess taken.)
24           THE COURT:  We're again outside the presence of the
25   jury.  Any matters that any counsel wish to raise?  Hearing
```

```
 1    none, we'll bring the jury back.  Next witness, Mr. Schwartz.
 2    Who is that?
 3              MR. SCHWARTZ:  Andrew Hinz.
 4              THE COURT:  Please be seated, ladies and gentlemen.
 5              We'll continue with the defense.
 6              Sir, would you come forward to be sworn.  Right up
 7    on the witness stand, please.
 8              THE CLERK:  Please raise your right hand.
 9                      (Witness sworn.)
10              THE CLERK:  Please have a seat.  State and spell
11    your name for the record.
12              THE WITNESS:  Andrew Fredrick Hinz H-i-n-z.
13              THE COURT:  Go ahead, please.
14              MR. SCHWARTZ:  Thank you, Your Honor.
15                         DIRECT EXAMINATION
16    BY MR. SCHWARTZ:
17    Q.   Good morning, sir.
18    A.   Good morning.
19    Q.   Are you employed?
20    A.   No, I am not.
21    Q.   And did you formerly work for Taser International?
22    A.   Yes, I did.
23    Q.   What years did you work for Taser International?
24    A.   I worked for Taser International from January of 2004 to
25    October of 2011.
```

```
1            THE COURT:  Where do you reside, sir?  What city?
2            THE WITNESS:  Scottsdale, Arizona.
3   BY MR. SCHWARTZ:
4   Q.    Are you currently freelancing?
5   A.    Uh, yes, consulting.
6   Q.    You're self-employed?
7   A.    Yes.
8   Q.    And what was your assignment or job at Taser
9   International during those years?
10  A.    I was the Director of Medical and Technical Services.
11  Q.    What did that entail?
12  A.    Uh, that entailed I was the point of contact for
13  taser-related investigations and then also coordinated the
14  medical research internal and external for electronic control
15  devices.
16            MR. SCHWARTZ:  And Your Honor, if counsel may read
17  into the record a stipulation by both parties?
18            THE COURT:  Go right ahead.
19            MR. SCHWARTZ:  It's stipulation regarding
20  Government's Exhibit No. 54.  United States of America and
21  Defendant Anthony Sclafani hereby stipulate and agree that
22  Government's Exhibit 54 is a Taser X-26 cartridge booked
23  under the name Sclafani used on Angelica Vargas February 26,
24  2005.  Contains the taser cartridge, probes and wire
25  fragments inspected and analyzed by Andrew Hinz October 21st,
```

```
 1    2010, and which are referenced in Government's Exhibits 88,

 2    89, and 90 and 91.  So stipulated.

 3              THE COURT:  Is that the stipulation that the

 4    government agreed to?

 5              MR. ARKOW:  Yes, Your Honor.

 6              THE COURT:  It will be received.

 7              MR. SCHWARTZ:  May I ask madam clerk to have placed

 8    in front of the witness Defense Exhibit 207?

 9              THE COURT:  Certainly.

10    BY MR. SCHWARTZ:

11    Q.   If you could turn the notebook to Exhibit 207.

12    A.   I'm there.

13    Q.   And can you look at those pages of that part of the

14    exhibit and let me know when you're done looking at them and

15    if they're familiar to you?

16    A.   I'm all set.

17    Q.   Do you recognize what Defense Exhibit 207 is?

18    A.   Yes, I do.

19    Q.   What is it?

20    A.   It's a report by done my concerning the probe analysis

21    that was sent to me.

22    Q.   And the probe analysis pursuant in this case are probes

23    that were, I guess, discharged from a taser?

24    A.   Yes.

25    Q.   And could you describe what kind of analysis you did?
```

A.   Um, I used an optical microscope to look at the probe

wire mount and also the probe air gap to determine if there

was any physical changes associated with the discharge of the

taser and to also estimate duration of that discharge if

there was physical changes present.

Q.   How could you do that?  How can you estimate the, I

guess, lack of a better term, the amount of time of the

discharge?

A.   Um, based on samples that I received in training classes

where probes are shot into human volunteers and generated a

database to show different amounts of physical changes and

then compare them to the discharge to the evidence which I am

analyzing and then estimating the time.  If the circuit was

completed and to estimate the time.

Q.   And with those physical changes, there was a carbon

build-up as well as melted insulation?

A.   Yes.

        MR. SCHWARTZ:  Your Honor, may I publish Defense

207?

        MR. ARKOW:  Objection, Your Honor.  It's not

admitted and the government oppose its admission.  It's a

hearsay document.

        THE COURT:  Do you wish to be heard?

        MR. SCHWARTZ:  Yes, Your Honor.  Shall I ask a few

more questions?

1    Q.   Looking at the first page of 207, do you recognize what

2    that page is?

3    A.   Page 1?

4    Q.   Yes.

5    A.   Yes.

6    Q.   What is that?

7    A.   Uh, page 1 of 207 is my analysis of the taser probe, the

8    address of who I'm making the report out to and my

9    preliminary report cover page.

10   Q.   How soon in time did you write the report when you made

11   the analysis?

12   A.   Um, I took the pictures on the 21st so that would have

13   been the day that I took the pictures, and then within the

14   next couple of days I wrote the report.

15   Q.   And was that report written by you in the course and

16   scope of your job as an analyst at Taser International?

17   A.   Yes.

18   Q.   Is it something that you have been trained to do?

19   A.   Yes.

20            THE COURT:  Objection is overruled.  It may be

21   received.

22            MR. SCHWARTZ:  Thank you, Your Honor.

23            MR. ARKOW:  It's still hearsay.

24            THE COURT:  It will be received.

25                 (Exhibit 207 was admitted.)

1          MR. ARKOW:  It's also prepared for litigation and

2     it's inadmissible.

3          THE COURT:  All right.  You made your record.

4          MR. SCHWARTZ:  May I publish it, Your Honor,

5     please?

6          THE COURT:  Go ahead.

7     BY MR. SCHWARTZ:

8     Q.   This is the report you just referenced a moment ago?

9     A.   Yes.

10    Q.   Now, in your analyzing of these particular probes, were

11    you able to determine the amount of time that the actual

12    taser or the probes were conducting electricity?

13    A.   Based on the amount of physical changes, I estimated it

14    was no less than two seconds and no greater than five

15    seconds.

16    Q.   For this particular set of probes.

17    A.   For this particular set of probes.

18    Q.   Now, would there be any change in the physicality of the

19    probes as you just related if the probes were shot from a

20    taser, but there was no closing of the circuit?

21    A.   Can you rephrase that for me?

22    Q.   Yes.  You mentioned a moment ago one of the things that

23    you have to take into account is that there has to be a

24    closing of the circuit when that taser was deployed; is that

25    correct?

1    A.    Correct.

2    Q.    What if probes shot were into individual and the circuit

3    was not closed?  Would that affect a change in the

4    physicality of the probes?

5    A.    No.  There would be no, there would be little or none

6    physical changes to the probes and the device would arc in

7    front of the gun.  It wouldn't be conducting electricity down

8    the range so it would arc in front of the device.

9    Q.    And in your experience that arc makes a clicking sound;

10   correct?

11   A.    Correct.

12   Q.    And if there was some change where one of the probes or

13   both of the probes ended up having enough time to actually

14   effectuate a closing of the circuit, would that then

15   effectuate a change in the physicality of the probes?

16   A.    Can you rephrase that?

17   Q.    Sure.  If the probe -- if the probes are shot out of a

18   taser and there was no closing of the circuit, but eventually

19   the circuit was completed, would that completion effectuate a

20   change in the probes physically?

21   A.    Yes.

22   Q.    You would expect to see a carbon build-up?

23   A.    I would expect to see physical changes to the surface

24   scoring, pitting, carbon buildup on the surface, melting of

25   the installation on the wire.

```
 1   Q.    Those are things you saw in this case; correct?

 2   A.    Correct.

 3   Q.    And you were able to determine or quantify the amount of

 4   time that electricity flowed through based on those different

 5   factors?

 6   A.    When compared to the samples, yes.

 7   Q.    Now, if there were multiple activations of a taser with

 8   the same set of probes, would you be able to determine which

 9   activation actually had the circuit closed?

10   A.    No, I would not.

11   Q.    So based on this test, you could determine at least one

12   had been a closed circuit?

13              THE COURT:  That's leading.

14              MR. SCHWARTZ:  Thank you, Your Honor.

15   Q.    From this test you determined if there was even more

16   than one activation of the taser probes?

17   A.    Can you repeat the question?

18   Q.    From the testing you did in this case, could you

19   determine if there's more than one activation based on your

20   tests?

21   A.    Yes.

22   Q.    Those activations not a closing circuit, just the fact

23   that the probes were shot and there was an activation, could

24   you tell that?

25   A.    Yes.
```

```
 1    Q.   What could you tell?
 2    A.   I could tell that there was one circuit that was
 3    completed of between no less than two seconds and no greater
 4    than five seconds.
 5    Q.   Could you tell that -- strike that.  You could tell one
 6    circuit was completed; correct?
 7    A.   Yes.
 8    Q.   Could you tell if that -- other activations were not
 9    completed circuits?
10    A.   No.  I could only see that there was one completed
11    circuit through those probes.
12              MR. SCHWARTZ:  Have just a moment, please
13    Your Honor?
14              THE COURT:  Of course.
15              MR. SCHWARTZ:  Nothing further at this time,
16    Your Honor.
17              THE COURT:  Cross-examination, Mr. Arkow.
18                        CROSS-EXAMINATION
19    BY MR. ARKOW:
20    Q.   Your inspection of the taser probes that were shot by
21    Defendant Sclafani's taser concluded that those probes
22    completed an electrical circuit in the target where the
23    probes struck; is that correct?
24    A.   Can you rephrase that?
25    Q.   Your inspection of the taser probes, that's Government's
```

1    Exhibit 54, Defendant Sclafani's taser probe, your inspection

2    concluded that those taser probes if they struck an

3    individual, completed an electrical circuit through that

4    individual's body?

5    A.   Yes.

6    Q.   And that means that electricity flowed from Defendant

7    Sclafani's taser gun through the wire through the probe

8    through the person's body and then out through the other

9    probe in the person's body through the wire for a complete

10   electrical circuit?

11   A.   Yes.

12   Q.   And that means that the taser shocked that person's

13   body.

14          THE COURT:  Are you asking?

15          MR. ARKOW:  What?

16          THE COURT:  Are you asking?

17   BY MR. ARKOW:

18   Q.   Does that mean that the taser probe from Defendant

19   Sclafani's taser shocked that person's body?

20   A.   Yes.

21   Q.   That means that -- does that mean that there was an

22   electrical circuit, an electricity went through the taser

23   probes through that person's body?

24   A.   Yes.

25   Q.   Are you familiar with the term neuromuscular

1    incapacitation?

2    A.    Yes.

3    Q.    Can you explain to the jury what that refers to?

4    A.    Neuromuscular incapacitation is that the taser produces

5    19 pulses per second of a particular wave form and the device

6    fires for five seconds.  So once the circuit is completed, it

7    essentially tells that muscle group to turn on and off 19

8    times within that one second or for the default five-second

9    firing, which then results in what is called NMI.  It looks

10   like the muscle is frozen and then results in incapacitation.

11   Q.    Given your inspection of the Defendant Sclafani's taser

12   probe, does that mean the person whose body was struck by

13   these taser probes was subject to the effect of this

14   neuromuscular incapacitation?

15   A.    No.

16   Q.    What would determine whether the person would suffer the

17   neuromuscular incapacitation?

18   A.    It would have to -- it would have to be determined by

19   the amount of spread between those probes and the location in

20   the body where the probes impacted.

21   Q.    And if the spread was a certain distance, then the

22   person would be subject to neuromuscular incapacitation;

23   right?

24   A.    Yes.

25   Q.    What is that distance?

UNITED STATES DISTRICT COURT

1    A.    Uh, that is greater than 12 inches or more.

2    Q.    And if the distance was 12 inches or less and the person

3    was struck by the probes, the person would still feel the

4    pain of the taser?

5    A.    Yes.

6    Q.    And that pain that the person would feel whose body is

7    struck by the probes would be equivalent to the pain the

8    person would feel if the taser was used in the drive stun

9    mode on the person's body; correct?

10            MR. SCHWARTZ:  Objection.  Misstates the evidence.

11            THE COURT:  Overruled.  You may answer.

12            THE WITNESS:  From my personal experience, yes.

13   BY MR. ARKOW:

14   Q.    And that's painful?

15   A.    Yes.

16   Q.    Other than this one taser probe of Defendant Sclafani,

17   Government Exhibit 54, were you provided any other taser

18   probes to analyze for determining whether or not an

19   electrical -- whether there was a taser shot?

20   A.    I was just provided with these two probes and the two

21   wire housings.

22   Q.    Do you have any knowledge whether Defendant Sclafani

23   used any other taser probes in connection with any

24   activation?

25   A.    No knowledge.

1          MR. ARKOW:  May I have a moment, Your Honor?

2          THE COURT:  Of course.

3    BY MR. ARKOW:

4    Q.   And the taser probes that you analyzed were two taser

5    probes; correct?

6    A.   Yes.

7    Q.   And two taser probes relate to one cartridge?

8    A.   Yes.

9    Q.   Each cartridge, each taser deployment projects two taser

10   probes into the air into the person?

11   A.   Yes.

12   Q.   And if Defendant Sclafani used a second cartridge and

13   shot it at a person, it would be possible that the person

14   would feel additional taser shocks?

15         MR. SCHWARTZ:  Objection.  Speculation.  Lack of

16   foundation.

17         THE COURT:  Sustained.  You can ask if he knows.

18   BY MR. ARKOW:

19   Q.   Do you know if Defendant Sclafani used a second taser

20   cartridge and shot the tasers at a person would the person

21   feel additional taser shocks based on that shock?

22         MR. SCHWARTZ:  Objection.  Speculation.  Also

23   improper hypothetical.

24         THE COURT:  Overruled.  You may answer if you can.

25         THE WITNESS:  It's not enough information for me.

1    Can you rephrase the question because it seems to be two

2    different questions?

3    BY MR. ARKOW:

4    Q.   If Defendant Sclafani used another taser probe to shoot

5    at a person and that circuit was completed, would that person

6    feel an additional taser shock beyond the probe that you

7    analyzed?

8    A.   Yes.

9         MR. ARKOW:  Could I have one moment?

10        No further questions.

11        THE COURT:  Anything further of this witness?

12        MR. SCHWARTZ:  Yes.

13                    REDIRECT EXAMINATION

14   BY MR. SCHWARTZ:

15   Q.   The taser probes you analyzed were provide by the FBI;

16   correct?

17   A.   Correct.

18   Q.   Based on your training, do you recall the question asked

19   by counsel that you would expect there would have to be

20   larger than a 12-inch spread of those probes on the body with

21   proper contact for there to be a neuromuscular

22   incapacitation?

23   A.   Yes.

24   Q.   If there was less than a 12-inch spread, would that

25   effectuate based on your training a neuromuscular

1    incapacitation?

2    A.    It could depending on the individual based on my

3    experience and research that I have assisted in.

4    Q.    Would it also depend on where those probes were making

5    contact to the body?

6    A.    Yes.

7    Q.    Would it also depend on how well each probe made

8    contact?

9    A.    Yes.

10            MR. SCHWARTZ:  Nothing further at this time.

11            THE COURT:  Anything further of this witness?

12            MR. ARKOW:  Nothing further from the government.

13            THE COURT:  All right.  Thank you, sir.  You are

14    excused.

15            Would you come straight ahead.  Come straight up on

16    the witness stand, sir.  Right here.  Yes, straight ahead.

17    Right up on the witness stand, sir.

18            THE CLERK:  Please raise your right hand.

19                        (Witness sworn.)

20            THE CLERK:  Please have a seat.  State and spell

21    your name for the record.

22            THE WITNESS:  My name is Daniel Richard Tregarthen

23    my last name is spelled T-r-e-g-a-r-t-h-e-n.

24            THE COURT:  Go ahead, Mr. Schwartz.

25            MR. SCHWARTZ:  Thank you.

```
 1                      DIRECT EXAMINATION
 2   BY MR. SCHWARTZ:
 3   Q.   Mr. Tregarthen, are you employed?
 4   A.   I have my own business.
 5   Q.   What is that?
 6   A.   The name of the business is called Internal Affairs
 7   Connections, Incorporated.
 8   Q.   What do you do in relation to that business?  What is
 9   that business?
10   A.   It's a firm that conducts personal investigations for
11   public agencies and pre-employment background investigations
12   for police and fire.
13            THE COURT:  Where are you located, sir?
14            THE WITNESS:  I currently work out of my house in
15   Rancho Palos Verdes.
16            THE COURT:  Go ahead.
17   BY MR. SCHWARTZ:
18   Q.   And in regards to that business, what does that business
19   entail?  What do you do?
20   A.   Well, when the business initially started to conduct
21   internal affairs investigations and provide consulting for
22   police agencies in internal affairs investigations.
23   Q.   And what about your background and experience, your
24   training, I guess, would give you that kind of a background
25   for that kind of business?
```

A.    I spent 23-and-a-half years with the Los Angeles Police

Department.  I was promoted to sergeant in 1971.  In 1981 I

transferred to Internal Affairs division as a complaint

investigator.  It was a two-year assignment.  I was asked to

stay past the two years and was given a tour without any

restrictions as far as transferring out.  I became the

training officer for Internal Affairs division.

        I would take the place of the lieutenants when they

were gone for a long period of time and for a couple of days

at a time, I was taking the place of one of the captains when

they were gone.  In addition to that, I have a bachelor of

science degree from Pepperdine University.

        THE COURT:  In what field, sir?

        THE WITNESS:  Public management.

        When I left the Los Angeles Police Department, it

was due to a back injury and I had some restrictions on what

I could do.  There was an incident in Long Beach involving a

motorist by the name of John Jackson and without getting

into --

        THE COURT:  No, sir.  Thank you.

        THE WITNESS:  Long Beach hired me --

        THE COURT:  No, sir.


BY MR. SCHWARTZ:

Q.   And based on that background and experience, have you

 1    had training in writing reports based on those interviews?

 2    A.   Yes, I've received training and I've provided training

 3    and I've written manuals on the subject.

 4    Q.   And were you contacted by Desert Hot Springs Police

 5    Department back in 2005 to conduct an Internal Affairs

 6    investigation?

 7    A.   Yes, I was.

 8    Q.   And in the case of the complaint of Mr. Jamal White, do

 9    you remember that?

10    A.   Yes, sir.

11    Q.   And the officer being investigated was that Police

12    Sergeant Tony Sclafani?

13    A.   Yes.

14    Q.   Did you have a chance to interview Mr. Jamal White

15    pursuant to that investigation?

16    A.   There was a time when we met.  I tried to interview him.

17    It wasn't completed.

18    Q.   But did you have a chance to ask him questions about

19    what his version of the events, he being Jamal White?

20    A.   Yes.

21    Q.   And was that tape recorded?

22    A.   No.

23    Q.   Why not?

24    A.   He did not want to be tape recorded.

25    Q.   Did you take notes?

1    A.    I took notes.

2    Q.    And at some point from those notes did you make a

3    report?

4    A.    Yes, I did.

5    Q.    And have you had a chance today to look over that report

6    that you wrote a number of years ago?

7    A.    Yes, sir.

8    Q.    And do you recall if Mr. White told you how many times

9    he had been tased on the night by client Tony Sclafani?

10   A.    Yes, sir.

11   Q.    How many times?

12   A.    There were two different incidents when he was tased.

13   One occurred on Ironwood and another one occurred at the jail

14   or outside the jail.  I believe he told me he was tased twice

15   on Ironwood, and then again when he was at the jail.

16   Q.    Do you recall that specifically or would it refresh your

17   recollection to look at the report?

18   A.    I might need the report for that.

19           MS. CARTER:  Objection, Your Honor.  Move to strike

20   the last answer as improper evidence under 804 B(1).  I'm

21   sorry.  Under 801 as improper extrinsic evidence.

22           THE COURT:  Did you wish to offer anything,

23   Mr. Schwartz?

24           MR. SCHWARTZ:  Yes, Your Honor.  It's not being

25   offered for the truth of the matter asserted.  Merely

```
 1    impeachment for multiple versions of the same event.
 2              MS. CARTER:  Nevertheless, it's improper under 801
 3    D(1)(a).
 4              THE COURT:  I'm gonna overrule the objection.  Go
 5    ahead.
 6              MS. CARTER:  Your Honor, may I request that the
 7    jury be instructed this testimony is not being offered for
 8    the truth of the matter?
 9              THE COURT:  Yes, it's not being offered for the
10    truth of the matter.  Offered again for what reason?
11              MR. SCHWARTZ:  Multiple versions of the same event.
12              May counsel have the clerk give a copy of the
13    report to Mr. Tregarthen.
14              THE COURT:  You may.
15    BY MR. SCHWARTZ:
16    Q.   Mr. Tregarthen, take a look, don't read anything out
17    loud to the jury to familiarize yourself.  Let me know when
18    you've had a chance to do that.
19    A.   Yes, I have read that.
20    Q.   And you recognize what that is?
21    A.   This is the portions of the document that I created when
22    I conducted the investigation on a complaint made by
23    Mr. White.
24              THE COURT:  Is there a date?
25              THE WITNESS:  The date?  I submitted it on June 26,
```

1    2005.

2    BY MR. SCHWARTZ:

3    Q.   And you noted a moment earlier Mr. White had described

4    to you being tased on Ironwood; is that correct, just for

5    foundational purposes?

6    A.   Could you repeat that, please?

7    Q.   A moment earlier you noted that Mr. White had described

8    to you being tased on Ironwood?

9    A.   Yes, sir.

10          THE COURT:  Would you put that report aside now.

11   You have read it.  Have you read it, sir?

12          THE WITNESS:  Yes, I have.

13          THE COURT:  Well, put it aside, please.

14   BY MR. SCHWARTZ:

15   Q.   And where on Ironwood did Mr. White, if you recall, tell

16   you he had been tased, if you recall?

17   A.   The first incident he said he was tased was in a police

18   car and that was on Ironwood east of Palm Drive.  The second

19   time he was tased was at the police station.

20   Q.   And did Mr. White tell you how many times all together

21   he remembered being tased?

22   A.   I thought it was three times.

23   Q.   Would it refresh your recollection to see your report?

24   A.   Yes.

25   Q.   Turn to the back page with the Post-It on it and read to

```
 1   yourself and let me know when you had a chance to do so.
 2   A.   Okay.  I have read it.
 3   Q.   And does that refresh your memory about how many times
 4   Mr. White told you he had been tased all together that night?
 5   A.   Yes, it was three times.
 6   Q.   Based on your recollection first, did he seem to be sure
 7   about that or unsure?
 8   A.   He seemed certain about that.
 9             MR. SCHWARTZ:  Just a moment Your Honor, please?
10             THE COURT:  You may.
11             MR. SCHWARTZ:  Nothing further at this time,
12   Your Honor.
13             THE COURT:  All right.  Cross-examination,
14   Ms. Carter.
15             MS. CARTER:  Thank you, Your Honor.
16                       CROSS-EXAMINATION
17   BY MS. CARTER:
18   Q.   The person named Anthony Sclafani that we have been
19   referring to, do you know who that person is?
20   A.   I'm having trouble hearing you, ma'am.
21   Q.   Do you know who Anthony Sclafani is?
22   A.   Yes, I do.
23   Q.   You know him, don't you because you conducted
24   investigations into complaints of excessive force against him
25   by Jamal White and Angelica Vargas; correct?
```

1    A.   Yes, ma'am.

2    Q.   And that was in April of 2005; correct?

3    A.   Yes.

4    Q.   Had you ever met Anthony Sclafani before that?

5    A.   No, I had not.

6    Q.   How would you characterize your current relationship

7    with Anthony Sclafani?

8    A.   Well, characterize I talked to him twice with regard to

9    Internal Affairs cases as an accused, maybe some other times

10   during that time period.  And then maybe about a year ago, I

11   had a phone conversation with him.  Other than that, I can't

12   really characterize my relationship with him because there is

13   none.

14   Q.   Now, the person that we're talking about Anthony

15   Sclafani, do you see him sitting in the courtroom today?

16   A.   Yes, ma'am.

17   Q.   Can you describe for the jury what he is wearing and

18   where he is sitting?

19   A.   He is sitting on the -- at the defense counsel in the

20   middle.  He is wearing either a black or navy blue suit.

21            THE COURT:  Indicating for the record the Defendant

22   Sclafani.

23

24   BY MS. CARTER:

25   Q.   Now, your telephone conversation with the defendant

1    about a year ago, defendant called you, didn't he?

2    A.    Yes, ma'am.

3    Q.    And he talked to you about this case, didn't he?

4    A.    I don't think we talked the specifics of the cases.  He

5    talked about that he was under investigation and maybe had

6    been arraigned on some charges, but I doubt very seriously we

7    would have talked about the particulars of the case.

8    Q.    He called you and told you that he had been arraigned on

9    charges in this case; correct?

10   A.    Yes.

11   Q.    What else did he tell you about the charges?

12   A.    Only that it was involving some of the witnesses that I

13   had interviewed on cases for Desert Hot Springs.

14   Q.    Was that including Angelica Vargas and Jamal White?

15   A.    I'm not sure if we talked about their names

16   specifically.

17   Q.    Did he reference those two complainants even if not

18   specifically by name?

19   A.    I believe so.

20   Q.    What did he say to you about those two complainants?

21   A.    I think the topic had to do with he had obtained legal

22   counsel and that I would be receiving a phone call from

23   either an attorney or investigator in his behalf and he

24   wanted to know if I would cooperate.

25   Q.    What did you tell him?

1    A.    I told him I would cooperate.

2    Q.    Now, defendant also called you a couple of times during

3    the FBI investigation that lead to this case, didn't he?

4    A.    I believe there was only the one phone conversation.

5    Q.    Did you meet with the FBI agents in October of 2011?

6    A.    Did I talk to an agent in 2011?

7              THE COURT:   Just a minute.   Is that what you asked?

8              MS. CARTER:   I can rephrase.

9              THE COURT:   Please.

10   BY MS. CARTER:

11   Q.    Did you meet with FBI agents and an Assistant United

12   States Attorney at your residence in October of 2011?

13   A.    Yes, I did.

14   Q.    During that time didn't you tell the government that the

15   defendant had called you a couple of times during the FBI

16   investigation that lead to this case?

17   A.    I don't have any recollection of Sclafani calling me

18   other than that one time, and I don't have any recollection

19   of telling the FBI investigators that he called me several

20   times.

21   Q.    Might it refresh your recollection to review a report of

22   the interview that you had at your residence with the FBI and

23   the U.S. Attorney's Office in October of 2011?

24   A.    What was that?

25   Q.    Do you think it might refresh your recollection if you

1    reviewed a report of the interview that was conducted in

2    October of 2011 between yourself and FBI agents and the U.S.

3    Attorney's Office?

4    A.   It might, but I was not aware that there was a report.

5         MS. CARTER:  Your Honor, may I show this report

6    dated October 12, 2011 describing an interview on

7    October 7th, 2011 to defense counsel and then to the witness?

8         THE COURT:  Please.

9         MS. CARTER:  And may I give it to your clerk?

10        THE COURT:  Certainly.

11   BY MS. CARTER:

12   Q.   Could you please turn to the second to last paragraph on

13   the last page, page 4 of the report?  And let me know when

14   you had a chance to read it yourself.

15   A.   What paragraph am I reading?

16   Q.   The second to the last paragraph on page 4 of the

17   report.

18   A.   I have read it.

19   Q.   Does this refresh your recollection that defendant

20   called you a couple of times during the FBI investigation

21   that lead to this and stopped when he was indicted?

22   A.   No.

23   Q.   Does this refresh your recollection that defendant asked

24   you what he should do during the investigation?

25   A.   I don't know that I understand the question.

```
 1   Q.   Did defendant call you during the investigation of this

 2   case and ask you what to do in this investigation?

 3   A.   I see it says in the report --

 4            THE COURT:  No.  Ask it again, please.

 5   BY MS. CARTER:

 6   Q.   Did defendant call you during the investigation of this

 7   case and ask you what he should do during this investigation?

 8   A.   I think that was something we my have discussed.  I

 9   don't think he specifically asked me what should I do.

10   Q.   You had a discussion with him along those lines however?

11   A.   Yes, I did.

12   Q.   And that was during the investigation of this case?

13   A.   Yes, and --

14            THE COURT:  Just a minute.  Are you having a

15   problem, sir?

16            THE JUROR:  No, I'm listening.

17            THE WITNESS:  I don't know if the conversation took

18   place during the investigation or after the indictment.

19            MS. CARTER:  May I retrieve the document?

20   Q.   You gave the defendant some advice about what to do

21   during the investigation, didn't you?

22   A.   I thought it had more to do with courtroom demeanor.

23   Q.   You were sympathetic to him when you got his inquiries,

24   weren't you?

25   A.   I don't know that sympathetic would be the appropriate
```

```
 1    term.
 2    Q.    You weren't sympathetic to Jamal White, were you?
 3    A.    I'm not sure that it applies in the relationship that I
 4    would have had with a witness or complainant in an Internal
 5    Affairs case.  I needed to talk to him.  I needed to get
 6    information.  I was frustrated because he wouldn't cooperate.
 7    Q.    You didn't think he was a very good witness, did you?
 8    A.    No, I did not.
 9    Q.    When you did speak with Jamal White, you went to his
10    home; correct?
11    A.    Yes.
12    Q.    He wouldn't meet with you at a government building,
13    would he?
14    A.    No, he would not.
15    Q.    And when you got to his house, he told you he didn't
16    want to speak with you at all?
17    A.    Yes.
18    Q.    He told you he didn't want the interview taped, didn't
19    he?
20    A.    That's correct.
21    Q.    He wouldn't sign the admonishment that you read to him,
22    would he?
23    A.    No, he would not.
24    Q.    And in fact he told you that he had a lawyer and didn't
25    want to make a statement without his lawyer present, didn't
```

1    he?

2    A.    That's correct.

3    Q.    He told you that he was afraid of retaliation and didn't

4    want to provide any information, didn't he?

5    A.    Yes, that's what he said.

6    Q.    But you insisted on asking him questions anyway and

7    saying that the interview wouldn't take long, didn't you?

8    A.    I don't know that I would have told him that it wouldn't

9    take long, but I told him that it was important that I get

10   his statement.

11   Q.    You told him that you just wanted a few details, didn't

12   you?

13   A.    I didn't say a few details.  I needed to know the

14   details of the incident.

15   Q.    You kept questioning him even though he told you

16   repeatedly that he didn't want to talk to you, didn't you?

17   A.    That's not true.

18   Q.    You kept questioning him, didn't you?

19   A.    When he told me that he didn't want to talk anymore, I

20   wanted an explanation about it and then I left his house.

21   Q.    You kept asking him questions after he told you he

22   didn't want the interview videotaped, didn't you?

23   A.    No.

24   Q.    Is there a portion of the interview that was videotaped?

25   A.    No.

1    Q.   So your questions came after the decision not to

2    videotape Jamal White, didn't they?

3    A.   Not to videotape?

4    Q.   Yes.

5    A.   We don't videotape witnesses.  We audio tape them.

6    He --

7            THE COURT:  You've answered.

8    BY MS. CARTER:

9    Q.   You asked him questions after Jamal White told you he

10   didn't want to be taped, didn't you?

11   A.   Yes.

12   Q.   And you asked him questions after he told you that he

13   had an attorney and didn't want to answer questions without

14   his attorney present?

15           THE COURT:  That's asked and answered.  Go ahead to

16   something else.

17           MS. CARTER:  Yes, Your Honor.

18   Q.   Now, you testified that you didn't tell Mr. White that

19   you would just ask him a few details.  Do you recall that?

20           MR. SCHWARTZ:  Objection.  Misstates the testimony.

21           THE COURT:  That's overruled.

22           THE WITNESS:  I didn't tell him a few details.  I

23   wanted specific details about the incident.

24   BY MS. CARTER:

25   Q.   Didn't you write in your report Tregarthen advised

```
 1   Mr. White that he only wanted to know some of the details
 2   surrounding the incident when the officers used force after
 3   he was arrested?
 4   A.   That's correct.
 5   Q.   Now, when you spoke with the FBI in 2011, you chalked
 6   Mr. White's reluctance up to paranoia, didn't you?
 7   A.   Yes.
 8   Q.   You didn't take his fears seriously, did you?
 9   A.   I didn't take his what seriously?
10   Q.   Fears of retaliation seriously.
11   A.   I have a concern about that, but it seemed like his
12   fears were more imagined than anything else.
13   Q.   You didn't respect his wish to have his lawyer present
14   before he made any statements, did you?
15   A.   That's not true.
16   Q.   You didn't wait for his lawyer to be present before you
17   asked him questions, did you?
18   A.   There was never a time when we were gonna meet with his
19   attorney.  I set up several different meetings with
20   Mr. White.  The first time I talked to him, he said he would
21   agree to be at his residence and make a statement.  When I
22   called him --
23            MS. CARTER:  Objection.  Nonresponsive.  Move to
24   strike.
25            THE COURT:  It will be stricken.  Ask another
```

```
1    question.
2    BY MS. CARTER:
3    Q.   Jamal White didn't ultimately tell you his full side of
4    the story, did he?
5    A.   No, he did not.
6    Q.   Did you feel like Jamal White was trying to get rid of
7    you as you asked him questions?
8    A.   I don't know what was in his mind about why he wouldn't
9    talk to me.
10   Q.   You didn't interview Dennis Decker?
11   A.   No, I didn't.
12   Q.   Is that because Defendant Sclafani never listed him as
13   being present on his supplemental arrest report?
14   A.   That would be a reason.
15   Q.   The only other officer you interviewed besides defendant
16   about this Jamal White incident was the arresting officer
17   Matthew Drew; correct?
18   A.   Yes, ma'am.
19   Q.   Is that because Defendant Sclafani never listed any
20   witnesses in his supplemental arrest report?
21   A.   That's correct.
22   Q.   Now, you have testified about -- do you recall
23   testifying about your experiences as an L.A. Police
24   Department officer?
25   A.   Could you repeat that, please?
```

```
 1   Q.   Do you recall testifying about your experiences as an
 2   LAPD police officer?
 3   A.   Yes, ma'am.
 4   Q.   Were you also a detective at the Harbor patrol for six
 5   years?
 6   A.   Yes, ma'am.
 7   Q.   Were you also a patrol sergeant for the Southwest
 8   patrol?
 9   A.   Yes, ma'am.
10   Q.   Were you also a consultant and a contractor for the
11   Long Beach Police Department for 20 years?
12   A.   Yes, ma'am.
13   Q.   And then thereafter you owned your own internal affairs
14   consulting firm; correct?
15   A.   Not in that order.
16   Q.   How long have you owned your own internal affairs
17   consulting firm?
18   A.   Since 1989.
19   Q.   Based on all of this training and experience, even
20   though Jamal White refused to give you full information, did
21   you conclude that if you were the defendant transporting
22   Jamal White, you would have had another officer follow you
23   while you transported him?
24   A.   Yes, ma'am.
25   Q.   Based on your training and experience, did you perceive
```

```
 1    no legitimate law enforcement reason for defendant to have
 2    pulled over his patrol car if an arrestee was handcuffed and
 3    caged in the back seat?
 4              MR. SCHWARTZ:  Objection.  Relevance.
 5              THE COURT:  Overruled.  You may answer.
 6              THE WITNESS:  There could be a reason to pull over.
 7    BY MS. CARTER:
 8    Q.   Didn't you tell the FBI when you interviewed with them
 9    in October of 2011 that there was no reason why Sclafani or
10    any officer should pull over if an arrestee was handcuffed
11    and caged in the back of a patrol car?
12    A.   I don't remember telling them that.
13    Q.   Would it refresh your recollection to review the report
14    of the interview or might it refresh your recollection?
15    A.   We can try it again.  It didn't help the first time.
16              THE COURT:  Let's move on.
17    BY MS. CARTER:
18    Q.   Based on your training and experience whether someone is
19    handcuffed in the back of a patrol car is a factor in
20    determining whether to pull over and pepper spray the person
21    or just keep on driving, isn't it?
22              MR. SCHWARTZ:  Objection.  Relevance.
23              THE COURT:  Overruled.  You may answer.
24              THE WITNESS:  I can understand why you might pull
25    over.  I'm not sure why you might pepper spray them.
```

```
 1   BY MS. CARTER:

 2   Q.    In your assessment whether someone is handcuffed in the

 3   back of a patrol car is a factor; isn't it?

 4   A.    Yes, ma'am.

 5   Q.    Whether someone is handcuffed is a factor when using

 6   force in other situations, isn't it?

 7   A.    Yes, it is.

 8   Q.    Having someone handcuffed, can reduce the potential for

 9   injury to an officer, can't it?

10   A.    Yes, ma'am.

11   Q.    Having someone handcuffed, can reduce the risk that

12   person can escape, can't it?

13   A.    Yes.

14   Q.    Having someone handcuffed, could mean that an officer

15   has more options to use a lesser degree of force or avoid

16   force, couldn't it?

17   A.    That is correct.

18   Q.    Mr. Tregarthen, when you interviewed Angelica Vargas,

19   you didn't take her allegation seriously either, did you?

20   A.    I take all the allegations seriously.

21   Q.    In your interview with FBI in October of 2011, you

22   described her as a terrible witness, didn't you?

23   A.    She was not a very good witness, ma'am.

24   Q.    You complained to the government that Angelica Vargas

25   was crying during the interview.
```

```
 1              THE COURT:  Question.

 2    BY MS. CARTER:

 3    Q.   Did you complain to the government that Angelica Vargas

 4    was crying during the interview?

 5    A.   I don't know if I complained about it.  I stated that

 6    she was crying.

 7    Q.   Was that one reason she was a terrible witness?

 8    A.   There were other reasons.

 9    Q.   Was that one reason she was a terrible witness?

10    A.   I don't know that the crying was the reason that I

11    didn't regard her as being a good witness.

12    Q.   You told the FBI that she couldn't remember what

13    happened during the incident, didn't you?

14    A.   That's correct.

15    Q.   But she tell you, didn't she, she was sprayed with mace

16    and tased for no reason?

17              MR. SCHWARTZ:  Objection.  Hearsay.

18              MS. CARTER:  Your Honor, I'm not offering this for

19    the truth of the matter, but --

20              THE COURT:  It's overruled.  You may proceed.

21    BY MS. CARTER:

22    Q.   Angelica Vargas did tell you, didn't she, that she was

23    sprayed with mace and tased for no reason?

24    A.   Yes, ma'am.

25    Q.   She told you that at some point on the day of the
```

```
 1   incident she banged on the cell door to use the phone, didn't
 2   she?
 3              MR. SCHWARTZ:  Objection.  Hearsay again,
 4   Your Honor.
 5              THE COURT:  Overruled.
 6              THE WITNESS:  Yes.
 7   BY MS. CARTER:
 8   Q.   She told you when an officer opened the door, she
 9   stepped out believing she was being allowed to use the phone,
10   didn't she?
11   A.   Could you repeat the question?  I'm having trouble
12   hearing you.
13              MS. CARTER:  One moment, Your Honor.
14   Q.   Angelica Vargas told you, didn't she, that when an
15   officer opened the door, she stepped out believing she was
16   being allowed to use the telephone?
17   A.   I believe that's correct.
18   Q.   She told you, didn't she, that when she stepped out the
19   officer called her a smart ass and maced her, didn't she?
20              MR. SCHWARTZ:  Objection.  Double hearsay and
21   relevance.
22              THE COURT:  Overruled.
23              THE WITNESS:  I'm not certain about that.  I know
24   the macing part is correct.
25   BY MS. CARTER:
```

1   Q.   She told you that she began to gag because of the smell

2   of what she was sprayed with, didn't she?

3   A.   Yes.

4   Q.   Then she told you she began crying out in her cell for

5   fresh air, didn't she?

6   A.   Yes, ma'am.

7   Q.   She told you that someone opened the door again, didn't

8   she?

9   A.   Yes --

10        MR. SCHWARTZ:  Objection, Your Honor.  For

11   expediency, a running objection.

12        THE COURT:  You may have a running objection.

13   Overruled.

14   BY MS. CARTER:

15   Q.   And she told you that she was tased at that point and

16   called an ugly ass girl, wasn't she?

17   A.   Yes, ma'am.

18   Q.   She told you she was in pain and could not hold her

19   bladder and urinated on herself, didn't she?

20   A.   Yes, ma'am.

21   Q.   She told you that the officers pulled her from the cell

22   and allowed her to crawl outside, didn't she?

23   A.   Yes.

24   Q.   She told you that once she was out there, the officers

25   made comments about her and tased her again, didn't she?

1    A.    Yes.

2    Q.    She told you that the tasing ended when the officer who

3    maced her and tased her when she was outside said that he was

4    tired of her and allowed her to return to the jail, didn't

5    she?

6    A.    Yes.

7    Q.    She denied escaping, didn't she?

8    A.    Yes.

9    Q.    She denied obstructing the officers or being

10   uncooperative, didn't she?

11   A.    That is correct.

12   Q.    She denied assaulting or attempting to assault anyone,

13   didn't she?

14   A.    Yes.

15   Q.    She said that all she did was demand a telephone call

16   and fresh air, didn't she?

17   A.    Yes, ma'am.

18          MS. CARTER:  May I have a moment, Your Honor?

19          THE COURT:  You may.

20   BY MS. CARTER:

21   Q.    So Angelica Vargas did tell you a lot about what

22   happened to her on the night of February 25th, 2011 (sic),

23   didn't she?

24   A.    Yes.

25          MS. CARTER:  Nothing further.

1          THE COURT:  Redirect.

2          MR. SCHWARTZ:  Yes, Your Honor.  Thank you.

3

4                    REDIRECT EXAMINATION

5    BY MR. SCHWARTZ:

6    Q.   Did Angelica Vargas tell you if she had an anxiety

7    disorder at the time of the incident?

8          THE COURT:  Excuse me.  Tell you what?

9    BY MR. SCHWARTZ:

10   Q.   Did Angelica Vargas tell you she had an anxiety disorder

11   during the time of this incident?

12   A.   Yes, she did.

13         MS. CARTER:  Objection.  Relevance.  I'm not sure

14   that he's offering it for the same reason.

15         THE COURT:  On what basis are you offering it?

16         MR. SCHWARTZ:  Counsel be heard at side bar,

17   Your Honor?

18         THE COURT:  No, not at this time, but I'll let the

19   answer stand.

20   BY MR. SCHWARTZ:

21   Q.   You noted earlier on cross-examination that you felt

22   that Angelica Vargas was a terrible witness.  You remember

23   that?

24   A.   Yes, sir.

25   Q.   Why?

1    A.    She tended to ramble and get off the subject.  She

2    became hysterical to the point where she was nonresponsive.

3    Part of the conditions of the interview was that her common

4    law husband was allowed to sit in the interview with her and

5    he agreed that the interview couldn't go any further because

6    of her unresponsiveness.

7    Q.    And did Ms. Vargas tell you that she had drank alcohol

8    the day of the incident?

9    A.    Yes.

10   Q.    How much alcohol did she tell you she drank if you

11   remember?

12   A.    She said that she had a beer.

13   Q.    One beer?

14   A.    There may have been some other drinks, but specifically

15   she had a beer before the incident.

16   Q.    And did she tell you -- counsel asked you about

17   Ms. Vargas relating to you during that interview that at some

18   point the door was open and she stepped out.  Do you recall

19   that question?

20   A.    Yes.

21   Q.    Did Ms. Vargas tell you that she had been pounding on

22   the door before the door was opened?

23   A.    Yes.

24   Q.    Had she been yelling before the door was opened?

25   A.    Yes.

1    Q.   And did Ms. Vargas tell you that an officer with blond

2    spiked hair is one who maced her?

3    A.   Yes.

4    Q.   And that an officer, the officer with blond spiked hair,

5    is one who made the comment, the derogatory comment to her?

6    Did she tell you that?

7    A.   Yes, sir.

8    Q.   And did Ms. Vargas tell you after she was maced if she

9    had an anxiety attack or not?

10   A.   She did say that she had an anxiety attack.

11   Q.   Did she tell you whether or not she blacked out from

12   that anxiety attack?

13   A.   Yes.

14   Q.   What did she tell you?

15   A.   She did black out.

16   Q.   Did she tell you that because of her disorder, she was

17   prone to black outs?

18   A.   Yes.

19   Q.   She did tell you she was on any drugs or medication

20   because of her disorder at the time?

21   A.   She had a prescription, but she hadn't been taking the

22   prescribed medication.

23   Q.   Did she tell you what the prescription was for, what

24   drug?

25   A.   I believe it was Prozac.

1    Q.    And did Ms. Vargas tell you that the officer with the

2    blond spiked hair whether or not he was the one who tased

3    her?

4              THE COURT:  That's asked and answered.

5              MR. SCHWARTZ:  I believe it was mace, Your Honor.

6              THE COURT:  Go ahead.

7    BY MR. SCHWARTZ:

8    Q.    Did Ms. Vargas tell you whether or not the officer with

9    the blond spiked hair was the one who tased her?

10   A.    Yes.

11   Q.    What did she say regarding that?

12   A.    She was explaining the circumstances and I asked for a

13   description of the individual and she described that was the

14   best description she could give me.

15   Q.    That he was an officer with blond spiked hair?

16   A.    Yes.

17   Q.    And did Ms. Vargas describe to you whether or not during

18   this entire incident she was suffering from her anxiety

19   attacks?

20   A.    What was that again?

21   Q.    Did Ms. Vargas tell you whether or not during the entire

22   incident she was suffering from an anxiety attack?

23             MS. CARTER:  Objection.  Vague.

24             THE COURT:  Why don't you rephrase it.

25   BY MR. SCHWARTZ:

1   Q.   In the course of your interview with Ms. Vargas, did she

2   describe to you whether or not during the incident that she

3   had been maced and tased that she was suffering from an

4   anxiety attack?

5   A.   Yes.

6   Q.   And what did she tell you regarding that?

7   A.   The -- to begin with, she blacked out after the traffic

8   accident she had been involved in when the officer first got

9   there.  And then again she mentioned that she blacked out,

10  but I can't remember specifically right now if it was after a

11  tasing or a pepper spray and which of the two incidents.

12  Q.   And did Ms. Vargas relate to you that when she had been

13  tased by the officer, she heard a clicking or a popping

14  sound?

15  A.   Yes.

16  Q.   What did she say?

17  A.   That there was a popping sound.

18  Q.   A loud clicking or popping sound?

19  A.   Yes.

20  Q.   And do you recall when counsel asked you whether or not

21  you felt Mr. White was a good witness?  Do you recall that?

22  A.   Yes.

23  Q.   You said you did not feel Mr. White was a good witness.

24  You recall that?

25  A.   Yes.

1   Q.   Why?

2   A.   He was reluctant to answer my questions.  The process of

3   conducting a personal investigation involves obtaining

4   specific details surrounding incidents in order to get better

5   information about the investigation.  Mr. White didn't

6   provide that information.

7   Q.   Now, in the course of trying to interview Mr. White, did

8   you ever set up meetings with him where he had agreed to meet

9   with you and did not show up?

10  A.   Pardon me?

11  Q.   Did you ever set up meetings with Mr. White prior to

12  actually interviewing him, where he had agreed to meet with

13  you at a date and time and he did not show up?

14  A.   Yes, I did.

15  Q.   And as counsel asked you based on your training and

16  expertise, did you find Mr. White to be a credible witness?

17  A.   Credible?

18       MS. CARTER:  Objection.  Improper question,

19  Your Honor.

20       THE COURT:  Sustained.

21  BY MR. SCHWARTZ:

22  Q.   Did you find anything about Mr. White's version of the

23  events to be contradicted by the physical evidence you had

24  seen?

25  A.   Yes, I did.

1    Q.   Do you remember what that was?

2    A.   Yes, sir.

3    Q.   What was that?

4    A.   According to Mr. White, he was tased by Sergeant

5    Sclafani while in the police car and on Ironwood after

6    Mr. Sclafani had stopped.  When I checked Sclafani's taser,

7    it registers every time the taser is used and there was no

8    taser use at the time Mr. White said he was tased.

9    Q.   And counsel asked you whether or not a person being

10   handcuffed would have any kind of relevance to use of force.

11   You remember that?

12   A.   Yes.

13   Q.   Based on your training and experience, if a prisoner is

14   handcuffed, is he still considered dangerous?

15   A.   They are still dangerous, yes.

16   Q.   If the person is able to kick is he still considered

17   dangerous?

18   A.   Yes.

19            MR. SCHWARTZ:  Have a moment please, Your Honor?

20            THE COURT:  You may.

21   BY MR. SCHWARTZ:

22   Q.   As part of your investigation, did you interview Karen

23   Harper, Mr. White's girlfriend at the time?

24   A.   Yes.

25            MS. CARTER:  Objection.  Beyond the scope.

1          THE COURT:  It is beyond the scope.

2          MR. SCHWARTZ:  Nothing further at this time.

3          THE COURT:  Yes.  Recross.

4                    RECROSS-EXAMINATION

5     BY MS. CARTER:

6     Q.   When Angelica Vargas described the person who opened the

7     door and maced her, could she give a clear description of the

8     person?

9     A.   Was this when the door was first opened for her?

10    Q.   When the door was first opened for her after she had

11    been requesting a phone call and an officer opened the door

12    and maced her, could she give a clear description of who that

13    person was?

14    A.   No.

15    Q.   Were any of her descriptions of the officers

16    particularly clear?

17    A.   No.

18    Q.   Did Angelica Vargas describe being tased by two

19    different officers?

20    A.   Yes.

21    Q.   Was Angelica Vargas sure that the same officer who

22    opened the door and maced her when she was asking to make a

23    phone call was one of the officers who later tased her?

24    A.   I believe that's what she told me.

25    Q.   Now, defense counsel asked you something about whether

1    Ms. Vargas made statements about blacking out.  Do you recall

2    that?

3    A.   Yes.

4    Q.   Did Angelica Vargas say she blacked out or did she say

5    that she was close to blacking out?

6    A.   I think she said both.

7    Q.   Did Jamal White say that he had been pepper sprayed in

8    the back of the police car?

9    A.   Yes.

10   Q.   And was that consistent with defendant's statements in

11   his police report only where he admitted pepper spraying

12   Jamal White in the back of his police car?

13   A.   Yes.

14   Q.   If you knew that Jamal White had given several

15   statements to the FBI over the years and always maintained

16   that the first tase happened at the police station, do you

17   think that coupled with the difficult interview circumstances

18   that you described might make it possible that you

19   misunderstood where White said the first tasing occurred?

20            THE COURT:  That's an improper question.

21            MR. SCHWARTZ:  Thank you, Your Honor.

22            THE COURT:  Almost anything is possible.  Go ahead.

23   BY MS. CARTER:

24   Q.   Do you -- going back to where you said that the

25   discussion that of blacking out or being close to blacking

1    out, did Ms. Vargas tell you that she was blacked out or

2    close to blacking out during the tasing or as a result of the

3    tasing?

4    A.   As a result.

5              MS. CARTER:  May I have a moment, Your Honor?

6              THE COURT:  Of course.

7    BY MS. CARTER:

8    Q.   You mentioned that you reviewed the taser download as

9    part of your investigation of the Jamal White incident; is

10   that correct?

11   A.   Yes.

12   Q.   Did you also review taser downloads as part of the

13   Angelica Vargas investigation?

14   A.   Yes.

15   Q.   Do you recall which taser -- what taser downloads you

16   reviewed for the Jamal White incident?

17   A.   It would have been for Sergeant Sclafani's taser.

18   Q.   What taser downloads did you review as part of the

19   Angelica Vargas incident?

20   A.   I believe it was all of the officers that might have

21   been involved.

22   Q.   Did that include Defendant Sclafani?

23   A.   Yes.

24   Q.   Did that include Matthew Gutting?

25   A.   Yes.

1    Q.   For either the Jamal White or Angelica Vargas incidents,

2    did you review only one taser download for Defendant

3    Sclafani?

4    A.   I don't understand the question.

5    Q.   For -- how many taser downloads did you review for

6    Defendant Sclafani?  Just one or more than one?

7    A.   One for the Vargas and then another one for the White

8    case.

9    Q.   Who provided -- were these taser downloads provided to

10   you by the Desert Hot Springs Police Department?

11   A.   Yes.

12   Q.   Did Sergeant Radanomous Gill download all of the taser

13   downloads and provide them to you?

14   A.   Yes, ma'am.

15   Q.   The circumstances of the Jamal White interview were

16   difficult, weren't they?

17   A.   Frustrating, yes.

18   Q.   And that was because Jamal White didn't want to talk to

19   you, wasn't it?

20   A.   Ultimately, yes.

21   Q.   Do those difficult circumstances make it more likely

22   that you could have been mistaken about where Jamal White

23   said he was first tased?

24   A.   No, ma'am.

25             MS. CARTER:  May I have a moment, Your Honor?

1          THE COURT:  You may.

2    BY MS. CARTER:

3    Q.    Did you review taser downloads for 12 different officers

4    who were working the night of the Jamal White incident?

5    A.    No, I did not.

6          MS. CARTER:  Nothing further, Your Honor.

7          THE COURT:  Anything further of this witness?

8          MR. SCHWARTZ:  No, Your Honor.  Thank you.

9          THE COURT:  Thank you, sir.  You're excused.

10         We're gonna take a belated luncheon recess at this

11   time.  Sorry, we tried to finish this witness.  Everyone

12   please rise for the jury.

13                    (Jury not present.)

14         THE COURT:  All right.  Please be seated.  Outside

15   the presence of the jury.  I think this is the time,

16   Mr. Schwartz that you can make your Rule 29 motion for the

17   record as you had indicated previously.

18         MR. SCHWARTZ:  Thank you, Your Honor.  Since I have

19   indicated to the Court our previous position, I'll not

20   belabor it.  I'll make the motion pursuant to Rule 29 on both

21   counts and submit on previous comments that were outside the

22   presence of the jury.

23         THE COURT:  Very well.  That motion is denied.

24   We'll proceed.  You have a witness available at 2 o'clock?

25         MR. SCHWARTZ:  Yes Your Honor.

 1          THE COURT:  All right.  And you have enough

 2   witnesses to take us through the day, I take it?

 3          MR. SCHWARTZ:  I hope so.  I haven't checked

 4   outside in a few minutes, but I would hope so.

 5          THE COURT:  2 o'clock then.

 6          MR. SCHWARTZ:  Thank you.

 7                  (Lunch recess.)

 8          THE COURT:  Good afternoon.  We're again outside

 9   the presence of the jury.  I understand there is a matter to

10   be taken up.

11          MR. SCHWARTZ:  Yes, Your Honor.

12          THE COURT:  We'll start with you.

13          MR. SCHWARTZ:  Thank you, Your Honor.

14          We discussed with counsel our witnesses left.  One

15   was Chief Williams who was currently the Chief of Police at

16   Desert Hot Springs Police Department.  I related to counsel

17   our plans were to call him to testify to one, the difference

18   between an officer who is on probationary status as opposed

19   to permanent which did come with Officer Decker's testimony

20   regarding my client's status at the time.

21          THE COURT:  Is Chief Williams with the Department

22   back in 2005?

23          MR. SCHWARTZ:  No, but the rules regarding

24   probationary officers and their status hasn't changed.

25          THE COURT:  How can he tell us?

1          MR. SCHWARTZ:  He can tell us?  He can tell us his

2    experience based on he's been through the different ranks of

3    the administration and how that's been the kind of status for

4    a number of years.

5          THE COURT:  But can he tell us about the subject

6    time?  Can he tell us about 2005?

7          MR. SCHWARTZ:  I believe he can, Your Honor.

8          THE COURT:  Was he there?

9          MR. SCHWARTZ:  It's no different for Desert Hot

10   Springs Police Department than anywhere else in the State of

11   California.

12         THE COURT:  In 2005?

13         MR. SCHWARTZ:  Correct.

14         THE COURT:  How can he tell us that?

15         MR. SCHWARTZ:  Because he's familiar with the civil

16   service rules and procedures regarding Skelly hearings,

17   regarding an officer's status.  And one of the laws of the

18   State of California based on case law --

19         THE COURT:  Why can't we have a stipulation in that

20   regard?

21         MR. SCHWARTZ:  That's fine with me, Your Honor.

22   More than willing to stipulate to that fact.  The law is what

23   it is.

24         THE COURT:  Is there some reason the government

25   isn't stipulating to this?

1           MR. ARKOW:  Could we have a moment, Your Honor?

2           THE COURT:  You may.

3           MR. ARKOW:  Your Honor, I understand that defense

4    counsel made that representation, but defense hasn't provided

5    and the government is not aware of any evidentiary basis to

6    agree that that information is correct.  That is what

7    happened in Desert Hot Springs in 2005 the relevant time

8    period was true for every police department in all of

9    California.  The government is just not in a position to in

10   good faith agree to a stipulation in the abstract.  And even

11   if there were certain laws that could be pulled from

12   California rules or regulations, what's relevant is what the

13   practices and procedures were regarding officers on probation

14   at Desert Hot Springs in 2005.

15           THE COURT:  You have made your record.  I don't see

16   how Chief Williams testifies with regard to this offer that's

17   been made.  All right.  Do we have somebody else?

18           MR. SCHWARTZ:  Yes, Your Honor.  I also addressed

19   with counsel that we may just have one more witness left

20   other than Chief Williams and after him we would probably

21   rest.  I did discuss with counsel, there is a stipulation as

22   to one more piece of evidence which we'll announce on the

23   record, but they have a rebuttal use of force expert here

24   throughout the trial.  If we rest, we will not be putting on

25   the use of force expert in our case-in-chief and would be

1    objecting to a rebuttal use of force expert at that point.  I

2    think it would be irrelevant at that point.

3         There's been questions by the government to their

4    witnesses, specifically Eddie Cole, about use of force and

5    how he was specifically trained at Desert Hot Springs Police

6    Department based on the guidelines.  I don't think this

7    expert adds anything to that.  I don't think this expert was

8    there in 2005 during the taser training and use of force

9    training.  I think he cannot speculate as to how they

10   interpreted things backed in 2005 based on the addendum, how

11   they should have been trained or not trained.  He can't give

12   a legal opinion about a use of force or not because that's

13   the jury's purview.  I think he becomes irrelevant without an

14   expert on my side testifying to any training that's generally

15   given to police officers throughout the State, generally how

16   they would perceive things and their expectations.  There's

17   no evidence of that.  I think he would irrelevant in that

18   vein and we would be objecting to him as a rebuttal witness

19   on that basis.

20         THE COURT:  All right.  Ms. Carter, you wish to be

21   heard on that?

22         MS. CARTER:  Yes, Your Honor.

23         A couple of things.  First of all, as to the

24   remainder of Chief Williams testimony --

25         THE COURT:  I just said Chief Williams based on the

offer of proof that was given to me will not be testifying.

MS. CARTER:  Okay, Your Honor.  We had thought there might be another basis on which he would be offered. Then I'll move on.  With regard to the use of force expert, Your Honor, we believe there has been enough in there to warrant a rebuttal witness if the government were to so call one because several people who are not at Desert Hot Springs at the time and people who were Desert Hot Springs at the time, but even people who weren't, Mr. Tregarthen just testified, he testified about various use of force issues based on his training and experience, which although extensive, did not encompass Desert Hot Springs.  In addition there were many questions asked by the defense to put it in issue with regard to the government's case-in-chief --

THE COURT:  Well, I think there's probably been enough on cross-examination that there could be rebuttal.  It should be brief.

MS. CARTER:  Yes, Your Honor.

MR. SCHWARTZ:  Can I be heard on that last matter?

THE COURT:  Yes.

MR. SCHWARTZ:  Just for the record, I respect the Court's ruling.  The government asked those questions over objection of Mr. Tregarthen it was outside the scope of any kind of direct testimony, and it would seem to me to be disingenuous to cross-examine on an issue of that nature just

1    to allow yourself to put on a rebuttal witness who wasn't

2    cross-examined on this.  Defense never asked about it from

3    their own witness.

4           You also had Greg Meyer testify for them.  He

5    testified that he's a use of force expert.  He's also a taser

6    expert.  They sought no evidence of that when they had the

7    opportunity.  They did not give him any materials for that

8    purpose.  We didn't go into that with him either.  There's no

9    rebuttal for that.

10          We didn't ask Mr. -- as far as Detective Cole, that

11   was gone into by the government not by counsel.  Counsel went

12   into it on cross because the government went into it and

13   counsel needed to testify on particular training that

14   Detective Cole remembered the specifics at Desert Hot

15   Springs.  I don't believe this expert could testify to any of

16   those things.  Certainly not in 2005 and the training at

17   Desert Hot Springs and how it was interpreted by those

18   officers.  None of that.  If it's generalized, he can testify

19   to that.  I think at this point, we're wasting both parties

20   time.  We'll have our expert here first thing tomorrow at

21   9 o'clock for another brief rebuttal to their rebuttal.  To

22   be quite frank, I think both are a waste of time at this

23   point.

24          THE COURT:  Talk to each other whether you could

25   exclude that, it would be helpful.  Is there anything else?

1          MS. CARTER:  No, Your Honor, unless the Court would

2     like to hear further about the use of force rebuttal expert.

3          THE COURT:  As I said, I think Mr. Schwartz is more

4     on the money about this.  We're just really getting into

5     things that have already been covered.  Not sure what the

6     rebuttal except with regard to cross-examination and there

7     was objection to it as he rightfully points out, even though

8     those objections were overruled.

9          MS. CARTER:  May I be heard briefly, Your Honor?

10          THE COURT:  All right.

11          MS. CARTER:  Your Honor, I just respectfully want

12     to point out that I believe that it was the defense that got

13     into with Mr. Meyer the use of force issues not the

14     government.  The government did not proffer him as a use of

15     expert.  It was the defense that discussed that on

16     cross-examination and of course it was addressed then again

17     by the government, but I think that in addition the use of

18     force issue with Cole were certainly brought up by the

19     defense.  All the government did was introduce some policy

20     documents before Mr. Cole's testimony even began.  Then it

21     was the defense who first began questioning him about.  I

22     would just point to Mr. Tregarthen who the government did ask

23     him some questions about that, but in part because it related

24     to his role as an IA examiner and things he was saying about

25     the various witnesses that he was examining.  And certainly

1    the defense addressed it again on redirect.  So with that,

2    Your Honor, we would submit at this time and maybe it's

3    something that we should revisit at the close of the defense

4    case.  And at that point, maybe it's not something the

5    government intends to do.

6            THE COURT:  All right.  Do that.  I have indicated

7    that at this juncture if you can agree not to go into it any

8    further, it should be very brief.  That's all.  And at the

9    close of the case, I'm not going to change that.  It should

10   be brief.  All these matters have taken longer than they

11   should.  Let's bring the jury back, please.

12           Do you have the next witness?  Who is that next

13   witness?

14           MR. SCHWARTZ:  Sergeant Gus Paiz.

15           THE COURT:  Please be seated.

16                    (Jury present.)

17           THE COURT:  We will continue now with the defense

18   case.  Come straight ahead.  Come right up on the witness

19   stand to be sworn, please.

20           THE CLERK:  Please raise your right hand.

21                    (Witness sworn.)

22           THE WITNESS:  First name is Gustavo, G-u-s-t-a-v-o.

23   Last is Paiz, P-a-i-z.

24           THE COURT:  And do you have a middle name?

25           THE WITNESS:  Adolfo, A-d-o-l-f-o.

```
 1                    THE COURT:  Thank you.

 2              You may proceed.

 3                    MR. SCHWARTZ:  Thank you, Your Honor.

 4                         DIRECT EXAMINATION

 5    BY MR. SCHWARTZ:

 6    Q.    Mr. Paiz, are you employed?

 7    A.    Yes.

 8    Q.    How are you employed?

 9    A.    With the City of Desert Hot Springs Police Department.

10    Q.    What's your rank?

11    A.    Sergeant.

12    Q.    How long have you held that rank?

13    A.    For two years.

14                    THE COURT:  Sergeant, have you checked your weapon

15    before coming into the courtroom?

16                    THE WITNESS:  I'm not armed, Your Honor.

17                    THE COURT:  You checked your weapon.

18                    THE WITNESS:  No, I didn't bring a firearm into the

19    court.

20                    MR. SCHWARTZ:  Thank you, Your Honor.

21    BY MR. SCHWARTZ:

22    Q.    And before the rank of sergeant, what rank or position

23    did you hold?

24    A.    A police officer.

25    Q.    How long did you hold that position or that rank?
```

1   A.    For eight years.

2   Q.    AND how long you been with Desert Hot Springs Police

3   Department?

4   A.    Ten years.

5   Q.    Do you know when you started there, the date and the

6   month you started Desert Hot Springs?

7   A.    Yes.

8   Q.    What is that?

9   A.    June of 2001.

10  Q.    And you were working in Desert Hot Springs Police

11  Department back in the beginning of 2005.

12  A.    Yes.

13  Q.    And do you know my client seated right here?

14  A.    Yes, I do.

15  Q.    Who is he?

16  A.    Tony Sclafani.

17  Q.    How do you know him?

18           THE COURT:   Indicating for the record the

19  defendant.

20           MR. SCHWARTZ:   Thank you, Your Honor.

21  BY MR. SCHWARTZ:

22  Q.    How do you know him?

23  A.    He's my co-worker.

24  Q.    And back in 2005, was there a computer system that kept

25  track of records called the RIM system?

1    A.    Yes.

2    Q.    Were you familiar with that system back then?

3    A.    Yes.

4    Q.    And how was that system operated in relationship to

5    booking evidence and police reports?

6    A.    It would help us document the evidence that was booked

7    as evidence in whatever criminal case or whatever report that

8    you would take out in the field.

9    Q.    And what was the procedure for booking in evidence at

10   that time back in 2005 in relationship to the RIM's system?

11   A.    Whenever you obtained evidence, you would grab a

12   property control receipt which we would call a PCR, and you

13   would fill it out.  It would ask you questions as make,

14   model, description, and you would sign it and date it.

15   Q.    Okay.  What happened after that?

16   A.    And you would book the property into an evidence locker,

17   and you would retain the PCR with you.

18   Q.    Now, when an officer did that, booked the property into

19   an evidence locker and filled out a PCR, would there be any

20   notation on RIM's on that date that it was filled out and

21   booked into the evidence locker?

22   A.    If you happened to write the report that day, there

23   would be an entry, but if you didn't write the report that

24   day, it would not be entered into until you wrote the report.

25   Q.    So what is the catalyst for an entry on a case to be in

1    the RIM system?  Would it be the booking of the evidence or
2    the writing of the report?  If you can answer.
3    A.   I'm sorry, can you rephrase that?  I didn't understand
4    that.
5    Q.   Sure.  What event or events would be that would spark or
6    initiate a case being entered into the RIM system?
7    A.   It would be a criminal report, an arrest report, any
8    report into the RIM system.
9    Q.   So simply booking evidence into an evidence locker with
10   a PCR, would that initiate that evidence being placed into
11   the RIM system?
12   A.   Yes.
13   Q.   Without a report being written?
14   A.   Oh, no.  You need a report in order to book evidence.
15   Q.   So to clarify, if evidence is booked into the evidence
16   locker, and a PCR was filled out, but the report was written
17   later than the date that the evidence was booked in, would
18   there be any entry in the RIM system on that date, the date
19   of the booking of the evidence in the evidence locker?
20   A.   No.  There would only be what's on the PCR.  It could be
21   days, weeks or months before you actually went into the
22   report and documented the type of property that was booked as
23   evidence into the locker.  So the date on the PCR would not
24   necessarily correspond to the date in RIMS because the date
25   of the entry into the locker room is not gonna be the same as

1    the RIMS entry.

2    Q.    And back in the beginning of 2005, in your experience,

3    was it common or uncommon for officers to be behind in

4    reports?

5    A.    It was common.

6    Q.    And do you have any kind of an estimate if you know --

7    or from your own experience, how common was it for you to be

8    behind in reports back in 2005?

9    A.    The average for me was sometimes 35 to 45 reports.

10   Q.    Is that per week, per month?

11   A.    Uh, just at any given time cause we were so busy.  It

12   all depends how fast you completed your reports.

13   Q.    Now, if the evidence was booked in timely right after

14   the incident took place, but the report was written well

15   after the fact, would that be reflected in RIMS, the

16   difference in the dates?

17   A.    Not necessarily.  The . . . the entry in RIMS is gonna

18   reflect the date that you are writing that report.

19   Q.    Now, back in 2005, did the Desert Hot Springs Police

20   Department share the building with any other city facility?

21   A.    I know we shared the building with the whole city like

22   city halls, other city personnel.  I don't really recall at

23   2005.

24   Q.    And in 2005, the parking lot was in the Desert Hot

25   Springs Police Department, was that shared by civilian or

1    non-civilian employees working for the City?

2    A.    Yes.

3    Q.    And how many gates were there in that parking lot, the

4    entire parking lot back in 2005?

5    A.    Three.

6    Q.    And how were they activated to open and close to your

7    knowledge?

8    A.    Through a gate clicker.

9    Q.    Remote control?

10   A.    Yes.

11   Q.    Could they also be activated by a motion sensor?  Okay.

12   Were they also activated by a motion sensor?

13   A.    Uh, not of human -- of like a vehicle, of anything of a

14   big mass, if you will.

15   Q.    Like a car?

16   A.    Yeah.  Yes.

17   Q.    Now, are you familiar with the terms as it relates to

18   Desert Hot Springs Police Department back in 2005 meat eaters

19   and lettuce eaters?

20   A.    Yes.

21   Q.    How so?

22   A.    It was term that was loosely thrown around to

23   describe -- describe the officer that you were.

24   Q.    Which were you if either one?

25   A.    I was a meat eater at one point, and then I became a

1    lettuce eater.

2    Q.   Is that something you did individually or just how

3    people described you?

4    A.   How one person described me.

5    Q.   And --

6          THE COURT:  Well, just a minute.

7          One person described you as previously being a meat

8    eater and then becoming a lettuce eater?

9          THE WITNESS:  Yes, Your Honor.

10          MR. SCHWARTZ:  Thank you, Your Honor.

11   BY MR. SCHWARTZ:

12   Q.   And were those serious denotations for officers or more

13   like a joke around the department?

14   A.   No, it was a joke.

15   Q.   Do you remember how the whole joke started?

16   A.   We got called out to a burglary in progress.  Officers

17   went out to the location.  We surrounded the house, and the

18   burglar was inside.  We called out the burglar.  He didn't

19   come out.  And when we tried to make entry inside the house,

20   he managed to jump the fence.  We, myself and a sergeant at

21   that time, chased the subject for a short period, and he

22   managed to escape, and we lost him.  And, uh, another two

23   officers found him, and he was taken into custody.  And

24   because we lost him, uh, we were deemed lettuce eaters.

25   Q.   Is that where the term started?

A.    Yes.

THE COURT:  Didn't you just testify that you had previously been called a meat eater before you were called a lettuce eater?

THE WITNESS:  Yes, Your Honor.

THE COURT:  How did that work in relation to what you just told us?

THE WITNESS:  Because I was under -- previous to working to the sergeant where I was involved in the foot pursuit and we lost him, I was assigned to a different sergeant who came up with the term, and I was under his command.  He was my supervisor.  So when I worked under his command, I was deemed a meat eater because I was on his shift.

THE COURT:  So then it really started before this burglary chase; is that right?

THE WITNESS:  Yes.

MR. SCHWARTZ:  May I just confer, Your Honor, please, for a moment?

THE COURT:  Certainly.

BY MR. SCHWARTZ:

Q.   And the classifications that the Court just clarified being meat eaters and lettuce eaters, when they started, that was before my client started working at Desert Hot Springs; is that correct?

```
 1    A.    I just don't recall.

 2              MR. SCHWARTZ:  Nothing further at this time,

 3    Your Honor.

 4              THE COURT:  Cross-examination, Ms. Carter.

 5              MS. CARTER:  Thank you, Your Honor.

 6                        CROSS-EXAMINATION

 7    BY MS. CARTER:

 8    Q.    It wasn't a compliment to be called a lettuce eater, was

 9    it?

10    A.    No.

11    Q.    It was a compliment to be called a meat eater, wasn't

12    it?

13              THE COURT:  What's your answer?

14              THE WITNESS:  No.

15    BY MS. CARTER:

16    Q.    The people who used these terms, meat eaters and lettuce

17    eaters, were the people who used them more like -- were they

18    more the meat eaters or more the lettuce eaters?

19    A.    The meat eaters.

20    Q.    And the meat eaters were proud to be meat eaters,

21    weren't they?

22    A.    No.

23    Q.    The meat eaters thought that it was better to use more

24    force rather than less when interacting with subjects, didn't

25    they?
```

UNITED STATES DISTRICT COURT

1          MR. SCHWARTZ:  Objection.  Vague, Your Honor.

2          THE COURT:  Could we have a time frame?

3    BY MS. CARTER:

4    Q.   Around the time period before February 2005, people who

5    called themselves meat eaters thought it was better to use

6    more force rather than less when interacting with subjects,

7    didn't they?

8          MR. SCHWARTZ:  Objection, relevance.

9          THE COURT:  That's overruled.

10         You may answer if you can.

11         THE WITNESS:  No.

12   BY MS. CARTER:

13   Q.   And they thought the lettuce eaters' way of handling

14   suspects was not as good as the meat eaters' way of handling

15   suspects, didn't they?

16         MR. SCHWARTZ:  Objection.  Vague both as to time

17   and people.

18         THE COURT:  Overruled.

19         You may answer.

20         THE WITNESS:  No.

21   BY MS. CARTER:

22   Q.   Now, you said that you at some point became a lettuce

23   eater because one person in particular started calling you a

24   lettuce eater instead of a meat eater.  Do you recall that?

25   A.   Yes.

```
 1    Q.    Who was that person?

 2    A.    Dave Henderson.

 3    Q.    Didn't Henderson start calling you a lettuce eater after

 4    the burglary incident that you just described?

 5    A.    Yes.

 6    Q.    And that was because you were the officer who let the

 7    burglary suspect run right past him without shooting him,

 8    weren't you?

 9    A.    I let -- he got away.  I didn't need to shoot him.

10    Q.    Sergeant Cole told you to shoot him, and you didn't

11    shoot him; correct?

12    A.    Yes.

13    Q.    And he ran right past you; correct?

14    A.    Yes.

15    Q.    It wasn't a compliment, was it, when Henderson started

16    calling you a lettuce eater instead of a meat eater, was it?

17    A.    Yes.

18    Q.    It was an insult when Henderson started calling you a

19    lettuce eater, wasn't it?

20    A.    No.

21    Q.    Now, Henderson and Sergeant Radanomous Gill ultimately

22    caught the burglary suspect who ran past you; correct?

23    A.    Yes.

24    Q.    And they found him under a wheel barrel; correct?

25    A.    I wasn't there.
```

1    Q.   Did you later learn that they found the suspect under a

2    wheel barrel?

3              MR. SCHWARTZ:  Objection.  Relevance, foundation.

4              THE COURT:  Overruled.

5              THE WITNESS:  Yes.

6    BY MS. CARTER:

7    Q.   Did Henderson and Gill brag to you about kicking the

8    wheel barrel that the suspect was hiding under?

9              MR. SCHWARTZ:  Objection, hearsay.  Relevance.

10             THE COURT:  Overruled.

11             You may answer.

12             THE WITNESS:  No.

13   BY MS. CARTER:

14   Q.   Did Henderson and Gill tell you that they had kicked the

15   wheel barrel that the suspect was hiding under?

16             MR. SCHWARTZ:  Objection.  Hearsay and relevance.

17             THE COURT:  You may have a running objection, but

18   it's overruled.

19             MR. SCHWARTZ:  Thank you, Your Honor.

20             THE WITNESS:  No.

21   BY MS. CARTER:

22   Q.   Did Henderson and Gill tell you that they had kicked the

23   subject when they found him?

24   A.   No.

25   Q.   Did Henderson and Gill tell you that they had kicked the

1    subject with the wheel barrel that he was hiding under?

2    A.   No.

3    Q.   Did Henderson and Gill talk about tasing the subject

4    that they found hiding under the wheel barrel?

5    A.   No.

6    Q.   How long have you known the defendant?

7    A.   Since he was hired.  I don't remember the exact year.

8    Q.   Ever -- you've known the defendant ever since he started

9    working at the Desert Hot Springs Police Department?

10   A.   Yes.

11   Q.   He's your friend, isn't he?

12   A.   Yes.

13   Q.   You consider him a mentor, don't you?

14   A.   Yes.

15   Q.   Do you socialize with him outside of work?

16   A.   Yes.

17   Q.   Have you been -- how often do you socialize with him

18   outside of work?

19   A.   That was a vague question.  Can you specify?

20   Q.   How often do you currently socialize with him outside of

21   work?

22   A.   Once a day.

23   Q.   Have you been to his house?

24   A.   Yes.

25   Q.   Has he been to your house?

1   A.   Yes.

2   Q.   Have you met each other's families?

3   A.   Yes.

4   Q.   Are your families friends?

5   A.   Yes.

6   Q.   Do your families socialize together?

7   A.   Yes.

8   Q.   You were promoted to sergeant two years ago; correct?

9   A.   Yes.

10  Q.   You gave an acceptance speech at the time that you were

11  promoted, didn't you?

12  A.   Yes.

13  Q.   And in that speech, you thanked the defendant for

14  getting you the job of sergeant, didn't you?

15  A.   No.

16  Q.   You thanked the defendant, didn't you, as part of your

17  acceptance speech?

18  A.   For being my mentor.

19  Q.   In any of the conversations that you've had with

20  defendant at work or in the daily conversations that you've

21  had with defendant outside of work, do you -- has defendant

22  ever mentioned this case?

23  A.   Yes.

24  Q.   What has he said about it?

25  A.   The way it's going.

1   Q.   So defendant talked to you about how this case is going

2   for him.

3   A.   Yes.

4   Q.   Does defendant talk to you about other people who may

5   testify in this case?

6   A.   Yes.

7   Q.   Before defendant was indicted, did he talk to you about

8   being investigated by the FBI?

9   A.   Yes.

10  Q.   Did he tell you that it was in connection with two

11  arrestees, Angelica Vargas and Jamal White?

12  A.   That I don't recall.

13  Q.   Did he talk to you before he was indicted about the

14  people who might be talking with the FBI?

15  A.   No.

16  Q.   The two of you never discussed who might be talking to

17  the FBI before defendant was indicted?

18  A.   No.

19  Q.   What was defendant telling you about the investigation?

20  A.   That he was indicted.

21  Q.   What did defendant tell you before he was indicted about

22  this FBI investigation?

23  A.   That it involved some type of use of force.

24  Q.   At any point, did you tell the defendant things that you

25  thought might be helpful to him in defending the charges in

1   this case?

2   A.   I gave him points of perspective.

3   Q.   You gave him your ideas about the case; correct?

4   A.   Yes.

5   Q.   And you gave him your advice about the case; correct?

6   A.   Yes.

7   Q.   And you gave him your perspective on potential witnesses

8   in this case, didn't you?

9   A.   No.

10  Q.   You feel professionally indebted to defendant, don't

11  you, because he's been your mentor for several years?

12  A.   Not indebted.

13  Q.   You feel professionally grateful to defendant because he

14  has been your mentor for many years, don't you?

15  A.   Yes.

16  Q.   You feel personally grateful to defendant because he is

17  a close friend, don't you?

18  A.   Yes.

19  Q.   You had heard, hadn't you, that before defendant --

20  you'd heard before defendant was indicted, hadn't you, that

21  Andrea Heath might be cooperating with the FBI?

22  A.   Well, she was cooperating with the FBI.

23  Q.   You knew that, didn't you?

24  A.   I had heard of it.

25  Q.   You discussed that with defendant, didn't you?

1   A.   Yes.

2   Q.   Defendant was also aware that Andrea Heath was

3   cooperating with the FBI, wasn't he?

4   A.   I can't answer for him.

5   Q.   Well, you discussed her cooperation with the FBI with

6   them.  You just testified to that; correct?

7   A.   Yes.

8   Q.   At some point between February 2005 and today, you

9   supervised Andrea Heath, didn't you?

10  A.   Yes.

11  Q.   You reported to defendant instances of potential

12  misconduct by Andrea Heath, didn't you?

13  A.   No.

14  Q.   You discussed with defendant, didn't you, that Andrea

15  Heath may have had help writing police reports?

16  A.   Yes.

17  Q.   That information was later reported to Kate Singer who

18  was evaluating Andrea Heath at the time, wasn't it?

19  A.   Yes.

20  Q.   And you yourself --

21          THE COURT:  Well, just a minute.

22          Who was Kate Singer, please?

23          THE WITNESS:  I'm sorry, Your Honor?

24          THE COURT:  Who was Kate Singer?

25          THE WITNESS:  She was a police commander.

```
 1    BY MS. CARTER:

 2    Q.   You yourself collected memoranda from other officers

 3    reporting instances of alleged misconduct by Andrea Heath,

 4    didn't you?

 5    A.   Well, when I think of the word misconduct, I think

 6    illegal, and the memorandums were not illegal activity.  It

 7    was her performance of her duties, officer safety that

 8    jeopardized in their belief their -- their safety.  She

 9    wasn't using proper safety methods.

10    Q.   You collected memoranda criticizing Andrea Heath's

11    performance and turned them in to Commander Singer, didn't

12    you?

13    A.   Not criticizing.  It was facts based on what they

14    observed.

15    Q.   These weren't facts that you observed, were they?

16    A.   No, I observed one of 'em.

17    Q.   With the exception of one incident, these weren't facts

18    you observed, were they?

19    A.   Yes.

20    Q.   But you collected the memoranda documenting any problems

21    with Andrea Heath's performance and forwarded them to Kate

22    Singer, didn't you?

23    A.   The memorandums were for officer safety out in the field

24    that jeopardized her peers.

25            MS. CARTER:  Move to strike as nonresponsive.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  The motion to strike is overruled.

2    BY MS. CARTER:

3    Q.    You forwarded these to Kate Singer, didn't you?

4          THE COURT:  That's asked and answered.

5          MS. CARTER:  May I publish for the jury and this

6    witness Exhibit 1, the diagram?

7          THE COURT:  Go right ahead.

8    BY MS. CARTER:

9    Q.    Do you see the parking area designated on the diagram

10   that is gray on the top of Exhibit 1?

11   A.    Yes.

12   Q.    You're not aware, are you, of any incident where an

13   arrestee in the jail escaped from that parking area prior to

14   2005, are you?

15   A.    I don't recall.

16   Q.    You're not aware, are you, of any incident where an

17   arrestee escaped from the jail into a city office in the same

18   building as the Desert Hot Springs Police Department, are

19   you?

20   A.    I don't recall.

21   Q.    Did you discuss Andrea Heath's alleged performance

22   problems with the defendant?

23   A.    Yes.

24   Q.    You did so after the defendant was indicted, didn't you?

25   A.    That I don't recall.

```
 1   Q.   You did so during the investigation of this case, didn't
 2   you?
 3   A.   That's kind of vague.  Can you rephrase the question?
 4   Q.   You discussed Andrea Heath's alleged performance
 5   problems with the defendant in 2010 and 2011, didn't you?
 6   A.   I don't recall.  I don't know when she departed from the
 7   department.
 8   Q.   You yourself were supervising Andrea Heath -- when did
 9   you become a sergeant?  I'm sorry, I'll rephrase.  You were
10   supervising Andrea Heath in February 2010, weren't you?
11   A.   Yes.
12   Q.   You were her field training officer for some probational
13   training that she was going through, wasn't you -- weren't
14   you?
15   A.   Yes.
16   Q.   During that time period, you were discussing her alleged
17   performance problems with the defendant, weren't you?
18   A.   No.
19   Q.   You were discussing them with Commander Singer, weren't
20   you?
21   A.   Yes.
22   Q.   You've discussed Andrea Heath's alleged performance
23   problems with defendant since you became a sergeant two years
24   ago; correct?
25   A.   Yes.
```

1    Q.    In February 2010, when Andrea Heath was going through a

2    training program, Defendant Sclafani was in a supervisory

3    position over her, wasn't he?

4    A.    Directly over her?  He was a supervisor.

5    Q.    He was the administrative sergeant, wasn't he?

6    A.    Yes.

7    Q.    And that was a higher position than the rest of the

8    sergeants, wasn't it?

9    A.    No.

10   Q.    As administrative sergeant, he was in a position to

11   speak with Commander Singer about Andrea Heath's performance

12   issues, wasn't he?

13   A.    Anyone -- or I could of.  Yes, he could of.

14   Q.    You were in a position where you could speak to

15   Commander Singer about Andrea Heath's performance problems;

16   correct?

17   A.    Yes.

18   Q.    And you did so; correct?

19   A.    Yes.

20   Q.    Desert Hot Springs Police Department didn't do anything

21   to remove defendant from a supervisory role over Andrea Heath

22   or others who had cooperated in the FBI investigations, did

23   they?

24   A.    He wasn't her supervisor.

25               THE COURT:  Well, strike that answer.

```
 1              Request the question again, please.
 2     BY MS. CARTER:
 3     Q.    The Desert Hot Springs Police Department didn't do
 4     anything to prevent defendant from commenting on the
 5     performance of officers who had cooperated in the FBI
 6     investigation, did they?
 7              MR. SCHWARTZ:  Objection.  Foundation, speculation.
 8              THE COURT:  Sustained.
 9     BY MS. CARTER:
10     Q.    To your knowledge, the Desert Hot Springs Police
11     Department never did anything to prevent the defendant from
12     being in a position where he could comment on the performance
13     problems of officers who had cooperated against him in the
14     FBI investigation.
15     A.    I can't --
16              THE COURT:  Is that a question?
17     BY MS. CARTER:
18     Q.    To your knowledge.
19     A.    Uh, I can't answer that.
20     Q.    The Department -- the Desert Hot Springs Police
21     Department didn't do anything to prevent you, a close friend
22     of the defendant's, from supervising any of the officers who
23     have cooperated in the FBI investigation, did they?
24     A.    I cooperated with the FBI investigation so . . .  does
25     that mean I can't do my job?  I . . .
```

```
 1                 MS. CARTER:  Move to strike as nonresponsive.
 2                 THE COURT:  It will be stricken.
 3    BY MS. CARTER:
 4    Q.   The Desert Hot Springs Police Department didn't do
 5    anything, did it, to remove you from a position where you
 6    could supervise officers who were cooperating in an
 7    investigation against your close friend, the defendant.
 8                 THE COURT:  Did they.
 9    BY MS. CARTER:
10    Q.   Did they?
11    A.   They didn't need to.
12    Q.   They didn't do anything to remove you from a position
13    where you could supervise officers who were cooperating
14    against your close friend, the defendant, did they?
15    A.   They didn't need to.
16    Q.   They didn't do anything --
17                 THE COURT:  Well, just a minute.
18                 Is that a no?
19                 THE WITNESS:  No?
20                 THE COURT:  Let's move on, please.
21                 MS. CARTER:  May I have a moment, Your Honor?
22                 THE COURT:  You may.
23                 MS. CARTER:  Nothing further at this time.
24                 THE COURT:  Okay.
25                 Redirect.
```

```
 1          MR. SCHWARTZ:  Thank you, Your Honor.

 2

 3

 4                    REDIRECT EXAMINATION

 5   BY MR. SCHWARTZ:

 6   Q.   Sergeant, the memorandums that counsel went over with

 7   you regarding Andrea Heath, you mentioned that they had come

 8   to you about this.  Who are the "they" that you're talking

 9   about?

10   A.   Officers that were assigned to my shift that worked

11   directly with her.

12   Q.   Okay.  So the officers who came to you with concerns or

13   complaints about Andrea Heath, did you solicit them or did

14   they come directly to you?

15   A.   They came directly to me.  I didn't -- I didn't solicit

16   them.

17   Q.   And to your knowledge, were any of those officers

18   involved in this case or this investigation?

19   A.   No.

20   Q.   And as a sergeant, when officers come to you with

21   complaints about a fellow officer what are you supposed to do

22   based on your job description and your responsibility?

23   A.   I gather the information and if there is any policy

24   violation, I issue a memorandum and send it up the chain of

25   command.
```

1    Q.    And if there are potential policy violations in that

2    chain of command, is the administrative sergeant one of those

3    people in the chain of command?

4    A.    No.

5    Q.    And when you say chain of command, would it go to

6    Commander Singer?

7    A.    It would go directly to Commander Singer.

8    Q.    Now, did you discuss any of those complaints of officer

9    safety that other officers came to you with my client at the

10   time?

11   A.    Yes.

12   Q.    And in that discussion, did my client have any direct

13   control of the supervision of Andrea Heath at that time?

14   A.    No.

15   Q.    And was my client part of a decision to put Andrea Heath

16   on the field training officer program at that time?

17   A.    No.

18   Q.    Whose decision was that?

19   A.    Commander Singer's with my recommendation.

20   Q.    At the time that Officer Heath was put on the field

21   training officer program, how long had she been a police

22   officer at Desert Hot Springs if you know?

23   A.    She was there before I started and so I started in 2001.

24   Q.    And based on your training and experience, were the

25   issues brought to your attention the type of issues that

1    would prompt you to recommend more training in a program of

2    that nature?

3    A.   Yes.

4    Q.   Why?

5    A.   Because she was putting herself and her peers in

6    predicaments that could be potentially hazardous and

7    threatening and she needed more training.

8    Q.   And counsel asked you at some point you related to

9    Commander Singer that you thought Officer Heath had help

10   writing reports.  Do you remember that question?

11   A.   Yes.

12   Q.   And why did you relate that to Commander Singer?

13   A.   I didn't relate it directly to Commander Singer.

14   Q.   Did you have -- did you make any opinion or document any

15   opinion of that nature about Andrea Heath to Commander

16   Singer?

17   A.   No.

18   Q.   That was just a thought or idea you had at the time?

19   A.   Yes, only because I was supervising her PIP.

20   Q.   What's a PIP?

21   A.   It was Performance Improvement Plan.  It's issued to

22   officers who get a below standard evaluation and at the time

23   I was new, I was a new sergeant, newly promoted and I was

24   issued her PIP.  And throughout her PIP, I saw that her

25   reports got really good in a short time frame and it just

1    puzzled me that from when they started to a month-and-a-half

2    into the PIP, it was a significant difference.  And it just

3    seemed odd to me that the reports just improved vastly.  And

4    at the time she was dating a detective and I came to the

5    presumption that he was probably helping her.

6    Q.    And when you came to that presumption, did you ever

7    document that or make any allegations of misconduct based on

8    that presumption?

9    A.    No, I didn't document anything.

10   Q.    And you testified that my client is a friend of yours;

11   right?

12   A.    Yes.

13   Q.    Have you testified in court before, before today not in

14   this case, but just in general?

15   A.    Yes.

16   Q.    How many times if you can estimate?

17   A.    I would say more than 40.

18   Q.    You know what it means to take an oath to tell the

19   truth?

20   A.    Yes.

21   Q.    And although my client's your friend, would you lie for

22   him in court?

23   A.    No.

24   Q.    Would you lie for him anywhere?

25   A.    No.

1   Q.   Back in 2010, 2011 the time frame counsel spoke to you,

2   was my client still employed as an administrative sergeant?

3              MS. CARTER:  Objection.  Relevance.

4              THE COURT:  That's overruled.  You may answer.

5              THE WITNESS:  I don't recall.

6   BY MR. SCHWARTZ:

7   Q.   Counsel asked you about officers who cooperated with the

8   FBI.  Did you yourself cooperate with the FBI?

9   A.   Yes.

10  Q.   Any other officers besides Andrea Heath that you worked

11  in 2010 and 2011 cooperated with the FBI?

12  A.   Yes.

13  Q.   And to your knowledge, had any of them complained about

14  my client at all?

15             MS. CARTER:  Objection.  Calls for speculation.

16             THE COURT:  Sustained.

17             MR. SCHWARTZ:  May I have just a moment,

18  Your Honor, please?

19             THE COURT:  Of course.

20             MR. SCHWARTZ:  Nothing further at this time.

21             THE COURT:  Is there anything for recross?

22                     RECROSS-EXAMINATION

23  BY MS. CARTER:

24  Q.   Your supervision of Andrea Heath's PIP, that didn't

25  start until after she was cooperating with the FBI; correct?

```
 1    A.    I don't know.
 2    Q.    Now, when you had your suspicion about Andrea Heath's
 3    boyfriend helping her writing her reports, you didn't
 4    communicate that to Commander Singer.  You communicated that
 5    to the defendant, didn't you?
 6    A.    Yes.
 7    Q.    Then he communicated that to Commander Singer; correct?
 8           MR. SCHWARTZ:  Objection.  Speculation.
 9    Foundation.
10           THE COURT:  You may answer if you have knowledge.
11           THE WITNESS:  I believe so.
12           THE COURT:  But do you know?
13           THE WITNESS:  Not for sure, no.
14           THE COURT:  Then that's your answer.
15    BY MS. CARTER:
16    Q.    Did defendant indicate to you that he had communicated
17    your suspicion to Commander Singer?
18    A.    I don't recall.
19           MS. CARTER:  May I have a moment Your Honor?
20           THE COURT:  Of course.
21           MS. CARTER:  Nothing further, Your Honor.
22           THE COURT:  Anything further of this witness?
23           MR. SCHWARTZ:  Not at this time, Your Honor.
24           Thank you.
25           THE COURT:  Thank you very much, Sergeant.  You're
```

1    excused.

2           You may call your next witness.

3           MR. SCHWARTZ:  At this time counsel would ask to

4    read into the record a stipulation regarding Exhibit 226?

5           THE COURT:  Certainly.

6           MR. SCHWARTZ:  Defendant Anthony Sclafani and

7    Plaintiff United States of America hereby stipulate and agree

8    as follows:  Defendant's Exhibit 226 are the redacted medical

9    records pertaining to Jamal White on February 25th, 2005 that

10   were obtained from the Desert Regional Medical Center that

11   were made for the purpose of medical diagnosis or treatment

12   and describing medical history, the past or present symptoms,

13   pains or sensations at or near the time of the occurrence of

14   the matter set forth therein.

15          226 is admissible under Federal Rule of Evidence

16   803 (4) and may be admitted into evidence.  The parties

17   respectfully request that the stipulation be read to the jury

18   at the appropriate time in the trial and this stipulation be

19   admitted into evidence.  So stipulated.

20          THE COURT:  Is that the stipulation the government

21   agreed to?

22          MR. ARKOW:  Yes.

23          THE COURT:  It will be received.

24          MR. SCHWARTZ:  Defendant would rest at this time

25   subject to rebuttal and we would like to be heard on that.

 1          THE COURT:  Let's dismiss the jury for a short

 2    while.

 3                    (Jury not present.)

 4          THE COURT:  Outside the presence of the jury.

 5          Do you wish to renew your Rule 29 position at this

 6    time, Mr. Schwartz?

 7          MR. SCHWARTZ:  We would do that for the record,

 8    Your Honor, as well as we would also like to still object and

 9    make more of a record about the rebuttal expert offered by

10    the government.

11          THE COURT:  With regard to the Rule 29 motion

12    having been renewed, it is denied.

13          MR. SCHWARTZ:  Thank you, Your Honor.

14          With regard to the rebuttal expert, Your Honor, the

15    force officer, we would ask respectfully for an offer of

16    proof specifically what he would be testifying about since

17    there was no force expert put forward in the case-in-chief of

18    the defense.  As well as again renewing the fact that having

19    been sitting here throughout the trial, I will actually take

20    issue with counsel's chronology of Detective Cole's

21    testimony.  The first 15 or more minutes of Detective Cole's

22    direct examination by Mr. Arkow was specifically the use of

23    force not by the defense.  That was the first 15 or

24    20 minutes.  Then they went into the addendum and the other

25    policies.  Then they went into Detective Cole's recollection

1   of events with Ms. Vargas.  That was beginning of the direct

2   examination.  It was got into by defense on cross after they

3   brought it out on direct.  Again, it seems a bit disingenuous

4   to have a rebuttal witness sit here throughout the trial,

5   rebuttal to the force expert.  We received no reports from

6   him.  We couldn't even receive a name, Your Honor.  Because I

7   asked him his name, I mispronounced it.  I thought it was

8   some different pronunciation.  That's when I was corrected by

9   the witness himself about his name.  No background, no

10  curriculum vitae, nothing.

11          THE COURT:  You've received no reports about the

12  prospective expert witness?

13          MR. SCHWARTZ:  None, Your Honor.  We were told he's

14  a rebuttal witness.  As a matter of fact, back in November on

15  November 1st spoke about having a possible rebuttal witness,

16  when we addressed that issue, we were told he was a rebuttal

17  witness and that would not be necessary.  We received nothing

18  in the interim period.  Our expert witness wrote a report a

19  long time ago in this matter.  There's no new evidence given

20  to him to write a report with.  Moreover, not even a

21  background.  I can't cross him on his background because

22  there's been nothing as to who he is so I can find out what

23  his background is and his credentials so there's nothing in

24  front of me to cross-examine him with at this juncture.

25          And considering the fact that there's no other

1   expert to rebut except for questions solicited by the

2   government of their own witness Detective Cole, it seems

3   disingenuous to talk in general terms about training and

4   experience.  Officer Cole testified very specifically to his

5   experience at Desert Hot Springs Police Department in that

6   particular addendum and how he was trained there and not

7   generally how officers are trained throughout the State of

8   California.

9           THE COURT:  Government wish to be heard?

10          MR. ARKOW:  Yes, Your Honor.  Just briefly on the

11  fact that the government hasn't provided any expert report

12  that's because there is not an expert report.  This issue was

13  specifically raised in November when the case was supposed to

14  go to trial and defense counsel specifically asked the Court

15  for notice of the government's rebuttal expert, and as I

16  remember, the Court indicated that because it's a rebuttal

17  expert, there is no need to give notice prior.

18          The expert has not written a report.  The expert

19  has met with the government and the statements of such

20  meetings will be provided to the defense should the

21  government call this witness prior to his testimony.  And the

22  fact that this witness on the use of force was not present or

23  is not a member of the Desert Hot Springs Police Department,

24  isn't the requirement for a use of force expert.

25          The government filed a motion on what's permitted

1    by use of force expert and it's not the use of expert be a

2    member of the Department or participate in the training.  The

3    defense own use of force expert also has no percipient

4    knowledge and no relationship to the Department and the

5    government didn't object to that use of force expert from

6    testifying based on that.  There needs to be restrictions as

7    the Court so ruled and government's rebuttal expert would

8    adhere to those restrictions.  There isn't requirement that

9    the person have percipient knowledge of the training.

10              THE COURT:  Well, that's fine, but the defense is

11   not put on anybody with regard to that in an expert nature.

12   Government's proposed expert witness on the use of force will

13   not testify.  Where are we now?

14              MR. SCHWARTZ:  We rest, Your Honor.  We have no

15   rebuttal witnesses.

16              THE COURT:  Does the government have any rebuttal

17   witnesses?

18              MR. ARKOW:  May I have a moment, Your Honor?

19              THE COURT:  You may.

20              MR. SCHWARTZ:  I apologize.  I may have misspoke.

21   We have no rebuttal witnesses at this time.  I have no idea

22   if the government has rebuttal witnesses or not.  We may

23   bring up or not bring up, I don't expect to, but again no

24   idea if they have rebuttal besides the proposed expert.  At

25   this time we rest and we are done with our case.

1          THE COURT:  I'm not sure I would allow surrebuttal

2    in any regard, but let's see.

3          MR. ARKOW:  Your Honor, have another brief moment?

4          THE COURT:  Take your time.

5          MR. ARKOW:  The government might have one exhibit

6    and we might be able to reach an agreement with the defense.

7    One exhibit to introduce in its rebuttal case, but it might

8    take some time, maybe in the neighborhood of 20 minutes to

9    organize that exhibit.

10          THE COURT:  All right.  We'll be in recess.

11          MR. ARKOW:  Your Honor, I don't know what the next

12    step of the procedure would be.

13          THE COURT:  The next step would be both sides

14    having fully rested, we'll go over the instructions and

15    tomorrow morning we'll have the arguments.

16          MR. ARKOW:  I did want to say that we did have the

17    instructions to go over.

18          THE COURT:  Let's take a recess.

19                    (Recess taken.)

20          THE COURT:  We're outside the presence of the jury.

21          Any matters that we need to take care of that would

22    require the jurors to remain here today?

23          MS. CARTER:  Your Honor, I think that just depends

24    on how the Court wants to proceed.  I think the government is

25    prepared to introduce a couple more exhibits.  Two of which

were marked by the defense as to which the foundation has

been stipulated by both parties.  That's Exhibits 205 and

206, as well as a new exhibit, Exhibit 92 for which the

government has a business records declaration Exhibit 92A and

the government has provided copies to the defense as well as

put them in the original exhibit folders and provided copies

to your clerk.

        I believe that after that, the defense may also

seek to introduce an exhibit to which the government has

stipulated as to foundation, but not to relevance and that's

the payroll records.  The government would object on

relevance, and we can discuss that more if the Court would

like to do so now.  Thereafter, Your Honor, I believe we're

also prepared to argue the disputed jury instructions and if

Your Honor would like to do all of that --

        THE COURT:  I haven't seen any opposition to the

jury instructions.  Did you file something?

        MS. CARTER:  I'll let Mr. Arkow speak to that

issue.

        THE COURT:  Well, if we don't know, we'll deal with

all of the argument as to these remaining exhibits why don't

let them go home.

        MS. CARTER:  Yes, Your Honor.  If Your Honor would

like to deal with these remaining exhibits and if Your Honor

would like to deal with the jury instructions all now, we

1      could let the jury go home, admit the remaining exhibits in

2      the morning and then close.

3             MR. SCHWARTZ:  I would concur on that, Your Honor.

4             THE COURT:  I don't understand why there should be

5      anything left for tomorrow.  If we don't need the jury here.

6             MS. CARTER:  Your Honor, I would say the only thing

7      we need the jury for would be to admit these different

8      exhibits and publish them for the jury.  I don't think that

9      will take very long.  The government doesn't plan to publish

10     the two voluminous exhibits which are Defense Exhibit 205 and

11     206, only the new Exhibit 92, which is just a few pages.  I

12     know the payroll records the defense wants in are voluminous.

13     I don't if they're planning on publishing that, that might

14     take a while, but if they're not planning on publishing it, I

15     think it would go in a matter of minutes.

16            THE COURT:  All right.  So are we ready to bring

17     the jury in then?

18            MS. CARTER:  Unless Your Honor wants to hear any

19     objections to the exhibits before they come in.

20            THE COURT:  What are the objections and to which

21     exhibit?

22            MS. CARTER:  We object to the introduction to

23     payroll records introduced by the defense.

24            THE COURT:  What exhibit is that now?

25            MR. SCHWARTZ:  203, Your Honor.

1          MS. CARTER:  And, Your Honor, the government's

2     objection on that would be the relevance of these voluminous

3     payroll records.

4          THE COURT:  Well, perhaps, we should just have an

5     offer on that.

6          MR. SCHWARTZ:  Yes, Your Honor.  It's really based

7     on the government seeking to admit Exhibits 92 and 93.

8          THE COURT:  That affects your 203?

9          MR. SCHWARTZ:  It does, Your Honor.

10          THE COURT:  Tell me how.

11          MR. SCHWARTZ:  92 and 93 deal with the Desert Hot

12     Springs Police Department jail inspection log that seems to

13     represent the date of the Jamal White incident with a number

14     of different officers logging in arrestees with no

15     explanation besides the charge and the time.  There aren't

16     even dates on many of them.  I think all of the different

17     bookings of the arrestees, just the name of the officer and

18     the arrestee and the case number and so forth.

19          And it seems to represent that all of these

20     officers were somehow available at a specific time frame on,

21     I guess, the 24th of February 2005.  Payroll records reflect

22     that many of these officers were either working overtime

23     and/or special assignments and not as available as this log

24     seems to represent, which is an incomplete portrait of what

25     was going on at the time.  Just a bunch of names and times of

1    somebody being booked in not what their assignment was, not

2    what their availability was.

3          Couple these with the CAD reports, which are the

4    other two exhibits that are voluminous that counsel mentioned

5    which -- and you couple -- you put those two together with

6    the patrol records it's much more of a full picture to be

7    argued to the jury if need be.  We don't plan on publishing

8    these three voluminous exhibits to the jury tomorrow.

9    Possibly pointing out parts of them based on counsel's

10   arguments if need be to explain things that may be on the

11   surface explanatory in the exhibit itself, especially in the

12   CAD report or the payroll record if it's explicit, but it

13   gives a full picture.

14         This does not.  It's a list of names of people who

15   are booked in with different officers so since they've

16   already been stipulated to in foundation, they are relevant

17   to help explain along with the other three exhibits a full

18   picture of who's available, what their assignments were, what

19   they may have been working as far as their shift that night.

20         THE COURT:  All right.  What's the government's

21   opposition then to 203?

22         MS. CARTER:  The government objects on the basis

23   that these records show, uh, that these records don't add

24   anything further beyond what's listed in the CAD reports,

25   which are the defendant's exhibits and explain what the

```
 1    nature is of all of the arrests that were listed in the jail

 2    logs.  I just don't think that 203 adds anything and it's

 3    irrelevant.

 4              THE COURT:  Well, what's the relevancy of 92?

 5              MS. CARTER:  Your Honor, the defense has argued

 6    that the defendant effectively couldn't call for backup and

 7    was alone in the jail because of the Department being so busy

 8    and the smallness of the Department and that there weren't

 9    other officers available to assist.  And I think that the

10    jail logs call that into question.

11              THE COURT:  Well, maybe the easiest thing to do is

12    just admit 92 as well as 203 and just move on.  It's been

13    indicated by the defense they don't intend to publish it.

14    Why don't we call the jury in and get this out of the way and

15    let them go home, and then we'll settle the instructions.

16                        (Jury present.)

17              THE COURT:  Please be seated, ladies and gentlemen.

18    We had some matters of law we had to take care of.  Let me

19    indicate to you the good news is that both sides have rested

20    except for certain stipulations that are to be read into the

21    record and I'm going to excuse you for the day and then

22    tomorrow morning at 9 o'clock we'll have the closing

23    arguments.

24              Who wishes to be heard?  Ms. Carter.

25              MS. CARTER:  Thank you, Your Honor.
```

1              At this time the government would move into

2     evidence Defense Exhibit 205 and 206 as well as Government's

3     Exhibit 92.  And it's moving Defense Exhibit 205 and 206 in

4     pursuant to a stipulation between the parties.  It moves in

5     Government's Exhibit 92 under the provisions of the Federal

6     Rule of Evidence 90211, certified business record.

7              THE COURT:  And that is the stipulation that you

8     have agreed to, Mr. Schwartz?

9              MR. SCHWARTZ:  Yes, Your Honor, regarding 205 and

10    206.

11             THE COURT:  Yes.

12             (Exhibits 205, 206 and 92 were admitted.)

13             MS. CARTER:  Your Honor, the government would

14    request permission to publish Exhibit No. 92.

15             THE COURT:  Go right ahead.

16             MS. CARTER:  Page 1 Desert Hot Springs Police

17    Department Jail Inspection Log.  Date/day:  February 24th,

18    2005.  Watch Commander:  Sclafani.  Page 2 of Government's

19    Exhibit 92.  Page 3 of Government's Exhibit 92.  Last entry

20    on page 3 shows arrestee's name Jamal White.  Page 4 of

21    Exhibit 92.  Thank you, Your Honor.

22             THE COURT:  Thank you.  Mr. Schwartz.

23             MR. SCHWARTZ:  Thank you, Your Honor.

24             At this time, defense would ask the Court to move

25    into evidence Defense Exhibit No. 203, which has already been

 1    stipulated to as to foundation and authentication and also

 2    based on the comments made previously on that.  We're not

 3    gonna publish to the jury at this time.

 4              THE COURT:  It will come in over objection.

 5              MR. SCHWARTZ:  Thank you, Your Honor.

 6                   (Exhibit 203 was admitted.)

 7              THE COURT:  Both sides fully rested now; is that

 8    right?

 9              MR. SCHWARTZ:  Yes, Your Honor.

10              MR. ARKOW:  Yes, Your Honor.

11              THE COURT:  Thank you.

12              Well, ladies and gentlemen, it's more important

13    than ever that you not discuss this matter among yourselves

14    or with anyone.  You've heard all of the evidence in the

15    case, but you've yet to hear the arguments, which are not

16    evidence, but can be important to you.  And more important

17    you have to receive the final instructions of the Court which

18    you must apply to the evidence which only you will have

19    found.  So just put the matter aside and we'll see you at

20    9 o'clock tomorrow morning for the arguments.  Everyone

21    please rise for the jury.

22                   (Jury not present.)

23              THE COURT:  We're outside the presence of the jury.

24    This is the time for instructions, settling them and I'll

25    start with the jointly proposed instructions.  And where I

mention numbers such as 1201 or 1304, I'm referring to
O'Malley unless I otherwise so indicate.

Joints 1 through 10 which are 1201, 1304, 1212,
1209, 1202, 1305, 2902, 2903, 2907 will all be used as
requested.  11 is a special and since you jointly agreed upon
it, the constitutional right to be free from unreasonable
search and seizure, it will be given as requested.  12, which
is 2904 under color of any law defined will be given as
requested.  13 is 2905 modified willfully is defined given in
standard form however.  14 is another -- this one is a 9th
Circuit 7.9.05 in modified form.  It will be given as
requested.

15, 16, 17, 18, 19, 20, 21, 22, 23 all O'Malley's
1211, 1204, 1205, 1207, 1208, 1105, 1104, 1103, and 1109 will
be given as requested.  24 is 1203 has to do with evidence
received in the case, stipulations.  There was no judicial
notice so it will be given in modified form leaving out
judicial notice and inferences will be taken care of in a
separate instruction already covered.

25 and 26 these are 1501 and 1507 will be given as
requested.  27 is 1506, credibility of witnesses and that
will be given in standard form.  28 is 1512 and defendant has
not testified so that will not be given.  29, 30, 31, 32,
1416, 1514, 1401, 1403 will be given as requested.  33 and
it's 2001, the verdict form, will be given as requested.  34

```
 1    is a special.  California Penal Code Section 835 (A) and that

 2    will be given as requested.

 3            Then we have three proposed instructions from the

 4    defense.  They're listed as Defendant's 34.  First of all, a

 5    special, qualified immunity.  That's something that's for the

 6    Court that would have been taken care of before the trial.

 7    Indeed if it had been granted, we would not have had the

 8    trial so that will not be given.  35 is also a special and

 9    that can be argued because it will not be given.  36 is also

10    a special, and that lends itself to argument as well and will

11    not be given.

12            Then there are several court standard instructions

13    that were not requested by either side jointly or otherwise.

14    These are 1210, burden of proof, reasonable doubt given in

15    standard form.  1706 motive explained and will be given in

16    standard form.  1707 proof of intent also be given in

17    standard form.

18            Now, I'll hear from the government with regard to

19    any objections or comments.

20            MR. ARKOW:  May I have a moment, Your Honor?

21            THE COURT:  You may.

22            MR. ARKOW:  Your Honor, I don't believe with the

23    exception of one of the Court's additional proposed

24    instructions that I don't have a copy of O'Malley.  Can I ask

25    the Court's indulgence on the 1706.  It's the motive.  I
```

```
 1    don't know if it's a lengthy instruction.  Might the Court be
 2    able to read it?  I don't have my handbook with me.
 3             THE COURT:  All right.  I don't have the standards
 4    here before me, but we'll get them in just a minute or two.
 5             MR. SCHWARTZ:  Your Honor, if I may for the record?
 6             THE COURT:  Mr. Schwartz.
 7             MR. SCHWARTZ:  Regarding 1210, presumption of
 8    innocence and burden of proof and reasonable doubt, just for
 9    the record, Mr. Arkow has brought that to my attention that
10    both sides seem to have omitted that inadvertently.  That did
11    not make it in so both sides would request, I know the Court
12    would give it sua sponte anyway, we would request it.
13             As far as the specials completely our inadvertence,
14    the first 34 we requested was a joint and the Court would
15    give it, the California Penal Code Section, but the next of
16    the three specials is also, I guess, marked 34 which is
17    rejected by the Court.  Just for housekeeping purposes, may
18    we renumber the remaining three so we have a clear record
19    about the first one being accepted which was a joint and the
20    next three being rejected.
21             THE COURT:  All right.  Well, we can renumber them
22    the Defendant's Proposed Instructions 35, 36 and 37 and they
23    stand rejected.
24             MR. SCHWARTZ:  Thank you, Your Honor.
25             THE COURT:  Thank you.
```

1          Just be a moment or so more.  1706 this is O'Malley

2    motive explained.  Intent and motive are different concepts

3    and should never be confused.  Motive is what prompts a

4    person to act or fail to act.  Intent refers only to the

5    state of mind of which the act is done or omitted.  Personal

6    advancement and financial gain, for example, are two

7    well-recognized motives for much of human conduct.

8          These praiseworthy motives may prompt one person to

9    voluntary acts of good while prompting another person to

10   voluntary acts of crime.  Good motive alone is never a

11   defense where the act done or omitted is a crime.  The motive

12   of the defendant is therefore is immaterial except insofar as

13   motive may aid in the determination of the state of mind or

14   the intent of the defendant.

15          MR. ARKOW:  Your Honor, can I have a moment?

16          THE COURT:  You may.

17          MR. ARKOW:  Thank you for reading the motive

18   instruction.  The government doesn't object to that.  Revisit

19   one of the elements instruction.  I don't know if now would

20   be the right time.  Instruction No. 13 on willfully, which

21   the Court indicated it would give in standard form.

22          THE COURT:  That's right.

23          MR. ARKOW:  This is O'Malley 2905.  Because the

24   statute specifically requires willfulness and that in this

25   case is an important element, the government feels that it is

1    important for the jury to be instructed in an excessive force

2    case what willfully means.  Willfully in an excessive force

3    case means to have the specific intent to use more force than

4    was necessary.

5           To a layperson, to a juror without explaining what

6    willfully means in the context of a deprivation of rights

7    case, I believe would be, well, it would be the better course

8    to actually define and give the jury a little more guidance

9    on what willfully means as applied in this case.  And that's

10   why the government would ask for the additional sentence,

11   which I just paraphrased in the Proposed Joint Instruction

12   No. 13.

13          The reason the government is asking for this is to

14   make clear that an unreasonable search and seizure isn't

15   sufficient in and of itself to amount to constitutional

16   violation of deprivation of rights.  That it also needs to

17   have this mental state which is willfully, and that it has to

18   be done with the intent to deprive the person of the right

19   with the intent to use more force than is necessary.

20          THE COURT:  Well, again, it's jointly agreed upon

21   so I'll actually give both.

22          All right.  Anything further with regard to the

23   instructions?

24          MR. ARKOW:  Not from the government.

25          THE COURT:  Mr. Schwartz?

1          MR. SCHWARTZ:  Your Honor, the Court mentioned 1707

2    and 1706; right?

3          THE COURT:  Yes.  You just heard me read 1706.

4          MR. SCHWARTZ:  Correct.

5          THE COURT:  And what was the other one?

6          MR. SCHWARTZ:  1707 which we don't have a copy in

7    front of us either.

8          THE COURT:  Proof of knowledge or intent.  1707,

9    the intent of a person or the knowledge that a person

10   possesses at any given time may not ordinarily be proof

11   directly because there is no way of directly scrutinizing the

12   workings of the human mind.  In determining the issue of what

13   a person knew or what a person intended at a particular time,

14   you may consider any statements made or acts done or omitted

15   by that person and all other facts and circumstances received

16   in evidence which may aid in your determination of that

17   person's knowledge or intent.

18         MR. SCHWARTZ:  Thank you, Your Honor.

19         THE COURT:  Let me ask is there anything further?

20         MR. SCHWARTZ:  Yes, Your Honor.  I apologize.  For

21   housekeeping with madam clerk providing both counsel a full

22   set of copies before tomorrow morning of the jury

23   instructions with the purpose of preparing closing or

24   tomorrow morning?  Do we have a set that we can actually

25   publish to the jury while we close to the jury?

```
 1              THE COURT:  You'll have it tomorrow after I get it

 2    together before it's read to the jury.  Just bear in mind

 3    that in your arguments, you can indicate where you think the

 4    Court may instruct, but you cannot instruct.  You can't just

 5    refer to particular instructions.

 6              MR. SCHWARTZ:  For my own edification, Your Honor,

 7    I apologize for the difference of forum, would the Court be

 8    instructing before argument or after?

 9              THE COURT:  I would be instructing after.

10              MR. SCHWARTZ:  So will we be allowed to publish the

11    actual instruction to the jury?

12              THE COURT:  No, that's the Court's burden.

13              MR. SCHWARTZ:  Thank you, Your Honor.

14              THE COURT:  Let me ask you how much time you're

15    asking for your opening and closing arguments.  First of all,

16    the government?

17              MR. ARKOW:  Your Honor, the government estimates

18    including both opening, closing and the rebuttal to do it

19    under two hours.

20              THE COURT:  Oh, you certainly will.  You'll do it

21    in an hour and 15 minutes and you can divide it up any way

22    you choose.  And defense may have up to that amount of time

23    as well.  You don't have to use it of course.

24              MR. SCHWARTZ:  Thank you, Your Honor.

25              THE COURT:  All right.  9 o'clock tomorrow morning.
```

1          THE CLERK:  Court is in recess.

2          (Proceedings were concluded at 4:35 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2


3    COUNTY OF LOS ANGELES        )

4                                 )  SS.

5    STATE OF CALIFORNIA          )

6

7    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

8    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

9    DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

10   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

11   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

12   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

13   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

14   OF MY STENOGRAPHIC NOTES.

15

16


17   DATE: JANUARY 8, 2013_____

18


19   ____/s/  LAURA MILLER ELIAS____

20   LAURA MILLER ELIAS, CSR 10019

21   FEDERAL OFFICIAL COURT REPORTER

22

23

24

25