```
1                   UNITED STATES OF AMERICA
                 UNITED STATES DISTRICT COURT
2                CENTRAL DISTRICT OF CALIFORNIA
                      WESTERN DIVISION
3
                          - - -
4                HONORABLE TERRY J. HATTER, JR.
             UNITED STATES DISTRICT JUDGE PRESIDING
5                         - - -

6
    UNITED STATES OF AMERICA,         )
7                                     )
                     PLAINTIFF,       )
8                                     )
    VS.                               )   CASE NO.:
9                                     )   CR 10-163-TJH
    ANTHONY SCLAFANI,                 )
10                                    )
                     DEFENDANT.       )
11                                    )
    _____)
12

13

14
                REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
                  FRIDAY, FEBRUARY 17, 2012
16
                   LOS ANGELES, CALIFORNIA
17

18

19

20

21             LAURA MILLER ELIAS, CSR 10019
             FEDERAL OFFICIAL COURT REPORTER
22           312 NORTH SPRING STREET, ROOM 453
             LOS ANGELES, CALIFORNIA 90012
23                  PH:  (213)620-0890

24

25
```

```
 1
         APPEARANCES OF COUNSEL:
 2
         ON BEHALF OF PLAINTIFF:
 3
                   BY:  MARGARET CARTER
 4                      STEVEN ARKOW
                   ASSISTANT UNITED STATES ATTORNEY
 5
                   1100 UNITED STATES COURTHOUSE
 6                 312 NORTH SPRING STREET
                   LOS ANGELES, CA 90012
 7

 8       ON BEHALF OF DEFENDANT:

 9                 SILVER HADDEN SILVER WEXLER & LEVINE

10                 BY:  MICHAEL SCHWARTZ, ESQ.
                        MICHAEL SIMIDJIAN, ESQ.
11
                   1428 SECOND STREET
12                 SANTA MONICA, CA 90401

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1                              INDEX
 2

 3     PROCEEDINGS                        PAGE

 4
       CLOSING ARGUMENTS
 5
       BY:  MR. ARKOW                      5
 6
       BY:  MR. SCHWARTZ                   31
 7
       BY:  MS. CARTER                     68
 8

 9
       JURY INSTRUCTIONS.................. 85
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    LOS ANGELES, CALIFORNIA; FRIDAY, FEB. 17, 2012; 9:15 A.M.

 2                          -  -  -

 3              THE COURT:  Good morning.  We're outside the

 4    presence of the jury.  I understand that there are several

 5    witnesses in the case who wish to be here for final arguments

 6    and there's no objection on either side and if that's so,

 7    they may, of course, remain.

 8              Any counsel have anything before we commence the

 9    closing arguments?

10              MR. ARKOW:  Not from the government.

11              MR. SCHWARTZ:  No, Your Honor.  Thank you.

12              THE COURT:  Thank you.  Let's bring the jury in

13    then.

14                        (Jury present.)

15              THE COURT:  Has anything about this matter come to

16    your attention since you were here yesterday?  If so, please

17    raise a hand.  I see no hands being raised.

18              As I indicated to you, all of the evidence has been

19    completed, but we now move to arguments.  And I also believe

20    I told you that since the government alone the bears the

21    burden of proof in this case, they get two bites at the apple

22    as it were.  They'll open the closing arguments.  You'll hear

23    from Mr. Schwartz on behalf of the defendant and then you

24    will hear again from the government in a closing or rebuttal

25    argument.
```

```
1          And while the lawyers may during their arguments
2     tell you what they think the Court may be instructing with
3     regard to the law, only the Court can instruct you so bear
4     that in mind.  And once the arguments have been completed,
5     then I will give you the final instructions of the Court
6     which you must apply to the facts which only you will have
7     found.  All right.  We'll start now with the government.
8     Mr. Arkow.
9          MR. ARKOW:  Yes, Your Honor.  Thank you.
10         Ladies and gentlemen of the jury, police officers
11    are given substantial power, but they are not allowed to
12    abuse that power.  In this case defendant abused that power
13    when he pepper sprayed and tased Jamal White and Angelica
14    Vargas without any legitimate or law enforcement
15    justification.  The evidence that you have seen and heard in
16    this trial establishes beyond a reasonable doubt that
17    defendant used unreasonable and excessive force on vulnerable
18    victims who were in the custody and who were at the Desert
19    Hot Springs Police Department station, Jamal White and
20    Angelica Vargas, and that he is guilty of Counts I and II of
21    the indictment.
22         Defendant was angry with Jamal White for mouthing
23    off to him or insulting him or cursing him.  Those were
24    words.  Those words did not give defendant a license to use
25    force against Jamal White who was in his custody with
```

1    handcuffs behind his back in the patrol car and on the

2    booking bench in the jail area.  And on very next day,

3    defendant took advantage of another arrestee Angelica Vargas,

4    a pitiable, defenseless, drunken woman who couldn't even

5    stand up much less run and escape from the jail.  Ms. Vargas

6    had vomited in the patrol car, she smelled up the jail, but

7    these were not law enforcement or legitimate justifications

8    that warranted defendant pepper spraying Ms. Vargas in the

9    eyes and tasing Ms. Vargas repeatedly including one of the

10   taser shots to Ms. Vargas' left breast.

11        The indictment is in two counts.  Count I relates

12   to the incident involving Jamal White and Count II relates to

13   the incident involving Angelica Vargas.  Both counts charge a

14   deprivation of rights under color of law.  Essentially, that

15   defendant used excessive force as a police officer.  Count I

16   is that he used excessive force against Jamal White on

17   February 24th, 2005 and Count II charges defendant with using

18   excessive force against Ms. Vargas the very next day on

19   February 25th, 2005.

20        It's the same elements, it's the same components,

21   the same requirements that the government must prove for each

22   of these counts.  I expect the Court will instruct you that

23   the government must prove the following elements beyond a

24   reasonable doubt for this offense of deprivation of rights.

25        First, there are five elements.  The first element

1    the individual identified in Count I that would be Jamal

2    White, on Count II that would be Ms. Vargas was in the State

3    of California.  I'm just gonna read through the elements and

4    then I'm gonna go through the evidence that supports them.

5    Element two that the defendant deprived the victim, this

6    individual, of a right secured by the constitution.  In this

7    case this is the right to be free from unreasonable search

8    and seizure.  In other words, if an officer uses unreasonable

9    force, then the officer has made an unreasonable seizure.

10   Unreasonable seizure and unreasonable force that's the same

11   thing.

12            Third, that the defendant acted under color of law.

13   Fourth, that the defendant acted willfully and fifth that the

14   individual suffered either bodily harm or that the defendant

15   used a dangerous weapon.  In this case both things happened.

16   There was bodily harm and there was a dangerous weapon used.

17            As I said, there are five elements and most of my

18   opening closing argument is gonna be addressing two of the

19   elements, that is that the defendant used unreasonable force

20   that's No. 2 and No. 4 that when defendant did use the force,

21   he was acting willfully.

22            Let me just go through the evidence more quickly on

23   the other elements.  The first element is not in dispute.

24   The two victims Mr. White, Ms. Vargas were in California in

25   Desert Hot Springs, California when all this happened.  The

```
 1    third element, defendant acted under color law.  That is also

 2    not in dispute.  Defendant was a police officer, he was a

 3    patrol sergeant, he was the watch commander on duty on both

 4    of these nights when these incidents occurred.  And the fifth

 5    element, that is also not in dispute.  That is that the

 6    victims in this case Mr. White and Mr. Vargas suffered bodily

 7    harm.

 8            As to bodily harm, I expect the Court will instruct

 9    you that bodily harm means any injury to the body no matter

10    how temporary.  It doesn't need to be severe.  It doesn't

11    need to be permanent.  Pain alone is enough to satisfy bodily

12    harm.  And you heard testimony that pepper spray and taser

13    shocks cause pain.  That's bodily harm.

14            Also, there was use of a dangerous weapon.  There

15    was a taser used.  I expect the Court will instruct you that

16    a dangerous weapon is just an object that can be used to

17    inflict substantial bodily harm.  And here every time the

18    defendant fired his taser, even if the taser probes didn't

19    connect and didn't penetrate the individual's body on every

20    occasion, the fact that the defendant was using a taser and

21    even if the probes missed, the fact that defendant was

22    sending these probes with the fish hooks at the ends sailing

23    through the air at 180 feet per second I believe is what Greg

24    Meyer testified how fast the taser probes go out.  The fact

25    that defendant was using a taser meant defendant was using a
```

1    dangerous weapon.

2         Now, going back to the two elements regarding

3    whether the force was reasonable or unreasonable and whether

4    defendant acted willfully.  I expect the Court will instruct

5    you that in determining whether the force was reasonable and

6    the government submits that the evidence has shown beyond a

7    reasonable doubt that the force was unreasonable.  It was

8    unreasonable because no force was required in either of the

9    instances.  Unreasonable force is physical force that's used

10   without a legitimate law enforcement purpose or it's physical

11   force that unreasonably exceeds the need for force.

12        It is unreasonable for a police officer to use

13   force to punish or to retaliate.  A police officer cannot use

14   force simply out of frustration or anger or being insulted

15   and that the government submits is what happened here.  That

16   the defendant used force against Mr. White because he was

17   angry and he used force against Ms. Vargas for no legitimate

18   reason.  And the defendant used force and he did so

19   willfully.

20        And in this case, I expect the Court will instruct

21   you that what willfully means, what it means when defendant

22   used that force when he pepper sprayed the victims and when

23   he tased the victims, it meant that the defendant had the

24   intent to use more force than was necessary under the

25   circumstances.  And again, in both of these incidents, no

1    force was necessary.

2         As I go through the facts supporting each of the

3    counts, the incident involving Mr. White and the incident

4    involving Ms. Vargas, I expect that much of the evidence will

5    overlap and cover the same, much of the same evidence will

6    cover the point that defendant used more force than was

7    necessary and that defendant acted willfully.

8         And to give you just one example of what I mean is

9    in the incident involving Mr. White when Mr. White was on the

10   booking bench in the jail and defendant tased him.  And

11   Mr. White is on the floor and he's writhing in pain and the

12   defendant said words to the effect get up or I'll tase you

13   again, and then defendant tased Mr. White again.  That

14   evidence that shows that defendant used more force against

15   Mr. White than was necessary and that the defendant's action

16   was willful.

17        Now, the factors that the Court I believe will

18   instruct you that you can use to help determine whether as a

19   police officer defendant's conduct was reasonable, whether

20   the force was reasonable are as follows.  Looking at the

21   severity of the crime for which the person is arrested.

22   Looking to see if there was any threat, if at all, posed by

23   the person arrested.  Whether there was any resistance.

24   Whether the person attempted to flee and whether there were

25   less forceful means or methods available.

1        And this is essentially the same factors that you

2   also heard about and saw displayed in the Desert Hot Springs

3   Police Department use of force policy.  And basically, if you

4   step back, it's just common sense on what would be reasonable

5   under the circumstances.  What types of considerations would

6   an officer, would a reasonable officer make to determine

7   whether force is necessary and how much force, if any, force

8   was necessary.  And in this case the evidence shows that no

9   force was necessary.  There was no legitimate law enforcement

10  reason.

11        Let me go through each of these specific items now

12  applied to Count I, the Jamal White incident.  Jamal White

13  was arrested at his apartment on Ironwood Drive for a

14  relatively minor crime.  It was a parole violation.  He was

15  compliant at the arrest scene.  How do you know that Jamal

16  White was compliant?  Because of the witness testimony.

17        There was Karen Harper who he shared the apartment

18  with.  There was Jamal White and there was Officer Matthew

19  Drew who all testified that at the arrest scene Mr. White

20  complied with all of the officer's commands and was not

21  resisting, was not fleeing, was not a threat.

22        To take one, I believe, telling example to show

23  that at the arrest Mr. White was compliant --

24        MR. SCHWARTZ:  Object to I believe as counsel is

25  testifying.

1        THE COURT:  Ladies and gentlemen, this is only

2   argument.  It is not evidence.  You may proceed.

3        MR. ARKOW:  To take one telling example, when

4   Officer Drew testified that he was on the apartment landing,

5   the stairs with Mr. White alone while the defendant was

6   inside the apartment talking to Ms. Harper.  Officer Drew

7   took the pulse rate of Mr. White and he demonstrated how he

8   did it.  How he had to have Mr. White's wrist and how the

9   people take the pulse rate on the wrist.  Officer Drew had to

10  hold the wrist in such a way and have his fingers so he can

11  take the pulse.

12        That situation in and of itself shows you that in

13  order for Officer Drew to take Mr. White's pulse, Mr. White

14  had to essentially be calm, certainly not resisting,

15  certainly compliant, and you had the opportunity to hear

16  Mr. White himself testify on the stand.  And as I expect the

17  Court will instruct you that all individuals are protected

18  under the constitution from the right not to be subjected to

19  unreasonable force by police officers.  Arrestees, parole

20  violators, prisoners, suspects and Mr. White.

21        And Mr. White who took the stand was candid about

22  how he acted and how he mouthed off and how he cursed and his

23  behavior in the patrol car.  He didn't try to sugar coat it.

24  He told you that he cursed out, meaning insulted the

25  defendant.  Mr. White had nothing to gain from testifying in

 1    this case.  He's not on parole anymore.  He dropped the

 2    complaint he had against the Desert Hot Springs Police

 3    Department for this incident when he was worried about

 4    Ms. Harper's situation.  He didn't want to cause any trouble

 5    to her.  The government submits that Mr. White's testimony

 6    was credible and it was supported by the other testimony and

 7    by the evidence.

 8         The evidence is uncontradicted that Mr. White was

 9    escorted from the apartment arrest scene alone by defendant

10    to the patrol car.  And Mr. White was not resisting.  He was

11    not combative.  There was no reason to use force.  And you

12    know that Mr. White was not resisting because if Mr. White

13    was, Officer Drew was still at the scene.  He went back to

14    talk to Ms. Harper.  If there was any reason that the

15    defendant needed backup or assistance, Officer Drew was right

16    there.

17         So this demonstrates that Mr. White was compliant.

18    He went in the patrol car.  He was handcuffed the whole time

19    with his -- handcuffed behind his back and he is put in the

20    patrol car.  And this is where he's insulting defendant and

21    they're going back and forth with each other.  And the

22    defendant tells Mr. White to shut up, but Mr. White doesn't

23    shut up.  He keeps talking and the defendant pulls over his

24    patrol car, gets out of the car, opens up the back door where

25    Mr. White is seated and shoots pepper spray directly into

1    Mr. White's eyes.

2          And Mr. White's immediate reaction is pain.  The

3    chemical irritates his eyes, his mouth, his nose.  Phelm is

4    coming up.  It's hard for him to breathe.  There was no

5    evidence to contradict that what was presented to you that

6    Mr. White was not posing a threat when defendant pepper

7    sprayed Mr. White in the car.  There was no legitimate law

8    enforcement reason for the defendant to use force against

9    Mr. White.

10          Defendant in his police report, his use of force

11   report, admits that he pulled over the patrol car and pepper

12   sprayed Mr. White while Mr. White was handcuffed in the back

13   seat of the patrol car.  And even the defense's own witness

14   Dan Tregarthen, he was a veteran of the Los Angeles Police

15   Department officer who was in charge of handling the Internal

16   Affairs investigation for Desert Hot Springs, he said there

17   was no law enforcement reason for the defendant to pull over

18   the car and pepper spray Mr. White.  There was no evidence

19   that Mr. White was resisting or combative or trying to flee

20   when defendant pepper sprayed him.

21          As I said before, the circumstances of what

22   happened demonstrate that Mr. White was complying and not

23   resisting and no force was warranted.  Defendant acted alone.

24   If Mr. White was resisting, defendant would have called for

25   backup.  As I said, Officer Drew was still at the scene.  The

1  police station, Desert Hot Springs was about two miles away

2  from Mr. White's apartment.

3        The jail inspection log that's Government

4  Exhibit 92 for that night and the incident reports of all of

5  the police officer activity, that's Defense Exhibit 205, show

6  that there were many officer, at least ten officers working

7  that night, but no other officers were called to the scene.

8  No officers were called because no officers were needed to

9  assist.

10       Then the defendant drives Mr. White to the station

11 and they park in what's either called the parking lot, the

12 back area or sometimes it's been referred to as the sally

13 port.  And Government Exhibit 30 is one of the photographs of

14 the booking area looking out into that parking sally port

15 area where the patrol cars arrive when they bring the

16 prisoner.

17       And in the sally port, defendant tells Mr. White to

18 clean up the mess that's as a result of the hacking up from

19 being pepper sprayed.  And Mr. White says I'm not gonna clean

20 up the mess.  I don't have a way to clean up the mess.  I'm

21 handcuffed.  He tells defendant you clean up the mess.  You

22 shouldn't have pepper sprayed me.  And this is making

23 defendant angry, angrier and angrier.

24       Then the defendant takes Mr. White into the booking

25 area which has this what we call the booking bench, that

```
 1    wooden bench right next to the exit door.  He puts Mr. White
 2    on the booking bench and Mr. White the whole time is still
 3    handcuffed behind his back.  The defendant doesn't handcuff
 4    Mr. White to the bench.  Again, it shows Mr. White wasn't
 5    doing anything where force was required.  Mr. White was
 6    compliant.  Otherwise, if Mr. White was resisting, defendant
 7    would have handcuffed Mr. White to the bench at that time.
 8    The defendant did none of that.
 9            In the booking area, you heard the testimony of
10    another Desert Hot Springs officer who was there who eye
11    witnessed what happened next and that's Dennis Decker.  And
12    he saw that Mr. White and defendant were arguing with each
13    other, were yelling back and forth.  That Mr. White was
14    calling the defendant names.  Calling him a fat Italian.  And
15    Mr. White admitted that he called defendant names and he
16    called defendant a coward for having used force against him,
17    a handcuffed prisoner.
18            And you heard Mr. Decker testify that defendant was
19    getting angrier and angrier with Mr. White cursing and
20    talking back.  Defendant tells Mr. White to shut up while
21    Mr. White is handcuffed on the booking bench.  Mr. White
22    tells defendant you shut up and that's when the defendant
23    tasers Mr. White handcuffed on the booking bench for three
24    seconds.  Not just a little touch, not just a little shock,
25    but for one second, two seconds, three seconds.
```

1          The defendant takes the taser and drive stuns into

2     Mr. White's body 19 pulses of electricity each second are

3     convulsing through Mr. White's body and that's painful and

4     that sends Mr. White to the floor where he's writhing on the

5     floor having been tased by the defendant.  And what does the

6     defendant say to Mr. White as Mr. White is on the floor?  If

7     you don't get up, I'll tase you again.  Now, Mr. White at

8     this time he can't physically possibly get on his own in that

9     condition and that's when defendant tasers Mr. White a second

10    time and this time with the probes for a full five-second

11    cycle.

12         And the defendant in the use of force report admits

13    that he tased Mr. White in the booking area.  The use of

14    force report Government Exhibit 69, pointing to the

15    paragraph, "I deployed my taser X26.  White was stuck with

16    the darts giving him one 5-second cycle.  This had an

17    immediate effect on White."

18         So defendant used more force than was necessary

19    because no force was necessary and defendant's actions were

20    willful because he intended to use more force than was

21    reasonable against Mr. White.  Mr. White is handcuffed on the

22    bench and before defendant tasers Mr. White the second time,

23    he's telling Mr. White get up or I'll tase you again.  That's

24    a command that Mr. White physically can't comply with.

25         Mr. White at that time was on the ground and

 1    basically a turtle laying upside down with his shell on the

 2    ground, the shell of his back.  And at that time the

 3    defendant is in complete control of the situation.  There was

 4    no risk to officer safety.  On cross-examination, defendant's

 5    counsel repeatedly was asking Dennis Decker, the officer who

 6    was eye witnessing that and using the words kicking and

 7    thrashing, kicking and thrashing to suggest that when Mr.

 8    White was on the ground, Mr. White was resisting.  But it was

 9    clear that what Mr. Decker was saying was not that Mr. White

10    was resisting, but that he was moving his body.  And it

11    became clear because of redirect examination of my trial

12    partner Ms. Carter had Mr. Decker testify to exactly what

13    Mr. White was doing.  It was that Mr. White was not

14    endangering officers, not posing a risk, but that he was

15    moving his body in reaction to having been tased from the

16    defendant's taser when he was on the booking bench.  That he

17    was reacting, screaming and crying out from having been sent

18    up to the ground by the drive stun that defendant did when he

19    tased him.

20         If Mr. Decker or any other officer there thought

21    Mr. White was posing a risk or a threat to them, then

22    Mr. Decker wouldn't have done what the defendant ordered

23    Mr. Decker to do at the time and that's after Mr. White was

24    tased the second time.  Mr. Decker said that Mr. White was

25    even moving more from the five-second time, that he was

1    moving his legs even more.  That there was no risk to these

2    officers because Dennis Decker ordered by the defendant

3    closed in, moved in and picked Mr. White up and put him back

4    on the bench.  Mr. Decker and the other Officer who helped

5    Mr. Decker wouldn't have been able to pick -- wouldn't have

6    exposed themselves, wouldn't have picked Mr. White up if

7    Mr. White wasn't really posing a threat.  He wasn't posing a

8    threat.  His body was convulsing from having been tased by

9    the defendant.

10           And then Mr. Decker and the officer put Mr. White

11   on the bench, defendant leaves Mr. White on the bench just to

12   sit there for about a half hour.  Doesn't handcuff Mr. White

13   to the bench.  Doesn't throw Mr. White in jail.  Mr. White

14   has really been a resistant, combative suspect?  Those things

15   would have happened and those things didn't happen.  The

16   governments submits that Mr. Decker's testimony was credible.

17   Mr. Decker testified to what he saw.  He didn't try to fill

18   in, to overstate details that he didn't see.  The booking

19   area was a small area you heard.  Mr. Decker's view was not

20   obstructed.

21           We saw Mr. White laying on the booking bench arms

22   cuffed behind his back.  Mr. Decker was very matter of fact

23   about what he saw.  They were arguing back and forth.

24   Defendant was getting angrier and angrier and that's when the

25   defendant drive stunned Mr. White.  He fell to the floor.

1    There was no law enforcement justification for that.  It was

2    just done out of anger.

3          And defendant lied about how many times he tased

4    Mr. White that night.  In the use of force report that

5    defendant wrote, he falsely says that he tased Mr. White for

6    that five-second cycle.  He wrote that report.  It's dated

7    the same date as the incident, February 24, 2005.

8          The whole purpose of this use of force report is to

9    document what happened, to document the use of force.  And he

10   only describes in this report the one taser.  He doesn't say

11   anything about the first tasing.  The defendant doesn't say

12   anything about the other officers who were there.

13         And how do you know that besides the testimony of

14   Mr. Decker that defendant tased Mr. White not just the one

15   time the defendant mentions in the report, but twice?  You

16   know that from defendant's own taser download which shows at

17   2146 and 2147 which translates into the common time as 9:26

18   and 9:27, two back-to-back tasings, the three-second cycle

19   and the five-second cycle.  The download report doesn't lie.

20   That has the memory chip that records how many times

21   defendant tased, but his police report only mentioned the one

22   time.

23         The evidence on Count I is that Mr. White was not a

24   threat, didn't pose a risk, wasn't attempting to flee and

25   there was no reason to use force under these circumstances.

1   The evidence has shown beyond a reasonable doubt on Count I

2   that defendant used more force than was reasonable and he did

3   so willfully and that he abused his power because he thought

4   he could get away with it, just like he thought he could get

5   away with it with Angelica Vargas on the very next day.

6          Now, I want to turn to Count II.  Each count is to

7   be decided separately based on the evidence, but the

8   circumstances are also very telling in that for what happened

9   to Mr. White and what happened to Ms. Vargas is that they

10  were both pepper sprayed and tased by the defendant who

11  was -- they were in his custody and it was in the jail.  And

12  there was no legitimate law enforcement reason.

13         The pattern of defendant's conduct against

14  Mr. White and then the very next day Ms. Vargas shows

15  defendant's MO, his method.  How he abused his power as a

16  police officer in that he believed he's the one is charge.

17         Now, as to Ms. Vargas and the factors, on the

18  severity of the crime and whether she posed a risk and

19  whether she was attempting to flee and whether any force was

20  justified, the evidence has shown in her case she was

21  arrested for the drunk driving citation.  She rear-ended the

22  bus and there was no injury.  She was vomiting in the patrol

23  car with Officer Gutting on the way back to the station.

24         She wasn't resisting.  She wasn't attempting to

25  flee.  She was too drunk to run.  She was too drunk to walk

1    and stand.   Remember how Matthew Gutting, the officer who

2    arrested her said she couldn't even stand.   There was no law

3    enforcement reason for defendant to taser Ms. Vargas or to

4    pepper spray Ms. Vargas.

5         Now, in Count I you obviously heard the victim,

6    Mr. White, testify.   And as to Ms. Vargas, you didn't hear

7    her testify, but the evidence has shown and the evidence that

8    you have been presented which shows beyond a reasonable doubt

9    that there was no law enforcement reason for the defendant to

10   pepper spray or tase Ms. Vargas.

11        And let me go over the evidence that you have heard

12   on this count which shows that.   Ms. Vargas was confined in

13   jail cell.   Confined in two ways.   She was confined because

14   to begin with a jail cell is a place of confinement.   She's

15   in the holding cell and then the holding cell is within the

16   jail cell which is a secure area.   The sally port that's

17   immediately outside has gates, has walls.   Nowhere that

18   Ms. Vargas can go.   But in addition to physically, the

19   environment being confining, Ms. Vargas herself because of

20   her physically being drunk, she has no ability to run.   She

21   has no ability to walk let alone escape away from the jail.

22        As to defendant's use of force in his use of force

23   report, he admits that he pepper sprayed Ms. Vargas.   This is

24   Government Exhibit 66.   He said he opened the cell door and

25   he put pepper spray in Ms. Vargas' face and it had an

immediate effect.  And that's when he opened up the cell door

for the first time.

Then defendant opened the sally port exit door to

air out the jail, to get ventilation.  And then at some point

later before defendant tased Ms. Vargas, he opened the cell

door a second time, and the second time is when he deployed

his taser.

Now, this shows that even defendant doesn't think

that Ms. Vargas is an escape or a flight risk.  If Ms. Vargas

was flight risk, defendant knowing that the sally port exit

door is open, wouldn't have opened Ms. Vargas' cell door if

he really thought she was an escape risk.  Defendant tased

Ms. Vargas three times and in his use of force report he

admits that he tased her.  Now, the taser cartridge probe

that was, the only one that was still in evidence, was

analyzed and inspected by the man who used to work at Taser

International, Andrew Hinz.  And he tested it and examined it

and it showed that defendant's taser probe had a complete

circuit meaning the electricity went through Ms. Vargas and

she was shocked and that was painful.  That was from

defendant's taser probe that showed that defendant tased

Ms. Vargas and that it had the effect that it did pulse

through her body.  And you know he used force and you know

there was law enforcement reason for defendant to use force

against Ms. Vargas because of the timing of when defendant

```
1    tased Ms. Vargas.  Again, a download report from defendant's
2    taser gun shows that the defendant and I'm going to translate
3    the time tased Ms. Vargas three times in about 40 seconds
4    starting at 6:15.  And you remember the testimony of Officer
5    Gutting that he tased Ms. Vargas, his download report shows
6    that in Exhibit 51 that he tased Ms. Vargas before.  He tased
7    Ms. Vargas at 6:12.  And Officer Gutting testified that once
8    he tased Ms. Vargas and the probes struck her in the back,
9    she fell down within one to two seconds.  There was no law
10   enforcement reason at that point to tase Ms. Vargas or do
11   anything to Ms. Vargas.  And Mr. Gutting's taser was at 6:12.
12   So after 6:12 is when defendant tased her.  6:15 for 40
13   seconds three times.  There is no reason after Mr. Gutting
14   had tased Ms. Vargas and she fell and Mr. Gutting said no
15   reason to use force against Ms. Vargas, that's when defendant
16   activated and deployed and tased Ms. Vargas three times.
17   Those tasings after Mr. Gutting's tasing was unreasonable.
18           Now, defense may argue in their closing that there
19   was time drifts on these download reports, but there's been
20   no evidence.  That was just speculation.  There is no
21   evidence that these download reports are inaccurate at this
22   time.  There is evidence that these download reports were
23   downloaded by the same computer for the purpose of the
24   Internal Affairs investigation.  And that was not just, you
25   know, like someone taking video camera for someone's
```

seven-year-old birthday party.  These are downloaded reports
that were done for a serious matter, the Internal Affairs
investigation.  And the person who is doing the download
report would see on the computer if there was any discrepancy
between the real time and the taser clock time.  And if there
was, they would have noted that when the downloaded reports
were printed out and there is no note that the download
reports at the time are inaccurate or that there was any time
drift.

Defendant tased Ms. Vargas three times in 40
seconds.  Ms. Vargas was target practice at that time, and
one of the taser puncture wounds hit Ms. Vargas' left breast.
Why would the shock be to Ms. Vargas' chest, her front if
Ms. Vargas was escaping from or going away from the jail?
It's not consistent.  The taser wound to Ms. Vargas' left
breast that is not consistent with any claim that Ms. Vargas
was trying to escape or leave the jail.

Now, after the use of force, after the tasing, the
defendant met with Officer Gutting in the office so they can
go over how they were gonna cover it up.  And they tried to
coordinate their story and they tried to write police reports
that would not -- would basically be so vague or would omit
things, that, you know, the truth of what happened to
Ms. Vargas.  But it couldn't square with what ended up being
the physical evidence in the case and the absurdity of the

1    story that Ms. Vargas was trying to escape.

2          They said Ms. Vargas was too drunk to run, too

3    drunk to get past anyone.  When Officer Gutting arrested her,

4    testified that he couldn't even do a field sobriety test on

5    her because she couldn't stand.  And then when Officer

6    Gutting brought her back to the station, she was too -- also

7    drunk and he had to walk her into the jail cell and take her

8    through the process of booking.  And Ms. Vargas' blood is

9    drawn by the nurse who comes to the station at about 4:59.

10   It's in Exhibit 49 and it shows the Bio-Tox Lab the blood

11   draw almost 5:00 and her blood alcohol content is 20-22,

12   that's three times the legal limit.

13         And the defense's own witness, the consultant on

14   how blood alcohol affects someone's body, even the defense's

15   own witness testified that if a person, and it was truly as

16   Ms. Vargas said she couldn't stand or walk with that blood

17   alcohol content, then an hour or two that person would be in

18   the same condition, same physical condition, same lack of

19   mobility and that's exactly what happened here.

20         You know when the blood draw was because that was

21   taken by an independent lab Bio-Tox.  And then the time span

22   to the download report which are 6:15, that's basically

23   within an hour or two after she got a .20, she's three times

24   the legal limit, can't stand or walk.  She's not running

25   away.  She's not walking away two hours later.  There was no

1    reason to tase Ms. Vargas.  Ms. Vargas was not escaping.

2           And just you remember the pictures of the -- of the

3    outside area of Government Exhibit 40, shows you the wall

4    outside the sally port.  She's not jumping or climbing over

5    that wall.  There's the gate.  What Ms. Vargas is doing is

6    suffocating, not being able to breathe on the pepper spray.

7    The other officers, you know, felt the pepper spray and

8    Ms. Vargas was in the holding cell.  Her clothes are wet and

9    torn.

10          And then she's released on the citation and she

11   doesn't even leave the jail.  She has nowhere to go.  She

12   stays in the lobby of the jail.  If this was a woman who was

13   escaping after being tased and pepper sprayed, the first

14   thing that she would be doing, she would be high-tailing and

15   getting out of this whole thing.  But she's not escaping

16   because one, physically she can't and two, she doesn't have a

17   place to go.  She's waiting in the lobby, sitting there and

18   that's where Mr. Decker was also there that next night sees

19   the defendant ranting to get this woman, to get her out of

20   here.

21          And she does the leave station, but where does she

22   go?  She goes across the street.  She's just wondering around

23   in that paper-thin jumpsuit that Detective Cole had given to

24   her and she has nowhere to go.  And Detective Cole sees her

25   and calls over and she's waving, she's flagging him down.

1    She's wanting help.  She's not running away from the police

2    car.

3          Remember Detective Cole had seen her earlier in the

4    night when she was in the holding cell.  She's crying and

5    she's got the toilet paper wrapped around her feet and

6    Detective Cole comes in to help her to give her the blanket.

7    And Ms. Vargas doesn't try to run out of the cell when

8    Detective Cole opens the door.  She doesn't try to, you know,

9    escape then.  She didn't try to escape at any point.  She's

10   in no physical condition to escape and she has nowhere to go.

11   So when she sees Detective Cole on the street, he tries to

12   help and he brings her to a hotel.

13         Defendant's force was excessive because no force

14   was necessary and it was willful.  He repeatedly tased

15   Ms. Vargas.  She was basically compared to defendant in size

16   and his position, she was a weakling.  She was an overweight,

17   small, drunk woman.  And defendant and Officer Gutting tried

18   to cover up this force.  Mr. Gutting's police report doesn't

19   mention anything about the defendant's use of force, about

20   the defendant's tasering.  And the defendant's use of force

21   doesn't mention anything about the force that Mr. Gutting

22   used, that Mr. Gutting fired the taser.

23         These are use of force reports.  The whole purpose

24   of these use of force report is document the force that was

25   used, to be complete, to be accurate.  If you look at the

1    defendant's use of force, it's a lie.

2           Now, there was one taser cartridge that wasn't

3    destroyed and the FBI got it and it was sent to the taser lab

4    and you saw that there was defendant's taser probe that was

5    effective, there was a complete cycle.  But the other

6    evidence was destroyed.

7           The other taser probes and you know there were

8    other taser probes used because defendant's own police report

9    said that, you know, activated it several times and Gutting

10   used his taser.  Those tasers they've been destroyed and not

11   only the taser probes have been destroyed, but the

12   photographs that were taken of Ms. Vargas' injuries.

13   Mr. Gutting took a bunch of photos to document her injury,

14   but with the exception of the one photo of Ms. Vargas'

15   breast, he deleted them all.

16          He deleted the photos because that's deleting the

17   evidence that shows Ms. Vargas was injured.  He testified

18   that Ms. Vargas had -- was injured in the back, that was one

19   of the photos.  Another photo was the right shoulder.  The

20   photo of Government Exhibit 3, Ms. Vargas' left breast and,

21   of course, the puncture wound of the taser because that's the

22   whole purpose the photos were taken to show where Ms. Vargas

23   was struck.  The photo would not have been taken if this

24   wasn't a taser puncture wound.

25          And you heard from Mr. Meyer, Greg Meyer that

```
 1    certain areas that should be avoided if you're gonna use the
 2    taser.  His tasering of Ms. Vargas was totally unnecessary,
 3    unwarranted and unreasonable because there was no law
 4    enforcement reason.
 5            And one other point about the cover-up.  There was
 6    evidence of more than one taser cartridge probe.  Government
 7    Exhibit 56 every time there's an entry to the report, how
 8    many times the reports are being changed.  Well, just on the
 9    issue alone of how many taser cartridges there are, on
10    March 25th, 2005, that's a month after the incident, three
11    spent taser cartridges were supposedly booked into evidence,
12    and then on that same day it's changed, the quantity, from
13    three taser probes to two.  And then it's changed back from
14    two to three.  And then again it's continuing to change two
15    to three.  You know what you collected in evidence.  Why is
16    it changing back and forth so many times?
17            And then when you get to April 14th, this is six
18    weeks after the incident, now it's changed again by Officer
19    Gutting to go from three to two.  To destroy, to get rid of
20    the evidence showing that the taser probes that were used and
21    having those in evidence.  Because the taser probe, that one
22    taser probe, that one remaining in evidence, that was
23    inspected by Taser International person that was evidence
24    that showed that there was a taser shock on Ms. Vargas
25    because he was able to tell by the data in that taser probe
```

1    that the circuit was completed.

2            Based on the evidence that's been presented, based

3    on the laws, defendant abused his powers as a police officer

4    and he violated the law that protects everyone from being

5    subjected to unreasonable force.  And based on that evidence,

6    we ask you to find the only verdict that's consistent with

7    the evidence and that fairness requires and that justice

8    requires, find the defendant and hold him accountable for

9    what he did to Mr. White and Ms. Vargas.  Find the defendant

10   guilty of Counts I and II in the indictment.

11           THE COURT:  Thank you, Mr. Arkow.

12           Now, on behalf of the defendant, Mr. Sclafani,

13   we'll hear from Mr. Schwartz.

14           MR. SCHWARTZ:  Thank you.

15           Sometimes it's hard to know where to begin.  Begin

16   at the end.  This case has been presented to you incomplete.

17   This case has been presented to you through innuendo,

18   speculation and not reliable evidence.  There's been a number

19   of disingenuous arguments made by the prosecution right

20   before you just a few minutes ago.  And what's more than

21   troubling is that the prosecution here has the burden of

22   proof.

23           I won't go through a history lesson, but our

24   country has gone through a lot of phases to get where we're

25   at and it may not be perfect, but it is one of the best in

 1    the world.  Why?  Because we hold the government to having a

 2    burden of proof.  We hold the government proving somebody

 3    guilty beyond a reasonable doubt with reliable, credible

 4    evidence not speculation, not innuendo.  This case has been

 5    filled with it and so has the argument.

 6              An example to just start off, counsel argued about

 7    a cover-up.  Has there been any real evidence of a cover-up?

 8    Now, it's expected the Court will instruct you not to leave

 9    your common sense at the door, folks.  Don't expect people's

10    life experience to walk in and pretend you've got no

11    background and common sense.  People need to use their

12    intellect.  If you're intellectually honest with this case,

13    the government has not proven its case.

14              If Matthew Gutting is to be believed by the

15    government when they need him to be believed and disbelieved

16    as a conspirator of some kind when they don't want him to be

17    believed, what kind of credible evidence is that?  What is

18    that?  Because of the burden of proof and presumption of

19    innocence, the government's not allowed to cherry pick.  They

20    have to take their entire case, all the evidence warts and

21    all.  How fair is that to cherry pick?

22              Believe Matthew Gutting when it's convenient for

23    our case, disbelieve him and see him as a coconspirator when

24    it's less.  Believe Jamal White when it's convenient for our

25    case and forget about the times when he's inconsistent,

1  contradictory and even lying under oath when it's not.

2  That's why we have this system.  Because we have 12 people

3  who can cross their arms, look at the government and say

4  prove it to me.

5      The government showed you Exhibit 76, the case

6  audit and it had a number of entries about changing taser

7  cartridges from three to two and two to three and back and

8  forth.  Next to every entry was Matthew Gutting's number not

9  my client's.  There is no evidence in the record that my

10  client stood over his shoulder when it was done.  No evidence

11  they spoke about it.  No evidence they had conferred about it

12  none.  Not from Matthew Gutting's mouth, not from anyone's

13  mouth.

14      Now, there was mention by Matthew Gooding about a

15  Sergeant Gill because that also, that number was on a couple

16  of the entries at the end.  Government never called Sergeant

17  Gill to explain why his entry was there.  And what's more

18  importantly, use your common sense.  If Matt Gutting was

19  trying to cover something up by changing it, would he change

20  it back and forth and back and back and forth creating a

21  paper trail on a computer?  If you're really trying to cover

22  something up, you don't want anybody to know about and you

23  have to change something in the report, would you do it back

24  and forth over and over again?  If you're trying to say there

25  were multiple taser cartridges and then you've got to make it

small like there were two, would you change it from three to
two, then back to two to three.  Did you have a change of
heart all of a sudden?  Back to three to two.  Had a change
of heart, back to two to three.  You don't leave your common
sense at the door.

　　　　　If my client was looking to cover things up with
Ms. Vargas, these are examples and there were multiple taser
cartridges, multiple tasers and Matt Gutting had his own
camera to take photographs, now, remember based on counsel's
argument that this was a gratuitous tasing of some kind, just
for kicks, would he take away, would he tell the person who
is the coconspirator of sorts, you don't take the photos with
your camera.  Give it to a third party.  Let Andrea Heath
take the photos because then it's harder to cover up that
way.  Would that make any sense?

　　　　　And the question is well, we're worried about her
privacy.  If the two of them really did this, you think they
were worried about her privacy to take a few photographs?
That makes no sense.  And it's a specious argument to put a
redacted police report in front of you that's blacked out and
to say he never said this in the report, he never said that.
That's their evidence.  That's how this case has been tried
from the get-go.  That's simply wrong.

　　　　　Being a juror is probably the hardest job in this
courtroom.  You determine the facts.  And if you cannot

determine the facts at the end of this case, you get to the

end of these arguments and you're back deliberating and you

can't tell exactly what happened, you're on a proverbial

fence.  There is no verdict form for on the fence.  Verdict

form is either not guilty or guilty.  There's no form for on

the fence.  No form for abstaining.

If you're on that fence because you can't tell what

happened, yeah, there's evidence one way, there's evidence

another way, the government's job is to push you over that

fence.  They haven't done it.  He's not guilty.  It wasn't a

technicality, folks.  He was never guilty to begin with.

That's what's fair, that's the presumption of innocence.

The presumption of innocence says my client gets

the benefit of the doubt not the government.  The benefit of

the doubt goes to the defendant.  They have to prove it.

They have to be able to erase every reasonable doubt.  I

expect the Court to instruct you about what a reasonable

doubt is, the definition of it.  A doubt that would give you

pause in an important affairs of your life, important

affairs.

Now, when Jamal White testified, he testified that

he was tased first he said only once.  He was asked several

times by counsel how many times were you tased?  One time.

Are you sure?  One time.  If this was such a horrible

incident for him, he can't remember twice?  Once he's

1    reminded about the multiple versions of his story on cross,

2    then he comes up with two times.

3            And the first time he comes up with was some form

4    of what he called, what's been termed as a drive stun.  Where

5    is it, folks?  There is evidence the government can't get

6    away from.  Greg Meyer testified for the government.  He

7    testified he's been a taser expert for over 30 plus years.

8    Not just an expert how the taser actually works, also use of

9    force.

10           Isn't it ironic they never asked him any questions

11   about use of force here from Mr. Meyer?  Use of force expert

12   on the taser bar none.  The government's own paid witness.

13   Let's not give him any materials about this case.  Any facts

14   about this case.  Let's just ask him about how the taser

15   operates.  Instead let's ask Eddie Cole about uses of force

16   and things of that nature and not Greg Meyer.

17           Well, things Greg Meyer did say a drive stun leaves

18   a welt and counsel asked him about that on redirect.  Could

19   it be you wouldn't see it maybe because of the pigmentation

20   of someone's skin?  He said look, there were different

21   factors, but the reality is it leaves a welt, it does.

22           Now, if Mr. White is tased in the chest as

23   testified to by Dennis Decker, where is any mark?  If it's on

24   the shirt, wouldn't there be some kind of a burn mark.  This

25   is electricity, folks.  You saw when that thing was fired.

1    You saw the electricity flying between it.  There's no mark

2    on the shirt at all?  No burn?  Nothing.  No welt, no

3    nothing.

4              According to Mr. Meyer, that's not consistent with

5    a drive stun at all.  That's the science.  Can't get away

6    from that.  What everybody wants to claim happened this

7    speaks against that.  That's called a reasonable doubt.

8    That's what that's called.  Because you had Mr. White giving

9    multiple versions of the same event, multiple versions.

10             Would you buy a car from someone like that?  Would

11   you trust someone like that?  But in a case about somebody

12   accused of two serious crimes, that you trust him for?  No,

13   you don't.  Dennis Decker said that the first tase happened

14   as a drive stun.  Dennis Decker also said on cross

15   unequivocally he did not see the whole thing.  Had he seen

16   it, he would have reported it and he didn't.  That's what he

17   said.  And he also said on cross-examination that when he saw

18   the drive stun, it made Mr. White convulse onto the floor.

19             You heard from Mr. Meyer uncontradicted that

20   doesn't happen with a drive stun.  Not it could happen

21   sometimes, not it depends on the person.  Mr. Meyer was

22   unequivocal and in 30 plus years training people, being

23   trained, tasing people, being tased, reading the literature,

24   testifying you do not convulse from a drive stun, period.

25             So what did Mr. Decker actually see then?  What

 1    could Mr. Decker have actually seen?  Dennis Decker testified

 2    that if he actually was in the jail at that time and he

 3    actually saw some of this incident, he did not see the whole

 4    thing.  And Dennis Decker testified that what he did see once

 5    White was on the floor that White was kicking and thrashing.

 6    And on cross-examination that was before that tase on the

 7    floor not after before.

 8         And Dennis Decker said unequivocally based on his

 9    training and experience, that somebody kicking and thrashing

10    like that could be dangerous to an officer.  If you can kick,

11    you can injure.  And Dennis Decker also said he saw Mr. White

12    kicking and thrashing on the floor.  And that my client was

13    closer to him, Mr. White than Dennis Decker was and he

14    couldn't see my client's vantage point, he couldn't.

15         You heard the same thing from Eddie Cole that based

16    on their training, based on the taser addendum that you have

17    seen, you don't second guess with hindsight unless you can

18    put yourself in the officer's position what they're

19    experiencing.  No matter how many times counsel asked Eddie

20    Cole that question, he didn't equivocate.  He didn't waiver.

21    It depends what the officer is experiencing.

22         This is the addendum.  And if you remember counsel

23    cross-examined or actually direct examination of Mr. Cole,

24    and tried to get Mr. Cole to separate out these two

25    paragraphs as if they're mutually exclusive and they're not.

And Detective Cole said he was to take the entire addendum, the entire use of force policy and you have to apply that to a particular situation.  Always keeping in mind, this is a paraphrase, always keeping in mind what the officer himself or herself is viewing or witnessing at the time.  Keeping that in mind.

Because of that, Dennis Decker would not report this.  He didn't say he was afraid to, and counsel got into the whole meat eater, lettuce eater thing with Dennis Decker. Another innuendo.  Another red herring to throw you off from whether or not its actually proven its case with hardcore, reliable facts.

And Dennis Decker said he was a lettuce eater and there were meat eaters and the meat eaters were mostly Gill and Henderson.  And he threw my client under the bus by saying that he was friends with Gill.  The whole thing started from that one burglary call and it had nothing to do with Anthony Sclafani.  And in that early call there was somebody bragging about maybe abusing a suspect not my client.  And after that call, that's when they had the lettuce eaters and meat eaters as a differentiation between two groups, two factions.

Why did it have to come in?  What relevance was that to this case at all?  And if the argument is well, Matt Gutting was labeled as well as some kind of a lettuce eater,

1    well, according to the government, Matt Gutting is a

2    coconspirator tasing people for no reason.  Is that a lettuce

3    eater?  The only reason any of that evidence came in through

4    the government was again through innuendo because it was not

5    through evidence.

6            You heard Gus Paiz testify uncontradicted those two

7    definitions that entire subject is a joke.  When counsel

8    asked Gus Paiz well, weren't you called a lettuce eater by a

9    supervisor because you wouldn't shoot the suspect running

10   away?  He said yes.  Who was the supervisor who called you

11   that?  Was it Tony Sclafani?  No.  Was it Sergeant Gill?  No.

12   Was it the one name mentioned a couple times and you have no

13   idea why Dave Henderson?  No.

14           It was Eddie Cole who Dennis Decker labeled as a

15   lettuce eater yet somehow he was commenting and somehow

16   berating a fellow lettuce eater when he was a meat eater.

17   See where this goes?  It's preposterous.  It's just there to

18   convict somebody on slander and innuendo.

19           Why was Andrea Heath mentioned at all?  The only

20   evidence about her whatsoever is taking photographs, that's

21   it.  And there was something strange about how she took the

22   photographs and how she gave the photographs to Decker rather

23   than to Gutting.  Why wasn't she called to testify about

24   that?

25           Yet counsel spent a number of minutes ad nauseam

with Sergeant Paiz about Andrea Heath and about whether

Andrea Heath was somehow being retaliated against and her

problems with the Department because of this case, because of

cooperating with the FBI.  You know what Sergeant Paiz said

to that question whether or not she cooperated with the FBI,

he looked counsel in the face and said so did I, we all did.

How is she relevant to any kind of argument?  Yet she's

thrown out there to say there's some form of retaliation.

There's some form of a huge conspiracy going on in this case.

It's never been proven.  No links there.  You heard it from

counsel and the only way they can convict is to speculate how

these things are tied together when they're not.

        The same questioning occurred if you remember Matt

Drew.  How many minutes, how long did we spend, an entire

morning on that case audit with Matt Drew.  The number 39 you

went into that report, you changed it.  He looked counsel

right back in the face and said that's not my ID number.  I'm

039.  Every officer has a zero in front.  Oh, who is that?

Who is that?  That's Caroline Firestone.  Who is she?  She's

a record clerk.

        And then on cross is it common for a records clerk

to go into a report and print it?  Yes.  So where's the big

conspiracy, folks, that Matt Drew is somehow conspiring to

cover up because Caroline Firestone, a records clerk, in the

course and scope of her duties went into the report and

1    printed it out.  That's been their case over and over again.

2            Defense expects the Court to instruct you and in

3    beginning of the case the Court actually did instruct you the

4    fact that my client has been indicted is not evidence of

5    anything.  Now you know why.  If the government could not

6    stand up in front of you and make a cogent, reasonable

7    argument in their case at some point we shouldn't even be

8    here.  If his argument, the government's argument was

9    nonsense and if didn't make any sense, if there was no

10   reasonableness in the argument whatsoever, we shouldn't be

11   here.

12           The fact he can put a few things together and make

13   it into an argument is not the finishing line.  It's the

14   starting point.  It doesn't come close to proving guilt

15   beyond a reasonable doubt.  That's what fair.  That's why we

16   have this system.

17           Again, counsel argued to you that what Matt Gutting

18   thinks is a taser mark in the breast in the photograph,

19   that's the only person they asked.  They had Greg Meyer on

20   the stand.  They specifically would not show him anything

21   about the case or the facts of the case.  They can show him a

22   photograph and say does that look like a taser mark

23   consistent with your 30 plus years of experience.  That's

24   their burden.  And they can argue the defense didn't either,

25   but that's their burden.  They to prove that.  They asked

1    Matthew Gutting who says that's a taser mark to me, oh, we

2    can use that.  Then when he says she was running away when I

3    tased her, oh, he must be lying about that.

4            Is that fair?  In real life would you do that?  No.

5    They can't.  They have a burden of proof.  And look what else

6    they presented about Matt Gutting as this coconspirator that

7    he's been in federal court a number of times changing three

8    to two and two to three with the cartridges.  Counsel

9    actually argued that since there are multiple activations

10   that must mean there are multiple cartridges.  Is there any

11   evidence of that?  Any evidence of that?

12           Did Mr. Meyer ever testify that with multiple

13   activations there must be multiple cartridges?  No.  Did

14   anybody testify there were multiple cartridges used?  No.

15   Any evidence of the multiple cartridges?  No.

16           Mr. Meyer did testify that it is common that when

17   someone gets tased if those darts don't make effective

18   contact, that in fact there's no closing of the circuit.

19   It's ineffective tasing.  And Mr. Meyer testified based on

20   his training and experience that officers are trained that if

21   there's no effect, they fire and pull the trigger again.  Not

22   they change darts.  They pull the trigger again so there will

23   be an effect.

24           Now, you can take Matt Gutting's word on a few

25   things for the government.  Matt Gutting said he heard a

```
 1    clicking sound.  Couldn't tell from his taser or anybody
 2    else.  Well, Mr. Meyer testified that that popping sound
 3    means there's no closing of the circuit.  And Andrew Hinz
 4    testified that you could have multiple activations with those
 5    two darts.  All he could tell was one activation had a closed
 6    circuit not that there were multiple darts or multiple
 7    cartridges.  He could tell, Mr. Hinz, from his testing, again
 8    uncontradicted, there was one closed circuit from the darts
 9    of no more than five seconds no less than two seconds.
10         Matthew Gutting turned in his report almost two
11    months late.  Anthony Sclafani on time.  Matthew Gutting
12    turns in the PTR for the data cartridge late.  Tony Sclafani
13    on time.  Where is the big cover-up?  This case again has
14    been about trying to throw up enough dirt, not evidence, dirt
15    to get somebody dirty.  You can't convict on that.
16         Counsel argued that the pepper spray of Jamal White
17    in the patrol car was excessive force.  My client was not
18    charged with the pepper spraying of Jamal White.  Why argue
19    that at all?  If it would have been excessive force, you
20    think he would have been indicted?  It's not in the
21    indictment.  The count against Jamal White deals specifically
22    with tase.  Let's throw enough dirt up against the wall and
23    hopefully somebody gets dirty.
24         Counsel also mentioned what counsel expects the
25    Court to instruct you about willfully depriving somebody of
```

```
 1    their constitutional rights.  Counsel expects the Court will
 2    instruct you about willfully.  My client must have the
 3    specific intent to violate their civil rights.  That means
 4    the specific intent to use more force than he knows is
 5    necessary in that situation.
 6            Now, let's go backwards, taking Ms. Vargas' case,
 7    second count what do you have?  In reality what do you have
 8    on that count?  You have a redacted police report that my
 9    client admits in the report in the non-redacted area that
10    Ms. Vargas was pepper sprayed once and tased.  That's all you
11    have.
12            Now, the government may argue that there is no
13    justification.  The government has to prove a
14    non-justification.  The government has to prove beyond a
15    reasonable doubt that the tasing was unjustified not just
16    unjustified, but with the specific intent to be
17    non-justified.  They didn't.  That's all you have.  They
18    haven't called Ms. Vargas to testify.  Anybody else who may
19    have witnessed it?  We don't know.  That's their burden of
20    proof.
21            So at the end of the day, all you have regarding
22    Ms. Vargas, all you have and it's never been in dispute my
23    client wrote a report that she was pepper sprayed and she was
24    tased.  Unless there is evidence as to the wrongdoing of it,
25    the specific intent to do wrong, that's not guilty.  That's
```

1    what that means.

2         And in a case like this, ladies and gentlemen, it

3    is a difficulty to be intellectually honest.  You've been

4    sitting here for two weeks.  You've seen lots of people

5    testify.  There's an indictment out there.  I mean, if that's

6    all they've got and I'm supposed to vote not guilty, then why

7    I am here?  It's the end of the case and that's all they've

8    got and it's not fair to convict somebody based solely on

9    that.

10        It was testified to that police officers use tasers

11   as a control device and according to the taser addendum

12   coupled with the use of force, specifically, Exhibits 12, 11

13   control devices and techniques.  And one of those control

14   devices are tasers, a control device.  Same level as pepper

15   spray.  And according to the use of force policy are no

16   different levels than going hands-on.

17        Meaning, if it's inevitable that you're gonna have

18   to, as described by the witness, place your hands on

19   somebody, I mean, physically control them in some way, that's

20   inevitable, then rather than you get injured possibly as the

21   officer or them get more injured, you go physical with

22   somebody and puts hands on them and there's a struggle, means

23   there's a much more lasting injury testified to by Mr. Meyer.

24        The reason for the tasers and its use is to cut

25   down on injuries.  If it's with the darts, the person is

```
 1    incapacitated if it works properly for five seconds, however
 2    long the trigger is pulled.  They can't moved.  That allows
 3    the officer to gain control.
 4         Police officers are charged in this country let
 5    alone in the State of California with securing and
 6    controlling inmates, arrestees, persons in their custody,
 7    securing and controlling.  Now, the government may argue that
 8    if they're tasing somebody unlawfully, you're not securing
 9    somebody.  And if it is unlawful, then that's true.  No
10    evidence it was unlawful.  They just said that it was done.
11         And in order to secure and control someone, you
12    have to have means to do it that is greater than any
13    resistance they can give you.  The question is how much
14    greater.  Too much greater, it's not reasonable.  But if
15    there's gonna be any form of a hands-on confrontation, the
16    taser was deployed to these officers to cut down on those
17    injuries.  There's no wrestling match on concrete.
18         Now, if Matt Gutting is correct and Ms. Vargas was
19    running out that door and he didn't see my client except for
20    at the doorway.  He didn't see him tase, but he decided to
21    tase, counsel argued his tase was also unreasonable.  If she
22    really is moving away, and there's no evidence otherwise,
23    folks.  I mean they can argue, government could argue that
24    she was too drunk to walk or stand.  Mr. Fort didn't say that
25    she couldn't.
```

1          Mr. Fort testified that if she was at that blood

2     alcohol level at the draw and there was an equivocation from

3     the other witnesses about when that draw was, 4 o'clock, 4:00

4     something on the VCR or the blood draw that Matt Gutting

5     filled out, 5 o'clock.  What Mr. Fort said it would be

6     consistent that she couldn't be mobile an hour or two hours

7     later.  That's what he said.

8          But the government never asked him that question

9     whether or not there are factors play into it like when she

10    was immobile before which was at 3 o'clock, not 4:00 not 5:00

11    not 6:00 at 3 o'clock when the traffic occurred and shortly

12    thereafter going to the station, the fact she'd just been in

13    a traffic collision rear-ended a school bus, would that play

14    into it at all?  If there were any other problems with her,

15    would that play into it at all?  They didn't ask those

16    questions.

17         Just purely with that alcohol level at 5:00 or

18    4 o'clock would you expect her to be mobile at 6 o'clock.

19    Mr. Fort testified that number one you need to have her

20    drinking pattern.  Number two, it's good to have her drinking

21    history.  If she's an accomplished alcoholic who drinks to

22    excess, then she can be mobile.  He's seen people at those

23    levels or higher running away from the police, driving cars

24    away from the police.  No way knowing.

25         And again if Matt Gutting is to be believed in

1    certain parts to help the government, can't not believe him

2    in other parts.  They're not allowed to cherry pick.  They

3    have a burden of proof.  And again, if Matt Gutting saw taser

4    darts go out and saw her fall down slowly, which counsel

5    argued for the government, but Matt Gutting also testified

6    that he saw one dart spiral out of control and hit the wall

7    which means not a closed circuit.  That his darts would not

8    have made her go down slowly.  His darts would not have made

9    Ms. Vargas incapacitated.  That's his own testimony.  Somehow

10   that was ignored.

11          So if she was affected by the taser, it had to be

12   somebody else's.  Couldn't have been Matt Gutting which would

13   lead to a reasonable inference that there was a second tasing

14   after Matt Gutting and that tasing was my client as she was

15   running past out the door.

16          Now, Mr. Meyer testified to the clock drift and he

17   was specific.  He said he's rarely seen two tasers that are

18   synched up unless someone took the time to put them on the

19   same computer and make sure they were synched to that

20   computer time.  He said an operator would only know that if

21   they were looking for it or if the screen came up as a

22   warning type of screen and say they're out of synch more than

23   ten minutes of the computer time.  He said some of the older

24   ones, five minutes.

25          Now, in this case we've had lots of computer

```
 1   evidence.  We've had those case audits, you've had downloads.
 2   Where is the computer evidence FBI or the government as to
 3   the synchronization from the computer clock on the computer
 4   when those tasers were downloaded?  Where's that.  Mr. Meyer
 5   was asked very specifically if there's more than one computer
 6   and Taser A is synched to this computer and maybe Taser B to
 7   this one, are they gonna be synched to the same time?  No,
 8   you have to be on the same computer.
 9           Counsel argued that there's evidence it was synched
10   to the same computer.  Where?  Nobody testified to that.
11   There's no documentation of that.  There's none.  Would that
12   be so hard for the government to get to meet their burden of
13   proof?
14           I'm going to ask your indulgence a few different
15   times to refer to my notes.  The case is very important and
16   in an attempt not just to expedite the thing, but for
17   clarity, both sides are not gonna argue for as long as the
18   evidence was given.  We would be here two more weeks.  We
19   have to have that argument cut down for clarity purposes to
20   cover the main points of each side's argument.
21           It's hard for the defense because not only do we
22   have to address what the prosecution's argued, the
23   government, and then what we plan on arguing ourselves, but
24   then we also have to address what we may think they may argue
25   in rebuttal.  And the second hard part is we've been trained
```

 1    as children and onward, most people remember the first thing

 2    they hear or the last thing.  The middle stuff somehow gets

 3    lost in the shuffle.

 4         And the defense is making the arguments in the

 5    middle.  We're gonna ask you even at this juncture don't

 6    forget what the defense argued.  Don't forget all these

 7    problems with their case.  All these holes in their case

 8    equals all reasonable doubts.  Yes, listen to the arguments,

 9    both arguments with an open mind, but don't forget these

10    things when somebody else stands up to argue to you.

11         In order to meet the burden of proving my client

12    guilty beyond a reasonable doubt, the government must show

13    you some circumstance that the tasing of Ms. Vargas was not

14    just unjustified, but my client did it willfully with the

15    specific intent for it to be unjustified.  You've got no

16    surrounding circumstances to it.  You've got none.

17         Now, they found Mr. White two time parolee,

18    two-time felon.  He came in and testified.  Ms. Vargas

19    didn't.  They found her for an interview for way back once

20    for the IA.  Without those surrounding circumstances and it's

21    a difficult job to be a juror, there is no evidence that my

22    client had the specific intent to deprive her of her civil

23    rights.  The specific intent to use excessive force.  There

24    is none.

25         And had Sergeant Sclafani decided to cover things

1    up because it was unlawful and had he decided to come up with

2    some story as to why and that story made no sense, don't you

3    think you would have heard about it?  In the redacted police

4    report, if there was part of that report that was

5    nonsensical, don't you think you would have seen it as

6    evidence of a cover-up, as evidence that he lied, as evidence

7    that we can't believe what he says in his police report.

8           They argued that about Mr. Gutting.  They argued

9    that right now.  How come we didn't see a reference to Matt

10   Gutting in his report.  How come we didn't see reference to

11   Tony Sclafani in Matt Gutting's report?  They argued that.

12   If there was some nonsensical or some made-up story that was

13   contradicted by other evidence and made up by some of the

14   witnesses in that report, don't you think you would have seen

15   that?

16          Again, it's a specious argument to say he doesn't

17   say this in his report and he didn't say that in a redacted

18   report.  And the testimony was from Dennis Decker and from

19   Matt Drew because of the way that jail was set up and the

20   lack of ventilation, when pepper spray or things of that

21   nature were used, the doors were opened to air out the place.

22   Remember Terry Sherman said had seen those doors open all the

23   time.  He talked about some kind of wind current, a vortex he

24   called it with AFIDs, but it's a regular occurrence because

25   there was no ventilation back then in 2005 when they shared

```
 1    offices with civilians.  They had to ventilate that area.

 2              Now, we expect the Court to instruct you as well

 3    that if there is evidence relating to an admission or some

 4    kind of statement by the defendant as an admission that you

 5    can view it with caution.  This is exactly why.  It's exactly

 6    why.  It's exactly why, folks, because looking at Mr. White's

 7    report on Mr. White, redacted report on Mr. White, counsel

 8    argued that he was unhandcuffed.  Well, nobody said that in

 9    testimony.  Again, another misleading argument.

10              The report doesn't say he was unhandcuffed.  The

11    report says I approached and attempted to handcuff him to the

12    stationary bench.  It didn't say unhandcuffed.  The bench

13    itself had handcuffs on it.  My client wasn't just upset and

14    angry.  He was attempting to handcuff a prisoner to a bench

15    to keep him under control.  Counsel argued that if he was so

16    out of control or a problem, why did he put him on the bench

17    unhandcuffed?

18              Well, my client wasn't trying to put him on the

19    bench unhandcuffed.  He was handcuffed.  He wasn't trying put

20    him on the bench unsecured.  He was trying to secure him to

21    the bench, that's what was going on.  And ironically Dennis

22    Decker didn't testify to that, not one way or the other.  The

23    government didn't ask him that question.  Did you see

24    attempting to handcuff him to a bench?  Was he handcuffed to

25    the bench?  Not at that time.  He didn't see the whole thing.
```

1        Now, on the night of the White incident, Defense

2   Exhibit 205, and it's voluminous, folks.  I'm not gonna tell

3   you to look through all of it.  You can if you want.  There

4   are certain things we have discussed already in the evidence

5   that were very specific to certain witnesses.  This is also

6   admitted and this is also a CAD report from Dennis Decker

7   from the night of the White incident.  And if you look at it,

8   Dennis Decker was on a call and he goes 10-8 meaning he

9   decides to leave that call what time at 9:39:39.  The tasing

10  of Mr. White happened At 9:45 six minutes later if the

11  downloads are accurate in their times.  That means Mr. Decker

12  would have to get back to the station within six minutes,

13  whatever else he was doing and be there to view or witness

14  this in its totality.

15        There's been no evidence that from where Palm Drive

16  is back to the station, what that distance is, how far that

17  is and if somebody could drive that only in six minutes, but

18  just try that.  Get into your car, going on the radio going

19  10-8, leaving, drive the distance, go through the gates, park

20  your car, get out of the car, close the door, go into the

21  jail, what other business you have to do in the jail.  Then

22  witness something.  All that in the six minutes.

23        Government didn't say anything about how many

24  traffic lights on the way, stop signs on the way.  No

25  evidence.  That's their burden because that's their witness.

1  And consistent with this, consistent with that time that he

2  was busy just six minutes before offsite somewhere else in

3  Desert Hot Springs, Dennis Decker he said he didn't see the

4  whole thing.  That's what's consistent.  That's called a

5  reasonable doubt.  That's what that's called.  That's why he

6  didn't report this at the time.  At the time he wasn't

7  sitting in custody on a felony.  At the time he was working,

8  but he couldn't see the whole thing.  He didn't even get

9  there in time to see most of it.

10       Dennis Decker testified that Matt Drew also was

11  there at the time.  That he and Matt Drew were the ones who

12  helped Mr. White up.  Matt Drew wasn't there.  He was on a

13  separate call and that also came into evidence through Matt

14  Drew.  Another CAD report and this is Matt Drew.  And he is

15  on a separate call when this tasing would have taken place.

16       But Dennis Decker said he was there.  These don't

17  lie, folks.  He wasn't.  Dennis Decker does.  At the very

18  least he has a very convenient memory when the prosecution

19  wants.  But putting these together next to each other paints

20  a much clearer picture of what he could have seen and what he

21  could not have.

22       Dennis Decker also testified that his direct

23  supervisor at the time was Eddie Cole not my client.  That my

24  client had been a supervisor for him, but not a direct

25  supervisor.  And Dennis Decker testified that my client was a

 1    probationary sergeant, and Dennis Decker testified that if it

 2    was probation, you could be let loose.  You could be

 3    terminated for no reason off your probation.

 4            Eddie Cole was the senior sergeant at the time.

 5    You saw Eddie Cole testify.  Did he look timid?  Did he look

 6    easily intimidated?  He was the senior sergeant.  He was

 7    Dennis Decker's direct supervisor.  He's one of these quote,

 8    unquote "lettuce eaters".

 9            And Dennis Decker doesn't report to his direct

10    supervisor, the senior sergeant that I saw misconduct.  I saw

11    illegality on part of the new probationary Sergeant Anthony

12    Sclafani.  Does that make sense?  He said he didn't because

13    he didn't see the whole thing.  And you know what, you may

14    find by the Bates stamp at the bottom 233, Dennis Decker

15    couldn't see the whole thing.  That's the evidence.

16            Again, to show how this evidence has come in, the

17    very first witness Karen Harper, the first witness for the

18    prosecution, she's asked on direct by counsel if Mr. White

19    was resisting at all when he was being escorted to the car

20    and she said no.  Was he mouthing off?  No.  Was there any

21    kind of resistance to the officers?  No.  Ironically, on

22    cross-examination we start asking details, she was asked

23    where she was sitting at the time.  She was sitting in her

24    apartment.  And Sergeant Sclafani, the other officer was

25    sitting across from her.  And from his vantage and from her

1    vantage point, he couldn't see where Officer Drew was outside

2    with Mr. White.  She couldn't see it.  And then on top of

3    that, she was asked could she hear it.  No, there was loud

4    music downstairs.  Were you trying to listen to it?  No.

5    Could you hear anything?  No.  Well, at some point the other

6    officer said he was gonna leave and talk to Mr. White.  And

7    you asked if you could see Mr. White again; right?  Yeah.

8    And he told you no?  Yeah.  Did you stick your head out the

9    door to try to see Mr. White at that point?  No.  I went to

10   go take a shower.  If she couldn't see where she was sitting

11   what was going on between White and Drew, but he leaves the

12   opposite direction to go take a shower so how can she testify

13   on direct that he was not being combative, he's not being

14   resistant and he was not mouthing off if she couldn't hear

15   anything and she couldn't see anything and she didn't see

16   anything because that's what they wanted, that's what she

17   gave them.

18          That's been their evidence this entire trial.

19   That's not right.  That's why we have the system.  We have a

20   system, one of the few systems in the world, where the

21   people, the citizenry, get look at the government and say you

22   have to prove it.  Asking the government doesn't mean we take

23   what you say for granted.  Prove it to us.  They haven't.

24          Now, what we have with Ms. Vargas is evidence a

25   record of three activations, that's what we have.  And it was

1    testified to both by Mr. Meyer and by Mr. Hinz that that's

2    all that shows.  It doesn't show whether or not there was a

3    closing of the circuit.  Doesn't show whether or not the

4    person actually felt the electricity.  Doesn't show what kind

5    of activation it was.  Was it a drive stun or was it the

6    darts?  It just shows three activations.  Doesn't show three

7    cartridges as counsel just argued to you, and you should be

8    somewhat intellectually insulted to be quite honest.

9          It shows three activations and Mr. Hinz went

10   forward to say oh, he could tell us one of these three with

11   the cartridge he had that was no more than five, no less than

12   two.  That's all he could tell us.  Which one of the three it

13   was, he couldn't tell.  No way of knowing.  Didn't say there

14   have to be multiple cartridges.  Mr. Meyer didn't testify it

15   had to be multiple cartridges.  Nobody testified as to

16   multiple cartridges.

17         And any changes Matt Gutting made to his report,

18   not to the computer, folks.  The testimony was that to go

19   into that RIM system is when you go into the report.  Not to

20   book in the evidence, not to PCR which is booking the

21   evidence.  When you go into that report, that report number

22   is what initiates or is a catalyst for the computer system,

23   the audit to have a record of it.  That's when it happens.

24   And it was testified to again uncontradicted by Gus Paiz that

25   that's the way system works.

1          And that's why you can something that the PCR shows

2     was booked in a given time and be months later you don't see

3     that entry about the booking in the audit.  Why?  Because the

4     audit shows when the report was written and when it got

5     booked into evidence through the report.  It doesn't show

6     when the person fills out the PCR.

7          Any changes Matt Gutting may have made, there's no

8     evidence my client had any part of those changes or would be

9     stupid enough as a sergeant who knows that there's a system,

10    who knows that -- Sergeant Paiz called him his mentor, that

11    to go into that report is gonna have something initiated in

12    the audit.  To somehow sit there with Matt Gutting and say

13    let's change it from three to two.  No, make that two to

14    three.  No, make that three to two.  How sensible is that?

15    How ridiculous is that?  That's their evidence.

16         I open the cell door.  I apply a half burst of

17    pepper spray to Vargas' face.  It had an immediate affect on

18    Vargas.  Couple that with the use of force.  Now, counsel

19    expects the Court to instruct you that a police officer in

20    the State of California in the lawful course and scope of his

21    or her duties, not only can use reasonable force that's

22    necessary, but for different purposes.  One is to effectuate

23    an arrest, one is to prevent escape and one is just to gain

24    control, overcome resistance.  And the use of force policy,

25    the same thing.  You see those Penal Code Sections.

1        And you have argument by counsel, you have heard

2    testimony throughout this case based on counsel's questions

3    that somebody Ms. Vargas' size, Ms. Vargas' weight with that

4    alcohol could hop a wall.  Could she really escape?  Again,

5    let's not leave our common sense at the door.  Who cares if

6    she can hop a wall?  Who cares if she's either a short chubby

7    drunken woman or she's a triathlete?  Escape doesn't mean

8    getting away for good.  Escape means out of my control and

9    custody.

10        Do you think any police officer could have an

11   arrestee walk out the jail door and say oh, well, she can't

12   hop the wall so I was let her stay out there awhile until she

13   falls asleep or hurts herself.  That's what escape means.  Is

14   it really an intelligent argument to say well, she couldn't

15   hop a wall so she's not a worry about escaping?  She's not a

16   threat to escape.  Escape means escape out of my control.

17   She has to be in custody.

18        And to go outside that parking lot, you heard

19   testimony, again uncontradicted, that parking lot was shared

20   by civilians.  Dennis Decker testified as well as others that

21   cars were kept running.  Maybe not every day, but it happens.

22   It happens often enough where a patrol car is kept running

23   and you just have somebody who was in a traffic collision DUI

24   and rear-ends a school bus that she runs out there, she walks

25   out there, any way she gets out there.  She's gonna hop into

1    a patrol car that's still running.

2              Oh, she can't get out the gate.  Okay.  So she'll

3    drive into the gate.  That's your excuse.  She couldn't get

4    away so she hurts herself or hurts somebody else.  She runs

5    out there and goes out there in that condition.  She can hurt

6    herself.  She can hurt somebody else whether it's another

7    officer or civilian.  That's as much as preventing escape as

8    getting away for good.  And it's ridiculous to argue that

9    because she couldn't hop a fence, she's not any kind of a

10   threat to escape.  It's ridiculous, but that's the way they

11   have argued this case.

12             Another telling factor, if you look at Ms. Vargas'

13   medical record, now, we can't make any assumptions, but you

14   would hope at least that she's at .22 blood alcohol level in

15   three weeks when she goes to the hospital in Arizona.  We

16   hope she's gonna report to a hospital for an examination that

17   she's sober and according to this, what we would hope would

18   be a sober state, she never talks about being tased.  She

19   never talks about pain from a taser dart.  Never talks about

20   anything besides being what she called mace and her ankle may

21   have somehow been twisted in the overall incident.  She

22   didn't blame who it was.  The way she describes it according

23   to roughly pushing and shoving and pulling.  You heard no

24   evidence of that from anybody.  Counsel hasn't argued that.

25   That was her recollection.

1          Now, if she recalls being pushed or pulled or

2     shoved in some form or another, does that sound like somebody

3     who is sitting down, laying down and being tase?  No.   If

4     there were any other things that went on, any other

5     misconduct that rose to the level to cause her pain or

6     anxiety of some kind, you think she would have reported it

7     and she claimed the ankle came from that.  All you heard

8     Eddie Cole testify he saw her walking down the street.  There

9     was no problem with her mobility that night.  She wasn't

10    limping.  She had no problem walking, not even staggering.

11    No problem with mobility as she's walking down the street.

12    He's lying to you.

13          And, again, counsel conveniently left out details.

14    Counsel argued that she saw Eddie Cole driving down the

15    street and she flagged -- she wanted a police officer.  She

16    flagged him down.  She wanted an officer to help her.  Well,

17    if she just got abused by police officers, why would she flag

18    down a patrol car?  And the answer is because it wasn't my

19    client or Matthew Gutting driving it.  This happened late at

20    night.  Don't throw your common sense out the window.  This

21    happened late at night on a street that Eddie Cole described

22    as having no traffic lights, so you're talking dark in the

23    desert, pitch dark.

24          He's driving an SUV that's marked with tinted

25    windows on all sides, the front, less of the tint in the

```
 1    back.  And he's driving towards her and she is walking this
 2    way and the only thing on that street then is headlights.
 3    Common sense, life experience can she see anybody that's
 4    behind the wheel as they get close?  Anybody?  She's seen two
 5    headlights in her face.  Did she make out who is behind the
 6    wheel at all?  And he said that when he made that turn, he
 7    saw her down the street and she started going like this,
 8    flagging him down.  That's when he went and he pulled over to
 9    her.
10         Now, if she just got abused, would she be flagging
11    down a police officer with no idea who was behind it?  No
12    idea who was driving it.  Any argument that she knew it
13    wasn't my client or Matthew Gutting, how?  There's no
14    evidence of that and the evidence speaks to the contrary.
15    From common sense life experience, look into a car's
16    headlights on the street, flashlight, you can't see anything.
17    In the pitch back all you can see are lights and who is
18    behind the wheel?
19         Same thing could be said of Exhibit 226,
20    Mr. White's medical records from that night, and his medical
21    records, somebody supposedly was abused, felt all this pain,
22    writhing in pain as counsel called it, doesn't speak to any
23    pain when seen by the doctor.  Doesn't give an explanation I
24    got beat up by the police.  I got tased by the police.  I got
25    sprayed by the police.  I was writhing in pain.  It still
```

1    hurts.  Look, here's my mark on my chest where I got tased.

2    Look, here's my mark here where I got tased.  Nothing.  How

3    credible is he?  These are not police officers he was talking

4    to.  Any argument that he was afraid to say something to

5    medical personnel, go through with it.

6            Now, as we spoke about in an effort for clarity,

7    these are not going to be long arguments.  Start winding

8    things up.  In speaking to the government's burden, in

9    speaking to the government's burden of proving beyond a

10   reasonable doubt, Dennis Decker with the problems with the

11   CAD reports that contradict it.  And if the testimony of

12   Mr. Meyers contradicts it and Jamal White again contradicts

13   Dennis Decker and it contradicts himself, even within his own

14   testimony.

15           Gotten over the lack of any evidence of Ms. Vargas

16   besides the fact that she was tased.  Now, that's not

17   evidence of specific intent to deprive someone of their civil

18   rights.  We went over that.  To use an analogy, try to wrap

19   things up a little bit.  You've heard evidence about the

20   ongoing investigation in this case.  Eddie Cole was asked

21   about it.  Gus Paiz was asked about it.  Multiple witnesses.

22           Eddie Cole testified that his training and

23   experience at Desert Hot Springs being trained on the taser,

24   that's what we have here back in 2005.  Eddie Cole testified

25   that the taser was used to gain compliance even for a passive

1  suspect who is passively noncomplying, passively resisting.

2  There's no testimony that it has to be somehow violent or

3  combative.  Counsel asked that to Eddie Cole first.  He

4  answered yes, but then in further questioning, no.  That's

5  not correct.

6          Refresh your memory with the taser addendum.

7  Refresh your memory with what the policy was.  With a control

8  device used to try to avoid those becoming combative, to

9  avoid those kind of hands-on situations, to avoid injury.

10  It's a very tough position to be in as a juror and yes,

11  police officers are given a lot of power in this country

12  because they have almost an impossible job.

13          When bullets are fired, most of us pay tax dollars

14  to be able to run away from the bullets.  They run into them.

15  When buildings are falling down --

16          MS. CARTER:  Objection, Your Honor.

17          THE COURT:  It's merely argument.

18          MR. SCHWARTZ:  Thank you, Your Honor.

19          When buildings are falling down, we run away from

20  them.  They run into them.  This policy coupled with how

21  counsel expects the Court to instruct, if you don't have

22  enough evidence to do that, you can't convict.

23          And in closing, by way of an analogy, this will be

24  in closing and only as an analogy, the difficulty of being a

25  juror and also, also how important it is.  And there are

```
 1    courts in the East where you have to get a guide to go
 2    through the jungle.  And while you're going through the
 3    jungle in this area of the world, you pay a guy.  The guy
 4    takes you through whether it's vines, whether it's jungles,
 5    mosquitos, the heat, all that kind of stuff maybe for a few
 6    days, maybe for a few months.
 7          When you get where you're going, you see a hut,
 8    nothing but a hut.  You don't see real doors just a hut.  And
 9    there is a little tunnel that you can crawl into to get into
10    the hut and it's dirty and it's muddy and there's probably
11    worms and other kinds of insects and whatnot to get to this
12    hut.  You just weathered the jungle, you've weathered the
13    heat, you've weathered the vines, all that goes with it the
14    thirst, the hunger.  You've weathered going through this dirt
15    to crawl into hut.
16          And when you get into that hut, it's no bigger than
17    the well of the court.  There is nothing there.  You paid
18    money for this.  You paid a guide for this.  There is nothing
19    there except a table with a cage and a bird and a key to the
20    lock on the cage.  And what you have paid money for as you
21    look through this hut and you see this bird and you see this
22    cage, you see the key is a small window on top of the hut.
23    What you paid money for is to open that cage and set the bird
24    free.  To experience the joy of setting another creature
25    free.  Once you have done that, you get to leave and that's
```

1    it.

2           With all the problems in the government's case, all

3    the innuendo evidence and the speculation arguments and the

4    specious arguments and the incomplete evidence, make no

5    mistake we've been through a jungle.  Maybe it took two weeks

6    to get there, but we've been through a jungle.  And with the

7    sword of reasonable doubts and with the shield of presumption

8    of innocence, we hacked through those vines.  We've crawled

9    through that little tunnel.  Here we are at the end in that

10   hut.

11          My client is the bird in that cage.  This nightmare

12   started in 2005, 2006, many years.  You can do that.  You

13   have those keys.  They're called the verdict.  You can take

14   those keys and do the right thing.  You can make the

15   government prove its case, which they haven't, and make them

16   have to prove beyond a reasonable doubt, make them meet their

17   burden, which they haven't and take those keys, those verdict

18   forms and do the right thing and the open the door and set

19   him free.  The evidence supports it in this case or lack

20   thereof and justice truly demands it not guilty on all

21   counts.  Thank you.

22          Thank you, Your Honor.

23          THE COURT:  Thank you, Mr. Schwartz.

24          We'll take a very brief recess and then we'll hear

25   the government's closing rebuttal argument.  Everyone please

```
 1    rise for the jury.
 2                         (Jury not present.)
 3          THE COURT:  Please be seated.  We're outside the
 4    presence of the jury.  Anything, Mr. Arkow?
 5          MR. ARKOW:  No, Your Honor.
 6          THE COURT:  Mr. Schwartz?
 7          MR. SCHWARTZ:  No, Your Honor.
 8          THE COURT:  We'll take about ten minutes.
 9                           (Recess taken.)
10          THE COURT:  Let's bring the jury in.
11                         (Jury present.)
12          THE COURT:  We're ready now to hear government's
13    closing argument.
14          Ms. Carter.
15          MS. CARTER:  Ladies and gentlemen, defendant
16    Anthony Sclafani is not a bird in a cage in the middle of the
17    jungle.  He's a police sergeant, a supervisory officer.  He
18    carries a gun, he carries a taser, he carries pepper spray.
19    He's a large man who was even larger in February 2005.  And
20    in February 2005, on back-to-back days, he pepper sprayed and
21    tased two arrestees, Jamal White and Angelica Vargas, for no
22    legitimate law enforcement reason, and the government has
23    proven that to you beyond a reasonable doubt.
24          Now, you'll notice that in the defense closing,
25    Mr. Schwartz didn't talk much about the actual issue in this
```

```
 1    case, whether the government has proven that there was no
 2    legitimate law enforcement reason for the force used against
 3    these two victims in this case and whether defendant knew it
 4    at the time that he pepper sprayed and tased them.  That's
 5    what this case is about, ladies and gentlemen, and that's
 6    what the government has proven in this case beyond a
 7    reasonable doubt.
 8              Let's talk about reasonable doubts for a little
 9    bit.  That is the government's burden.  The government
10    embraces that burden.  But reasonable doubt, ladies and
11    gentlemen, as we expect the Court to instruct you is not any
12    doubt.  It has to be doubt based on reason and common sense.
13    It can't be based on speculation.
14              And that's a lot of what you have heard from the
15    defense in this case.  You've heard a lot about what could
16    have been happening, what could have been a danger, what
17    could have been a risk.  But ladies and gentlemen, there is
18    no evidence in the case about any risk to the defendant from
19    either Jamal White or Angelica Vargas, and you can't
20    speculate as to what risk there could have been if the
21    evidence was something other than what it is.
22              Now, let's talk about what the evidence is for each
23    count and why it shows that there was no legitimate law
24    enforcement reason for the force that was used and why
25    defendant knew that when he used force.
```

1          Let's talk about Count I.  Jamal White.  The

2    evidence in this case, ladies and gentlemen, is that Jamal

3    White wasn't doing anything to defendant except for mouthing

4    off.  Jamal White admitted that to you.  He admitted that he

5    was mouthing off, yelling and cursing at defendant, and you

6    saw him up on the stand talk about that, and you saw that he

7    didn't seem that proud of it.

8          There were times where he was little sheepish about

9    saying the exact words he used, but he admitted them to you.

10   He admitted what he said to defendant, that he was mouthing

11   off, cursing, yelling, insulting him, calling him a coward

12   when he got to the station for pepper spraying him, calling

13   him out in front of other officers when they were passing by

14   through the jail.  That's what the evidence is of what Jamal

15   White was doing to the defendant.

16         And that evidence, ladies and gentlemen, is

17   corroborated by Dennis Decker.

18         Now, the defense wants you to disregard what Jamal

19   White said because there is one inconsistency in his

20   testimony about being -- about being tased before he sat on

21   that booking bench, about whether he was tased at the patrol

22   car when he was being told to clean up the vomit in the back

23   of the patrol car or whether he was tased in, uh -- when

24   he -- at the time that he was pepper sprayed or whether he

25   was tased at all.

1          So the defense says disregard everything.  They say

2     disregard everything of Dennis Decker because he only gets to

3     the scene at the time when Jamal White is on the booking

4     bench.  Ladies and gentlemen, that doesn't make any sense for

5     a variety of reasons.

6          First of all, we expect the Court to instruct you

7     that when you're evaluating the credibility of witnesses, you

8     can believe all of what they say, some of what they say or

9     none of what they say.

10          And ladies and gentlemen, you saw Jamal White talk

11     about the incident, and you saw Dennis Decker talk about the

12     incident.  And for the charged conduct in this case, Count I

13     charges the tasings on the booking bench, they tell the same

14     story, and for that reason, ladies and gentlemen, you should

15     believe them because they don't know each other, and they

16     have no motive to lie about it.

17          That's unlike the defendant who says in his report

18     that he was trying to handcuff Jamal White to the bench.

19     Yes, he says that in his report.  But Jamal White and Dennis

20     Decker tell you that that isn't true, that there was no

21     attempt made to handcuff Jamal White to the bench.

22          He was just left there, sitting on the bench,

23     mouthing off, insulting the defendant while defendant was in

24     and out of his office yelling back at the defendant but not

25     doing anything, not doing anything to handcuff him to the

1    bench or put him in a cell because the issue wasn't

2    restraining him.  The issue was that Jamal White was mouthing

3    off to defendant, and defendant was angry about it.

4              And Dennis Decker and Jamal White tell you the

5    exact same thing.  They don't know each other.  They're

6    coming at it from two totally different places in life.  One

7    person is the arrestee, the victim in this situation.

8    Another person is an officer who just happens to walk in from

9    a call and walk right into the middle of a verbal back and

10   forth between an arrestee and the sergeant that then leads to

11   the sergeant drive stunning Jamal White and then shooting

12   Jamal White with the taser darts for the full five-second

13   cycle.

14             Their testimony is consistent on the essential part

15   of Count I.  And there's no legitimate reason for it, they

16   both tell you that, and that's the evidence that is in the

17   record before you.  That's the evidence, that's not

18   speculation.  There's no legitimate law enforcement reason

19   for the first tasing or for the second tasing.

20             Now, the defense spent most of its time focusing on

21   the second tasing, the dart tasing which is the one that the

22   defendant admits in his report.

23             They again ask Dennis Decker a lot of coulda,

24   woulda, shoulda type questions.  Could kicking be dangerous?

25   Could thrashing be dangerous?  Could there be a revenge-type

1    of a problem?  Could somebody -- you know, he went through

2    all the furniture in the room.  You know, at some point, I

3    had written a note saying furniture danger because he tried

4    to create this big spectra of how all of these pieces of

5    furniture in the room could cause a danger.  Coulda, woulda,

6    shoulda, ladies and gentlemen.

7              That's not what happened, and you know that because

8    Dennis Becker told you what happened.  He told you, yeah,

9    maybe there could be this, there could that, there could be

10   the other.  But when he was asked was there a danger, he

11   unequivocally said no, there was no danger.  The only reason

12   for the tasings were because this defendant was angry at an

13   arrestee who was mouthing off.  There was no danger.  And

14   it's clear from the testimony that Dennis Decker gave because

15   he told you that all that moving around that Jamal White was

16   doing after both tasings was from pain from the taser.  That

17   was obvious to Dennis Decker.

18             Could it -- could it have been this?  Could it have

19   been that in another situation?  Maybe this?  Maybe that?

20   But in this situation, it was pain from the taser.  And in

21   this situation, there was more movement after the second

22   tasing than after the first tasing.  After the second tasing,

23   the defendant said pick him up, put him back on the bench.

24   Didn't tase him again, didn't do anything else, didn't put

25   him in a cell, didn't handcuff him to the bench.  Told two

1   other people, get close to him, get in there and put him back

2   on the bench, I'm going back to my office.

3          And that, ladies and gentlemen, shows the

4   willfulness element because that shows that this defendant

5   knew it wasn't necessary to tase Jamal White.  Because after

6   that second tasing when he was moving around even more, same

7   furniture in the room, same furniture danger, just put him

8   back on the bench, I'm going to go back to my office.  There

9   was no legitimate law enforcement reason for that, and that's

10   the evidence in this case, ladies and gentlemen.

11          Look at the jury instruction about credibility when

12   you get it back with you in the jury room, listen to the jury

13   instruction about the credibility of witnesses when the Court

14   instructs you, and think about those factors and think about

15   those people as you saw them testify.  I submit, ladies and

16   gentlemen, that they weren't exaggerating.  They told you

17   what they remembered and what they didn't remember.  Dennis

18   Decker didn't even know the name of the arrestee.  Never

19   referred to him by name.  He just knew what he saw, and he

20   told you what he saw.

21          Now, the defense also made a big deal about Dennis

22   Decker not reporting this because he didn't see the whole

23   thing.  Again, he told you what he saw, and the part that he

24   saw is the part that's charged in the indictment.

25          Dennis Decker also told you, however, what Desert

Hot Springs Police Department was like at that time.  He told

you that the defendant's buddy, Sergeant Gill, was one in

charge of IA.  He told you that there was a culture of not

reporting things, of covering it up.

And the defense's own witness, again another

sergeant who is a good buddy of the defendant, Sergeant Paiz,

during his testimony, you learned a little bit about what

happens to people who do talk about excessive force incidents

and what can happen when multiple sergeants, multiple

supervisors get together to scrutinize their performance in

the context of an ongoing proceeding.

I submit, ladies and gentlemen, that the fact that

Dennis Decker didn't report it is totally understandable in

light of the evidence that you've heard.  And you should

believe him because what he saw is what was the excessive

force charged in the indictment, and it's the exact same

story that Jamal White told you.  And they don't each other,

and they have no motive to lie about this.

Now, let's talk about Angelica Vargas and Count II

of the indictment, February 25th, 2005.  Now, Angelica Vargas

did not testify in this trial, but the evidence in this case

tells her story.  It tells what happened to her on February

25th, 2005.  And ladies and gentlemen, you have all the

evidence you need to conclude that there was no legitimate

law enforcement reason to pepper spray and tase Angelica

1   Vargas.

2          Can you please display Exhibit 4 and blow up the

3   portion that shows a height of 5'3"?

4          Exhibit 4, ladies and gentlemen, is a misdemeanor

5   citation that Gutting writes for Angelica Vargas, and you'll

6   see on here that Angelica Vargas is 5'3", overweight woman.

7   This defendant is a much taller, much larger person even as

8   he sits before you in the courtroom today, and the testimony

9   was that he was even a larger person at that time.

10         That's relevant, ladies and gentlemen, to what

11  options he had to use and whether the options he did use,

12  pepper spraying and repeatedly tasing, were justified.  And I

13  submit, ladies and gentlemen, that it was not justified or

14  reasonable for defendant to pepper spray or tase this woman

15  who was smaller than he was and who by the testimony of the

16  defense's own expert would have been so limited in her

17  mobility that she wouldn't be able to escape in the means

18  that was described by Matt Gutting.

19         Now, the Court may also instruct you that what the

20  attorneys say in their arguments are not evidence and that

21  what controls in this case is your recollection of the

22  testimony, your recollection of the evidence.  And there are

23  many points in listening to Mr. Schwartz's argument where I

24  disagreed about his characterization of the elements of

25  evidence where he told you that a witness had something that

1    I submit that they did not say.  And again, ladies and

2    gentlemen, it's your recollection of what the witnesses say

3    and what the evidence was that controls in this case.

4         But I submit to you, ladies and gentlemen, that

5    what defense expert Norm Fort said when he was questioned

6    about the mobility of someone who had had a .22 blood alcohol

7    level earlier in the night who was unable to stand on her

8    own, unable to walk on her own was that the mobility would be

9    basically the same a few hours after Ms. Vargas tested at .22

10   blood alcohol level.

11        So in other words, at the time she was tased,

12   ladies and gentlemen, she was so -- she was so drunk that she

13   could have posed no threat to defendant, no threat of escape.

14   She was smaller.  She was female.  She was drunk.  She needed

15   assistance earlier in the night to even get into her cell.

16   There is no reason for defendant to have used force against

17   Ms. Vargas, to use pepper spray or to use tasers.

18        Now, what other evidence have you heard about the

19   Angelica Vargas count?  Ladies and gentlemen, you've seen the

20   taser downloads of both this defendant and Matthew Gutting.

21   And I'd like to call them out by exhibit number because I

22   think they're very important in this case.  Exhibit 50 and

23   Exhibit 51.  And if you can display Exhibit 50, please.  And

24   I'll also call out by number the taser download for the White

25   incident because I think that's also very important.  It's

1    Exhibit 72.

2           What you'll see by looking at the download report

3    for the defendant is that these were not split second

4    encounters where there wasn't time to make other choices, to

5    get help, to do something other than repeatedly tase.

6           For Angelica Vargas, there is three tasings, and if

7    you could highlight the recording firing data, of five

8    seconds each.  And those tasings occurred over a relatively

9    long span of time, 40 seconds, ladies and gentlemen.  Now,

10   40 seconds isn't a long time when you're talking about this

11   trial, for example, or something else, but in this context,

12   it's a long time.  Three different tasings over 40 seconds.

13          The Jamal White tasing, you will see there is also

14   a span of about that amount.  I believe it's 45 seconds

15   between the start of the first tasing to the end of the last

16   tasing.

17          And again, ladies and gentlemen, when you're

18   reading this, remember that you heard from Greg Meyer that

19   the time recorded on these taser downloads is the end of each

20   cycle.  So if you want to look at the whole span of it of a

21   tasing incident from the first cycle to the end of the last

22   cycle, you basically have to subtract five seconds from the

23   beginning of the first cycle.  Then you'll know when the

24   first cycle started.  The last recorded time will be when the

25   last cycle ended.

1          And that's where I'm getting the times that I've

2     been talking about.  These were not split second encounters,

3     ladies and gentlemen.  These were not situations where there

4     were not other options.

5          Now, let's talk about Matthew Gutting.  The defense

6     on -- in their closing argument said the government can't

7     cherry pick.  Either he's a coconspirator or he's a

8     government witness.  What is he?

9          Ladies and gentlemen, the evidence makes very clear

10    what Matthew Gutting is.  Matthew Gutting tased Angelica

11    Vargas with this defendant and then made up a story about

12    escape that's totally implausible and fussed around with the

13    evidence to try to hide what really went on.  That's who

14    Matthew Gutting is.  That's what the evidence in the case

15    clearly shows.

16         Now, why is it fair for the government to say that

17    you should believe Matt Gutting when, for example, he said

18    earlier in the night that Angelica Vargas was too drunk

19    stand, was -- that he had to help her into the cell?

20         Ladies and gentlemen, Matthew Gutting is trying to

21    tell a story that will justify his use of force on Angelica

22    Vargas.  If there are parts of that story that don't help

23    him, you can believe them because he has no motive to lie

24    about that part of the story.  Again, when you're judging the

25    credibility of witnesses, you can believe part of what they

1    say, all of it or none of it.

2          It's very clear, ladies and gentlemen, what

3    happened here.  In part, you know that a cover-up happened

4    between these two because their escape excuse is totally

5    ridiculous.  Let's talk about why.

6          First of all, she is too drunk to escape.  Second,

7    Gutting describes this as a split second occurrence, that it

8    happened so fast, Sclafani was by the door, then she was out

9    there, I had to run to catch up, I fired.  He is saying that

10   she ran out there in just a couple of seconds.  Basically

11   Gutting has 10 seconds of explanation for 40 seconds of

12   tasing.  He says he's in the report room.  He hears the door

13   open.  He runs out.  He sees Sclafani standing by the door.

14   He sees Vargas out in the sally port area.  That doesn't make

15   any sense.  You saw how close of a space this was.

16         And if you can publish Exhibit 31.

17         You can see in the photograph the cell doors we're

18   talking about.  We've got one here, here and here.  I'm

19   making three dots, one on the doorway -- on the -- on --

20   three -- and these are three doorways on the right-hand side

21   of the photograph.  The cells are all extremely close to that

22   front door.  What is Sclafani doing the whole time?  He's

23   just standing by the door, and there's 40 seconds?  Gutting

24   runs out?  It's not very far out to the Sally port area.

25   Look at how close that patrol car is.

1          This story doesn't make any sense.  It doesn't

2     account for what was happening on the taser download.  It

3     doesn't account for how many times she was tased.

4          Now, there's been a lot of talk about time drift

5     with these taser downloads.  And the defense said in the

6     closing that there's no evidence that these were downloaded

7     from the same computer.  Where did that come from?

8     Speculation.  Ladies and gentlemen, it came from their own

9     witness, Daniel Tregarthen.  He said that the downloads were

10    downloaded for him to the IA by Sergeant Gill.  The

11    defendant's friend.  It was for an IA, something very

12    important.

13         Meyer testified, again in the defense's case, that

14    every time you do a download, you can tell if there's gonna

15    be sync problems.  And you can fix it.  And if there is a big

16    sync problem, you can't even move on to do the download.

17    Ladies and gentlemen, that's the evidence, that these taser

18    downloads reports don't have a sync problem.  Anything else

19    is speculation.  That's not in evidence.

20         Now, ladies and gentlemen, this whole sync problem

21    that defense wants you to focus on, that only affects the

22    difference between two independent devices, two taser

23    downloads, two tasers.  But Sclafani that shows 40 seconds of

24    tasing, that's just one device so you can know that there's

25    no time sync problem with the 40 seconds of tasing for

1    Angelica Vargas and the 45 seconds of tasing for Jamal White.

2              Now, let's talk about why else the escape story

3    doesn't make any sense.  Again, ladies and gentlemen, you've

4    seen the photographs from the Sally port area.  You know . .

5    . .

6              And if you could display Exhibit 38.

7              And you know it's enclosed by walls and gates.  You

8    know that no one's ever escaped from this area because of,

9    again, all of the coulda, woulda, shoulda that defense wants

10   you to think about, all the pure speculation in the defense

11   questions.  The evidence, ladies and gentlemen, is that no

12   one has ever escaped from that area.  And you know the

13   defendant didn't think it was a big risk either.  He opened

14   the door.

15             You also know, ladies and gentlemen, that Angelica

16   Vargas wasn't gonna be the one person who finally made the

17   miraculous escape from the Desert Hot Springs Police

18   Department jail Sally port area.  You know it because she's

19   too drunk to do it.

20             You also know it, ladies and gentlemen, because

21   when she was released, she stuck around.  She had nowhere to

22   go.  If she had a big escape plan, why did she end up at a

23   police station afterwards?  Why did she just sit there being

24   so annoying apparently by her mere presence that defendant

25   kept being mad about it, complaining, ranting to Dennis

```
 1    Decker?  She sat there because she didn't have anywhere to
 2    go.  She didn't have a car.  She had -- didn't have clothes.
 3    She didn't have anything.  If she escaped, she wouldn't even
 4    have anything to check into a hotel with.
 5              You also know, ladies and gentlemen, that she
 6    wasn't going anywhere because once she did get out, she
 7    wondered around, and then she flagged down a police officer.
 8    Now, defendant says that somehow, that hurts the government's
 9    case.  On the contrary, ladies and gentlemen, that just shows
10    that Angelica Vargas wasn't an escape risk.
11              Now, they wanna say somehow that she's making it
12    up?  She wasn't tased, and that's why she flagged the police
13    officer down because if she had gone through that, she would
14    never have done it?  That doesn't make any sense.  It's
15    undisputed that she was tased, ladies and gentlemen.  It's
16    undisputed that she was pepper sprayed.  Defendant admits
17    that in his police report.  Gutting admits that in his
18    testimony, that he tased her, and that he smelled pepper
19    spray.  It's undisputed.  So it can't mean that it never
20    happened to her.  We know it happened to her.
21              What it means, ladies and gentlemen, is she didn't
22    have anywhere to go.  She was so at a loss for what to do,
23    she flagged down a police officer even though she had just
24    had the taser.  She was not an escape risk.  It's totally
25    ridiculous.  And that out of all the reasons is why you
```

1    should believe that Matt Gutting is making that up to protect

2    himself and to protect the defendant.

3         Ladies and gentlemen, he's also making up the part

4    about her banging her head on the wall.  There's no injuries

5    of that.  You can see that in the medical records.  You can

6    better believe he would have saved those photos if there had

7    been anything so you can know that that's not right.

8         Ladies and gentlemen, I submit to you that the

9    government has proven its case beyond a reasonable doubt.

10   There was no legitimate law enforcement reason for either of

11   these tasings, for either of the pepper spray.  Defendant did

12   the same thing essentially on back to back nights.  He knew

13   it was wrong because there was no legitimate reason for doing

14   so.

15        Now, ladies and gentlemen, I know that it can

16   sometimes be difficult in a case like this.  Some of you may

17   believe that cops -- that police officers are the good guys.

18   They're the people who do the good things, and it's hard

19   sometimes to believe that a police officer can do a bad

20   thing.  But ladies and gentlemen, the evidence in this case

21   shows there's no legitimate law enforcement reason for this.

22        And for all of those police officers that do good

23   things, there are occasionally ones who fail to meet the

24   responsibility and fail to live up to the trust that is

25   placed in them by their Department and by the public.  And in

1    those cases, ladies and gentlemen, it doesn't matter whether

2    the people who say a view are likable.

3         Ladies and gentlemen, we now ask you to return the

4    only verdict that's consistent with the evidence in this

5    case; guilty on both counts of the indictment.

6         THE COURT:  Thank you, Ms. Carter.

7         Ladies and gentlemen of the jury, now that you've

8    heard all of the evidence that was received in the case and

9    each of the arguments of counsel, it becomes my duty to give

10   you these final instructions as to the law applicable to this

11   case.  You don't have to take notes.  We'll give you a copy

12   to have you with in the jury room.

13        You should use these instructions to guide you in

14   your decision making.  All of the instructions of law given

15   to you by the Court those which I gave you at the beginning

16   of the trial, those given during the trial and, indeed, these

17   final instructions must guide and govern your deliberations.

18   And it's your duty as jurors to follow the law as stated in

19   all of the instructions of the Court and for you to apply

20   these groups relative to the facts as you find them to be

21   from the evidence which has been received during the trial.

22        The lawyers have quite properly referred to some of

23   the applicable rules of law in their closing arguments to

24   you.  If, however, any difference appears to be in the law as

25   stated by counsel and that which is stated by the Court in

these instructions, you, of course, are to be governed by the
instructions given to you by the Court alone.

You are not to single out any one instruction as
stated in the law, but you must consider the instructions as
a whole in reaching your decisions.  Neither are you to be
concerned with the wisdom of any rule of law stated by the
Court, and you've taken an oath to that effect.

Regardless of any opinion you may have as to what
the law ought to be, it would be a violation of your sworn
duty to base any part of your verdict upon any other opinion
of the law from that which is given in these instructions of
the Court.  In the same way that it would be a violation of
your sworn duty as the judges of the facts to base your
verdict on anything but the evidence which has been presented
and received in this case.

Now, you were chosen as jurors for this trial in
order to evaluate all of the evidence received and to decide
each of the factual questions presented by the allegations
brought by the government in the indictment and the plea of
not guilty of the defendant.  In resolving the issues
presented to you for a decision in this trial, you must not
be persuaded by bias, prejudice, sympathy, public opinion for
or against any of the parties in this case.

Justice through trial by jury depends upon the
willingness of each individual juror to seek the truth from

1    the same evidence which is presented to all of you jurors

2    here in the courtroom.  You will arrive at a verdict by

3    applying the same rules of law as now have been given to each

4    of you through these instructions of the Court.

5          As I told you at the beginning of the trial, an

6    indictment is only a formal method used by the government to

7    accuse a defendant of a crime.  It is not evidence of any

8    kind against the defendant.  The defendant is presumed to be

9    innocent of the crimes charged, and even though this

10   indictment has been returned against the defendant, the

11   defendant begins this trial with absolutely no evidence

12   against him.

13         The defendant has pled not guilty to this

14   indictment and therefore denies that he is guilty of the

15   charges.

16         A separate crime is charged in each count of the

17   indictment.  Each charge and the evidence pertaining to it

18   should be considered separately by each member of the jury.

19   The fact that you may find the defendant guilty or not guilty

20   as to one of the counts should not control your verdict as to

21   the other count.

22         I instruct you that you must presume the defendant

23   to be innocent of the crimes charged.  Thus, the defendant

24   although accused of crimes in the indictment, begins the

25   trial with a "clean slate," quote unquote, with no evidence

 1   against him.  The indictment is not evidence of any kind.

 2   The defendant is, of course, not on trial for any act or

 3   crime not contained in the indictment, however.  The law

 4   permits nothing but legal evidence presented before you, the

 5   jury, and the Court to be considered in support of any charge

 6   against the defendant.  The presumption of innocence alone

 7   therefore is sufficient to acquit the defendant.

 8          The burden is always upon the prosecution to prove

 9   guilt beyond a reasonable doubt.  And this burden never

10   shifts to a defendant for the law never imposes upon the

11   defendant in a criminal case the burden of either calling any

12   witnesses or producing any evidence.  The defendant is not

13   even obligated to produce any evidence by cross-examining the

14   witnesses for the government.

15          It is not required that the government prove guilt

16   beyond all possible doubt.  The test is simply one of

17   reasonable doubt.  And a reasonable doubt is a doubt that's

18   based upon reason and common sense, so reasonable doubt is a

19   doubt that is the kind that would make any reasonable person

20   hesitate to act.  And proof beyond a reasonable doubt

21   therefore must be proof with such a convincing character that

22   a reasonable person would not hesitate to rely and act upon

23   it in the most important of his or her own affairs.

24          Unless the government has proven beyond a

25   reasonable doubt that the defendant has committed each and

1   every element of the offense charged against him in the

2   indictment, you must find the defendant not guilty of that

3   offense.  If you as a jury agree the evidence in the case is

4   reasonably permitting either of two conclusions, that is one

5   of innocence and the other of guilt, then as a jury, you

6   must, of course, adopt a conclusion of innocence.

7        Now, there's nothing particularly different in the

8   way that you as jurors should consider the evidence described

9   from that in which any reasonable and careful person would

10  deal with any very important question that must be resolved

11  by examining facts, opinions and evidence.

12       You are expected to use your good sense in

13  considering and evaluating the evidence in this case.  Use

14  the evidence only for those purposes for which it has been

15  received and give the evidence a reasonable and fair

16  construction in the light of your common knowledge and your

17  natural tendencies and inclinations as human beings.  If the

18  defendant can be proved guilty beyond a reasonable doubt, say

19  so.  If not proved guilty beyond a reasonable doubt, again

20  say so.

21       And keep constantly in mind that it would be a

22  violation of your sworn duty to base your verdict on anything

23  other than the evidence which has been received in the case

24  and the instructions of the Court.  Remember as well that the

25  law never imposes upon a defendant in a criminal case the

burden or duty to call any witnesses or produce any evidence because the burden of proving guilt beyond a reasonable doubt is always with the government.

Now, you're here to determine whether the government has proven the guilt of the defendant for the charges in the indictment beyond a reasonable doubt.  You're not called upon to render any verdict as to the guilt or innocence of any other person or persons.

So if the evidence in the case convinces you beyond a reasonable doubt of the guilt of the defendant of the crimes charged in the indictment, you should so find even though you may believe that one or more other unindicted persons are also guilty.  And if any reasonable doubt remains in your minds after impartial consideration of all of the evidence in the case, then it is your duty to find the defendant not guilty.

If any reference by the Court or by counsel in matters of testimony or exhibits does not coincide with your own recollection of that evidence, it's your recollection which should control throughout your deliberations and not the statements of the Court or of counsel.  Remember you're the sole judges of the evidence which has been received in this case.

Questions asked by a lawyer for either party to this case are not evidence as I've told you several times.

1    If a lawyer asks a question of a witness which concerns some

2    assertion of fact, therefore, you may not consider the

3    assertion by the lawyer as any evidence of that fact.  Only

4    the answers are evidence.

5         It is the duty of the Court to admonish a lawyer

6    who out of zeal for his or her cause does something which we

7    feel is not in keeping with the rules of evidence or

8    procedure.  You are to draw absolutely no inference against

9    the side for whom that admonition of the Court may have been

10   addressed during the trial of this particular case.

11        Now, testimony and exhibits can be admitted into

12   evidence during the trial only if it meets certain criteria

13   or standards.

14        It's the sworn duty of the attorney on each side of

15   the case to object when the other side offers testimony or

16   exhibits which either side feels is not properly admissible

17   under the rules of law.  Only by raising an objection can a

18   lawyer request and can obtain legally from the Court the

19   admissibility of the evidence being offered by the other

20   side.

21        You should not be influenced against an attorney or

22   his or her client he's representing who has made an

23   objection.  And please do not attempt morally to interpret my

24   rulings on objections as somehow indicating how I think you

25   should decide this case.  I'm simply making a ruling on a

legal question regarding a particular piece of testimony or exhibit.

In certain instances, evidence may be admitted only for some particular party or only for a particular purpose and not generated against all parties or for all purposes. For the limited purpose from which this evidence has been received, you will give it such weight that you feel it deserves.  You may not, however, use this evidence for any other purpose or against any party not specifically mentioned.

Now, during the course of a trial and here in this one, I occasionally asked questions of the witnesses, and I do so because I want to clarify a matter in that area.  You should not assume that I held any opinions on the matters from which my questions were related.  I'm not trying to help one side or hurt the other side.  Remember at all times that you as jurors are the sole judges of the facts of this case.

Now, there are two types of evidence which are generally presented during the trial, and that's true in this case as well.  These are direct evidence and circumstantial evidence.

Direct evidence is the testimony of a person who asserts or claims they have actual knowledge of a fact such as an eyewitness.  Circumstantial evidence on the other hand is proof of a chain of facts and circumstances indicating the

1    existence of a fact.

2         The law makes absolutely no distinction between the

3    weight or value that you give to either direct or

4    circumstantial evidence.  Nor is a greater degree of

5    certainty required of circumstantial evidence than of direct

6    evidence.  You should weigh all of the evidence in the case.

7         Now, the evidence in this case consists of the

8    sworn testimony of the witnesses regardless of who may have

9    called them, all exhibits received in evidence regardless of

10   who may have produced them and all facts which may have been

11   agreed to or stipulated.  When the attorneys on both sides

12   stipulate or agree as to the existence of a fact, you may

13   accept the stipulation as evidence and regard that fact as

14   having been proven.  You are not required to do so, however,

15   since you, again, are the sole judges of the facts.

16        Any proposed testimony or proposed exhibit to which

17   an objection was sustained by the Court and any testimony or

18   exhibit ordered stricken by the Court must be entirely

19   disregarded by you.  Anything you may have seen or heard

20   outside the courtroom is not evidence.  You must entirely

21   disregard it as well.  Questions, objections, statements and

22   the arguments of counsel are not evidence in the case.

23        You are to base your verdict only on the evidence

24   which has been received in this case.  In your consideration

25   of the evidence received, however, you're not limited to the

 1    bald statements of the witnesses or the bold assertions in

 2    the exhibits.

 3            In other words, you're not limited solely to what

 4    you've seen and heard as to the witnesses who've testified or

 5    to the exhibits that have been admitted.  You are permitted

 6    to draw from the facts which you find have been proved such

 7    reasonable inferences as you feel that justify it in the

 8    rightful experience and common sense.  And inferences are

 9    simply deductions of reason which reason and common sense

10    lead you to draw from the evidence received in the case.

11            The testimony of a witness may be discredited or as

12    we sometimes say impeached by a showing that he or she

13    previously made statements which are different and/or

14    inconsistent with his or her testimony given before.

15            The earlier inconsistent or contradictory

16    statements are admissible only to discredit and impeach the

17    credibility of the witness and not to establish the truth of

18    these earlier statements made somewhere other than here

19    during this trial.  It's your province as a juror to

20    determine the credibility of a witness who has made prior

21    inconsistent or contradictory statements.

22            If a person is shown to have knowingly testified

23    falsely concerning any important or material matter, you

24    obviously have a right to distrust the testimony of such an

25    individual concerning other matters.  You may reject all of

the testimony of that witness or give it such weight or
credibility as you may think it deserves.

The testimony of a witness may be discredited or
impeached by evidence showing that the witness has been
convicted of a felony.  That is a crime for which a person
may receive a prison sentence of more than one year.  Prior
convictions of a crime that is a felony is one of the
circumstances which you may consider in determining the
credibility of that witness.  It's your sole and exclusive
right as a juror to determine the weight to be given to any
prior convictions and the weight to be given to the testimony
of anyone who has previously been convicted of a felony.

Now, your decision on the facts of this case should
not be determined by the number of witnesses testifying for
or against the party.  You should consider all of the facts
and circumstances in evidence, determine which of the
witnesses you choose to believe or not to believe.  You may
find that the testimony of a smaller number of witnesses on
one side is more convincing than the testimony of a greater
number of witnesses on the other side.

Evidence relating to any alleged statement,
confession, admission or act or omission alleged to have been
made or done by defendant outside court and after a crime has
been committed should always be considered by you, the jury,
with caution and weighed with great care.  All such alleged

statements, confessions or admissions should be disregarded entirely unless the other evidence in the case convinces you as a jury beyond a reasonable doubt that the statement, confession, admission or act or omission was either made or done knowingly and voluntarily.

In determining whether any alleged statement, confession, admission or act or omission alleged to have been made by the defendant outside of court and after a crime has been committed is knowingly and voluntarily made or done, you as a jury should consider the age, training, education, occupation and physical or mental condition of the defendant and mistreatment if under interrogation as shown by all of the evidence in the case.

Also consider all other circumstances and evidence surrounding the making of the alleged statement, confession or admission.  And if after considering the evidence, you determine that a statement, confession, admission or act or omission was either done knowingly and voluntarily, you may give it such weight as you think it deserves under the circumstances.

Now, the rules of evidence ordinarily do not permit witnesses to testify as to their own opinions or their own conclusions about important questions in a trial.  An exception to this rule exists as to those persons who are described as "expert witnesses," unquote expert.

1          An "expert witness," quote unquote, is someone who

2     by education or by experience may have become knowledgeable

3     in some technical, scientific or very specialized area.  If

4     such knowledge or experience may be of assistance to you in

5     understanding some of the evidence or in determining a fact,

6     an "expert witness," quote unquote, in that area may state an

7     opinion as to a matter in which he or she claims they're an

8     expert.

9          You should consider each expert opinion received in

10    evidence in this case and give it such weight, if any, that

11    you may think it deserves.  You should consider the testimony

12    of expert witnesses just as you consider other evidence in

13    this case.

14         If you should decide that the opinion of an expert

15    witness is not based upon sufficient education or experience

16    or if you should conclude that the reasons given in support

17    of the opinion are not sound or if you should conclude that

18    the opinion is outweighed by other evidence, you may

19    disregard the opinion in part or in its entirety.  As I've

20    told you several times, you, the jury, are the sole judges of

21    the facts in this case.

22         Now, the defendant in a criminal case has an

23    absolute right under our constitution not to testify and I've

24    told you that previously.  The fact that the defendant did

25    not testify must not be discussed or considered in any way in

 1   deliberating and then arriving at your verdict.  No inference

 2   of any kind may be drawn from the fact that the defendant

 3   decided to exercise his privilege under the constitution and

 4   did not testify.  As I've stated before, the law never

 5   imposes upon the defendant in a criminal case the burden of

 6   calling any witnesses or producing any evidence.

 7           And I remind you the defendant is not on trial for

 8   any act or any conduct not specifically charged in the

 9   indictment.

10           Ladies and gentlemen, let me read to you the

11   indictment.  Once again, you'll have a copy of the indictment

12   with you in the jury room as well.

13           The grand jury charges in Count I, 18 United States

14   Code Section 242 that on about February the 24th, 2005 in

15   Riverside County within the Central District of California,

16   the Defendant Anthony Sclafani, then a sworn law enforcement

17   officer employed by the City of Desert Hot Springs Police

18   Department while acting under color of law did stun Jamal

19   White with an X26 taser gun, a dangerous weapon, after Jamal

20   White had been arrested and handcuffed which resulted in

21   bodily injury to Jamal White.  And therefore did willfully

22   deprive Jamal White of the rights secured and protected by

23   the constitution and laws of the United States to be secure

24   in his person against an unreasonable search and seizure.

25           Count II.  18 United States Code Section 242.  On

or about February 25th, 2005 in Riverside County within the Central District of California, Defendant Anthony Sclafani then a sworn law enforcement officer employed by the City of Desert Hot Springs Police Department while acting under color of the law did spray Angelica Vargas in her face and eyes with pepper spray and did stun Angelica Vargas with an X26 taser gun, a dangerous weapon after Angelica Vargas had been detained, which resulted in bodily injury to Angelica Vargas. And thereby did willfully deprive Angelica Vargas of the rights secured and protected by the constitution and laws of the United States to be secure in her person against an unreasonable search and seizure.  The indictment it's been signed as a true bill by the foreperson of the grand jury and countersigned by the proper officials in the United States Attorney's Office.

Now, the indictment charges that certain offenses were committed on or about a certain date.  Although it is necessary for the government to prove beyond a reasonable doubt that the offense was committed reasonably near the date which is alleged in the indictment, it's not necessary for the government to prove that the offense was committed precisely on the date it was charged.

Section 835 A of the California Penal Code states:

Any peace officer who has reasonable cause to believe that a person to be arrested has committed a public

1    offense may use reasonable force to effect the arrest, to

2    prevent escape or to overcome resistance.

3            A peace officer who makes or attempts to make an

4    arrest need not retreat or desist from his efforts by reason

5    of the resistance or threatened resistance of the person

6    being arrested; nor shall such officer be deemed an aggressor

7    or lose his right to self-defense by the use of reasonable

8    force to effect the arrest or to prevent the escape or to

9    overcome resistance.

10           Section 242 of Title 18 of the United States Code

11   in part states that:

12           Whoever, under color of any law, statute,

13   ordinance, regulation or custom, willfully subjects any

14   person in any state, territory, commonwealth, possession or

15   district to the deprivation of any rights, privileges or

16   immunities secured or protected by the constitution or laws

17   of the United States shall be guilty of an offense against

18   the United States.

19           The Fourth Amendment to the constitution guarantees

20   the right to be free from an unreasonable search and seizure.

21   This right applies to all people regardless of whether they

22   may be suspected of criminal activity.  The law enforcement

23   officer's use of unreasonable force against an arrestee is an

24   unreasonable seizure within the meaning of the Fourth

25   Amendment of the constitution.

1          Unreasonable force is a physical force used without

2     a legitimate law enforcement purpose or physical force that

3     unreasonably exceeds the need for the force.

4          To determine whether the defendant used

5     unreasonable force, you should consider all of the

6     circumstances of the incident from the point of a view of a

7     reasonable officer on the scene, rather than the 20/20 vision

8     of hindsight.  In deciding whether the defendant used

9     unreasonable force, you may consider:

10          (A)  The severity of the crime committed by the

11     individual;

12          (B)  The threat that the individual posed to the

13     safety of the officers or others, if any;

14          (C)  Whether at the time the force was used the

15     individual was actively or passively resisting the officer in

16     the lawful performance of his duties, resisting arrest or

17     attempting to flee at the time force was used;

18          (D)  Whether less forceful means or methods were

19     available;

20          (E) Officers are not required to use the least

21     intrusive means available.

22          Force used to retaliate, or to punish, that has no

23     legitimate law enforcement purpose, constitutes unreasonable

24     or excessive force.

25          Provocation by mere insulting or threatening words

alone will not excuse an unlawful use of force by a law
enforcement officer.  No law enforcement officer is entitled
to use force against someone based on that person's verbal
statements alone.

Whether the defendant used unreasonable force in
violation of the Fourth Amendment does not depend on the
degree of injury caused.

The phrase "under color of any law" means the real
or purported use of authority provided by law.  A person acts
"under color of any law" when that person acts in his
official capacity or claims to act in his official capacity.

Acts committed "under color of any law" of a state
include not only the actions of officials within the limits
of their lawful authority, but also the actions of state
officials who exceed the limits of their lawful authority
while purporting or claiming to act in performance of their
official duties.

"Under color of any law" of a state means not only
state laws, but also acts done by an official under color of
any ordinance of any county or municipality, or regulation
issued by a state, county, or municipal official, and even
includes acts done under color of some state or local custom.

The phrase "under color of any law", therefore,
includes all acts both lawful and unlawful, done under the
real, purported, or claimed authority of any state, county or

municipal officer, or any state or local custom.

To act "willfully" is to act voluntarily and deliberately with the intent to deprive the persons identified in the indictment of the right to be secure in his or her person against an unreasonable search and seizure.  In this case, willfully means the specific intent to use more force than was necessary under the circumstances against the persons.

Although the government must prove beyond a reasonable doubt that the defendant voluntarily and deliberately did an act that deprived the persons identified in the indictment of a right guaranteed and protected by the constitution, it is not necessary for the government to prove that the defendant knew that this action would actually violate anyone's constitutional rights.

The government must prove that the conduct of the defendant deprived the alleged victim of a right or rights secured by the constitution or laws of the United States. Each count of the indictment charges that the defendant deprived the alleged victim of the right to be secure in his or her person against an unreasonable search and seizure. The Court instructs you this is a right secured by the constitution or the laws of the United States.

To sustain its burden of proof for the crime of deprivation of a constitutional right under color of law, as

charged in Count I and Count II of the indictment, the

government must prove the following five elements beyond a

reasonable doubt:

One:  The individual as identified in the Count I

of the indictment as Jamal White, and in Count II of the

indictment as Angelica Vargas, was in the state of

California.

Two:  Defendant there deprived this individual of a

right which is secured or protected by the constitution or

laws of the United States.

Three:  Defendant acted under color of law by

depriving the individual of a constitutional right.

Four:  Defendant acted willfully to deprive the

individual of such right and.

Five:  The individual suffered bodily harm as a

result of the acts of the defendant or the defendant used a

dangerous weapon.

The fifth element the government must prove is

that:  1.  The individual, as identified in Counts I and II,

suffered bodily harm or injury; or 2.  The defendant used a

dangerous weapon.

First, with regard to bodily harm or injury, the

government need not prove that the defendant intended to

cause bodily harm or injury; the government need only prove

that bodily injury resulted from the defendant's wrongful

conduct.  Bodily injury or harm means a cut, abrasion,
bruise, burn or disfigurement, physical pain, or any other
injury to the body, no matter how temporary.

Second, with regard to the use of a dangerous
weapon, the term "dangerous weapon" quote, unquote refers to
any object capable of inflicting great bodily harm.  You may
consider both the physical capabilities of the object and the
manner in which the object was used in determining whether
the object was a "dangerous weapon" quote, unquote.

Counts I and II of the indictment allege two
separate means or methods by which the defendant is alleged
to have satisfied the fifth element, that is, (1) bodily
injury; or (2) use of a dangerous weapon.  The government is
not required to prove both of the two means or methods
alleged; it must prove only one, with all of you agreeing on
which one, if any, the government has proved.

Intent and motive are different concepts and should
never be confused.

Motive is what prompts a person to act or fail to
act.  Intent, on the other hand, refers only to the state of
mind for which the act is done or omitted.

Personal advancement and financial gain, for
example, are two very well-recognized motives for much of
human conduct.  These otherwise praiseworthy motives,
however, may prompt one person to voluntary acts of good

while prompting another person to voluntary acts of crime.

Good motive alone is never a defense where the act done or omitted is a crime.  The motive of the defendant is, therefore, immaterial except insofar as evidence of motive may aid in the determination of the state of mind or the intent of the defendant.

The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind.  In determining the issue of what a person intended at a particular time, you may consider any statements made or acts done or omitted by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

Now, you, as the jurors, are the sole and exclusive judges of the credibility of each of the witnesses called to testify in this case and only you determine the importance or weight, if any, that their testimony deserves.  After making your assessment concerning the credibility of a witness, you may decide to believe all of that witness's testimony, only a portion of it, or none of it.

In making your assessment of that witness you should carefully scrutinize all of the testimony given by that witness, the circumstances under which each witness has

testified, and all of the other evidence which tends to show whether a witness, in your opinion, is worthy of belief. Consider each witness's intelligence, motive to falsify, state of mind, and appearance and manner while on the witness stand.  Consider the witness's ability to observe the matters as to which he or she has testified and consider whether he or she impresses you as having an accurate memory or recollection of these matters.  Consider also in any relation a witness may bear to either side of the case, the manner in which each witness might be affected by your verdict, and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness or between the testimony of different witnesses may or may not cause you to disbelieve or discredit such testimony.  Two or more persons witnessing an incident or transaction may simply see or hear it differently.  Innocent misrecollection, much like failure of recollection, is not an uncommon human experience.  In weighing the effect of a discrepancy, however, always consider whether it pertains to a matter of importance or an insignificant detail and consider whether the discrepancy results from innocent error or from intentional falsehood.

After making your own judgment or assessment concerning the believability of a witness, you can then

attach such importance or weight to that testimony, if any,
that you feel it deserves.  You will then be in a position to
decide whether the government has proven the charges beyond a
reasonable doubt.

The punishment provided by law for the offense
charged in the indictment is a matter exclusively within the
province of the Court and should never be considered by you
the jury in any way in arriving at an impartial verdict as to
the offenses charged.

A verdict form has been prepared for your
convenience and reads as follows with the proper caption of
the court:

If you find the Defendant Anthony Sclafani not
guilty or guilty of deprivation of rights under color of law
charged in Count I in the indictment and not guilty or
guilty, again place the check-off, of deprivation of rights
under color of law charged in Count II of the indictment.

Now, you'll take this form to the jury room and,
when you have reached unanimous agreement as to your verdict,
you will have your foreperson write your verdict on the form,
date and sign the form, and then return it with your verdict
to the courtroom.

If it becomes necessary during your deliberations
to communicate with the Court, you can send a note signed by
your foreperson or by one or more other members of the jury

```
 1    through the bailiff.  No member of the jury should ever

 2    attempt to communicate with the Court by any means other than

 3    a signed writing and the Court will never communicate with

 4    any member of the jury concerning the evidence, your

 5    opinions, or the deliberations other than in writing or

 6    orally here in open court.

 7            If you maybe need some more paper or pens or

 8    pencils, just knock on the door and let the bailiff know.  If

 9    it's a matter that deals with deliberations, you cannot

10    communicate other than in writing or here orally in open

11    court.

12            You will note from the oath about to be taken by

13    the bailiff that they too, as well as all other persons, are

14    forbidden to communicate in any way or manner with any member

15    of the jury again concerning the evidence, your opinions, or

16    the deliberations.

17            Do we have the bailiffs here?

18                      (Bailiffs sworn.)

19        (Vernon Williams, Richard Smith, Nate Bradshaw.)

20            THE COURT:  Now, ladies and gentlemen, bear in mind

21    also they you're never to reveal to any person, even me, how

22    you stand as a jury numerically or otherwise, on the question

23    of whether or not the government has sustained its burden of

24    proof until after you have reached a unanimous verdict.

25            Now, upon retiring to the jury room to begin your
```

1    deliberations, you must select one of your members to act as

2    your foreperson.  This foreperson will preside over your

3    deliberations and will be your spokesperson here in open

4    court.

5         Your verdict must represent the collective judgment

6    of the jury.  In order to return a verdict, it's necessary

7    that each juror agree to it.  The verdict, in other words,

8    must be unanimous.

9         It is your duty to consult with one another and to

10   deliberate with one another with a view towards reaching an

11   agreement, that is, if you can do so without violence to

12   individual judgment.  Each of you must decide the case for

13   himself and herself, but do so only after an impartial

14   consideration of all of the evidence in the case with your

15   fellow jurors.  In the course of your deliberations, don't

16   hesitate to reexamine your own views and to change your

17   opinion if you're convinced that it was erroneous.  At the

18   same time, however, you should not surrender your honest

19   conviction solely because of the opinion of your fellow

20   jurors and for the mere purpose of thereby returning a

21   unanimous verdict.

22        Remember at all times that you're not partisans

23   here.  You're judges.  You're the judges of the facts of this

24   case.  Your sole interest is to seek the truth from the

25   evidence which has been received during this trial.

```
1            Your verdict must be based solely upon the evidence
2    received in this case.  Nothing you have seen or read outside
3    of court may be considered.  Nothing that I have said or done
4    during the course of this trial is intended in any way to
5    somehow suggest to you what I think your verdict should be.
6    Nothing said in these instructions and nothing in any form of
7    verdict, is to suggest or convey to you in any way or manner
8    any intimation as to what verdict I think you should return.
9    What the verdict shall be is the exclusive responsibility of
10   you, ladies and gentlemen of the jury.  As I have told you
11   many times, you're the sole judges of the facts.  If you'll
12   excuse me just a minute.
13            If counsel will come to side bar with the reporter.
14        (Following proceedings were held at side bar:)
15        THE COURT:  Any objections or comments with regard
16   to the instructions?
17        MS. CARTER:  No, Your Honor.
18        THE COURT:  The other side?
19        MR. SCHWARTZ:  No objections or comments.
20        THE COURT:  It made it more comfortable for me.
21   You have the same instructions.
22        MR. SCHWARTZ:  I don't how the Court addresses
23   this, but we're stipulating that the jury can come and take
24   breaks as they please with permission of the court bailiff
25   and the parties not be present in court for this.
```

```
 1              THE COURT:  It's my practice if we excuse one of
 2    the first 12, to let the remaining alternate go in and start
 3    deliberations from the top again.
 4              MR. SCHWARTZ:  Yes.
 5              MS. CARTER:  Yes.
 6                   (Side bar concluded.)
 7              THE COURT:  You're going to lunch at one of
 8    Ms. Skipper's favorite five star restaurants.  I haven't been
 9    there yet so I'm gonna ask you what you think about it.  It's
10    in the new Caltrans building at 1st and Main.  They've shut
11    down a couple of the other cafeterias around here.  I don't
12    know if it's because of bad food or what, but they're just
13    having trouble.  Hopefully, they'll be reopened, but this one
14    is just a block away.
15              And remember while you're at lunch, just enjoy
16    lunch, don't talk about the matter at all.  All 13 of you
17    will be there at lunch.  I'm gonna ask the alternates that
18    they go upstairs to the jury assembly room.  Please do not
19    talk about the matter with anyone.  If one of your colleagues
20    has to be excused for any reason, then you'll go in to the
21    deliberations and they'll have the start from the very top
22    again.
23              After the first 12 jurors do get back, then your
24    first order of business will the selection of a foreperson.
25    You'll have with you in the jury room copies of those items
```

1    that have been received in evidence, a copy of the

2    instructions which I have read to you as well as a copy of

3    the indictment.

4              Everyone, please rise for the jury.

5                   (Jury not present.)

6              THE COURT:  We're outside the presence of the jury

7    I would think since the jurors are going to have to walk down

8    to First and Main and then back that they probably won't

9    start their deliberations much before 2 o'clock so you'll

10   have that amount of time to satisfy your luncheon needs as

11   well.  After that I would ask that the -- at least one

12   counsel on each side be available within five minutes notice

13   from the clerk and the reason for that is very simple.  If I

14   get a note that deals with the substance of the

15   deliberations, it's my practice to go over that with the

16   lawyers before responding to the jury and it's very important

17   you be here.

18             Now, Mr. Schwartz, I know that you're gonna have to

19   leave before too long.  If Mr. Simidjian can remain.  If we

20   receive a note dealing with the substance and it's before

21   sundown, he can communicate with you, and that would be fine.

22   If we reach the point of sundown, we'll just have the jury go

23   home and come back on Tuesday and continue their

24   deliberations at that time.

25             MR. SCHWARTZ:  Thank you.

1           THE COURT:  All right.  Thank you, all.

2       (In court proceedings conclude at 12:40 p.m.)

3               (Jury deliberates.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          CERTIFICATE OF REPORTER

3

4    COUNTY OF LOS ANGELES        )

5                                 )  SS.

6    STATE OF CALIFORNIA          )

7

8    I, LAURA ELIAS, OFFICIAL REPORTER, IN AND FOR THE UNITED

9    STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA,

10   DO HEREBY CERTIFY THAT I REPORTED, STENOGRAPHICALLY, THE

11   FOREGOING PROCEEDINGS AT THE TIME AND PLACE HEREINBEFORE SET

12   FORTH; THAT THE SAME WAS THEREAFTER REDUCED TO TYPEWRITTEN

13   FORM BY MEANS OF COMPUTER-AIDED TRANSCRIPTION; AND I DO

14   FURTHER CERTIFY THAT THIS IS A TRUE AND CORRECT TRANSCRIPTION

15   OF MY STENOGRAPHIC NOTES.

16

17

18   DATE: JANUARY 8, 2013_____

19

20      ___/s/  LAURA MILLER ELIAS_____

21   LAURA MILLER ELIAS, CSR 10019

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25